<u>**ORAL ARGUMENT NOT YET SCHEDULED**</u>

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

No. 25-5333

---

APPALACHIAN VOICES, et al.,
*Plaintiff-Appellants,*
*v.*
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,
*Defendant-Appellees.*
On Appeal from the United States District Court
for the District of Columbia
No. 25-cv-01982
The Hon. Richard J. Leon, Senior Judge

---

**PLAINTIFF-APPELLANTS' OPENING BRIEF**

---

Ben Grillot
Kimberley Hunter
Irena Como
James Whitlock
Southern Environmental Law Center
122 C Street NW, Suite 325
Washington, DC 20001
Telephone: (202) 828-8382
Facsimile: (202) 347-6041
bgrillot@selc.org
kmeyer@selc.org
icomo@selc.org
jwhitlock@selc.org

Toby Merrill
Graham Provost
Cassandra Crawford

Hana V. Vizcarra
Deena Tumeh
Molly Prothero
Andrew Saavedra
Linnet Davis-Stermitz
Earthjustice
1001 G Street NW, Suite 1000
Washington, DC 20001
(202) 667-4500
hvizcarra@earthjustice.org
dtumeh@earthjustice.org
mprothero@earthjustice.org
asaavedra@earthjustice.org
ldavisstermitz@earthjustice.org

Gary DiBianco Lawyers for Good
Government

Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
(510) 738-6788
toby@publicrightsproject.org
graham@publicrightsproject.org
cassandra@publicrightsproject.org

David Chiu
San Francisco City Attorney
Yvonne R. Meré
Sara J. Eisenberg
1390 Market Street, 7th Floor
San Francisco, CA 94102
(415) 554-4274
yvonne.mere@sfcityatty.org
sara.eisenberg@sfcityatty.org

6218 Georgia Avenue NW, # 5001
Washington, DC 20011
(202) 258-6826
Gary@lawyersforgoodgovernment.org

Alison Holcomb
Office of King County Prosecuting
Attorney Leesa Manion
401 5th Avenue, Suite 800
Seattle, WA 98104
(206) 477-9483
aholcomb@kingcounty.gov

*Counsel for Plaintiff-Appellants*

**October 27, 2025**

## CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

**(A)    Parties and *Amici***

**(i) Parties, Intervenors, and *Amici* Who Appeared in the District Court**

This case is an appeal from the ruling of a district court.

**(ii) Parties to this Case**

<u>Appellants:</u>

Appellants are Appalachian Voices; 2C Mississippi; Air Alliance Houston; Allegheny County; Pennsylvania; Bessemer Historical Society (d/b/a Steelworks Center of the West); City and County of San Francisco, California; City of Sacramento, California; City of Springfield, Massachusetts; Deep South Center for Environmental Justice; Downwinders At Risk; Health Resources in Action; Inter-Tribal Council of Michigan; Kalamazoo County, Michigan; Lowcountry Alliance for Model Communities; Martin Luther King Jr. County, Washington; Native Village of Kipnuk; Parks Alliance of Louisville, Inc.; Pittsburgh Conservation Corps (d/b/a Landforce); PUSH Buffalo; Southwest Renewal Foundation of High Point, Inc., Treasure Island Mobility Management Agency; and WE ACT for Environmental Justice.

<u>Appellees:</u>

Appellees are the United States Environmental Protection Agency ("EPA") and

Lee Zeldin, in his official capacity as Administrator of the EPA.

<u>Intervenors:</u>

None at present.

**(iii) *Amici* in this Case**

None at present.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... vii

GLOSSARY .................................................................................... xii

INTRODUCTION ............................................................................. 1

STATEMENT OF JURISDICTION ................................................... 3

STATUTES AND REGULATIONS ................................................... 3

STATEMENT OF THE ISSUES ........................................................ 3

STATEMENT OF THE CASE ........................................................... 4

    I.    Congress mandated that EPA implement the Environmental and
        Climate Justice Block Grant program. .................................. 4

    II.   EPA made a policy level decision to eliminate the entire
        Environmental and Climate Justice Block Grant program despite
        Section 138's requirements. .................................................. 7

    III.  This Lawsuit ...................................................................... 10

    IV.  The Tucker Act and the Court of Federal Claims ............... 12

SUMMARY OF THE ARGUMENT .................................................. 13

STANDARD OF REVIEW ............................................................... 17

ARGUMENT ................................................................................... 18

    I.   Plaintiffs stated valid Administrative Procedure Act claims properly
       within the district court's jurisdiction. ................................... 18

        A.   The Tucker Act does not apply to challenges to agency directives
            setting forth a policy to eliminate a statutorily mandated grant
            program. ........................................................................ 19

        B.   Plaintiffs challenge agency directives setting forth a policy to
            eliminate a statutorily mandated program. ...................... 22

C.    District court jurisdiction here flows from longstanding caselaw interpreting the Tucker Act. .......................................................27

    1. Plaintiffs' claims rest on the Constitution and statutes, not contracts. ...............................................................................28

    2. The type of relief Plaintiffs seek is not contractual in nature…31

II. Plaintiffs stated valid constitutional claims properly within the district court's jurisdiction. ...................................................................36

A.    Plaintiffs have standing to assert separation of powers claims. ....37

B.    Plaintiffs pled a valid separation of powers claim. ......................40

    1. Agencies cannot constitutionally refuse a congressional mandate to spend appropriated funds based on policy objections. .....41

    2. Plaintiffs' separation of powers claim is constitutional and not statutory. ...............................................................................44

    3. *Global Health Council* and *NTEU* should not be extended to the context of a complete elimination of a mandatory spending program. ...................................................................................51

C.    Plaintiffs pled a valid Presentment Clause claim. .........................54

CONCLUSION ......................................................................................56

CORPORATE DISCLOSURE STATEMENT .......................................60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aiken County*,
  725 F.3d 255 (D.C. Cir. 2013).......................... 16, 39, 40, 41, 42, 44, 49, 50, 54

*Am. Nat. Ins. Co. v. F.D.I.C.*,
  642 F.3d 1137 (D.C. Cir. 2011).......................................................................17

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015).........................................................................................50

*Bell v. Hood*,
  327 U.S. 678 (1946).........................................................................................37

*Bennett v. Spear*,
  520 U.S. 154 (1997).........................................................................................23

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988)...............................................................13, 32, 33, 34, 35

*Chamber of Com. of U.S. v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996)...................................................................46, 54

*Cincinnati Soap Co. v. United States*,
  301 U.S. 308 (1937).........................................................................................37

*Climate United Fund v. Citibank*,
  No. 25-5122, 2025 WL 2502881 (D.C. Cir. Sept. 2, 2025) .............33, 42, 43, 52

*Clinton v. City of New York*,
  524 U.S. 417 (1998)...............................................................................39, 54, 55

*Coal. of MISO Transmission Customers v. FERC*,
  45 F.4th 1004 (D.C. Cir. 2022).......................................................................26

*Collins v. Yellen*,
  594 U.S. 220 (2021)...................................................................................36, 40

*Corr'l. Servs. Corp. v. Malesko*,
  534 U.S. 61 (2001)...................................................................................37, 50

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
    38 F.4th 1099 (D.C. Cir. 2022)...............................................................20, 27, 28

*Dalton v. Specter*,
    511 U.S. 462 (1994)...................................... 16, 44, 45, 46, 47, 52, 54

*Dames & Moore v. Regan*,
    453 U.S. 654 (1981)...............................................................................47, 48

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992).....................................................................................48

*Free Enter. Fund. v. Pub. Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010).....................................................................................36

*Global Health Council v. Trump*,
    No. 25-5097, 2025 WL 2480618 (D.C. Cir., Aug. 28, 2025) ...........................51

*Global Health Council v. Trump*,
    No. 25-5097, 2025 WL 2709437 (D.C. Cir. Aug. 28, 2025) ................48, 49, 52

*Great-West Life & Annuity Ins. Co. v. Knudson*,
    534 U.S. 204 (2002).....................................................................................13

*Hettinga v. United States*,
    677 F.3d 471 (D.C. Cir. 2012).....................................................................17

*Ingersoll-Rand v. United States*,
    780 F.2d 74 (D.C. Cir. 1985)...................................................................29, 30

*Kendall v. United States*,
    37 U.S. 524 (1838).......................................................................................38

*King v. Jackson*,
    487 F.3d 970 (D.C. Cir. 2007).....................................................................17

*LeBlanc v. United States*,
    50 F.3d 1025 (Fed. Cir. 1995) .....................................................................12

*Matthews v. Zane's Lessee*,
    9 U.S. 92 (1809) .........................................................................................38

*McKinney v. District of Columbia*,
No 24-7027, 2025 WL 1873334 (D.C. Cir. July 8, 2025).................................17

*Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*,
763 F.2d 1441 (D.C. Cir. 1985) ..................................................................28, 29

*Megapulse v. Lewis*,
672 F.2d 959 (D.C. Cir. 1982)..............................................................27, 28, 31

*Meridian Inv., Inc. v. Fed. Home Loan Mortg. Corp.*,
855 F.3d 573 (4th Cir. 2017) ..........................................................................12

*Nat'l Ctr. for Mfg. Sciences v. United States*,
114 F.3d 196 (Fed. Cir. 1997) .........................................................................34

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*,
145 S. Ct. 2658 (2025).................................................. 15, 20, 21, 22, 23, 25, 26

*Nat'l Treasury Emps. Union v. Vought*,
149 F.4th 762 (D.C. Cir. 2025).........................................................48, 51, 53, 54

*Off. of Pers. Mgmt. v. Richmond*,
496 U.S. 414 (1990)........................................................................................38

*Rochester Pure Waters Dist. v. EPA*,
960 F.2d 180 (D.C. Cir. 1992)..........................................................................38

*Sols. in Hometown Connections v. Noem*
(4th Cir. No. 25-1640) ........................................................................15, 20, 21

*Spectrum Leasing Corp. v. United States*,
764 F.2d 891 (D.C. Cir. 1985).........................................................................30

*Teton Historic Aviation Found. v. U.S. Dep't of Def.*,
785 F.3d 719 (D.C. Cir. 2015)..........................................................................26

*Tootle v. Sec'y of the Navy*,
446 F.3d 167 (D.C. Cir. 2006)..........................................................................34

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)........................................................................................26

*Trudeau v. Fed. Trade Comm'n*,
  456 F.3d 178 (D.C. Cir. 2006)............................................................36

*U.S. Dep't of Army v. Blue Fox, Inc.*,
  525 U.S. 255 (1999)..........................................................................32

*U.S. Dep't of the Navy v. FLRA*,
  665 F.3d 1339 (D.C. Cir. 2012)....................................................37, 39

*United States v. King*,
  395 U.S. 1 (1969)..............................................................................13

*Widakuswara v. Lake*,
  No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 28, 2025).................28, 29, 31

*Yee v. Jewell*,
  228 F. Supp. 3d 48 (D.D.C. 2017)....................................................34

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952)...........................................................37, 38, 47, 53

**Statutes**

5 U.S.C. § 702 ...........................................................................19, 32, 35

5 U.S.C. § 706 ..................................................................................3, 33

5 U.S.C. § 706(2)(A).............................................................................23

5 U.S.C. § 706(2)(B).............................................................................23

28 U.S.C. § 1291 ....................................................................................3

28 U.S.C. § 1331 ....................................................................................3

28 U.S.C. § 1491 ..................................................................................12

28 U.S.C. § 1491(a)(1)..........................................................................19

42 U.S.C. § 7438 ..................................................................................1, 4

42 U.S.C. § 7438(a)(1)............................................................................4

42 U.S.C. § 7438(a)(2)............................................................................4

42 U.S.C. § 7438(b)(1)..................................................................5

42 U.S.C. § 7438(b)(2)..................................................................5

42 U.S.C. § 7438(b)(3)..................................................................5

42 U.S.C. § 7438(c) .....................................................................4

**Federal Register Notices**

90 Fed. Reg. 8,339 (Jan. 29, 2025) ...............................................7

90 Fed. Reg. 8,353 (Jan. 29, 2025) ...............................................7

**Rules**

Fed. R. of App. Pro. 28(f) .............................................................3

