[ORAL ARGUMENT NOT YET SCHEDULED]
No. 25-5333

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

APPALACHIAN VOICES, *et al.*,

*Plaintiffs-Appellants*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,

*Defendants-Appellees*.

_____

*On Appeal from the United States District Court
for the District of Columbia*

_____

**BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER
AS *AMICUS CURIAE* IN SUPPORT OF APPELLANTS AND REVERSAL**

_____

Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
Miriam Becker-Cohen
Nina Henry
CONSTITUTIONAL
  ACCOUNTABILITY CENTER
1730 Rhode Island Ave. NW
Suite 1200
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

## STATEMENT REGARDING CONSENT TO FILE
## AND SEPARATE BRIEFING

Pursuant to D.C. Circuit Rule 29(b), undersigned counsel for *amicus curiae* represents that counsel for all parties have consented to the filing of this brief.[1]

Pursuant to D.C. Circuit Rule 29(d), undersigned counsel for *amicus curiae* certifies that a separate brief is necessary.  *Amicus* is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history.  CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and to protect the rights, freedoms, and structural safeguards that our nation's charter guarantees.  CAC has filed *amicus* briefs in multiple cases about the Constitution's separation of powers, including on the issue of whether *Dalton v. Specter* bars certain separation-of-powers claims, and has accordingly developed expertise in the relevant constitutional text and history.

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amicus curiae* or its counsel made a monetary contribution to its preparation or submission.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

## CERTIFICATE AS TO PARTIES, RULINGS,
## AND RELATED CASES

I.     PARTIES AND *AMICUS*

Except for *amicus* Constitutional Accountability Center and any other *amici* who had not yet entered an appearance in this case as of the filing of Appellants' brief, all parties, intervenors, and *amici* appearing in this Court are listed in Appellants' brief.

II.    RULINGS UNDER REVIEW

Reference to the ruling under review appears in Appellants' brief.

III.   RELATED CASES

Reference to any related cases pending before this Court appears in Appellants' brief.

Dated:  November 3, 2025                    /s/ Brianne J. Gorod
                                            Brianne J. Gorod

                                            *Counsel for Amicus Curiae*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................... v

GLOSSARY ........................................................................................... ix

INTEREST OF *AMICUS CURIAE* ........................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................... 1

ARGUMENT ......................................................................................... 8

I.    The Constitution's Separation of Powers Prohibits the President from Unilaterally Withholding Appropriated Funds Based on Disagreement with Congressional Policy ......................................... 8

    A. The Text, Structure, and History of the Appropriations and Spending Clauses Demonstrate Congress's Exclusive Power of the Purse ................................................................................ 8

    B. All Three Branches of Government Have Consistently Interpreted the Constitution as Barring the Executive Branch from Refusing to Spend Appropriated Funds .......................... 12

II.    Plaintiffs' Separation-of-Powers Claim Is Reviewable Under *Dalton v. Specter* ................................................................................ 16

    A. The District Court Misinterpreted *Dalton v. Specter* ............... 17

    B. The District Court Erred in Relying on *Global Health Council* ..................................................................................... 20

    C. The District Court Misunderstood the Nature of Plaintiffs' Separation-of-Powers Claim ..................................................... 25

III.    An Accurate Reading of *Dalton* Will Not Open the Floodgates to Statutory Claims Disguised as Constitutional Ones .......................... 27

CONCLUSION ...................................................................................... 29

iv

## TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Am. Forest Res. Council v. United States*,
    77 F.4th 787 (D.C. Cir. 2023) ................................................................. 28

*Ashcroft v. Iqbal*,
    556 U.S. 6623 (2009) ............................................................................. 23

*Campaign Clean Water, Inc. v. Ruckelshaus*,
    361 F. Supp. 689 (E.D. Va. 1973) .......................................................... 15

*City & County of San Francisco v. Trump*,
    897 F.3d 1225 (9th Cir. 2018) ................................................................ 12

*City of New Haven v. United States*,
    809 F.2d 900 (D.C. Cir. 1987) ............................................................... 13

*CFPB v. Cmty. Fin. Servs. Ass'n of Am.*,
    601 U.S. 416 (2024) .......................................................................... 2, 8, 9

*Chamber of Com. of U.S. v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ............................................................... 27

*Climate United Fund v. Citibank, N.A.*,
    No. 25-5122, 2025 WL 2502881 (D.C. Cir. Sept. 2, 2025) ..................... 22

*Clinton v. City of New York*,
    524 U.S. 417 (1998) ............................................................................ 2, 15

*Cmty. Action Programs Exec. Dirs. Ass'n of N.J. v. Ash*,
    365 F. Supp. 1355 (D.N.J. 1973) ........................................................... 15

*Dakota Cent. Tele. Co. v. South Dakota ex rel. Payne*,
    250 U.S. 163 (1919) ............................................................................... 22

*Dalton v. Specter*,
    511 U.S. 462 (1994) ...................................................... 1, 2, 4-7, 17-19, 27

*Dames & Moore v. Regan*,
    453 U.S. 654 (1981) ............................................................................... 20

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Franklin v. Massachusetts*,
　505 U.S. 788 (1992) ................................................................. 20

*Global Health Council v. Trump*,
　153 F.4th 1 (D.C. Cir. 2025) ........................................ 2, 7, 21-23

*Global Health Council v. Trump*,
　No. 25-5097, 2025 WL 27094378 (D.C. Cir. Aug. 28, 2025) .................. 21, 22

*Guadamuz v. Ash*,
　368 F. Supp. 1233 (D.D.C. 1973) ............................................... 15

*Harrington v. Bush*,
　553 F.2d 190 (D.C. Cir. 1977) ................................................... 8

*In re Aiken County*,
　725 F.3d 255 (D.C. Cir. 2013) ............................... 3, 6, 11, 17, 24

*Kendall v. United States ex rel. Stokes*,
　37 U.S. 524 (1838) ...................................................... 3, 14

*Louisiana ex rel. Guste v. Brinegar*,
　388 F. Supp. 1319 (D.D.C. 1975) ............................................... 15

