**ORAL ARGUMENT SCHEDULED FOR MARCH 16, 2026**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

No. 25-5333

---

APPALACHIAN VOICES, et al.,
*Plaintiff-Appellants,*
*v.*
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,
*Defendant-Appellees.*
On Appeal from the United States District Court
for the District of Columbia
No. 25-cv-01982
The Hon. Richard J. Leon, Senior Judge

---

**DEFERRED JOINT APPENDIX VOL. I of III,
PAGES JA001-JA144**

---

Hana V. Vizcarra
Deena Tumeh
Molly Prothero
Andrew Saavedra
Linnet Davis-Stermitz
Earthjustice
1400 L St NW, Lobby 2
Unit 34117
Washington, DC 20005
(202) 667-4500
hvizcarra@earthjustice.org
dtumeh@earthjustice.org
mprothero@earthjustice.org

Ben Grillot
Kimberley Hunter
Irena Como
James Whitlock
Southern Environmental Law Center
122 C Street NW, Suite 325
Washington, DC 20001
Telephone: (202) 828-8382
Facsimile: (202) 347-6041
bgrillot@selc.org
kmeyer@selc.org
icomo@selc.org
jwhitlock@selc.org

asaavedra@earthjustice.org
ldavisstermitz@earthjustice.org

Toby Merrill
Graham Provost
Cassandra Crawford
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
(510) 738-6788
toby@publicrightsproject.org
graham@publicrightsproject.org
cassandra@publicrightsproject.org

David Chiu
San Francisco City Attorney
Yvonne R. Meré
Sara J. Eisenberg
1390 Market Street, 7th Floor
San Francisco, CA 94102
(415) 554-4274
yvonne.mere@sfcityatty.org
sara.eisenberg@sfcityatty.org

Gary DiBianco Lawyers for Good
Government
6218 Georgia Avenue NW, # 5001
Washington, DC 20011
(202) 258-6826
Gary@lawyersforgoodgovernment.org

Alison Holcomb[+]
Office of King County Prosecuting
Attorney Leesa Manion
Christopher Sanders*
401 5th Avenue, Suite 800
Seattle, WA 98104
(206) 477-9483
aholcomb@kingcounty.gov

[+] Notice of intent to withdraw (Jan. 12,
2026)
* Application for pro hac vice
admission forthcoming, pending
acceptance of e-filing registration

*Counsel for Plaintiff-Appellants*

**January 27, 2026**

# TABLE OF CONTENTS

## VOLUME 1 OF 3

Civil Docket, *Appalachian Voices v. EPA*, No. 25-1982 (RJL)(D.D.C) .............JA001

Complaint, Dkt. 1 ...........................................................................................JA019

Complaint, Ex. 1-A, Declaration of Travis Voyles, Dkt. 1-4..............................JA067

Complaint, Ex. 1-B, Declaration of Daniel Coogan, Dkt. 1-4 ...........................JA072

Complaint, Ex. 1-C, Email from T. Voyles re TCTACS, Dkt. 1-4.....................JA076

Complaint, Ex. 1-D, Email from Jacob Borney to ISC, Dkt. 1-4........................JA096

Complaint, Ex. 1-E, Declaration of Michelle Roos, Dkt. 1-4 ............................JA098

Complaint, Ex. 1-F, Email from D. Coogan to T. Voyles, Dkt. 1-4 ...................JA106

Complaint, Ex. 1-G, Email from M. Wise, Dkt. 1-4. ...........................................JA110

Complaint, Ex. 1-H, Email from D. Coogan, Dkt. 1-4 ......................................JA114

Complaint, Ex. 1-I, EPA Grant Termination SOP, Dkt. 1-4...............................JA118

Complaint, Ex. 1-J, Sample Termination Letter, Dkt. 1-4 ..................................JA120

Complaint, Ex. 1-K, CCG Grant Terms and Conditions, Dkt. 1-4 .....................JA123

## VOLUME 2 OF 3

Declaration of the Native Village of Kipnuk, Dkt. 29-3 ......................................JA145

Declaration of PUSH Buffalo, Dkt. 29-4 .............................................................JA159

Declaration of 2C Mississippi, Dkt. 29-5 ............................................................JA166

Declaration of Allegheny County, Pennsylvania, Dkt. 29-6................................JA176

Declaration of Stay Ready NOLA, Dkt. 29-7 ......................................................JA184

Declaration of Treasure Island Mobility Management Agency, Dkt. 29-8 .........JA192

Declaration of Bessemer Historical Society d/b/a Steelworks Center of the West,
        Dkt. 29-9 ....................................................................................JA199

Declaration of County of Contra Costa, California, Dkt. 29-10 ..........................JA208

Declaration of Kalamazoo County, Michigan, Dkt. 29-11. .................................JA219

Declaration of City of Rochester, New York, Dkt. 29-12....................................JA226

Declaration of Health Resources in Action, Dkt. 29-13......................................JA232

Declaration of Children's Environmental Literacy Foundation, Dkt. 29-14. ......JA254

Declaration of Southwest Renewal Foundation, Dkt. 29-15................................JA263

Declaration of Sixth Street Community Center, Dkt. 29-16. ...............................JA272

Declaration of Institute for Sustainable Communities, Dkt. 29-17......................JA280

Declaration of WE ACT for Environmental Justice, Dkt. 29-18 .........................JA294

Declaration of Landforce, Dkt. 29-19. ................................................................JA302

Declaration of Parks Alliance for Louisville, Dkt. 29-20 ...................................JA310

Declaration of Deep South Center for Environmental Justice, Dkt. 29-21..........JA318

Declaration of Lowcountry Alliance for Model Communities, Dkt. 29-22.........JA324

Declaration of Day One, Dkt. 29-23....................................................................JA331

Declaration of Air Alliance Houston, Dkt. 29-24 ...............................................JA342

Declaration of Inter-Tribal Council of Michigan, Inc., Dkt. 29-25.....................JA351

Declaration of City of Springfield, Massachusetts, Dkt. 29-26.. .........................JA359

Declaration of Steps Coalition, Dkt. 29-27 .........................................................JA373

Declaration of City of Sacramento, Dkt. 29-28...................................................JA382

Declaration of Martin Luther King, Jr. County, Dkt. 29-29 ................................JA388

Declaration of Ironbound Community Corporation, Dkt. 29-30..........................JA396

Declaration of Trinity Alliance of the Capital Region, Dkt. 29-31......................JA405

Declaration of Downwinders at Risk, Dkt. 29-32 ................................................JA413

Declaration of Glynn Environmental Coalition, Dkt. 29-33. ...............................JA419

Declaration of EcoAction Partners, Dkt. 29-34....................................................JA436

Declaration of Southwestern Michigan Planning Commission, Dkt. 29-35. .......JA445

Declaration of the City of New York, Dkt. 29-36 .................................................JA452

Declaration of EcoWorks, Dkt. 29-37. .................................................................JA460

Declaration of the Center for Community Energy and Environmental Justice,
      Dkt. 29-38..................................................................................................JA470

Declaration of Young, Gifted, & Green, Dkt. 29-39............................................JA479

Declaration of City and County of San Franciso, Dkt. 29-40 ..............................JA488

Declaration of El Puente de Williamsburg, Dkt. 29-41 .......................................JA495

Declaration of Appalachian Voices, Dkt. 29-42. .................................................JA508

## VOLUME 3 of 3

Plaintiffs' Reply in Support of Motion for Preliminary Injunction, Ex. 2, House
      Report No. 94-1656, Dkt. 77-2 ..................................................................JA517

Plaintiffs' Reply in Support of Motion for Preliminary Injunction, Ex. 3, Senate
      Report No. 996, Dkt. 77-3..........................................................................JA548

Plaintiffs' Reply in Support of Motion for Preliminary Injunction, Ex. 4, Testimony
      from Sovereign Immunity: Hearing on S. 3568, Dkt. 77-4 .......................JA581

Plaintiffs' Opposition to Defendant's Motion to Dismiss, Ex. 1, EPA Email re
        "Final Financial Report", Dkt. 87-1 .........................................................JA844

Memorandum Opinion, August 29, 2025, Dkt. 98................................................JA851

Order, August 29, 2025, Dkt. 99. ........................................................................JA873

Notice of Appeal, Dkt. 100...................................................................................JA874

Transcript of Preliminary Injunction Hearing, August 5, 2025. ..........................JA878

APPEAL,CLOSED,TYPE−D

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:25−cv−01982−RJL

APPALACHIAN VOICES et al v. UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY et al
Assigned to: Judge Richard J. Leon
Case in other court:  USCA, 25−05333
Cause: 05:702 Administrative Procedure Act

Date Filed: 06/25/2025
Date Terminated: 09/04/2025
Jury Demand: None
Nature of Suit: 890 Other Statutory
Actions
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 06/25/2025 | 1 | COMPLAINT against All Defendants ( Filing fee $ 405 receipt number ADCDC−11776713) filed by HEALTH RESOURCES IN ACTION, SOUTHWEST RENEWAL FOUNDATION OF HIGH POINT, INC., CITY OF SACRAMENTO, CALIFORNIA, NATIVE VILLAGE OF KIPNUK, 2C MISSISSIPPI, TREASURE ISLAND MOBILITY MANAGEMENT AGENCY, APPALACHIAN VOICES, PARKS ALLIANCE OF LOUISVILLE, INC., WE ACT FOR ENVIRONMENTAL JUSTICE, MARTIN LUTHER KING JR. COUNTY, WASHINGTON, INTER−TRIBAL COUNCIL OF MICHIGAN, CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, AIR ALLIANCE HOUSTON, DEEP SOUTH CENTER FOR ENVIRONMENTAL JUSTICE, INSTITUTE FOR SUSTAINABLE COMMUNITIES, PUSH BUFFALO, KALAMAZOO COUNTY, MICHIGAN, LOWCOUNTRY ALLIANCE FOR MODEL COMMUNITIES, CITY OF SPRINGFIELD, MASSACHUSETTS, ALLEGHENY COUNTY, PENNSYLVANIA, PITTSBURGH CONSERVATION CORPS (D/B/A LANDFORCE), DOWNWINDERS AT RISK, BESSEMER HISTORICAL SOCIETY (D/B/A STEELWORKS CENTER OF THE WEST). (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet, # 2 Summons Summons for EPA, # 3 Summons Summons for Lee Zeldin, # 4 Exhibit Exhibit 1)(Grillot, Benjamin) (Attachment 1 replaced on 6/26/2025) (znmw). (Entered: 06/25/2025) |
| 06/25/2025 | 2 | NOTICE of Appearance by Toby R. Merrill on behalf of ALLEGHENY COUNTY, PENNSYLVANIA, CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, CITY OF SACRAMENTO, CALIFORNIA, CITY OF SPRINGFIELD, MASSACHUSETTS, KALAMAZOO COUNTY, MICHIGAN, MARTIN LUTHER KING JR. COUNTY, WASHINGTON, NATIVE VILLAGE OF KIPNUK, TREASURE ISLAND MOBILITY MANAGEMENT AGENCY (Merrill, Toby) (Entered: 06/25/2025) |
| 06/26/2025 | | Case Assigned to Judge Paul L. Friedman. (znmw) (Entered: 06/26/2025) |
| 06/26/2025 | 3 | SUMMONS (2) Issued Electronically as to UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE M. ZELDIN. (Attachments: # 1 Notice and Consent)(znmw) (Entered: 06/26/2025) |
| 06/26/2025 | | NOTICE OF NEW CASE ERROR regarding 1 Complaint,,,,,. The following error(s) need correction: Missing summonses− U.S. government. When naming a U.S. government agent or agency as a defendant, you must supply a summons for each defendant & two additional summonses for the U.S. Attorney & U.S. Attorney General. Please submit using the event Request for Summons to Issue. (znmw) (Entered: 06/26/2025) |
| 06/26/2025 | 4 | REQUEST FOR SUMMONS TO ISSUE *Jeanine Ferris Pirro* filed by HEALTH RESOURCES IN ACTION, SOUTHWEST RENEWAL FOUNDATION OF HIGH POINT, INC., CITY OF SACRAMENTO, CALIFORNIA, NATIVE VILLAGE OF KIPNUK, 2C MISSISSIPPI, TREASURE ISLAND MOBILITY MANAGEMENT AGENCY, APPALACHIAN VOICES, PARKS ALLIANCE OF LOUISVILLE, INC., WE ACT FOR ENVIRONMENTAL JUSTICE, MARTIN LUTHER KING JR. COUNTY, WASHINGTON, INTER−TRIBAL COUNCIL OF MICHIGAN, CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, AIR ALLIANCE HOUSTON, DEEP SOUTH CENTER FOR ENVIRONMENTAL JUSTICE, |

JA001

| | | |
|---|---|---|
| | | INSTITUTE FOR SUSTAINABLE COMMUNITIES, PUSH BUFFALO, KALAMAZOO COUNTY, MICHIGAN, LOWCOUNTRY ALLIANCE FOR MODEL COMMUNITIES, CITY OF SPRINGFIELD, MASSACHUSETTS, ALLEGHENY COUNTY, PENNSYLVANIA, PITTSBURGH CONSERVATION CORPS, DOWNWINDERS AT RISK, BESSEMER HISTORICAL SOCIETY. Related document: 1 Complaint,,,, filed by 2C MISSISSIPPI, DEEP SOUTH CENTER FOR ENVIRONMENTAL JUSTICE, CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, ALLEGHENY COUNTY, PENNSYLVANIA, CITY OF SPRINGFIELD, MASSACHUSETTS, AIR ALLIANCE HOUSTON, INSTITUTE FOR SUSTAINABLE COMMUNITIES, NATIVE VILLAGE OF KIPNUK, LOWCOUNTRY ALLIANCE FOR MODEL COMMUNITIES, PARKS ALLIANCE OF LOUISVILLE, INC., SOUTHWEST RENEWAL FOUNDATION OF HIGH POINT, INC., APPALACHIAN VOICES, PUSH BUFFALO, TREASURE ISLAND MOBILITY MANAGEMENT AGENCY, DOWNWINDERS AT RISK, KALAMAZOO COUNTY, MICHIGAN, BESSEMER HISTORICAL SOCIETY, HEALTH RESOURCES IN ACTION, CITY OF SACRAMENTO, CALIFORNIA, MARTIN LUTHER KING JR. COUNTY, WASHINGTON, WE ACT FOR ENVIRONMENTAL JUSTICE, INTER−TRIBAL COUNCIL OF MICHIGAN, PITTSBURGH CONSERVATION CORPS.(Grillot, Benjamin) (Entered: 06/26/2025) |
| 06/26/2025 | 5 | REQUEST FOR SUMMONS TO ISSUE *Pamela Bondi* filed by HEALTH RESOURCES IN ACTION, SOUTHWEST RENEWAL FOUNDATION OF HIGH POINT, INC., CITY OF SACRAMENTO, CALIFORNIA, NATIVE VILLAGE OF KIPNUK, 2C MISSISSIPPI, TREASURE ISLAND MOBILITY MANAGEMENT AGENCY, APPALACHIAN VOICES, PARKS ALLIANCE OF LOUISVILLE, INC., WE ACT FOR ENVIRONMENTAL JUSTICE, MARTIN LUTHER KING JR. COUNTY, WASHINGTON, INTER−TRIBAL COUNCIL OF MICHIGAN, CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, AIR ALLIANCE HOUSTON, DEEP SOUTH CENTER FOR ENVIRONMENTAL JUSTICE, INSTITUTE FOR SUSTAINABLE COMMUNITIES, PUSH BUFFALO, KALAMAZOO COUNTY, MICHIGAN, LOWCOUNTRY ALLIANCE FOR MODEL COMMUNITIES, CITY OF SPRINGFIELD, MASSACHUSETTS, ALLEGHENY COUNTY, PENNSYLVANIA, PITTSBURGH CONSERVATION CORPS, DOWNWINDERS AT RISK, BESSEMER HISTORICAL SOCIETY. Related document: 1 Complaint,,,, filed by 2C MISSISSIPPI, DEEP SOUTH CENTER FOR ENVIRONMENTAL JUSTICE, CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, ALLEGHENY COUNTY, PENNSYLVANIA, CITY OF SPRINGFIELD, MASSACHUSETTS, AIR ALLIANCE HOUSTON, INSTITUTE FOR SUSTAINABLE COMMUNITIES, NATIVE VILLAGE OF KIPNUK, LOWCOUNTRY ALLIANCE FOR MODEL COMMUNITIES, PARKS ALLIANCE OF LOUISVILLE, INC., SOUTHWEST RENEWAL FOUNDATION OF HIGH POINT, INC., APPALACHIAN VOICES, PUSH BUFFALO, TREASURE ISLAND MOBILITY MANAGEMENT AGENCY, DOWNWINDERS AT RISK, KALAMAZOO COUNTY, MICHIGAN, BESSEMER HISTORICAL SOCIETY, HEALTH RESOURCES IN ACTION, CITY OF SACRAMENTO, CALIFORNIA, MARTIN LUTHER KING JR. COUNTY, WASHINGTON, WE ACT FOR ENVIRONMENTAL JUSTICE, INTER−TRIBAL COUNCIL OF MICHIGAN, PITTSBURGH CONSERVATION CORPS.(Grillot, Benjamin) (Entered: 06/26/2025) |
| 06/26/2025 | 6 | NOTICE of Appearance by Gary DiBianco on behalf of INSTITUTE FOR SUSTAINABLE COMMUNITIES, INTER−TRIBAL COUNCIL OF MICHIGAN, KALAMAZOO COUNTY, MICHIGAN, NATIVE VILLAGE OF KIPNUK (DiBianco, Gary) (Entered: 06/26/2025) |
| 06/26/2025 | 7 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by 2C MISSISSIPPI (Grillot, Benjamin) (Entered: 06/26/2025) |
| 06/26/2025 | 8 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by AIR ALLIANCE HOUSTON (Grillot, Benjamin) (Entered: 06/26/2025) |
| 06/26/2025 | 9 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by BESSEMER HISTORICAL SOCIETY (Grillot, Benjamin) (Entered: 06/26/2025) |
| 06/26/2025 | 10 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by DOWNWINDERS AT RISK (Grillot, Benjamin) (Entered: 06/26/2025) |

| | | |
|---|---|---|
| 06/26/2025 | 11 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by DEEP SOUTH CENTER FOR ENVIRONMENTAL JUSTICE (Grillot, Benjamin) (Entered: 06/26/2025) |
| 06/26/2025 | 12 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by HEALTH RESOURCES IN ACTION (Grillot, Benjamin) (Entered: 06/26/2025) |
| 06/26/2025 | 13 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by INSTITUTE FOR SUSTAINABLE COMMUNITIES (Grillot, Benjamin) (Entered: 06/26/2025) |
| 06/26/2025 | 14 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by INTER−TRIBAL COUNCIL OF MICHIGAN (Grillot, Benjamin) (Entered: 06/26/2025) |
| 06/26/2025 | 15 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by PUSH BUFFALO (Grillot, Benjamin) (Entered: 06/26/2025) |
| 06/26/2025 | 16 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by WE ACT FOR ENVIRONMENTAL JUSTICE (Grillot, Benjamin) (Entered: 06/26/2025) |
| 06/26/2025 | 17 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by APPALACHIAN VOICES (Grillot, Benjamin) (Entered: 06/26/2025) |
| 06/26/2025 | 18 | NOTICE of Appearance by Hana Veselka Vizcarra on behalf of AIR ALLIANCE HOUSTON, BESSEMER HISTORICAL SOCIETY, DEEP SOUTH CENTER FOR ENVIRONMENTAL JUSTICE, DOWNWINDERS AT RISK, HEALTH RESOURCES IN ACTION, INSTITUTE FOR SUSTAINABLE COMMUNITIES, INTER−TRIBAL COUNCIL OF MICHIGAN, PUSH BUFFALO, WE ACT FOR ENVIRONMENTAL JUSTICE (Vizcarra, Hana) (Entered: 06/26/2025) |
| 06/26/2025 | 19 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by LOWCOUNTRY ALLIANCE FOR MODEL COMMUNITIES (Grillot, Benjamin) (Entered: 06/26/2025) |
| 06/26/2025 | 20 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Andrew Saavedra, Filing fee $ 100, receipt number ADCDC−11779592. Fee Status: Fee Paid. by AIR ALLIANCE HOUSTON, BESSEMER HISTORICAL SOCIETY, DEEP SOUTH CENTER FOR ENVIRONMENTAL JUSTICE, DOWNWINDERS AT RISK, HEALTH RESOURCES IN ACTION, INSTITUTE FOR SUSTAINABLE COMMUNITIES, INTER−TRIBAL COUNCIL OF MICHIGAN, PUSH BUFFALO, WE ACT FOR ENVIRONMENTAL JUSTICE. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing, # 3 Text of Proposed Order)(Vizcarra, Hana) (Entered: 06/26/2025) |
| 06/26/2025 | 21 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by PARKS ALLIANCE OF LOUISVILLE, INC. (Grillot, Benjamin) (Entered: 06/26/2025) |
| 06/26/2025 | 22 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by PITTSBURGH CONSERVATION CORPS (Grillot, Benjamin) (Entered: 06/26/2025) |
| 06/26/2025 | 23 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by SOUTHWEST RENEWAL FOUNDATION OF HIGH POINT, INC. (Grillot, Benjamin) (Entered: 06/26/2025) |
| 06/27/2025 | 24 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Linnet Davis−Stermitz, Filing fee $ 100, receipt number ADCDC−11781953. Fee Status: Fee Paid. by AIR ALLIANCE HOUSTON, BESSEMER HISTORICAL SOCIETY, DEEP SOUTH CENTER FOR ENVIRONMENTAL JUSTICE, DOWNWINDERS AT RISK, HEALTH RESOURCES IN ACTION, INSTITUTE FOR SUSTAINABLE COMMUNITIES, INTER−TRIBAL COUNCIL OF MICHIGAN, PUSH BUFFALO, WE ACT FOR ENVIRONMENTAL JUSTICE. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing, # 3 Text of Proposed Order)(Vizcarra, Hana) (Entered: 06/27/2025) |

| 06/27/2025 | 25 | NOTICE of Appearance by Mary Prothero on behalf of AIR ALLIANCE HOUSTON, BESSEMER HISTORICAL SOCIETY, DEEP SOUTH CENTER FOR ENVIRONMENTAL JUSTICE, DOWNWINDERS AT RISK, HEALTH RESOURCES IN ACTION, INSTITUTE FOR SUSTAINABLE COMMUNITIES, INTER−TRIBAL COUNCIL OF MICHIGAN, PUSH BUFFALO, WE ACT FOR ENVIRONMENTAL JUSTICE (Prothero, Mary) (Entered: 06/27/2025) |
|---|---|---|
| 06/27/2025 | 26 | NOTICE of Appearance by Deena Tumeh on behalf of AIR ALLIANCE HOUSTON, BESSEMER HISTORICAL SOCIETY, DEEP SOUTH CENTER FOR ENVIRONMENTAL JUSTICE, DOWNWINDERS AT RISK, HEALTH RESOURCES IN ACTION, INSTITUTE FOR SUSTAINABLE COMMUNITIES, INTER−TRIBAL COUNCIL OF MICHIGAN, PUSH BUFFALO, WE ACT FOR ENVIRONMENTAL JUSTICE (Tumeh, Deena) (Entered: 06/27/2025) |
| 06/27/2025 | 27 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Jillian Blanchard, Filing fee $ 100, receipt number ADCDC−11782408. Fee Status: Fee Paid. by INSTITUTE FOR SUSTAINABLE COMMUNITIES, INTER−TRIBAL COUNCIL OF MICHIGAN, KALAMAZOO COUNTY, MICHIGAN, NATIVE VILLAGE OF KIPNUK. (Attachments: # 1 Declaration Declaration in Support of Motion to Appear Pro Hac Vice)(DiBianco, Gary) (Entered: 06/27/2025) |
| 06/27/2025 | 28 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Larissa Koehler, Filing fee $ 100, receipt number ADCDC−11782415. Fee Status: Fee Paid. by INSTITUTE FOR SUSTAINABLE COMMUNITIES, INTER−TRIBAL COUNCIL OF MICHIGAN, KALAMAZOO COUNTY, MICHIGAN, NATIVE VILLAGE OF KIPNUK. (Attachments: # 1 Declaration Declaration in Support of Motion to Appear Pro Hac Vice)(DiBianco, Gary) (Entered: 06/27/2025) |
| 06/27/2025 | | MINUTE ORDER granting 24 Motion for Leave to Appear Pro Hac Vice **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Paul L. Friedman on June 27, 2025. (lcao) (Entered: 06/27/2025) |
| 06/27/2025 | | MINUTE ORDER granting 20 Motion for Leave to Appear Pro Hac Vice **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Paul L. Friedman on June 27, 2025. (lcao) (Entered: 06/27/2025) |
| 06/27/2025 | 29 | MOTION for Preliminary Injunction by 2C MISSISSIPPI, AIR ALLIANCE HOUSTON, ALLEGHENY COUNTY, PENNSYLVANIA, APPALACHIAN VOICES, BESSEMER HISTORICAL SOCIETY, CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, CITY OF SACRAMENTO, CALIFORNIA, CITY OF SPRINGFIELD, MASSACHUSETTS, DEEP SOUTH CENTER FOR ENVIRONMENTAL JUSTICE, DOWNWINDERS AT RISK, HEALTH RESOURCES IN ACTION, INSTITUTE FOR SUSTAINABLE COMMUNITIES, INTER−TRIBAL COUNCIL OF MICHIGAN, KALAMAZOO COUNTY, MICHIGAN, LOWCOUNTRY ALLIANCE FOR MODEL COMMUNITIES, MARTIN LUTHER KING JR. COUNTY, WASHINGTON, NATIVE VILLAGE OF KIPNUK, PARKS ALLIANCE OF LOUISVILLE, INC., PITTSBURGH CONSERVATION CORPS, PUSH BUFFALO, SOUTHWEST RENEWAL FOUNDATION OF HIGH POINT, INC., TREASURE ISLAND MOBILITY MANAGEMENT AGENCY, WE ACT FOR ENVIRONMENTAL JUSTICE. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order Attachment A, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Exhibit D, # 7 Exhibit E, # 8 Exhibit F, # 9 Exhibit G, # 10 Exhibit H, # 11 Exhibit I, # 12 Exhibit J, # 13 Exhibit K, # 14 Exhibit L, # 15 Exhibit M, # 16 Exhibit N, # 17 Exhibit O, # 18 Exhibit P, # 19 Exhibit Q, # 20 Exhibit R, # 21 Exhibit S, # 22 Exhibit T, # 23 Exhibit U, # 24 Exhibit V, # 25 Exhibit W, # 26 Exhibit X, # 27 Exhibit Z, # 28 Exhibit AA, # 29 Exhibit BB, # 30 Exhibit CC, # 31 Exhibit DD, # 32 Exhibit EE, # 33 Exhibit FF, # 34 Exhibit GG, # 35 Exhibit HH, # 36 Exhibit II, # 37 Exhibit JJ, # 38 Exhibit KK, # 39 Exhibit LL, # 40 Exhibit MM, # 41 Exhibit NN, # 42 Exhibit Y)(Vizcarra, Hana) (Entered: 06/27/2025) |
| 06/27/2025 | 30 | MOTION to Certify Class by 2C MISSISSIPPI, AIR ALLIANCE HOUSTON, ALLEGHENY COUNTY, PENNSYLVANIA, APPALACHIAN VOICES, BESSEMER HISTORICAL SOCIETY, CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, CITY OF SACRAMENTO, CALIFORNIA, CITY OF |

| | | |
|---|---|---|
| | | SPRINGFIELD, MASSACHUSETTS, DEEP SOUTH CENTER FOR ENVIRONMENTAL JUSTICE, DOWNWINDERS AT RISK, HEALTH RESOURCES IN ACTION, INSTITUTE FOR SUSTAINABLE COMMUNITIES, INTER−TRIBAL COUNCIL OF MICHIGAN, KALAMAZOO COUNTY, MICHIGAN, LOWCOUNTRY ALLIANCE FOR MODEL COMMUNITIES, MARTIN LUTHER KING JR. COUNTY, WASHINGTON, NATIVE VILLAGE OF KIPNUK, PARKS ALLIANCE OF LOUISVILLE, INC., PITTSBURGH CONSERVATION CORPS, PUSH BUFFALO, SOUTHWEST RENEWAL FOUNDATION OF HIGH POINT, INC., TREASURE ISLAND MOBILITY MANAGEMENT AGENCY, WE ACT FOR ENVIRONMENTAL JUSTICE. (Attachments: # 1 Memorandum in Support Memorandum in Support of Motion to Certify Class, # 2 Exhibit Exhibit 1, # 3 Exhibit Exhibit 2, # 4 Exhibit Exhibit 3, # 5 Exhibit Exhibit 4, # 6 Exhibit Exhibit 5, # 7 Exhibit Exhibit 6, # 8 Exhibit Exhibit 7, # 9 Exhibit Exhibit 8, # 10 Exhibit Exhibit 9, # 11 Exhibit Exhibit 10, # 12 Exhibit Exhibit 11, # 13 Text of Proposed Order Proposed Order)(Grillot, Benjamin) (Entered: 06/27/2025) |
| 06/30/2025 | 31 | SUMMONS (2) Issued Electronically as to U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(zjm) (Entered: 06/30/2025) |
| 06/30/2025 | | NOTICE OF ERROR regarding 27 MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Jillian Blanchard, Filing fee $ 100, receipt number ADCDC−11782408. Fee Status: Fee Paid., 28 MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Larissa Koehler, Filing fee $ 100, receipt number ADCDC−11782415. Fee Status: Fee Paid.. The following error(s) need correction: Pro Hac Vice motion must be accompanied by a Declaration which include the attorneys office address and telephone number. Please refile using the event Declaration. The motion must also be accompanied by a Certificate of Good Standing issued within the last 30 days (LCvR 83.2(c)(2)). Please file certificate as an Errata (zjm) (Entered: 06/30/2025) |
| 07/01/2025 | 32 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Irena Como, Filing fee $ 100, receipt number ADCDC−11789593. Fee Status: Fee Paid. by 2C MISSISSIPPI, AIR ALLIANCE HOUSTON, ALLEGHENY COUNTY, PENNSYLVANIA, APPALACHIAN VOICES, BESSEMER HISTORICAL SOCIETY, CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, CITY OF SACRAMENTO, CALIFORNIA, CITY OF SPRINGFIELD, MASSACHUSETTS, DEEP SOUTH CENTER FOR ENVIRONMENTAL JUSTICE, DOWNWINDERS AT RISK, HEALTH RESOURCES IN ACTION, INSTITUTE FOR SUSTAINABLE COMMUNITIES, INTER−TRIBAL COUNCIL OF MICHIGAN, KALAMAZOO COUNTY, MICHIGAN, LOWCOUNTRY ALLIANCE FOR MODEL COMMUNITIES, MARTIN LUTHER KING JR. COUNTY, WASHINGTON, NATIVE VILLAGE OF KIPNUK, PARKS ALLIANCE OF LOUISVILLE, INC., PITTSBURGH CONSERVATION CORPS, PUSH BUFFALO, SOUTHWEST RENEWAL FOUNDATION OF HIGH POINT, INC., TREASURE ISLAND MOBILITY MANAGEMENT AGENCY, WE ACT FOR ENVIRONMENTAL JUSTICE. (Attachments: # 1 Exhibit Declaration of Irena Como, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order Proposed Order)(Grillot, Benjamin) (Entered: 07/01/2025) |
| 07/01/2025 | 33 | DECLARATION *OF LARISSA KOEHLER* by INSTITUTE FOR SUSTAINABLE COMMUNITIES, INTER−TRIBAL COUNCIL OF MICHIGAN, KALAMAZOO COUNTY, MICHIGAN, NATIVE VILLAGE OF KIPNUK re 28 MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Larissa Koehler, Filing fee $ 100, receipt number ADCDC−11782415. Fee Status: Fee Paid.. (DiBianco, Gary) (Entered: 07/01/2025) |
| 07/01/2025 | 34 | ERRATA *CERIFICATE OF GOOD STANDING* by INSTITUTE FOR SUSTAINABLE COMMUNITIES, INTER−TRIBAL COUNCIL OF MICHIGAN, KALAMAZOO COUNTY, MICHIGAN, NATIVE VILLAGE OF KIPNUK re 28 Motion for Leave to Appear Pro Hac Vice,. (DiBianco, Gary) (Entered: 07/01/2025) |
| 07/01/2025 | 35 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− James S. Whitlock, Filing fee $ 100, receipt number ADCDC−11790057. Fee Status: Fee Paid. by 2C MISSISSIPPI, AIR ALLIANCE HOUSTON, ALLEGHENY COUNTY, PENNSYLVANIA, APPALACHIAN VOICES, BESSEMER HISTORICAL |

