**ORAL ARGUMENT SCHEDULED FOR MARCH 16, 2026**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

No. 25-5333

---

APPALACHIAN VOICES, et al.,
*Plaintiff-Appellants,*
*v.*
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,
*Defendant-Appellees.*
On Appeal from the United States District Court
for the District of Columbia
No. 25-cv-01982
The Hon. Richard J. Leon, Senior Judge

---

**PLAINTIFF-APPELLANTS' FINAL REPLY BRIEF**

---

Hana V. Vizcarra
Deena Tumeh
Molly Prothero
Andrew Saavedra
Linnet Davis-Stermitz
Earthjustice
1250 I Street NW, 4th Floor
Washington, DC 20005
hvizcarra@earthjustice.org
dtumeh@earthjustice.org
mprothero@earthjustice.org
asaavedra@earthjustice.org
ldavisstermitz@earthjustice.org

Toby Merrill
Graham Provost
Cassandra Crawford

Ben Grillot
Kimberley Hunter
Irena Como
James Whitlock
Southern Environmental Law Center
122 C Street NW, Suite 325
Washington, DC 20001
Telephone: (202) 828-8382
Facsimile: (202) 347-6041
bgrillot@selc.org
kmeyer@selc.org
icomo@selc.org
jwhitlock@selc.org

Gary DiBianco Lawyers for Good
Government
6218 Georgia Avenue NW, # 5001

Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
(510) 738-6788
toby@publicrightsproject.org
graham@publicrightsproject.org
cassandra@publicrightsproject.org

David Chiu
San Francisco City Attorney
Yvonne R. Meré
Sara J. Eisenberg
1390 Market Street, 7th Floor
San Francisco, CA 94102
(415) 554-4274
yvonne.mere@sfcityatty.org
sara.eisenberg@sfcityatty.org

Washington, DC 20011
(202) 258-6826
Gary@lawyersforgoodgovernment.org

Alison Holcomb[+]
Office of King County Prosecuting
Attorney Leesa Manion
Christopher Sanders*
401 5th Avenue, Suite 800
Seattle, WA 98104
(206) 477-9483
aholcomb@kingcounty.gov

[+] Notice of intent to withdraw (Jan. 12, 2026)
* Application for pro hac vice admission forthcoming, pending acceptance of e-filing registration

*Counsel for Plaintiff-Appellants*

**February 4, 2026**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION ...............................................................................1

ARGUMENT .......................................................................................2

    I.    Plaintiffs' claims are not moot. ..............................................2

    II.   The Tucker Act is no impediment to jurisdiction over Plaintiffs' claim that EPA's policy directive eliminating a statutorily mandated grant program violated the Administrative Procedure Act. .........................10

        A.   Under *NIH*, Plaintiffs' challenge to EPA's directive to eliminate the statutorily mandated Section 138 program is a distinct APA claim that belongs in federal court. ...............11

        B.   EPA's remaining arguments are unpersuasive....................18

    III.  The Court should remand the constitutional claims in light of upcoming en banc review....................................................26

CONCLUSION....................................................................................28

CORPORATE DISCLOSURE STATEMENT .......................................32

CERTIFICATE OF COMPLIANCE.....................................................33

CERTIFICATE OF SERVICE .............................................................34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Pub. Health Ass'n v. NIH*,
145 F.4th 39 (1st Cir. 2025).................................................................15

*Arizona v. EPA*,
No. 25-cv-02015 (W.D. Wash.)...........................................................9

*Bennett v. Spear*,
520 U.S. 154 (1997)............................................................................17

*Bowen v. Massachusetts*,
487 U.S. 879 (1988)............................................................................25

*Climate United Fund v. Citibank*,
2025 WL 3663661 (D.C. Cir. Dec. 17, 2025) ...................................26

*Climate United Fund v. Citibank, N.A.*,
154 F.4th 809 (D.C. Cir. 2025)...........................................................28

*Coal. of Miso Transmission Customers v. FERC*,
45 F.4th 1004 (D.C. Cir. 2022)......................................................19, 20

*Connecticut v. Schweiker*,
684 F.2d 979 (D.C. Cir. 1982).............................................................4

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
38 F.4th 1099 (D.C. Cir. 2022).......................................................22, 24

*Dalton v. Specter*,
511 U.S. 462 (1994).............................................................................27

*Darby v. Cisneros*,
509 U.S. 137 (1993).............................................................................5

*Dep't of Education v. California*,
604 U.S. 650 (2025).............................................................................11

*Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC) Inc.*,
528 U.S. 167 (2000).............................................................................20

ii

*Global Health Council v. Trump*,
   153 F.4th 1 (D.C. Cir. 2025)...................................................................27

*Global Health Council v. Trump*,
   No. 25-5097, 2025 WL 2709437, (D.C. Cir. Aug. 28, 2025) ...........27

*Harris County v. Kennedy*,
   786 F. Supp. 3d 194 (D.D.C. 2025)......................................................2

*Hercules Inc. v. EPA*,
   938 F.3d 276 (D.C. Cir. 1991)..............................................................23

*Ingersoll-Rand v. United States*,
   780 F.2d 74 (D.C. Cir. 1985)................................................................23

*Jacksonville Port Auth. v. Adams*,
   556 F.2d 52 (D.C. Cir. 1977)..................................................................4

*Kareem v. Haspel*,
   986 F.3d 859 (D.C. Cir. 2021)..............................................................20

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)..............................................................................18

*Massachusetts v. Kennedy*,
   No. 1:25-cv-10814 (D. Mass.)...............................................................14

*Md. Dep't of Human Resources v. Dep't of Health & Human Servs.*,
   763 F.2d 1441 (1985)............................................................................25

*Megapulse, Inc. v. Lewis*,
   672 F.2d 959 (D.C. Cir. 1982).................................................22, 23, 26

*Nat'l Treasury Emps. Union v. Vought*,
   2025 WL 3659406 (D.C. Cir. Dec. 17, 2025) ....................................27

*Nat'l Institutes of Health v. Am. Pub. Health Ass'n*,
   145 S. Ct. 2658 (2025).............................. 1, 10, 15, 16, 17, 22, 23, 25

*Nat'l Treasury Employees Union v. Vought*,
   149 F.4th 762 (D.C. Cir. 2025)....................................................17, 27

*Rochester Pure Waters Dist. v. EPA*,
 960 F.2d 180 (D.C. Cir. 1992)......................................................................4