Fed. R. of Civ. Pro. 12(b)(1).......................................................17

Fed. R. of Civ. Pro. 12(b)(6).......................................................17

**Constitutional Provisions**

U.S. Const. art I, § 1...................................................................38

U.S. Const. art. I § 8, cl. 1...........................................................49

U.S. Const. art. I § 9, cl. 7....................................................37, 50

U.S. Const. art. II, § 3 .................................................................38

**Other Authorities**

The Federalist No. 48 (James Madison) ......................................38

Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* (2d ed. 1836)...........................39

Joseph Story, *Commentaries on the Constitution of the United States* (1833) ...............................................................................39

Louis L. Jaffe & Edith G. Henderson, *Judicial Review and the Rule of Law: Historical Origins*, 72 L.Q. Rev. 345 (1956). ..........................50

# GLOSSARY

APA …………………………...……………………….Administrative Procedure Act

CAA………………………………………………………..………Clean Air Act

EPA………………………………...…………………Environmental Protection Agency

(including Defendant Administrator Lee Zeldin)

EO…………………………………...……………………………Executive Order

## INTRODUCTION

Defendants EPA and EPA Administrator Lee Zeldin ("EPA") made an unlawful decision to dismantle a federal grant program mandated and funded by Congress based solely on their disagreement with Congress' intended purposes. In Section 138 of the Clean Air Act, Congress created, funded, and directed EPA to carry out an "Environmental and climate justice block grant program." 42 U.S.C. § 7438. EPA made a final agency decision to cancel this program for "policy reasons," effectively eliminating Section 138 from the U.S. Code. It did so without invoking any statutory or constitutional authority for its directive to disregard Congress's command. Now, Defendants seek to evade judicial review. Defendants' theory is that if an agency policy decision results in downstream consequences for individual grantees, the decision may only be challenged piecemeal through breach of contract claims in the Court of Federal Claims. In this telling, those most affected by EPA's unlawful directive to eliminate the grant program—the grantees—cannot challenge the legality of this policy decision in federal court.

But Plaintiffs seek standard Administrative Procedure Act ("APA") relief setting aside an unlawful agency action. And everyone—including the Supreme Court and the federal government itself—agrees that there is federal court jurisdiction for claims like this one, where plaintiffs challenge final agency action setting forth a policy to eliminate a program that Congress mandated and funded.

Here, EPA took final agency action directing the elimination of a statutorily mandated grant program, and Plaintiffs challenge that decision as arbitrary and capricious and contrary to law. Plaintiffs' APA claims center on constitutional and statutory requirements, not contractual issues.

Plaintiffs also raise valid constitutional claims plainly within the federal district court's jurisdiction. It is well-established that the Court of Federal Claims does not allow constitutional claims like those raised by Plaintiffs, and it is incontrovertible that the Court of Federal Claims is without power to provide Plaintiffs the relief they seek, or indeed any equitable relief. The district court erred because it misconstrued Plaintiffs' claims contending that the agency lacked authority to eliminate the Section 138 grant program as, instead, claims simply contesting Defendants' exercise of congressionally granted discretion. But, unsurprisingly, Congress conferred no authority on EPA to eliminate a grant program it mandated the agency to establish. Courts have long recognized the availability of challenges to unconstitutional executive actions based on a want of authority. This Court should reject EPA's effort to recast Plaintiffs' claims and confirm grantees' ability to vindicate their rights in federal district court and to hold the executive branch to its legal obligations.

## STATEMENT OF JURISDICTION

Plaintiffs asserted claims under the Administrative Procedure Act, 5 U.S.C. § 706, and the U.S. Constitution and invoked the district court's jurisdiction under 28 U.S.C. § 1331. JA___. On August 29, 2025, the district court dismissed the case and entered final judgment. JA___. Plaintiffs filed a timely notice of appeal. JA___. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATUTES AND REGULATIONS

Pursuant to Federal Rule of Appellate Procedure 28(f), relevant statutes and regulations are included in an addendum.

## STATEMENT OF THE ISSUES

1.     Whether the federal district court has jurisdiction over APA claims that (a) address an agency's policy-level final agency action eliminating a statutorily mandated grant program, (b) seek to enforce rights under the Constitution and statutes, and (c) ask the court to award the classic APA remedy of setting aside unlawful agency action.

2.     Whether Plaintiffs state a valid constitutional claim that an agency policy decision to defy a congressional mandate, made without authority, violates the Constitution's separation of powers and the Presentment Clause.

3

## STATEMENT OF THE CASE

I.    **Congress mandated that EPA implement the Environmental and Climate Justice Block Grant program.**

In 2022, Congress amended the Clean Air Act to create a new "Environmental and climate justice block grants" program. Pub. L. No. 117-169, § 60201, 136 Stat. 1818, 2078 (2022) (codified at 42 U.S.C. § 7438) ("Clean Air Act Section 138" or "Section 138"). Using a block grant model first developed under the Nixon administration, Congress appropriated $2.8 billion to EPA "to remain available until September 30, 2026," for projects to directly benefit communities across the country. 42 U.S.C. § 7438(a)(1). Plaintiffs and proposed class members are recipients of grants under this program.

Recognizing that the communities most in need of assistance might lack the expertise to apply for and implement their projects, Congress appropriated an additional $200 million for technical assistance to support grant recipients in designing projects, preparing applications, and performing on their grants. *Id*. § 7438(a)(2). And it required EPA to "reserve 7 percent" of these amounts for administrative costs to "carry out" its Section 138 duties. *Id.* § 7438(c).

Congress then set forth the following statutory mandate:

> EPA "*shall use*" these funds "to award grants . . . to eligible entities to carry out [certain specified activities] that benefit disadvantaged communities, as defined by the Administrator."

4

*Id.* § 7438(b)(1) (emphasis added). Congress defined eligible entities to include "community-based nonprofit organization[s]," "a partnership of community-based nonprofit organizations," or a partnership between such nonprofits and "an Indian tribe, a local government, or an institution of higher education." *Id.* § 7438(b)(3). Section 138 further enumerates the public health activities to be funded by the awards:

> (A) community-led air and other pollution monitoring, prevention, and remediation, and investments in low- and zero-emission and resilient technologies and related infrastructure and workforce development that help reduce greenhouse gas emissions and other air pollutants;
>
> (B) mitigating climate and health risks from urban heat islands, extreme heat, wood heater emissions, and wildfire events;
>
> (C) climate resiliency and adaptation;
>
> (D) reducing indoor toxics and indoor air pollution; or
>
> (E) facilitating engagement of disadvantaged communities in State and Federal advisory groups, workshops, rulemakings, and other public processes.

*Id.* § 7438(b)(2).

EPA created several grant subprograms to fulfill this statutory mandate,[1] namely the Thriving Communities Grantmaking Program, the Community Change

---

[1] *Inflation Reduction Act Environmental and Climate Justice Program*, EPA (last updated Mar. 27, 2025), https://www.epa.gov/inflation-reduction-act/inflation-reduction-act-environmental-and-climate-justice-program [https://perma.cc/3BKM-DR5D]. EPA also created the UPLIFT Climate and

5

Grants Program, the Environmental Justice Collaborative Problem-Solving

Cooperative Agreements, the Government-to-Government Program, and the

Thriving Communities Technical Assistance Centers ("TCTAC") program.

To apply for these Section 138 subprograms, applicants were required to

provide detailed project budgets and plans to complete their projects within a

specified timeframe. Grant preparation often took hundreds of hours of work to

ensure compliance with rigorous statutory and regulatory requirements. JA___

(Compl. Ex. 1-E at ¶ 4 (M. Roos Decl.)). Many of the grant projects involved

partnerships between two or more groups and could not be implemented by a

single group alone.

Ultimately, prior to the decision to eliminate the grant program challenged

here, EPA had awarded over 350 grants under Section 138's Environmental and

Climate Justice Block Grant program across the five subprograms. After the grants

were awarded, grantees began to stand up their projects as required by their grant

awards: They further developed plans, made operational changes to implement

their projects, hired staff, worked with partners, engaged their communities,

contracted for work, vetted and awarded applications for subawards, and more—all

in service of benefitting the communities they serve and achieving the goals laid

---

Environmental Community Action Grant program but awarded no grants under
that subprogram. *Id.*

out by Congress. *See, e.g.*, JA___-___ (Compl. ¶¶ 73-75; 81-82; 86-89; 93-94; 98-100).[2]

## II.    EPA made a policy level decision to eliminate the entire Environmental and Climate Justice Block Grant program despite Section 138's requirements.

From the first days following the change in administration, President Trump and his officials took steps to disrupt the will of Congress. Although Congress had made no change in the law, EPA ultimately issued a unilateral and self-described "policy" directive, based on the administration's policy preferences, to eliminate the statutorily mandated Environmental and Climate Justice Block Grant program.

The Trump administration announced its new policy direction through two executive orders issued on January 20, 2025. *See Unleashing American Energy*, Exec. Ord. No. 14,154 (Jan. 20, 2025), 90 Fed. Reg. 8,353, 8,357 (Jan. 29, 2025) ("Energy EO"); *Ending Radical and Wasteful Government DEI Programs and Preferencing*, Exec. Ord. No. 14,151 (Jan. 20, 2025), 90 Fed. Reg. 8,339, 8,339 (Jan. 29, 2025) ("Anti-Equity EO"). EPA moved quickly to implement these orders, ultimately reaching a final agency policy decision to eliminate the entire

---

[2] One of these grants was to the Native Village of Kipnuk for a riverbank stabilization project made necessary by melting permafrost. JA___ (Compl. ¶ 75). In October 2025, a storm surge caused catastrophic flooding in the village, highlighting the urgent need for such investment. *See Dozens Rescued in Remote Alaskan Villages in Storm that Swept Away Homes*, N.Y. Times (Oct. 13, 2025) https://www.nytimes.com/2025/10/13/us/alaska-flooding-rescues.html [https://perma.cc/CZS6-CS3J].

statutorily mandated grant program "for policy reasons." JA___ (Compl. Ex. 1-A (Voyles Decl.) ¶ 3).

This final, policy-level agency decision is reflected in the records and testimony of senior EPA officials. As EPA Assistant Deputy Administrator Travis Voyles put it, on February 25, 2025, he "decided" to eliminate the entire Environmental and Climate Justice Block Grant program, concluding in a single day that all of the "grant programs" it includes "should be terminated for policy reasons." JA___ (Compl. Ex. 1-A ¶ 3) (emphasis added); *see also* JA___ (Compl. Ex. 1-B (Coogan Decl.) ¶¶ 5-6).