*Nat'l Treasury Emps. Union v. Vought*,
　149 F.4th 762 (D.C. Cir. 2025) ......................................... 22, 23

*Pennsylvania v. Weinberger*,
　367 F. Supp. 1378 (D.D.C. 1973) ............................................... 15

*Rochester Pure Waters Dist. v. EPA*,
　960 F.2d 180 (D.C. Cir. 1992) ................................................... 8

*Seven Cnty. Infrastructure Coal. v. Eagle County*,
　145 S. Ct. 1497 (2025) ....................................................... 28

*Sierra Club v. Trump*,
　929 F.3d 670 (9th Cir. 2019) ................................................... 6

*Train v. City of New York*,
　420 U.S. 35 (1975) ........................................................... 15

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

*United States v. McIntosh*,
  833 F.3d 1163 (9th Cir. 2016) .................................................. 11, 24

*U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*,
  665 F.3d 1339 (D.C. Cir. 2012) ................................................ 8

*U.S. House of Representatives v. Mnuchin*,
  976 F.3d 1 (D.C. Cir. 2020) ...................................................... 10

*VoteVets Action Fund v. U.S. Dep't of Veterans Affs.*,
  992 F.3d 1097 (D.C. Cir. 2021) ................................................ 23

*Widakuswara v. Lake*,
  No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025) ...................... 12

*Widakuswara v. Lake*,
  No. 25-5144, 2025 WL 1521355 (D.C. Cir. May 28, 2025) .................... 12

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ................................................................ 6, 18, 19

## CONSTITUIONAL PROVISIONS

Articles of Confederation of 1781, art. IX, para. 6 ........................................ 9

Del. Const. of 1776, art. VII ............................................................... 9

Mass. Const. of 1780, ch. 2, § 1, art. XI .................................................. 9

U.S. Const. art. I, § 8, cl. 1 ............................................................... 2, 10

U.S. Const. art. I, § 9, cl. 7 ............................................................... 3, 10, 24

U.S. Const. art. II § 3 ..................................................................... 9

## STATUTES AND LEGISLATIVE MATERIALS

120 Cong. Rec. (1974) ..................................................................... 13

Pub. L. No. 93-344, tit. X, 88 Stat. 297 ................................................. 12

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

S. Rep. No. 93-688 (1974) .............................................................. 13

2 U.S.C. § 683 .............................................................................. 13

2 U.S.C. § 684 .............................................................................. 13


BOOKS, ARTICLES, AND OTHER AUTHORITIES

Josh Chafetz, *Congress's Constitution: Legislative Authority and the Separation of* Powers (2017) .......................................................... 11

*The Debates in the Several State Conventions on the Adoption of the Federal Constitution* (Jonathan Elliot ed., 1836) ...................... 1, 11

Exec. Order No. 14,154, 90 Fed. Reg. 8353 (Jan. 29, 2025) ......................... 26

*The Federalist No. 30* (Clinton Rossiter ed., 1961) ....................... 2, 10

*The Federalist No. 78* (Clinton Rossiter ed., 1961) ........................ 10

Paul F. Figley & Jay Tidmarsh, *The Appropriations Power and Sovereign Immunity*, 107 Mich. L. Rev. 1207 (2009) ................................. 9

F.W. Maitland, *The Constitutional History of England* (1908) ..................... 9

*Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools*, 1 Supp. Op. O.L.C. 303 (1969) ................... 4, 16

*The President's Veto Power*, 12 Op. O.L.C. 128 (1988) ............................. 16

*The Records of the Federal Convention of 1787* (Max Farrand ed., 1911) .... 9

John G. Roberts, Jr., *Memorandum for Fred F. Fielding Re: Impoundment Authority* (Aug. 15, 1985) .......................................................... 16

Joseph Story, *Commentaries on the Constitution of the United States* (1833) ...................................................................................... 11

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| CAA | Clean Air Act |
| EPA | Environmental Protection Agency |
| GHC | Global Health Council |
| ICA | Impoundment Control Act |
| IRA | Inflation Reduction Act |
| NEPA | National Environmental Policy Act |
| OLC | Office of Legal Counsel |

**INTEREST OF *AMICUS CURIAE***

Constitutional Accountability Center (CAC) is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history. CAC works to improve understanding of the Constitution and preserve the rights, freedoms, and structural safeguards that it guarantees, and accordingly has an interest in this case.

**INTRODUCTION
AND SUMMARY OF ARGUMENT**

The district court's conclusion in this case—that presidential usurpation of Congress's appropriations and spending powers raises no problem of constitutional dimension—would have astonished the founding generation. To the Framers of our Constitution, perhaps no tenet was more central to the preservation of liberty than the need to separate the powers of the sword and the purse. As Alexander Hamilton put it, "neither one nor the other shall have both, because this would destroy that division of powers on which political liberty is founded, and would furnish one body with all the means of tyranny." 2 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 348-49 (Jonathan Elliot ed., 1836).

The district court decision reduces this constitutional pillar to an empty promise through a fundamental misunderstanding of the Supreme Court's decision in *Dalton v. Specter*, 511 U.S. 462 (1994). The root of the court's error was

1

interpreting *Dalton*'s holding that "*all* executive actions in excess of statutory authority" are not "*ipso facto* unconstitutional," *id.* at 472 (emphasis added), to mean that *no* executive action in excess of statutory authority may *ever* give rise to an actionable constitutional claim.  To the extent that the district court relied on this Court's decision in *Global Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025) ["*GHC I*"], for that syllogism, it erred in doing so.  *Global Health Council* is distinguishable, and because the panel majority's analysis of *Dalton* was deeply flawed, it should not be extended beyond the facts of that case.