| | | |
|---|---|---|
| | | SOCIETY, CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, CITY OF SACRAMENTO, CALIFORNIA, CITY OF SPRINGFIELD, MASSACHUSETTS, DEEP SOUTH CENTER FOR ENVIRONMENTAL JUSTICE, DOWNWINDERS AT RISK, HEALTH RESOURCES IN ACTION, INSTITUTE FOR SUSTAINABLE COMMUNITIES, INTER−TRIBAL COUNCIL OF MICHIGAN, KALAMAZOO COUNTY, MICHIGAN, LOWCOUNTRY ALLIANCE FOR MODEL COMMUNITIES, MARTIN LUTHER KING JR. COUNTY, WASHINGTON, NATIVE VILLAGE OF KIPNUK, PARKS ALLIANCE OF LOUISVILLE, INC., PITTSBURGH CONSERVATION CORPS, PUSH BUFFALO, SOUTHWEST RENEWAL FOUNDATION OF HIGH POINT, INC., TREASURE ISLAND MOBILITY MANAGEMENT AGENCY, WE ACT FOR ENVIRONMENTAL JUSTICE. (Attachments: # 1 Exhibit Declaration of James S. Whitlock, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order Proposed Order)(Grillot, Benjamin) (Entered: 07/01/2025) |
| 07/01/2025 | 36 | NOTICE of Change of Address by Gary DiBianco (DiBianco, Gary) (Entered: 07/01/2025) |
| 07/01/2025 | 37 | DECLARATION *OF JILLIAN BLANCHARD* by INSTITUTE FOR SUSTAINABLE COMMUNITIES, INTER−TRIBAL COUNCIL OF MICHIGAN, KALAMAZOO COUNTY, MICHIGAN, NATIVE VILLAGE OF KIPNUK re 27 MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Jillian Blanchard, Filing fee $ 100, receipt number ADCDC−11782408. Fee Status: Fee Paid.. (DiBianco, Gary) (Entered: 07/01/2025) |
| 07/01/2025 | 38 | ERRATA *CERIFICATE OF GOOD STANDING* by INSTITUTE FOR SUSTAINABLE COMMUNITIES, INTER−TRIBAL COUNCIL OF MICHIGAN, KALAMAZOO COUNTY, MICHIGAN, NATIVE VILLAGE OF KIPNUK re 27 Motion for Leave to Appear Pro Hac Vice,. (DiBianco, Gary) (Entered: 07/01/2025) |
| 07/02/2025 | 39 | ORDER directing parties to meet and confer and file a joint status report. See Order for details. Signed by Judge Paul L. Friedman on July 2, 2025. (lcao) (Entered: 07/02/2025) |
| 07/02/2025 | | MINUTE ORDER granting 35 Motion for Leave to Appear Pro Hac Vice. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Paul L. Friedman on July 2, 2025. (lcao) (Entered: 07/02/2025) |
| 07/02/2025 | | MINUTE ORDER granting 32 Motion for Leave to Appear Pro Hac Vice. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Paul L. Friedman on July 2, 2025. (lcao) (Entered: 07/02/2025) |
| 07/02/2025 | | MINUTE ORDER granting 27 Motion for Leave to Appear Pro Hac Vice. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Paul L. Friedman on July 2, 2025. (lcao) (Entered: 07/02/2025) |
| 07/02/2025 | | MINUTE ORDER granting 28 Motion for Leave to Appear Pro Hac Vice. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Paul L. Friedman on July 2, 2025. (lcao) (Entered: 07/02/2025) |
| 07/02/2025 | 40 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Kimberley Claire Hunter, Filing fee $ 100, receipt number ADCDC−11792682. Fee Status: Fee Paid. by 2C MISSISSIPPI, AIR ALLIANCE HOUSTON, ALLEGHENY COUNTY, PENNSYLVANIA, APPALACHIAN VOICES, BESSEMER HISTORICAL SOCIETY, CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, CITY OF SACRAMENTO, CALIFORNIA, CITY OF SPRINGFIELD, MASSACHUSETTS, DEEP SOUTH CENTER FOR ENVIRONMENTAL JUSTICE, DOWNWINDERS AT RISK, HEALTH RESOURCES IN ACTION, INSTITUTE FOR SUSTAINABLE COMMUNITIES, INTER−TRIBAL COUNCIL OF MICHIGAN, KALAMAZOO COUNTY, MICHIGAN, LOWCOUNTRY ALLIANCE FOR MODEL COMMUNITIES, MARTIN LUTHER KING JR. COUNTY, WASHINGTON, NATIVE VILLAGE OF KIPNUK, PARKS ALLIANCE OF LOUISVILLE, INC., PITTSBURGH CONSERVATION CORPS, PUSH BUFFALO, SOUTHWEST |

| | | |
|---|---|---|
| | | RENEWAL FOUNDATION OF HIGH POINT, INC., TREASURE ISLAND MOBILITY MANAGEMENT AGENCY, WE ACT FOR ENVIRONMENTAL JUSTICE. (Attachments: # 1 Exhibit Declaration of Kimberley Claire Hunter, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order Proposed Order)(Grillot, Benjamin) (Entered: 07/02/2025) |
| 07/02/2025 | 41 | ERRATA by 2C MISSISSIPPI, AIR ALLIANCE HOUSTON, ALLEGHENY COUNTY, PENNSYLVANIA, APPALACHIAN VOICES, BESSEMER HISTORICAL SOCIETY, CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, CITY OF SACRAMENTO, CALIFORNIA, CITY OF SPRINGFIELD, MASSACHUSETTS, DEEP SOUTH CENTER FOR ENVIRONMENTAL JUSTICE, DOWNWINDERS AT RISK, HEALTH RESOURCES IN ACTION, INSTITUTE FOR SUSTAINABLE COMMUNITIES, INTER−TRIBAL COUNCIL OF MICHIGAN, KALAMAZOO COUNTY, MICHIGAN, LOWCOUNTRY ALLIANCE FOR MODEL COMMUNITIES, MARTIN LUTHER KING JR. COUNTY, WASHINGTON, NATIVE VILLAGE OF KIPNUK, PARKS ALLIANCE OF LOUISVILLE, INC., PITTSBURGH CONSERVATION CORPS, PUSH BUFFALO, SOUTHWEST RENEWAL FOUNDATION OF HIGH POINT, INC., TREASURE ISLAND MOBILITY MANAGEMENT AGENCY, WE ACT FOR ENVIRONMENTAL JUSTICE re 30 Motion to Certify Class,,,,. (Attachments: # 1 Exhibit Corrected Motion to Certify Class)(Grillot, Benjamin) (Entered: 07/02/2025) |
| 07/02/2025 | 42 | NOTICE of Appearance by Jessica Lundberg on behalf of All Defendants (Lundberg, Jessica) (Entered: 07/02/2025) |
| 07/02/2025 | 43 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Graham Provost, Filing fee $ 100, receipt number ADCDC−11794045. Fee Status: Fee Paid. by ALLEGHENY COUNTY, PENNSYLVANIA, CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, CITY OF SACRAMENTO, CALIFORNIA, CITY OF SPRINGFIELD, MASSACHUSETTS, KALAMAZOO COUNTY, MICHIGAN, MARTIN LUTHER KING JR. COUNTY, WASHINGTON, NATIVE VILLAGE OF KIPNUK, TREASURE ISLAND MOBILITY MANAGEMENT AGENCY. (Attachments: # 1 Declaration Decl. of Graham Provost, # 2 Supplement Cert. of Good Standing for Graham Provost)(Merrill, Toby) (Entered: 07/02/2025) |
| 07/02/2025 | 44 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Elaine Poon, Filing fee $ 100, receipt number ADCDC−11794066. Fee Status: Fee Paid. by ALLEGHENY COUNTY, PENNSYLVANIA, CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, CITY OF SACRAMENTO, CALIFORNIA, CITY OF SPRINGFIELD, MASSACHUSETTS, KALAMAZOO COUNTY, MICHIGAN, MARTIN LUTHER KING JR. COUNTY, WASHINGTON, NATIVE VILLAGE OF KIPNUK, TREASURE ISLAND MOBILITY MANAGEMENT AGENCY. (Attachments: # 1 Declaration Decl. of Elaine Poon, # 2 Supplement Cert. of Good Standing for Elaine Poon)(Merrill, Toby) (Entered: 07/02/2025) |
| 07/02/2025 | 45 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Cassandra Crawford, Filing fee $ 100, receipt number ADCDC−11794070. Fee Status: Fee Paid. by ALLEGHENY COUNTY, PENNSYLVANIA, CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, CITY OF SACRAMENTO, CALIFORNIA, CITY OF SPRINGFIELD, MASSACHUSETTS, KALAMAZOO COUNTY, MICHIGAN, MARTIN LUTHER KING JR. COUNTY, WASHINGTON, NATIVE VILLAGE OF KIPNUK, TREASURE ISLAND MOBILITY MANAGEMENT AGENCY. (Attachments: # 1 Declaration Decl. of Cassandra Crawford, # 2 Supplement Cert. of Good Standing for Cassandra Crawford)(Merrill, Toby) (Entered: 07/02/2025) |
| 07/02/2025 | 46 | Joint STATUS REPORT by 2C MISSISSIPPI, AIR ALLIANCE HOUSTON, ALLEGHENY COUNTY, PENNSYLVANIA, APPALACHIAN VOICES, BESSEMER HISTORICAL SOCIETY, CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, CITY OF SACRAMENTO, CALIFORNIA, CITY OF SPRINGFIELD, MASSACHUSETTS, DEEP SOUTH CENTER FOR ENVIRONMENTAL JUSTICE, DOWNWINDERS AT RISK, HEALTH RESOURCES IN ACTION, INSTITUTE FOR SUSTAINABLE COMMUNITIES, INTER−TRIBAL COUNCIL OF MICHIGAN, KALAMAZOO COUNTY, MICHIGAN, LOWCOUNTRY ALLIANCE FOR MODEL COMMUNITIES, MARTIN LUTHER KING JR. COUNTY, WASHINGTON, NATIVE VILLAGE OF |

| | | |
|---|---|---|
| | | KIPNUK, PARKS ALLIANCE OF LOUISVILLE, INC., PITTSBURGH CONSERVATION CORPS, PUSH BUFFALO, SOUTHWEST RENEWAL FOUNDATION OF HIGH POINT, INC., TREASURE ISLAND MOBILITY MANAGEMENT AGENCY, WE ACT FOR ENVIRONMENTAL JUSTICE. (Vizcarra, Hana) (Entered: 07/02/2025) |
| 07/03/2025 | 47 | NOTICE of Appearance by Irena Como on behalf of 2C MISSISSIPPI, APPALACHIAN VOICES, LOWCOUNTRY ALLIANCE FOR MODEL COMMUNITIES, PARKS ALLIANCE OF LOUISVILLE, INC., PITTSBURGH CONSERVATION CORPS, SOUTHWEST RENEWAL FOUNDATION OF HIGH POINT, INC. (Como, Irena) (Entered: 07/03/2025) |
| 07/03/2025 | | MINUTE ORDER: in light of the parties' 46 Joint Status Report, defendants shall file their response to plaintiffs' 29 Motion for Preliminary Injunction on or before July 14, 2025. Defendants shall file their response to plaintiffs 30 Motion in Support of Class Certification on or before July 16, 2025. Plaintiffs shall file their reply in support of their 29 Motion for Preliminary Injunction on or before July 18, 2025. Plaintiffs shall file their reply in support of their 30 Motion in Support of Class Certification on or before July 21, 2025. The parties shall appear for oral argument on July 23, 2025 at 3:00 p.m. in Courtroom 29 in the William B. Bryant Annex to the E. Barrett Prettyman Courthouse at 333 Constitution Avenue N.W., Washington, D.C. 20001. SO ORDERED. Signed by Judge Paul L. Friedman on July 3, 2025. (lcao) (Entered: 07/03/2025) |
| 07/03/2025 | | MINUTE ORDER granting 40 Motion for Leave to Appear Pro Hac Vice **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Paul L. Friedman on July 3, 2025. (lcao) (Entered: 07/03/2025) |
| 07/03/2025 | | MINUTE ORDER granting 43 Motion for Leave to Appear Pro Hac Vice **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Paul L. Friedman on July 3, 2025. (lcao) (Entered: 07/03/2025) |
| 07/03/2025 | | MINUTE ORDER granting 45 Motion for Leave to Appear Pro Hac Vice **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Paul L. Friedman on July 3, 2025. (lcao) (Entered: 07/03/2025) |
| 07/03/2025 | 48 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Julie Hayden Wilensky, Filing fee $ 100, receipt number ADCDC−11795549. Fee Status: Fee Paid. by CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA. (Attachments: # 1 Declaration Decl. and Cert. of Good Standing for Julie Wilensky)(Merrill, Toby) Docket text modified on 7/3/2025 (zhcn). (Entered: 07/03/2025) |
| 07/03/2025 | 49 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Yvonne Rosil Mere, Filing fee $ 100, receipt number ADCDC−11795592. Fee Status: Fee Paid. by CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA. (Attachments: # 1 Declaration Decl. and Cert. of Good Standing for Yvonne Mere)(Merrill, Toby) Docket text modified on 7/3/2025 (zhcn). (Entered: 07/03/2025) |
| 07/03/2025 | 50 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Alison Chinn Holcomb, Filing fee $ 100, receipt number ADCDC−11795603. Fee Status: Fee Paid. by MARTIN LUTHER KING JR. COUNTY, WASHINGTON. (Attachments: # 1 Declaration Decl. and Cert. of Good Standing for Alison Holcomb)(Merrill, Toby) Docket text modified on 7/3/2025 (zhcn). (Entered: 07/03/2025) |
| 07/03/2025 | 51 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− David J. Hackett, Filing fee $ 100, receipt number ADCDC−11795632. Fee Status: Fee Paid. by MARTIN LUTHER KING JR. COUNTY, WASHINGTON. (Attachments: # 1 Declaration Decl. and Cert of Good Standing for David Hackett)(Merrill, Toby) (Entered: 07/03/2025) |
| 07/03/2025 | 52 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Sara Jennifer Eisenberg, Filing fee $ 100, receipt number ADCDC−11795656. Fee Status: Fee Paid. by CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA. (Attachments: # 1 Declaration Decl. and Cert of Good Standing for Sara Eisenberg)(Merrill, Toby) |

| | | |
|---|---|---|
| | | (Entered: 07/03/2025) |
| 07/03/2025 | | MINUTE ORDER granting 44 Motion for Leave to Appear Pro Hac Vice **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Paul L. Friedman on July 3, 2025. (ATM) (Entered: 07/03/2025) |
| 07/03/2025 | | Set/Reset Deadlines:( Responses due by 7/14/2025, Replies due by 7/21/2025.), Set/Reset Hearings:( Motion Hearing set for 7/23/2025 at 03:00 PM in Courtroom 29A− In Person before Judge Paul L. Friedman.) (tj) (Entered: 07/03/2025) |
| 07/03/2025 | 53 | NOTICE of Appearance by Cassandra Crawford on behalf of ALLEGHENY COUNTY, PENNSYLVANIA, CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, CITY OF SACRAMENTO, CALIFORNIA, CITY OF SPRINGFIELD, MASSACHUSETTS, KALAMAZOO COUNTY, MICHIGAN, MARTIN LUTHER KING JR. COUNTY, WASHINGTON, NATIVE VILLAGE OF KIPNUK, TREASURE ISLAND MOBILITY MANAGEMENT AGENCY (Crawford, Cassandra) (Entered: 07/03/2025) |
| 07/03/2025 | | MINUTE ORDER granting 48 Motion for Leave to Appear Pro Hac Vice **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Paul L. Friedman on July 3, 2025. (ATM) (Entered: 07/03/2025) |
| 07/03/2025 | | MINUTE ORDER granting 49 Motion for Leave to Appear Pro Hac Vice **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Paul L. Friedman on July 3, 2025. (ATM) (Entered: 07/03/2025) |
| 07/03/2025 | | MINUTE ORDER granting 50 Motion for Leave to Appear Pro Hac Vice. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Paul L. Friedman on July 3, 2025. (ATM) (Entered: 07/03/2025) |
| 07/03/2025 | | MINUTE ORDER granting 51 Motion for Leave to Appear Pro Hac Vice. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Paul L. Friedman on July 3, 2025. (ATM) (Entered: 07/03/2025) |
| 07/03/2025 | | MINUTE ORDER granting 52 Motion for Leave to Appear Pro Hac Vice. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Paul L. Friedman on July 3, 2025. (ATM) (Entered: 07/03/2025) |
| 07/03/2025 | 54 | NOTICE of Appearance by Andrew Saavedra on behalf of AIR ALLIANCE HOUSTON, BESSEMER HISTORICAL SOCIETY, DEEP SOUTH CENTER FOR ENVIRONMENTAL JUSTICE, DOWNWINDERS AT RISK, HEALTH RESOURCES IN ACTION, INSTITUTE FOR SUSTAINABLE COMMUNITIES, INTER−TRIBAL COUNCIL OF MICHIGAN, PUSH BUFFALO, WE ACT FOR ENVIRONMENTAL JUSTICE (Saavedra, Andrew) (Entered: 07/03/2025) |
| 07/03/2025 | 55 | NOTICE of Appearance by Larissa Mika Koehler on behalf of INSTITUTE FOR SUSTAINABLE COMMUNITIES, INTER−TRIBAL COUNCIL OF MICHIGAN, KALAMAZOO COUNTY, MICHIGAN, NATIVE VILLAGE OF KIPNUK (Koehler, Larissa) (Entered: 07/03/2025) |
| 07/03/2025 | 56 | NOTICE of Appearance by Julie Wilensky on behalf of CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, TREASURE ISLAND MOBILITY MANAGEMENT AGENCY (Wilensky, Julie) (Entered: 07/03/2025) |
| 07/03/2025 | 57 | NOTICE of Appearance by Sara J. Eisenberg on behalf of CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, TREASURE ISLAND MOBILITY MANAGEMENT AGENCY (Eisenberg, Sara) (Entered: 07/03/2025) |
| 07/03/2025 | 58 | NOTICE of Appearance by Yvonne Mere on behalf of CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, TREASURE ISLAND MOBILITY MANAGEMENT AGENCY (Mere, Yvonne) (Entered: 07/03/2025) |

| 07/04/2025 | 59 | NOTICE of Appearance by Kimberley Hunter on behalf of 2C MISSISSIPPI, APPALACHIAN VOICES, LOWCOUNTRY ALLIANCE FOR MODEL COMMUNITIES, PARKS ALLIANCE OF LOUISVILLE, INC., PITTSBURGH CONSERVATION CORPS, SOUTHWEST RENEWAL FOUNDATION OF HIGH POINT, INC. (Hunter, Kimberley) (Entered: 07/04/2025) |
|---|---|---|
| 07/07/2025 | 60 | RESPONSE re 29 MOTION for Preliminary Injunction *by Amici States in Support of Plaintiffs* filed by STATE OF NEW YORK. (Shulock, Nathan) (Entered: 07/07/2025) |
| 07/08/2025 | 61 | NOTICE of Appearance by James S. Whitlock on behalf of 2C MISSISSIPPI, APPALACHIAN VOICES, LOWCOUNTRY ALLIANCE FOR MODEL COMMUNITIES, PARKS ALLIANCE OF LOUISVILLE, INC., PITTSBURGH CONSERVATION CORPS, SOUTHWEST RENEWAL FOUNDATION OF HIGH POINT, INC. (Whitlock, James) (Entered: 07/08/2025) |
| 07/09/2025 | 62 | Case randomly reassigned to Judge Richard J. Leon. Judge Paul L. Friedman is no longer assigned to the case. (ztnr) (Entered: 07/09/2025) |
| 07/10/2025 | 63 | NOTICE of Appearance by Graham Provost on behalf of ALLEGHENY COUNTY, PENNSYLVANIA, CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, CITY OF SACRAMENTO, CALIFORNIA, CITY OF SPRINGFIELD, MASSACHUSETTS, KALAMAZOO COUNTY, MICHIGAN, MARTIN LUTHER KING JR. COUNTY, WASHINGTON, NATIVE VILLAGE OF KIPNUK, TREASURE ISLAND MOBILITY MANAGEMENT AGENCY (Provost, Graham) (Entered: 07/10/2025) |
| 07/10/2025 | | MINUTE ORDER. Due to a scheduling conflict with another case, it is hereby ORDERED that the hearing set for July 23, 2025 at 3:00 PM is VACATED. It is further ORDERED that the parties shall meet and confer and file a joint status report by July 15, 2025, proposing additional dates that the parties are available to appear for oral argument on plaintiffs' motions. SO ORDERED. Signed by Judge Richard J. Leon on 7/10/2025. (lcrjl2) (Entered: 07/10/2025) |
| 07/11/2025 | 64 | NOTICE of Appearance by Linnet Rose Davis−Stermitz on behalf of AIR ALLIANCE HOUSTON, BESSEMER HISTORICAL SOCIETY, DEEP SOUTH CENTER FOR ENVIRONMENTAL JUSTICE, DOWNWINDERS AT RISK, HEALTH RESOURCES IN ACTION, INSTITUTE FOR SUSTAINABLE COMMUNITIES, INTER−TRIBAL COUNCIL OF MICHIGAN, PUSH BUFFALO, WE ACT FOR ENVIRONMENTAL JUSTICE (Davis−Stermitz, Linnet) (Entered: 07/11/2025) |
| 07/11/2025 | 65 | Joint STATUS REPORT by 2C MISSISSIPPI, AIR ALLIANCE HOUSTON, ALLEGHENY COUNTY, PENNSYLVANIA, APPALACHIAN VOICES, BESSEMER HISTORICAL SOCIETY, CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, CITY OF SACRAMENTO, CALIFORNIA, CITY OF SPRINGFIELD, MASSACHUSETTS, DEEP SOUTH CENTER FOR ENVIRONMENTAL JUSTICE, DOWNWINDERS AT RISK, HEALTH RESOURCES IN ACTION, INSTITUTE FOR SUSTAINABLE COMMUNITIES, INTER−TRIBAL COUNCIL OF MICHIGAN, KALAMAZOO COUNTY, MICHIGAN, LOWCOUNTRY ALLIANCE FOR MODEL COMMUNITIES, MARTIN LUTHER KING JR. COUNTY, WASHINGTON, NATIVE VILLAGE OF KIPNUK, PARKS ALLIANCE OF LOUISVILLE, INC., PITTSBURGH CONSERVATION CORPS, PUSH BUFFALO, SOUTHWEST RENEWAL FOUNDATION OF HIGH POINT, INC., STATE OF NEW YORK, TREASURE ISLAND MOBILITY MANAGEMENT AGENCY, WE ACT FOR ENVIRONMENTAL JUSTICE. (Grillot, Benjamin) (Entered: 07/11/2025) |
| 07/14/2025 | 66 | MOTION to Dismiss by UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE M. ZELDIN. (Lundberg, Jessica) (Entered: 07/14/2025) |
| 07/14/2025 | 67 | Memorandum in opposition to re 29 MOTION for Preliminary Injunction filed by UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE M. ZELDIN. (Lundberg, Jessica) (Entered: 07/14/2025) |
| 07/15/2025 | | MINUTE ORDER. Upon consideration of the parties join status report, the parties shall convene for a hearing on the motions pending before the Court on August 5, 2025 at 4:00 PM in Courtroom 18 before Judge Richard J. Leon (In Person). SO ORDERED. Signed by Judge Richard J. Leon on 7/15/2025. (lcrjl2) (Entered: |

| | | |
|---|---|---|
| | | 07/15/2025) |
| 07/16/2025 | 68 | Memorandum in opposition to re 30 MOTION to Certify Class filed by UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE M. ZELDIN. (Lundberg, Jessica) (Entered: 07/16/2025) |
| 07/17/2025 | 69 | NOTICE of Appearance by Chloe Fross on behalf of Gather, American Society of Adaptation Professionals, Clean Air Coalition of Western New York, Climate and Energy Project, Connecticut Roundtable on Climate and Jobs, Eastern Rhode Island Conservation District, Emerald Cities Collaborative, Engineers Without Borders, Erie County Restorative Justice Coalition, GreenRoots, Healthy Bourbon County Action Team, City of Oakridge, Racial & Environmental Justice Committee, Rhode Island School Recycling Project, Santa Fe Green Chamber of Commerce, Transportation for Massachusetts, Urban Sustainability Directors Network (Fross, Chloe) (Entered: 07/17/2025) |
| 07/17/2025 | 70 | Unopposed MOTION for Leave to File Amicus Brief by GATHER, AMERICAN SOCIETY OF ADAPTATION PROFESSIONALS, CLEAN AIR COALITION OF WESTERN NEW YORK, CLIMATE AND ENERGY PROJECT, CONNECTICUT ROUNDTABLE ON CLIMATE AND JOBS, EASTERN RHODE ISLAND CONSERVATION DISTRICT, EMERALD CITIES COLLABORATIVE, ENGINEERS WITHOUT BORDERS, ERIE COUNTY RESTORATIVE JUSTICE COALITION, GREENROOTS, HEALTHY BOURBON COUNTY ACTION TEAM, CITY OF OAKRIDGE, RACIAL & ENVIRONMENTAL JUSTICE COMMITTEE, RHODE ISLAND SCHOOL RECYCLING PROJECT, SANTA FE GREEN CHAMBER OF COMMERCE, TRANSPORTATION FOR MASSACHUSETTS, URBAN SUSTAINABILITY DIRECTORS NETWORK. (Attachments: # 1 Proposed Amicus Brief, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L, # 14 Exhibit M, # 15 Exhibit N, # 16 Exhibit O, # 17 Exhibit P, # 18 Exhibit Q)(Fross, Chloe) (Entered: 07/17/2025) |
| 07/17/2025 | 71 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Alexandra Enriquez St. Pierre, Filing fee $ 100, receipt number ADCDC−11825758. Fee Status: Fee Paid. by AMERICAN SOCIETY OF ADAPTATION PROFESSIONALS, CITY OF OAKRIDGE, CLEAN AIR COALITION OF WESTERN NEW YORK, CLIMATE AND ENERGY PROJECT, CONNECTICUT ROUNDTABLE ON CLIMATE AND JOBS, EASTERN RHODE ISLAND CONSERVATION DISTRICT, EMERALD CITIES COLLABORATIVE, ENGINEERS WITHOUT BORDERS, ERIE COUNTY RESTORATIVE JUSTICE COALITION, GATHER, GREENROOTS, HEALTHY BOURBON COUNTY ACTION TEAM, RACIAL & ENVIRONMENTAL JUSTICE COMMITTEE, RHODE ISLAND SCHOOL RECYCLING PROJECT, SANTA FE GREEN CHAMBER OF COMMERCE, TRANSPORTATION FOR MASSACHUSETTS, URBAN SUSTAINABILITY DIRECTORS NETWORK. (Attachments: # 1 Exhibit A. Declaration, # 2 Exhibit B. Certificate of Good Standing, # 3 Exhibit C. PO)(Fross, Chloe) (Entered: 07/17/2025) |
| 07/17/2025 | 72 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Erica Kyzmir−McKeon, Filing fee $ 100, receipt number ADCDC−11825792. Fee Status: Fee Paid. by AMERICAN SOCIETY OF ADAPTATION PROFESSIONALS, CITY OF OAKRIDGE, CLEAN AIR COALITION OF WESTERN NEW YORK, CLIMATE AND ENERGY PROJECT, CONNECTICUT ROUNDTABLE ON CLIMATE AND JOBS, EASTERN RHODE ISLAND CONSERVATION DISTRICT, EMERALD CITIES COLLABORATIVE, ENGINEERS WITHOUT BORDERS, ERIE COUNTY RESTORATIVE JUSTICE COALITION, GATHER, GREENROOTS, HEALTHY BOURBON COUNTY ACTION TEAM, RACIAL & ENVIRONMENTAL JUSTICE COMMITTEE, RHODE ISLAND SCHOOL RECYCLING PROJECT, SANTA FE GREEN CHAMBER OF COMMERCE, TRANSPORTATION FOR MASSACHUSETTS, URBAN SUSTAINABILITY DIRECTORS NETWORK. (Attachments: # 1 Exhibit A. Declaration, # 2 Exhibit B. Certificate of Good Standing, # 3 Exhibit C. PO)(Fross, Chloe) (Entered: 07/17/2025) |
| 07/17/2025 | 73 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Heidi H. Trimarco, Filing fee $ 100, receipt number ADCDC−11825808. Fee Status: Fee Paid. by AMERICAN SOCIETY OF ADAPTATION PROFESSIONALS, CITY OF OAKRIDGE, CLEAN AIR COALITION OF WESTERN NEW YORK, CLIMATE |

| | | |
|---|---|---|
| | | AND ENERGY PROJECT, CONNECTICUT ROUNDTABLE ON CLIMATE AND JOBS, EASTERN RHODE ISLAND CONSERVATION DISTRICT, EMERALD CITIES COLLABORATIVE, ENGINEERS WITHOUT BORDERS, ERIE COUNTY RESTORATIVE JUSTICE COALITION, GATHER, GREENROOTS, HEALTHY BOURBON COUNTY ACTION TEAM, RACIAL & ENVIRONMENTAL JUSTICE COMMITTEE, RHODE ISLAND SCHOOL RECYCLING PROJECT, SANTA FE GREEN CHAMBER OF COMMERCE, TRANSPORTATION FOR MASSACHUSETTS, URBAN SUSTAINABILITY DIRECTORS NETWORK. (Attachments: # 1 Exhibit A. Declaration, # 2 Exhibit B. Certificate of Good Standing, # 3 Exhibit C. PO)(Fross, Chloe) (Entered: 07/17/2025) |
| 07/17/2025 | 74 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Rachel Genna Briggs, Filing fee $ 100, receipt number ADCDC−11825840. Fee Status: Fee Paid. by AMERICAN SOCIETY OF ADAPTATION PROFESSIONALS, CITY OF OAKRIDGE, CLEAN AIR COALITION OF WESTERN NEW YORK, CLIMATE AND ENERGY PROJECT, CONNECTICUT ROUNDTABLE ON CLIMATE AND JOBS, EASTERN RHODE ISLAND CONSERVATION DISTRICT, EMERALD CITIES COLLABORATIVE, ENGINEERS WITHOUT BORDERS, ERIE COUNTY RESTORATIVE JUSTICE COALITION, GATHER, GREENROOTS, HEALTHY BOURBON COUNTY ACTION TEAM, RACIAL & ENVIRONMENTAL JUSTICE COMMITTEE, RHODE ISLAND SCHOOL RECYCLING PROJECT, SANTA FE GREEN CHAMBER OF COMMERCE, TRANSPORTATION FOR MASSACHUSETTS, URBAN SUSTAINABILITY DIRECTORS NETWORK. (Attachments: # 1 Exhibit A. Declaration, # 2 Exhibit B. Certificate of Good Standing, # 3 Exhibit C. PO)(Fross, Chloe) (Entered: 07/17/2025) |
| 07/17/2025 | 75 | NOTICE of Appearance by Alison Chinn Holcomb on behalf of MARTIN LUTHER KING JR. COUNTY, WASHINGTON (Holcomb, Alison) (Main Document 75 replaced on 7/18/2025) (mg). (Entered: 07/17/2025) |
| 07/18/2025 | 76 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Mollie Mindes Lee, Filing fee $ 100, receipt number ADCDC−11827595. Fee Status: Fee Paid. by CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA. (Attachments: # 1 Declaration Decl of Lee, # 2 Supplement Cert of Good Standing)(Merrill, Toby) (Entered: 07/18/2025) |
| 07/18/2025 | 77 | REPLY to opposition to motion re 29 Motion for Preliminary Injunction,,,,,, filed by 2C MISSISSIPPI, AIR ALLIANCE HOUSTON, ALLEGHENY COUNTY, PENNSYLVANIA, APPALACHIAN VOICES, BESSEMER HISTORICAL SOCIETY, CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, CITY OF SACRAMENTO, CALIFORNIA, CITY OF SPRINGFIELD, MASSACHUSETTS, DEEP SOUTH CENTER FOR ENVIRONMENTAL JUSTICE, DOWNWINDERS AT RISK, HEALTH RESOURCES IN ACTION, INSTITUTE FOR SUSTAINABLE COMMUNITIES, INTER−TRIBAL COUNCIL OF MICHIGAN, KALAMAZOO COUNTY, MICHIGAN, LOWCOUNTRY ALLIANCE FOR MODEL COMMUNITIES, MARTIN LUTHER KING JR. COUNTY, WASHINGTON, NATIVE VILLAGE OF KIPNUK, PARKS ALLIANCE OF LOUISVILLE, INC., PITTSBURGH CONSERVATION CORPS, PUSH BUFFALO, SOUTHWEST RENEWAL FOUNDATION OF HIGH POINT, INC., TREASURE ISLAND MOBILITY MANAGEMENT AGENCY, WE ACT FOR ENVIRONMENTAL JUSTICE. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(Vizcarra, Hana) (Entered: 07/18/2025) |
| 07/21/2025 | 78 | REPLY to opposition to motion re 30 Motion to Certify Class,,,, filed by 2C MISSISSIPPI, AIR ALLIANCE HOUSTON, ALLEGHENY COUNTY, PENNSYLVANIA, APPALACHIAN VOICES, BESSEMER HISTORICAL SOCIETY, CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, CITY OF SACRAMENTO, CALIFORNIA, CITY OF SPRINGFIELD, MASSACHUSETTS, DEEP SOUTH CENTER FOR ENVIRONMENTAL JUSTICE, DOWNWINDERS AT RISK, HEALTH RESOURCES IN ACTION, INSTITUTE FOR SUSTAINABLE COMMUNITIES, INTER−TRIBAL COUNCIL OF MICHIGAN, KALAMAZOO COUNTY, MICHIGAN, LOWCOUNTRY ALLIANCE FOR MODEL COMMUNITIES, MARTIN LUTHER KING JR. COUNTY, WASHINGTON, NATIVE VILLAGE OF KIPNUK, PARKS ALLIANCE OF LOUISVILLE, INC., PITTSBURGH CONSERVATION CORPS, PUSH BUFFALO, SOUTHWEST RENEWAL FOUNDATION OF HIGH POINT, INC., TREASURE ISLAND |