*Solutions in Hometown Connections v. Noem*,
 No. 25-1640 (4th Cir.) ..................................................10, 16, 17, 25

*Spectrum Leasing Corp. v. United States*,
 764 F.2d 891 (D.C. Cir. 1985)....................................................23

*Sugar Cane Growers Co-Op v. Veneman*,
 289 F.3d 89 (D.C. Cir. 2002)......................................................23

*Swierkiewicz v. Sorema N. A.*,
 534 U.S. 506 (2002)....................................................................10

*Teton Historic Aviation Found. v. U.S. Dep't of Def.*,
 785 F.3d 719 (D.C. Cir. 2015)....................................................19

*Tootle v. Sec'y of the Navy*,
 445 F.3d 167 (D.C. Cir. 2006)....................................................21

*TransUnion LLC v. Ramirez*,
 594 U.S. 413 (2021)....................................................................18

*Tucson Airport Auth. v. Gen. Dynamics Corp.*,
 136 F.3d 641 (9th Cir. 1998) ......................................................22

*Vartelas v. Holder*,
 566 U.S. 257 (2012)......................................................................3

**Statutes**

1 U.S.C. § 109................................................................................3

5 U.S.C. § 702................................................................................5

42 U.S.C. § 4370f...........................................................................9

42 U.S.C. § 7438.......................................................................7, 16

**Regulations**

2 C.F.R. § 200.342.........................................................................5

iv

2 C.F.R. § 200.344 ................................................................................5

**Other Authorities**

Congressional Budget Office, Estimated Budgetary Effects of an Amendment
in the Nature of a Substitute to H.R. 1, the One Big Beautiful Bill Act,
Relative to CBO's January 2025 Baseline (June 27, 2025) ...............................6

H.R. 1, 119th Cong., § 60016 (1st. Sess. 2025)...................................................3, 4

U.S. House of Representatives, Markup of Budge Reconciliation
Transcript (May 13, 2025) ....................................................................7

## INTRODUCTION

EPA eliminated the Environmental and Climate Justice Block Grant program mandated by Congress in Section 138 of the Clean Air Act. EPA did so absent any authority merely because it disagreed with the policy purposes Congress set out in the law. The decision to eliminate this statutorily mandated program for policy reasons is well-documented in the record and is a distinct final agency action. A straightforward application of Justice Barrett's controlling concurrence in *National Institutes of Health v. American Public Health Association*, 145 S. Ct. 2658 (2025) ("*NIH*"), makes clear that the district court had jurisdiction over Plaintiffs' challenge to EPA's policy directive eliminating the Section 138 program. Defendants cannot avoid judicial review of their actions by trying to write Plaintiffs' independent claim regarding this policy directive out of Plaintiffs' complaint.

H.R. 1 does not change this analysis nor affect the outcome here. While Defendants contend that H.R. 1 rescinded the funds at issue in this case, that act only rescinded *unobligated* funds. Under longstanding fiscal law principles and agency practice, the funds related to Plaintiffs' grants were obligated at the time of H.R. 1's enactment. The text of the legislation, the Congressional Budget Office's ("CBO") analysis of it, and legislators' documented understanding of the meaning

of that text at the time of passage make it clear that Congress did not rescind these funds.

Accordingly, this Court should reverse the district court's dismissal and remand with instructions that it has jurisdiction over Plaintiffs' Administrative Procedure Act ("APA") claim challenging EPA's policy-level directive to eliminate the Section 138 program. And as to Plaintiffs' constitutional claims, this Court will soon hear two cases en banc that will bear directly on the validity of the trial court's categorical rejection of those claims. This Court should reverse the dismissal of those claims and remand with instructions to the district court to reconsider the constitutional claims in light of these forthcoming decisions.

## ARGUMENT

### I. Plaintiffs' claims are not moot.

Plaintiffs' claims are not moot as a legal or practical matter. Defendants contend that when Congress enacted H.R. 1, it summarily rescinded the funds that were awarded to Plaintiffs. But the ordinary meaning of the text of the statute, together with longstanding principles of fiscal law and practice and the context in which the bill was enacted, make plain that Congress rescinded only a small fraction of the funding for the Section 138 program, and certainly not the funds that remain obligated to each of the Plaintiffs. *Harris County v. Kennedy*, 786 F. Supp. 3d 194, 202 (D.D.C. 2025) (in an analogous setting, finding that where "the

2

Act rescinded only unobligated appropriations, any grants that had already been issued were left undisturbed").

**1.** Plaintiffs filed this case prior to the passage of H.R. 1. To the extent Defendants argue that Congress took steps with that legislation to legally moot Plaintiffs' claims, they are wrong. For Congress to pass legislation with retroactive application, it must do so expressly and unambiguously. *Vartelas v. Holder*, 566 U.S. 257, 266 (2012); 1 U.S.C. § 109 ("repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide.").

Here, Congress took no steps, express or otherwise, to release Defendants from their prior obligations under the Administrative Procedure Act, the Constitution or the Clean Air Act. Indeed, Congress retained the text of Section 138 of the Clean Air Act that *mandates* the grant program, H.R. 1 tit. VI, § 60016. Congress included no express language to extinguish relief under Plaintiffs' pending claims and, as explained below, did not rescind the funding attached to Plaintiffs' specific grants.

The only relevant case cited by Defendants does not help them. There, Congress, having full knowledge of a plaintiff's pending claim, spoke with clear intent to rescind the exact amount of funding for an entire grant program, and thus made clear its intent that the specific pot of funding could not be used to provide

3

requested relief. *See Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992). The court distinguished other cases where Congress had been less clear, and courts used their equitable powers to grant relief to plaintiffs notwithstanding a lapse in Congressional appropriations. *See Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 56 (D.C. Cir. 1977); *Connecticut v. Schweiker*, 684 F.2d 979, 997–98 (D.C. Cir. 1982). *Rochester* has no relevance when, as here, Congress was express in only rescinding "unobligated" funds and left the grant program intact.

**2.** By its plain text, H.R. 1 directed rescission only of "unobligated balances" of the Section 138 grant program. H.R. 1, 119th Cong. § 60016 (2025). The parties agree on this. Defs.' Br. at 13. The question then is whether Plaintiffs' awarded grant funds—as well as the funding associated with similarly situated grants in the Section 138 program—were deemed "unobligated" by Congress at the time H.R. 1 became law. A basic understanding of the lengthy process required to de-obligate previously obligated funding makes clear they were not.