> 22
> 23        3.        On February 25, 2025, I conducted an individualized review of EPA grant programs
> 24    for consistency with Agency policy priorities. That day, I decided that certain grant programs,
> 25    identified by "Assistance Number Listing," should be terminated for policy reasons. I orally
> 26    communicated my decision to Daniel Coogan, Deputy Assistant Administrator for Infrastructure
> 27    and Extramural Resources in the Office of Mission Support. That evening, Mr. Coogan sent an

JA___ (Compl. Ex. 1-A) (emphasis added). That evening, Deputy Assistant Administrator Daniel Coogan conveyed Voyles's decision about the grant programs to EPA staff, listing the "grant programs" that "require[d] some action." JA___ (Compl. Ex. 1-F).[3]

---

[3] Voyles's and Coogan's references to "programs" includes all of the subprograms of the Environmental and Climate Justice Block Grant program, which are

Implementing the February 25th agency decision to eliminate the program completely, EPA suspended grantees' access to the grant payment portal and then terminated the more than 350 individual grants within the Section 138 program. JA___ (Compl. Ex. 1-A (T. Voyles Decl.) ¶¶ 4-5);[4] JA___ (Defs.' Mot. To Dismiss) at 15 (stating "all grants" terminated).

The record reflects that, in this process, EPA conducted no individual grant-by-grant review and did not provide any justification for its decision to eliminate the Environmental and Climate Justice Block Grant program beyond its policy disagreement with Congress's direction to implement the grant program. JA___ (Compl. Ex. 1-E (Roos Decl.) ¶¶ 10-16). And EPA's actions make clear the agency's contemporaneous understanding that it had made a policy-level decision to eliminate the entire program, rather than reaching individualized decisions about specific grants in a program that was otherwise ongoing. At the same time it was summarily shutting off tens of millions of dollars in grant program funds, EPA

---

denoted, respectively, by the Catalog of Federal Domestic Assistance ("CFDA") Number Listings 66.306, 66.309, 66.312, 66.615, and 66.616—and which are each listed in the table in Coogan's email. JA___ (Compl. Ex. 1-H).

[4] On March 7, Coogan informed EPA staff: "[W]e just had a check in with Travis [Voyles] and as part of a broader effort related to certain grant programs, please put a control on ASAP accounts for all grants funded under the following grant programs so recipients cannot draw funds." JA___ (Compl. Ex. 1-H (using "programs" to refer to the subprograms of the Environmental and Climate Justice Block Grant program in addition to three other grant programs Deputy Administrator Voyles ordered eliminated at the same time).

issued a press release touting purported "taxpayer savings" from its decision to eliminate the grant program—confirming it had no intention of continuing to spend these funds in any ongoing grant program to carry out Congress's mandate.[5] That agenda is further confirmed by EPA's announcement of its plans to eliminate all staff that support the grantees.[6] To date, EPA has taken no steps to continue this congressionally mandated grant program, much less award this grant funding to other grantees.

## III.    This Lawsuit

Plaintiffs filed this suit on behalf of themselves and a proposed class of similarly situated class members who were eligible and interested in participating in the Environmental and Climate Justice Block grant program and had received

---

[5] *EPA Administrator Lee Zeldin Cancels 20 Grants in 2nd Round of Cuts with DOGE, Saving Americans More than $60M,* EPA (Feb. 25, 2025), https://www.epa.gov/newsreleases/epa-administrator-lee-zeldin-cancels-20-grants-2nd-round-cuts-doge-saving-americans [https://perma.cc/46FP-VMTN]

[6] Administrator Zeldin announced in March 2025 that EPA would terminate all "Environmental Justice and Diversity, Equity, and Inclusion arms of the agency," placing all staff on administrative leave. *EPA Terminates Biden's Environmental Justice, DEI Arms of Agency*, EPA (Mar. 12, 2025), https://www.epa.gov/newsreleases/epa-terminates-bidens-environmental-justice-dei-arms-agency [https://perma.cc/Q5WB-HQEL]. Further reporting indicates that Zeldin told EPA leaders in an internal memorandum that he was "directing 'the reorganization and elimination' of the offices of environmental justice at all 10 E.P.A. regional offices as well as the one in Washington." Lisa Friedman, *E.P.A. Plans to Close All Environmental Justice Offices*, N.Y. TIMES, at 1 (Mar. 11, 2025), https://www.nytimes.com/2025/03/11/climate/epa-closure-environmental-justice-offices.html [https://perma.cc/ZDK3-GRKL].

such grants. In that action, Plaintiffs challenged EPA's final decision to eliminate the entire grant program, effectively voiding Section 138 of the Clean Air Act. *See* JA___-___ (Compl. ¶¶ 1-3, 14) (discussing termination of the program). Plaintiffs sought relief under the APA, alleging that EPA's policy decision to eliminate the entire Section 138 grant program was arbitrary and capricious (Count III) and contrary to law (Count IV), and that EPA's clear intention not to spend any appropriated funds was also contrary to law (Count V). Plaintiffs also pled two constitutional claims based on EPA's unlawful actions, violation of the Constitution's separation of powers (Count I) and the Presentment Clause (Count II).

Plaintiffs promptly moved for a preliminary injunction, asking the court to enjoin EPA from unlawfully dismantling the Environmental and Climate Justice Block Grant program. JA___ (D. Ct. Dkt. 29). EPA filed a competing Motion to Dismiss. JA___ (D. Ct. Dkt. 66). The district court held a hearing on August 5, 2025, and on August 29, 2025, it granted the Motion to Dismiss and denied Plaintiffs' Motion for Preliminary Injunction, finding that the court lacked jurisdiction over the APA claims and that Plaintiffs had no cause of action for their constitutional claims. JA___-___ (D. Ct. Dkt. 98 at 7-8); JA___ (D. Ct. Dkt. 99) (Order).

## IV.     The Tucker Act and the Court of Federal Claims

Congress enacted the Tucker Act in 1887 to enable private parties to sue the United States for money damages. *See Meridian Inv., Inc. v. Fed. Home Loan Mortg. Corp.*, 855 F.3d 573, 578 n.2 (4th Cir. 2017) (describing history of Tucker Act). As Congress explained, the Act was designed "to allow private claims against the government, including contract claims," and vested exclusive jurisdiction over claims for money damages in the Court of Federal Claims when the damages claimed exceed $10,000. *Id.* at 578; *see also* 28 U.S.C. § 1491.

The Court of Federal Claims may only hear claims involving "a substantive right enforceable against the federal government *for money damages*." *LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995) (emphasis added) (citation modified). Thus, while the Court of Federal Claims can hear disputes involving constitutional provisions deemed money-mandating, such as Takings claims under the Fifth Amendment, the court undisputedly lacks jurisdiction over separation of powers claims. *Id.*

The Court of Federal Claims also lacks authority to grant equitable remedies such as an injunction to vacate a challenged policy. It "does not have the general equitable powers of a district court to grant prospective relief," and the Supreme Court has "stated categorically that 'the Court of Claims has no power to grant equitable relief.'" *Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988) (quoting

12

*Richardson v. Morris*, 409 U.S. 464, 465 (1973)); *see Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002) (distinguishing *Bowen*'s "going forward" relief from an injunction solely to enforce a contractual obligation to pay money past due). Likewise, the Court of Federal Claims lacks authority to issue declaratory judgments. *United States v. King*, 395 U.S. 1, 5 (1969).

## SUMMARY OF THE ARGUMENT

Plaintiffs challenge EPA's arbitrary, unlawful, and unconstitutional decision to eliminate an entire congressionally mandated grant program. The Environmental and Climate Justice Block Grant program was created by Congress and required EPA to award nearly $3 billion to communities across the country to address the impacts of legacy pollution and climate change. Based simply on a disagreement with this policy, EPA eliminated this program—without any statutory or constitutional authority for doing so.

Plaintiffs challenge the decision to eliminate this grant program as a violation of both the APA and the Constitution. Defendants have made no effort to defend the validity of their actions or even gestured towards any legal authority. Instead, Defendants argue that Plaintiffs' APA claims belong in the Court of Federal Claims under the Tucker Act, and that Plaintiffs cannot bring their constitutional claims at all. They are wrong on both counts.

*First*, Plaintiffs present standard APA claims—that EPA acted arbitrarily and capriciously when the agency took the discrete agency action of eliminating a statutorily mandated grant program without reasoned explanation or consideration of reliance interests, and that EPA acted unlawfully when it did so contrary to the Constitution and federal law. These claims address a final action taken by the agency for policy reasons and reviewable in federal district court.

These APA claims are not founded upon contracts. They are not based on the terminations of the individual grants, but rather the procedural, statutory and constitutional issues raised by elimination of an entire grant program. Analysis of these claims does not turn on the agreements themselves, or on any determinations EPA might have made about individual grants—indeed, it made none. Rather, it turns on the requirements of statutes, including the APA, and the Constitution. Further, the relief Plaintiffs seek—the restoration of the grant program—is prospective and forward-looking relief that is unavailable in the Court of Federal Claims and is appropriate, non-contractual relief for the legal injury Plaintiffs have suffered.

Indeed, both the Supreme Court and the federal government itself have recently confirmed that APA claims challenging final agency action setting forth a policy to close a program that is statutorily mandated to exist are properly brought in federal district court. For one, Justice Barrett's controlling opinion in the

14

Supreme Court's recent stay order in *National Institutes of Health v. American Public Health Association,* 145 S. Ct. 2658 (2025) ("*NIH*"), affirms expressly that challenges to policy-level decisions, like the one here, belong in federal district court.

And just last week, the federal government conceded in the Fourth Circuit that "a claim where there is a final discrete agency action setting forth a policy to close a program that is statutorily mandated to exist" would be reviewable in federal court under the standard articulated by Justice Barrett in *NIH*. Oral Argument (Oct. 23, 2025), *Solutions in Hometown Connections v. Noem* (4th Cir. No. 25-1640).[7]

*Second*, Plaintiffs pled valid constitutional claims properly within the federal district court's jurisdiction. The elimination of the Environmental and Climate Justice Block Grant program is a classic separation of powers violation. Congress enacted a law mandating EPA to spend appropriated funds in a particular way. By refusing to faithfully execute that law, EPA violated the separation of powers.

This Court has long recognized that agencies cannot refuse a statutory mandate to spend appropriated funds based on policy objections. To do so would

---

[7] A recording of the argument is available at ca4.uscourts.gov/OAarchive/mp3/25-1640-20251023.mp3 [https://perma.cc/K9KW-94QN]. This statement occurs at 22:13-34. JA__ (Transcript).

improperly allow the executive branch to encroach upon the Framers' carefully delineated role for Congress—controlling the power of the purse.

The district court's conclusion that Plaintiffs' separation of powers claim was statutory—and not constitutional—is based on a misapplication of the Supreme Court's decision in *Dalton v. Specter*, 511 U.S. 462 (1994). This case is nothing like *Dalton*, which turned on the fact that Congress had clearly provided the President with broad discretion and where there was no claim that the executive branch had decided to dispense with the statutory mandate entirely. *Id.* at 470-71. Here, by contrast, Congress mandated that EPA allocate funds for Environmental and Climate Justice Block grants and granted no discretion to disregard that directive, yet EPA unilaterally decided, for "policy reasons," to eliminate the program. This is a textbook violation of the separation of powers. Prior binding decisions of this Court, including *In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013), lay out this bedrock constitutional principle—that the executive must follow statutory mandates to spend appropriated money. Plaintiffs adequately pled their constitutional claims and this Court should reverse the district court's decision.

## STANDARD OF REVIEW

This Court reviews a district court's decision to dismiss under Federal Rule of Civil Procedure 12(b)(6) de novo. *King v. Jackson*, 487 F.3d 970, 972 (D.C. Cir. 2007). When reviewing such a decision, the Court must accept all well-pled allegations in the complaint as true and construe them in the light most favorable to the plaintiffs. *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012). Claims should not be dismissed if a complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *McKinney v. District of Columbia*, No 24-7027, 2025 WL 1873334, at *3 (D.C. Cir. July 8, 2025) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

On review of a district court's dismissal for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1), this Court also makes legal determinations de novo. *Am. Nat. Ins. Co. v. F.D.I.C.*, 642 F.3d 1137, 1139 (D.C. Cir. 2011). The appellate court assumes the "truth of all material factual allegations in the complaint" and "construes the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged." *Id.* (citation modified).