I.  The choice to vest Congress with control over appropriations and spending was "uncontroversial" at the Founding, *CFPB v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416, 431 (2024), a consensus reflecting centuries of struggle in England for legislative supremacy over fiscal matters.  When the Framers gathered to draft the new Constitution, there was no question that the authority to spend and appropriate funds would be given to Congress.  Indeed, Congress's "Power … to pay the Debts and provide for the common Defence and general Welfare of the United States," U.S. Const. art. I, § 8, cl. 1, was deemed "indispensable" to the federal government's ability to do its job, *The Federalist No. 30*, at 188 (Alexander Hamilton) (Clinton Rossiter ed., 1961).  At the same time, the Appropriations Clause evinced a clear limitation on executive authority: "[n]o Money shall be

drawn from the Treasury, but in Consequence of Appropriations made by Law."
U.S. Const. art. I, § 9, cl. 7.

Both the Supreme Court and this Court have recognized that these
provisions, coupled with structural separation-of-powers principles, mean the
executive has no constitutional power to "spend less than the full amount
appropriated by Congress for a particular project or program" for "policy reasons."
*In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.).  The
Supreme Court first made this clear in 1838, unanimously rejecting the authority of
the Postmaster General to withhold appropriated funding for a contract he claimed
was tainted by political favoritism.  *Kendall v. United States ex rel. Stokes*, 37 U.S.
524 (1838).  The issue came to a head again during the 1970s when "President
Nixon, the Mahatma Gandhi of all impounders, asserted … that his constitutional
right to impound appropriated funds was absolutely clear."  *Clinton v. City of New
York*, 524 U.S. 417, 468 (1998) (Scalia, J., concurring in part and dissenting in
part) (quotation marks omitted).  A slew of decisions "proved him wrong."  *Id.*

Both Congress and the executive branch have expressed the same view—
Congress through passage of the Impoundment Control Act of 1974 (ICA) and the
executive branch through a series of authoritative memoranda.  As future Chief
Justice Rehnquist put it while heading the Department of Justice's Office of Legal
Counsel (OLC), it is "extremely difficult to formulate a constitutional theory to

justify a refusal by the President to comply with a congressional directive to spend." *Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools*, 1 Supp. Op. O.L.C. 303, 310 (1969) ["Rehnquist Memo"].

**II.**  The district court did not so much as acknowledge these constitutional principles.  Instead, it simply decided that Plaintiffs' constitutional claims were "predicated on underlying statutory violations" of the Clean Air Act (CAA) and Inflation Reduction Act (IRA) and must be dismissed under *Dalton*.  Op. 20.  That conclusion was based on a misunderstanding of both *Dalton* and Plaintiffs' separation-of-powers claim.

In *Dalton*, the Supreme Court grappled with a claim that the President had exceeded his statutorily delegated discretion in closing a naval shipyard.  In concluding that the statute granted unbridled discretion to the President and rejecting the plaintiffs' separation-of-powers claim, the Court clarified that "*all* executive actions in excess of statutory authority" are not "*ipso facto* unconstitutional."  *Dalton*, 511 U.S. at 472 (emphasis added).

The district court read that language to mean that *no* executive action in excess of statutory authority is *ever* unconstitutional.  But that is not what *Dalton* says.  Indeed, *Dalton* makes clear that certain executive actions in excess of statutory authority *do* give rise to actionable constitutional claims, including when

4

the President "act[s] in violation of the Constitution," *id.* at 474, by exercising a power not delegated to him, or one expressly delegated to another branch, *id.* at 473. In such instances, there is "a want of [Presidential] power," as opposed to "a mere excess or abuse of discretion in exerting a power given." *Id.* at 474 (alteration in original) (quoting *Dakota Cent. Tele. Co. v. South Dakota ex rel. Payne*, 250 U.S. 163, 184 (1919)).

Plaintiffs' separation-of-powers claim fits this bill, and to the extent the district court relied on this Court's decision in *Global Health Council* to conclude otherwise, it was wrong to do so. Not only was *Global Health Council*'s analysis of *Dalton* deeply flawed, as multiple members of the en banc court suggested, but it also was decided in a different posture—on appeal of a preliminary injunction after an evidentiary hearing, where the government's litigating position and defenses were properly taken into account, not on appeal of the dismissal of a complaint, where all the plaintiff's plausible allegations must be taken as true. Moreover, the *Global Health Council* panel analogized to *Dalton* because it apparently thought the plaintiffs' constitutional claim was predicated on the President exceeding some statutorily delegated discretion. Here, in contrast, the district court did not even attempt to identify *any* discretion granted by the CAA or IRA—it simply decided that the alleged violation of a statutory mandate by the executive branch necessarily foreclosed review of a claim that the President

usurped Congress's power of the purse. Under that logic, no separation-of-powers claim sounding in violations of the Appropriations Clause would ever be reviewable. *But see Aiken County*, 725 F.3d at 260 (holding that "where … appropriated money is available for an agency to perform a statutorily mandated activity," failure to perform "that statutory mandate" gives rise to an actionable separation-of-powers claim).

Here, Plaintiffs do not "simply alleg[e] that the President has exceeded his statutory authority," *Dalton*, 511 U.S. at 473, by acting beyond the bounds of discretion granted by the CAA and IRA. Rather, Plaintiffs allege that by unilaterally canceling an entire mandatory grant program for which Congress appropriated nearly $3 billion of federal funding, the President has arrogated a power that belongs exclusively to Congress—the power of the purse—without *any* statutory or constitutional authorization. That makes this case like *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), the archetypal separation-of-powers case, and makes Plaintiffs' claim "fundamentally a constitutional one," *Sierra Club v. Trump*, 929 F.3d 670, 696-97 (9th Cir. 2019).

**III.** If endorsed by this Court, the district court's reading of *Dalton* would have staggering implications. The President could escape liability for a constitutional claim simply by pointing to some statutory provision that dubiously authorized his conduct. Worse still, executive branch defendants could transform a

6

plaintiff's allegation of statutory violations into a defense to any constitutional claim arising out of the same course of conduct. The resulting rule would be that a plaintiff may bring an actionable separation-of-powers claim only if he or she alleges that the President violated the Constitution without engaging in any arguable statutory violation. Perversely, engaging in statutory violations would give executive branch defendants a get-out-of-jail-free card on any separation-of-powers claim.