| | | |
|---|---|---|
| | | MOBILITY MANAGEMENT AGENCY, WE ACT FOR ENVIRONMENTAL JUSTICE. (Vizcarra, Hana) (Entered: 07/21/2025) |
| 07/21/2025 | 79 | ERRATA *MOTION for Leave to Appear Pro Hac Vice* by AMERICAN SOCIETY OF ADAPTATION PROFESSIONALS, CITY OF OAKRIDGE, CLEAN AIR COALITION OF WESTERN NEW YORK, CLIMATE AND ENERGY PROJECT, CONNECTICUT ROUNDTABLE ON CLIMATE AND JOBS, EASTERN RHODE ISLAND CONSERVATION DISTRICT, EMERALD CITIES COLLABORATIVE, ENGINEERS WITHOUT BORDERS, ERIE COUNTY RESTORATIVE JUSTICE COALITION, GATHER, GREENROOTS, HEALTHY BOURBON COUNTY ACTION TEAM, RACIAL & ENVIRONMENTAL JUSTICE COMMITTEE, RHODE ISLAND SCHOOL RECYCLING PROJECT, SANTA FE GREEN CHAMBER OF COMMERCE, TRANSPORTATION FOR MASSACHUSETTS, URBAN SUSTAINABILITY DIRECTORS NETWORK re 72 Motion for Leave to Appear Pro Hac Vice,,,. (Attachments: # 1 Exhibit A. Declaration, # 2 Exhibit B. Certificate of Good Standing, # 3 Exhibit C. Proposed Order)(Fross, Chloe) (Entered: 07/21/2025) |
| 07/21/2025 | 80 | ERRATA *MOTION for Leave to Appear Pro Hac Vice* by AMERICAN SOCIETY OF ADAPTATION PROFESSIONALS, CITY OF OAKRIDGE, CLEAN AIR COALITION OF WESTERN NEW YORK, CLIMATE AND ENERGY PROJECT, CONNECTICUT ROUNDTABLE ON CLIMATE AND JOBS, EASTERN RHODE ISLAND CONSERVATION DISTRICT, EMERALD CITIES COLLABORATIVE, ENGINEERS WITHOUT BORDERS, ERIE COUNTY RESTORATIVE JUSTICE COALITION, GATHER, GREENROOTS, HEALTHY BOURBON COUNTY ACTION TEAM, RACIAL & ENVIRONMENTAL JUSTICE COMMITTEE, RHODE ISLAND SCHOOL RECYCLING PROJECT, SANTA FE GREEN CHAMBER OF COMMERCE, TRANSPORTATION FOR MASSACHUSETTS, URBAN SUSTAINABILITY DIRECTORS NETWORK re 74 Motion for Leave to Appear Pro Hac Vice,,,. (Attachments: # 1 Exhibit A. Declaration, # 2 Exhibit B. Certificate of Good Standing, # 3 Exhibit C. Proposed Order)(Fross, Chloe) (Entered: 07/21/2025) |
| 07/22/2025 | | MINUTE ORDER. It is hereby ORDERED that the 70 Unopposed Motion for Leave to File Amicus Brief is GRANTED. The Amicus Brief attached to the Motion [70−1] is deemed filed with the Court upon entry of this order. SO ORDERED. Signed by Judge Richard J. Leon on 7/22/2025. (lcrjl2) (Entered: 07/22/2025) |
| 07/22/2025 | | MINUTE ORDER. It is hereby ORDERED that the 72 Motion for Leave to Appear Pro Hac Vice is GRANTED. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. SO ORDERED. Signed by Judge Richard J. Leon on 7/22/2025. (lcrjl2) (Entered: 07/22/2025) |
| 07/22/2025 | | MINUTE ORDER. Upon consideration of the 73 Motion to Admit Heidi Trimarco Pro Hac Vice, it is hereby ORDERED that the motion is DENIED for failure to comply with Local Rule 83.2(e)(2)'s requirement that the motion "be accompanied by a certificate of the court or bar for the state in which the applicant regularly practices, which has been issued within thirty (30) days of filing." Exhibit B attached to the motion is not a certification that complies with the local rules. SO ORDERED. Signed by Judge Richard J. Leon on 7/22/2025. (lcrjl2) (Entered: 07/22/2025) |
| 07/22/2025 | | MINUTE ORDER. It is hereby ORDERED that the 74 Motion for Leave to Appear Pro Hac Vice is GRANTED. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. SO ORDERED. Signed by Judge Richard J. Leon on 7/22/2025. (lcrjl2) (Entered: 07/22/2025) |
| 07/22/2025 | | MINUTE ORDER. It is hereby ORDERED that the 76 Motion for Leave to Appear Pro Hac Vice is GRANTED. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. SO ORDERED. Signed by Judge Richard J. Leon on 7/22/2025. (lcrjl2) (Entered: 07/22/2025) |
| 07/22/2025 | 81 | AMICUS BRIEF by AMERICAN SOCIETY OF ADAPTATION PROFESSIONALS, CITY OF OAKRIDGE, CLEAN AIR COALITION OF WESTERN NEW YORK, CLIMATE AND ENERGY PROJECT, CONNECTICUT ROUNDTABLE ON |

| | | |
|---|---|---|
| | | CLIMATE AND JOBS, EASTERN RHODE ISLAND CONSERVATION DISTRICT, EMERALD CITIES COLLABORATIVE, ENGINEERS WITHOUT BORDERS, ERIE COUNTY RESTORATIVE JUSTICE COALITION, GATHER, GREENROOTS, HEALTHY BOURBON COUNTY ACTION TEAM, RACIAL & ENVIRONMENTAL JUSTICE COMMITTEE, RHODE ISLAND SCHOOL RECYCLING PROJECT, SANTA FE GREEN CHAMBER OF COMMERCE, TRANSPORTATION FOR MASSACHUSETTS, URBAN SUSTAINABILITY DIRECTORS NETWORK. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q)(mg) (Entered: 07/22/2025) |
| 07/23/2025 | | MINUTE ORDER. It is hereby ORDERED that the 71 Motion for Leave to Appear Pro Hac Vice is GRANTED. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. SO ORDERED. Signed by Judge Richard J. Leon on 7/23/2025. (lcrjl2) (Entered: 07/23/2025) |
| 07/23/2025 | 82 | NOTICE of Appearance by Jillian Blanchard on behalf of INSTITUTE FOR SUSTAINABLE COMMUNITIES, INTER−TRIBAL COUNCIL OF MICHIGAN, KALAMAZOO COUNTY, MICHIGAN, NATIVE VILLAGE OF KIPNUK (Blanchard, Jillian) (Entered: 07/23/2025) |
| 07/25/2025 | 83 | NOTICE of Appearance by Erica Kyzmir−McKeon on behalf of AMERICAN SOCIETY OF ADAPTATION PROFESSIONALS, CITY OF OAKRIDGE, CLEAN AIR COALITION OF WESTERN NEW YORK, CLIMATE AND ENERGY PROJECT, CONNECTICUT ROUNDTABLE ON CLIMATE AND JOBS, EASTERN RHODE ISLAND CONSERVATION DISTRICT, EMERALD CITIES COLLABORATIVE, ENGINEERS WITHOUT BORDERS, ERIE COUNTY RESTORATIVE JUSTICE COALITION, GATHER, GREENROOTS, HEALTHY BOURBON COUNTY ACTION TEAM, RACIAL & ENVIRONMENTAL JUSTICE COMMITTEE, RHODE ISLAND SCHOOL RECYCLING PROJECT, SANTA FE GREEN CHAMBER OF COMMERCE, TRANSPORTATION FOR MASSACHUSETTS, URBAN SUSTAINABILITY DIRECTORS NETWORK (Kyzmir−McKeon, Erica) (Entered: 07/25/2025) |
| 07/25/2025 | 84 | NOTICE of Appearance by Alexandra St. Pierre on behalf of AMERICAN SOCIETY OF ADAPTATION PROFESSIONALS, CITY OF OAKRIDGE, CLEAN AIR COALITION OF WESTERN NEW YORK, CLIMATE AND ENERGY PROJECT, CONNECTICUT ROUNDTABLE ON CLIMATE AND JOBS, EASTERN RHODE ISLAND CONSERVATION DISTRICT, EMERALD CITIES COLLABORATIVE, ENGINEERS WITHOUT BORDERS, ERIE COUNTY RESTORATIVE JUSTICE COALITION, GATHER, GREENROOTS, HEALTHY BOURBON COUNTY ACTION TEAM, RACIAL & ENVIRONMENTAL JUSTICE COMMITTEE, RHODE ISLAND SCHOOL RECYCLING PROJECT, SANTA FE GREEN CHAMBER OF COMMERCE, TRANSPORTATION FOR MASSACHUSETTS, URBAN SUSTAINABILITY DIRECTORS NETWORK (St. Pierre, Alexandra) (Entered: 07/25/2025) |
| 07/25/2025 | 85 | NOTICE of Appearance by Mollie Mindes Lee on behalf of CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, TREASURE ISLAND MOBILITY MANAGEMENT AGENCY (Lee, Mollie) (Entered: 07/25/2025) |
| 07/28/2025 | 86 | NOTICE of Appearance by Rachel Genna Briggs on behalf of AMERICAN SOCIETY OF ADAPTATION PROFESSIONALS, CITY OF OAKRIDGE, CLEAN AIR COALITION OF WESTERN NEW YORK, CLIMATE AND ENERGY PROJECT, CONNECTICUT ROUNDTABLE ON CLIMATE AND JOBS, EASTERN RHODE ISLAND CONSERVATION DISTRICT, EMERALD CITIES COLLABORATIVE, ENGINEERS WITHOUT BORDERS, ERIE COUNTY RESTORATIVE JUSTICE COALITION, GATHER, GREENROOTS, HEALTHY BOURBON COUNTY ACTION TEAM, RACIAL & ENVIRONMENTAL JUSTICE COMMITTEE, RHODE ISLAND SCHOOL RECYCLING PROJECT, SANTA FE GREEN CHAMBER OF COMMERCE, STATE OF NEW YORK, TRANSPORTATION FOR MASSACHUSETTS, URBAN SUSTAINABILITY DIRECTORS NETWORK (Briggs, Rachel) (Entered: 07/28/2025) |

JA014

| | | |
|---|---|---|
| 07/28/2025 | 87 | Memorandum in opposition to re 66 MOTION to Dismiss filed by 2C MISSISSIPPI, AIR ALLIANCE HOUSTON, ALLEGHENY COUNTY, PENNSYLVANIA, APPALACHIAN VOICES, BESSEMER HISTORICAL SOCIETY, CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, CITY OF SACRAMENTO, CALIFORNIA, CITY OF SPRINGFIELD, MASSACHUSETTS, DEEP SOUTH CENTER FOR ENVIRONMENTAL JUSTICE, DOWNWINDERS AT RISK, HEALTH RESOURCES IN ACTION, INSTITUTE FOR SUSTAINABLE COMMUNITIES, INTER–TRIBAL COUNCIL OF MICHIGAN, KALAMAZOO COUNTY, MICHIGAN, LOWCOUNTRY ALLIANCE FOR MODEL COMMUNITIES, MARTIN LUTHER KING JR. COUNTY, WASHINGTON, NATIVE VILLAGE OF KIPNUK, PARKS ALLIANCE OF LOUISVILLE, INC., PITTSBURGH CONSERVATION CORPS, PUSH BUFFALO, SOUTHWEST RENEWAL FOUNDATION OF HIGH POINT, INC., TREASURE ISLAND MOBILITY MANAGEMENT AGENCY, WE ACT FOR ENVIRONMENTAL JUSTICE. (Attachments: # 1 Exhibit 1)(Vizcarra, Hana) (Entered: 07/28/2025) |
| 07/30/2025 | 88 | MOTION for Extension of Time to File Response/Reply as to 66 MOTION to Dismiss by UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE M. ZELDIN. (Lundberg, Jessica) (Entered: 07/30/2025) |
| 07/30/2025 | 89 | Consent MOTION to Allow Remote Listening to August 5, 2025 Hearing Via Public Access Audio Line by ALLEGHENY COUNTY, PENNSYLVANIA, CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, CITY OF SACRAMENTO, CALIFORNIA, CITY OF SPRINGFIELD, MASSACHUSETTS, KALAMAZOO COUNTY, MICHIGAN, MARTIN LUTHER KING JR. COUNTY, WASHINGTON, NATIVE VILLAGE OF KIPNUK, TREASURE ISLAND MOBILITY MANAGEMENT AGENCY. (Attachments: # 1 Text of Proposed Order)(Crawford, Cassandra) (Entered: 07/30/2025) |
| 07/31/2025 | 90 | NOTICE of Appearance by Elaine Poon on behalf of CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, CITY OF SACRAMENTO, CALIFORNIA, CITY OF SPRINGFIELD, MASSACHUSETTS, KALAMAZOO COUNTY, MICHIGAN, MARTIN LUTHER KING JR. COUNTY, WASHINGTON, NATIVE VILLAGE OF KIPNUK, TREASURE ISLAND MOBILITY MANAGEMENT AGENCY (Poon, Elaine) (Main Document 90 replaced on 7/31/2025) (znmw). (Entered: 07/31/2025) |
| 07/31/2025 | | MINUTE ORDER. The Court has scheduled a hearing for August 5, 2025 at 4:00 PM on the parties' pending motions. See Min. Order (Jul. 15, 2025). The parties shall come prepared to argue plaintiffs' motion for a preliminary injunction and defendants' motion to dismiss. Each party shall designate one counsel to argue both motions. The order of the hearing will be as follows: 20 minutes for plaintiffs' argument on both motions; 20 minutes for defendants' argument on both motions; 5 minutes rebuttal from plaintiffs; and 5 minutes rebuttal from defendants. Plaintiffs have also requested remote access for the hearing, but the Court generally does not permit public access audio lines. Accordingly, it is ORDERED that plaintiffs' 89 Motion to Allow Remote Listening is DENIED; it is further ORDERED that defendants' 88 Motion for an Extension to File their Reply in Support of their Motion to Dismiss is DENIED. Defendants shall file their reply no later than August 4, 2025. SO ORDERED. Signed by Judge Richard J. Leon on 7/31/2025. (lcrjl2) (Entered: 07/31/2025) |
| 08/01/2025 | | Set/Reset Deadlines: Replies due by 8/4/2025. (zljn) (Entered: 08/01/2025) |
| 08/04/2025 | 91 | REPLY to opposition to motion re 66 Motion to Dismiss filed by UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE M. ZELDIN. (Lundberg, Jessica) (Entered: 08/04/2025) |
| 08/05/2025 | | Minute Entry for Motions Hearing held before Judge Richard J. Leon on 8/5/2025. Oral arguments submitted on Plaintiffs' Motion 29 for Preliminary Injunction and Defendants' Motion 66 to Dismiss. Court takes matters under advisement. Forthcoming Order. Court Reporter: Chandra Kean. (zljn) (Entered: 08/05/2025) |
| 08/12/2025 | 92 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. All Plaintiffs, RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 7/3/2025., RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 7/3/2025. ( Answer due for ALL FEDERAL DEFENDANTS by |

| | | |
|---|---|---|
| | | 9/1/2025.) (Attachments: # 1 Exhibit Return Receipt − EPA, # 2 Exhibit Return Receipt − Zeldin, # 3 Exhibit Return Receipt − U.S Attorney General, # 4 Exhibit Return Receipt − U.S Attorney)(Grillot, Benjamin) (Entered: 08/12/2025) |
| 08/12/2025 | 93 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. UNITED STATES ENVIRONMENTAL PROTECTION AGENCY served on 7/1/2025. (See docket entry 92 to view document) (mg) (Entered: 08/13/2025) |
| 08/14/2025 | 94 | NOTICE OF WITHDRAWAL OF APPEARANCE as to CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, TREASURE ISLAND MOBILITY MANAGEMENT AGENCY. Attorney Julie Wilensky terminated. (Wilensky, Julie) (Entered: 08/14/2025) |
| 08/22/2025 | 95 | NOTICE OF SUPPLEMENTAL AUTHORITY by UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE M. ZELDIN (Attachments: # 1 Supplement)(Lundberg, Jessica) (Entered: 08/22/2025) |
| 08/25/2025 | 96 | NOTICE OF SUPPLEMENTAL AUTHORITY by 2C MISSISSIPPI, AIR ALLIANCE HOUSTON, ALLEGHENY COUNTY, PENNSYLVANIA, AMERICAN SOCIETY OF ADAPTATION PROFESSIONALS, APPALACHIAN VOICES, BESSEMER HISTORICAL SOCIETY, CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, CITY OF OAKRIDGE, CITY OF SACRAMENTO, CALIFORNIA, CITY OF SPRINGFIELD, MASSACHUSETTS, CLEAN AIR COALITION OF WESTERN NEW YORK, CLIMATE AND ENERGY PROJECT, CONNECTICUT ROUNDTABLE ON CLIMATE AND JOBS, DEEP SOUTH CENTER FOR ENVIRONMENTAL JUSTICE, DOWNWINDERS AT RISK, EASTERN RHODE ISLAND CONSERVATION DISTRICT, EMERALD CITIES COLLABORATIVE, ENGINEERS WITHOUT BORDERS, ERIE COUNTY RESTORATIVE JUSTICE COALITION, GATHER, GREENROOTS, HEALTH RESOURCES IN ACTION, HEALTHY BOURBON COUNTY ACTION TEAM, INSTITUTE FOR SUSTAINABLE COMMUNITIES, INTER−TRIBAL COUNCIL OF MICHIGAN, KALAMAZOO COUNTY, MICHIGAN, LOWCOUNTRY ALLIANCE FOR MODEL COMMUNITIES, MARTIN LUTHER KING JR. COUNTY, WASHINGTON, NATIVE VILLAGE OF KIPNUK, PARKS ALLIANCE OF LOUISVILLE, INC., PITTSBURGH CONSERVATION CORPS, PUSH BUFFALO, RACIAL & ENVIRONMENTAL JUSTICE COMMITTEE, RHODE ISLAND SCHOOL RECYCLING PROJECT, SANTA FE GREEN CHAMBER OF COMMERCE, SOUTHWEST RENEWAL FOUNDATION OF HIGH POINT, INC., STATE OF NEW YORK, TRANSPORTATION FOR MASSACHUSETTS, TREASURE ISLAND MOBILITY MANAGEMENT AGENCY, URBAN SUSTAINABILITY DIRECTORS NETWORK, WE ACT FOR ENVIRONMENTAL JUSTICE (Grillot, Benjamin) (Entered: 08/25/2025) |
| 08/27/2025 | 97 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Heidi H. Trimarco, Filing fee $ 100, receipt number ADCDC−11917359. Fee Status: Fee Paid. by AMERICAN SOCIETY OF ADAPTATION PROFESSIONALS, CITY OF OAKRIDGE, CLEAN AIR COALITION OF WESTERN NEW YORK, CLIMATE AND ENERGY PROJECT, CONNECTICUT ROUNDTABLE ON CLIMATE AND JOBS, EASTERN RHODE ISLAND CONSERVATION DISTRICT, EMERALD CITIES COLLABORATIVE, ENGINEERS WITHOUT BORDERS, ERIE COUNTY RESTORATIVE JUSTICE COALITION, GATHER, GREENROOTS, HEALTHY BOURBON COUNTY ACTION TEAM, RACIAL & ENVIRONMENTAL JUSTICE COMMITTEE, RHODE ISLAND SCHOOL RECYCLING PROJECT, SANTA FE GREEN CHAMBER OF COMMERCE, TRANSPORTATION FOR MASSACHUSETTS, URBAN SUSTAINABILITY DIRECTORS NETWORK. (Attachments: # 1 Exhibit A. Declaration, # 2 Exhibit B. Certificate of Good Standing, # 3 Exhibit C. Proposed Order)(Fross, Chloe) (Entered: 08/27/2025) |
| 08/29/2025 | | MINUTE ORDER. It is hereby ORDERED that the 97 Motion for Leave to Appear Pro Hac Vice is GRANTED. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. SO ORDERED. Signed by Judge Richard J. Leon on 8/29/2025. (lcrjl2) (Entered: 08/29/2025) |
| 08/29/2025 | 98 | MEMORANDUM OPINION. Signed by Judge Richard J. Leon on 8/29/2025. (lcrjl2) (Entered: 08/29/2025) |

| | | |
|---|---|---|
| 08/29/2025 | 99 | ORDER. Consistent with the attached Order, plaintiffs' 29 Motion for Preliminary Injunction DENIED; plaintiffs' 30 Motion to Certify Class is DENIED; and defendants' 66 Motion to Dismiss is GRANTED. See attached Order for details. Signed by Judge Richard J. Leon on 8/29/2025. (lchb) Modified text to correct spelling on 9/1/2025 (zljn). (Entered: 08/29/2025) |
| 09/16/2025 | 100 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 98 Memorandum & Opinion, 99 Order on Motion for Preliminary Injunction,, Order on Motion to Certify Class,, Order on Motion to Dismiss, by 2C MISSISSIPPI, AIR ALLIANCE HOUSTON, ALLEGHENY COUNTY, PENNSYLVANIA, APPALACHIAN VOICES, BESSEMER HISTORICAL SOCIETY, CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, CITY OF SACRAMENTO, CALIFORNIA, CITY OF SPRINGFIELD, MASSACHUSETTS, DEEP SOUTH CENTER FOR ENVIRONMENTAL JUSTICE, DOWNWINDERS AT RISK, HEALTH RESOURCES IN ACTION, INTER−TRIBAL COUNCIL OF MICHIGAN, KALAMAZOO COUNTY, MICHIGAN, LOWCOUNTRY ALLIANCE FOR MODEL COMMUNITIES, MARTIN LUTHER KING JR. COUNTY, WASHINGTON, NATIVE VILLAGE OF KIPNUK, PARKS ALLIANCE OF LOUISVILLE, INC., PITTSBURGH CONSERVATION CORPS, PUSH BUFFALO, SOUTHWEST RENEWAL FOUNDATION OF HIGH POINT, INC., TREASURE ISLAND MOBILITY MANAGEMENT AGENCY, WE ACT FOR ENVIRONMENTAL JUSTICE. Filing fee $ 605, receipt number ADCDC−11961868. Fee Status: Fee Paid. Parties have been notified. (Grillot, Benjamin) Modified docket text to add party, pursuant to Counsel on 9/17/2025 (mg). (Entered: 09/16/2025) |
| 09/16/2025 | 101 | Emergency MOTION for Injunction *Pending Appeal* by 2C MISSISSIPPI, AIR ALLIANCE HOUSTON, ALLEGHENY COUNTY, PENNSYLVANIA, APPALACHIAN VOICES, BESSEMER HISTORICAL SOCIETY, CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, CITY OF SACRAMENTO, CALIFORNIA, CITY OF SPRINGFIELD, MASSACHUSETTS, DEEP SOUTH CENTER FOR ENVIRONMENTAL JUSTICE, DOWNWINDERS AT RISK, HEALTH RESOURCES IN ACTION, INTER−TRIBAL COUNCIL OF MICHIGAN, KALAMAZOO COUNTY, MICHIGAN, LOWCOUNTRY ALLIANCE FOR MODEL COMMUNITIES, MARTIN LUTHER KING JR. COUNTY, WASHINGTON, NATIVE VILLAGE OF KIPNUK, PARKS ALLIANCE OF LOUISVILLE, INC., PITTSBURGH CONSERVATION CORPS, PUSH BUFFALO, SOUTHWEST RENEWAL FOUNDATION OF HIGH POINT, INC., TREASURE ISLAND MOBILITY MANAGEMENT AGENCY, WE ACT FOR ENVIRONMENTAL JUSTICE. (Attachments: # 1 Exhibit 1 − Letter, # 2 Exhibit 2 − Email, # 3 Text of Proposed Order)(Grillot, Benjamin) (Entered: 09/16/2025) |
| 09/17/2025 | 102 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 100 Notice of Appeal to DC Circuit Court. (mg) (Entered: 09/17/2025) |
| 09/17/2025 | | MINUTE ORDER. The Government shall respond to Plaintiffs' 101 Emergency Motion for Injunction Pending Appeal by Friday, September 19, 2025 at 5:00 PM. Plaintiffs may file a reply brief in support of its motion by Monday, September 22, 2025 at 5:00 PM. SO ORDERED. Signed by Judge Richard J. Leon on 9/17/2025. (lcrjl2) (Entered: 09/17/2025) |
| 09/18/2025 | 103 | TRANSCRIPT OF PROCEEDINGS before Judge Richard J. Leon held on August 5, 2025; Page Numbers: 1−38. Date of Issuance: September 18, 2025. Court Reporter/Transcriber Chandra Kean, RMR, Telephone number 202−354−3404. Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at |

| | | |
|---|---|---|
| | | www.dcd.uscourts.gov.<br><br>Redaction Request due 10/9/2025. Redacted Transcript Deadline set for 10/19/2025. Release of Transcript Restriction set for 12/17/2025.(Kean, Chandra) (Entered: 09/18/2025) |
| 09/19/2025 | | USCA Case Number 25−5333 for <u>100</u> Notice of Appeal to DC Circuit Court filed by 2C MISSISSIPPI, DEEP SOUTH CENTER FOR ENVIRONMENTAL JUSTICE, CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, ALLEGHENY COUNTY, PENNSYLVANIA, CITY OF SPRINGFIELD, MASSACHUSETTS, AIR ALLIANCE HOUSTON, NATIVE VILLAGE OF KIPNUK, LOWCOUNTRY ALLIANCE FOR MODEL COMMUNITIES, PARKS ALLIANCE OF LOUISVILLE, INC., SOUTHWEST RENEWAL FOUNDATION OF HIGH POINT, INC., APPALACHIAN VOICES, PUSH BUFFALO, TREASURE ISLAND MOBILITY MANAGEMENT AGENCY, DOWNWINDERS AT RISK, KALAMAZOO COUNTY, MICHIGAN, BESSEMER HISTORICAL SOCIETY, CITY OF SACRAMENTO, CALIFORNIA, MARTIN LUTHER KING JR. COUNTY, WASHINGTON, WE ACT FOR ENVIRONMENTAL JUSTICE, INTER−TRIBAL COUNCIL OF MICHIGAN, PITTSBURGH CONSERVATION CORPS. (znmw) (Entered: 09/19/2025) |
| 09/19/2025 | <u>104</u> | Memorandum in opposition to re <u>101</u> Emergency MOTION for Injunction *Pending Appeal* filed by UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE M. ZELDIN. (Lundberg, Jessica) (Entered: 09/19/2025) |
| 09/22/2025 | <u>105</u> | REPLY to opposition to motion re <u>101</u> Motion for Injunction,,, *pending appeal* filed by 2C MISSISSIPPI, AIR ALLIANCE HOUSTON, ALLEGHENY COUNTY, PENNSYLVANIA, APPALACHIAN VOICES, BESSEMER HISTORICAL SOCIETY, CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, CITY OF SACRAMENTO, CALIFORNIA, CITY OF SPRINGFIELD, MASSACHUSETTS, DEEP SOUTH CENTER FOR ENVIRONMENTAL JUSTICE, DOWNWINDERS AT RISK, HEALTH RESOURCES IN ACTION, INTER−TRIBAL COUNCIL OF MICHIGAN, KALAMAZOO COUNTY, MICHIGAN, LOWCOUNTRY ALLIANCE FOR MODEL COMMUNITIES, MARTIN LUTHER KING JR. COUNTY, WASHINGTON, NATIVE VILLAGE OF KIPNUK, PARKS ALLIANCE OF LOUISVILLE, INC., PITTSBURGH CONSERVATION CORPS, PUSH BUFFALO, SOUTHWEST RENEWAL FOUNDATION OF HIGH POINT, INC., TREASURE ISLAND MOBILITY MANAGEMENT AGENCY, WE ACT FOR ENVIRONMENTAL JUSTICE. (Grillot, Benjamin) (Entered: 09/22/2025) |
| 09/25/2025 | <u>106</u> | MEMORANDUM OPINION. Signed by Judge Richard J. Leon on 9/25/2025. (lcrjl2) (Entered: 09/25/2025) |
| 09/25/2025 | <u>107</u> | Order. Consistent with the attached Order, plaintiffs' <u>101</u> Emergency Motion for Injunction is DENIED. See attached for details. Signed by Judge Richard J. Leon on 9/25/2025. (lcrjl2) (Entered: 09/25/2025) |
| 01/12/2026 | <u>108</u> | NOTICE OF WITHDRAWAL OF APPEARANCE as to MARTIN LUTHER KING JR. COUNTY, WASHINGTON. Attorney Alison Chinn Holcomb terminated. (Holcomb, Alison) (Entered: 01/12/2026) |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**APPALACHIAN VOICES**
164 South Depot St.
Boone, NC 28607

**2°C MISSISSIPPI**
212-B Draperton Ct.
Ridgeland, MS 39157

**AIR ALLIANCE HOUSTON**
2520 Caroline St.
Houston, TX 77004

**ALLEGHENY COUNTY, PENNSYLVANIA**
436 Grant St.
Pittsburgh, PA 15219

**BESSEMER HISTORICAL SOCIETY (D/B/A STEELWORKS CENTER OF THE WEST)**
215 Canal St.
Pueblo, CO 81004

**CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA**
1 Dr. Carlton B. Goodlett Pl.
San Francisco, CA 94102

**CITY OF SACRAMENTO, CALIFORNIA**
915 I St.
Sacramento, CA 95814

**CITY OF SPRINGFIELD, MASSACHUSETTS**
36 Court St.
Springfield, MA 01103

**DEEP SOUTH CENTER FOR ENVIRONMENTAL JUSTICE**
9801 Lake Forest Blvd.
New Orleans, LA 70127

JA019

**DOWNWINDERS AT RISK**
1808 S. Good Latimer Expy. #202
Dallas, TX 75226

**HEALTH RESOURCES IN ACTION**
2 Boylston St.
Boston, MA 02116

**INSTITUTE FOR SUSTAINABLE**
**COMMUNITIES**
535 Stone Cutters Way
Montpelier, VT 05602

**INTER-TRIBAL COUNCIL**
**OF MICHIGAN**
2956 Ashmun St.
Sault Ste. Marie, MI 49783

**KALAMAZOO COUNTY, MICHIGAN**
201 W. Kalamazoo Ave.
Kalamazoo, MI 49007

**LOWCOUNTRY ALLIANCE FOR**
**MODEL COMMUNITIES**
2125 Dorchester Rd.
North Charleston, SC 29405

**MARTIN LUTHER KING JR.**
**COUNTY, WASHINGTON**
401 Fifth Ave.
Seattle, WA 98104

**NATIVE VILLAGE OF KIPNUK**
P.O. Box 57
Kipnuk, AK 99614

**PARKS ALLIANCE OF LOUISVILLE, INC.**
1711 Gresham Rd.
Louisville, KY 40205

**PITTSBURGH CONSERVATION CORPS**
**(D/B/A/ LANDFORCE)**
201 North Braddock Ave.
Pittsburgh, PA 15208

JA020

**PUSH BUFFALO**

429 Plymouth Ave.
Buffalo, NY 14213

**SOUTHWEST RENEWAL FOUNDATION
OF HIGH POINT, INC.**

501 W. High Avenue
High Point, NC 27260

**TREASURE ISLAND MOBILITY
MANAGEMENT AGENCY**

1455 Market St., 22nd Floor
San Francisco, CA 94103

**WE ACT FOR ENVIRONMENTAL
JUSTICE**

1854 Amsterdam Ave. – 2nd Floor
New York, NY 10031

*Plaintiffs, on behalf of themselves and
all others similarly situated,*

v.                                                    Civil Case No.: _____

**UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY;**

1200 Pennsylvania Ave. NW
Washington, D.C. 20460

**LEE ZELDIN, in his official capacity as
Administrator of the United States
Environmental Protection Agency;**

Mail Code 1101A
1200 Pennsylvania Ave. NW
Washington, D.C. 20460

*Defendants.*

## CLASS ACTION COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

    Plaintiffs, individually and on behalf of a class of others similarly situated, bring this

action against Defendants United States Environmental Protection Agency ("EPA") and

Administrator Lee Zeldin, in his official capacity (collectively, "Defendants").