While Defendants suggest that upon a notice of termination all grant funds become unobligated except for some (indeterminate) amount of "pre-termination costs and reasonable closeout expenses," this is not how federal appropriations law works. Defs.' Br. at 12. EPA cannot terminate a grant and de-obligate funding for it on a single day. Instead, when the government initiates a grant termination, it

4

starts a process that may or may not ultimately result in permanent termination, and, if so, only then in de-obligation of some portion of grant funds.

This is a longstanding standardized, lengthy process that has been carefully designed to afford grantees due process, avoid mistakes, and otherwise follow the law. After the government begins the termination process, there is an opportunity for grantees to bring an administrative dispute.[1] 2 C.F.R. § 200.342. Plaintiffs may appeal any negative outcome from this process to a court of law. 5 U.S.C. § 702.[2] If, ultimately, the termination is deemed lawful, grantees and the government must engage in a comprehensive closeout process to determine exactly how much funding is still owed to the grantee. 2 C.F.R. § 200.344. De-obligation of funds does not occur until this final close-out process is complete, because until that point the question of whether some or all of the funds continue as obligated remains unresolved.

EPA recognizes this process and applied it to the Section 138 program. *See* JA844 (Dkt 87-1, Ex. 1) (EPA email explaining that "we don't process

---

[1] Plaintiffs thus do not agree, as Defendants suggest, that their agreements have been "formally terminate[d]." Defs.' Br. at 13. Rather, as the complaint pleaded, Plaintiffs allege that EPA sent them form letters "*purporting to* formally terminate the grants." JA044 (Compl. ¶ 114) (emphasis added).

[2] This framework does not require administrative exhaustion before bringing a claim. *Darby v. Cisneros*, 509 U.S. 137, 153–54 (1993) (APA claims only require administrative exhaustion when expressly required by statute or agency rule.).

deobligation until we get a final financial report" and that grantees "typically have 120 days" to submit this report after their termination is finalized). And in keeping with the process, many Plaintiffs administratively contested their terminations to EPA,[3] in addition to filing this case. To date, no court has made a final determination that EPA's terminations were lawful, and the grant awards cannot properly be closed out until litigation has been resolved. Because the lengthy process to de-obligate funds is not complete, funding for Plaintiffs' grants remains fully obligated *today*. Certainly, it was obligated at the time Congress debated and passed H.R. 1 last July.

**3.** Congress enacted H.R. 1 with these principles in mind. It thus knew that, by rescinding only "unobligated balances," it would not rescind the funding for Plaintiffs' grants. For instance, in keeping with the well-established fiscal practice described above, when the CBO estimated the budgetary effects of H.R. 1,[4] it concluded the bill's rescission amount would encompass a total of just $516 million. That small amount, a fraction of the $3 billion appropriated to this

---

[3] *See, e.g.*, JA153 (Kipnuk Decl. ¶ 26); JA172-173 (2°C Mississippi Decl. ¶¶ 25–26); JA 268 (Southwest Renewal Decl. ¶¶ 25–26); JA287-288 (Inst for Sust. Comms. Decl. ¶¶ 21, 25); JA305-306 (Landforce Decl.¶¶ 16–18); JA335 (Day One Decl. ¶ 9).

[4] Congressional Budget Office, Estimated Budgetary Effects of an Amendment in the Nature of a Substitute to H.R. 1, the One Big Beautiful Bill Act, Relative to CBO's January 2025 Baseline (June 27, 2025), https://www.cbo.gov/publication/61534 [https://perma.cc/YA6E-G3GX].

program in 2022, 42 U.S.C. § 7438, falls well short of what would have been available if the funds that supported already-awarded grants were also rescinded.[5]

The congressional debate on H.R.1 confirms that understanding. As Representative Morgan Griffith—H.R. 1 proponent and Chair of the Environmental Subcommittee—put it in a House Energy and Commerce Committee discussion, if a "grant was already given, as far as this bill is concerned, then that would still be going forward."[6] Specifically, Rep. Griffith explained that the legislation would not impact any EPA proceedings regarding grants that had been awarded, noting that "as of tonight, as of right now, that money is not available to us because it has been obligated"[7] and underscoring that "this action that we take does not impact that action that may or may not be going on in the administration."[8] Rep. Griffith further explained that if any awarded

---

[5] This number likely includes funding that had not been awarded at the time, such as for the UPLIFT Climate and Environmental Community Action Grant program which EPA created but awarded no grants under [https://perma.cc/3BKM-DR5D], and funds set aside to administer the grant program.

[6] U.S. House of Representatives, Markup of Budge Reconciliation Transcript, at 244:5962-64 (May 13, 2025), https://www.congress.gov/119/meeting/house/118261/documents/HMKP-119-IF00-Transcript-20250513.pdf [https://perma.cc/PSS2-KE85].

[7] *Id.* at 248:6067-6069.

[8] *Id.* at 246:6011-6016.

funds were later successfully de-obligated, their rescission would need to be addressed in a "future rescission."[9]

**4.** Defendants attempt to muddy the waters by suggesting that after EPA sent letters purporting to terminate Plaintiffs' grants only minimal expenses remained due to Plaintiffs for "allowable costs incurred before termination and reasonable closeout expenses." Defs.' Br. at 13. In this telling, Defendants appear to suggest that Congress somehow forecast what these as-yet uncalculated expenses would be and then rescinded what was left over. But there is no evidence this is what Congress did or could have done.

First, and most important, using plain language Congress rescinded "unobligated funds," not some forecast of what may or may not ultimately become de-obligated in the future. Second, because many grant terminations were still in the administrative dispute process at the time H.R. 1 became law; Congress did not purport to prejudge the outcome of those proceedings. Third, the approach EPA advocates is unworkable as a practical matter. The fiscal law principles outlined above are intended to provide certainty about whether particular funds are obligated or not. By contrast, under EPA's approach there would be a bucket of funds that would remain in limbo long after Congress acted, as it would remain

---

[9] *Id.* at 247:6056.

uncertain whether funds were obligated until the validity of grant terminations was ultimately determined and, if so, until any remaining close-out obligations were calculated. There is no evidence this is what Congress intended.

**5.** Finally, it is worth noting that while Defendants suggest that Congress's actions foreclose any relief for Plaintiffs on the merits, they do not assert that, as a practical matter, they no longer have access to the funds necessary to restore the Section 138 program. Defs.' Br. at 15.