17

## ARGUMENT

EPA's decision to eliminate an entire congressionally mandated program was a violation of both the APA and the Constitution. Defendants did not meaningfully defend their decision below and instead sought to evade judicial review altogether by arguing that any challenge belonged in the Court of Federal Claims. Defendants are wrong. The district court had jurisdiction over Plaintiffs' APA claims because, as the Supreme Court has held, and the federal government recently agreed, a challenge to a final, discrete agency action closing a statutorily mandated program is a proper APA challenge, not a claim to be brought in the Court of Federal Claims. Further, Plaintiffs' constitutional claims present a classic separation of powers violation. The executive may not disregard a congressional mandate to spend funds based on a policy disagreement. This is not a mere statutory transgression, but a violation of the very structure of the Constitution. This Court should reverse the district court's dismissal.

### I. Plaintiffs stated valid Administrative Procedure Act claims properly within the district court's jurisdiction.

Some of the grants cases that have come before the federal courts in recent months have posed close questions about the boundary between APA and Tucker Act jurisdiction. This is not one of them. The Supreme Court, the federal government, and Plaintiffs here all agree that when a program is statutorily mandated to exist, and the executive branch nonetheless makes a final, discrete

18

decision, as a matter of policy, to close that program, Plaintiffs may challenge that decision under the APA.

That is exactly what happened here: EPA reached a final policy decision to eliminate the statutorily mandated Environmental and Climate Justice Block Grant program, and Plaintiffs claim that that decision was arbitrary and capricious and contrary to law. JA___- __ (Compl. at ¶¶ 186-213). Those claims thus were properly brought under the APA. The district court reached a contrary conclusion by treating Plaintiffs' claims as challenges to their individual grant terminations, and thus as essentially contractual claims within the jurisdiction of the Court of Federal Claims under the Tucker Act. JA___ (Slip Op. at 8-18). But that is not what Plaintiffs claim. Because Plaintiffs bring precisely the sort of challenge to a policy-level agency decision that courts have long recognized—and the Supreme Court has just affirmed—properly belongs in federal district court, the district court had jurisdiction.

## A.    The Tucker Act does not apply to challenges to agency directives setting forth a policy to eliminate a statutorily mandated grant program.

The Tucker Act vests the Court of Federal Claims with jurisdiction over claims founded upon "express or implied contract[s] with the United States." 28 U.S.C. § 1491(a)(1). Because the APA's waiver of sovereign immunity does not apply if another statute "expressly or impliedly forbids" the claim, *see* 5 U.S.C.

19

§ 702, if a plaintiff's claims were in fact founded upon "express or implied contracts" and thus within the jurisdiction of the Court of Federal Claims, those claims could not be heard in federal district court. But federal courts do not lack jurisdiction over a claim simply because it requires "some reference to or incorporation of a contract." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (quoting *Megapulse v. Lewis*, 672 F.2d 959, 967-68 (D.C. Cir. 1982)).

But while a plaintiff may not be able to bring an APA challenge to the termination of a grant or contract, that same logic does not extend to agency guidance concerning those contracts—even if that guidance leads to their termination. *See NIH*, 145 S. Ct. at 2661 (Barrett, J., concurring). As Justice Barrett recently explained: "That the agency guidance discusses internal policies related to grants does not transform [the] challenge into a claim 'founded . . . upon contract' that only the [Court of Federal Claims] can hear." *Id.* Or, in the federal government's phrasing, so long as the plaintiff challenges "a discrete final agency action setting forth a policy to close a program that is statutorily mandated to exist," the Tucker Act does not apply and the challenge is reviewable in district

20

court. Oral Argument (Oct. 23, 2025), *Solutions in Hometown Connections v. Noem* (4th Cir. No. 25-1640).[8]

The Supreme Court's recent decision in *NIH* illustrates the distinction between challenges to grant terminations (which "likely" cannot be brought under the APA) and challenges to policy directives requiring the elimination of grant programs (which can). *NIH*, 145 S. Ct. at 2661 (Barrett, J., concurring). In *NIH*, as Justice Barrett explained, "various plaintiffs" brought APA challenges to both "agency guidance discuss[ing] internal policies related to grants" and to "individual grant terminations." *Id.* After the First Circuit granted preliminary relief on both types of APA challenges, the federal government sought a stay from the Supreme Court. Four justices would have denied the stay application in full;

---

[8] Indeed, the federal government's full answer to the court acknowledges even more clearly the availability of APA claims to set aside such unlawful policy directives. Beginning at 22:13 in the recording of the argument, government counsel states:

> I think it might help to show what a claim might look like that perhaps would fit more closely with *NIH*. And that would be a claim where there is a final discrete agency action setting forth a policy to close a program that is statutorily mandated to exist. And *a plaintiff could challenge that policy, seek to set aside that policy for the future such that whatever decisions the agency were to make about grants going forward they couldn't rely on that policy*. That would be more like *NIH*.

Oral Argument (Oct. 23, 2025), *Solutions in Hometown Connections v. Noem* (4th Cir. No. 25-1640) (emphasis added). A link to the recording is available at note 7, *supra*.

21

four would have granted it. But as the deciding the vote, Justice Barrett articulated the distinction explained above, emphasizing that the court likely had jurisdiction over the challenge to the agency's policy decision as reflected in guidance documents. *Id.* (finding government not entitled to stay of the district court's judgments "insofar as they vacate the guidance documents"). As Justice Jackson observed in her dissenting opinion, this means that a majority of the Supreme Court recognized in *NIH* that "district courts may still exercise jurisdiction over— and vacate—grant-related policies that contravene federal law, including [those that are arbitrary and capricious]." *Id.* at 2671 (Jackson, J., dissenting).

**B.      Plaintiffs challenge agency directives setting forth a policy to eliminate a statutorily mandated program.**

And that is what Plaintiffs do here: They contend that EPA adopted, as a final policy decision, a directive requiring the elimination of a congressionally mandated grant program, and that EPA acted contrary to law, arbitrarily and capriciously, and counter to the Constitution in doing so. Under *NIH*, those claims bear all the hallmarks of an APA claim. The district court erred in concluding otherwise.

This is because Plaintiffs' APA claims challenge a discrete and final agency policy decision: the decision to eliminate the Environmental and Climate Justice Block Grant program in its entirety. JA___- __ (Compl. at ¶¶ 186-205). That this was a discrete and final policy decision is confirmed by EPA's own records and

22

testimony. *Id.* at ¶¶ 109-15. This "final agency action" is "subject to judicial review" under the APA. 5 U.S.C. § 704.[9] Plaintiffs were aggrieved by EPA's directive to eliminate the grant program because it deprived them of the opportunity to participate in a statutorily mandated program and had consequences for their individual grants. Plaintiffs challenge EPA's policy directive as "arbitrary and capricious," *see* 5 U.S.C. § 706(2)(A), as "not in accordance with law," *see id.*, and as contrary to the Constitution, *see id.* § 706(2)(B). And Plaintiffs seek typical APA relief: they ask the court to "hold unlawful and set aside" the challenged EPA action. 5 U.S.C. § 706(2)(A). In these respects, Plaintiffs' claims look just like standard APA claims—because they are.

Justice Barrett's reasoning in *NIH* shows why these are APA claims rather than contract disputes. Indeed, the resemblance is striking: In that case, the National Institutes of Health first developed internal guidance documents to "align its funding with changed policy priorities mandated by a series of executive orders"—just as EPA here issued a directive to eliminate the Environmental and Climate Justice Block Grant program to align its conduct with policy priorities

---

[9] A final agency action is one that "marks the consummation of the agency's decisionmaking process" and is one "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 156 (1997). Here, the decision to eliminate the Environmental and Climate Justice Block Grant program was the consummation of the agency's decisionmaking process and resulted in direct legal consequences to the Plaintiffs.

under executive orders. *Id.* at 2660-61. The National Institutes of Health then terminated existing grants based on this new policy guidance—just as EPA did here. Consistent with this reasoning, the district court retains jurisdiction over APA claims challenging each agency's respective policy-level guidance or directives—which are plainly not founded upon contract—even if it might lack jurisdiction, under *NIH*, to hear a specific APA challenge to EPA's termination of any particular, individual grant.

The district court, however, mistook Plaintiffs' claims for an assortment of "bundled together" challenges to EPA's terminations of their individual grants. JA___ (Slip Op. at 13). That view seems to stem in part from confusion about the role one small part of Plaintiffs' requested relief played in this case—specifically, Plaintiffs' request that, to unwind the unlawful action they challenged, their individual grants and period of performance be reinstated. But that request was meant only to capture Plaintiffs' understanding—formed prior to the Supreme Court's clarification of the proper scope of relief in these actions in *NIH*—that an order restoring the terminated grants was appropriate secondary relief in light of their primary request for relief: vacatur of EPA's directive to eliminate the Section 138 grant program as a whole. In light of *NIH*, Plaintiffs recognize that the proper remedy for the APA claim here is simply the traditional APA relief contemplated

in that case—vacatur of EPA's arbitrary and unlawful action eliminating the Environmental and Climate Justice Block Grant program.

Nor do Plaintiffs' APA claims by their nature require that any particular Plaintiff or class member receive any particular funds that have been awarded to it in an EPA grant, as the district court seemed to believe. JA___ (Slip Op. at 15). Plaintiffs seek only to restore the Environmental and Climate Justice Block grant program through traditional APA relief.[10] Similarly, Plaintiffs do not assert claims for damages or any other rights stemming from breaches by EPA of its obligations under grants or contracts. Their APA claims and requested relief are, instead, focused on reversing the unlawful decision to eliminate an entire program.

To look past that requested relief, the district court suggested that the declaratory judgment Plaintiffs sought had no "value" independent of monetary relief they could potentially obtain in the Court of Federal Claims. *See* JA___ (Slip Op. at 13). But Justice Barrett's concurrence in *NIH* shows why that is false. As she explained, the "termination of grants," on the one hand, and the issuance of "guidance" implementing "changed policy priorities," on the other, are "distinct agency actions." 145 S. Ct. at 2661. Plaintiffs challenge only the latter here and seek the corresponding APA remedy. The district court's reasoning also conflicts

---

[10] Of course, an order setting aside the unlawful directive terminating the grant program may have downstream consequences for the individual grants.

with *NIH*'s recognition of the independent value of setting aside unlawful policy guidance and directives—Justice Barrett recognized that "vacating the guidance does not reinstate terminated grants," 145 S. Ct. at 2661, and nonetheless determined that an APA challenge to the guidance was proper. Here too, relief vacating EPA's directive is not the same thing as relief directly reinstating the grants; restoring the statutorily mandated grant program has independent value to Plaintiffs.

The district court's analysis improperly conflates the facts that establish Plaintiffs' standing to bring this action with the source of the rights Plaintiffs assert or the basis for Plaintiffs' claims. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021) (recognizing the "important difference [] between" a cause of action and a concrete injury). Moreover, Plaintiffs would have standing to challenge the termination of the entire Environmental and Climate Justice Grant program even without their existing grant agreements. This Court has made clear that a plaintiff suffers harm for standing purposes where "it has been walled off from an entire category of projects for which it is qualified, prepared, and eager to compete." *Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004, 1016 (D.C. Cir. 2022); *see, e.g.*, *Teton Historic Aviation Found. v. U.S. Dep't of Def.*, 785 F.3d 719, 724-25 (D.C. Cir. 2015). So too here.