That scenario is what should give this Court pause—not *the Global Health Council* panel's concern that allowing constitutional claims to proceed will incentivize plaintiffs to "avoid statutory limits on review by reframing any alleged statutory violation by the President as a constitutional one." *GHC I*, 153 F.4th at 14. *Dalton* itself ensures that a claim that the President merely acted "in excess" of statutorily delegated discretion, 511 U.S. at 473—without also violating the Constitution by usurping another branch's power—may not be recast as a constitutional claim. That restriction applies to a vast array of challenges to agency actions, from arbitrary-and-capricious review under the Administrative Procedure Act (APA) to petitions for review of agency decisions under the National Environmental Policy Act (NEPA). But it does not allow executive branch officials to avoid answering to separation-of-powers allegations whenever their acts violate both the Constitution *and* a statute. This Court should reverse.

7

**ARGUMENT**

I.    **The Constitution's Separation of Powers Prohibits the President from Unilaterally Withholding Appropriated Funds Based on Disagreement with Congressional Policy.**

Under the Constitution, the power of the purse is "exclusive" to Congress, *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (Kavanaugh, J.), which "has absolute control of the moneys of the United States." *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992) (quoting *Harrington v. Bush*, 553 F.2d 190, 194 n.7 (D.C. Cir. 1977)). Plaintiffs' separation-of-powers claim seeks to enforce that principle. It challenges the executive branch's unilateral cancellation of a grant program implementing a mandatory appropriation, in contravention of constitutional text, structure, and history, as well as longstanding interpretations of that text, structure, and history by all three branches of government.

A.    **The Text, Structure, and History of the Appropriations and Spending Clauses Demonstrate Congress's Exclusive Power of the Purse.**

"By the time of the Constitutional Convention, the principle of legislative supremacy over fiscal matters engendered little debate and created no disagreement," as the Founders were intimately familiar with the struggles in England over the purse strings and sought to avoid a repeat of that saga. *CFPB*, 601 U.S. at 427-31. In the seventeenth century, British kings used their royal

8

prerogatives to tax and spend without the approval of Parliament, *see id.*, antagonizing the legislature and blurring the distinction between the monarch's pocket money and the national treasury, F.W. Maitland, *The Constitutional History of England* 431-33 (1908). After the Glorious Revolution, royal attempts to seize the purse were finally squelched. *See, e.g.*, *id.* at 433 ("Since the Revolution the practice has [been,] … in granting money to the crown, parliament has appropriated the supply to particular purposes more or less narrowly defined."); Paul F. Figley & Jay Tidmarsh, *The Appropriations Power and Sovereign Immunity*, 107 Mich. L. Rev. 1207, 1229 (2009) (describing Parliament's elimination of the King's prerogative to determine how the "civil list"—the domestic budget—would be spent).

In "defining the Executive powers" of the new federal government, the American Founders firmly rejected the historic "Prerogatives of the British Monarch." 1 *The Records of the Federal Convention of 1787*, at 65 (Max Farrand ed., 1911) (James Wilson). Indeed, almost every post-Independence state constitution vested spending and appropriations authority in a legislative body. *See, e.g.*, Del. Const. of 1776, art. VII; Mass. Const. of 1780, ch. 2, § 1, art. XI. Even the Articles of Confederation, despite leaving the federal government without the power to raise revenue through taxation, granted the appropriations power to the Confederation Congress. Articles of Confederation of 1781, art. IX, para. 6.

9

Against that backdrop, when the Framers drafted the new Constitution, there was no question that Congress would be granted the exclusive powers to raise, spend, and appropriate funds.  Congress's authority "to pay the Debts and provide for the common Defence and general Welfare of the United States," U.S. Const. art. I, § 8, cl. 1, was deemed "indispensable" to the federal government's ability to do its job, *The Federalist No. 30*, *supra*, at 188 (Alexander Hamilton).  The language of this clause was as "comprehensive as any that could have been used," Alexander Hamilton, *Report on the Subject of Manufactures* 54 (1791), and the Founders were resolute in their conviction that such sweeping power should be granted to the people's representatives in Congress—the branch that "not only commands the purse but prescribes the rules by which the duties and rights of every citizen are to be regulated," *The Federalist No. 78*, *supra*, at 465 (Alexander Hamilton).

At the same time that they empowered Congress, the Framers limited executive authority over finances: "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. art. I, § 9, cl. 7. Because the Appropriations Clause "is phrased as a limitation, it means that 'the expenditure [of] public funds is proper only when authorized by Congress, not that public funds may be expended unless prohibited by Congress.'"  *U.S. House of Representatives v. Mnuchin*, 976 F.3d 1, 8 (D.C. Cir. 2020) (quotation marks

10

omitted).  In this manner, "[t]he Appropriations Clause plays a critical role in the Constitution's separation of powers among the three branches of government and the checks and balances between them."  *United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016).

Indeed, the Clause's simple and uncontroversial command was repeatedly invoked during the ratification debates to assuage "Anti-Federalist fears of a tyrannical president."  Josh Chafetz, *Congress's Constitution: Legislative Authority and the Separation of Powers* 57 (2017).  As Charles Pinckney put it, "[w]ith this powerful influence of the purse, [Congress] will be always able to restrain the usurpations of the other departments."  4 *Debates in the Several State Conventions*, *supra*, at 330.  Or in Edmund Randolph's words, the President "can handle no part of the public money except what is given him by law."  3 *id.* at 201; *see also, e.g.*, 2 *id.* at 349 (Alexander Hamilton); 3 *id.* at 17 (George Nicholas); 3 *id.* at 201 (James Madison).  These statements reflect the fundamental rule embodied in the Appropriations Clause: the President has no power over federal funds except that which is explicitly delegated by statute.