3

JA021

## INTRODUCTION

1. In February 2025, the Environmental Protection Agency ("EPA"), under direction from President Trump, began to eliminate the Environmental and Climate Justice Block Grant program—a program Congress created and funded by specific appropriations as part of the Inflation Reduction Act ("IRA").

2. Over the next several weeks and months, EPA continued to eliminate the program, without any assessment of the consequences of its actions, and without any attempt to otherwise execute Congress's directive or administer its appropriations.

3. EPA's termination of the program is unlawful. It violates bedrock separation-of-powers principles by effectively repealing a congressional enactment and impounding funds based on nothing more than the President's disagreement with policies Congress duly enacted.

4. Further, it represents textbook arbitrary and capricious agency action by failing to engage in reasoned decision-making, ignoring important aspects of the problem—including the reliance interests of hundreds of entities impacted, ignoring potential alternatives, and relying on considerations Congress did not allow.

5. When Congress enacted the IRA in 2022, it amended the Clean Air Act to include the Environmental and Climate Justice Block Grant program.

6. Congress did so for a simple reason: it wanted to ensure that the benefits of its investments would flow to "disadvantaged communities"—those that face the greatest impacts from pollution and environmental degradation and have historically had little voice in the decision-making processes that affect them. 42 U.S.C. § 7438(b)(1).

7. Congress knew that individual communities would best know what programs and resources they most urgently needed. So, building on a block-grant model first developed by the

JA022

Nixon Administration, Congress designated a set of activities—including community-led air monitoring, climate resilience and adaptation projects, and workforce development projects to reduce greenhouse gas emissions—that would be eligible for grant funding. *Id.* § 7438(b)(2).

8. Congress explicitly required EPA to award this grant funding directly to disadvantaged communities—through community-based nonprofit organizations, Indian Tribes, local governments, and institutions of higher education that proposed to carry out eligible activities tailored to those communities' needs. *Id.* § 7438(b)(3).

9. Congress appropriated $3 billion of federal funding specifically to fund these activities. *Id.* § 7438(a). To effectuate Congress's mandate, EPA developed, as relevant here, four grant programs and a technical assistance program, and began a competitive grant-awarding process.

10. EPA reviewed thousands of applications, assessed their merit under strict criteria, selected the best ones, and awarded grants.

11. On the ground, hundreds of grantees, including Plaintiffs and proposed class members, got to work to improve their communities. They began to administer the grant programs they had committed to, and they received periodic reimbursement from EPA.

12. All this work came to a halt once President Trump entered office. On January 20, 2025, the President issued an executive order directing federal agencies to stop disbursement of all funds under the Inflation Reduction Act, including the grant funds at issue here. *Unleashing American Energy*, Exec. Order No. 14,154 (Jan. 20, 2025), 90 Fed. Reg. 8353, 8357 (Jan. 29, 2025) ("Energy EO"). He also mandated the termination of all "equity-related" grants or contracts within 60 days. *Ending Radical and Wasteful Government DEI Programs and Preferencing*, Exec. Order No. 14,151 (Jan. 20, 2025), 90 Fed. Reg. 8339, 8339 (Jan. 29, 2025) ("Anti-Equity EO").

13. EPA then began implementing these executive orders. It first froze all grant funding authorized under the Inflation Reduction Act, then moved to terminate the Environmental and Climate Justice Block Grant program—and all grants providing technical assistance for those grant applications. Ex. 1-A at ¶¶ 3–6; Ex. 1-B at ¶¶ 5–6; Ex. 1-C.

14. EPA terminated the grants *en masse*. As the agency has since admitted, it did not review individual grants—but rather reviewed "grant programs" and terminated them "for policy reasons" without distinguishing among grant recipients or activities. Ex. 1-A at ¶ 3; *see also* Ex. 1-C at 1–2; Ex. 1-D; Ex. 1-E ¶¶ 13-17. Instead, EPA made broad program-level decisions and sent out substantively identical termination notices to all grantees. Ex. 1-G; Ex. 1-I; Ex. 1-J.

15. Plaintiffs and proposed class members are the community-based nonprofit organizations, Tribes, local governments, and higher education institutions that EPA selected to receive those grants.

16. EPA's unlawful termination of the Environmental and Climate Justice Block Grant program thwarts Congress's mandate and has harmed and continues to harm Plaintiffs and proposed class members—as well as communities across the country—who are now unable to address environmental harms through these community-driven environmental, climate, and public health projects.

## **JURISDICTION AND VENUE**

17. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under federal law including the U.S. Constitution and the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 551 *et. seq.*

18. This Court has authority to enter a declaratory judgment and to provide temporary, preliminary, and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of

JA024

Civil Procedure; the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers. The APA further authorizes the Court to grant temporary and permanent relief from agency action. 5 U.S.C. §§ 705–06.

19. Plaintiffs and proposed class members bring this action under the U.S. Constitution and the APA, 5 U.S.C. §§ 702, 704. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and may issue declaratory and injunctive relief under 28 U.S.C. §§ 2201(a) and 2202, as well as vacatur under 5 U.S.C. § 706.

20. Venue is proper under 28 U.S.C. § 1391(b) and (e) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district. Defendants are a United States agency headquartered in Washington, D.C. and an officer of that agency sued in his official capacity.

## PARTIES

### Plaintiffs

21. Plaintiffs and proposed class members are nonprofit organizations, Tribes, local governments, and higher education institutions that each received one or more grants from the Environmental and Climate Justice Block Grant program. EPA terminated their grants when it terminated the Environmental and Climate Justice Block Grant program.

22. Plaintiff Appalachian Voices is a nonprofit organization headquartered in North Carolina that brings people together to protect the land, air, and water of Central and Southern Appalachia, and advance a just transition to a generative and equitable clean energy economy.

23. Plaintiff 2°C Mississippi is a nonprofit organization headquartered in Mississippi. The organization partners with Jackson, Mississippi communities to create climate resilience through adaptation, mitigation, and education projects.

JA025

24. Plaintiff Air Alliance Houston is a nonprofit organization headquartered in Texas that uses research, education, and advocacy to reduce the public health impacts of air pollution, primarily in Harris County. The organization routinely partners with smaller local environmental, climate, and community-based organizations and coalitions to achieve its mission.

25. Plaintiff Allegheny County is a municipality established under the laws of the Commonwealth of Pennsylvania. It is the second-most populous county in Pennsylvania and operates under a Home Rule Charter. In recent years, certain communities within the county have endured increased flooding, resulting in property damage and homes left uninhabitable.

26. Plaintiff Bessemer Historical Society (doing business as Steelworks Center of the West) ("Steelworks") is a nonprofit organization headquartered in Colorado. Steelworks operates a museum, provides education programs, and works to meet its community's needs, including by combating food deserts, addressing lack of public transportation, and building community resilience to disasters.

27. Plaintiff City and County of San Francisco ("San Francisco") is a municipal corporation organized and existing under and by virtue of the laws of the State of California and a charter city and county. San Francisco is home to several communities that suffer greater environmental burdens than other neighborhoods in the city.

28. Plaintiff City of Sacramento ("Sacramento") is a municipal corporation organized and existing under and by virtue of the laws of the State of California and a charter city. Although it is one of the nation's most integrated and diverse cities, like many cities, it experiences a differential in tree canopy across neighborhoods, with disadvantaged neighborhoods experiencing an up to 15-degree differential in temperatures.

29. Plaintiff City of Springfield ("Springfield") is a municipal corporation existing by virtue

8

of the laws of the Commonwealth of Massachusetts. Springfield is the third-largest city in the Commonwealth of Massachusetts and the fourth-largest in the New England region. Nestled in a valley that often traps air pollution, Springfield is ranked the #4 asthma capital in the United States. It also has significantly increased risk of childhood lead exposure and pedestrian fatalities.

30. Plaintiff Deep South Center for Environmental Justice is a nonprofit organization headquartered in Louisiana that conducts research, education, and health and safety training programs for environmental careers in the South and promotes the right of all people to be free from environmental harm.

31. Plaintiff Downwinders at Risk ("Downwinders") is a nonprofit organization headquartered in Texas that works to reduce particulate matter pollution in the Dallas-Fort Worth area and is a leading advocate for clean air in North Texas.

32. Plaintiff Health Resources in Action ("HRiA") is a nonprofit organization headquartered in Massachusetts. The organization partners with and awards grants to individuals, organizations, and communities to develop and implement local public health initiatives.

33. Plaintiff Institute for Sustainable Communities ("ISC") is a nonprofit organization headquartered in Vermont that trains and awards grants to local organizations to address environmental and safety issues. The organization supports small, community-based organizations' access to funding for projects that promote safe, clean, healthy, and resilient environments.

34. Plaintiff Inter-Tribal Council of Michigan is a nonprofit organization headquartered in Michigan that advocates for member tribes in the development of programs and policies which will improve the economy, education, and quality of life for Michigan's Native Americans. The

Council provides technical assistance to member tribes, and assists in the development of tribal regulations, ordinances, and policies applicable to health and human services.

35. Plaintiff Kalamazoo County is a municipal corporation and governmental subdivision organized and existing under the laws of the State of Michigan. As a result of industry historically located along the riverbed in Kalamazoo, certain neighborhoods within the county now experience air quality issues.

36. Plaintiff Lowcountry Alliance for Model Communities is a nonprofit organization headquartered in South Carolina. The organization addresses quality of life concerns, including environmental issues, in North Charleston, through development, education, employment, housing, and community involvement initiatives.

37. Plaintiff Martin Luther King, Jr. County ("King County") is a home rule charter county organized and existing under and by virtue of the constitution and laws of the State of Washington. King County experiences several climate-related stressors—including wildfires, flooding, extreme heat events, and poor indoor air quality—that harm community health.

38. Plaintiff the Native Village of Kipnuk ("Kipnuk") is a Federally-recognized Native American Tribe located in Kipnuk, Alaska. 85 Fed. Reg. § 5462. Almost all of Kipnuk's residents identify as of the Yup'ik culture, speak the Native language (Yup'ik), and maintain traditional lifeways, including subsistence hunting, fishing, and gathering to support their families and neighbors and ensure food security. The Village of Kipnuk is built on permafrost, but the permafrost is thawing.

39. Plaintiff Parks Alliance of Louisville, Inc. (also known as Louisville Parks Foundation) is a nonprofit organization headquartered in Kentucky. The organization's mission is to improve public health by equitably investing in and advocating for public parks in Louisville.

JA028

40. Plaintiff Pittsburgh Conservation Corps (d/b/a Landforce) ("Landforce") is a nonprofit organization headquartered in Pennsylvania that recruits and trains Pittsburgh-area adults in ecological restoration, providing them the support and skills to find and keep good-paying, permanent jobs.

41. Plaintiff PUSH Buffalo is a nonprofit organization headquartered in New York that works to create strong neighborhoods by supporting affordable and sustainable housing for local residents; addressing environmental issues including air pollution and lead, mold, and asbestos in homes; and training residents for careers in clean energy and sustainability.

42. Plaintiff Southwest Renewal Foundation of High Point, Inc. is a nonprofit organization headquartered in North Carolina. The organization's mission is to improve environmental health and community prosperity in High Point, which has some of the highest concentrations of poverty and adverse health impacts in the state.

43. Plaintiff Treasure Island Mobility Management Agency ("TIMMA") is a transportation agency existing under and by virtue of the laws of the State of California. TIMMA is responsible for developing and implementing a comprehensive transportation program for Treasure Island, defined also to include Yerba Buena Island. Treasure Island and Yerba Buena Island are located within the City and County of San Francisco. Treasure Island is one of San Francisco's lowest-income neighborhoods, with 42.1% of its residents below the federal poverty level, and it has a pollution score higher than that of 85-90% of all census tracts in California. TIMMA is a separate legal entity from the City and County of San Francisco.

44. Plaintiff WE ACT for Environmental Justice ("WE ACT") is a nonprofit organization headquartered in New York that works to ensure residents participate meaningfully in the creation of environmental health policies through environmental health education, workforce

11

JA029

development, and education about participatory engagement in government decision-making processes.

45. Plaintiffs have all been directly harmed by EPA's unlawful actions. Due to the termination of the Environmental and Climate Justice Block Grant program, Plaintiffs have been forced to lay off employees and cut essential programs.

46. For example, Plaintiff Deep South Center for Environmental Justice laid off three full-time employees and two contractors while Plaintiff Parks Alliance of Louisville terminated a Park Superintendent after losing its EJCPS grant. The Institute for Sustainable Communities has furloughed or laid off nearly 50% of its workforce due to the termination of its grant and the CEO of the Lowcountry Alliance for Model Communities is working without pay to prevent layoffs.

47. Further, Plaintiffs have suffered reputational harms—including a loss of goodwill and erosion of trust within their communities from having to break promises based on the expectation of continued federal support. Plaintiffs have had to cancel contracts, direct subawardees to stop work, and communicate to the public that they can no longer launch or continue their urgently needed projects.

48. These harms are redressable through a favorable decision. Granting Plaintiffs and proposed class members the relief sought here will allow them to continue work on their awarded grant projects and improve the health, safety, and resilience of frontline communities across the country.

JA030

**Defendants**

49. Defendant EPA is an independent agency in the executive branch of the United States government. *See* 5 U.S.C. § 552; Reorganization Plan No. 3 of 1970, 84 Stat. 2086 (July 9, 1970).

50. EPA is responsible for enforcing the Nation's environmental laws, for overseeing congressionally mandated grants and programs related to environmental protection, and for distributing funds Congress specifically appropriated to these grants and programs.

51. Defendant Lee Zeldin ("Defendant Zeldin") is the Administrator of the EPA. He is sued in his official capacity.

52. Defendant Zeldin and the EPA are tasked with the implementation of the Energy EO and the Anti-Equity EO's directive to "terminate … 'equity-related' grants or contracts." Anti-Equity EO § 2(b)(i).

53. Defendant Zeldin and the EPA awarded and then terminated the grants authorized by 42 U.S.C. § 7438 to Plaintiffs and proposed class members.

**Class Definition**

54. Plaintiffs bring this action on behalf of themselves and all others who are similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2).

55. Plaintiffs seek to represent the following class:

> All entities that received awards from the EPA authorized in whole or in part by 42 U.S.C. § 7438 which EPA then terminated after January 20, 2025 (including statutory partners). The covered awards are Environmental Justice Collaborative Problem Solving Cooperative Agreements (CFDA 66.306); Environmental and Climate Justice Community Change Grants (CFDA 66.616); Thriving Communities Grantmaking Grants (CFDA 66.615); Environmental Justice Government-to-Government Program awards awarded to non-State entities (CFDA 66.312), as well as awards to Thriving Communities Technical Assistance Centers (CFDA 66.309).

JA031

This class excludes the plaintiffs in *Sustainability Institute v. Trump*, No. 25-cv-2152-RMG (D.S.C.) or *Green & Healthy Homes Initiative, Inc. v. EPA*, No. 25-cv-01096 (D. Md.) and excludes entities whose awards were expressly terminated for identified financial or performance failures.

## FACTUAL ALLEGATIONS

### EPA's Environmental and Climate Justice Block Grant Program

56. In 2022, when Congress enacted the IRA, it made substantial federal investments in cutting-edge clean energy technology, lower energy costs, and mitigating the impacts of greenhouse gas emissions and toxic air pollution.

57. Congress intended these funds to support communities across the country, prioritizing those that have long borne the brunt of environmental and health harms.

58. As part of the IRA, Congress amended the Clean Air Act to create a new program for "Environmental and Climate Justice Block Grants." Pub. L. No. 117-169 § 60201, 136 Stat. 1818, 2078 (codified at 42 U.S.C. § 7438).

59. Using a block grant model first developed under the Nixon Administration, Congress appropriated $2.8 billion to EPA for projects to directly benefit communities across the country.

60. Recognizing that some communities most in need of assistance might lack the expertise to apply for and implement their projects, Congress appropriated another $200 million for technical assistance to support grant recipients in designing projects, preparing applications, and performing on their grants. 42 U.S.C. § 7438(a)(2).

61. Further, Congress required EPA to "reserve 7 percent" of these amounts for administrative costs to "carry out" these projects. *Id.* § 7438(c).

62. To ensure that these grants benefited those most impacted by pollution and environmental harms, Congress instructed that the EPA Administrator "***shall***" use these funds "to award grants for periods of up to 3 years to eligible entities to carry out [certain specified] activities . . . that

14

JA032

benefit disadvantaged communities," *id.* § 7438(b)(1) (emphasis added), such as "community-led air and other pollution monitoring, prevention, and remediation"; "mitigating climate and health risks from urban heat islands, extreme heat, wood heater emissions, and wildfire events"; "climate resiliency and adaptation"; "reducing indoor toxics and indoor air pollution"; and "facilitating engagement of disadvantaged communities in State and Federal advisory groups, workshops, rulemakings, and other public processes," *id.* § 7438(b)(2).

63. This funding was directed to "community-based nonprofit organizations," "a partnership of community-based nonprofit organizations," or a partnership between such nonprofits and "an Indian tribe, a local government, or an institution of higher education." *Id.* § 7438(b)(3).

64. EPA followed the congressional mandate established in 42 U.S.C. § 7438 and created four grant programs and a technical assistance program.[1]

65. Grant projects in the four grant programs have a performance period of three years or less. *Id.* § 7438(b)(1). Grants for the technical assistance program last for five years.[2]

66. Plaintiffs and proposed class members are recipients of grants under one or more of these programs.

**<u>Community Change Grants</u>**

67. Community Change Grants ("CCGs") fund projects that enhance climate resiliency or adaptation, mitigate climate and health risks, engage in community-led air and water pollution

---

[1] *Inflation Reduction Act Environmental and Climate Justice Program*, EPA (last updated Mar. 27, 2025), https://perma.cc/3BKM-DR5D. Although EPA also created the UPLIFT Climate and Environmental Community Action Grant program, no grants were awarded under that program. *Id.*

[2] *FAQs – EJ Thriving Communities Technical Assistance Centers Program (EJ TCTAC)* at 1, EPA (Oct. 2022), https://perma.cc/4QLC-SSY9.

JA033

monitoring, or develop a workforce that supports greenhouse gas reduction in disadvantaged communities most burdened by these environmental and health harms.[3]

68. To ensure meaningful community engagement, these grants are structured as partnerships between two community-based nonprofits, or between a community-based nonprofit and a federally recognized Tribe, a local government as defined in 2 C.F.R. § 200.1, or an institution of higher education.[4]

69. Prior to applying for a CCG, the Lead Applicant and its Statutory Partner must enter into a partnership agreement. If the application is selected for award, the Lead Applicant must enter into a subaward with the Statutory Partner to perform the promised elements of the project.[5]

70. Following Congress's direction, EPA established a competitive bidding process that called on applicants to submit grant proposals. EPA selected 105 recipients from 2,700 applications and awarded a total of nearly $1.6 billion to those proposals the agency judged best able to carry out Congress's mandate.

71. The following Plaintiffs and proposed class representatives received Community Change Grants: 2°C Mississippi, Air Alliance Houston, Inter-Tribal Council of Michigan, Kalamazoo County, the Native Village of Kipnuk, Landforce, PUSH Buffalo, Southwest Renewal Foundation, Springfield, TIMMA, and WE ACT for Environmental Justice.

72. Plaintiffs' Community Change Grants funded projects to develop community resilience hubs, workforce development programs, community education projects, and air quality monitoring, as well as to address high energy costs, among other initiatives.

---

[3] *Frequently Asked Questions: Community Change Grants Program* 2, EPA (Aug. 2023), https://perma.cc/AGH2-X245.

[4] *Id*. at 1.

[5] *Environmental and Climate Justice Community Change Grants Program Notice of Funding Opportunity (NOFO)*, EPA (Oct. 3 2024), https://perma.cc/HB8N-84N2.

JA034

73. For example, as part of its Climate Action Plan, Kalamazoo County's project included developing climate resiliency hubs and an associated training program for disaster preparedness and ensuring safe and energy-efficient housing through home energy audits, home weatherization upgrades, and deployment of air quality monitors. The project was designed to benefit low-income, pollution-burdened, and climate-insecure communities, where housing stock with lead pipes, poor weatherization, and other flaws has contributed to air toxicity and high rates of asthma and cardiovascular disease.

74. Air Alliance Houston was awarded a Community Change Grant to create or expand a permit engagement project in ten Texas counties. The project involved the development of tools, trainings, and technical assistance to help residents meaningfully contribute to highly technical permitting decisions for pollution sources in their neighborhoods by submitting comments and participating in permitting hearings.

75. The Native Village of Kipnuk was awarded a Community Change Grant to fund the Kipnuk Riprap Riverbank Stabilization Project, which aims to prevent environmental and cultural catastrophe. As the permafrost thaws in the village, the once-frozen riverbank becomes soft, and the erosion rate from the Kugkaktlik River accelerates. As of 2009, approximately 0.7 acres were lost each year, and the erosion rate has only increased since then. Kipnuk has already lost some of its critical infrastructure. Additional critical infrastructure—including the fuel header and pump house, boardwalks, the village corporation store, wind turbines, and the bulk fuel tank farm—are now all at risk. The grant-funded Stabilization Project aimed to stabilize the riverbank by building a revetment—a structure to keep the riverbank from eroding. The project also included removal of hazardous materials that pose a risk of contaminating the Kugkaktlik

JA035

River, and local workforce development and training to enable construction and maintenance of the revetment.

**Thriving Communities Grantmaking Program**

76. The Thriving Communities Grantmaking Program was designed to alleviate the burden of the federal grant process on small, resource-constrained community-based organizations.[6] EPA selects Grantmakers, who then create their own subaward application process and distribute subawards to community-based nonprofits, local governments, institutions of higher education, and Native American organizations planning to address environmental issues with assessment, planning, or development activities.

77. Some Grantmakers were selected to award subawards only in one EPA Region ("Regional Grantmakers"), while others were selected to award subgrants nationally ("National Grantmakers").[7]

78. EPA selected 11 Grantmakers and awarded each up to $60 million.[8]

79. The Grantmakers received their EPA grants in two parts: an initial grant to set up their subaward program and infrastructure, followed by a second installment for the subawards to local recipients.

80. EPA selected Plaintiffs and proposed class representatives HRiA and the Institute for Sustainable Communities as Thriving Communities Grantmakers.

---

[6] *Environmental Justice Thriving Communities Grantmaking (TCGM) Program*, EPA, https://perma.cc/UJ4P-2PNN.

[7] *FAQs – The Environmental Justice Thriving Communities Grantmaking Program (EJ TCGM)* at 6, EPA Office of Environmental Justice and External Civil Rights (June 2023), https://perma.cc/YCJ7-T2PJ.

[8] *Environmental Justice Thriving Communities Grantmaking (TCGM) Program*, EPA, https://perma.cc/L54N-QTY3.

JA036

81. HRiA was chosen as a Grantmaker for EPA Region 1.[9] As a Regional Grantmaker, HRiA awarded subgrants to local Tribes and community-based organizations in Region 1 to address local and regional needs such as flooding and stormwater planning, heat resilience, transportation access, forever chemicals, and job training.

82. EPA selected Institute for Sustainable Communities as a National Grantmaker. Like HRiA, the Institute for Sustainable Communities awarded subgrants focused on building capacity in communities. As a National Grantmaker, it awarded subgrants to more than 90 projects across the country before EPA shut down the program. These included projects that reduce exposure to harmful air quality, train youth leaders in weather and its impact on agriculture and water quality, install wastewater treatment systems in rural communities lacking adequate wastewater management, and support the development of affordable, sustainable housing. The funding for these projects is now on hold due to the disruption of the grant.

**Environmental Justice Collaborative Problem Solving Cooperative Agreements**

83. Environmental Justice Collaborative Problem Solving Cooperative ("EJCPS") Agreements are grants designed to fund organizations solving local environmental and public health problems through collaborative partnerships with other stakeholders, such as local businesses, industry, local government, medical service providers, and academic institutions.[10]

---

[9] EPA has ten Regional offices, each of which is responsible for executing programs in specific states and territories. The TCTAC for Region 1 serves local Tribes and community-based organizations in Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont.

[10] *The Collaborative Problem-Solving Cooperative Agreement Program*, EPA (last updated Mar. 21, 2025), https://perma.cc/29EE-JLBE; *see also Biden-Harris Administration Announces Nearly $1.6 Billion in Environmental and Climate Justice Community Change Grants*, EPA (Dec. 12, 2024),https://perma.cc/8CU2-KPDE.

84. The Clean Air Act mandates that applicants be community-based organizations (or partnerships of such organizations) with grant projects addressing challenges like natural disaster preparedness and recovery, lack of access to healthy food, and water quality issues. 42 U.S.C. § 7438(b)(2), (b)(3). Qualifying work under these grants includes projects to develop health impact assessments, emergency response plans, and economic revitalization initiatives.[11]

85. In fiscal year 2023, EPA awarded a total of $43.8 million in EJCPS Grants to 98 recipients.[12]

86. Plaintiffs and proposed class representatives Appalachian Voices, 2°C Mississippi, Downwinders at Risk, HRiA, Lowcountry Alliance for Model Communities, Parks Alliance of Louisville, and Steelworks received EJCPS grants. Their ECJPS projects were designed to improve natural disaster preparedness; mitigate flooding; provide access to low-cost renewable energy, sustainable transportation, and workforce development opportunities; and improve indoor air quality in schools.

87. For example, HRiA received EJCPS funding to develop and implement plans to improve indoor air quality in Massachusetts schools in districts where students are most burdened by asthma and extreme heat.

88. Appalachian Voices received EJCPS funding to implement shovel-ready infrastructure projects in five economically depressed communities in rural Virginia suffering from the impacts of the decline of the coal industry. One flood-prone community in Pound, Virginia, planned to build a flood-mitigating riverwalk to prevent floodwaters from disturbing dilapidated buildings full of mold and asbestos and thereby releasing these harmful substances into the air.

---

[11] *2023 Environmental Justice Collaborative Problem Solving (EJCPS) Program Project Summaries* at 1, EPA, https://perma.cc/A2CR-52AJ.

[12] *Id.*

89. Because EPA terminated the grant, Appalachian Voices is unable to continue the project. Pound cannot fund the project on its own: the town's ability to bring in tax revenue has been so diminished by economic decline that its ability to pay its bills is a continual struggle.

**Government-to-Government Program**

90. The Government-to-Government Program supports government activities that integrate environmental considerations into governmental decision-making and measurably improve environmental and public health.[13] EPA awarded these grants to partnerships between community organizations and either Tribes or local governments.[14]

91. In 2023, EPA awarded roughly $58 million of Government-to-Government Program grants to approximately 62 local governments and Tribes, including Plaintiffs and proposed class representatives Allegheny County, King County, Sacramento, and San Francisco.

92. Plaintiffs' projects aimed to address challenges such as air quality, toxic pollution, water quality, food insecurity, affordable transportation access, and emergency preparedness.[15]

93. For example, King County's project aimed to empower communities to take an active role in improving housing and health outcomes, including by: (1) educating 2,300 frontline community members, caregivers, and childcare providers on healthy homes and climate resilience, and (2) providing 700 homes and childcare providers with in-home assessments to

---

[13] *The Environmental Justice Government-to-Government (EJG2G) Program*, EPA, https://perma.cc/W9C5-9EKN.

[14] While the Government-to-Government program also provides grants to states, states are not "eligible entities" for the purposes of 42 U.S.C. § 7438 funding; accordingly, those grants are not relevant here. 42 U.S.C. § 7438(b)(3).

[15] *2023 Environmental Justice Government-to-Government (EJG2G) Program Project Summaries*, EPA, https://perma.cc/HDU9-Z3JW.

JA039

identify indoor air quality concerns and Healthy Homes Kits to support healthier indoor environments.

94. San Francisco's project aimed to engage communities that are most burdened by air pollution levels and predominantly low-income to recommend and implement community-led climate action to inform implementation of San Francisco's 2021 Climate Action Plan. Through partnerships with community-based organizations, the project would increase communities' capacity to understand and act on climate change; improve government response and services; improve health outcomes; and reduce greenhouse gas emissions in local communities. Such community partnership is essential to the success of San Francisco's 2021 Climate Action Plan, which aims to reach net-zero carbon emissions by 2040.

**Thriving Communities Technical Assistance Centers**

95. In partnership with the Department of Energy, EPA created the Environmental Justice Thriving Communities Technical Assistance Centers ("TCTACs") to support the Thriving Communities Grantmaking Program, among other grant programs. TCTACs assist under resourced communities with identifying grant funding sources, writing grant proposals, and managing federal grants, including those authorized under 42 U.S.C. § 7438.[16]

96. EPA awarded $177 million to fund 18 TCTACs across the country. *Id.*

97. Plaintiffs and proposed class representatives Deep South Center for Environmental Justice, Institute for Sustainable Communities, and WE Act for Environmental Justice were designated as TCTACs.

---

[16] *Biden-Harris Administration Announces $177 Million for 17 New Technical Assistance Centers Across the Nation to Help Communities Access Historic Investments to Advance Environmental Justice*, EPA (Apr. 13, 2023), https://perma.cc/KT4B-YZ7E.

98. Deep South Center for Environmental Justice was designated the TCTAC for EPA

Regions 4 and 6, which cover the Southeast and South Central United States. Prior to the

termination of the grant program, the Deep South Center for Environmental Justices Community

Investment Recover Center was serving approximately 70 grassroots partner organizations across

13 states.