In another similarly situated case, Defendants recently informed the district court that all obligated and unobligated funding associated with a separate grant program remained in place in a Treasury account, where it could be used "to satisfy any remaining obligations for allowable costs" under a statute that requires balances like these "to remain available through the seventh fiscal year after their period of availability." Decl. of Gregg Treml, *Arizona v. EPA*, Dkt. 102-1, No. 25-cv-02015 (W.D. Wash. Dec. 5, 2025) (explaining funds would "remain available until September 30, 2031 – per 42 U.S.C. § 4370f"). Because the same obligations under 42 U.S.C. § 4370f attach to the Section 138 grants, Defendants presumably have access to the funds needed to provide relief to Plaintiffs in this case.

## II. The Tucker Act is no impediment to jurisdiction over Plaintiffs' claim that EPA's policy directive eliminating a statutorily mandated grant program violated the Administrative Procedure Act.

Plaintiffs and Defendants agree on one key point: When a plaintiff challenges a discrete, final agency action setting forth a policy to end a "statutorily mandated" program, that challenge is reviewable in district court. *See* Oral Argument (Oct. 23, 2025), *Solutions in Hometown Connections v. Noem*, No. 25-1640, (4th Cir.) ("*Solutions* Oral Argument")[10]; *see also, e.g.*, *NIH*, 145 S. Ct. at 2661 (Barrett, J., concurring); Defs.' Br. at 23–24.

Rather than contest that point here, the government tries to reframe Plaintiffs' complaint and insist that this case has only ever been a series of challenges to Plaintiffs' individual grant terminations. But that assertion is wrong and fails to accept Plaintiffs' well-pleaded complaint as true, as the courts must on a motion to dismiss. *See, e.g.*, *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508 n.1 (2002). Plaintiffs pled, in painstaking detail, that EPA's policy-level directive to eliminate the statutorily mandated Section 138 program violated the APA. Certainly, Plaintiffs also alleged that EPA's termination of their individual grants violated the APA. But the Plaintiffs in *NIH* challenged individual grant terminations, too. While Justice Barrett's concurrence in *NIH* foreclosed

---

[10] A recording of the argument is available at https://www.ca4.uscourts.gov/OAarchive/mp3/25-1640-20251023.mp3 [https://perma.cc/K9KW-94QN]. This statement occurs at 22:13-34.

jurisdiction over the latter claim, it explicitly recognized that claims that, like Plaintiffs' policy-level claim, challenge agency policy-level directives eliminating entire grant programs belong in federal court.

Try as it might, the government cannot escape that conclusion. Plaintiffs' complaint plainly pleads an APA claim challenging EPA's policy-level directive to eliminate the entire Environment and Climate Justice Block Grant program, effectively erasing an entire section of the U.S. Code. This claim thus belongs in federal court.

A.    **Under *NIH*, Plaintiffs' challenge to EPA's directive to eliminate the statutorily mandated Section 138 program is a distinct APA claim that belongs in federal court.**

Under a straightforward application of the controlling concurrence in *NIH*, the district court had jurisdiction over Plaintiffs' challenge to EPA's policy directive eliminating the Section 138 grant program. Pls.' Br. at 18–26. EPA's primary rejoinder is that Plaintiffs did not actually bring a programmatic challenge.[11] Instead, they assert, Plaintiffs have taken a batch of bundled-together challenges to individual terminations and improperly "rebrand[ed]" them as a challenge to a policy-level decision. Defs.' Br. at 22. This assertion plainly misreads Plaintiffs' complaint, which thoroughly and consistently makes clear that

---

[11] Defendants rely on *Department of Education v. California*, 604 U.S. 650, 650 (2025). This opinion pre-dates *NIH* and addresses a narrower set of issue than *NIH*, which is controlling here.

one of Plaintiffs' claims is a challenge to EPA's policy-level directive to eliminate the entire Section 138 grant program. And just as in *NIH*, that claim is not a "rebrand" of Plaintiffs' concern with their individual grant terminations, but a separate claim distinct from the individual grant claims. This separate claim remains properly heard in federal court.

**1.** The "essence," "heart," and "primary" focus of Plaintiffs' complaint (Defs.' Br. at 16, 19, 22) is spelled out in detail over nearly 60 paragraphs: EPA, acting on Executive Orders to dismantle programs like these, issued a directive to eliminate the entire Section 138 grant program. *See, e.g.*, JA024 (Compl. ¶ 13) (government "moved to terminate" entire program); *see also, e.g.*, JA024 (Compl. ¶ 14) (EPA "reviewed" these "'grant programs' and terminated them"); JA043 (Compl. ¶¶ 111–12) (similar); JA055 (Compl. ¶ 174) ("EPA terminated these entire grant programs *en masse* for 'policy reasons.'"). This was, Plaintiffs explained, a *policy* decision, JA043 (Compl. ¶ 111 (quoting Ex.1-A ¶ 3 (T. Voyles Decl.))), made at the *program* level, JA024 (Compl. ¶ 14); JA067 (Compl. Ex. 1-A).

Plaintiffs did not have to speculate as to the program-wide nature of the decision: EPA said as much in its own words. As Travis Voyles, an Assistant Deputy Administrator, explained in a sworn declaration, on a single day in February, he "decided that certain grant programs"—including all grant programs EPA had created under Section 138—"should be terminated for policy reasons."

*See* JA070; JA106. (Compl. Ex. 1-A at 3; 1-F). This was to be, he had previously explained, a "broad approach" requiring the agency to cancel each and every grant because "the entire program is inconsistent with Administration priorities." JA076 (Compl. Ex. 1-C).

Plaintiffs' complaint challenges this policy-level decision as contrary to law and arbitrary and capricious in violation of the Administrative Procedure Act, and accordingly seeks to set it aside. *See* JA057-061 (Compl. ¶¶ 186–205). So in formulating their claims, just as in spelling out the facts, Plaintiffs again emphasized—over and over—that they objected to EPA's policy-level decision to eliminate the entire program. *See, e.g.*, JA058 (Compl. ¶ 189) ("EPA's termination" of the Section 138 "grant programs" was "arbitrary and capricious"); JA060 (Compl. ¶¶ 200–01) (EPA's "termination" of the "program" was contrary to law).[12]

---

[12] Similar references abound throughout the complaint. *See, e.g.*, JA058 (Compl. ¶ 188) ("EPA's termination of the Environmental and Climate Justice Block Grant program" was a final agency action); JA058, JA058-059 (Compl. ¶¶ 190–91, 193–94) (EPA terminated the "program without [considering] 'an important aspect of the problem'," based on factors it was not intended to consider and that contravened statutory objectives); JA056 (Compl. ¶ 175) ("EPA's decision to terminate the [Section 138] program" contravened congressional directives); JA056, JA057 (Compl. ¶¶ 179, 183–84) (that decision contravened the Constitution).