26

**C.    District court jurisdiction here flows from longstanding caselaw interpreting the Tucker Act.**

This outcome should not be surprising because it flows from longstanding circuit precedent. Under that caselaw, to determine whether a claim is essentially contractual—and therefore outside the federal courts' jurisdiction—this Court has used a two-part test that examines the "source of rights upon which the plaintiff bases its claims" and the "type of relief sought." *Megapulse*, 672 F.2d at 968.

In evaluating these questions, the Court must "make rational distinctions between actions sounding genuinely in contract and those based on [] *independent legal grounds.*" *Id.* at 969-70 (emphasis added). Factors in this inquiry include whether "the plaintiff's asserted rights and the government's purported authority arise from statute, whether the plaintiff's rights exist prior to and apart from rights created under the contract, and whether the plaintiff seeks to enforce any duty imposed upon the government by the relevant contracts to which the government is a party." *Crowley*, 38 F.4th at 1107 (citation modified).

Application of this test shows why Plaintiffs' APA claims are properly within the federal district court's jurisdiction: Plaintiffs' claims are based in statutory or constitutional rights and seek forward-looking injunctive relief.

### 1. Plaintiffs' claims rest on the Constitution and statutes, not contracts.

Plaintiffs' claims are within federal court jurisdiction because the rights Plaintiffs assert arise from statutes and the Constitution, not from the terms of any contract.

The first prong of the *Megapulse* test is the "source of rights upon which the plaintiff bases its claims." 672 F.2d at 968. To determine the source of Plaintiffs' rights under *Megapulse*, the question is "what the court must examine to resolve the case." *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *12 (Pillard, J., dissenting), *stay pending appeal vacated*, 2025 WL 1521335, at *1 (D.C. Cir. May 28, 2025) (en banc) (adopting Judge Pillard's reasoning in vacating the panel's stay). When a plaintiff's "asserted rights" arise "from statute" and those rights "exist prior to and apart from rights created under the contract," as they do here, their claims belong in the district court, not the Court of Federal Claims. *Widakuswara*, 2025 WL 1288817, at *11 (Pillard, J., dissenting) (quoting *Crowley*, 38 F.4th at 1107); *see also Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1449 (D.C. Cir. 1985) (Bork, J.).

Plaintiffs allege that EPA usurped Congress's power in its decision to eliminate the Environmental and Climate Justice Block Grant program and violated the Constitution and the Clean Air Act regardless of the terms of any individual grant agreement. As in *Crowley*, Plaintiffs assert the right to "be free

28

from government action beyond . . . congressional authority," a statutory and constitutional right that "exist[s] prior to and apart from" any rights that may exist under Plaintiffs' grant agreements. 38 F.4th at 1108. As we explained above, *see supra* at Part I.B., the unlawful termination of the grant program injures Plaintiffs even apart from any individual grant. Because Plaintiffs' claims rest on these independent grounds, they are properly brought in federal district court.

The nature of the questions the district court would need to evaluate to resolve Plaintiffs' claims underscores that the claims are not contractual in nature. Resolving Plaintiffs' APA claims will require this Court to address clear regulatory and statutory questions regarding EPA's actions and, ultimately, whether those actions exceeded its authority or were contrary to law. *Widakuswara,* 2025 WL 1288817, at *12. Such an analysis does not require this Court to look at, let alone interpret, the terms of an "agreement negotiated by the parties." *Md. Dep't of Hum. Res*, 763 F.2d at 1449. Thus, the claims here are not "essentially"—or even conceivably—contract claims.

In concluding otherwise, the district court mistakenly analogized this case to circuit precedent involving a different situation—cases where claims were "incorporated into the contract." JA___ (Slip Op. at 15, quoting *Ingersoll-Rand v. United States*, 780 F.2d 74, 75 (D.C. Cir. 1985)). That is not the case here, though. Plaintiffs challenge the elimination of an entire congressionally mandated grant

program as unlawful—a claim that is wholly unrelated to the terms of individual grants. By contrast, those cases involved situations where the dispute was "entirely contained within the terms of the contract." *Ingersoll-Rand*, 780 F.2d at 78.

For instance, in *Ingersoll-Rand*, the government terminated the plaintiffs' contract based on a specific provision of the contract. *Id.* at 75. The plaintiffs argued that the termination of the contract was arbitrary and capricious under the APA and sought reinstatement of the contract itself. *Id.* at 79-90. Therefore, the case turned on whether the text of "the contract forbids termination under these conditions." *Id.* at 78. The claim thus belonged in the Court of Federal Claims because "it [was] possible to conceive of this dispute as entirely contained within the terms of the contract." *Id.* In contrast, Plaintiffs' claims here—that EPA unlawfully dismantled an entire grant program—do not implicate the terms of the grant agreements and cannot be resolved via reference to them.

The district court's reliance on *Spectrum Leasing Corp. v. United States*, 764 F.2d 891 (D.C. Cir. 1985), *see* JA___ (Slip Op. at 14), is similarly flawed. In *Spectrum*, the government collected contractual liquidated damages from a firm by stopping lease payments for other products it had provided; the company claimed the stoppage violated procedures in the Debt Collection Act and brought an APA claim seeking "an order compelling the government to pay money owed in exchange for goods procured under an executory contract." 764 F.2d at 894. The

suit fundamentally sought to enforce the contract, as confirmed by the backward-looking, past-due payment sought.

Plaintiffs' challenge, by contrast, does not seek to enforce any contract. Rather, they allege that EPA's decision to eliminate an entire federal grant program without legal authority, reasoned decision-making, or a consideration of reliance interests disregarded the requirements of the APA, effectively attempted to undo Congress's enactment of Section 138 of the Clean Air Act, and violated the Constitution's separation of powers. Determining whether Plaintiffs succeed on these claims requires interpreting the Constitution and statutes, rather than the terms of their grants. The claims are properly before the federal district court.

### 2. The type of relief Plaintiffs seek is not contractual in nature.

The "type of relief" Plaintiffs seek confirms that their APA claims are not contractual in nature. *Megapulse*, 672 F.2d at 968. The "crux of this inquiry . . . boils down to whether the plaintiff effectively seeks to attain money damages." *Widakuswara*, 2025 WL 1288817, at *13 (Pillard, J., dissenting) (quoting *Crowley*, 38 F.4th at 1107). Plaintiffs do not. They ask the district court to set aside EPA's unlawful policy directive eliminating the entire Environmental and Climate Justice Block Grant program, not relief enforcing the terms of any particular grant. There is nothing contractual about this requested relief, nor would EPA's legal violation be appropriately addressed through contractual remedies.

31

The mere fact that granting the requested relief might, down the road, result in payments being made to qualifying grantees once the grant program is restored does not change this result. Rather, Supreme Court, D.C. Circuit, and Federal Circuit precedent has long made clear that prospective, downstream monetary consequences are not the sort of "money damages" the Tucker Act concerns. Since the 1976 amendment of the APA to waive sovereign immunity, the Supreme Court and Federal Circuit have carefully interpreted the Tucker Act *in pari materia* with the APA to distinguish between claims that seek *specific* relief—such as an order requiring the United States to follow through on legal duties—and those that seek *substitute* relief—that is, monetary compensation for consequential harms that have been previously suffered when the United States violates a contractual duty.

The Supreme Court drew this distinction when analyzing the definition of the term "money damages" in the text of the APA in *Bowen*, a grant-in-aid case:

> We begin with the ordinary meaning of the words Congress employed. The term 'money damages,' 5 U.S.C. § 702, we think, normally refers to a sum of money used as compensatory relief. Damages are given to the plaintiff to *substitute* for their suffered loss, whereas specific remedies 'are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled.'

*Bowen*, 487 U.S. at 894-95 (quoting *Md. Dep't of Hum. Res.*, 763 F.2d at 1446 and Dan B. Dobbs, *Handbook on the Law of Remedies*, 135 (1973)). Thus, the Court explained, claims seeking specific relief are governed by Section 702 of the APA and heard in district court. Claims for substitute relief are not governed by that

32

provision, and thus are heard in the Court of Federal Claims. *Id.* at 894-95; *U.S. Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 262 (1999) (the APA's sovereign immunity waiver turns on the statutory definition of "money damages" and the distinction between "specific relief and substitute relief").

Applied here, that framework yields a straightforward result. Plaintiffs do not seek money damages to compensate for past harms, which would not provide adequate relief. That fact distinguishes this case from *Climate United Fund v. Citibank*, No. 25-5122, 2025 WL 2502881, at *7 (D.C. Cir. Sept. 2, 2025). In that case, the grantees "s[ought] to set aside their grant terminations," and thus "s[ought] specific performance" under their grant agreements. *Id.* at *7. Here, by contrast, Plaintiffs have not presented claims challenging their individual terminations.[11] Rather, they seek specific forward-looking relief: a declaratory judgment that the dismantling of the program violates the APA, 5 U.S.C. § 706, and an injunction requiring EPA to continue operating it. Nor is restoration of the entire Environmental and Climate Justice Block Grant program the type of relief available in the Court of Federal Claims, which "has no power to grant equitable relief." *Bowen*, 487 U.S. at 905. While the practical effect of reinstating the entire

---

[11] See discussion of Plaintiffs' claims and original, pre-*NIH* request for relief *supra* at 24-25.

program may result in the disbursement of funds, that "is not a sufficient reason to characterize the relief as 'money damages.'" *Id.* at 893.

In fact, Plaintiffs' claims are similar in many respects to the claims the Court considered in *Bowen*—a case that, like this one, involved a grant-in-aid program. In *Bowen*, the Court explained that it did not "regard judicial review of an agency's disallowance decision as an action for damages." *Id.* at 898. Instead, a suit "seeking to enforce the statutory mandate" is "not a suit seeking money in compensation for damage[s]." *Id.* at 900. The same is true here.

What is more, as *Bowen* explains, the Court of Federal Claims could not be an adequate alternative forum for claims like these because it lacked the "general equitable powers of a district court" to grant the relief requested by Massachusetts. *Id.* at 905. And the D.C. Circuit has "categorically reject[ed] the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims." *Tootle v. Sec'y of the Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006). That makes sense in the context of Section 702's "impliedly forbids" clause: "there cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act." *Id.* at 177; *see also Yee v. Jewell*, 228 F. Supp. 3d 48, 56 (D.D.C. 2017). Notably, the Federal Circuit has even *returned* cases to federal district court when—as here—Congress has directed that appropriated grant funds be used in a particular way because the

34

Court of Federal Claims does not provide an adequate remedy. *Nat'l Ctr. for Mfg. Sciences v. United States*, 114 F.3d 196, 198 (Fed. Cir. 1997) (explaining that grant restrictions governing future disbursal of funds made money judgement inappropriate and reversing district court's transfer order).

Indeed, Congress expressly contemplated that the APA's waiver of sovereign immunity would provide relief in the context of federal grant programs like this one. At the time Congress amended Section 702 of the APA in 1976, both the House and Senate Committee reports "indicate[d] that Congress understood that § 702, as amended, would authorize judicial review of the 'administration of Federal grant-in-aid programs.'" *Bowen*, 487 U.S. at 898 (citing H.R. Rep. 94-1656, at 9 (1976) (JA___) and S. Rep. No. 94-996, at 8 (1976) (JA___)).[12] That is because such agreements involve a "complex ongoing relationship between the parties" for which "a naked money judgement against the United States" will not always be an "adequate substitute." *Id.* at 905.