A critical corollary to this rule is that the President has no constitutional authority to, for "policy reasons," "spend less than the full amount appropriated by Congress for a particular project or program."  *Aiken County*, 725 F.3d at 261 n.1. Such authority would give the President, not Congress, the ultimate "power to

11

decide[] how and when any money should be applied for these purposes."
3 Joseph Story, *Commentaries on the Constitution of the United States* § 1342, at
213 (1833). And the President's duty to "take Care that the Laws be faithfully
executed," U.S. Const. art. II, § 3, further prohibits the executive branch from
"redistribut[ing] or withhold[ing] properly appropriated funds in order to effectuate
its own policy goals." *City & County of San Francisco v. Trump*, 897 F.3d 1225,
1235 (9th Cir. 2018). Failure to execute appropriations laws in accordance with
their terms thus amounts to the "effective[] repeal[]" of those laws in violation of
"the separation of powers, the Presentment Clause, the Appropriations Clause, the
Spending Clause, and the Take Care Clause." *Widakuswara v. Lake*, No. 25-5144,
2025 WL 1288817, at *12 (D.C. Cir. May 3, 2025) (Pillard, J., dissenting); *see
Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355, at *1 (D.C. Cir. May 28,
2025) (en banc) (vacating panel decision "substantially for the reasons explained
by Judge Pillard").

## B. All Three Branches of Government Have Consistently Interpreted the Constitution as Barring the Executive Branch from Refusing to Spend Appropriated Funds.

**1.** Congress manifested its understanding that the President may not
unilaterally withhold appropriated funds through enactment of the ICA in 1974,
Pub. L. No. 93-344, tit. X, 88 Stat. 297, 332. Passed in the wake of President
Nixon's attempt to cut billions of dollars from federal programs he disfavored, the

Act prohibited the President from deferring or rescinding appropriated funds without sending a "special message" to Congress justifying the decision. 2 U.S.C. §§ 683-84. Deferrals may not be made for policy reasons, *id.* § 684(b), and rescissions must be approved by Congress, *id.* § 683.

Notably, although the Act's procedures facilitating communication between the executive branch and Congress were new, its basic principles were merely a "reassert[ion]" of Congress's "control over the budgetary process" under the Appropriations Clause, the Spending Clause, and longstanding separation-of-powers principles. *City of New Haven v. United States*, 809 F.2d 900, 906 (D.C. Cir. 1987). The ICA codified the constitutional rule that the President may not withhold or condition appropriated funds without congressional approval. *See, e.g.*, S. Rep. No. 93-688, at 73-74 (1974) (cataloging pre-ICA cases rejecting impoundments as unconstitutional, and explaining that the ICA is "consistent" with them in its rejection of the idea that federal funds can be withheld "for fiscal policy purposes"). As one Representative put it, the ICA would "return to the Congress the basic powers of budgeting that were originally intended by the Founding Fathers in the Constitution." 120 Cong. Rec. 19668 (1974) (Rep. Albert Ullman); *see also, e.g.*, *id.* at 20464 (Sen. Samuel Ervin, Jr.) (The bill "is based on the assumption that the President has no power under the Constitution to impound

lawfully appropriated funds in the absence of a delegation of such authority by the Congress.").

**2.**  Federal courts have also consistently construed the Constitution's separation of powers as barring the executive branch from unilaterally withholding appropriated funds.  In *Kendall*, the Supreme Court unanimously rejected the Postmaster General's claim that he could withhold money that Congress had required him to spend.  The Justices balked at the Attorney General's defense that the President possessed some inherent constitutional authority to rescind appropriated funds, which he had in turn delegated to the Postmaster General, remarking that "[t]o contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the constitution, and entirely inadmissible."  *Kendall*, 37 U.S. at 613.  Sanctioning such a theory would be, according to the Court, "asserting a principle, which, if carried out in its results, to all cases falling within it, would be clothing the President with a power entirely to control the legislation of congress." *Id.*

During the Nixon years and prior to the passage of the ICA, many of Nixon's impoundments were also tested in courts across the country, where the administration argued it had "'inherent power' to impound congressionally appropriated funds," premised on Article II's Vesting and Take Care Clauses.

14

*Guadamuz v. Ash*, 368 F. Supp. 1233, 1243 (D.D.C. 1973). This claim was rejected. Court after court held that the Appropriations Clause, Spending Clause, and broader separation-of-powers principles bar the executive from "refus[ing] to spend … appropriations." *Id.* at 1244; *see, e.g.*, *Louisiana ex rel. Guste v. Brinegar*, 388 F. Supp. 1319, 1324-25 (D.D.C. 1975); *Pennsylvania v. Weinberger*, 367 F. Supp. 1378, 1381 (D.D.C. 1973); *Campaign Clean Water, Inc. v. Ruckelshaus*, 361 F. Supp. 689, 696 (E.D. Va. 1973); *Cmty. Action Programs Exec. Dirs. Ass'n of N.J. v. Ash*, 365 F. Supp. 1355, 1360 (D.N.J. 1973).

By the time one of these cases made it to the Supreme Court, the Nixon administration had abandoned its constitutional argument. *See Train v. City of New York*, 420 U.S. 35, 42-49 (1975). As Justice Scalia later summarized it, "our decision … in *Train* … proved [President Nixon] wrong" in his claim to a "constitutional right to impound appropriated funds." *Clinton*, 524 U.S. at 468 (Scalia, J., concurring in part and dissenting in part) (quotation marks omitted).

**3.** Even the executive branch has acknowledged that the Constitution does not permit it to withhold appropriated funds in furtherance of the President's policy preferences. Future Chief Justice Rehnquist, writing in 1969 as the head of OLC, explained that "[w]ith respect to the suggestion that the President has a constitutional power to decline to spend appropriated funds, we must conclude that existence of such a broad power is supported by neither reason nor precedent."

15

Rehnquist Memo 309.  Rehnquist wrote that although "[i]t may be argued that the spending of money is inherently an executive function, … the execution of any law is, by definition, an executive function, and it seems an anomalous proposition that because the Executive branch is bound to execute the laws, it is free to decline to execute them."  *Id.* at 310.