99. The Institute for Sustainable Communities was designated as a national TCTAC and also

served as the interim TCTAC for EPA Region 1. As a national TCTAC, it supported both regional

TCTACs and communities through training and developing centralized resources. Before its

award was terminated, it had processed over 100 technical assistance requests from regional

TCTACs.

100. WE ACT is the TCTAC for EPA Region 2 and entered into agreements with steering

committee partners, a project consultant, and 18 subawardees.

**<ins>EPA's Termination of the Environmental and Climate Justice Block Grant Program</ins>**

<ins>President Trump Issues Executive Orders Instructing EPA
to Terminate Environmental and Climate Justice Block Grant Program</ins>

101. Shortly after his inauguration, on January 20, 2025, President Trump issued an

executive order declaring "that *no Federal funding be employed in a manner contrary to the*

*principles outlined in this section*." *Unleashing American Energy*, Exec. Order No. 14,154 (Jan.

20, 2025), 90 Fed. Reg. 8353, 8354 (Jan. 29, 2025) ("Energy EO") at § 2 (emphasis added).

102. Section 7 of the Energy EO, titled "Terminating the Green New Deal," further provided

that:

> [a]ll agencies shall immediately pause the disbursement of funds appropriated
> through the Inflation Reduction Act of 2022 (Public Law 117-169) or the
> Infrastructure Investment and Jobs Act (Public Law 117-58) . . . and shall review
> their processes, policies, and programs for issuing grants, loans, contracts, or any

other financial disbursements of such appropriated funds *for consistency with* the law and *the policy outlined in section 2 of this order*.

Energy EO § 7 (emphases added), 90 Fed Reg. at 8354.

103. The Energy EO forbade the disbursement of any funds that the executive branch deems inconsistent with certain agency policies. *Id.*

104. The Energy EO cited no legal authority for its across-the-board freeze of congressionally appropriated funds.

105. Also on January 20, 2025, President Trump issued an executive order directing federal agencies to "*terminate . . .* all . . . 'equity-related' grants or contracts" within sixty days, i.e., by March 21, 2025, among other directives. *Ending Radical and Wasteful Government DEI Programs and Preferencing*, Exec. Order No. 14,151 (Jan. 20, 2025), 90 Fed. Reg. 8339, 8339 (Jan. 29, 2025) ("Anti-Equity EO") at § 2(b) (emphasis added).

106. The Anti-Equity EO also instructed federal agencies to provide the director of OMB with a list of all "Federal Grantees" who received Federal funding for "environmental justice" programs, *id.* § 2(b)(ii)(C) and ordered agencies to "terminate" all "environmental justice" offices and positions, *id.* § 2(b)(i).

107. The Anti-Equity EO did not define "equity-related" grants or "environmental justice."

108. The Anti-Equity EO cited no legal authority to categorically terminate all "equity-related" grants and contracts.

<u>EPA Terminates the Environmental and Climate Justice Block Grant Program</u>

109. EPA then began implementing these executive orders. On February 20, 2025, EPA Assistant Deputy Administrator Travis Voyles identified a set of certain "approved to cancel" Environmental and Climate Justice Block Grants as well as TCTACs as targets for termination.

JA042

Ex. 1-C (T. Voyles Email re cancelling grants - Feb. 20, 2025). EPA terminated these grants

shortly thereafter and identified the terminations as "taxpayer savings" in a press release.[17]

110. EPA then proceeded to cancel all Environmental and Climate Justice Block Grants. On

February 25, 2025, Mr. Voyles conducted a review of EPA grant programs "for consistency with

Agency policy priorities." Ex. 1-A ¶ 3 (T. Voyles Decl.). He did so based on the "Assistance

Number Listing" identifying entire grant programs. *Id.*

111. Mr. Voyles then unilaterally—in the course of a single day—decided to terminate

Environmental Justice Collaborative Problem-Solving Cooperative Agreements (CFDA 66.306);

Environmental and Climate Justice Community Change Grants (CFDA 66.616); Thriving

Communities Grants (CFDA 66.615); the Environmental Justice Government-to-Government

Program (66.312); and the TCTAC program (66.309) "for policy reasons." Ex. 1-A ¶ 3 (T. Voyles

Decl.); Ex. 1-F (D. Coogan Email to T. Voyles – Feb. 25, 2025).

112. This decision expanded on Mr. Voyles' earlier instructions to staff  to "apply a broad

approach and cancel them all [TCTACs] in the vein the program is inconsistent with

Administration priorities." Ex. 1-C (T. Voyles Email re cancelling grants - Feb. 20, 2025).

113. While this termination was in process, EPA put a "control" in the Automated System for

Administrative Payment ("ASAP") system, and grantees could not draw down any funds. Ex. 1-

H (G. Treml email re account hold – Mar. 7, 2025). EPA applied this control at the grant program

level, meaning that the single "control" applied to all Environmental and Climate Justice Block

Grants.

---

[17] *EPA Administrator Lee Zeldin Cancels 20 Grants in 2nd Round of Cuts with DOGE, Saving Americans More than $60M*, EPA (Feb. 25, 2025), https://perma.cc/KV5D-XK99.

114. In February through May 2025, EPA sent form letters to grantees purporting to formally terminate the grants. EPA instructed its grant managers to terminate grants with a boilerplate template response to each grantee. EPA directed grant managers to "Copy/paste email language from Grant Termination [memo]" and then attach a form termination letter to the email. Ex. 1-G at 2 (M. Wise email re termination procedure – Feb. 21, 2025); *see also* Ex. 1-I (EPA Grant Termination Standard Operating Procedure); Ex. 1-J (Boilerplate Termination Letter).

115. EPA has stated its intent to terminate all grants awarded to Plaintiffs and proposed class members under the Environmental and Climate Justice Block Grant program for "policy reasons." Ex. 1-A ¶ 3 (T. Voyles Decl.); *see also* Ex. 1-B ¶¶ 5–6 (D. Coogan Decl.).

## LEGAL FRAMEWORK

### I.    Congress's Legislative Authority

#### A.    The Power of the Purse

116. The United States Constitution grants Congress the power to make the laws of this nation. The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives." U.S. Const. art. I, § 1.

117. Congress's lawmaking powers are at their apex on matters of federal funding. The Constitution grants the power of the purse to Congress, not the President. *See, e.g.*, *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am. Ltd.*, 601 U.S. 416, 420 (2024); *see also* Mem. from John G. Roberts, Jr. to Fred F. Fielding at 1 (Aug. 15, 1985), https://perma.cc/G5AA-GJAU ("[N]o area seems more clearly the province of Congress than the power of the purse.").

118. This power is "exclusive" to Congress, which "has absolute control of the moneys of the United States" under our Constitution. *Rochester Pure Waters Dist. v. EPA*, 960 F. 2d 180, 185

(D.C. Cir. 1992) (citation and quotations omitted). "Any exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 425 (1990).

119. Congress's power over the purse is rooted in two constitutional provisions. The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. The Appropriations Clause expressly "was intended as a restriction upon the disbursing authority of the Executive department." *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937).

120. The Spending Clause provides that "Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defense and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1.

121. Through these multiple grants of authority, the Constitution gives Congress broad power to legislate spending and to decide how and when its appropriations are spent. *See South Dakota v. Dole*, 483 U.S. 203, 206 (1987).

122. When Congress passes a law appropriating money for a particular purpose, the President must spend that money for that purpose. This duty stems from the Take Care Clause, which states that the President "shall take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3; *see Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes laws and the President . . . 'faithfully execute[s]' them.").

123. "[A] President sometimes has policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program. But in those circumstances,

even the President does not have unilateral authority to refuse to spend the funds." *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.).

124. If a President disagrees with Congress's spending decision, he can veto the legislation; but once a spending law has passed, the executive branch must spend the money on the terms Congress has provided. *See Train v. City of New York*, 420 U.S. 35, 40–44 (1975).

125. The executive branch has no constitutional power to amend or repeal statutes, *Clinton v. City of New York,* 524 U.S. 417, 438 (1998) and doubly lacks the power to supplant Congress's spending directives with his own.

126. When the executive branch intrudes on Congress's power over the purse, it violates the separation of powers. "Congress's power of the purse is the ultimate check on the otherwise unbounded power of the Executive," *U.S. House of Representatives v. Burwell*, 130 F. Supp. 3d 53, 76 (D.D.C. 2015), and acts as a "bulwark of the Constitution's separation of powers," *U.S. Dep't of Navy v. Fed. Labor Rel. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012). Allowing the Executive to usurp this power "would be clothing the President with a power entirely to control the legislation of congress, and paralyze the administration of justice." *Kendall v. U.S. ex rel. Stokes*, 37 U.S. 524, 613 (1838).

127. "Liberty is always at stake when one or more of the branches seek to transgress the separation of powers." *Clinton*, 524 U.S. at 450 (Kennedy, J., concurring). Nowhere is this more apparent than when a President attempts to unilaterally seize the Nation's purse strings and nullify a congressional enactment to serve his policy goals.

### B.    The Presentment Clauses

128. The Presentment Clauses form equally "integral parts of the constitutional design for the separation of powers." *Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 946 (1983).

JA046

129. These Clauses provide that "[e]very Bill which shall have passed the House of Representatives and the Senate, shall, before it becomes a Law, be presented to the President of the United States," and that "before [a law] shall take Effect, [it] shall be approved by [the President], or being disapproved by him, shall be repassed by two thirds of the Senate and House of Representatives, according to the Rules and Limitations prescribed in the Case of a Bill." U.S. Const. art. I, § 7, cl. 2–3.

130. The Presentment Clauses grant the President "a limited and qualified power to nullify proposed legislation by veto." *Chadha*, 462 U.S. at 947. This "finely wrought and exhaustively considered" constitutional procedure precludes by implication the President's power "to enact, to amend, or to repeal statutes" in any other way. *Clinton*, 524 U.S. at 438–39 (quoting *Chadha*, 462 U.S. at 951).

131. The Constitution's careful limitations on the President's role in lawmaking are designed to protect the people from tyranny. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 633 (1952) (Douglas, J., concurring) ("The Framers with memories of the tyrannies produced by a blending of executive and legislative power rejected that political arrangement.").

### C.    Jurisdiction over constitutional claims

132. Federal district courts have jurisdiction over nonstatutory claims to enjoin federal officials from acting unconstitutionally. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010); *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949); *see also Strickland v. United States*, 32 F. 4th 311, 363-66 (4th Cir. 2022). These claims arise when federal officials act "beyond the scope of their powers" and "in an unconstitutional manner." *Strickland*, 32 F.4th at 366.

133. Claims for nonstatutory review of constitutional infirmities are deeply rooted in the history of the judiciary. "Indeed, the most famous case of all, *Marbury v. Madison*, was a nonstatutory review case." Jonathan R. Siegel, *Suing the President: Nonstatutory Review Revisited*, 97 Colum. L. Rev. 1612, 1625 (1997).

134. Where plaintiffs bring nonstatutory claims for injunctive or declaratory relief against federal officials for alleged unconstitutional action, "sovereign immunity does not bar a suit." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996); *see also Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355 (D.C. Cir. May 28, 2025) (en banc) (adopting J. Pillard's dissent in *Widakusawara*, 2025 WL 1288817).

135. Sovereign immunity does not bar such claims because actions that exceed constitutional authority "are considered individual and not sovereign actions." *Strickland*, 32 F. 4th at 366 (quoting *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949)).

136. "[W]henever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen*, 594 U.S. 220, 245 (2021).

137. The Tucker Act does not confer jurisdiction over constitutional claims on the Court of Federal Claims unless they are based on constitutional provisions that create "a substantive right enforceable against the federal government for money damages." *LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995).

138. Separation-of-powers and Presentment Clauses claims are not based on such provisions, and are not reviewable in the Court of Federal Claims. *Id*.

## II.    The Administrative Procedure Act

139. Congress enacted the APA to ensure fairness and stability in agency action by mandating reasoned decision-making, and to guard against agencies' pursuit of a political agenda

without adherence to legal process. *See United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950) (describing the APA "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices"); *see also N.C. Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 772 (4th Cir. 2012) (Wilkinson, J., concurring) (noting that the APA prohibits policy change based on "political winds and currents" without adherence to "law and legal process").

140. To effectuate these goals, the APA imposes both substantive and procedural constraints on final agency action. *See Cent. Tex. Tel. Coop., Inc. v. Fed. Commc'ns Comm'n*, 402 F.3d 205, 209 (D.C. Cir. 2005). As to the former, the APA requires courts to set aside agency action that is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)–(C).

141. The APA tasks courts—not the Executive—with "deciding whether an agency has acted within its statutory authority." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). This is because the APA "codifies" the "elemental proposition reflected by judicial practice dating back to *Marbury*," that "courts, not agencies" decide what the law is. *Id.* at 371.

142. As to process, the APA requires an agency to "acknowledge and explain" and show "good reasons" for changes in position. *U.S. Telecom Ass'n v. Fed. Commc'ns Comm'n*, 825 F.3d 674, 706–07 (D.C. Cir. 2016) (citation and quotations omitted).

143. To enforce these principles, the APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

144. An agency fails to engage in "reasoned decisionmaking," and its actions are arbitrary and capricious, when the agency "has relied on factors which Congress has not intended it to consider, [or] entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 52 (1983).

145. An agency must "examine the relevant data and articulate a satisfactory explanation for its action," *id.* at 43, "including a rational connection between the facts found and the choice made," *Dep't of Commerce v. New York*, 588 U.S. 752, 773 (2019) (quoting *State Farm*, 463 U.S. at 43). "This foundational precept of administrative law is especially important where, as here, an agency changes course." *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020).

146. When an agency is not writing on a "blank slate" but is "changing [its] position," the agency must "provide a more detailed justification than what would suffice for a new policy" if, "for example, . . . its prior policy has engendered serious reliance interests that must be taken into account." *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

147. When changing policy, agencies must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 33 (2020). "[W]hen an agency rescinds a prior policy its reasoned analysis must [also] consider the alternatives that are within the ambit of the existing policy." *Id.* at 30 (citation and quotations omitted).

148. At bottom, an agency must give "good reasons for the new policy," *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 223 (2016) (citation and quotations omitted), including "a

32

reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy," *Fox*, 556 U.S. at 515-16.

149. Section 702 of the APA waives sovereign immunity and vests jurisdiction over APA claims for injunctive or declaratory relief in the federal district courts. 5 U.S.C. § 702.

150. That waiver does not apply where another statute grants consent to suit explicitly or expressly or impliedly forbids the relief which is sought. *Id.*

151. The Tucker Act, 28 U.S.C. § 1491, does not grant consent to suit over claims for equitable relief, nor does it expressly or impliedly forbid federal district courts from granting that relief.  *See Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817 at *13 (D.C. Cir. May 3, 2025) (Pillard, J., dissenting),[18] *citing Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988).

## CLASS ACTION ALLEGATIONS

152. The allegations in the preceding paragraphs are incorporated herein by reference. Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2).

153. Plaintiffs seek to represent the following class (the "proposed class"):

> All entities that received awards from the EPA authorized in whole or in part by 42 U.S.C. § 7438 which EPA then terminated after January 20, 2025 (including statutory partners). The covered awards are Environmental Justice Collaborative Problem-Solving Cooperative Agreements (CFDA 66.306); Environmental and Climate Justice Community Change Grants (CFDA 66.616); Thriving Communities Grantmaking Grants (CFDA 66.615); Environmental Justice Government-to-Government Program awards awarded to non-State entities (CFDA 66.312), as well as awards to Thriving Communities Technical Assistance Centers (CFDA 66.309).

> This class excludes the plaintiffs in *Sustainability Institute v. Trump*, No. 25-cv-2152-RMG (D.S.C.) or *Green & Healthy Homes Initiative, Inc. v. EPA*, No. 25-cv-01096 (D.

---

[18] Judge Pillard's dissent in the *Widakuswara* panel decision was substantially adopted by the D.C. Circuit sitting en banc. *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355, at *1 (D.C. Cir. May 28, 2025) (denying stay pending appeal "substantially for the reasons explained by Judge Pillard.").

Md.) and excludes entities whose awards were expressly terminated for identified financial or performance failures.

154. Plaintiffs reserve the right to modify or amend the class definition prior to the Court's determination on certification.

155. Certification of a class is appropriate where: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). The disposition of the claims of all class members will provide substantial benefits to all parties and the Court.

### Rule 23(a)(1) - Numerosity

156. The proposed class is so numerous that joinder of all members is impracticable. *See* Fed. R. Civ. P. 23(a)(1). Defendants terminated approximately 350 awards[19] under these programs to entities across the country.

### Rule 23(a)(2) - Commonality

157. The proposed class's claims turn on common questions of fact or law that are capable of classwide resolution. *See* Fed. R. Civ. P. 23(a)(2). The legality of Defendants' mass terminations is a common question capable of resolution in one stroke. The proposed class representatives seek common declaratory and injunctive relief concerning the legality of Defendants' mass termination actions, and relief mandating Defendants cease these constitutional and statutory violations.

158. Among the common questions of law and fact for the class are:

---

[19] The exact number of proposed class members is readily identifiable and known to Defendants.

JA052

a) Whether EPA engaged in a course of conduct that unlawfully terminated the Environmental and Climate Justice Block Grant program under which class members received their grants;

b) Whether EPA's termination of the Environmental and Climate Justice Block Grant program violated the Constitution's Separation of Powers and Presentment Clauses;

c) Whether EPA's termination of the Environmental and Climate Justice Block Grant program violated the APA;

d) Whether Plaintiffs and the other class members are entitled to injunctive and/or declaratory relief.

### Rule 23(a)(3) - Typicality

159. Plaintiffs' claims are typical of the proposed class as a whole. *See* Fed. R. Civ. P. 23(a)(3). Each class member's claim arises from the same course of events (Defendants' termination of the Environment and Climate Justice Block Grant program) and each class member has experienced the same injury (the termination of their grants) if relief is denied.

### Rule 23(a)(4) - Adequacy

160. Plaintiffs will fairly and adequately represent the proposed class. *See* Fed. R. Civ. P. 23(a)(4). They are committed to seeking a declaration and injunction that will benefit all members of the proposed class equally by declaring their award terminations illegal and restoring those awards and grant programs as they existed before the terminations. Plaintiffs are aware of their obligations as class representatives and willing to dedicate time and effort to vigorously pursue this matter on behalf of every member of the proposed class.

161. Proposed class counsel have extensive relevant experience and are committed to zealously representing the proposed class. *See* Fed. R. Civ. P. 23(a)(4), 23(g). Proposed class counsel are attorneys from Southern Environmental Law Center, Public Rights Project, and Earthjustice with extensive complex civil litigation experience in administrative law, constitutional law, and class actions, including work on IRA funding freezes and terminations in

*Sustainability Institute et al. v. Trump et al.*, No. 25-cv-2152 (D.S.C.) and *Cultivate KC et al. v. USDA et al.*, No. 25-cv-00737 (D.D.C.), and extensive knowledge of both the details of Defendants' unlawful actions and the relevant law. *See* Fed. R. Civ. P. 23(a)(4), (g). Counsels' relevant qualifications are more fully set forth in the declarations to be filed with a forthcoming Motion for Class Certification and its accompanying memorandum and exhibits.

162. The combined efforts of counsel and proposed class counsel have included significant time and resources helping disadvantaged communities obtain IRA and IIJA federal funding for climate resilience, clean energy and climate justice projects, and securing access to clean, affordable drinking water.

163. Since January 2025, counsel and proposed class counsel have investigated and challenged unlawful grant freezes, disruptions, and terminations. This work has included providing legal and technical guidance to affected grantees, and engaging in consultations with coalitions, stakeholders, attorneys, and national experts working to address these funding disruptions.

164. Proposed class counsel have devoted significant time and resources to becoming knowledgeable about Defendants' unlawful grant freeze and termination practices.

## Rule 23(b)(2)

165. Certification of the proposed class is appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants acted on grounds generally applicable to the class when they terminated the grant programs *en masse*, for the same purported policy reasons. Fed. R. Civ. P. 23(b)(2). EPA's actions violate the Constitution and the APA in the same way for all class members. Accordingly, injunctive and declaratory relief are appropriate for the class as a whole.

JA054

## CLAIMS FOR RELIEF

## COUNT I

### *Violation of Separation of Powers*

166. The allegations in the preceding paragraphs are incorporated herein by reference.

167. "[W]henever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins*, 594 U.S. at 245.

168. The U.S. Constitution grants Congress, not the President, exclusive power over the nation's purse and the power to legislate. U.S. Const. art. I, § 9, cl. 7; art. I, § 8, cl. 1; art. I, § 1.

169. When Congress appropriates funds for a specified purpose, the President has a duty to spend those funds on the terms set by Congress. *See* U.S. Const. art. II, § 3 (Take Care Clause).

170. The President has no constitutional power to terminate funds appropriated by Congress, particularly when the termination is based on Presidential policies rather than Congress's spending directives. *See, e.g.*, *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1231–35 (9th Cir. 2018).

171. Congress has enacted the Environmental and Climate Justice Block Grant program under the IRA and Clean Air Act and appropriated $3 billion in funding for those programs to serve enumerated purposes specified in these statutory programs. 42 U.S.C. § 7438.

172. Consistent with its constitutional and statutory duties, EPA obligated these funds to specific entities via a rigorous, regulated, and competitive grantmaking process.

173. Defendants are constitutionally required to carry out these congressionally mandated programs, and to obligate and distribute the funds that Congress appropriated for these programs.

174. EPA terminated these entire grant programs *en masse* for "policy reasons." Ex. 1-A ¶ 3 (T. Voyles Decl.).

JA055

175. EPA's decision to terminate the Environmental and Climate Justice Block Grant program contravenes Congress's directives in the Clean Air Act as amended by the IRA to fund the statutory programs at issue in this case. *See, e.g.*, 42 U.S.C. § 7438(b)(1) (directing that EPA "shall" award grants for certain activities "that benefit disadvantaged communities").

176. EPA did not identify any statutory, regulatory, or constitutional authority to terminate congressionally appropriated funds based on the President's policy preferences.

177. Indeed, the President's policy preferences as articulated in the Anti-Equity EO conflict with the very purposes for which Congress created the Environmental and Climate Justice Block Grants—namely to "benefit disadvantaged communities" and advance "environmental and climate justice."

178. All the relevant constitutional powers here—the powers to appropriate, spend, and legislate—belong solely to Congress. The President has no constitutional power to unilaterally withhold funds appropriated by Congress, much less based on policies that conflict with what Congress specified.

179. EPA's decision to terminate the grant programs authorized by 42 U.S.C. § 7438 violates Congress's spending power, *see* U.S. Const. art. I, § 8, cl. 1 (Spending Clause), art. I, § 9, cl. 7 (Appropriations Clause), and Congress's power to legislate, *see* U.S. Const. art. I, § 1 (Legislative Power), and thus violates the separation of powers.

## <u>COUNT II</u>

### <u>*Violation of the Presentment Clauses*</u>

180. The allegations in the preceding paragraphs are incorporated herein by reference.

181. The Presentment Clauses limit the President's role in lawmaking to vetoing an "entire bill . . . *before* the bill becomes law." *Clinton*, 524 U.S. at 439. "Presidential action that either

JA056

repeals or amends *parts of duly enacted statutes*" violates the Presentment Clauses. *Id.* (emphasis added).

182. EPA's termination of the grant programs mandated by 42 U.S.C. § 7438 violates the Presentment Clauses because it seeks to "terminat[e]" parts of the IRA after they were passed by Congress and signed by the President. *See* Energy EO § 7; Anti-Equity EO § 2(b)(i).

183. In purpose and in effect, EPA's termination of grant programs required by 42 U.S.C. § 7438 unlawfully amends the spending provisions of the IRA by ending grant programs mandated by Congress, based on *presidential* policies that are wholly different than *Congress's* directives for the funds and programs. *See supra* ¶¶ 109-115.

184. By cancelling Congress's spending directives and replacing them with the President's policy preference to withhold appropriated funds, EPA's termination of the grant programs authorized by 42 U.S.C. § 7438 seeks to repeal that section and amend the IRA in violation of the Presentment Clauses. *See* U.S. Const. Art. I, § 7, cl. 2–3.

185. For these reasons, EPA's termination of the grant programs authorized by 42 U.S.C. § 7438 violates the Presentment Clauses.

## COUNT III

### *Violation of the APA – Arbitrary and Capricious*

186. The allegations of the preceding paragraphs are incorporated herein by reference.

187. The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

JA057

188. EPA's termination of the Environmental and Climate Justice Block Grant program for policy reasons, and each subsequent termination of Plaintiffs' grants and TCTACs, are final agency actions subject to review under the APA.

189. EPA's termination of the grant programs, and its subsequent termination of all grants, is arbitrary and capricious for multiple reasons.

190. First, EPA terminated grant programs for which Congress had appropriated $3 billion under the IRA without engaging in a "reasoned analysis" for the terminations as the APA requires. *State Farm,* 463 U.S. at 57.  EPA has not provided an explanation as to why terminating the entire Environmental and Climate Justice Block Grant program was necessary to effectuate the Administration's general "policy priorities."

191. Second, EPA terminated the Environmental and Climate Justice Block Grant program without consideration of "an important aspect of the problem."  *Id.* at 43. Specifically, EPA failed to consider the "serious reliance interests" of Plaintiffs and proposed class members of the class on those funds. *Fox,* 556 U.S. at 515. EPA also failed to consider the consequences of suddenly cutting funding to hundreds of nonprofits, Tribes, local governments, universities and the communities they serve.

192. Instead, EPA "cut the fuel supply to a vast, complicated, nationwide machine— seemingly without any consideration for the consequences of that decision." *Nat'l Council of Nonprofits v. Off. of Mgmt. and Budget*, 763 F. Supp. 3d 36, 55 (D.D.C. 2025). To say that EPA "'failed to consider an important aspect of the problem' would be putting it mildly." *Id.*

193. Third, EPA's decision to terminate the grant programs authorized by 42 U.S.C. § 7438 relies "on factors which Congress has not intended [EPA] to consider." *State Farm*, 463 U.S. at

43. Specifically, this action terminated funds based on the *agency's* policies, contrary to Congress's specific directives and purposes for appropriating funds in the IRA.

194. Fourth, EPA failed to consider how the wholesale termination of the Environmental and Climate Justice Block Grant program would impact the "primary goal[s]" of Clean Air Act Section 138. *Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*, 921 F.3d 1102, 1111, 1115 (D.C. Cir. 2019) (finding agency action arbitrary and capricious where it failed to "consider the impact of the change on [the agency program's] 'primary purpose' or otherwise explain how it is compatible with that purpose").

195. The unexplained termination of these grant funds epitomizes agency action by "whim and caprice of the bureaucracy." *N.C. Growers' Ass'n*, 702 F.3d at 772 (Wilkinson, J., concurring).

196. EPA's actions that terminated the grant programs authorized by 42 U.S.C. § 7438 and its subsequent termination of all grants must be vacated as arbitrary and capricious under the APA. 5 U.S.C. § 706(2)(A).

## COUNT IV

### *Violation of the APA – Contrary to Law*

197. The allegations of the preceding paragraphs are incorporated herein by reference.

198. The APA requires courts to hold unlawful and set aside agency actions "contrary to constitutional right, power, privilege, or immunity," "in excess of statutory jurisdiction, authority, or limitations," or "not in accordance with law." 5 U.S.C. § 706(2)(A)–(C).

199. "Courts"—not the Executive—"must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright*, 603 U.S. at 412.

200. For four reasons, EPA's termination of the Environmental and Climate Justice Block Grant program is outside of the agency's statutory authority, contrary to law, and without observance of procedure required by law. 5 U.S.C. § 706(2)(A)–(C). These agency actions must be held unlawful and vacated under the APA. *Id.* § 706(2).

201. First, EPA's termination of the grant programs is outside of its statutory authority. *Id.* § 706(2)(C). No federal law or regulation gives EPA the power to terminate funding appropriated by Congress and obligated by executive agencies. The executive branch has terminated these grant programs based on policies that are entirely different than, and in many cases directly in conflict with, the directives and purposes specified by Congress for expending the funds.

202. By refusing to expend appropriated funds based on the *President's* priorities rather than "stated statutory factors," the "Executive has acted contrary to law and in violation of the APA." *New York*, 2025 WL 357368, at *2.

203. Second, these agency actions are unconstitutional on the grounds set forth in Counts I–II and are thus "not in accordance with law" and "contrary to constitutional right, power, privilege, or immunity" under the APA, 5 U.S.C. § 706(2)(A), (B).

204. Third, these agency actions are "not in accordance with" the Clean Air Act, as amended by the IRA, 42 U.S.C. § 7438(b)(1), which appropriated money to the grant programs at issue here. 5 U.S.C. § 706(2)(A). Defendants' actions are not in accordance with the statutory requirements to create, fund, and carry out these programs. *See* 42 U.S.C. § 7438(b)(1) (directing that EPA "shall" award grants for certain activities "that benefit disadvantaged communities" and enumerating specific categories of eligible activities and eligible recipients).

205. Fourth, these agency actions are "not in accordance with" the Impoundment Control Act of 1974 ("ICA"). 5 U.S.C. § 706(2)(A); *see* 2 U.S.C. § 683. By terminating the grant programs

and individual grants, Defendants have unlawfully withheld the expenditure of funds.

Defendants initially deferred the funds for impermissible policy reasons and without following

the ICA's requirements for notifying Congress, and then unilaterally rescinded the funds,

contravening the ICA's requirement that should the President seek such a rescission, he must

request it of Congress and *Congress* must act to rescind the funds. 2 U.S.C. § 683(b).

## COUNT V

### *Violation of the APA – Contrary to Law*
### De-Obligation of All Environment and Climate Justice Block Grants

206. The allegations of the preceding paragraphs are incorporated herein by reference.

207. In enacting the federal grant programs at issue in this case, Congress mandated that $3

billion in funding for those programs be obligated to serve enumerated purposes. 42 U.S.C.

§ 7438(a), (b)(2).

208. In recognition of Congress's instruction, EPA issued programmatic terms for the grant

programs that recognize the requirement to fully obligate the funds that Congress appropriated

for the Environmental and Climate Justice Block Grant program.

209. For example, the Community Change Grant Program terms stipulate that if EPA de-

obligates any awarded funds it must "re-obligate them by an award to another Community

Change Grant recipient receiving an award pursuant to Notice of Funding Opportunity EPA-R-

OEJECR-OCS-23-04 to effectuate the objectives of Section 138 of the Clean Air Act, 42 USC

§ 7438 within 90 days of the de-obligation." Ex. 1-K at 16 (Community Change Grant

Programmatic Terms and Conditions).

210. Yet EPA's termination of the grant programs at issue here includes no effort to comply

with Congress's requirement that the funds remain obligated to the Environmental and Climate

JA061

Justice Block Grant program. Instead, EPA viewed these terminations as "immediate taxpayer savings," evidencing its intent to specifically *not obligate* the funds.[20]

211. Contrary to Congress's instruction, upon information and belief, EPA now seeks to de-obligate the entirety of the remaining appropriated funds without any provision for the funds to be re-obligated.

212. For the reasons set forth above, EPA's termination of the Environmental and Climate Justice Block Grants violates the Constitution; the Clean Air Act, as amended by the IRA; and the Impoundment Control Act. It also violates Congress's express instruction that the appropriated funds be obligated.

213. EPA's termination of the grant programs authorized by 42 U.S.C. § 7438 and intention to de-obligate the previously awarded funds is in excess of the agency's statutory authority, unconstitutional, and not in accordance with law. 5 U.S.C. § 706(2)(A)–(C). These agency actions must be held unlawful and vacated under the APA. *Id.* § 706(2).

## **PRAYER FOR RELIEF**

For the reasons set forth above, Plaintiffs respectfully request that the Court grant the following relief:

A. Certify this class as a Class Action pursuant to Federal Rule of Civil Procedure 23(b)(2);

B. Issue a declaratory judgment that the termination of grant programs mandated by Section 138 of the Clean Air Act, 42 U.S.C. § 7438, and the termination of legally-obligated grant awards issued under those programs violate the United States Constitution and the APA, 5 U.S.C. § 706;

---

[20] *EPA Administrator Lee Zeldin Cancels 400+ Grants in 4th Round of Cuts with DOGE, Saving Americans More than $1.7B*, EPA (Mar. 10, 2025), https://perma.cc/6FSC-GKFJ.