**2.** EPA contends that, notwithstanding the dozens of paragraphs Plaintiffs devoted to alleging this policy-level claim from the outset of this case, Plaintiffs' central challenge to a programmatic decision was in fact only a sideshow and a "rebrand" of challenges to each of their individual grant terminations. Defs.' Br. at 22. But there was nothing to "rebrand" because Plaintiffs *did* challenge their individual grant-terminations—not through their claim that EPA's policy-level decision violated the APA, but by treating those terminations as separate agency actions that themselves violated the APA.

As the complaint puts it, Plaintiffs challenged *both* the "termination of the [grant program] for policy reasons, *and* each subsequent termination of Plaintiffs' grants." JA058 (Compl. ¶ 188 (emphasis added)); *see also* JA059 (Compl. ¶ 196) (similar)). These were, Plaintiffs alleged, distinct "final agency actions"—in the plural—that were each arbitrary and capricious and contrary to law. JA058 (Compl. ¶ 189); *see also* JA060 (Compl. ¶ 203) (referring to these "agency actions").

The complaint's distinction between programmatic and individual claims is on all fours with the complaint the Supreme Court evaluated in *NIH*. Indeed, the parallels between the two cases are striking. In *NIH*, as here, the plaintiffs alleged that the government undertook an initial pause, Am. Compl. ¶¶ 103–05, Dkt. 75, *Massachusetts v. Kennedy*, No. 1:25-cv-10814 (D. Mass. Apr. 14, 2025); adopted a

14

"series of directives" to "blacklist" grants on certain disfavored topics, *id.* ¶¶ 104–17; then executed those directives by, among other things, terminating already-issued grants, *id.* ¶¶ 144–58.

And in *NIH*, as here, the plaintiffs sought to "set aside" *both* NIH's "unlawful blacklisting policies—*and* the actions taken to implement those policies." *Id.* ¶ 9; *see also id.* ¶¶ 93, 220. So, in *NIH* the district court, the First Circuit, and the Supreme Court "treat[ed]" the two types of actions "separately." *See Am. Pub. Health Ass'n v. NIH*, 145 F.4th 39, 50 (1st Cir. 2025). As Justice Barrett's controlling concurrence explained, an agency's "grant terminations" and its "issuance of guidance" or other directives restricting what grants may be awarded are "distinct agency actions" that may each be challenged for their own deficiencies. *NIH*, 145 S. Ct. at 2661 (Barrett, J., concurring). Applied here, that means that even if Plaintiffs' challenge to their individual grant terminations belongs in the Court of Federal Claims, their challenge to a final agency action setting forth a policy to end a statutorily mandated program is reviewable in district court.

**3.** EPA suggests that permitting Plaintiffs to bring challenges to agency directives terminating grant programs in federal district court would work an "end run around the Tucker Act." Defs.' Br. at 22–23. Not so. As Justice Barrett explained, just because a directive "discusses policies related to grants does not

15

transform" a challenge to that directive "into a claim 'founded . . . upon' contract" that can be heard only in the Court of Claims. *NIH*, 145 S. Ct. at 2661 (Barrett, J., concurring) (quoting 28 U.S.C. § 1491(a)(1)). And the government has elsewhere recognized that claims challenging a "policy to close a program that is statutorily mandated to exist" belong in federal court under *NIH*, even if that policy relates to agency grant programs. *See Solutions* Oral Argument 22:13.

**4**. For similar reasons, EPA's claim that elimination of the Section 138 grant program cannot be challenged as "a freestanding agency action" because it is "inseparable and indistinct" from the decision to "terminate the grants *en masse*," Defs.' Br. at 24, fails. This view cannot be reconciled with *NIH*. The elimination of an entire congressionally mandated grant program for "policy reasons" is different in kind—not just in magnitude—from terminating individual grants. There is nothing "partial" about the agency action Plaintiffs challenge here. EPA's policy decision renders 42 U.S.C. § 7438 a nullity. And the directive in question had all the hallmarks of a distinct, final agency action, independent of the decision to terminate individual grants.

*First*, to the extent the government suggests otherwise, it makes no difference that this case involves a directive from a decision-making official rather than the "policy guidance" Justice Barrett described in *NIH*. As government counsel has explained, precisely the same logic applies to other, similarly discrete

16

agency actions that likewise set forth an agency policy. *See Solutions* Oral Argument 22:13. There is not a special jurisdictional rule for guidance alone.

*Second*, the directive easily passes the test for a distinct final agency action. Based on the deciding official's own description, his directive represented the "consummation of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). As EPA stated under oath, they undertook a "review" of various "grant programs" and, ultimately, made a "decision" to eliminate the Environment and Climate Justice Block Grant program for "policy reasons." JA069-070 (Compl. Ex. 1-A). And that decision resulted in a final determination of "rights or obligations," *Bennett*, 520 U.S. at 178—first by obligating EPA officials to wind the program to a close and then by depriving future grantees of the opportunity to compete for future awards. This is precisely the type of agency decision that Justice Barrett explained was reviewable in *NIH*. *See* 145 S. Ct. at 2661 (Barrett, J., concurring) ("NIH issued internal guidance documents describing those priorities: Going forward, the agency will not fund research related to DEI objectives, gender identity, or COVID–19.")[13]

---

[13] The fact that agency officials later attested to each of these steps distinguishes this case from the guesswork this Court found inadequate in *NTEU*—and in any event, this Court has now vacated that decision. *See NTEU*, 149 F.4th at 787–89.

17

And that action was distinct from EPA's subsequent actions to terminate hundreds of individual grants in the program. While those terminations may have eventually followed from EPA's initial directive, they were not its only legal consequence, because by requiring the elimination of the entire program, EPA also foreclosed the agency from issuing any further grants under Section 138. So, while each of EPA's grant-termination decisions were themselves final agency actions, those actions were distinct from EPA's initial policy-level decision to ignore Section 138 and shutter the program.

### B. EPA's remaining arguments are unpersuasive

EPA makes several additional arguments, each of which does not withstand scrutiny.