\* \* \*

As this Court's precedent makes plain, *NIH* underscored, and the federal government concurs, the Tucker Act does not preclude claims that challenge

---

[12] Both the House and Senate reports cite to testimony from Sovereign Immunity: Hearing on S.3568 before the Subcommittee on Administrative Practice and Procedure of the Senate Committee on the Judiciary, 91st Cong., 2d Sess. JA___ (Pls' Reply in Supp. of Mot. for Prelim. Inj. Ex. 4).

policy-level decisions under the APA. Plaintiffs' claims make such a challenge and thus properly belong in federal district court.

## II. Plaintiffs stated valid constitutional claims properly within the district court's jurisdiction.

EPA's unilateral decision to eliminate a statutorily mandated grant program based solely on the President's policy disagreements with Congress violated the Constitution's separation of powers and the Presentment Clause. When the executive branch refuses to spend funds that Congress appropriated for a specific purpose based on the executive branch's disagreement with Congress's policy decisions, that refusal violates the Constitution. This Court has previously explained the bedrock constitutional principles that require the President and subordinate executive branch agencies to comply with statutory mandates to implement programs and spend duly appropriated funds, and expressly rejected the notion that mere policy disagreement would permit the executive to disregard congressional commands. Because Plaintiffs contend that Congress conferred no authority whatsoever on EPA to eliminate the Section 138 grant program—and do not contest how EPA exercised authorities Congress *did* confer—Plaintiffs' claims are, under longstanding case law, constitutional and not statutory. This Court should reverse the dismissal of these claims.

36

**A.    Plaintiffs have standing to assert separation of powers claims.**

Both the D.C. Circuit and the Supreme Court have long held that there is a "direct cause of action" under the Constitution to enjoin unconstitutional agency action. *Trudeau v. Federal Trade Comm'n*, 456 F.3d 178, 190, 190 n.22 (D.C. Cir. 2006); *Free Enter. Fund. v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010). Thus, "whenever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen*, 594 U.S. 220, 245 (2021). And injunctive relief is the "proper means" for courts to prevent government entities from acting unconstitutionally. *Corr'l. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001); *see also Bell v. Hood*, 327 U.S. 678, 684 n.4 (1946) (collecting cases). Thus, here, the District Court can issue an injunction undoing EPA's unconstitutional actions.

In the seminal case *Youngstown Sheet & Tube Co. v. Sawyer*, the Supreme Court clearly articulated the limits of executive power. 343 U.S. 579 (1952). All executive power must come either "from an act of Congress or the Constitution itself." *Id.* at 587. And when "the President takes measures incompatible with the express or implied will of Congress," then "his power is at its lowest ebb." *Id.* at 637 (Jackson, J. concurring). Here, no statute authorizes the elimination of the entire Section 138 grant program—in fact, Congress mandated that EPA carry out

37

the program. Accordingly, any authority EPA had to act here must stem from the Constitution itself.

The Constitution carefully delineates Congress's exclusive appropriation powers. The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I § 9, cl. 7. It thus "protects Congress's exclusive power over the federal purse." *U.S. Dep't of the Navy v. FLRA*, 665 F.3d 1339, 1346 (D.C. Cir. 2012); *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937) (the Appropriations Clause "was intended as a restriction upon the disbursing authority of the Executive department"). Article I vests in Congress the power to pass legislation, including appropriations laws. U.S. Const. art I, § 1 ("[a]ll legislative Powers herein shall be vested in a Congress of the United States"); *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (an appropriations act is "Law"). Thus, "Congress has absolute control of the moneys of the United States." *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992) (citation modified); *see also* Federalist No. 48 (J. Madison) (explaining that Congress "alone has access to the pockets of the people").

The Constitution also forbids the executive branch from encroaching on Congress's powers. Regarding the enactment of laws, the President is limited to "recommendation and veto." *Youngstown*, 343 U.S. at 655 (Jackson, J.

concurring). Under Article II, the executive branch "shall take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. But the executive branch does not have dispensing power—that is, the ability to disobey duly enacted laws for policy reasons. *See Matthews v. Zane's Lessee*, 9 U.S. 92, 98 (1809) (Marshall, C.J.) ("The president cannot dispense with the law, nor suspend its operation."); *Kendall v. United States*, 37 U.S. 524, 613 (1838) (dispensing power "has no . . . support in any part of the constitution.").

This limitation is particularly important when it comes to appropriated funds, because Congress's power of the purse is absolute. As then-Judge Kavanaugh once put it, the President "does not have unilateral authority to refuse to spend [congressionally appropriated] funds." *Aiken County*, 725 F.3d at 261 n.1. A contrary rule of open disregard for congressional control over spending decisions would effect a drastic alteration to the balance of power between Congress and the executive. "If not for the Appropriations Clause, 'the executive would possess an unbounded power over the public purse of the nation; and might apply all its monied resources at his pleasure.'" *Dep't of Navy v. Fed. Labor Relations Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (quoting 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1342, at 213-14 (1833)).

Indeed, the harm would extend beyond Congress, because the structural features of the Constitution also provide an important bulwark to safeguard

39

individual liberty. As Justice Kennedy observed, when "the decision to spend [is] determined by the Executive alone, without adequate control by the citizen's Representatives in Congress, liberty is threatened." *Clinton v. City of New York*, 524 U.S. 417, 451 (1998) (Kennedy, J., concurring). And as Alexander Hamilton argued, unless "the purse is lodged in one branch, and the sword in another," the "division of powers, on which political liberty is founded" would be destroyed, and "would furnish one body with all means of tyranny." 2 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 349 (Jonathan Elliot ed., 2d ed. 1836) (Alexander Hamilton).

### B.    Plaintiffs pled a valid separation of powers claim.

Here, EPA eliminated the Environmental and Climate Justice Block Grant program due to a policy disagreement with Congress. JA___-___ (Compl. ¶¶ 61-100, 171, 8-9). In disregarding Congress's statutory requirements, EPA arrogated to itself a power that belongs to another branch. This decision to usurp Congress's control of spending and nullify a congressional mandate violates the very structure of the Constitution. Plaintiffs, as parties injured by that unlawful decision, may bring a constitutional claim. *Collins*, 594 U.S. at 245.

40

1.    **Agencies cannot constitutionally refuse a congressional mandate to spend appropriated funds based on policy objections.**

This Court has repeatedly held that the Constitution prohibits the executive branch from substituting its own policy preferences for Congress's mandate to spend appropriated funds. As then-Judge Kavanaugh explained on behalf of this Court in *Aiken County*, pursuant to "settled, bedrock principles of constitutional law," the President and subordinate executive branch agencies "must follow statutory *mandates* so long as there is appropriated money available and the President has no constitutional objection to the statute." 725 F.3d at 259 (emphasis in original). "[W]here previously appropriated money is available for an agency to perform a statutorily mandated activity," there is "no basis for a court to excuse the agency from that statutory mandate." *Id.* at 259-60. Neither the President nor subordinate executive branch agencies "may [] decline to follow a statutory mandate [] simply because of policy objections." *Id.* at 259.

Applying these settled constitutional principles in *Aiken*, this Court rejected the Nuclear Regulatory Commission's attempted refusal to spend duly appropriated funds on a statutorily mandated review simply because of the agency's policy objections. The Nuclear Regulatory Commission had chosen to "simply shut down its review" rather than approve or disapprove of licenses as part of an appropriated and statutorily mandated license evaluation process for nuclear

41

waste disposal. 725 F.3d at 257-58. Because this refusal to undertake the statutorily

mandated expenditures was unlawful, this Court granted mandamus to require the

agency to expend the appropriated funds and proceed with the mandated evaluation

process. *Id*. at 266-67.

Plaintiffs raise the same separation of powers concern here. Congress

mandated that EPA implement the Environmental and Climate Justice Block Grant

program in Section 138 of the Clean Air Act. To be sure, the President and current

EPA leadership may have strongly-held policy objections to that program. "But

Congress sets the policy, not" the President or subordinate executive branch

agencies. *Id.* at 260. Were the Court to countenance EPA's decision to ignore

Congress's mandates, it would radically rework our constitutional structure.

"[A]llowing agencies to ignore statutory mandates" and refuse to implement

programs or to spend duly appropriated funds simply based on policy

disagreements with Congress "would gravely upset the balance of powers between

the Branches and represent a major and unwarranted expansion of the Executive's

power at the expense of Congress." *Id.*

Thus, in *Climate United*, this Court confirmed that a complete dismantling

of an entire program—as happened here—would trigger *Aiken*'s prohibition, while

distinguishing situations—unlike here—where there was no evidence that the

agency had made such a sweeping decision. 2025 WL 2502881, at *11. The Court

explained that, if plaintiffs raised claims that the executive branch planned to "properly supervise" ongoing grantmaking rather than wholly disagree with Congress's choices, *Aiken County* would not apply. *Id.* But if, by contrast, there were evidence showing that the executive acted to "dismantle" entire grant "programs without congressional approval," such evidence would be akin to the situation in *Aiken County*. *Id.* This case presents the precise scenario distinguished in *Climate United. Compare id.* (explaining "that [the district court's conclusion that] 'EPA seeks to dismantle these grant programs in their entirety as a policy matter' . . . was not supported by any evidence in the record") *with* JA___ (Compl. ¶ 14 (collecting evidence that EPA had determined to terminate the grant program on policy grounds).[13]

Defendants' assertion of a unilateral authority to refuse to spend appropriated funds reflects an open disregard for congressional control over spending decisions and the basic strictures of the appropriations power. *See supra* Part II.A. EPA's decision to disregard the requirements of Section 138 violated the Constitution and harmed Plaintiffs, and Plaintiffs have stated a valid constitutional claim.

---

[13] Further, unlike in *Climate United*, EPA has evidenced no intention to "recommit" the grant money at issue here. 2025 WL 2502881, at *11. Instead, EPA has touted its elimination of the program as "taxpayer savings"— demonstrating its clear intention to shutter the entire program. JA___ (Compl. ¶ 109).

### 2. Plaintiffs' separation of powers claim is constitutional and not statutory.

Plaintiffs' separation of powers claim rests on EPA's unconstitutional refusal to comply with Congress's command in Section 138 of the Clean Air Act to spend the duly appropriated funds Congress told EPA to use. This decision to eliminate the grant program was without basis in law. Defendants did not rely on any authority under the statute or the Constitution that provides a legal basis to refuse Section 138's requirements. This refusal therefore violates "settled, bedrock principles of constitutional law," *Aiken*, 725 F.3d at 259, and Plaintiffs state a valid constitutional claim.

Where the President or a subordinate executive branch agency contends that a challenged action was undertaken as a bona fide exercise of discretion conferred by statute, courts have sometimes grappled with whether to understand the challenge as a constitutional or statutory claim. That issue is not presented in this case because Defendants provided no constitutional or statutory basis for EPA's decision to eliminate the Section 138 grant program. And courts have long recognized claims challenging the lack (or want) of authority for an executive action—rather than simply contending that an action was in excess of authority that has been conferred—as constitutional claims.