Fifteen years later, future Chief Justice Roberts reached a similar conclusion for the Reagan administration Office of White House Counsel.  He wrote a memo seeking to "dampen any hopes that inherent constitutional impoundment authority may be invoked to achieve budget goals," warning that "[o]ur institutional vigilance with respect to the constitutional prerogatives of the presidency requires appropriate deference to the constitutional prerogatives of the other branches, and no area seems more clearly the province of Congress than the power of the purse."  John G. Roberts, Jr., *Memorandum for Fred F. Fielding Re: Impoundment Authority* 1 (Aug. 15, 1985).  The Reagan administration OLC later adopted Roberts's position in an advisory opinion.  *See The President's Veto Power*, 12 Op. O.L.C. 128, 167 (1988).

## II.    Plaintiffs' Separation-of-Powers Claim Is Reviewable Under *Dalton v. Specter*.

As the above discussion makes clear, the Constitution's text, structure, and history all demonstrate that the executive branch has no power to unilaterally withhold appropriated funds in furtherance of the President's policy agenda.  These

16

are "settled, bedrock principles of constitutional law." *Aiken County*, 725 F.3d at 259. And they are the core of Plaintiffs' separation-of-powers claim. The district court's conclusion that Plaintiffs' constitutional claims must be dismissed simply because Defendants' actions *also* "have violated, and are continuing to violate, the [CAA] and the IRA," Op. 20, misconstrues both *Dalton v. Specter* and the nature of Plaintiffs' constitutional claims.

### A.    The District Court Decision Misinterpreted *Dalton v. Specter*.

In *Dalton v. Specter*, a group of plaintiffs challenged the President's decision to close a naval shipyard pursuant to a 1990 statute governing base closures, asserting that the President "violated the terms of the [governing statute] by accepting procedurally flawed recommendations" from other executive branch officials regarding the shipyard's closure. 511 U.S. at 474. The Court rejected the plaintiffs' effort to convert this alleged statutory violation into a constitutional violation. It reasoned that the plaintiffs' constitutional claim was really just a challenge to the President's "exercise [of] discretion Congress ha[d] granted him" through the governing law. *Id.* at 476. And critically, that law did "not *at all* limit the President's discretion." *Id.* (emphasis added).

In rejecting the plaintiffs' separation-of-powers claim, the Supreme Court corrected a misperception by the court below: "[o]ur cases do not support the proposition that *every* action by the President, or by another executive official, in

excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id.* at 472 (emphasis added).  The Court noted that its prior decisions would not have distinguished between statutory and constitutional claims "[i]f *all* executive actions in excess of statutory authority were *ipso facto* unconstitutional." *Id.* (emphasis added).  But the Court never suggested that *no* action by the President in excess of his statutory authority may *ever* violate the Constitution.  And the Court's repeated inclusion of "*ipso facto*" and "necessarily" in its formulations demonstrate that this was intentional.

Indeed, *Dalton* makes clear that some executive actions in excess of statutory authority *do* give rise to actionable constitutional claims, including whenever the President "act[s] in violation of the Constitution," *id.* at 474, such as when he exercises a power not delegated to him, or one expressly delegated to another branch, *id.* at 473.  In such instances, there is "a want of [Presidential] power," as opposed to "a mere excess or abuse of discretion in exerting a power given." *Id.* at 474 (quotation marks omitted).

Of course, a "want of [Presidential] power," *id.*, may exist when the President violates both the Constitution *and* a statute.  The President's authority to act "must stem either from an act of Congress or from the Constitution itself," *Youngstown*, 343 U.S. at 585, so it is hardly surprising that separation-of-powers

18

claims challenging executive actions often require inquiry into statutory provisions to ascertain whether they authorize or foreclose those actions.

To be sure, *Youngstown* was the rare case in which "no statutory authority was claimed" by the executive, as the Court noted in *Dalton*. *Dalton*, 511 U.S. at 473. Rather, the President claimed only constitutional authority to seize the country's steel mills in the face of a nationwide strike. *Youngstown*, 343 U.S. at 585-86. Given the conceded absence of any statutory authority in *Youngstown*, that decision does not stand for the proposition "that an action taken by the President in excess of his statutory authority *necessarily* violates the Constitution." *Dalton*, 511 U.S. at 473 (emphasis added).

At the same time, *Youngstown* explicitly contemplated courts' adjudication of separation-of-powers claims alongside analysis of statutory violations arising out of the same set of facts. Indeed, in his famous *Youngstown* concurrence, Justice Robert Jackson analyzed the text of several federal condemnation statutes and concluded that their policies were inconsistent with President Truman's seizure of the steel mills, putting the President's power at its lowest ebb. *Youngstown*, 343 U.S. at 639-40. Thus, under the district court's formulation, the very claim in *Youngstown* would not be actionable as a constitutional claim.

Since *Youngstown*, the Supreme Court has confirmed that allegations of statutory violations do not foreclose review of separation-of-powers claims. For

19

instance, in *Dames & Moore v. Regan*, 453 U.S. 654 (1981), the Court resolved the merits of a claim that the President and the Treasury Secretary went "beyond their statutory and constitutional powers." *Id.* at 667. Unlike in *Youngstown*, in *Dames & Moore* the President "purported to act under authority of" two federal statutes, *id.* at 675, which the Court had to interpret to resolve the separation-of-powers claim, *id.* at 670-74. The presence of the statutory dispute did not, however, nullify the plaintiffs' freestanding constitutional claim. *Id.* at 674.

Likewise, in *Franklin v. Massachusetts*, 505 U.S. 788 (1992), the plaintiffs challenged the executive branch's method of counting overseas federal employees for the census, bringing claims "under both the APA and the Constitution." *Id.* at 796. The Court held that the APA claims were not viable, *id.* at 796-801, but also made explicit that this "d[id] not dispose of [the plaintiffs'] constitutional claims," *id.* at 801. Although the executive branch relied entirely on statutory authority, *id.* at 791-94, the Court resolved "[o]n the merits" the plaintiffs' claim "that the Secretary [of Commerce]'s allocation of overseas federal employees … violated the command of Article I, § 2, cl. 3." *Id.* at 803. *Dalton* did not silently overrule these cases.