C.  Pursuant to 5 U.S.C. § 706 of the Administrative Procedure Act, hold unlawful and set aside EPA's termination of federal grant programs authorized by Section 138 of the Clean Air Act., 42 U.S.C. § 7438;

D.  Preliminarily and permanently enjoin EPA from taking action to terminate grant programs authorized by Section 138 of the Clean Air Act, 42 U.S.C. § 7438;

E.  Require EPA to reinstate all grant awards previously authorized by Section 138 of the Clean Air Act, 42 U.S.C. § 7438, for all class members, that were terminated beginning in February 2025;

F.  Require EPA to make adequate staffing and other resources available to effectuate the grant programs mandated by Section 138 of the Clean Air Act, 42 U.S.C. § 7438;

G.  Require EPA to extend the period of performance to allow Plaintiffs and class members to complete the period of performance specified in their grant agreements, accounting for the time between the time they lost access to their grant funding and this Court's order;

H.  Retain jurisdiction over this matter to ensure compliance with the above relief;

I.  Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, in accordance with law pursuant to 28 U.S.C. § 2412; and

J.  Grant such other and further relief as this Court may deem just and proper.

Respectfully submitted this 25th day of June 2025,

/s/ Ben Grillot
Ben Grillot (D.C. Bar No. 982114)
Kimberley Hunter (N.C. Bar No. 41333)
(Pro Hac Vice forthcoming)
Irena Como (N.C. Bar No. 51812)
(Pro Hac Vice forthcoming)
James Whitlock (N.C. Bar No. 34304)
(Pro Hac Vice forthcoming)
SOUTHERN ENVIRONMENTAL LAW CENTER
122 C St NW, Suite 325

45

JA063

Washington, DC 20001
Telephone: (202) 828-8382
Facsimile: (202) 347-6041
bgrillot@selc.org
kmeyer@selc.org
icomo@selc.org
jwhitlock@selc.org

*Counsel for Appalachian Voices, 2°C Mississippi,
Lowcountry Alliance for Model Communities, Parks
Alliance of Louisville, Pittsburgh Conservation
Corps (Landforce) and Southwest Renewal
Foundation and Proposed Class Counsel*

/s/ Hana V. Vizcarra
Hana V. Vizcarra (D.C. Bar No. 1011750)
Deena Tumeh (D.C. Bar No. 1741543)
Linnet Davis-Stermitz (WA Bar No. 63190)
(Pro Hac Vice forthcoming)
Molly Prothero (D.C. Bar No. 1779237)
Andrew Saavedra (N.Y. Bar No. 6062814)
(Pro Hac Vice forthcoming)
EARTHJUSTICE
1001 G Street NW, Suite 1000
Washington, D.C. 20001
Telephone: (202) 667-4500
hvizcarra@earthjustice.org
dtumeh@earthjustice.org
ldavisstermitz@earthjustice.org
mprothero@earthjustice.org
asaavedra@earthjustice.org

*Counsel for Air Alliance Houston, Bessemer
Historical Society (d/b/a Steelworks Center of the
West), Deep South Center for Environmental
Justice, Downwinders at Risk, Health Resources in
Action, Institute for Sustainable Communities,
Inter-Tribal Council of Michigan, PUSH Buffalo,
and WE ACT for Environmental Justice and
Proposed Class Counsel*

/s/ Toby Merrill
Toby Merrill (D.C. Bar ID MA0006)
Graham Provost (D.C. Bar No. 1780222)
Elaine Poon (VA Bar No. 91963)
(Pro Hac Vice forthcoming)

JA064

PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609
Telephone: (510) 738-6788
toby@publicrightsproject.org
graham@publicrightsproject.org
elaine@publicrightsproject.org

*Counsel for Allegheny County, Kalamazoo County, King County, Native Village of Kipnuk, City of Sacramento, City and County of San Francisco, City of Springfield, and Treasure Island Mobility Management Agency and Proposed Class Counsel*

/s/ Gary DiBianco
Gary DiBianco (D.C. Bar No. 458669)
Jillian Blanchard (CA Bar No. 203593)
(Pro Hac Vice forthcoming)
Larissa Koehler (CA Bar No. 289581)
(Pro Hac Vice forthcoming)
LAWYERS FOR GOOD GOVERNMENT
6218 Georgia Avenue NW, # 5001
Washington, D.C. 20011
Telephone: (202) 258-6826
Gary@lawyersforgoodgovernment.org
Jillian@lawyersforgoodgovernment.org
Larissa@lawyersforgoodgovernment.org

*Co-Counsel for Institute for Sustainable Communities, Inter-Tribal Council of Michigan, Kalamazoo County, and Native Village of Kipnuk*

/s/ Yvonne R. Meré
David Chiu (CA Bar No. 189542)
SAN FRANCISCO CITY ATTORNEY
Yvonne R. Meré (CA Bar No. 175394)
(Pro Hac Vice forthcoming)
Chief Deputy City Attorney
Mollie M. Lee (CA Bar No. 251404)
(Pro Hac Vice forthcoming)
Chief of Strategic Advocacy
Sara J. Eisenberg (CA Bar No. 269303)
(Pro Hac Vice forthcoming)
Chief of Complex and Affirmative Litigation
Julie Wilensky (CA Bar No. 271765)
(Pro Hac Vice forthcoming)

47

JA065

Deputy City Attorney
1390 Market Street, 7th Floor
San Francisco, CA 94102
Telephone: (415) 554-4274
yvonne.mere@sfcityatty.org
mollie.lee@sfcityatty.org
sara.eisenberg@sfcityatty.org
julie.wilensky@sfcityatty.org

*Counsel for Plaintiffs City and County of San Francisco and Treasure Island Mobility Management Agency*

/s/ David J. Hackett
David J. Hackett (WA Bar No. 21234)
(pro hac vice forthcoming)
General Counsel to King County Executive &
Special Deputy Prosecutor
Alison Holcomb (WA Bar No. 23303)
(pro hac vice forthcoming)
Deputy General Counsel to King County Executive
& Special Deputy Prosecutor
OFFICE OF KING COUNTY PROSECUTING ATTORNEY
LEESA MANION
401 5th Avenue, Suite 800
Seattle, WA 98104
(206) 477-9483
David.Hackett@kingcounty.gov
aholcomb@kingcounty.gov

*Counsel for Plaintiff Martin Luther King, Jr. County*

48

JA066

APPALACHIAN VOICES, ET AL v. EPA

# EXHIBIT 1-A

## Declaration of Travis Voyles

## EPA Assistant Deputy Administrator

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA**

The Sustainability Institute, et. al.,

                Plaintiffs,

     v.

DONALD J. TRUMP, in his official
capacity as President of the United
States, et. al.,

                Defendants

Civil Action No.: 2:25-cv-02152-RMG

## DECLARATION OF TRAVIS VOYLES

I, TRAVIS VOYLES, declare and state as follows:

1.     I am an Assistant Deputy Administrator at the U.S. Environmental Protection Agency. The Assistant Deputy Administrator is the EPA official responsible for providing executive and logistical support for the EPA Administrator. I have held this position since January 2025. I make the following factual statements based on my personal knowledge and belief. If called as a witness, I could and would competently testify thereto.

2.     The following is provided in response to paragraph 1 of the April 29, 2025, Court Order ("the Order"), specifically regarding:

- Grant #2 on Exhibit A to the Order, Grant #5F-03D33625-0 to Earth Island Institute, listed as "Termination in Progress";

- Grant #3 on Exhibit A to the Order, Grant #03D30824[1] to The Sustainability Institute, listed as "Termination in Progress";

- Grant #4 on Exhibit A to the Order, Grant #97T28301 to Leadership Counsel for Justice and Accountability, listed as "Termination in Progress";

---

[1] Exhibit A erroneously omitted a zero from the beginning of this grant number.

1

- Grant #5 on Exhibit A to the Order, Grant #96272300 to Bronx River Alliance, listed as "Termination in Progress";

- Grant #6 on Exhibit A to the Order, Grant #97T28901 to Earth Island Institute, listed as "Termination in Progress";

- Grant #7 on Exhibit A to the Order, Grant #00A01479 to City of New Haven, listed as "Termination in Progress";

- Grant #8 on Exhibit A to the Order, inadvertently identified as Grant #0E+00000 to the City of Madison, and therefore incorrectly listed as "Closed", and which should be listed as Grant #00E05005 to the City of Madison, and "Termination in Progress";

  and

- Grant #9 on Exhibit A to the Order, Grant #00A01441 to City of New Haven, listed as "Terminated";

- Grant #10 on Exhibit A to the Order, Grant #95336801 to City of Baltimore, listed as "Terminated";

- Grant #11 on Exhibit A to the Order, Grant #03D03424 to CleanAIRE NC, listed as "Terminated";

- Grant #12 on Exhibit A to the Order, Grant #96229424 to Bronx River Alliance, listed as "Terminated".

3.      On February 25, 2025, I conducted an individualized review of EPA grant programs for consistency with Agency policy priorities. That day, I decided that certain grant programs, identified by "Assistance Number Listing," should be terminated for policy reasons. I orally communicated my decision to Daniel Coogan, Deputy Assistant Administrator for Infrastructure and Extramural Resources in the Office of Mission Support. That evening, Mr. Coogan sent an

2

JA069

email to me, copying others, documenting the decision I had made earlier that day. *See* Exhibit 1, Bates No. EPA_00289735.

4. On March 7, 2025, Mr. Coogan sent an email to leadership in the EPA Office of the Chief Financial Officer instructing them to put a financial control in the Automated Standard Application for Payments (ASAP) system for the grants that had been identified for termination. In a separate email, I elaborated that the purpose of the control was "to prevent any drawdowns in the time between announcement and execution [of grant termination] through [the Office of Mission Support]." *See* Exhibit 2, Bates No. EPA_00048219.

5. Later that day, staff in the EPA Office of the Chief Financial Officer executed my instructions, and sent an email back to their leadership with an attached excel spreadsheet verifying the programs they had subjected to the financial control, as well as a list of the individual awards for which drawdowns had been frozen as a result. *See* Exhibit 3, Bates No. EPA_00000735 and Exhibit 4, Bates No. EPA_00000739. Each of the grants listed in Paragraph 1 of this Declaration appears on that spreadsheet.

6. Consistent with my instruction, throughout March, EPA began terminating the grants I had originally identified for termination on February 25, 2025, while noting the need to comply with court orders in various cases. *See* Exhibit 5, Bates No. EPA_00292053 and Exhibit 6, Bates No. EPA_00292054. Accordingly:

- Grant #9 on Exhibit A to the Order, Grant #00A01441 to City of New Haven was terminated on March 27, 2025;

- Grant #10 on Exhibit A to the Order, Grant #95336801 to City of Baltimore was terminated on March 26, 2025;

- Grant #11 on Exhibit A to the Order, Grant #03D03424 to CleanAIRE NC, was terminated on March 28, 2025; and

- Grant #12 on Exhibit A to the Order, Grant #96229424 to Bronx River Alliance, was terminated on March 28, 2025.

JA070

7.     The process of terminating grants while remaining in compliance with court orders continues today. *See* Exhibit 7, Decl. of Daniel Coogan filed in *Woonasquatucket River Watershed Council et al. v. Department of Agriculture et al.*, 1:25-cv-00097 (D.R.I.), April 23, 2025, at para 5.

8.     Accordingly, each of the grants identified in Paragraph 1 of this Declaration as "termination in progress" has not been terminated, and, as of the date of this Declaration, each of those recipients currently has access to draw down funding from ASAP.

9.     In response to paragraph 4 of the April 29, 2025, Order, regarding Grant #15 on Exhibit A to the Order, Grant #0602.24.082555 to Alliance for the Shenandoah Valley, upon further review, that grant is not from the U.S. Environmental Protection Agency. Therefore, I have no information to provide regarding that grant.

10.     In response to paragraph 5 of the April 29, 2025, Order, regarding Grant #8 on Exhibit A to the Order, as indicated in paragraph 1 of this Declaration above, Exhibit A erroneously identified the subject grant as Grant #0E+00000 to the City of Madison, and as a result incorrectly listed as the grant as "Closed." Upon further review, the grant at issue is Grant #00E05005 to the City of Madison, and its status is "Termination in Progress." Funds are currently available to the recipient.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 6th day of May 2025.

/s/
TRAVIS
VOYLES



Digitally signed by TRAVIS VOYLES
Date: 2025.05.06 15:00:29 -04'00'

Travis Voyles
Assistant Deputy Administrator
United States Environmental Protection Agency

4

APPALACHIAN VOICES, ET AL v. EPA

# EXHIBIT 1-B

# Declaration of Daniel Coogan

# EPA Office of Mission Support Deputy Assistant Administrator

# DECLARATION OF DANIEL COOGAN

I, Daniel Coogan, declare and state as follows:

1.    I am the Deputy Assistant Administrator for Infrastructure and Extramural Resources in the Office of Mission Support, for the United States Environmental Protection Agency ("EPA") located at 1200 Pennsylvania Avenue, NW, Washington, D.C. 20460. I have been in my current position since December 2023, and I have been at the agency since November 2004.   I make the following factual statements based on my personal knowledge and belief.  If called as a witness, I could and would competently testify thereto.

2.    During the transition between the last Presidential Administration and the current Administration, EPA has limited activity on grant awards and actions so career staff can brief the new Administration on the on-going grants and programs and help the new Administration understand how the program aligns with their priorities including ensuring the safeguard of Agency funds.

3.    As part of this effort, and distinct from any Executive Orders or OMB memorandums, EPA leadership conducted an individualized, grant-by-grant review to determine which grants should continue, which should be modified, and which should be terminated based on alignment with Administration priorities or the purposes for which the Federal award was made. EPA began this process for the Administration in January 2025.

4.    The review process resulted in EPA continuing all Infrastructure Investments and Jobs Act ("IIJA") grants, which include 2,004 active grants totaling $27.5 billion. Many Inflation Reduction Act ("IRA") grants remain active following review, including 979 active grants totaling $39.5 billion.

5.    The above review process occurred prior to the issuance of the preliminary injunction on April 15, with decisions to terminate tranches of IRA grants made on the following dates: February 13, March 3, March 10, and April 14.

**Exhibit G**                                                                                          JA073

EPA is in the process of sending out the formal termination/cancellation notices to all of the impacted grantees. EPA has already sent out formal notices to approximately 377 grantees. For the remaining approximately 404 grantees, EPA plans to issue notices within the next two weeks.

6.    EPA has only paused access to funding in Automatic Standard Application for Payments ("ASAP") for recipients of the following IRA grant programs which are slated to be terminated as mentioned above: Environmental Justice Collaborative Problem-Solving Cooperative Agreement Program; Surveys, Studies, Investigations, Training and Special Purpose Activities Relating to Environmental Justice; Environmental Justice Government-to-Government (EJG2G) Program; Environmental Justice Small Grant Program; Financial Assistance For Community Support Activities To Address Environmental Justice Issues; Environmental Justice Thriving Communities Grantmaking Program (EJ TCGM); Environmental and Climate Justice Block Grant Program; and Reducing Embodied Greenhouse Gas Emissions for Construction Materials and Products.

7.    EPA understands the Court's Order to require that all funds appropriated under the IRA or IIJA be unfrozen unless there is a pre-existing determination (from before entry of the preliminary injunction) to pause that funding on an individualized basis for some other, independent reason (i.e., apart from the fact that it was appropriated under the IRA or IIJA).  The above still-paused, soon-to-be-terminated IRA grants meet those criteria.  Accordingly, EPA believes that continued pauses of those grants complies with the Court's Order.  EPA is not "freezing, halting, or pausing on a non-individualized basis the processing and payment of funding that (1) was appropriated under the Inflation Reduction Act or the Infrastructure Investment and Jobs Act and (2) has already been awarded." *Woonasquatucket River Watershed Council v. United States Dep't of Agric.*, No.

JA074

1  1:25-cv-00097-MSM-PAS, 2025 U.S. Dist. LEXIS 71378 (D.R.I. Apr. 15, 2025)

2  (order granting preliminary injunction).

3       8.      Despite the current pause on these grants, EPA will still reimburse all

4  costs incurred prior to the grant formally being terminated, once recipients submit

5  final invoices as part of the grant close-out process as detailed in the grant

6  termination letter and at 2 CFR § 200.334.

7       9.      Restoring access to the paused grants would expose EPA and taxpayers

8  to tremendous risk as recipients would have the ability to draw-down large portions

9  of grant funding in ASAP, and could believe that they have an incentive to make

10  such draws if they believed the pause on the suspension was temporary. Recouping

11  these funds upon termination of the grants would be difficult.

12       I declare under penalty of perjury that the foregoing is true and correct.

13

14  DANIEL       Digitally signed by
             DAN EL COOGAN
15  COOGAN       Date: 2025.04 23
             10:45:40 -04'00'

16  Daniel Coogan
   Deputy Assistant Administrator for
17  Infrastructure and Extramural
   Resources
18  Office of Mission Support
   U.S. Environmental Protection
19  Agency

20

21

22

23

24

25

26

27

28

JA075

APPALACHIAN VOICES, ET AL v. EPA

# EXHIBIT 1-C

# Email from T. Voyles re TCTACs

6/24/2024



--

Travis Voyles
C: (202) 787-0595

**From:** Voyles, Travis
**Sent:** Thursday, February 20, 2025 8:22 AM
**To:** Killian, Cole <Killian.Cole@epa.gov>; Loving, Kathryn <Loving.Kathryn@epa.gov>
**Cc:** Corlett, Thomas <Corlett.Thomas@epa.gov>; Hanson, Paige (Catherine) <hanson.catherine@epa.gov>; Vaseliou, Molly <Vaseliou.Molly@epa.gov>
**Subject:** RE: Loving, Kathryn shared "contract_details" with you

Good Morning Team—

Below are the next set of approved to cancel grants. $42,261,933 total in remaining funds it looks like, but OMS can confirm.

One flag I have is the first few large ones are the EJ Thriving Communities Technical Assistance Centers (TCTACs)— https://www.epa.gov/environmentaljustice/environmental-justice-thriving-communities-technical-assistance-centers. There were 18 in total established, so a number of them are missed here. Not sure why they didn't all get captured (they may not have all gone out yet), but I would want to apply a broad approach and cancel them all in the vein the entire program is inconsistent with Adminstration priorities and I personally do not see the need for these because at the state-level, EPA and the TCTAC grantees refused to engage with the state in any kind of coordination. This should result in a larger $$ amount.

I can flag for OMS separately too that we want the cancellation to extend to every TCTAC grantee.

| Date Cancellation Process Started | Rationale | Terms and Conditions (T&C) | URL |
|---|---|---|---|
| 2/11/2025 | Environmental justice work; DEI EO issues. Wasteful. | Signed before July 1, 2024. No notice and comment required: 2 CFR 200.340(a)(2) (2003) | https://www.usaspending.gov/award/ASST_NON_84061101_6800 |
| 2/11/2025 | Environmental justice work; DEI EO issues. Wasteful. | Signed before July 1, 2024. No notice and comment required: 2 CFR 200.340(a)(2) (2003) | https://www.usaspending.gov/award/ASST_NON_13746681_6800 |

EPA_00299077

| 2/11/2025 | Environmental justice work; DEI EO issues. Wasteful. | Signed before July 1, 2024. No notice and comment required: 2 CFR 200.340(a)(2) (2003) | https://www.usaspending.gov/award/ASST_NON_98T65801_6800 |
|---|---|---|---|
| 2/11/2025 | Environmental justice work; DEI EO issues. Wasteful. | Signed before July 1, 2024. No notice and comment required: 2 CFR 200.340(a)(2) (2003) | https://www.usaspending.gov/award/ASST_NON_95314201_6800 |

EPA_00299078

| 2/11/2025 | Environmental justice work; DEI EO issues. Wasteful. | Signed before July 1, 2024. No notice and comment required: 2 CFR 200.340(a)(2) (2003) | https://www.usaspending.gov/award/ASST_NON_96701501_6800 |
| 2/11/2025 | Environmental justice work; DEI EO issues. Wasteful. | Signed before July 1, 2024. No notice and comment required: 2 CFR 200.340(a)(2) (2003) | https://www.usaspending.gov/award/ASST_NON_00E03450_6800 |
| 2/11/2025 | Environmental justice work; DEI EO issues. Wasteful. | Signed before July 1, 2024. No notice and comment required: 2 CFR 200.340(a)(2) (2003) | https://www.usaspending.gov/award/ASST_NON_00E03451_6800 |

EPA_00299079

| 2/11/2025 | Environmental justice work; DEI EO issues. Wasteful. | Signed before July 1, 2024. No notice and comment required: 2 CFR 200.340(a)(2) (2003) | https://www.usaspending.gov/award/ASST_NON_00I10501_6800 |
| 2/11/2025 | Environmental justice work; DEI EO issues. Wasteful. | Signed before July 1, 2024. No notice and comment required: 2 CFR 200.340(a)(2) (2003) | https://www.usaspending.gov/award/ASST_NON_95338201_6800 |

EPA_00299080

| 2/11/2025 | Environmental justice work; DEI EO issues. Wasteful. | Signed before July 1, 2024. No notice and comment required: 2 CFR 200.340(a)(2) (2003) | https://www.usaspending.gov/award/ASST_NON_98T88701_6800 |
| 2/11/2025 | Environmental justice work; DEI EO issues. Wasteful. | Signed before July 1, 2024. No notice and comment required: 2 CFR 200.340(a)(2) (2003) | https://www.usaspending.gov/award/ASST_NON_95334801_6800 |

JA082

| | | | |
|---|---|---|---|
| 2/11/2025 | Environmental justice work; DEI EO issues. Wasteful. | Signed before July 1, 2024. No notice and comment required: 2 CFR 200.340(a)(2) (2003) | https://www.usaspending.gov/award/ASST_NON_03D03124_6800 |
| 2/11/2025 | Environmental justice work; DEI EO issues. Wasteful. | Signed before July 1, 2024. No notice and comment required: 2 CFR 200.340(a)(2) (2003) | https://www.usaspending.gov/award/ASST_NON_02F50801_6800 |

EPA_00299082

USCA Case #25-5333    Document #2156180    Filed: 01/27/2026    Page 90 of 150

| 2/11/2025 | Environmental justice work; DEI EO issues. Wasteful. | Signed before July 1, 2024. No notice and comment required: 2 CFR 200.340(a)(2) (2003) | https://www.usaspending.gov/award/ASST_NON_98T91501_6800 |
| 2/11/2025 | Environmental justice work; DEI EO issues. Wasteful. | Signed before July 1, 2024. No notice and comment required: 2 CFR 200.340(a)(2) (2003) | https://www.usaspending.gov/award/ASST_NON_02J56601_6800 |

EPA_00299083

| 2/11/2025 | Environmental justice work; DEI EO issues. Wasteful. | Signed before July 1, 2024. No notice and comment required: 2 CFR 200.340(a)(2) (2003) | https://www.usaspending.gov/award/ASST_NON_00A01436_6800 |
| 2/11/2025 | Environmental justice work; DEI EO issues. Wasteful. | Signed before July 1, 2024. No notice and comment required: 2 CFR 200.340(a)(2) (2003) | https://www.usaspending.gov/award/ASST_NON_98T91201_6800 |

EPA_00299084

| 2/11/2025 | Environmental justice work; DEI EO issues. Wasteful. | Signed before July 1, 2024. No notice and comment required: 2 CFR 200.340(a)(2) (2003) | https://www.usaspending.gov/award/ASST_NON_02F50601_6800 |
|---|---|---|---|

| Financial Account Indentifier Number (FAIN) | Award Amount | Total Outlayed Amount (Estimate) | Remaining Amount (Estimate) | Recipient Name |
|---|---|---|---|---|

EPA_00299085

| 84061101 | $8,000,000 | $1,564,072.97 | $6,435,927.03 | INSTITUTE FOR SUSTAINABLE COMMUNITIES |
|---|---|---|---|---|
| 13746681 | $8,000,000 | $0.00 | $8,000,000.00 | DEEP SOUTH CENTER FOR ENVIRONMENTAL JUSTICE INC |

EPA_00299086

| | | | | |
|---|---|---|---|---|
| 98T65801 | $5,100,000 | $908,057.59 | $4,191,942.41 | SAN DIEGO STATE UNIVERSITY FOUNDATION |
| 95314201 | $5,000,000 | $449,582.62 | $4,550,417.38 | NATIONAL WILDLIFE FEDERATION |

EPA_00299087

| | | | | |
|---|---|---|---|---|
| 96701501 | $5,000,000 | $1,069,922.66 | $3,930,077.34 | WICHITA STATE UNIVERSITY |
| 0.00E+00 | $5,000,000 | $1,278,176.09 | $3,721,823.91 | REGENTS OF THE UNIVERSITY OF MINNESOTA |
| 0.00E+00 | $4,000,000 | $1,324,675.77 | $2,675,324.23 | BIG, NFP |

JA089

| | | | | |
|---|---|---|---|---|
| 00I10501 | $4,000,000 | $91,832.00 | $3,908,168.00 | MONTANA STATE UNIVERSITY |
| 95338201 | $500,000 | | $500,000.00 | APPALACHIAN VOICES |

| | | | | |
|---|---|---|---|---|
| 98T88701 | $500,000 | $72,910.10 | $427,089.90 | BAYVIEW HUNTERS POINT COMMUNITY ADVOCATES, INC. |
| 95334801 | $500,000 | | $500,000.00 | NUEVA ESPERANZA, INC. |

JA091

EPA_00299090

| 03D03124 | $500,000 | $67,487.25 | $432,512.75 | PARKS ALLIANCE OF LOUISVILLE, INC. |
|---|---|---|---|---|
| 02F50801 | $500,000 | | $500,000.00 | EARTH CARE INTERNATIONAL |

EPA_00299091

| 98T91501 | $500,000 | $11,350.40 | $488,649.60 | THE FRIENDSHIP HOUSE ASSOCIATION OF AMERICAN INDIANS |
| 02J56601 | $500,000 | | $500,000.00 | OREGON COAST VISITORS ASSOCIATION, INC. |

| 00A01436 | $500,000 | | $500,000.00 | NEW HAVEN ECOLOGY PROJECT INC |
| 98T91201 | $500,000 | | $500,000.00 | COUNCIL FOR NATIVE HAWAIIAN ADVANCEMENT |

JA094

| 02F50601 | $500,000 | | $500,000.00 | BLACK UNITED FUND OF TEXAS, INC. |
|----------|----------|--|-------------|----------------------------------|

| Description | Date Signed |
|-------------|-------------|

EPA_00299094

APPALACHIAN VOICES, ET AL v. EPA

# EXHIBIT 1-D

# Email from Jacob Burney to ISC

Message

| | |
|---|---|
| **From:** | Burney, Jacob [Burney.Jacob@epa.gov] |
| **Sent:** | 2/23/2025 9:52:52 PM |
| **To:** | Segovia, Theresa [Segovia.Theresa@epa.gov]; Park, Susan [Park.Susan@epa.gov]; Belle, Kara [Belle.Kara@epa.gov]; Clarke, Rosita [clarke.rosita@epa.gov]; Triantafillou, Kathy [triantafillou.kathy@epa.gov] |
| **CC:** | Drummond, James [Drummond.James@epa.gov]; Quenemoen, Marianna [Quenemoen.Marianna@epa.gov] |
| **Subject:** | TCTAC Terminations - Copies of Amendments w/ substantial noncompliance Termination Provision |
| **Attachments:** | OMB Form 00I10501-1.pdf; OMB Form 95314201-2.pdf; OMB Form 13746681-2.pdf; OMB Form 00E03450-2 (1).pdf; OMB Form 98T65801-2 (1).pdf; OMB Form 96701501-2 (1).pdf; Termination_Memo_Template_Feb21.docx_XJ00E03450-4.docx |

**Importance:**    High

Greetings Theresa, Susan and Lead Region:

I wanted to consolidate information for everyone for easier reference.

Attached are the 6 TCTAC grants who received termination letters over the weekend yet have the termination provision that states only substantial noncompliance and/or adequate evidence of waste, fraud, and abuse can be the bases for EPA to unilaterally terminate the award:
1.    Montana State University (R8)
2.    Wichita State University (R7)
3.    University of Minnesota (R5)
4.    Deep South Center for EJ (R4/R6)
5.    San Diego State University Foundation (R9)
6.    National Wildlife Federation (R3)

These amendments also updated each of the grants requiring the recipient to comply with the FY25 EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later.  Also, please note that according to the substantial noncompliance termination provision, any uncommitted funds from a termination must come back to the program for re-obligation to another TCTAC within 90 days.

For reference purposes, I've also included one of the **Termination Form Memos** that was sent to the TCTACs detailing the reason for the unilateral termination.

I think it's important that we run this information up our respective leadership chains this week to ensure leadership is aware.

Hope this helps in keeping everything sorted.

Regards,
Jacob

Jacob J. Burney  |  Division Director |  Grants Management Division  | Office of Environmental Justice and External Civil Rights |
Tel:202.564.2907 | US EPA 1200 Pennsylvania Ave. NW (2201A) Washington, DC 20460 | Burney.Jacob@epa.gov

EPA_00224027

APPALACHIAN VOICES, ET AL v. EPA

# EXHIBIT 1-E

## Declaration of Michelle Roos

## Environmental Protection Network

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

### DECLARATION OF MICHELLE ROOS
### ENVIRONMENTAL PROTECTION NETWORK

I, Michelle Roos, declare as follows:

1.  My name is Michelle Roos. I live in the Bronx, New York. This declaration is based on my personal knowledge, professional education, and experience with EPA grant-making practices and procedures. I am over the age of eighteen and suffer from no legal incapacity. I am the Executive Director of the Environmental Protection Network ("EPN"), a nonprofit organization that has both been directly affected by federal funding terminations and is currently assisting over 500 Environmental Protection Agency grantees and subrecipients who have been subject to federal funding freezes and terminations.

2.  EPN is a nonpartisan organization composed of over 650 former U.S. Environmental Protection Agency ("EPA") career staff and political appointees from both political parties. Established in January 2017, EPN serves as a trusted resource, offering objective analysis and scientific expertise to protect the integrity of EPA and its mission to safeguard human health and the environment. EPN's core initiatives include advocating for policies and institutional changes that address environmental injustices, public health, and climate challenges and providing pro bono technical assistance and training to frontline communities and under-resourced government agencies. Additionally, EPN educates Congress and serves as a critical resource for journalists and strategic partners, ensuring that environmental policies are informed by rigorous scientific understanding and a commitment to public health.

3.  EPN has been providing pro bono capacity building technical assistance on EPA financial assistance opportunities since the spring of 2021 and has assisted nonprofits and local, state, and Tribal government agencies apply for federal funding in the climate, air, and environmental justice programs since early 2022. Over the past four years, EPN and its volunteer network have provided direct and indirect technical assistance to over 1,000 EPA applicants applying for awards under the Environmental and Climate Justice Block Grant Program. Specifically, EPN directly assisted approximately 400 Community Change Grant ("CCG") Program potential applicants, and dozens of Environmental Justice Collaborative-Problem Solving ("EJCPS") and Government-to-Government ("EJG2G") potential applicants during their respective competitive application processes.

4.  In my experience, it often takes grant applicants between 150-300 hours of work to complete complex federal funding applications. EPA's Notices of Funding Opportunities require preparing budgets, documentation, and detailed scopes of work. They also require workplans for achieving environmental results and legally-binding agreements for subawards to statutorily required partners to show their ability to carry out all of the statutory, regulatory and programmatic requirements.

5.  When I worked at EPA as a career employee during the George W. Bush administration, I co-launched and co-managed a bipartisan-supported regional grant program to reduce emissions from diesel engines along the West Coast and learned a tremendous amount about how federal grants programs operate. Years later, I co-launched EPN's pro bono capacity-building technical assistance program. We have directly assisted hundreds of organizations in applying for, and implementing, federal grants. During the last 3 years EPN has become an important hub for pro bono technical assistance to under-resourced

2

organizations and government agencies interested in applying for and managing EPA grants. I personally circulate resources, help to facilitate webinars and office hours, answer dozens of specific questions each week, and have seen and experienced firsthand the devastating impact of EPA's arbitrary federal funding freezes and terminations.