**1.** First, EPA asserts that Plaintiffs lack standing to challenge EPA's policy-level directive dismantling the Section 138 program. *See* Defs.' Br. at 24–25. In doing so, EPA conflates standing with its jurisdictional arguments under the Tucker Act. There is an "important difference" between facts establishing a cause of action and those establishing plaintiff's standing. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021). Here, there is no question that the elimination of the Environmental and Climate Justice Block Grant program caused a concrete injury to the Plaintiffs. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

18

Beyond a clear interest in the specific grants they were awarded, restoring the statutorily mandated grant program more generally has independent value to Plaintiffs, as they have explained. *See* Pls.' Br. at 26. As this Court has made clear, a plaintiff suffers harm for standing purposes where "it has been walled off from an entire category of projects for which it is qualified, prepared, and eager to compete." *Coal. of Miso Transmission Customers v. FERC*, 45 F.4th 1004, 1016 (D.C. Cir. 2022); *see also Teton Historic Aviation Found. v. U.S. Dep't of Def.*, 785 F.3d 719, 724–25 (D.C. Cir. 2015). So too here.

EPA's effort to wave away this theory is unavailing. EPA complains that Plaintiffs have "refashion[ed] their injury" on appeal, shifting focus from the harms that flowed from the termination of their individual grants. Defs.' Br. at 25 (citing JA030 (Compl. ¶ 48)). But here yet again, nothing has been reframed; both theories can easily be inferred from the face of the complaint, not to mention Plaintiffs' detailed declarations. Plaintiffs alleged that EPA terminated the entire Section 138 program and touted its termination as "taxpayer savings," thereby stating clearly EPA's decision to award *none* of the appropriated funds—walling Plaintiffs off from participating in the program. JA061-062 (Compl. ¶ 210); *see also, e.g.*, JA024 (Compl. ¶¶ 14, 16).

And there is especially "good reason to think" Plaintiffs were "qualified, prepared, and eager" to compete for those opportunities, since they alleged they

19

previously did so, and depended on grant funds. *Coal. of MISO Transmission Customers*, 45 F.4th at 1015.[14] The elimination of the entire grant program thus injured Plaintiffs beyond the self-evident harms flowing from the termination of their individual grants.[15]

Meanwhile, as to EPA's complaint that those injuries are no longer redressable in light of H.R. 1, that argument is both wrong and beside the point. As explained above, the program still contains the majority of its congressional appropriation because those funds were obligated when H.R. 1 was enacted, as Congress recognized. Further, H.R. 1 was enacted after the complaint was filed and thus is irrelevant to standing. *Friends of the Earth, Inc. v. Laidlaw*

---

[14] *See, e.g.*, JA023, 024(Compl. ¶ 10, 15) (Plaintiffs were the "best" applicants out of "thousands"); JA055 (Compl. ¶ 172) (detailing the competitive selection process); JA035, 037, 038-039 (Compl. ¶¶ 75, 82, 88–89 (import of various projects); *see also, e.g.*, JA154-157 (Kipnuk Decl. ¶¶ 33–44) (need for grant); JA163 (PUSH Decl. ¶¶ 16–17) (efforts to replace grant funds); JA206 (Steelworks Decl. ¶¶ 30–31 (intent to apply for grants); JA324 Lowcountry (pursuing grant opportunities for funding); JA306-307 Landforce Decl. ¶¶20–21 (intention to secure funding).

[15] To the extent the government faults Plaintiffs for not describing their theory as one of loss of opportunity to compete, Plaintiffs were under no obligation to do so; the question for standing purposes is not how a plaintiff labels their claims, but whether, after accepting the complaint's "well-pleaded allegations as true and drawing all reasonable inferences" in their favor, the complaint "contain[s] sufficient factual matter . . . to state a claim of standing that is plausible on its face." *Kareem v. Haspel*, 986 F.3d 859, 866 (D.C. Cir. 2021) (citation modified).

*Environmental Servs. (TOC) Inc.*, 528 U.S. 167, 191 (2000) (standing is assessed "at the time the action commences").

**2.** EPA also asserts that Plaintiffs fail to address the APA's limitation on claims that are "expressly or impliedly forbidden" by the Tucker Act. Pls.' Br. at 30–31 (citing *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 645 (9th Cir. 1998)). Not so. Justice Barrett's concurrence in *NIH* recognizes that challenges to policy-level decisions—like the decision to eliminate the entire grant program here—can be heard in district court and are not forbidden by the Tucker Act.

As explained above, just because a claim requires some reference to or incorporation of a contract does not mean that the Tucker Act "forbid[s]" relief in district court. *See supra* II. A.; *see also* Pls.' Br. at 19–20. The Tucker Act cannot "impliedly forbid" an APA claim where the Court of Federal Claims would lack jurisdiction over the claim. *Tootle v. Sec'y of the Navy*, 445 F.3d 167, 176–77 (D.C. Cir. 2006). Here, because Plaintiffs seek forward-looking, injunctive relief that cannot be granted in the Court of Federal Claims—such as the restoration of an entire grant program—the Tucker Act does not impliedly forbid their claims. EPA's contention again ignores the distinction Justice Barrett drew in *NIH*.

EPA's cited authority on this point is inapposite. In *Tucson Airport Authority*, a defense contractor brought claims under the Contract Settlement Act,

21

seeking to enforce a provision of an express contract with the United States. The Ninth Circuit found that the plaintiff, General Dynamics, was asking the Court to "decide what its contract rights are." *Tucson Airport Auth,* 136 F.3d at 647. Not so here. Plaintiffs challenge an unlawful, policy-level directive to eliminate an entire federal grant program. This challenge exists independent of the individual grant agreements. While the application of that directive may (and did) implicate specific grants, that does not mean the Tucker Act "expressly or impliedly" forbids Plaintiffs from challenging the directive on its own. *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022); *see also NIH*, 145 S. Ct. at 2661 (Barrett, J., concurring). Thus, the Tucker Act does not impliedly forbid Plaintiffs' claims.

**3.** Finally, based on its mistaken view of Plaintiffs' claims as focused solely on the termination of individual grants, EPA misapplies this Circuit's longstanding test for whether the Tucker Act applies. *See Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (analyzing "the source of the rights upon which the plaintiff bases" the relevant claim or claims and the "type of relief" it seeks).