In rejecting Plaintiffs' separation of powers claim, the district court misunderstood this distinction in its application of the Supreme Court's decision in

44

*Dalton v. Specter* as well as recent decisions from this Court. JA___ (Slip Op. at

19). In *Dalton*, the plaintiffs sought to enjoin the Secretary of Defense from closing

a naval shipyard that the President chose to close pursuant to the Defense Base

Closure and Realignment Act of 1990—which granted the President unfettered

discretion to make a final closure decision on any proposed base closures. *Dalton,*

511 U.S. at 470 (the Act "does not by its terms circumscribe the President's

discretion"). As explained by the Supreme Court, "[t]he decision to close the

shipyard was the end result of an elaborate selection process prescribed by the

1990 Act," but the plaintiffs alleged that the recommendation the agency

ultimately adopted violated the Act's substantive and procedural requirements. *Id.*

at 464. The Supreme Court cautioned that "[o]ur cases do not support the

proposition that *every* action by the President, or by another executive official, in

excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id.* at

472 (emphasis added). The Court ultimately concluded that the plaintiffs' alleged

constitutional claim was really a statutory claim because it was, in essence, just a

challenge to the President's "exercise [of] discretion Congress ha[d] granted him"

in the statute. *Id.* at 476.

Here, the district court, viewing Plaintiffs' constitutional claims as

"predicated on underlying statutory violations," concluded that those claims should

be dismissed because "Plaintiffs [] may not circumvent the Tucker Act and the

APA's non-reviewability provision by reframing a statutory violation as constitutional claims." JA___ (Slip Op. at 20-21). But this misapplies *Dalton*'s analysis; the district court confused actions taken without authority with those taken in excess of authority granted. Plaintiffs' claims here contend that Defendants had *no* authority to eliminate the Section 138 grant program, and do not merely challenge EPA's "exercise [of] discretion Congress ha[d] granted" it by statute. *Dalton*, 511 U.S. at 476.

Such claims alleging a complete lack or want of authority for the executive's action are valid constitutional claims—particularly when they involve the executive branch usurping powers that the Constitution expressly reserves for Congress. *Dalton* itself supports this proposition. To be sure, *Dalton* noted that its prior decisions would not have distinguished between statutory and constitutional claims "[i]f *all* executive actions in excess of statutory authority were *ipso facto* unconstitutional." 511 U.S. at 472 (emphasis added). But the Court never suggested that presidential actions that violate a statute cannot violate the Constitution as well. Rather, *Dalton* makes clear that plaintiffs may bring constitutional claims when the President exercises a power not delegated to him, including when he usurps a power expressly delegated to another branch. *Id.* at 473. The difference is that, when he does the latter, there is "a want of

46

[Presidential] power"—not "a mere excess or abuse of discretion in exerting a power given." *Id.* at 474 (alteration in original) (citation modified).

This Court has long interpreted *Dalton* to require examination of constitutional claims that involve statutes to determine whether the claim turns on allegations of mere misapplication of a statute by the executive branch (e.g., actions in excess of authority granted), or instead allege a lack or want of authority for the action. *See, e.g.*, *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1331 (D.C. Cir. 1996). While the former claims may not be actionable constitutional claims, *Dalton* provides no bar to the latter.

Applying this distinction to Plaintiffs' constitutional claims here, Plaintiffs are not alleging that EPA failed to apply the criteria of Section 138 correctly; they contend that EPA has claimed the authority to countermand Congress's command. This is a cognizable constitutional claim under *Dalton*. The President's authority to act "must stem either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585. Here, neither the statute nor the Constitution provides any support for EPA's action. While Congress may choose to grant the executive discretion under a statute, it is axiomatic that a statute that requires a certain action does not give the executive authority to refuse to perform that action. Because Plaintiffs challenge the "want of [executive] power," 511 U.S. at 474,

47

rather than EPA's "exercise [of] discretion Congress ha[d] granted" it by statute, *id.* at 476, Plaintiffs state a constitutional claim, not a statutory one.

Courts have repeatedly found that such claims are cognizable. If they were not, the executive could escape judicial review of any separation-of-powers claim so long as it took care to violate a statute at the same time. Fortunately, the Supreme Court has never endorsed such a limitation, and has repeatedly approved of judicial review of separation-of-powers claims even when statutory disputes exist. In *Dames & Moore v. Regan*, 453 U.S. 654 (1981), for instance, the President "purported to act under authority of" two federal statutes. *Id.* at 675. The Court even had to interpret those statutes to resolve the separation-of-powers claim, *id*. at 670-74—yet the claim remained viable anyway. Similarly, in *Franklin v. Massachusetts*, 505 U.S. 788 (1992), the plaintiffs brought claims "under both the APA and the Constitution." *Id.* at 796. The Court rejected the APA claims, *id*. at 796-801, but not the constitutional ones, concluding "that the Secretary [of Commerce]'s allocation of overseas federal employees . . . violated the command of Article I," *id.* at 803. In reaching this conclusion, the Court was explicit that its resolution of the APA claims "d[id] not dispose of [the plaintiffs'] constitutional claims," *id.* at 801. These precedents make clear that claims that an executive action has violated a statute does not preclude a valid constitutional claim.

48

Like the district court here, recent decisions of this Court, including *Global Health Council v. Trump*, No. 25-5097, 2025 WL 2709437 (D.C. Cir. Aug. 28, 2025) and *National Treasury Employees Union v. Vought*, 149 F.4th 762 (D.C. Cir. 2025) ("*NTEU*") (one of which has a petition for en banc review pending) also overread *Dalton* to establish broad limits on constitutional claims. This Court need not reach how those cases interpret *Dalton* because they can be distinguished from Plaintiffs' claims here. *See* Part I.B.3., *infra*.

But regardless, the reading of *Dalton* adopted in those cases is in error. Indeed, several members of this Court have raised doubts about *Global Health Council*'s view of *Dalton*. Judge Garcia, in a statement respecting the denial of rehearing *Global Health Council* en banc, emphasized that the ability to bring a constitutional challenge was an "important question" but that addressing the question then "would serve primarily to delay resolution of the plaintiffs' statutory claim." 2025 WL 2709437, at *3 (Garcia, J.). Judge Pan similarly suggested that the court should "take the first opportunity" to revisit the panel's treatment of *Dalton*. *Id.* (Pan, J., dissenting).

If the *Dalton* Court's interpretations in those decisions are read as broadly as the district court did here, *no* executive action in excess of statutory authority could *ever* be challenged as unconstitutional. Such a rule would be inconsistent with the language of *Dalton* itself—and directly contrary to *Dames & Moore* and *Franklin*.

49

The district court's logic—that the executive's open refusal to accede to Congress's control of spending presents a mere statutory dispute—cannot be squared with *Aiken County* and the many other decisions that make clear that the Constitution may be violated by executive action that also violates a statute.

Thus, Plaintiffs' constitutional claims are not unreviewable simply because they also involve the violation of an appropriations statute. JA___ (Slip Op. at 20-21). Such an interpretation would make it impossible for any plaintiff injured by an unconstitutional violation of the Spending and Appropriations Clauses to seek relief, because Congress must appropriate funds by statute. U.S. Const. art. I § 8, cl. 1; art. 1, § 9, cl. 7. But injunctive relief "has long been recognized as the proper means for preventing entities from acting unconstitutionally." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001). "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015) (citing Louis L. Jaffe & Edith G. Henderson, *Judicial Review and the Rule of Law: Historical Origins*, 72 L.Q. Rev. 345 (1956)). Congress can only exercise its spending power through statutes appropriating funds and directing the Executive to spend them. If any challenge to the Executive's disregard of such mandates is merely "statutory" it would render specific commands under the Spending and

50

Appropriations power meaningless. As this Court has long recognized, such an approach would have "serious implications for our constitutional structure." *Aiken County*, 725 F.3d at 393-94 & n.1. It is "no overstatement to say that our constitutional system of separation of powers would be significantly altered if we were to allow executive and independent agencies to disregard federal law" by "declin[ing] to spend appropriated funds" on programs mandated by Congress. *Id.*

3. ***Global Health Council* and *NTEU* should not be extended to the context of a complete elimination of a mandatory spending program.**

The Court should not read *Global Health Council* and NTEU to control the claims here, because Plaintiffs' separation of powers claim arises in distinct factual circumstances to which they should not be extended. These cases should be properly understood narrowly as not applying to claims that properly challenge discrete, final agency actions that result in the elimination of a congressionally mandated program.

*First,* this Court's August 28, 2025 decision in *Global Health Council v. Trump* is readily distinguishable. 2025 WL 2480618 (D.C. Cir., Aug. 28, 2025). *Global Health Council* did not address the elimination of existing, congressionally mandated grant programs. Rather, the plaintiffs in *Global Health Council*, who unlike the Plaintiffs here were in a position to compete to be awarded new grants, challenged the Secretary of State's temporary suspension of a portion of new

51

foreign assistance funding obligations for the State Department and USAID. *Id.* at *2-3.

As to the constitutional claims in that case, the district court had enjoined the Executive Order after finding "no indication that the President had complied with the procedures required by the [Impoundment Control Act] or the Anti-Deficiency Act for impounding congressionally appropriated funds and thus reasoned that his actions likely violated the three statutes at issue and the Constitution." *Id.* at *11 (citing *AIDS Vaccine Advoc. Coal. v. Dep't of State*, 770 F. Supp. 3d 121, 144-48 & nn.14, 18 (D.D.C. 2025)).

On appeal, however, the Court determined that the plaintiffs' constitutional claims were precluded under *Dalton*. As the Court understood the claims, whether they were framed as constitutional or not, their underlying challenge was that "an official has acted in excess of his statutory authority." *Id.* at *14 (quoting *Dalton*, 511 U.S. at 472). Thus, the underlying action at issue in *Global Health Council* was a statutory violation—the Executive's failure to follow the procedures of the Impoundment Control Act or Anti-Deficiency Act in seeking to impound a portion of previously appropriated international aid funds. *Dalton* precluded that claim. By contrast, here, Plaintiffs allege an effort to usurp Congress's own constitutional authority by eliminating an entire congressionally mandated program, not that the executive improperly followed procedures outlined by statute for that program.

52

*Second*, *NTEU* is similarly distinguishable. In that case, the Court's decision turned on the fact that the agency had not, in fact, made a discrete decision to shut down the agency. *Id.* at 789. As the government has since explained in its opposition to rehearing in that case, the "action at issue" in *NTEU* was a "nonbinding and unfulfilled plan." Defs. Opp. to Pet. for Rehearing En Banc, Dkt. No. 2141424, at 17 n.2 (Oct. 21, 2025).

Again, not so here. Plaintiffs have pled—and provided evidence for—EPA's discrete decision to eliminate an entire congressionally mandated grant program. That distinction makes an important difference: By stopping short of fully shuttering the agency, the Consumer Financial Protection Bureau's actions created a series of statutory disputes about the extent to which its actions had deviated from congressional directives. By contrast, here, EPA unambiguously shut down an entire program, refused to spend the funds committed under it, and redirected all its resources elsewhere. What remains is not a statutory dispute about what Congress told EPA it could do, but a constitutional one about whether EPA could act independently from and in defiance of Congress.

And that conclusion makes sense, because the decision here to shutter the grant program created by Congress is an action for which EPA's authority, if it is to exist at all, "must be found in . . . the Constitution." *Youngstown*, 343 U.S. at 587. No statute authorizes EPA to eliminate this grant program or to disregard

an act of Congress. EPA did not merely act in "excess" of a specific statutory power; it acted without any statutory authorization whatsoever. Plaintiffs' claim thus properly rests on constitutional grounds.

Any broader reading of *Global Health Council* and *NTEU* that effectively precludes any constitutional claim whenever the executive branch usurps Congress's core Spending and Appropriations Clause powers would place those panel opinions at odds with *Aiken County* and *Reich*. *See Aiken County*, 725 F.3d at 257-59; *Reich*, 74 F.3d at 1332 (observing that *Dalton* is "inapposite" where the claim instead is that presidential action is "not even contemplated by Congress").