**B.    The District Court Erred in Relying on *Global Health Council*.**

To be sure, this Court's splintered decision in *Global Health Council* deviated from these Supreme Court precedents. That case involved a separation-

20

of-powers claim alleging that the President had usurped Congress's spending and appropriations authority through the impoundment of foreign aid funds, and the panel majority held that *Dalton* foreclosed that claim. *GHC I*, 153 F.4th at 14-17. The panel majority seemingly reached that result because it perceived (wrongly) that the ICA delegated some discretionary impoundment authority to the President and that the plaintiffs were alleging he exceeded that authority. *See id.* at 16. The panel barely engaged in any substantive analysis of the plaintiffs' actual constitutional claim. *See id.* at 14-17.

*Global Health Council*'s "unprecedented ruling" that *Dalton* "foreclose[s] private parties from bringing a constitutional cause of action when their constitutional argument overlaps with a claim that the President violated or exceeded his statutory authority," was wrong the day it was decided and should not be extended beyond the facts of that case. *Glob. Health Council v. Trump*, No. 25-5097, 2025 WL 2709437, at *1 (D.C. Cir. Aug. 28, 2025) ["*GHC II*"] (Pan, J.) (dissenting from denial of rehearing en banc). Indeed, several Judges of this Court wrote separately to make clear that they agreed to deny rehearing en banc in *Global Health Council* only because the panel majority amended and reissued its opinion to allow some of the plaintiffs' APA claims to go forward, meaning a prompt remand for adjudication of those APA claims would provide more expeditious relief for the plaintiffs. *See, e.g.*, *id.* at *3 (statement of Garcia, J.,

21

joined by Millett, J., respecting the denial of rehearing en banc) (explaining that "[g]ranting en banc review of the distinct question whether the plaintiffs' constitutional claim is viable would serve primarily to delay resolution of the plaintiffs' statutory claim," but that "[a] similar question in a future case may warrant the Court's en banc review"). Now, petitions for rehearing en banc are currently pending in two other cases that extended *Global Health Council*'s erroneous *Dalton* ruling. *See Nat'l Treasury Emps. Union v. Vought*, 149 F.4th 762, 821 (D.C. Cir. 2025), *petition for rh'g en banc filed*, No. 25-5091 (D.C. Cir. Sept. 29, 2025); *Climate United Fund v. Citibank, N.A.*, No. 25-5122, 2025 WL 2502881 (D.C. Cir. Sept. 2, 2025), *petition for rh'g en banc filed*, No. 25-5122 (D.C. Cir. Sept. 10, 2025).

In any event, *Global Health Council* is distinguishable on multiple grounds, as Plaintiffs explain in their opening brief. *See* Appellants Br. 51-54. Notably, *Global Health Council* was decided on the government's appeal of a preliminary injunction after an evidentiary hearing, and central to the Court's decision to vacate the injunction was the fact that the government "disclaim[ed]" on appeal "any constitutional defense," making "*Youngstown* … inapposite" in the eyes of the panel. *GHC I*, 153 F.4th at 15; *see also GHC II*, 2025 WL 2709437, at *1 (statement of Katsas, J., joined by Henderson, Rao, and Walker, JJ., concurring in the denial of rehearing en banc) (emphasizing that "[h]ad the government

22

challenged the district court's rejection of [its earlier] Article II defense in this Court, we could freely have considered it under *Youngstown*"). Here, on the appeal of an order granting a motion to dismiss, Defendants' strategic litigating position and the nature of their defenses are plainly irrelevant. What matters is that the Complaint "contain[s] sufficient factual matter, accepted as true," *VoteVets Action Fund v. U.S. Dep't of Veterans Affs.*, 992 F.3d 1097, 1104 (D.C. Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)), to state an actionable constitutional claim that Defendants violated the Constitution under the classic *Youngstown* framework. That should have been enough for the district court.

Moreover, *Global Health Council* seemingly rejected a separation-of-powers claim challenging an impoundment because the panel viewed that constitutional claim as predicated on the idea that the President was exceeding some discretionary authority delegated by the ICA, making the case akin to *Dalton*, *see GHC I*, 153 F.4th at 16; *Nat'l Treasury Emps. Union*, 149 F.4th at 821 (Pillard, J., dissenting) (stating that in *Global Health Council*, "a statute directly contemplated the presidential action under consideration"). That is different than what the district court did in this case. Here, the district court did not determine that the CAA or IRA delegated *any* discretionary authority to the executive branch (neither does). Rather, the court held that because the President allegedly *violated* the CAA and IRA—effectively rewriting them without the mandatory grant program—at the

23

same time that he infringed on a core congressional power, Plaintiffs could not bring an actionable constitutional claim.

If alleging violations of an appropriations statute automatically forecloses a separation-of-powers claim, it is difficult to see how a plaintiff could ever bring a cause of action against the executive branch for arrogation of Congress's appropriations power. Because the Appropriations Clause requires that appropriations be "made by Law," U.S. Const. art. I, § 9, cl. 7, constitutional claims challenging the executive's refusal to spend mandatory appropriated funds will almost always depend in part on whether the executive is acting in accordance with appropriations statutes. That fact has not stopped this Court from recognizing freestanding separation-of-powers claims alongside those statutory disputes. *See, e.g.*, *Aiken County*, 725 F.3d at 259 (holding that an agency's refusal to comply with "statutory mandates" violated the separation of powers against the backdrop of Congress's appropriations power); *see also McIntosh*, 833 F.3d at 1175 (holding that an alleged violation of an appropriations statute would also violate the Appropriations Clause and its "separation-of-powers limitation," which plaintiffs "can invoke to challenge [executive action]").

In sum, the district court's reading of *Dalton* boils down to a rule that a plaintiff may only bring a constitutional claim if the President violates the Constitution without engaging in any arguable statutory violation. That borders on

24

the absurd: the President could escape liability for a constitutional claim simply by pointing to some statutory provision that dubiously authorized his conduct, or by emphasizing Plaintiffs' allegations of a concurrent statutory violation arising out of the same conduct that also violated the Constitution. *Global Health Council* should not be read to command that result.

### C.    The District Court Misunderstood the Nature of Plaintiffs' Separation-of-Powers Claim.

Not only did the district court misconstrue *Dalton*, but it also misunderstood the nature of Plaintiffs' constitutional claims. Unlike in *Dalton*, the separation-of-powers claim here is not premised on the President exceeding some delegated discretionary authority. Rather, Plaintiffs' Complaint plausibly alleges that the President acted without any authority—constitutional or statutory—and thus violated the Constitution by usurping Congress's power of the purse. Compl. ¶ 176.

Specifically, Plaintiffs assert that through a series of executive orders and actions implementing those orders, the executive branch has unilaterally wiped out an entire grant program purely for "policy reasons." *Id.* ¶ 174 (quotation marks omitted). The executive orders themselves support that characterization. For instance, in the Executive Order titled "Unleashing American Energy," President Trump ordered the "[t]erminat[ion]" of grants created pursuant to the IRA and Infrastructure Investment and Jobs Act, requiring all agencies to "immediately

25

pause the disbursement of funds appropriated through" those statutes pending agency review "for consistency with … the [President's] policy." Exec. Order No. 14,154, § 7, 90 Fed. Reg. 8353, 8357 (Jan. 29, 2025). Notably, none of the challenged executive actions "identif[ied] any statutory, regulatory, or constitutional authority to terminate congressionally appropriated funds based on the President's policy preferences." Compl. ¶ 176.

That is because there is no such authority. As described above, the Constitution prohibits the President from rescinding appropriated funds unilaterally, and *Dalton*, *Franklin*, and *Dames & Moore* all make clear that a constitutional claim may lie when an officer violates the Constitution even if he also violates a statute along the way, or claims statutory authority for his actions. Moreover, as courts have recognized, a claim may be fundamentally a constitutional one under *Dalton* where executive officials possess neither statutory nor constitutional authority for their challenged actions.

That is precisely what Plaintiffs allege here. Plaintiffs assert that Defendants seized Congress's power of the purse by unilaterally canceling a mandatory grant program for which Congress appropriated funds based on disagreement with the policies the program furthers. Plaintiffs also claim Defendants took these actions without *any* valid statutory or constitutional authority, making *Youngstown*, not *Dalton*, the closer comparison to this case.

26

### III. An Accurate Reading of *Dalton* Will Not Open the Floodgates to Statutory Claims Disguised as Constitutional Ones.

The district court seemed concerned that Plaintiffs brought their constitutional claims to "circumvent the Tucker Act and the APA's non-reviewability provision," and that if *Dalton* and *Global Health Council* were not read broadly, it would invite the recharacterization of any number of statutory violations as violations of the "separation of powers." Op. 20-21. This risk is illusory.

*Dalton* itself illustrates why. There, the Court held that regardless of whether executive officials "compli[ed] with statutory procedures," the statute at issue "d[id] not *at all* limit the President's discretion in approving or disapproving [their] recommendations." *Dalton*, 511 U.S. at 476 (emphasis added). There was no allegation in *Dalton* that the President had usurped a core congressional power—just that he exceeded his delegated discretionary authority under the statute. Indeed, there was no dispute that the statute granted some degree of discretionary authority to the President—the only question was how expansively to read that grant of discretion. *Id.* at 475-77; *see Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1331 (D.C. Cir. 1996) ("*Dalton*'s holding merely stands for the proposition that when a statute entrusts a discrete specific decision to the President and contains no limitations on the President's exercise of that authority, judicial

27

review … is not available."); *Am. Forest Res. Council v. United States*, 77 F.4th 787, 797 (D.C. Cir. 2023) (same).

As another example, take *Motions Systems Corp. v. Bush*, 437 F.3d 1356 (Fed. Cir. 2006) (per curiam).  There, the plaintiff challenged the President's determination not to grant import relief to a company under a trade statute.  As in *Dalton*, the court held that the statute committed the determination to the President's discretion, and thus no separation-of-powers claim could be brought against him.  *Id.* at 1360-61.  The essence of the plaintiff's claim was, according to the court, that the President had exceeded his statutorily delegated discretion, not that he had violated the Constitution's structure.  *Id.*

Or imagine a statute that granted discretion to an agency to consider certain environmental effects before greenlighting infrastructure projects—not unlike NEPA.  *See Seven Cnty. Infrastructure Coal. v. Eagle County*, 145 S. Ct. 1497, 1513 (2025) (under NEPA, "agencies possess discretion and must have broad latitude" to make decisions about where to draw the line when considering environmental effects).  A claim brought against the agency for failure to consider certain environmental factors would not amount to a constitutional violation—just an abuse of statutory discretion.  *See Eagle County v. Surface Trans. Bd.*, 82 F.4th 1152, 1168-69 (D.C. Cir. 2023) (describing the petitioners' purely statutory and

28

procedural claims). Indeed, the same could be said about the vast majority of challenges to agency actions alleged to be arbitrary and capricious under the APA.

Critically, Plaintiffs are not alleging that the executive's termination of a grant program is an act in excess of discretionary authority conferred by statutes. They are alleging that the President acted with *no authority*, statutory or constitutional, and in the process usurped a power committed to Congress under Article I. That is a constitutional claim, and the courts should review it.

## CONCLUSION

For the foregoing reasons, this Court should reverse.

Respectfully submitted,

/s/ Brianne J. Gorod
Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
Miriam Becker-Cohen
Nina Henry
CONSTITUTIONAL ACCOUNTABILITY CENTER
1730 Rhode Island Ave. NW, Suite 1200
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

Dated: November 3, 2025

29

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,491 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.

Executed this 3rd day of November, 2025.


/s/ Brianne J. Gorod
Brianne J. Gorod

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of November, 2025, I electronically filed the foregoing document using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

Dated: November 3, 2025

/s/ Brianne J. Gorod
Brianne J. Gorod