6. Since the change in Administrations, EPN has been in touch with several hundred EPA grantees and subrecipients who have had their EPA grants frozen without notice of the reasons for the EPA actions and then received vague notifications that their grants were terminated. Specifically, in February, after losing access to their legally-obligated funding award, grantees started to receive termination letters citing general statements without factual support that their grant was inconsistent with, and no longer effectuates, agency priorities.

7. I have followed the public statements by EPA Administrator Zeldin, and I also have reviewed sworn declarations by EPA officials, including Daniel Coogan, in the *Sustainability Institute v. USDA and Woonsaquatucket River Watershed Council v. USDA* cases. For example, Mr. Coogan stated in his April 23, 2025 declaration that "EPA leadership conducted an individualized, grant-by-grant review to determine which grants should continue, which should be modified, and which should be terminated based on alignment with Administration priorities or the purposes for which the Federal award was made." My understanding is that this purported review has led to terminations of all EPA grants funded under Section 138 of the Clean Air Act, which authorized and appropriated funding for Environmental and Climate Justice Block grants.

8. Based on my review of EPA grant termination memos, between February 25, 2025, and May 2, 2025, EPA issued termination notices to grantees who held awards under the

JA101

Environmental and Climate Justice Block Grant Program, which is authorized under

Section 138 of the Clean Air Act.

9.   Attached hereto is a true and correct copy of a Freedom of Information Act request made

by EPN on May 13, 2025. The request asks for any communications, records, or analysis

reflecting the individual determinations for the following grant termination decisions:

- Environmental Justice Collaborative Problem-Solving Cooperative Agreement Program (CFDA # 66.306; 203 grants)

- Surveys, Studies, Investigations, Training and Special Purpose Activities Relating to Environmental Justice (CFDA # 66.309; 56 grants)

- Environmental Justice Government-to-Government (EJG2G) Program (CFDA # 66.312; 128 grants)

- Environmental Justice Small Grant Program (CFDA # 66.604; 132 grants)

- Financial Assistance For Community Support Activities To Address Environmental Justice Issues (CFDA # 66.614; 5 grants)

- Environmental Justice Thriving Communities Grantmaking Program (EJTCGM) (CFDA # 66.615; 20 grants)

- Environmental and Climate Justice Block Grant Program (CFDA # 66.616; 103 grants)

- Reducing Embodied Greenhouse Gas Emissions for Construction Materials and Products (CFDA # 66.721; 1 grant)."

10.  In my experience at EPA, terminations of grant programs prior to January 20, 2025, were

extremely uncommon. When they did happen, they would involve a number of internal

communications reflecting analyses of specific situations, including emails or other

electronic messages discussing progress reports and other grants-related documents that

establish some kind of non-compliance with the terms of the grant award. That same

practice would be followed if the termination was based on other grounds given the

importance of establishing a record for the basis of a termination decision as

4

contemplated by the Federal Records Act. There would be documentation of meetings with project officers, grants specialists, grants management officials, grants attorneys, grant program managers and/or other decision makers that would be involved in a termination. In addition, in the past, if an EPA representative identified a potential non-compliance to justify terminating the grant, they would often work directly with the grantee to resolve the issue through specific conditions.

11. Also in my experience, EPA personnel are aware of their obligations to preserve agency records subject to FOIA. EPA requires all employees—both career and political—to complete annual online FOIA training. This training is provided through the online FedTalent tool and is designed to educate employees on FOIA basics, processing procedures, and their responsibilities in handling FOIA requests. The training is mandatory and tracked by office managers for accountability. Moreover, the evaluations supporting the "individualized, grant-by-grant review" referred to in Mr. Coogan's declaration for potential termination would constitute agency records that would be subject to document preservation rules within the EPA.

12. Accordingly, in making the above FOIA request, it was my expectation that if each grant had been subject to individual evaluation, there would be substantial records responsive to the request.

13. Instead, I received the FOIA response dated June 12, 2025, attached hereto as Exhibit 2, which states: "The Office of Mission Support, Office of Grants and Debarment has reviewed your request and has located no responsive records."

JA103

14. Failure on the part of the EPA to find responsive records seems to contradict the strong language employed by Daniel Coogan in his declaration that there was an in-depth and individualized determination made for all grants before they were terminated.

15. The EPA has appeared to conduct en masse terminations that has had the effect of further punishing communities that already experience disproportionate impacts from pollution.

16. The FOIA response is consistent with my experience to date in working with over 200 grantees who have been either frozen or terminated under the Environmental and Climate Justice Block Grant Program. I have talked with hundreds of grantees when they were first frozen and then terminated who could not understand why this had happened or identify an individualized reason why their grant had been terminated. Most of them shared termination memos with me that used uniform and generic language relating to a vague 'change in Agency priorities.'

17. I spoke with a New York Times (NYT) reporter to share the story regarding the FOIA response.  The NYT reporter contacted EPA for a statement after which time, I was told by the NYT that the EPA said that they had made a mistake, and that they will be following up with EPN to correct the mistake to release additional records. As of the date and time I am executing this, I have not seen any additional documentation to support individualized review of the grant terminations and find it surprising that such documentation was only identified as being in existence after EPA was contacted by the NYT.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United

States, the foregoing is true and correct.

Executed this 24th day of June 2025.

*Michelle Roos*

**Michelle Roos**

APPALACHIAN VOICES, ET AL v. EPA

# EXHIBIT 1-F

# Email from D. Coogan to T. Voyles with list of grant programs to terminate

awarded); Environmental Justice Government-to-Government (EJG2G) Program ($2M pending); Environmental Justice Thriving Communities Grantmaking Program (EJ TCGM) ($29M awarded—these were cancelled right?); Environmental Education Grants Program ($876K pending; $4M awarded).

Hopefully I am not missing anything that is important, but let me know if there is anything else that would helpful in briefing on impacts.

--

Travis Voyles
C: (202) 787-0595


# Controlled by U.S. Environmental Protection Agency

**From:** Coogan, Daniel <Coogan.Daniel@epa.gov>
**Sent:** Tuesday, February 25, 2025 9:29 PM
**To:** Voyles, Travis <voyles.travis@epa.gov>; Loving, Kathryn <Loving.Kathryn@epa.gov>; Jehling, Erica <Jehling.Erica@epa.gov>
**Cc:** Molina, Michael <molina.michael@epa.gov>; Patrick, Kimberly <Patrick.Kimberly@epa.gov>
**Subject:** Next Steps on Grant Actions - Feb 25

## CUI//SP-BUDG

Travis, just wanted to make sure we are all aligned on today's discussion and next steps. Below is the list of grant programs that require some action from OMS (for those that you cleared to continue operating, like Brownfields, I am not including them below and we will just communicate that direction separately with the programs and regions). The one caveat that I forgot to mention is that OMB directed agencies to adopt a new term and condition (based on grant regs) on October 1 that limits agencies' discretion to terminate grants. So as to limit potential dispute and other risk, I recommend that we focus for now on awards prior to October 1 and then work with OGC to get clear direction on how to handle the post-October 1 awards. Please let me know if you have any concerns with what is detailed below. Once we have your approval, we will move out on taking the necessary actions.

| CFDA/Assistance Number Listing | CFDA/Assistance Listing Title | Unawarded Grants | Grants Awarded Prior to October 1, 2024 | Grants Awarded After October 1, 2024 |
|---|---|---|---|---|
| 66.040 | Diesel Emissions Reduction Act (DERA) State Grants | Pause pre-award. OMS direct OAR to clear with OAR political leadership that pending actions align with administration priorities. | No change. | No change. |
| 66.049 | Clean Heavy-Duty Vehicles Program | Cancel any unawarded/ unobligated actions and decommit funding. | Terminate grants and pay final invoices. | No new award actions but hold on any terminations until further discussion with OGC. |

EPA_00043571

| 66.306 | Environmental Justice Collaborative Problem-Solving Cooperative Agreement Program | Cancel any unawarded/ unobligated actions and decommit funding. | Terminate grants and pay final invoices. | No new award actions but hold on any terminations until further discussion with OGC. |
|---|---|---|---|---|
| 66.309 | Surveys, Studies, Investigations, Training and Special Purpose Activities Relating to Environmental Justice | Cancel any unawarded/ unobligated actions and realign with administration priorities. | Confirm funding source before further action. | Confirm funding source before further action. |
| 66.312 | Environmental Justice Government-to-Government (EJG2G) Program | Cancel any unawarded/ unobligated actions and decommit funding. | No change. | No change. |
| 66.604 | Environmental Justice Small Grant Program | Cancel any unawarded/ unobligated actions and decommit funding. | Terminate grants and pay final invoices. | No new award actions but hold on any terminations until further discussion with OGC. |
| 66.614 | Financial Assistance For Community Support Activities To Address Environmental Justice Issues | Cancel any unawarded/ unobligated actions and decommit funding. | Terminate grants and pay final invoices. | No new award actions but hold on any terminations until further discussion with OGC. |
| 66.615 | Environmental Justice Thriving Communities Grantmaking Program (EJ TCGM) | Cancel any unawarded/ unobligated actions and decommit funding. | Terminate grants and pay final invoices. | No new award actions but hold on any terminations until further discussion with OGC. |
| 66.616 | Environmental and Climate Justice Block Grant Program | Cancel any unawarded/ unobligated actions and decommit funding. | Terminate grants and pay final invoices. | No new award actions but hold on any terminations until further discussion with OGC. |
| 66.721 | Reducing Embodied Greenhouse Gas Emissions for Construction Materials and Products | Cancel any unawarded/ unobligated actions and decommit funding. | No change. | No change. |

EPA_00043572

| 66.951 | Environmental Education Grants Program | Hold any unawarded/ unobligated actions to ensure compliance with Administration priorities. | No change. | No change. |
|--------|---------|---------|---------|---------|

Controlled by U.S. Environmental Protection Agency

EPA_00043573

APPALACHIAN VOICES, ET AL v. EPA

# EXHIBIT 1-G

# Email from M. Wise re termination template

Message

| | |
|---|---|
| **From:** | Durand, Jessica [Durand.Jessica@epa.gov] |
| **Sent:** | 2/21/2025 10:03:35 PM |
| **To:** | Wise, Melissa [wise.melissa@epa.gov]; Lentz, Rachel [Lentz.Rachel@epa.gov] |
| **Subject:** | RE: Termination Memo |

Hi Melissa,

The Memo has been added: https://work.epa.gov/sites/default/files/2025-02/termination_memo_template.docx

And here is the SOP link again: https://work.epa.gov/sites/default/files/2025-02/grant_termination_sop.pdf

For reference, both documents are in the Policy Library. And it looks like this:

| Policy | Description | Topics |
|---|---|---|
| **Grant Termination SOP (pdf)** | **This SOP provides unilateral termination procedures.**<br><br>**Resources:**<br>**1.   Termination Memo Template (docx)** | **1.      Post-Award**<br>**2.      Closeout**<br>**3.      Terms and Conditions** |

Jessica Durand
Branch Supervisor, Policy and Training Branch
National Policy, Training, and Compliance Division
Office of Grants and Debarment
Durand.jessica@epa.gov

---

**From:** Wise, Melissa <wise.melissa@epa.gov>
**Sent:** Friday, February 21, 2025 3:55 PM
**To:** Lentz, Rachel <Lentz.Rachel@epa.gov>; Durand, Jessica <Durand.Jessica@epa.gov>
**Subject:** FW: Termination Memo
**Importance:** High

Hi Rachel and Jessica,

I was going to ask Ayo to post the Termination Memo to our intranet site.  Any concerns?

Thanks,
Melissa

---

**From:** Wise, Melissa
**Sent:** Friday, February 21, 2025 3:12 PM
**To:** Brown, Devon <Brown.Devon@epa.gov>; Schindel, Phillip <Schindel.Phillip@epa.gov>; Tocci, Brian F. <Tocci.Brian@epa.gov>; Rose, Kenneth <Rose.Kenneth@epa.gov>; Sherwood, Kelly <Sherwood.Kelly@epa.gov>;

JA111

Shelmon, Shantel <Shelmon.Shantel@epa.gov>; Sykes, Karen <Sykes.Karen@epa.gov>; Fields, Robert <Fields.Robert@epa.gov>; Dolan, Sheila <dolan.sheila@epa.gov>; Watkins, Christopher <Watkins.Christopher@epa.gov>; Rawls, Whitney <rawls.whitney@epa.gov>; Hulstein, Sarah <hulstein.sarah@epa.gov>; Seeger, Lindsay <seeger.lindsay@epa.gov>; Truong, Carolyn <Truong.Carolyn@epa.gov>; Mendiola, Angela <Mendiola.Angela@epa.gov>; Johnson, Peggy D. <johnson.peggyd@epa.gov>; Manion, Andrea <Manion.Andrea.L@epa.gov>; Lloyd, Keva <Lloyd.Keva@epa.gov>; Phillips, Lashaun <Phillips.Lashaun@epa.gov>
**Cc:** Segovia, Theresa <Segovia.Theresa@epa.gov>; Johnson, Arthur <Johnson.Arthur@epa.gov>; McManus, Catharine <mcmanus.catharine@epa.gov>; Eubanks, Kristy <Eubanks.Kristy@epa.gov>; Sanders, Amy <Sanders.Amy@epa.gov>; Stanton, MaryA <Stanton.Marya@epa.gov>; Krehbiel, Ben <Krehbiel.Ben@epa.gov>; McCluney, Lance <McCluney.Lance@epa.gov>; Drake, Kerry <Drake.Kerry@epa.gov>; Chung, Angela <Chung.Angela@epa.gov>; Coogan, Daniel <Coogan.Daniel@epa.gov>; Tsing-Choy, Kathy <Tsing-Choy.Kathy@epa.gov>; Jones-Peeler, Meshell <Jones-Peeler.Meshell@epa.gov>; Gulamali, Adil <Gulamali.Adil@epa.gov>; Sylvester, Kenneth <Sylvester.Kenneth@epa.gov>
**Subject:** Termination Memo
**Importance:** High

Good afternoon, GMOs,

Here is the final/cleared Termination Memo that should be attached to the email notification.

GMOs:

- Copy/paste email language from Grant Termination SOP to compose the email
- Complete/attach the Termination Memo to the email
- Attach Amendment from NGGS to the email

You are now clear to complete all terminations by COB today.  Please let me know if you have any questions.

Thank you,
Melissa

---

**From:** Wise, Melissa
**Sent:** Thursday, February 20, 2025 6:27 PM
**To:** Brown, Devon <Brown.Devon@epa.gov>; Schindel, Phillip <Schindel.Phillip@epa.gov>; Tocci, Brian F. <Tocci.Brian@epa.gov>; Rose, Kenneth <Rose.Kenneth@epa.gov>; Sherwood, Kelly <Sherwood.Kelly@epa.gov>; Shelmon, Shantel <Shelmon.Shantel@epa.gov>; Sykes, Karen <Sykes.Karen@epa.gov>; Fields, Robert <Fields.Robert@epa.gov>; Dolan, Sheila <dolan.sheila@epa.gov>; Watkins, Christopher <Watkins.Christopher@epa.gov>; Rawls, Whitney <rawls.whitney@epa.gov>; Hulstein, Sarah <hulstein.sarah@epa.gov>; Seeger, Lindsay <seeger.lindsay@epa.gov>; Truong, Carolyn <Truong.Carolyn@epa.gov>; Mendiola, Angela <Mendiola.Angela@epa.gov>; Johnson, Peggy D. <johnson.peggyd@epa.gov>; Manion, Andrea <Manion.Andrea.L@epa.gov>
**Cc:** Segovia, Theresa <Segovia.Theresa@epa.gov>; Johnson, Arthur <Johnson.Arthur@epa.gov>; McManus, Catharine <mcmanus.catharine@epa.gov>; Eubanks, Kristy <Eubanks.Kristy@epa.gov>; Sanders, Amy <Sanders.Amy@epa.gov>; Stanton, MaryA <Stanton.Marya@epa.gov>; Krehbiel, Ben <Krehbiel.Ben@epa.gov>; McCluney, Lance <McCluney.Lance@epa.gov>; Drake, Kerry <Drake.Kerry@epa.gov>; Chung, Angela <Chung.Angela@epa.gov>; Coogan, Daniel <Coogan.Daniel@epa.gov>; Tsing-Choy, Kathy <Tsing-Choy.Kathy@epa.gov>; Jones-Peeler, Meshell <Jones-Peeler.Meshell@epa.gov>; Gulamali, Adil <Gulamali.Adil@epa.gov>; Sylvester, Kenneth <Sylvester.Kenneth@epa.gov>
**Subject:** List of Grant Terminations - 2/20
**Importance:** High

Good evening, GMOs,

I am writing to inform you that the grants attached have been identified and cleared for termination.

JA112

**The Termination Memo has not yet been cleared.  Therefore, do <u>not</u> take any final action until I send the Termination Memo.**

However, I wanted to provide as much advance notice as possible so you can begin the termination/closeout process, following the Grant Termination SOP finalized today: https://work.epa.gov/sites/default/files/2025-02/grant_termination_sop.pdf (must be on VPN).

If you have any questions, please let me know.

*Melissa Wise*

Director, Office of Grants and Debarment
Office of Mission Support
U.S. Environmental Protection Agency
1300 Pennsylvania Ave., NW
Washington, D.C. 20460
(202) 924-9911

*My working hours may not be your working hours. Please do not feel obligated to reply outside of your normal work schedule.*



EPA_00316787

APPALACHIAN VOICES, ET AL v. EPA

# EXHIBIT 1-H

Email from D. Coogan ordering that a control be placed on listed ASAP accounts

Message

| | |
|---|---|
| **From:** | Treml, Gregg [Treml.Gregg@epa.gov] |
| **Sent:** | 3/7/2025 5:03:52 PM |
| **To:** | Gulamali, Adil [Gulamali.Adil@epa.gov]; Lavergne, Dany [lavergne.dany@epa.gov] |
| **CC:** | Kadeli, Lek [Kadeli.Lek@epa.gov]; Jones-Peeler, Meshell [Jones-Peeler.Meshell@epa.gov]; Robinson, Angel [robinson.angel@epa.gov]; Boyd, Wyatt [Boyd.Wyatt@epa.gov] |
| **Subject:** | FW: Place Hold/ Control in ASAP - 8 programs |

Adil/Dany,
Please lock the accounts associated with the list below.  Please confirm when complete.  If it is going to take longer than today, please let me know soonest.

Thank you,
-Gregg

Gregg Treml
Acting Chief Financial Officer
United States Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Room 4402A WJCN
**Washington, DC  20460**
(202)-564-1151
treml.gregg@epa.gov

---

**From:** Voyles, Travis <voyles.travis@epa.gov>
**Sent:** Friday, March 7, 2025 12:02 PM
**To:** Treml, Gregg <Treml.Gregg@epa.gov>
**Cc:** Molina, Michael <molina.michael@epa.gov>
**Subject:** RE: Place Hold/ Control in ASAP - 8 programs

Thank you for checking.

Yes, this is the direction. We are proceeding with cancelling these grants and would like to prevent any drawdowns in the time between announcement and execution through OMS.

--

Travis Voyles
C: (202) 787-0595

---

**From:** Treml, Gregg <Treml.Gregg@epa.gov>
**Sent:** Friday, March 7, 2025 12:00 PM
**To:** Voyles, Travis <voyles.travis@epa.gov>
**Cc:** Molina, Michael <molina.michael@epa.gov>
**Subject:** FW: Place Hold/ Control in ASAP - 8 programs

Travis,
Confirming this is your direction?

Thank you,
-Gregg

JA115

Gregg Treml
Acting Chief Financial Officer
United States Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Room 4402A WJCN
Washington, DC 20460
(202)-564-1151
treml.gregg@epa.gov

---

**From:** Coogan, Daniel <Coogan.Daniel@epa.gov>
**Sent:** Friday, March 7, 2025 11:53 AM
**To:** Treml, Gregg <Treml.Gregg@epa.gov>; Kadeli, Lek <Kadeli.Lek@epa.gov>; Jones-Peeler, Meshell <Jones-Peeler.Meshell@epa.gov>; Gulamali, Adil <Gulamali.Adil@epa.gov>
**Cc:** Patrick, Kimberly <Patrick.Kimberly@epa.gov>; Wise, Melissa <wise.melissa@epa.gov>
**Subject:** Place Hold/ Control in ASAP - 8 programs

All, we just had a check-in with Travis and as part of a broader effort related to certain grant programs, please put a control on ASAP accounts for all grants funded under the following grant programs so recipients cannot draw funds.

| CFDA/Assistance Number Listing | CFDA/Assistance Listing Title |
|---|---|
| 66.306 | Environmental Justice Collaborative Problem-Solving Cooperative Agreement Program |
| 66.309 | Surveys, Studies, Investigations, Training and Special Purpose Activities Relating to Environmental Justice |
| 66.312 | Environmental Justice Government-to-Government (EJG2G) Program |
| 66.604 | Environmental Justice Small Grant Program |
| 66.614 | Financial Assistance For Community Support Activities To Address Environmental Justice Issues |

JA116

| 66.615 | Environmental Justice Thriving Communities Grantmaking Program (EJ TCGM) |
| 66.616 | Environmental and Climate Justice Block Grant Program |
| 66.721 | Reducing Embodied Greenhouse Gas Emissions for Construction Materials and Products |

JA117

EPA_00051918

APPALACHIAN VOICES, ET AL v. EPA

# EXHIBIT 1-I

# EPA Grant Termination SOP

# GRANT TERMINATION SOP
### 200.340 Unilateral Termination Procedures
### Final 02/20/2025

This procedure is applicable to any assistance agreements subject to EPA General Terms and Conditions effective August 13, 2020 and all subsequent updates.

This action is both an Amendment and a Termination Notification under 2 CFR 200.341, meaning that it must be signed by an EPA Decision Official (generally an EPA Award Official/Grants Management Officer), and cannot be delegated.

[ HYPERLINK "https://work.epa.gov/sites/default/files/2024-06/sop_2024_g01.pdf" ] Awarding Official delegation list:

**Awarding Officials**

'✓' indicates delegated awards official(s) by region.

| Region | GMO/Branch Manager (BM) | MSDD/SRO |
|--------|------------------------|----------|
| Region 1 | | ✓ |
| Region 2 | ✓(GMO de-obligations/decreases only < $1M) | ✓ |
| Region 3 | ✓ (BM < $5M) | ✓ (> $5M) |
| Region 4 | ✓ (GMO) | |
| Region 5 | ✓ (GMO) (BM) | |
| Region 6 | ✓ (GMO < $5M) | ✓ (> $5M) |
| Region 7 | ✓ (GMO) | |
| Region 8 | ✓ (GMO) | |
| Region 9 | ✓ (GMO) | |
| Region 10 | ✓ (GMO, BM, Tribal Grant Section Manager) | |
| OGD HQ | ✓ (GMO, BM, Division Director) | |

### The Change Request (CR) and Amendment Process – Grant Specialist (GS)

To prepare the amendment for signature, the GS performs the following actions:

A.  Initiate a Change Request for "General Amendment Requiring Signature"



B.  Document and type on the "Details" of the CR as follows:

> This amendment is to stop work; terminate the agreement; reduce performance period duration; curtail scope of work; and waive certain reporting requirements. Administrative terms and conditions are added.

> Per 2 CFR 200.340 and the Termination General Terms and Conditions of this agreement, EPA is terminating this award. Your organization shall immediately stop work and take all reasonable steps to minimize the incurrence of costs otherwise allocable to the assistance agreement. See terms and conditions.

EPA_00142781

APPALACHIAN VOICES, ET AL v. EPA

# EXHIBIT 1-J

# Sample Termination Letter



## OFFICE OF MISSION SUPPORT

WASHINGTON, D.C. 20460

March 14, 2025

**MEMORANDUM**

**SUBJECT:**   Termination of EPA Assistance Agreement [Grant Number] under 2 CFR 200.340

**FROM:**   EPA Award Official

**TO:**   FirstName LastName, Title
Office (Recipient Authorized Organization Representative (AOR))

The purpose of this communication is to notify you that the U.S. Environmental Protection Agency (EPA) is hereby terminating Assistance Agreement No. [insert Grant Number] awarded to [recipient organization]. In accordance with 2 CFR 200.340(a)(2) (effective August 13, 2020 – September 30, 2024) and the Termination term and condition contained in the EPA General Terms and Conditions effective August 13, 2020 – September 30, 2024, EPA Assistance Agreement [INSERT Grant Number] is terminated in its entirety effective immediately on the grounds that the award no longer effectuates the program goals or agency priorities. The objectives of the award are no longer consistent with EPA funding priorities.

It is a priority of the EPA to eliminate discrimination in all programs throughout the United States. The EPA Administrator has determined that, per the Agency's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Agency's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives, "environmental justice" initiatives, and conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions. In addition to complying with the civil rights laws, it is vital that the Agency assess whether all grant payments are free from fraud, abuse, waste, and duplication, as well as to assess whether current grants are in the best interests of the United States.

The grant specified above provides funding for programs that promote or take part in DEI initiatives or environmental justice initiatives or other initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Agency priorities.

The process for closeout is generally outlined in 2 CFR 200.344. EPA is clarifying what reports are required and what reports are waived below. Other requirements are still in effect if applicable to your grant.

EPA is requiring the following closeout reports due within 120 days of closeout (2 CFR 200.344a:)
- Final Federal Financial Report, SF-425
- Final Technical Report
- Other programmatic reports identified in your terms and conditions

JA121

As part of this termination, EPA is waiving the following closeout reports:

- Property Report, SF-428
- Final Minority Business Enterprise/Woman Business Enterprise Utilization Under Federal Grants and Cooperative Agreements, EPA Form 5700-52A

The recipient may request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of this memo provided that such costs were contained in the approved workplan. Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g).

Also, per 2 CFR 200.472, a recipient may use grant funds to properly closeout their grant including reasonable and necessary costs that might occur after the date of this memo. If the recipient drew down funds from ASAP for costs beyond the termination date or for costs that exceed the amount necessary to properly closeout their grant, the recipient must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.

The EPA Grants Management Office has issued an amendment to the agreement to document the termination.

If you wish to dispute this termination decision, the Disputes Decision Official (DDO), [email address of the DDO], must receive the Dispute no later than 30 calendar days from the date this termination notice is electronically sent to you. Disputes must be sent electronically by email to the DDO, with a copy to the EPA Award Official, [email address of EPA Award Official] within the 30-day period stated above. The Dispute submitted to the DDO must include: (1) A copy of the disputed Agency Decision; (2) A detailed statement of the specific legal and factual grounds for the Dispute, including copies of any supporting documents; (3) The specific remedy or relief you seek under the Dispute; and (4) The name and contact information, including email address, of your designated point of contact for the Dispute. *See* 2 CFR 1500.15

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

ATTACHMENTS
1. Amendment Document
2. Name of file

cc: FirstName LastName (EPA Grant Specialist)
    (EPA Project Officer)
    (Grantee Program Manager)

JA122

EPA_00050317

APPALACHIAN VOICES, ET AL v. EPA

# EXHIBIT 1-K

# CCG Grant Programmatic Terms and Conditions

# Community Change Grants Terms and Conditions

## REQUIRED FOR ALL COMMUNITY CHANGE GRANTS (CCG) AWARDS

A. **General Award Information**
B. **Programmatic Reporting and Notification**
C. **Plans and Other Deliverables**
D. **Subawards**
E. **Procurement**
F. **Participant Support Costs**
G. **EPA Oversight**
H. **Compliance**

## IF APPLICABLE

I. **General Items**
J. **Construction**
K. **Foreign Entities and Travel**

## REQUIRED FOR ALL CCG AWARDS

## A. General Award Information

### A.1. Period of Performance

The period of performance under this award will start on the date specified in the **Budget/Project Period Start Date** of this award and end no later than three years from that date. However, the period of performance may end prior to three years from the start date specified in the Budget Period and Project Period of this award if the:

a. Recipient has disbursed the entire award amount, and/or
b. EPA Project Officer has advised the EPA Award Official that all required work of this award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(c), the recipient agrees to liquidate all allowable financial obligations incurred under the award no later than 120 calendar days after the end date of the period of performance.

Under no circumstances can the period of performance for this award exceed three years.

## B. Programmatic Reporting and Notification

### B.1. Performance Reports: Contents

a. In accordance with 2 CFR 200.329, the recipient agrees to submit quarterly performance reports (see Term and Condition "Performance Reports: Frequency" below) that includes information on each of the following areas:

1. A comparison of the actual accomplishments achieved under the award to the expected outputs/outcomes identified in the assistance agreement for the reporting period;

2. The reasons why the expected outputs/outcomes were not met and an explanation of how this will be addressed to ensure they are met in the future; and

3. Other pertinent information, including, when appropriate, analysis and explanation of cost overruns or higher-than-expected unit costs.

The information above may include overall best practices and/or lessons learned over the project performance period, and attachments and links for materials that may be helpful to other Environmental Justice grant recipients or similar organizations (e.g., tip sheets, "how-to" sheets, communication materials, outreach materials, web tools, etc.)

These reports will cover work status, work progress, difficulties encountered, preliminary data results and a statement of activity anticipated during the subsequent reporting period, including descriptions of activities anticipated during the subsequent reporting period and of equipment, techniques and materials to be used or evaluated. A discussion of expenditures along with a comparison of the percentage of the project completed to the project schedule and an explanation of significant discrepancies will be included in the report. This report will also include any changes of key personnel concerned with the project.

b. Further these reports must contain a summary of how the activities completed in the EPA-approved Community Change Grants workplan contribute to the Justice40 initiative under which 40% of overall benefits of certain federal investments flow to disadvantaged communities. These summaries may include information on the following activities designed to benefit disadvantaged communities, including:

1. Activities performed to reduce the risk and/or impact of climate change;

2. Activities performed to increase the use of clean energy and energy efficiency;

3. Activities performed to provide better access to affordable and sustainable housing;

4. Activities performed to provide training and workforce development;

5. Activities performed for the remediation and reduction of legacy pollution; and

6. Activities performed for the development of critical clean water and wastewater infrastructure.

The EPA PO will provide a Community Change Grants (CCG) Progress Report template to the recipient after award. Until the Office of Management and Budget (OMB) approves the template for mandatory use (hopefully by the first quarter reporting deadline), use of the template is optional. The template will contain all of the reporting requirements listed above.

Assuming use of the template becomes required, the EPA Project Officer will alert the recipient and provide the date on which the template becomes mandatory. The recipient agrees to use the template following OMB approval and notification of its mandatory use from the EPA Project Officer.

## B.2. Performance Reports: Frequency

The recipient agrees to submit quarterly performance reports electronically to the EPA Project Officer on the designated quarterly due date(s). **If the due date falls on a federal holiday or weekend, it is due the following business day.** The period end and due dates are listed in the below table.

| PERIOD ENDING | QUARTERLY DUE DATES |
| --- | --- |
| September 30 | October 31 |
| December 31 | January 31 |
| March 31 | April 30 |
| June 30 | July 31 |

The first quarterly report is due at the end of the first full quarter following the execution of the agreement, unless the recipient has incurred pre-award costs. If the recipient is authorized to incur pre-award costs, the grant performance period begins on the Budget/Period Start Date indicated on the Award document., and the recipient would provide a quarterly performance report following the end of the first full quarter after that date. Quarterly reports will continue thereafter and throughout the remainder of the performance period. The recipient must submit the final performance report no later than 120 calendar days after the end date of the period of performance as identified in this agreement. The final report must document all project activities occurring during the Period of Performance and as outlined in the executed agreement. **However, the statutory three-year performance period for this grant program may not be extended.** Any costs incurred after the end of the performance period are the responsibility of the recipient and may not be charged to the grant.

## B.3. Notification Requirements

The recipient's Project Manager must notify the EPA Project Officer within five working days of becoming aware of a significant development occurs that could impact the award. Significant developments include events that enable meeting milestones and objectives sooner (or later), or at less (or more) cost than anticipated or that produce different beneficial results than originally planned. Significant developments also include problems, delays, or adverse conditions which will impact the ability to meet the milestones or objectives of the award, including the outputs/outcomes specified in the assistance agreement work plan, and/or the need to change statutory partners or other collaborative entities and subrecipients.

If the significant developments negatively impact the award, the recipient must include information on their plan for corrective action and any assistance needed to resolve the situation.

EPA requires each recipient's chief executive officer or equivalent review and submit each of these reports. EPA will use information from these reports as a part of program-side public reporting, except to the extent that such information includes confidential business information (CBI) or personally identifiable information (PII) pursuant to 2 CFR 200.338.

## B.4. Subaward Performance Reporting

In addition to the EPA General Terms and Condition "Establishing and Managing Subawards" in effect October 1, 2024 or later, the recipient must report on its subaward monitoring activities under 2 CFR 200.332(e) which includes, but is not limited to, reporting on the following items:

a.  Summaries of financial and programmatic reports;

b.  Summaries of findings from site visits and/or desk reviews to ensure effective subrecipient performance;

c.  Environmental results from the subrecipient(s) achieved, including a narrative discussion of impacts of program on improvement of environmental conditions in the target community;

d.  Summaries of audit findings and related pass-through entity management decisions;

e.  Any disagreements or potential challenges with subrecipients that may interfere with the completion of subgrant performance, and action the pass-through entity has taken to mitigate them such as those specified at 2 CFR 200.332(f), 2 CFR 200.208, and the 2 CFR Part 200.339 Remedies for Noncompliance; and

f.  Summaries of the actions taken to ensure that the subawards are benefitting disadvantaged communities.

NOTE: EPA will only collect reporting information from the Recipient (rather than from any subrecipients), but each recipient may need to collect reporting information from subrecipients (e.g., Collaborating Entities, Statutory Partners) to meet these reporting requirements.

## B.5. Final Performance Report

The recipient agrees to submit a final report in the same OMB-approved format (if available) as the quarterly progress reports. The recipient must submit the final performance report no later than 120 calendar days after the end date of the period of performance as identified in this agreement. **The statutory three-year performance period for this grant program will not be extended**. Any costs incurred after the end of the performance period are the responsibility of the recipient and may not be charged to the grant.

The final report must document all project activities occurring during the Period of Performance as outlined in the executed agreement, including but not limited to detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Workplan.

Submitted reports must be ready to be published on the EPA website for public access and must not include any material that the recipient considers to be Confidential Business Information (CBI) or Personally Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or CBI in publishable reports.

Reports submitted with CBI and/or PII will not comply with this requirement and may result in remedial action by EPA. Should EPA identify CBI and/or PII in reports, the EPA Project Officer will require that the recipient re-submit the report without that information so that it can be published without redaction.

The recipient agrees to submit the final performance report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

**B.6. Post-Project Follow-Up and Engagement**

The EPA Community Change Grants Program is invested in the long-term success of each Community Change Grants recipient and the grant's impact on addressing the disproportionate environmental and public health impacts affecting communities.  For no less than three years after completion of the project, the recipient agrees to periodically update its designated EPA Project Officer on current community-based and environmental justice work the recipient is performing and how/if that work relates to its now completed Community Change Grants project. These periodic updates may include (but are not limited to) recent local media reports, additional grant funding received, new initiatives, and developing partnerships.

These post-project period updates allow the Community Change Grants Program to provide current and past recipients with additional guidance about applicable funding opportunities, potential collaborations, and technical assistance that may assist recipients in their future work.* The periodic updates also allow the program to track best practices that lead to greater project sustainability and long-term community revitalization for impacted community residents. The frequency of these periodic updates will be by mutual agreement and will be discussed with the recipient before the end of the project period. Recipients are also encouraged (but not required) to continue providing updates and engaging with their EPA Project Officer beyond the additional three years after the end of the project.

*NOTE – Compliance with this term & condition is strongly encouraged but not required, and non-compliance will not impact the recipient's subsequent application(s) for federal funding in any way. Compliance will not give the recipient any preference or priority during future EPA grant competitions and is not a guarantee for future EPA grant funding. Additionally, the recipient agrees not to submit a claim for compensation to EPA for providing these updates.

**B.7. Public or Media Events**

The recipient agrees to notify the EPA Project Officer immediately when known, or at least within 15 calendar days in advance of planned public or media events it is organizing to publicize projects under this award, to provide the opportunity for attendance and participation by federal representatives.

**B.8. Additional Reporting Requirements**

Additional reporting requirements and details are available in the EPA General Terms and Conditions, including but may not be limited to:

a.  Annual Federal Financial Reporting (FFR);
b.  Reporting Subawards and Executive Compensation;
c.  Annual MBE/WBE Utilization Under Federal Grants and Cooperative Agreements Report;
d.  Tangible Personal Property Report form series (SF-428);
e.  Reporting fraud, conflict of interest, bribery, or gratuity violations; and
f.  Closeout Reports.

## C.  Plans and Other Deliverables

**C.1. Quality Assurance**

Quality Assurance applies to all awards involving environmental information as defined in 2 CFR 1500.12 Quality Assurance. Quality assurance requirements apply to the collection of environmental data. Environmental data is any measurements or information that describe environmental processes, location, or conditions; ecological or health effects and consequences; or the performance of environmental technology. Environmental data includes information collected directly from measurements, produced from models and compiled from other sources, such as databases or literature.

a.   **Quality Management Plan (QMP):** Prior to beginning environmental information operations, the recipient must complete one of the two following options:

   1.   QMP Option 1: **Develop a QMP**

      a)   Prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard. Submit the document for EPA review; and

      b)   Obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval.

   **OR**:

   2.   QMP Option 2: **Submit a Current, Approved QMP**

      a)   Submit a current QMP that was previously approved by the EPA to your EPA Project Officer.

      b)   The EPA Quality Assurance or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer in writing if the QMP is acceptable for this agreement.

      c)   The recipient must submit the QMP within 60 days after the grant award.

      d)   The recipient must review their approved QMP at least annually. These document reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

      e)   The recipient must submit a QMP crosswalk with the QMP.

NOTE: Contractor support for the development of the QMP is an eligible cost under this program provided that the costs are reasonable. In addition, technical assistance may be available at no cost. Reach out to your EPA Project Officer if you are interested in obtaining assistance with developing your QMP.

b.   **Quality Assurance Project Plan (QAPP):** The recipient may need to develop at least one QAPP. A QAPP describes how environmental information operations are planned, implemented, documented, and assessed during the life cycle of a project. Requirements for QAPPs are found in the most recent version of EPA's Quality Assurance Project Plan Requirements/Standard Quality Assurance Project Plans (QAPP), available here.

Once the award is made, if a Quality Assurance Project Plan is required for the project, the recipient will draft a QAPP prior to beginning work on the project. You must reserve time and financial resources in the beginning of your project to prepare your QAPP. Recipients cannot begin data collection until EPA approves the QAPP.

Prior to beginning environmental information operations, the recipient must complete one of the three following options:

1. QAPP Option 1: **Develop a QAPP**

   a) Prepare QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard;

   b) Submit the document for EPA review, and

   c) Obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval.

   **OR**

2. QAPP Option 2: **Submit Previously EPA-Approved QAPP**

   a) Submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s).

   b) The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer in writing if the previously EPA-approved QAPP is acceptable for this agreement.

   **OR**

3. QAPP Option 3: **Provide EPA a Recipient-Approved QAPP, with EPA-Approved QMP**
   Provide EPA a copy of the recipient-approved QAPP if the recipient has an EPA-approved Quality Management Plan and a current EPA delegation to review and approve QAPPs.

   a) The recipient must submit the QAPP no more than 60 days after the grant award.

   b) The recipient shall notify the EPA Project Officer and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

   c) The recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the EPA Project Officer and the QAM at least annually and may also be submitted when changes occur.

   d) The recipient must submit a QAPP checklist with the QAPP.

**Note:** Contractor support for the development of the QAPP may be an eligible cost under this award, provided that the costs are reasonable. In addition, technical assistance may be available at no cost. Reach out to your EPA Project Officer if you are interested in obtaining assistance with developing your QAPP(s).

**c.   Quality Assurance and Subrecipients**

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure subrecipients develop and implement (or implement existing) Quality Assurance (QA) planning documents in accordance with this term and condition.

d. **For Reference:**

- Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

- EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

- EPA's Quality Program website has a list of QA managers, and Specifications for EPA and Non-EPA Organizations.

- The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

## C.2. Competency of Organizations Generating Environmental Measurement Data

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process.

Demonstration of competency may include (but not be limited to):

a. Current participation in accreditation or certification programs that are applicable to the environmental data generated under the EPA-funded assistance;
b. Ongoing participation by the organization in proficiency testing (PT) or round robin programs conducted by external organizations;
c. Ongoing U.S. EPA accepted demonstrations and audits/assessments of proficiency; and
d. Other pertinent documentation that demonstrates competency (e.g., past performance to similar statement of work [SOW]).

## C.3. Cost Allocation Plan

A cost allocation plan is a narrative description of the procedures that the recipient will use in identifying, measuring, and allocating costs incurred in support of programs administered or supervised by the recipient. A cost allocation plan is required when activities under the award will also be undertaken under other EPA grants or other funding sources.

Technical assistance may be available for assistance with developing cost allocation plans. Contact the EPA Project Officer if you would like to request assistance with your cost allocation plan.

## D. Subawards

### D.1. Subrecipient Capacity

Community Change Grant recipients making pass-through subawards must comply with applicable provisions of 2 CFR Part 200 and the EPA Subaward Policy.

In addition to the EPA General Term and Condition "Establishing and Managing Subawards", prior to making subawards, the recipient must ensure that the subrecipient has the capacity and capabilities to perform its subaward responsibilities and requirements in a timely, effective, and efficient manner.

### D.2. Statutory Partnership

The recipient must seek prior written approval from the Award Official if it wants to change the statutory partner for this grant from the entity identified in the selected application documented in the Partnership Agreement.

Due to the competitive nature of the Community Change Grant program, EPA approval will only be provided in very limited circumstances at EPA's sole discretion and will not be subject to dispute from the recipient. EPA approval is necessary to ensure that any proposed new statutory partner is an eligible subrecipient with comparable qualifications/expertise/experience to the original statutory partner such that performance of the grant will not be adversely impacted.

Requests for approval must be sent, along with any requested documentation, to the EPA Award Official, who will consult with the EPA Project Officer. EPA decides in its sole discretion whether to consider and/or approve the request.

### D.3. Collaborative Entities

The recipient must seek prior written approval from the Award Official if it wants to change collaborative entities for this grant from entities identified in the selected application.

Due to the competitive nature of the Community Change Grant program, EPA approval will only be provided in very limited circumstances at EPA's sole discretion and will not be subject to dispute from the recipient. EPA approval is necessary to ensure that any proposed collaborative entities are eligible subrecipients with comparable qualifications/expertise/experience to the original collaborative entities such that performance of the grant will not be adversely impacted.

Requests for approval must be sent, along with any requested documentation, to the EPA Award Official, who will consult with the EPA Project Officer. EPA decides in its sole discretion whether to consider and/or approve the request.

## E. Procurement

### E.1. Procurement Standards

The recipient agrees to conduct all procurement actions under this assistance agreement in accordance with the procurement standards set forth in  2 CFR 200.317 through 2 CFR 200.327,  2 CFR Part 1500,  40 CFR Part 33, and the EPA General Terms and Conditions. EPA provides additional guidance on complying

with these requirements in the Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements. Any costs incurred by the recipient under contracts and/or small purchases that EPA determines to be in noncompliance with EPA procurement standards shall be unallowable for Federal reimbursement.

As provided by 2 CFR 200.310, recipients must ensure that subrecipients acquire insurance to protect against loss, damage, and theft if a subaward includes cost for equipment. Costs for such insurance are allowable under this agreement.

## E.2. Equipment Disposition

Notwithstanding EPA General Term and Condition "Tangible Personal Property", in accordance with 2 CFR 200.313, when original or replacement equipment acquired under this agreement is no longer needed for the original project or program or for other activities currently or previously supported by EPA, the recipient may dispose of the equipment without further instruction from EPA, unless the equipment is sold during the period of performance. Proceeds of sales of equipment purchased with EPA funds during the period of performance are program income.

## E.3. Real Property

In accordance with 2 CFR 200.311, title to real property acquired or improved under this agreement will vest upon acquisition in the recipient. The property must be used for the originally authorized purpose as long as needed for that purpose, during which time the recipient must not dispose of or encumber its title or other interests except as provided by the EPA.

## E.4. Recording the Purchase and/or Improvement of Real Property

a. If the recipient acquires real property in whole or in part with EPA grant funds, the recipient must execute and record a statement of Federal interest (e.g., lien) on the deed that reflects the Federal contribution to the acquisition price. Liens on single family housing are required if EPA funds are used to acquire the real property and title to the property remains with the recipient.

Liens on improvements to real property are not required, including energy efficiency upgrades to homes and individual apartment units, remediation of asbestos or lead based paint in homes and apartment units, or installation of residential solar without regard to whether EPA funds were used to acquire the real property.

The statement of interest must, as applicable:

1. State the real property is subject to the Federal interest;
2. State that certain use and disposition requirements apply to the property;
3. Be acceptable in form and substance to the EPA Award Official;
4. Be placed on record in accordance with applicable State and local law;
5. Provide the percentage of the purchase price funded by the EPA;
6. Provide the EPA grant number;
7. Provide that use of the real property is restricted to the authorized purpose of the grant; and
8. Provide that the recipient is required to request disposition instructions when it ceases using the real property for the authorized purpose.

An example of a lien for the purchase of real property is:

JA133

**NAME OF RECIPIENT** purchased this land with **X%** federal funds under a grant program from the U.S. Environmental Protection Agency (EPA). **NAME OF RECIPIENT** may only use this land [STATE PURPOSE – e.g., as part of the Richland Creek Water Quality Project, delineated in the legal description attached as Exhibit A,] as described in EPA Grant No. **AB-1235678. NAME OF RECIPIENT** will be responsible for maintaining this deed restriction in perpetuity. In the event **NAME OF RECIPIENT** wishes to change the use of the land from the identified grant purpose or encumber the property, **NAME OF RECIPIENT** must contact the EPA, Region **#**, and request written instructions for disposition pursuant to 2 CFR 200.311.

The recipient shall provide a copy of the deed (stamped by the appropriate recording office), reflecting the recordation of the Federal Interest to the EPA Project Officer and Grant Specialist.

### E.5. Appraisals

Recipients must obtain an appraisal of the property conducted by an independent licensed appraiser, prior to using grant funds to purchase the property. All appraisals must be conducted in accordance with 49 CFR 24.103. Recipients must provide a copy of the appraisal to the EPA Project Officer.

### E.6. Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA)

The URA applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs.

a. **Property/Land Acquisition.** Recipients and subrecipients must comply with the Uniform Relocation Act and Federal Highway Administration's implementing regulations at 49 CFR Part 24, which require recipients and subrecipients to follow certain procedures for acquiring property for grant purposes, such as notice, negotiation, and appraisal requirements.
b. **Relocation.** The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing.

The recipient must comply with, and ensure subrecipients comply with, the URA and 49 CFR Part 24  if an EPA-funded acquisition of property results in temporary or permanent displacement of individuals or businesses. Please note that projects for community or Tribal relocation are not eligible under this grant program.  If a construction project has the incidental effect of temporarily or permanently displacing people or businesses, the URA will apply.

### E.7. Real Property Disposition

Pursuant to 2 CFR 200.311(d), when real property purchased with EPA grant funding is no longer needed for the originally authorized purpose, the recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

a. Retain title after compensating EPA. The recipient must pay an EPA an amount calculated by multiplying the percentage of EPA's contribution towards the cost of the original purchase (and costs of any improvements) by the fair market value of the property. However, in those situations where recipient is disposing of real property acquired or improved with a Federal award and acquiring

replacement real property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

b. Sell the property and compensate EPA. When the recipient sells the property, it must pay EPA an amount calculated by multiplying the percentage of EPA's contribution towards the cost of the original purchase (and cost of any improvements) by the proceeds of the sale after deducting any actual and reasonable expenses paid to sell or fix up the property for sale. When the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When directed to sell property, the recipient must sell the property using procedures that provide for competition to the extent practicable and that result in the highest possible return.

c. Transfer title to the Federal government or to a third party designated/approved by EPA. The recipient is entitled to be paid an amount calculated by multiplying the recipient's percentage of participation in the purchase of the real property (and cost of any improvements) by the current fair market value of the property.

d. Use the net sales proceeds as Program Income for the sustainability of the EPA-funded project or program.

# F. Participant Support Costs

### F.1. Participant Support Cost Requirements

*Participant support costs* are defined at 2 CFR 200.1 as direct costs that support participants and their involvement in the federally funded project, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants.

a. Examples of participant support costs in EPA financial assistance agreements include but are not limited to:
   1. Costs paid directly to or on behalf of participants;
   2. Stipends for interns, fellows, trainees, or attendees at community meetings;
   3. Registration fees, training materials;
   4. Temporary dependent care and travel costs when the purpose of the trip is to participate in the project activity;
   5. Travel assistance to non-employee program beneficiaries (e.g. travel assistance that nonprofit "co-regulator" organizations provide to State and Tribal workgroup members), including per diem; and
   6. Stipends and other incentives paid to participants in research experiments, focus groups, surveys or similar research activities.
   7. Participant Support Costs allowable under 2 CFR 1500.1(a)(2) to the extent authorized in the EPA-approved scope of work.

b. In accordance with 2 CFR 200.456, the recipient must establish written guidelines for participant support costs as applicable. These guidelines must:

   1. Provide eligibility, restrictions, timelines, and other programmatic requirements;

   2. Describe the activities that will be supported by the participant support costs;

   3. Specify the range of funding to be provided through the participant support costs;

4. Identify which party will have title to equipment (if any) purchased with a rebate or subsidy;

5. Establish reporting and source documentation requirements (e.g., invoices) for accounting records; and

6. Describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

Participant support costs must be treated consistently across all Federal awards. See the EPA Guidance on Participant Support Costs for more information.

### F.2. Training and Tuition Stipend Limitation

Individuals who are not U.S. citizens or lawfully admitted to the U.S. as permanent residents can receive training under Track I and Track II, as appropriate, as described in the approved workplan. However, in accordance with RAIN-2019-G09: EPA Policy on Participation in Fellowship, Internship, Scholarship and Similar Programs Funded by EPA Assistance Agreements, individuals who are not U.S. citizens or lawfully admitted to the U.S. as permanent residents cannot receive EPA funded stipends or tuition for participating in training. The recipient may fund these tuition and stipend costs through other, non-EPA sources.

### F.3. Tax Liability for Participant Support Costs

The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

### F.4. Individuals Excluded from Participant Support Costs under 2 CFR Part 180

Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are covered transactions for the purposes of 2 CFR 180.300 and EPA General Term and Condition "Suspension and Debarment". Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal non-procurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants. See EPA Guidance on Participant Support Costs.

## G. EPA Oversight

### G.1. EPA Project Officer Oversight and Monitoring

The Community Change Grants are awards under a new environmental justice program authorized under Clean Air Act Section 138 that has features, and scopes of work, that are atypical of most EPA environmental justice grants. Therefore, pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary in this award to

ensure that recipients effectively carry out the award. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official, after consultation with the Project Officer and any other appropriate EPA staff determines, based on a request by the recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary to ensure the effective performance of the award.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer, will oversee and monitor the grant agreement throughout the performance period. This includes but is not limited to:

a. Determining next steps if a Statutory Partner or other collaborating entity (subrecipient) is unable to participate in the grant as provided in the approved work plan. See also the Terms and Conditions in Section D above;

b. Monthly telephone calls, video calls, site visits, and/other form of communication for monitoring (emails, video conference, etc.);

c. Reviewing evidence of completion of project phases (e.g., planning) before providing approval for the recipient to begin work on the next project phase (e.g. implementation);

d. Reviewing the substantive terms included in the contracts or subawards (EPA's Project Officer will not suggest, recommend, or direct the recipient to select any particular contractor or subrecipient except to the extent permitted in Section 10 of the EPA's Subaward Policy). See also the "Procurement Standards" Term and Condition above, and, for grants that contain construction activities, the construction clauses in Section J below;

e. Reviewing proposed procurement, in accordance with the Procurement Standards in 2 CFR Part 200 and 2 CFR Part 1500). See also the "Procurement Standards" Term and Condition above.

f. Reviewing and commenting on performance reports prepared under the grant (the final decision on the content of reports will rest with the recipient);

g. Approving qualifications of key personnel if the recipient changes key personnel named in the application for funding or EPA approved scope of work as provided in 2 CFR 200.308(f)(2) (EPA will not select employees or contractors employed by the recipient;

h. Addressing compliance with Buy America Preferences, in accordance with 2 CFR Part 184, and the Build America Buy America Act, and providing technical assistance, if necessary, on compliance with CAA 314 and the Davis Bacon and Related Act; and/or

i. Addressing compliance with the National Historic Preservation Act and subsequent consultation if applicable.

**Method for Reconsideration**

If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the recipient may agree to additional areas of oversight and monitoring.

**G.2. Sufficient Progress**

The EPA Project Officer will assess whether the recipient is making sufficient progress in implementing the work plan under this award within 30 calendar days after the recipient submits its quarterly progress report as outlined in the Performance Reporting Term and Condition above. "Sufficient progress" will be assessed based on a comparison of the recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes and other project activities. This term and condition "flows down" to subrecipients, with the recipient required to assess whether each subrecipient is making sufficient progress in implementing this award under its subaward agreement. In addition, the recipient may increase the frequency and scope of the review of sufficient progress of subrecipients, in accordance with 2 CFR 200.332 Requirements for Pass-Through Entities.

If the EPA Project Officer determines that the recipient has not made sufficient progress in implementing its EPA-approved Community Change Grants Workplan, the recipient, if directed to do so under 2 CFR 200.208, must implement a corrective action plan concurred with by the EPA Project Officer and approved by the Award Official or Grants Management Officer within 30 calendar days of the request to do so.

# H. Compliance

### H.1. Compliance with Laws and Regulations

All funded activities under this program must comply with applicable federal, state, and local laws, and regulations, including but not limited to:

a. 2 CFR 200.435(b), which restricts the use of grant funds to defend a recipient that is subject to a criminal, civil or administrative proceeding against it commenced by any government for fraud or similar offenses;

b. 2 CFR 200.435(g), which precludes the use of grant funds to prosecute claims against the Federal Government; and

c. 2 CFR 200.450(c), which restricts the use of federal funds by nonprofit organizations for certain lobbying or electioneering activities but does not preclude the use of federal funds to promote adoption of local ordinances, including those related to zoning.

d. 40 CFR Part 5 and 40 CFR Part 7, which prohibit discrimination on the basis of race, color, national origin (including limited-English proficiency), disability, sex, and age by recipients and subrecipients of federal financial assistance.*

*For grants awarded to any entity in the State of Louisiana: pursuant to a permanent injunction issued by the U.S. District Court for the Western District of Louisiana, EPA will not impose any disparate-impact or cumulative-impact-analysis requirements under Title VI of the Civil Rights Act of 1964 in any pre-award assurances or terms and conditions accompanying the application for and receipt of this grant award.

### H.2. Remedies for Non-Compliance

The recipient agrees to comply with the terms and conditions of this award agreement. Should the recipient fail to adhere to the terms and conditions of this award agreement, the EPA may seek remedies under 2 CFR 200.208 and/or 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as well as advances not yet disbursed for allowable costs.

The recipient agrees to comply with the statutory requirements of Section 138 of the Clean Air Act. Should the recipient violate the statutory requirements of Section 138 by failing to use grant funds in accordance with Section 138 or by failing to ensure that the activities of its subrecipients are in accordance with Section 138, EPA may seek remedies under Section 113, which may subject the recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action. Should the recipient or its subrecipients make false claims or statements to EPA, EPA may refer the matter to DOJ to pursue claims under the False Claims Act (31 USC 3729) or take action under the Program Fraud Civil Remedies Act (40 CFR Part 27).

### H.3. Termination

In addition to the EPA General Term and Condition "Termination," EPA maintains the right to terminate the grant when the noncompliance with the terms and conditions is substantial, such that effective performance of the grant is materially impaired or there is adequate evidence of fraud, waste, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. The term "fraud, waste or abuse" had the meaning given in the EPA General Term and Condition "Reporting Requirement" in effect as of October 1, 2024 and defines fraud, waste, and abuse as "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733. Refer also to EPA General Term and Condition "Reporting Waste, Fraud and Abuse".

In accordance with 2 CFR 200.341, EPA will provide the recipient notice of termination.

If EPA partially or fully terminates the Assistance Agreement, EPA must:

a. De-obligate uncommitted funds and re-obligate them by an award to another Community Change Grant recipient receiving an award pursuant to Notice of Funding Opportunity EPA-R-OEJECR-OCS-23-04 to effectuate the objectives of Section 138 of the Clean Air Act, 42 USC § 7438 within 90 days of the de-obligation; and,
b. If partially terminated, amend the recipient's grant to reflect the reduced amount, based on the de-obligation.

### H.4. Community Change Grants Limitation on Indirect Costs

In addition to the EPA General Terms and Condition "Indirect Cost Rate Agreements", indirect costs charged against any grant  or subgrant awarded shall not exceed 20 percent of the total amount of the federal award, unless the recipient or subrecipient is an Indian Tribe as defined in section 302(r) of the Clean Air Act,  or an Intertribal consortium that meet the requirements of 40 CFR 35.504(a) and (c), even if the Intertribal consortium is eligible for funding as a Community Based Nonprofit Organization. There is no indirect cost cap for Tribal entities under this program.

### H.5. Fundraising

In accordance with 2 CFR 200.442(a) costs of organized fundraising, including financial campaigns, endowment drives, solicitation of gifts and bequests, and similar expenses incurred to raise capital or

obtain contribution are unallowable. Fundraising costs for meeting the Federal grant program objectives are allowable with the prior written approval of the Federal agency.

2 CFR 200.442(a) provides coverage on fundraising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients.

### H.6. Cybersecurity

a. The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

b. EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

c. If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

d. The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

### H.7. Suing the Government

In accordance with 2 CFR 200.435(g) costs for prosecuting claims against the Federal Government, including appeals of final Federal agency decisions, are unallowable.

Further, costs for suing state, tribal, and local governments are unallowable costs under this program.


### IF APPLICABLE


## I. General Items

**I.1. Leveraging**

The recipient agrees to make best efforts to provide the proposed leveraged funding that is described in the EPA-approved Community Change Grants workplan, if applicable. If the proposed leveraging does not materialize during the period of performance, and the recipient does not provide a satisfactory explanation, the EPA may consider this factor in evaluating future proposals from the recipient.

In addition, if the proposed leveraging does not materialize during the period of performance, then EPA may reconsider the legitimacy of the award. If EPA determines that the recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the application, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

**I.2. Program Income**

In accordance with 2 CFR 200.307(b) and 2 CFR 1500.8(b), the recipient and any subrecipient is authorized to earn program income during the period of performance. Program income will be added to funds committed to the program by EPA. In accordance with 2 CFR 200.307(a), program income earned during the period of performance may only be used for costs incurred during the period of performance or allowable closeout costs. Program income must be expended prior to requesting additional Federal funds.

In accordance with 2 CFR 200.307(d), costs incidental to the generation of program income may be deducted from gross income to determine program income, provided these costs have not been charged to the EPA award or another Federal financial assistance agreement. The recipient must retain adequate accounting records to document that any costs deducted from program income comply with regulatory requirements.

The recipient must provide as part of its quarterly performance report, a description of how program income is being used. A report on the amount of program income earned during the award period must be submitted with the annual Federal Financial Report, Standard Form 425.

**I.3. Use of Logos**

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

**I.4. Geospatial Data Standards**

(Track I and some Track II) All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at The Federal Geographic Data Committee website. The EPA Geospatial Policies and Standards web page contains updated links to EPA policies and standards. National policies and standards include:
1. Geospatial Data Act
2. Evidence Based Policymaking Act

# J. Construction

If this award contains construction activities, the Terms and Conditions in this Construction section apply. If your award does not contain construction activities, you may disregard this Construction section. The Terms and Conditions below provide definitions and guidelines. Also refer to the EPA General Term and Condition "Build America Buy America".

### J.1. Davis-Bacon and Related Acts (DBRA)

**a.    Program Applicability**

As provided in Section 314 of the Clean Air Act (42 USC § 7614), Davis-Bacon and Related Act (DBRA) (42 USC §§ 3141-3144) labor standards apply to projects assisted by awards made under the Community Change Grant Program. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects over $2,000 under this award agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Community Change Grant Program, the relevant construction type and prevailing wage classifications will be "Building," "Residential," and "Heavy." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Therefore, recipients must ensure that any construction work financed in whole or in part with funds under this award, as defined in these Terms and Conditions, complies with DBRA requirements and the requirements of these Terms and Conditions.  The recipient must ensure that these requirements apply to all construction projects assisted by funds under this award without regard to whether the work is contracted for by a subrecipient, contractor, subcontractor, or program beneficiary that receives financial assistance.

If the recipient encounters a situation that presents uncertainties regarding DBRA applicability under this award, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with subrecipient, program beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this term and condition or the DBRA requirements, the recipient agrees to promptly inform the Department of Labor for guidance or enforcement action, and copy the EPA Project Officer.

Consistent with the definitions at 29 CFR 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR 5.2.

**b.    Labor Laws**

DBRA is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

1. Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;

JA142

2. Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and

3. Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

**c.   Recipient Responsibilities When Entering Into and Managing Contracts:**

1. Solicitation and Contract Requirements:
   a) Include the Correct Wage Determinations in Bid Solicitations and Contracts: Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.
   b) Include DBRA Requirements in All Contracts: Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."
2. After Award of Contract:
   a) Approve and Submit Requests for Additional Wages Rates: Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).
   b) Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions: Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

**d.   Recipient Responsibilities When Establishing and Managing Additional Subawards:**

1. Include DBRA Requirements in All Subawards (including Loans): Include the following text on all subawards under this grant: "By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."
2. Provide Oversight to Ensure Compliance with DBRA Provisions: Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in 29 CFR 5.6.
3. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements: Recipients are responsible for oversight of subrecipients and must ensure that subrecipients comply with the requirements in subsection E, below.

To the extent permitted by law, the contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract and subcontract covered by Davis-Bacon and Related Acts in 29 CFR 5.1, and will be effective by operation of law, whether or not they are included or incorporated by reference into each contract and subcontract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

**e.   DBRA Compliance Monitoring Requirement**

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5 for all construction projects assisted under this award.

JA143

**J.2. Cross Cutters**

The recipient must comply with federal cross-cutting requirements. Cross-cutting federal authorities are the requirements of federal laws and Executive Orders that apply to most federal financial assistance programs. These requirements include, but are not limited to, National Historic Preservation Act (16 USC § 470); Endangered Species Act (P.L. 93-205); federal nondiscrimination laws, financial management policies, and executive orders on the protection of wetlands and flood plains and other crosscutters can be accessed here: https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements.

Sometimes, these authorities are expressly applied by the statute authorizing the assistance itself. More frequently, the requirements are not cited in the authorizing statute, but apply broadly by their own terms to a wide range of federal financial assistance programs. It is the responsibility of the Project Officers and the grantees to reach out to EPA Subject Matter Experts to understand the compliance required by each grant's activities.

# L.  Foreign Entities and Travel

**L.1. Foreign Entity of Concern**

As part of carrying out this award, the recipient agrees to ensure that entities the recipient contracts with, the recipient makes subawards to, or that receive funds as program beneficiaries at any tier of the funding under this grant agreement are not –

a.  Owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);
b.  Headquartered in a covered nation under 10 U.S.C 4872(d); or
c.  A subsidiary of an entity described in 1. or 2.

As of the date these terms and conditions became effective, covered nations under 10 U.S.C § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

**L.2. Foreign Travel**

Recipients must work with EPA's Project Officer to obtain the written consent of EPA's Office of International and Tribal Affairs (OITA) prior to:

a.  Performing work in a foreign country, and/or
b.  Awarding a subaward to a foreign or international organization, or a subaward to be performed in a foreign country even if that subaward is described in a proposed scope of work.

JA144