*First,* the "source" of the legal rights for Plaintiffs' challenge to the directive is not their individual grant agreements. EPA's policy directive was contrary to both statutory and constitutional law regardless of the terms of any individual grants. The fact that a claim requires "*some* reference" to a contract, is not

22

necessarily a claim "*on the contract*" as required to fall under the Tucker Act. *Megapulse*, 672 F.2d at 968 (emphasis added); *see also NIH*, 145 S. Ct. at 2661 (Barrett, J., concurring). Indeed, this Court routinely considers APA claims with some nexus to underlying contracts—provided that what Plaintiffs challenge is an overarching policy or directive. *See, e.g.*, *Hercules Inc. v. EPA*, 938 F.3d 276, 280, 282–83 (D.C. Cir. 1991) (evaluating APA challenge to EPA defining what constitutes a transfer of federal real property); *Sugar Cane Growers Co-Op v. Veneman*, 289 F.3d 89, 95–98 (D.C. Cir. 2002) (evaluating APA claim notwithstanding petitioners' potential claims for damages).

Notably, because Plaintiffs' claims, as discussed above, challenge EPA's decision to eliminate an entire grant program for policy reasons, this case is quite unlike the challenges in *Ingersoll-Rand v. United States*, 780 F.2d 74 (D.C. Cir. 1985) and *Spectrum Leasing Corp. v. United States*, 764 F.2d 891 (D.C. Cir. 1985). In those cases, the plaintiffs' claims turned on *specific provisions* of the contract—in *Ingersoll-Rand*, whether the text of "the contract forbids termination under these conditions," 780 F.2d at 78, and in *Spectrum Leasing*, whether the government properly invoked the liquidated damages provisions of a contract for data processing hardware and software, 764 F.2d at 892.

Plaintiffs' challenge, by contrast, does not seek to enforce any contract and their rights do not turn on any contractual terms. For example, in Plaintiffs'

23

contrary-to-law claim, the source of Plaintiffs' rights are the statutory and constitutional provisions that bar an administrative agency from unilaterally terminating a grant program mandated by Congress. To see why, consider that Plaintiffs could raise the same APA claims even if they were not among the organizations and entities already awarded Section 138 grants and instead planned to compete for such a grant in the future. If such a plaintiff challenged EPA's program-dismantling directive, it would—provided that funds were available, and it was ready and able to perform—undoubtedly have a valid APA claim, and there could be no argument that that claim was somehow contractual in nature.

Plaintiffs should be treated no differently. Both Plaintiffs and hypothetical prospective grant applicants have a right to "be free from government action beyond . . . congressional authority." *Crowley*, 38 F.4th at 1108. That right exists "prior to and apart from" any rights Plaintiffs might have—and prospective grant applicants would not—under the individual grant agreements. *Id.* at 1107. The APA provides a cause of action to ensure that impacted parties are free from the sort of lawless policymaking reflected in the EPA's unlawful directive. And regardless of who brought such an action, the district court would not need to analyze the terms or significance of any individual grant to resolve the claim.

*Second*, the relief sought here is not contractual in nature. Plaintiffs ask the Court to set aside EPA's unlawful policy directive to eliminate the entire program

created by Section 138 of the Clean Air Act. That request—to prospectively set aside unlawful final agency action—is standard APA relief, and the government has not seriously argued otherwise.

At argument in the Fourth Circuit, the federal government admitted that this relief would be the appropriate remedy for such a claim. *See Solutions* Oral Argument. And in this case, it does not change its tune. Instead, it fixates on Plaintiffs' interest in having their grants restored (Prayer for Relief E). But as already explained, that view misreads the complaint, where Plaintiffs were clear that, as relief for their policy-level claim, they sought to set aside EPA's decision to dismantle the Section 138 program (Prayer for Relief C and D). And it likewise ignores *NIH*, where Justice Barrett explained that "both logic and law" favored treating program-termination and individual grant-termination claims as distinct. 145 S. Ct. at 2661 (Barrett, J., concurring).

Properly conceived of as a separate claim, there is no serious argument that Plaintiffs' challenge to the termination of the Section 138 grant program seeks money damages. As already explained, money damages refer to *retrospective* compensation, given as a substitute for a suffered loss. *Bowen v. Massachusetts*, 487 U.S. 879, 894–95 (1988); *see also Md. Dep't of Human Resources v. Dep't of Health & Human Servs.*, 763 F.2d 1441 (1985). In challenging EPA's dismantling of the Section 138 grant program, Plaintiffs do not seek to rectify any loss, but

25

rather to secure prototypical prospective relief—restoring the program so that they and other participants may have an opportunity to participate in it.

Thus, under the longstanding *Megapulse* framework, the appropriate remedy for the APA contrary-to-law claims Plaintiffs raise (that EPA acted contrary to law when it unilaterally terminated the grant program) is the relief they seek (setting aside EPA's unlawful directive). By contrast, that legal wrong would not be remedied by contractual remedies—for instance, compensating Plaintiffs for the past harm they have suffered in being unable to carry out their grants.

## III.    The Court should remand the constitutional claims in light of upcoming en banc review.

As explained in Plaintiffs' opening brief, EPA's decision to usurp Congress's appropriations authority is not a mere statutory violation: It also violates the constitutional separation of powers and so gives rise to constitutional claims. Pls.' Br. at 40-53 and Constitutional Accountability Center Amicus Br., Doc. No. 2143442. The trial court disagreed based largely on its understanding of this Court's guidance, which the trial court understood to foreclose any "freestanding constitutional claim" where an agency has acted in contravention of a statute. JA870 (quoting *Global Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025). This Court has now taken two cases en banc that will determine whether the trial court's categorical rejection of constitutional claims was correct. *See Climate United Fund v. Citibank*, 2025 WL 3663661 (D.C. Cir. Dec. 17, 2025); *Nat'l*

26

*Treasury Emps. Union v. Vought*, 2025 WL 3659406 (D.C. Cir. Dec. 17, 2025). Given that the outcome of these en banc proceedings will ultimately determine the legal standards governing Plaintiffs' constitutional claims, the Court should remand those claims so that the trial court can assess them under the proper standard in the first instance.

The trial court relied chiefly on this Court's decision in *Global Health Council*, where the Court found that no constitutional claim could lie against an executive branch determination to withhold billions of dollars that Congress had instructed it to spend. As Judge Garcia wrote respecting the denial of rehearing en banc in that case, "[w]hether that holding is correct is not only an important question but also a complex one," which "may warrant the Court's en banc review." *Glob. Health Council*, No. 25-5097, 2025 WL 2709437, at *3 (D.C. Cir. Aug. 28, 2025) (Garcia, J.). The Court now appears to be undertaking that review in its decision to vacate the judgments and rehear en banc the decisions in *Climate United Fund v. Citibank, N.A.*, 154 F.4th 809 (D.C. Cir. 2025) and *Nat'l Treasury Employees Union v. Vought*, 149 F.4th 762 (D.C. Cir. 2025) ("*NTEU*"). These three decisions, rendered by overlapping panels, each ultimately adopted the same interpretation of *Dalton v. Specter*, 511 U.S. 462, 472 (1994) to foreclose constitutional claims. *Compare Global Health Council*, 153 F.4th at 14–17 (applying *Dalton*), *with NTEU*, 149 F.4th at 791–93 (describing plaintiffs' claims

27

as an "attempt to transform statutory claims into constitutional ones"), and *Climate United*, 154 F.4th at 826-27 (citing with approval *Global Health Council* and *NTEU's* holdings relating to *Dalton*).

This Court should remand Plaintiffs' claims to the trial court so that it can apply the en banc Court's ultimate rulings in *NTEU* and *Climate United* and decide, in the first instance, whether Plaintiffs can properly assert constitutional claims even though EPA, in usurping Congress's powers, necessarily also violated the statute through which Congress expressed its own appropriations judgment.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's entry of dismissal and remand with instructions that the district court has jurisdiction over Plaintiffs' APA claims, and that Plaintiffs' constitutional claims should be reconsidered in light of the forthcoming D.C. Circuit en banc decisions.


Dated: February 4, 2026                    Respectfully submitted,

                                           */s/ Hana V. Vizcarra*
                                           Hana V. Vizcarra (D.C. Bar No. 1011750)
                                           Deena Tumeh (D.C. Bar No. 1741543)
                                           Linnet Davis-Stermitz (WA Bar No. 63190)
                                           Molly Prothero (D.C. Bar No. 1779237)
                                           Andrew Saavedra (N.Y. Bar No. 6062814)
                                           EARTHJUSTICE
                                           1250 I Street NW, 4th Floor
                                           Washington, DC 20005 (202) 667-4500
                                           hvizcarra@earthjustice.org

dtumeh@earthjustice.org
ldavisstermitz@earthjustice.org
mprothero@earthjustice.org
asaavedra@earthjustice.org

*Counsel for Air Alliance Houston, Bessemer Historical Society (d/b/a Steelworks Center of the West), Deep South Center for Environmental Justice, Downwinders at Risk, Health Resources in Action, Inter-Tribal Council of Michigan, PUSH Buffalo, and WE ACT for Environmental Justice and Proposed Class Counsel.*

*/s/ Ben Grillot*
Ben Grillot (D.C. Bar No. 982114)
Kimberley Hunter (N.C. Bar No. 41333)
Irena Como (N.C. Bar No. 51812)
James Whitlock (N.C. Bar No. 34304)
SOUTHERN ENVIRONMENTAL LAW CENTER
122 C Street NW, Suite 325
Washington, DC 20001
Telephone: (202) 828-8382
Facsimile: (202) 347-6041
bgrillot@selc.org
kmeyer@selc.org
icomo@selc.org
jwhitlock@selc.org

*Counsel for Appalachian Voices, 2°C Mississippi, Lowcountry Alliance for Model Communities, Parks Alliance of Louisville, Pittsburgh Conservation Corps (d/b/a Landforce) and Southwest Renewal Foundation and Proposed Class Counsel.*

*/s/ Toby Merrill*
Toby Merrill (D.D.C. Bar ID MA0006)
Graham Provost (D.C. Bar No. 1780222)
Cassandra Crawford (N.C. Bar No. 45369)
PUBLIC RIGHTS PROJECT

29

490 43rd Street, Unit #115
Oakland, CA 94609
Telephone: (510) 738-6788
toby@publicrightsproject.org
graham@publicrightsproject.org
cassandra@publicrightsproject.org

*Counsel for Allegheny County, Kalamazoo
County, King County, Native Village of Kipnuk,
City of Sacramento, City and County of San
Francisco, City of Springfield and Treasure
Island Mobility Management Agency, and
Proposed Class Counsel.*

*/s/ Gary DiBianco*
Gary DiBianco (D.C. Bar No. 458669)
LAWYERS FOR GOOD GOVERNMENT
1319 F Street NW, Suite 301, PMB 387
Washington DC 20004
(202) 258-6826
Gary@lawyersforgoodgovernment.org

*Co-Counsel for Native Village of Kipnuk, Inter-
Tribal Council of Michigan, and Kalamazoo
County.*

*/s/ Yvonne R. Meré*
David Chiu (CA Bar No. 189542)
*San Francisco City Attorney*
Yvonne R. Meré (CA Bar No. 175394)
*Chief Deputy City Attorney*
Mollie M. Lee (CA Bar No. 251404)
*Chief of Strategic Advocacy*
Sara J. Eisenberg (CA Bar No. 269303)
*Chief of Complex and Affirmative Litigation*
1390 Market Street, 7th Floor
San Francisco, CA 94102
Telephone: (415) 554-4274
yvonne.mere@sfcityatty.org
mollie.lee@sfcityatty.org

30

sara.eisenberg@sfcityatty.org

*Counsel for Appellants City and County of San Francisco and Treasure Island Mobility Management Agency.*

<u>/s/ Alison Holcomb</u>
Alison Holcomb[+]
Deputy General Counsel to King County Executive and Special Deputy Prosecutor
Christopher Sanders*
OFFICE OF KING COUNTY PROSECUTING ATTORNEY LEESA MANION
401 5th Avenue, Suite 800
Seattle, WA 98104
(206) 477-9483
aholcomb@kingcounty.gov

+ Notice of intent to withdraw (Jan. 12, 2026)
* Application for pro hac vice admission forthcoming, pending acceptance of e-filing registration

*Counsel for Appellant Martin Luther King, Jr. County.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1,

I state that no Plaintiffs have any parent company and that no publicly held

company has a 10% or greater ownership interest in any Plaintiffs.


Dated: February 4, 2026                     */s/ Hana V. Vizcarra*
                                            Hana V. Vizcarra

32

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g), I certify that this filing complies with Fed. R. App. P. 32(a)(7)(B) because this document contains 6,491 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I further certify that this filing complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this filing has been prepared using a proportionally spaced typeface in Microsoft Word 365 using Times New Roman 14-point.

Dated: February 4, 2026                    */s/ Hana V. Vizcarra*
                                            Hana V. Vizcarra

## CERTIFICATE OF SERVICE

I hereby certify that on February 4, 2026, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit through this Court's CM/ECF system, which will serve a copy of the on all registered users.

Dated: February 4, 2026

*/s/ Hana V. Vizcarra*
Hana V. Vizcarra