### C.    Plaintiffs pled a valid Presentment Clause claim.

Plaintiffs' Presentment Clause claim should not have been dismissed as the district court's rejection of it cannot be reconciled with Supreme Court precedent that prohibits the executive from unilaterally refusing to spend appropriated funds. In *Clinton v. New York*, 524 U.S. 417 (1998), the Supreme Court struck down the line-item veto as unconstitutional because Article I, § 7 of the Constitution makes clear that the President cannot cancel a law without Congress's express authorization. *Id.* at 464 (Scalia, J., concurring). Decided after *Dalton*, the Court's opinion in *Clinton* specifically rejected the argument that cancelling congressionally appropriated programs was "merely [an] exercise of discretionary authority granted to the President." *Id.* at 442.

54

Yet that is what EPA sought to do here: create a version of the Inflation Reduction Act without the inclusion of Section 138 of the Clean Air Act. But the Constitution does not permit "the President to enact, to amend, or to repeal statutes." *Id.* at 438. *Clinton* made clear that doing so "would authorize the President to create a different law—one whose text was not voted on by either House of Congress or presented to the President for signature." *Id.* at 448. But the astounding, unreviewable power Defendants claim in this case—the power to refuse, at any time, to spend statutorily mandated appropriations even in the absence of any statutory or constitutional basis to disregard the spending requirement—is far broader than that conferred by the line-item veto addressed in *Clinton*. It makes little sense that Congress, the President, and the Supreme Court would have bothered to debate the constitutionality of the line-item veto if the President, instead, could simply sign the bill and then refuse to spend those appropriations with which he had a policy disagreement. Yet that is the power Defendants claim here. The Court should reject this violation of the separation of powers.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district courts' entry of dismissal and remand with instructions that the federal district court has jurisdiction over Plaintiffs' APA claims, and that Plaintiffs have pled constitutional claims.

Dated: October 27, 2025

Respectfully submitted,

*/s/ Ben Grillot*
Ben Grillot (D.C. Bar No. 982114)
Kimberley Hunter (N.C. Bar No. 41333)
Irena Como (N.C. Bar No. 51812)
James Whitlock (N.C. Bar No. 34304)
SOUTHERN ENVIRONMENTAL LAW CENTER
122 C St NW, Suite 325
Washington, DC 20001
Telephone: (202) 828-8382
Facsimile: (202) 347-6041
bgrillot@selc.org
kmeyer@selc.org
icomo@selc.org
jwhitlock@selc.org

*Counsel for Appalachian Voices, 2°C Mississippi, Lowcountry Alliance for Model Communities, Parks Alliance of Louisville, Pittsburgh Conservation Corps (d/b/a Landforce) and Southwest Renewal Foundation and Proposed Class Counsel.*

*/s/ Hana V. Vizcarra*
Hana V. Vizcarra (D.C. Bar No. 1011750)
Deena Tumeh (D.C. Bar No. 1741543)
Linnet Davis-Stermitz (WA Bar No. 63190)

56

Molly Prothero (D.C. Bar No. 1779237)
Andrew Saavedra (N.Y. Bar No. 6062814)
EARTHJUSTICE
1001 G Street NW, Suite 1000
Washington, D.C. 20001
(202) 667-4500
hvizcarra@earthjustice.org
dtumeh@earthjustice.org
ldavisstermitz@earthjustice.org
mprothero@earthjustice.org
asaavedra@earthjustice.org

*Counsel for Air Alliance Houston, Bessemer Historical Society (d/b/a Steelworks Center of the West), Deep South Center for Environmental Justice, Downwinders at Risk, Health Resources in Action, Inter-Tribal Council of Michigan, PUSH Buffalo, and WE ACT for Environmental Justice and Proposed Class Counsel.*

*/s/ Toby Merrill*
Toby Merrill (D.D.C. Bar ID MA0006)
Graham Provost (D.C. Bar No. 1780222)
Cassandra Crawford (N.C. Bar No. 45369)
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609
Telephone: (510) 738-6788
toby@publicrightsproject.org
graham@publicrightsproject.org
cassandra@publicrightsproject.org

*Counsel for Allegheny County, Kalamazoo County, King County, Native Village of Kipnuk, City of Sacramento, City and County of San Francisco, City of Springfield and Treasure Island Mobility Management Agency, and Proposed Class Counsel.*

*/s/ Gary DiBianco*

57

Gary DiBianco (D.C. Bar No. 458669)
LAWYERS FOR GOOD GOVERNMENT
1319 F St NW, Ste 301, PMB 387
Washington DC 20004(202) 258-6826
Gary@lawyersforgoodgovernment.org

*Co-Counsel for Native Village of Kipnuk, Inter-Tribal Council of Michigan, and Kalamazoo County.*

/s/ *Yvonne R. Meré*
David Chiu (CA Bar No. 189542)
*San Francisco City Attorney*
Yvonne R. Meré (CA Bar No. 175394)
*Chief Deputy City Attorney*
Mollie M. Lee (CA Bar No. 251404)
*Chief of Strategic Advocacy*
Sara J. Eisenberg (CA Bar No. 269303)
*Chief of Complex and Affirmative Litigation*
*Deputy City Attorney*
1390 Market Street, 7th Floor
San Francisco, CA 94102
Telephone: (415) 554-4274
yvonne.mere@sfcityatty.org
mollie.lee@sfcityatty.org
sara.eisenberg@sfcityatty.org

*Counsel for Appellants City and County of San Francisco and Treasure Island Mobility Management Agency.*

/s/ *Alison Holcomb*
Alison Holcomb
Deputy General Counsel to King County
Executive and Special Deputy Prosecutor
OFFICE OF KING COUNTY PROSECUTING
ATTORNEY LEESA MANION
401 5th Avenue, Suite 800
Seattle, WA 98104
(206) 477-9483

58

aholcomb@kingcounty.gov

*Counsel for Appellant Martin Luther King, Jr.*
*County.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1,

I state that no Plaintiffs have any parent company and that no publicly held

company has a 10% or greater ownership interest in any Plaintiffs.


**Dated: October 27, 2025**               /s/ Ben Grillot
                                          Ben Grillot

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify that this filing complies with Fed. R. App. P. 32(a)(7)(B) because this document contains 12,484 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I further certify that this filing complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this filing has been prepared using a proportionally spaced typeface in Microsoft Word 365 using Times New Roman 14-point.

Dated: October 27, 2025                    /s/ Ben Grillot
                                           Ben Grillot

61

**CERTIFICATE OF SERVICE**

I hereby certify that on October 27, 2025, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit through this Court's CM/ECF system, which will serve a copy of the on all registered users.

Dated: October 27, 2025                    /s/ Ben Grillot
                                           Ben Grillot

# ADDENDUM

## ADDENDUM TABLE OF CONTENTS

**Federal Statutes**

**5 U.S.C. § 702**..................................................................................**1a**

**5 U.S.C. § 704**..................................................................................**2a**

**5 U.S.C. § 706, (2)(A)(B)**....................................................................**3a**

**28 U.S.C. § 1291**...............................................................................**4a**

**28 U.S.C. § 1331**...............................................................................**5a**

**28 U.S.C. § 1491, (a)(1)**.....................................................................**6a**

**42 U.S.C. § 7438(a)(1)**.......................................................................**9a**

**42 U.S.C. § 7438(a)(2)**.......................................................................**9a**

**42 U.S.C. § 7438(b)(1)**.......................................................................**9a**

**42 U.S.C. § 7438(b)(2)**.......................................................................**9a**

**42 U.S.C. § 7438(b)(3)**.......................................................................**10a**

**42 U.S.C. § 7438(c)**...........................................................................**10a**

**5 U.S.C. § 702. Right of review**

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: Provided, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

**5 U.S.C. § 704. Actions reviewable**

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

## 5 U.S.C. § 706, (2)(A)(B). Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1)   compel agency action unlawfully withheld or unreasonably delayed; and

(2)   hold unlawful and set aside agency action, findings, and conclusions found to be—

   (A)   arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

   (B)   contrary to constitutional right, power, privilege, or immunity;

   (C)   in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

   (D)   without observance of procedure required by law;

   (E)   unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

   (F)   unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**28 U.S.C. § 1291. Final decisions of district courts**

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

**28 U.S.C. § 1331. Federal Question**

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

## 28 U.S.C § 1491, (a)(1). Claims against United States generally; actions involving Tennessee Valley Authority

(a)

 (1) The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States.

 (2) To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States. In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just. The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41, including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act.

(b)

 (1) Both the Unites States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the

award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

(2)    To afford relief in such an action, the courts may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs.

(3)    In exercising jurisdiction under this subsection, the courts shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action.

(4)    In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.

(5)    If an interested party who is a member of the private sector commences an action described in paragraph (1) with respect to a public-private competition conducted under Office of Management and Budget Circular A–76 regarding the performance of an activity or function of a Federal agency, or a decision to convert a function performed by Federal employees to private sector performance without a competition under Office of Management and Budget Circular A–76, then an interested party described in section 3551(2)(B) of title 31 shall be entitled to intervene in that action.

(6)    Jurisdiction over any action described in paragraph (1) arising out of a maritime contract, or a solicitation for a proposed maritime contract, shall be governed by this section and shall not be subject to the jurisdiction of the district courts of the United States under the Suits in Admiralty Act (chapter 309 of title 46) or the Public Vessels Act (chapter 311 of title 46).

(c)    Nothing herein shall be construed to give the United States Court of Federal Claims jurisdiction of any civil action within the exclusive jurisdiction of the Court of International Trade, or of any action against, or founded on conduct of, the Tennessee Valley Authority, or to amend or modify the provisions of the

Tennessee Valley Authority Act of 1933 with respect to actions by or against the Authority.

**42 U.S.C. § 7438. Environmental and climate justice block grants**

(a)    Appropriation

In addition to amounts otherwise available, there is appropriated to the Administrator for fiscal year 2022, out of any money in the Treasury not otherwise appropriated—

(1)    $2,800,000,000 to remain available until September 30, 2026, to award grants for the activities described in subsection (b); and

(2)    $200,000,000 to remain available until September 30, 2026, to provide technical assistance to eligible entities related to grants awarded under this section.

(b)    Grants

(1)    In general

The Administrator shall use amounts made available under subsection (a)(1) to award grants for periods of up to 3 years to eligible entities to carry out activities described in paragraph (2) that benefit disadvantaged communities, as defined by the Administrator.

(2)    Eligible activities

An eligible entity may use a grant awarded under this subsection for—

(A) community-led air and other pollution monitoring, prevention, and remediation, and investments in low- and zero-emission and resilient technologies and related infrastructure and workforce development that help reduce greenhouse gas emissions and other air pollutants;

(B) mitigating climate and health risks from urban heat islands, extreme heat, wood heater emissions, and wildfire events;

(C) climate resiliency and adaptation;

(D) reducing indoor toxics and indoor air pollution; or

(E) facilitating engagement of disadvantaged communities in State and Federal advisory groups, workshops, rulemakings, and other public processes.

(3)    Eligible entities

In this subsection, the term "eligible entity" means—

(A) a partnership between—

(i) an Indian tribe, a local government, or an institution of higher education; and

(ii) a community-based nonprofit organization;

(B) a community-based nonprofit organization; or

(C) a partnership of community-based nonprofit organizations.

(c)    Administrative costs

The Administrator shall reserve 7 percent of the amounts made available under subsection (a) for administrative costs to carry out this section.

(d)    Definition of greenhouse gas

In this section, the term "greenhouse gas" means the air pollutants carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride.