**ORAL ARGUMENT SCHEDULED FOR MARCH 16, 2026**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 25-5333

---

APPALACHIAN VOICES, et al.,
*Plaintiff-Appellants,*
*v.*
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,
*Defendant-Appellees.*
On Appeal from the United States District Court
for the District of Columbia
No. 25-cv-01982
The Hon. Richard J. Leon, Senior Judge

---

**DEFERRED JOINT APPENDIX VOL. II of III,**
**PAGES JA145-JA516**

---

Hana V. Vizcarra
Deena Tumeh
Molly Prothero
Andrew Saavedra
Linnet Davis-Stermitz
Earthjustice
1400 L St NW, Lobby 2
Unit 34117
Washington, DC 20005
(202) 667-4500
hvizcarra@earthjustice.org
dtumeh@earthjustice.org
mprothero@earthjustice.org

Ben Grillot
Kimberley Hunter
Irena Como
James Whitlock
Southern Environmental Law Center
122 C Street NW, Suite 325
Washington, DC 20001
Telephone: (202) 828-8382
Facsimile: (202) 347-6041
bgrillot@selc.org
kmeyer@selc.org
icomo@selc.org
jwhitlock@selc.org

asaavedra@earthjustice.org
ldavisstermitz@earthjustice.org

Toby Merrill
Graham Provost
Cassandra Crawford
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
(510) 738-6788
toby@publicrightsproject.org
graham@publicrightsproject.org
cassandra@publicrightsproject.org

David Chiu
San Francisco City Attorney
Yvonne R. Meré
Sara J. Eisenberg
1390 Market Street, 7th Floor San
Francisco, CA 94102
(415) 554-4274
yvonne.mere@sfcityatty.org
sara.eisenberg@sfcityatty.org

Gary DiBianco Lawyers for Good
Government
6218 Georgia Avenue NW, # 5001
Washington, DC 20011
(202) 258-6826
Gary@lawyersforgoodgovernment.org

Alison Holcomb[+]
Office of King County Prosecuting
Attorney Leesa Manion
Christopher Sanders*
401 5th Avenue, Suite 800
Seattle, WA 98104
(206) 477-9483
aholcomb@kingcounty.gov

[+] Notice of intent to withdraw (Jan. 12,
2026)
* Application for pro hac vice
admission forthcoming, pending
acceptance of e-filing registration

*Counsel for Plaintiff-Appellants*

**January 27, 2026**

# **TABLE OF CONTENTS**

## **VOLUME 1 OF 3**

Civil Docket, *Appalachian Voices v. EPA*, No. 25-1982 (RJL)(D.D.C) .............JA001

Complaint, Dkt. 1 ........................................................................................JA019

Complaint, Ex. 1-A, Declaration of Travis Voyles, Dkt. 1-4...............................JA067

Complaint, Ex. 1-B, Declaration of Daniel Coogan, Dkt. 1-4 ............................JA072

Complaint, Ex. 1-C, Email from T. Voyles re TCTACS, Dkt. 1-4.....................JA076

Complaint, Ex. 1-D, Email from Jacob Borney to ISC, Dkt. 1-4........................JA096

Complaint, Ex. 1-E, Declaration of Michelle Roos, Dkt. 1-4 ............................JA098

Complaint, Ex. 1-F, Email from D. Coogan to T. Voyles, Dkt. 1-4 ...................JA106

Complaint, Ex. 1-G, Email from M. Wise, Dkt. 1-4. ...........................................JA110

Complaint, Ex. 1-H, Email from D. Coogan, Dkt. 1-4 .......................................JA114

Complaint, Ex. 1-I, EPA Grant Termination SOP, Dkt. 1-4...............................JA118

Complaint, Ex. 1-J, Sample Termination Letter, Dkt. 1-4 ..................................JA120

Complaint, Ex. 1-K, CCG Grant Terms and Conditions, Dkt. 1-4 .....................JA123

## **VOLUME 2 OF 3**

Declaration of the Native Village of Kipnuk, Dkt. 29-3 ......................................JA145

Declaration of PUSH Buffalo, Dkt. 29-4 ...........................................................JA159

Declaration of 2C Mississippi, Dkt. 29-5 ...........................................................JA166

Declaration of Allegheny County, Pennsylvania, Dkt. 29-6................................JA176

Declaration of Stay Ready NOLA, Dkt. 29-7 .....................................................JA184

Declaration of Treasure Island Mobility Management Agency, Dkt. 29-8 .........JA192

Declaration of Bessemer Historical Society d/b/a Steelworks Center of the West, Dkt. 29-9 ..................................................................................JA199

Declaration of County of Contra Costa, California, Dkt. 29-10 ..........................JA208

Declaration of Kalamazoo County, Michigan, Dkt. 29-11. ..................................JA219

Declaration of City of Rochester, New York, Dkt. 29-12....................................JA226

Declaration of Health Resources in Action, Dkt. 29-13.......................................JA232

Declaration of Children's Environmental Literacy Foundation, Dkt. 29-14. ......JA254

Declaration of Southwest Renewal Foundation, Dkt. 29-15................................JA263

Declaration of Sixth Street Community Center, Dkt. 29-16. ...............................JA272

Declaration of Institute for Sustainable Communities, Dkt. 29-17......................JA280

Declaration of WE ACT for Environmental Justice, Dkt. 29-18 .........................JA294

Declaration of Landforce, Dkt. 29-19. ..................................................................JA302

Declaration of Parks Alliance for Louisville, Dkt. 29-20 ....................................JA310

Declaration of Deep South Center for Environmental Justice, Dkt. 29-21..........JA318

Declaration of Lowcountry Alliance for Model Communities, Dkt. 29-22.........JA324

Declaration of Day One, Dkt. 29-23......................................................................JA331

Declaration of Air Alliance Houston, Dkt. 29-24 .................................................JA342

Declaration of Inter-Tribal Council of Michigan, Inc., Dkt. 29-25......................JA351

Declaration of City of Springfield, Massachusetts, Dkt. 29-26.. .........................JA359

Declaration of Steps Coalition, Dkt. 29-27 ...........................................................JA373

Declaration of City of Sacramento, Dkt. 29-28.....................................................JA382

Declaration of Martin Luther King, Jr. County, Dkt. 29-29 ................................JA388

Declaration of Ironbound Community Corporation, Dkt. 29-30.........................JA396

Declaration of Trinity Alliance of the Capital Region, Dkt. 29-31......................JA405

Declaration of Downwinders at Risk, Dkt. 29-32 ..................................................JA413

Declaration of Glynn Environmental Coalition, Dkt. 29-33. ...............................JA419

Declaration of EcoAction Partners, Dkt. 29-34.....................................................JA436

Declaration of Southwestern Michigan Planning Commission, Dkt. 29-35. .......JA445

Declaration of the City of New York, Dkt. 29-36..................................................JA452

Declaration of EcoWorks, Dkt. 29-37. ...................................................................JA460

Declaration of the Center for Community Energy and Environmental Justice,
      Dkt. 29-38.........................................................................................................JA470

Declaration of Young, Gifted, & Green, Dkt. 29-39.............................................JA479

Declaration of City and County of San Franciso, Dkt. 29-40 ..............................JA488

Declaration of El Puente de Williamsburg, Dkt. 29-41 ........................................JA495

Declaration of Appalachian Voices, Dkt. 29-42. ...................................................JA508

## VOLUME 3 of 3

Plaintiffs' Reply in Support of Motion for Preliminary Injunction, Ex. 2, House
      Report No. 94-1656, Dkt. 77-2 .....................................................................JA517

Plaintiffs' Reply in Support of Motion for Preliminary Injunction, Ex. 3, Senate
      Report No. 996, Dkt. 77-3..............................................................................JA548

Plaintiffs' Reply in Support of Motion for Preliminary Injunction, Ex. 4, Testimony
      from Sovereign Immunity: Hearing on S. 3568, Dkt. 77-4 ........................JA581

Plaintiffs' Opposition to Defendant's Motion to Dismiss, Ex. 1, EPA Email re "Final Financial Report", Dkt. 87-1 .........................................................JA844

Memorandum Opinion, August 29, 2025, Dkt. 98...............................................JA851

Order, August 29, 2025, Dkt. 99. ..........................................................JA873

Notice of Appeal, Dkt. 100...............................................................JA874

Transcript of Preliminary Injunction Hearing, August 5, 2025. ..........................JA878

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

APPALACHIAN VOICES, et al.

*Plaintiffs, on behalf of themselves and all others similarly situated*

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY and LEE ZELDIN, in his
official capacity as Administrator of the United States
Environmental Protection Agency

Defendants.

**DECLARATION OF THE NATIVE VILLAGE OF KIPNUK, A
FEDERALLY-RECOGNIZED NATIVE AMERICAN TRIBE**

I, Rayna M. Paul, declare as follows:

Background

1.  My name is Rayna M. Paul, and I live in Kipnuk, Alaska. This declaration is based on my personal knowledge and professional education and experience. I am over the age of eighteen and suffer from no legal incapacity. I submit this declaration in support of the claim of The Native Village of Kipnuk, which is one of several grant recipients affected by the freeze and terminations of federal grant funding.

JA146

2. The Native Village of Kipnuk is a Federally-recognized Native American Tribe per 85 Fed. Reg. § 5462 and is located in Kipnuk, Alaska.   Kipnuk has approximately 974 residents with a per capita annual income of only $12,107 and a poverty rate over 26%.

3. Our community does not have a piped water and sewer system connected to any of our residential homes. This means we do not have running water in our homes and must collect our water in the summer from rainwater or from the local lakes and from chipped ice in the winter. To go to the bathroom, we must use honey buckets (5-gallon buckets) which, when full, are dumped into hoppers which then must then be transported manually to the honey bucket sewage lagoon. Some of our other buildings such as the AVCP triplex building, CVRF building, and the health clinic have toilets that flush, but the sewage goes to a holding tank which still must be drained and hauled manually to the honey bucket sewage lagoon. The only buildings which have flushable toilets are the school and the laundromat.

4. Kipnuk is nestled along a bend in the Kugkaktlik River.  Almost all of Kipnuk's residents identify as of the Yup'ik culture, speak the Native language (Yup'ik), and maintain traditional lifeways including subsistence hunting, fishing, and gathering to support their families and neighbors, and for food security.  Kipnuk is a remote village, meaning that it is not on a road system. We are located approximately 98 nautical miles from the nearest airport hub of Bethel, and 436 nautical miles from Alaska's continuous road system. Transport in or out of the village must be by airplane or, in the summer months, by boat. Barges carrying construction equipment and supplies can only reach Kipnuk during the summer months, when the river bordering the village is free of ice.

JA147

5.  I am the Environmental Director for the Native Village of Kipnuk. I have worked in this position for six years. As Environmental Director, I manage the Environmental Department, including resilience and adaptation planning, and work to address the risks of erosion, flooding, and permafrost thaw.  My department also manages solid waste, hazardous waste, annual cleanup, and emergency and disaster preparedness and recovery.

6.  Under my supervision, the Native Village of Kipnuk applied for and was awarded a Community Change Grant from the United States Environmental Protection Agency ("EPA") ("the Grant").  The Grant was awarded to implement the Kipnuk Riprap Riverbank Stabilization Project to stabilize a portion known as Reach 3 of the quickly-eroding bank of the Kugkaktlik River so that the erosion does not jeopardize critical infrastructure and cultural resources, and does not threaten the release of hazardous waste that is stored near the riverbank.  The Grant was for three years starting March 1, 2025.

The "Terminated" Grant is Critical to the Environment and to the Future of the Tribe

7.  The Kipnuk Riprap Riverbank Stabilization Project, discussed below in more detail, is essential to prevent environmental and cultural catastrophe.  Any further delay in starting will create a risk that our village will suffer environmental, physical, and cultural harms that cannot be reversed.

8.  Addressing the environmental harm first, the village is built on permafrost, which is common in Alaska. Permafrost is a layer of ground that stays frozen throughout the year and is located under a surface layer of ground that thaws during the summer months.

9.  The permafrost in and around Kipnuk is thawing and the land is eroding.  Images and maps of the Village are attached as Exhibit 1.  As the permafrost thaws, the erosion rate

JA148

accelerates as the once frozen riverbank becomes soft. That causes the land to sink, increasing the frequency and severity of flooding. Floods accelerate the rate of erosion and cause more permafrost thaw.  This causes a cycle of destruction. (*2009 study:  US Army Corps of Engineers, Alaska Baseline Erosion Assessment, 2009, Appendix F: Community Erosion Assessment, Kipnuk, Alaska, 26 January 2009.*)  This is especially true along the banks of the Kugkaktlik River.  The riverbank recedes up to 22 feet every year in some places.  As of 2009, approximately 0.7 acres were lost each year. Since that time, the erosion has accelerated, as demonstrated by erosion monitoring measurements and erosion forecasting. This accelerated erosion is putting the health and safety of our community members and critical infrastructure at ever increasing risk.

10. We have already lost some of our critical infrastructure to erosion, demonstrating the imminent danger to our village.  The Tribal Bunkhouse was demolished because erosion made it unstable and at risk of collapsing into the river.  This bunkhouse was a source of income to the Tribe, and was used to house visitors and workers.  Now, visitors must stay at the school. At least one home has already been relocated away from the riverbank due to the risk of erosion. We plan to relocate an additional two homes this coming winter, and other at-risk homes in the future.

11. Our critical infrastructure located close to the project area, including the fuel header and pump house, boardwalks, the village corporation store, wind turbines, and the bulk fuel tank farm, are at risk if the Kipnuk Riprap Riverbank Stabilization Project is not completed promptly.  The fuel header, which is now only ten feet from the riverbank, is at imminent risk. When barges bring fuel to the village, the fuel is offloaded and transferred from the barge into the bulk fuel tanks through this fuel header. The pump house, which is our village's "gas station," is only 88 feet from the river.

JA149

12. Our village depends on boardwalks because the ground is too marshy and wet to walk on or drive four wheelers or other vehicles in the summer. Unfortunately, some boardwalks are at risk of falling into the river. Fifteen feet of boardwalk had to be removed in the fall of 2024 because the ground had eroded out from under it and it was too dangerous to walk on. The boardwalks are still at risk as the ground continues to erode.

13. The village corporation hardware store and warehouse, also located on Reach 3, are at imminent risk from riverbank erosion. The warehouse had to be moved away from the encroaching erosion just last month to avoid it collapsing into the river. The hardware store itself is only 128 feet from the riverbank. We also had to move four connex storage containers located next to the warehouse to prevent them from falling into the river.

14. Our wind turbines, which reduce the cost of generating electricity by almost 50%, are projected to be at the river edge between 2033 and 2043. However, erosion has been accelerating at an alarming rate, and the permafrost is quickly thawing, which will cause erosion to occur even more quickly than before. This means that the erosion may reach the wind turbines much sooner than expected.

15. The bulk fuel tank farm is similarly at risk. Our entire community relies on the fuel from this tank farm for running our power plant generators; for transportation (four-wheelers, boats, and snowmachines); and for heat and lights for our homes and public spaces, including our school, health clinic, public safety building, laundry facility, Tribal buildings, stores, etc.

16. Hazardous materials located close to the riverbank could release pollutants into the river. These hazardous materials include abandoned fuel tanks, transformers, lead acid batteries, and glycol that can become inundated during a flooding event or dislodged into the river. Without the Grant, we may not have the funding to remove and relocate these

JA150

hazardous materials to a safe location. This could result in the contamination of our river, the ocean, and surrounding lands that we rely on for our food.

17. Kipnuk once stood hundreds of feet away from the riverbank, more protected from storm surges and flooding during extreme weather events. Recently, more frequent storms, strong river currents, frequent flooding, warming temperatures, accelerated permafrost thaw and resulting subsidence (sinking of the land), and rising sea level have caused the riverbank to erode at an alarmingly fast rate as shown in this table:

| Measurements in feet from structure to riverbank, showing rate of erosion | | | | |
|---|---|---|---|---|
| Structure | 2019 | 2023 | 2024 | 2025 |
| Tribal Bunkhouse | 130' | 22' | 15'6" | --- |
| Residential Buildings | 106' | 78' | 50'5" | 49'3" |
| New Bulk Fuel Header | 76' | 32' | 18'4" | 10' |
| Village Corp Warehouse | --- | 52' | 44'5" | --- |
| Power pole anchor | --- | 13' | 11' | 6' |

*Figure 1: Table of erosion rates along the Kipnuk riverfront.*

In September 2022, Typhoon Merbok further exacerbated the erosion with high waters, turbulent waves, and ripping currents. Another storm, in August 2024, caused even more erosion and flooding, resulting in a major disaster declaration.

18. As more land falls into the Kugkaktlik River, the strip of land on which our village is located continues to narrow, squeezing our village between the lakes to the south and the river to the north. We will soon have no safe place in our village to move homes, buildings, and other infrastructure at risk from erosion.

JA151

19. The Grant clearly describes the cultural importance of the Kipnuk Riprap Riverbank

Stabilization Project:

> This project enables [the] community to continue to live in the land they have inhabited since time immemorial, increases the protection of community and critical infrastructure during and after extreme weather events, reduces conditions that promote mold growth which reduces health risks from indoor air quality, and enables the community to carry out their subsistence activities while avoiding or preventing new pollution.

See the Grant Agreement attached as Exhibit 2.

20. If the project does not go forward, contamination from hazardous waste will jeopardize

our use of the river and land for subsistence hunting, fishing, and gathering. Community

members rely on subsistence activities for food security and for their cultural identity.

The loss of the fuel header, pump house, boardwalks, wind turbines, and bulk fuel tank

farm will jeopardize our community members' ability to carry on their daily lives.

21. The window for construction in Kipnuk is very short because when the river, riverbank,

and ground are frozen, the needed studies and mitigations cannot be performed.

Typically construction can only be done in the months from June to September.  Barges

carrying equipment and supplies needed for the project can reach Kipnuk only in the

summer when the river has thawed. If the Grant is not funded this June, engineering

planning and design for the project cannot begin in 2025, putting off this essential project

for a minimum of a full year.  This also means that construction of the project may not be

able to be completed in the three-year term allowed.

22. The loss of the current Grant would delay construction of a riverbank stabilization project

for at least a year if not longer. The application for the current Grant required significant

time and effort. I worked with a technical assistance team of four people and our statutory

partner Alaska Institute for Justice from February to August 2024 to gather information

JA152

and prepare the application.  Then, after it was submitted, it took the EPA from

September 2024 until January 2025 to award the Grant.

The Grant Award and Purported Termination Timeline

23. On December 12, 2024, the EPA announced on its website that Kipnuk had been awarded

a Community Change Grant.

24. On January 13, 2025, the EPA issued its Notice of Award and Grant Agreement to the

Village of Kipnuk for the Kipnuk Riprap Riverbank Stabilization Project, in the amount

of $19,998,693, with a grant start date of March 1, 2025.  See Exhibit 2.

25. Shortly after the grant money became available, we learned that it was suspended, and

then briefly started again.  The EPA Office of Mission Support formally notified the

Native Village of Kipnuk that its Grant was terminated by letter dated May 2, 2025.  That

letter says in part:

> This EPA Assistance Agreement is terminated effective immediately on
> the grounds that the remaining portion of the Federal award will not
> accomplish the EPA funding priorities for achieving program goals. The
> objectives of the award are no longer consistent with EPA funding
> priorities.

See Exhibit 3.  The EPA confirmed the termination of the Grant on May 2, 2025 in an

"Assistance Amendment."  A copy of the "Assistance Amendment" is attached hereto as

Exhibit 4.

26. The Native Village of Kipnuk promptly disputed the Grant termination in a letter dated

May 3, 2025, pointing out that the grounds for termination were invalid, and reserving

their right to litigate.

Work Under the Grant

27.  The work to be done under the Grant includes several engineering and community

initiatives. All these have been halted by the EPA Grant termination.

8

JA153

28. The riverbank stabilization includes building a structure to keep the riverbank from eroding, called a revetment. The revetment will protect 1,424 feet of riverbank and 1,900 feet of boardwalk used by community members to travel within the village.

29. The project includes removing hazardous materials that pose a risk of contaminating the Kugkaktlik River, including transformers, lead acid batteries, and glycol. The project will also remove abandoned fuel tanks at risk of falling into and contaminating the river.

30. Local workforce development and training are included as important components of the Grant, which will increase the long-term capacity of the Native Village of Kipnuk. This includes hiring and training a project manager; and hiring and training a bookkeeper on both accounting skills and grant management skills.

31. The Grant also includes funding to train Tribal staff on heavy equipment maintenance and operation. This will increase Tribal capacity for purposes of constructing the revetment, as well as maintaining the revetment once construction is completed.

32. The only thing the Native Village of Kipnuk has been able to accomplish under the Grant is buying a bulldozer that is to be used to construct and maintain the revetment. The bulldozer had to be purchased early in the process so that it can be shipped by barge during the few summer months when the waterways are passable.

The Native Village of Kipnuk Cannot Afford This Work Without the Grant

33. The Native Village of Kipnuk cannot stabilize the riverbank without this grant. As I noted above, we have a high poverty rate in Kipnuk and residents lack financial resources. They cannot pay for this work themselves.

34. The Native Village of Kipnuk does not have taxing authority and cannot raise funds itself for riverbank stabilization, or anything else. It depends on grants to fund local government projects. The power plant, which is owned by the Tribe, seeks to keep its

JA154

rates as low as possible and generates only enough income to pay the costs of generating and distributing power.  The Tribal Bunkhouse did provide income for the Tribe but it had to be torn down, as I described above.

Disruption Caused by Grant Termination

35. In February 2025, we hired a bookkeeper to work on the Grant project.  She began working on March 5, 2025. However, after I discovered that the Grant was suspended, I told the bookkeeper that the funding was suspended, and that I had to let her go until and unless we got that funding back. She worked only from March 5, 2025, to March 10, 2025. I was not able to draw down funds from the Grant to pay her wages because the funds were suspended. I still have not been able to do that.

36. The village of Kipnuk posted a job for a project manager for the Grant project, but we were not able to hire for that position because the Grant was terminated.

Negative Effects on Democracy Caused by Grant Termination

37. The Native Village of Kipnuk and the Tribal Council both have an obligation to ensure the wellbeing of their constituencies.  We cannot fulfill that democratic obligation without the Grant.

38. The only reason that the Native Village of Kipnuk settled in Kipnuk is because the Federal government built the school and other infrastructure there around 1922. The Tribe had been nomadic for thousands of years, but when the government built the school in Kipnuk, they told us we had to settle there so that our children could attend school. Failure to do so would risk having our children taken away and sent to boarding school, as had happened in the past. But Kipnuk is no longer a safe place to live and work. And now the Federal government is taking back the grant money that would have helped to

JA155

make it a safer place to live not only for my generation, but also for future generations.

This is unconscionable and violates my trust in the Federal government.

39. In fact, the Federal government has trust responsibility to the Native Village of Kipnuk.

As noted by the Secretary of the Interior in 2014:

> The United States' trust responsibility is a well-established legal obligation that originates from the unique, historical relationship between the United States and Indian tribes … The trust responsibility consists of the highest moral obligations that the United States must meet to ensure the protection of tribal and individual Indian lands, assets, resources, and treaty and similarly recognized rights.

US Secretary of the Interior, Order No. 3335, 2014 (citations omitted).

40. There have been repeated studies on the erosion of the riverbank bordering Kipnuk and the risk that erosion poses to our village. The Grant was the first time that the Federal government committed to take action to help our community stabilize the riverbank and prevent the looming devastation that inaction will bring.  Now, with the purported termination of the Grant, the government is seeking to back out of its commitment by refusing to fund the construction of a project that is critical to protect the health and safety of our community members and infrastructure.

41. Erosion has long been a concern of, and a priority for, our community. There was full support for the Kipnuk Riprap Riverbank Stabilization Project from both the Tribal Council and the community. EPA's purported termination is viewed as a broken promise by the Federal Government.

42. Community-wide relocation—which would require finding a safer location and moving or building new infrastructure, including homes, a school, a health clinic, and other public buildings—is not a viable option for my community. We do not have the money and other resources needed to relocate. And there is no government agency that has the

authority or resources to help with this process. Our Tribal leaders and local elders have chosen to protect in place. They know what is best for our community based on their extensive knowledge, experience, wisdom, and holistic view of the past and the future. Because they have chosen to protect in place, I focus my work on protecting our current location.

43. Restarting the Grant funding will allow the Native Village of Kipnuk and our subawardees to move forward with the Kipnuk Riprap Riverbank Stabilization Project. This project will help us stop the ongoing and accelerating erosion that is threatening our homes, buildings, and other critical infrastructure, and our way of life. This project will also help us prevent contamination from hazardous waste that may jeopardize our use of the river and land for subsistence hunting, fishing, and gathering.  Restarting the Grant will help us to preserve our way of life and heritage for generations to come.

44. Reinstating our Grant would allow the Village of Kipnuk to immediately rehire our bookkeeper and seek to hire the project manager who would help oversee the Kipnuk Riprap Riverbank Stabilization Project. Furthermore, because we are still within the Summer months where construction is possible, we may yet be able to order supplies to be delivered to the Village of Kipnuk via barge. We would immediately be able to hire workers and order critical supplies needed to resume the project to prevent riverbank erosion that is actively endangering Kipnuk.

*(signature on following page)*

JA157

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States, the foregoing is true and correct.

June 23, 2025

Rayna M. Paul, Environmental Director, the Native Village of Kipnuk

JA158

EXHIBIT B

Docusign Envelope ID: 82BC54CC-D8C7-44B1-8FC9-58CACBA4B189

Case 1:25-cv-01982-PLF    Document 29-4    Filed 06/27/25    Page 2 of 32
USCA Case #25-5333    Document #2156180    Filed: 01/27/2026    Page 22 of 378

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

## DECLARATION OF DAWN WELLS-CLYBURN, PUSH BUFFALO

I, Dawn Wells-Clyburn, declare and state as follows:

1. I am the Executive Director at PUSH Buffalo (PUSH). In my role as Executive Director, I lead the organization, am responsible for overseeing its strategic direction, and I work to ensure its sound fiscal management.

2. I have worked at PUSH for 12 years. I am familiar with PUSH's organization, policies, practices, and programs.

3. Established in 2005, PUSH works to mobilize the residents of Buffalo, New York to create strong neighborhoods with quality, affordable housing, to expand local hiring opportunities, and to advance racial, economic, and environmental justice.

4. One way PUSH works to implement its mission is by running programs that retrofit residential homes to prepare them for weatherization work, that connect unemployed and underemployed residents of Buffalo with job training for clean energy initiatives and hiring opportunities in construction, and that provide community leadership and governance tools to community members.

5. These programs are funded through a mix of public and private dollars. We receive support from individual donors, as well as grants from philanthropic funds. PUSH also receives funding from the New York State Department of Homes and Community Renewal, and the New York State Energy Research and Development Authority. Since 2016 or 2017, PUSH has also received funds from the Environmental Protection

JA160

Docusign Envelope ID: 82BC54CC-D8C7-44B1-8FC9-58CACBA4B189

Case 1:25-cv-01982-PLF    Document 29-4    Filed 06/27/25    Page 3 of 32
USCA Case #25-5333    Document #2156180    Filed: 01/27/2026    Page 23 of 378

Agency's (EPA) workforce grant, which has been renewed since then every two to three years.

6.  In 2024, we applied for an EPA Community Change Grant to implement the following initiatives: (1) Establish one hundred and fifty Community Resilience Hubs throughout the City of Buffalo; (2) create communication and technology accessibility by purchasing portable network kits and solar power kits and distributing them to the Community Resilience Hubs; (3) create Workforce Development Training Centers; (4) conduct green jobs employment training; (5) create and distribute a $5 million fund for home improvements related to environmental health; (6) conduct outdoor air quality monitoring and outreach; and (7) develop an air quality intervention plan for each neighborhood in the City of Buffalo.

7.  Within the Community Resiliency Hubs, we proposed to establish a first responder training program for four residents per Hub to create a network of volunteers who could respond in extreme weather events to ensure the safety of their neighbors and coordinate with other volunteers across the city. These volunteers would also receive training in conflict de-escalation and on community health issues.

8.  The $5 million home improvements fund would be used to pay for costs associated with lead, mold, and asbestos remediation in homes throughout the city. This work would make homes eligible for additional improvements to improve their energy efficiency, like installing new insulation and double-paned windows, installing solar panels, and converting home heating from natural gas to electric heat pump systems.

9.  On December 11, 2024, our application for the Community Change Grant was approved. EPA approved a total funding amount of $20,152,214.00. Ex. 1.

2

JA161

Docusign Envelope ID: 82BC54CC-D8C7-44B1-8FC9-58CACBA4B189

Case 1:25-cv-01982-PLF    Document 29-4    Filed 06/27/25    Page 4 of 32
USCA Case #25-5333    Document #2156180    Filed: 01/27/2026    Page 24 of 378

10. After being awarded the grant, PUSH began to take steps to implement the grant. The organization hired one additional full-time employee whose salary was to be fully paid from the grant funds, started discussions with six potential subcontractors, and started conversations with partner organizations about how the grant money would be spent in the neighborhoods we serve. Specifically, PUSH convened several planning meetings with partner organizations and formed a governance committee to ensure that all pre- and post-award requirements would be met. PUSH employees dedicated significant hours to ensure that the organization would have the capacity necessary to administer the grant funds.

11. PUSH could not begin drawing down funds from the grant until we satisfactorily completed EPA's pre-award certification review process. On March 21, 2025, we received confirmation from EPA of PUSH's satisfactory completion of EPA's pre-award certification review process. Ex.2.

12. On March 25, 2025, PUSH requested guidance from EPA on when we would receive our login credentials for the Automated Standard Application for Payments (ASAP) system—the system through which federal grantees can withdraw the funds that they have been awarded. Ex. 3.

13. We sent follow up emails to EPA again on April 3, 2025 and April 16, 2025. Aside from a March 27, 2025 reply from an EPA employee requesting our grant number, we did not receive a response to our requests. *Id.*

14. Despite these multiple requests, and despite meeting the necessary prerequisites to begin drawing down funds from the grant, PUSH has never received login credentials for ASAP.

3

Docusign Envelope ID: 82BC54CC-D8C7-44B1-8FC9-58CACBA4B189

15. On May 2, 2025, we received notice from EPA that our Community Change Grant was terminated. The only reason listed on the termination letter was that "the remaining portion of the Federal award will not accomplish the EPA funding priorities for achieving program goals," and that "the objectives of the award are no longer consistent with EPA funding priorities." Ex. 4.

16. Since we received the termination notice, we have attempted to increase our fundraising to implement the programs that were planned under the grant at a dramatically reduced scale. We have not yet had to reduce any staff hours, but we have had to shift funds within our budget to cover a new employee's salary that was supposed to be paid for through the CCG grant. We have also had to put an indefinite hold on hiring the six subcontractors.

17. Our increased fundraising efforts have impacted our organization's planning, organizing, and policy work. For example, an increasing share of my own work as Executive Director is being directed toward fundraising to make up the gap caused by the termination of our Community Change Grant, which is preventing me from dedicating an appropriate amount of attention to the launch and support of two of PUSH's newest initiatives— Community Engagement and Climate and Community Homes. Additionally, PUSH's Director of Movement Building has had to focus on fundraising efforts to the detriment of his work building out PUSH's Community Organizing and Sustainability teams.

18. If the CCG grant program is not restored soon, I am concerned that our organization will be unable to enact the programs as we had originally planned. For example, PUSH went through a significant process to identify six subcontractors to take on different aspects of the grant, but we have not been able to access the grant funds to pay them. If the grant

4

JA163

Docusign Envelope ID: 82BC54CC-D8C7-44B1-8FC9-58CACBA4B189

Case 1:25-cv-01982-PLF    Document 29-4    Filed 06/27/25    Page 6 of 32
USCA Case #25-5333    Document #2156180    Filed: 01/27/2026    Page 26 of 378

funds are released now, we can begin paying the contractors. If we are forced to wait several more months for the funds to be released, some or all of the contractors may need to take on different work in the meantime, and our hiring process will need to start again. This would require a significant use of PUSH's resources and would take time and employee effort that would otherwise be spent on actually administering the grant.

19. PUSH is similarly concerned that consultants with subject matter expertise who we had intended to hire for this grant will walk away from this project and take on other work in the coming months.

20. In addition to the above-described consequences to our organization, I am concerned about the impact to the Buffalo community that will result if our programs are not enacted as originally planned. The need for a decentralized network of community resiliency hubs in the face of increasing extreme weather events has been clear for several years now, and was put on tragic display during Winter Storm Elliott in 2022. Forty-one people died in Erie County as a result of the storm, 911 service for certain areas was not restored for three days, and some neighborhoods in Buffalo went without electricity for two weeks. Our CCG grant funds were to be spent on purchasing portable network devices and solar power kits for one-hundred and fifty Buffalo neighborhoods to ensure people remain connected to vital services during the next storm, as well as on providing first responder training to four individuals in each of the one-hundred and fifty neighborhoods.

21. Without these funds, I am gravely concerned that Buffalo residents will be as vulnerable to harm from the next major winter storm as we were from Winter Storm Elliott.

JA164

22. If the Community Change Grant program is restored and our awarded grant reinstated, PUSH will be able to begin paying our project consultants and contractors, senior staff will be able to refocus on core operational work and away from fundraising activities to make up for the lost grant funds, and our community will begin to benefit from the investments made possible by this grant.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

*Dawn Wells-Clyburn*

Date: 6/27/2025

Dawn Wells-Clyburn

6

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**DECLARATION OF DOMINIKA PARRY, 2°C MISSISSIPPI**

I, Dominika Parry, declare as follows:

1.       My name is Dominika Parry, and I live in Ridgeland, Mississippi. This

declaration is based on my personal knowledge and professional education and experience. I am

over the age of eighteen and suffer from no legal incapacity. I submit this declaration in support

of 2°C Mississippi (2CM), which is one of several grant recipients affected by the federal grant

pause.

2.       I want to be a named plaintiff in this case. I understand that, as a class

representative, it would be my responsibility to represent the interests of all the class members in

this lawsuit, and not just my own personal interests. I also understand the need to stay informed

about what is happening in the case. I understand that I agree to represent other nonprofit groups

with terminated Environmental Justice Collaborative Problem-Solving Cooperative Agreements

and Environmental and Climate Justice Community Change Grants.

3.       I am the founding President of 2CM. Before founding 2CM, I spent most of my

career in academia as an Assistant Professor in the Earth and Environment Department at Boston

University, Visiting Assistant Professor at the Martin School of Public Policy and

Administration at the University of Kentucky, and a researcher at the Department of Forestry and

Wildlife Ecology at the University of Wisconsin-Madison.

4.       I received my PhD in 2003 from Yale University's School of Forestry and

Environmental Studies, where I also trained as a Postdoctoral Associate, working on valuation of

air pollution damages.

JA167

5.      2CM is a 501(c)(3) community-based organization founded in 207, that works with communities in Jackson, Mississippi to create climate resilience through adaption, mitigation and education projects. Our focus is disadvantaged, largely African American communities that suffer most from the severe and negative impacts of climate change on their health and wellbeing. 2CM's current projects include co-designing with communities, green infrastructure solutions to mitigate urban heat islands and flooding in the city's most neglected communities. We have developed strategic partnerships and collaborate with local community-based organizations to increase our capacity to obtain funds for and develop projects that have positive impact on the communities we serve.

6.      2CM is a small organization, with only one full-time (CEO) staff, two hourly (Projects Director and Accountant) staff, and one part-time (Community Coordinator) staff person.

7.      2CM is the recipient of multiple governmental funding agreements, which together constitute the vast majority of our budget. Two of our governmental funding agreements were awarded by the U.S. Environmental Protection Agency (EPA).

8.      2CM was awarded a $500,000 Environmental Justice Collaborative Problem-Solving Cooperative Agreement on August 1, 2024 under Clean Air Section 138. Under the terms of our grant Agreement, 2CM agreed to complete the project over a 3-year period ending in September 2027.

9.      2CM was awarded $19,889,515 through the Environmental and Climate Justice Community Change Grant Program under Clean Air Act Section 138. Under the terms of our grant Agreement, 2CM agreed to complete the project over a 3-year period ending in February 2028.

JA168

10.     The pursuit of these grants required us to pass up other funding opportunities. While we were in the process of applying for these grant opportunities and negotiating the terms of our award agreement, there were numerous partner organizations reaching out and asking us to partner with them on several grant proposals. We chose to decline these invitations to focus on the Environmental Justice Collaborative Problem-Solving Cooperative Agreement Program and Environmental and Climate Justice Community Change Grant Program.

### Environmental Justice Collaborative Problem-Solving
### Cooperative Agreement Program

11.     2CM was awarded an Environmental Justice Collaborative Problem-Solving Cooperative Agreement to replace several abandoned properties, considered blight, in West Jackson, Mississippi with a system of flood controlling microparks. This grant would fund the development of microparks in partnership with community members using our previously developed architectural co-design process. The microparks would offer natural solutions to urban flooding through rain gardens and equitable access to green infrastructure, recreational opportunities and will build and strengthen community cohesion, improve residents' quality of life, mental and physical health and increase access to climate education through local art.

12.     Jackson, Mississippi is vulnerable to flooding and became the topic of national news after heavy rains in 2022 led to flooding from the Pearl River, which in turn overwhelmed the O.B. Curtis Water Plant, leaving the city without running water for over 30 days. This nationally recognized crisis accelerated discussion about supporting historically disinvested cities where frontline communities have been left with chronically underfunded, failing infrastructure and with no resources to address the unequally distributed growing risks from climate change. At the same time, neighborhoods in West Jackson experience high levels of

poverty and a history of disinvestment.  In two of the four census tracts in the project area, 68%

of residents live below the poverty line, and over 95% are African Americans. In the project

area, the prevalence of asthma ranges from the 95th to 100th percentile compared to the US as a

whole; heart diseases range from the 90th to the 100th percentile; and overall low life expectancy

is in the 95th to 100th percentile range.  Our project aims to play a part in alleviating these

burdens by co-developing with the community system of several microparks on vacant properties

to create local flood resilience, as well as to provide recreational, educational, and community-

building functions.

13.    Access to our awarded funding was disrupted starting on January 29, 2025 when

we learned that our account had been listed as "suspended."  Our account was later reactivated

and then suspended again.

14.    On March 28, 2025, we received a letter from the EPA stating that it was

terminating our Environmental Justice Collaborative Problem-Solving Cooperative Agreement.

15.    We sent a letter of disagreement with the termination decision to EPA officials on

March 28, 2025.

16.    On May 30, 2025, our EPA award official sent a memorandum to the EPA

Regional Administrator Dispute Decision Official for Region 4 requesting that the termination

decision be upheld.

17.    We had already selected sites for the microparks before the grant was terminated.

We hired contractors to do demolition work to develop the parks and agreed to pay them over

$20,000 for this work. This work had begun when we received the termination letter. These

properties were cleared and ready for reshaping the land to allow for redirecting water. Upon the

JA170

termination of our Environmental Justice Collaborative Problem-Solving Cooperative

Agreement, we had to pay these contractors to do this demolition work with funding from a

foundation grant, which was not the initial plan. Now that this project has been disrupted by the

termination, these sites sit unattended with grass growing up to 4 feet tall.

18.    We selected these properties based on the assumption that we would have access

to all of the funding. Given the status of our terminated grant, we will have to do a redesign of

the microparks with only half of the originally obligated funding.  I am not certain if what we

can accomplish with only half of the funding will have an impact on flood control.

19.     The termination of this grant is a disappointment to the community that has been

left behind by the federal government for decades. The communities that are the focus of this

project are in some of the poorest census tracts in the entire country. 75% of properties in these

communities are dilapidated. When we got our grant award, members started believing they

could make meaningful changes and formed a neighborhood association to work on this project.

The neighborhood association had already set up a schedule for regular maintenance at the

microparks. Community members had big plans for how to utilize these parks and what the

future could hold. Now that hope has been taken away.

**Environmental and Climate Justice Community Change Grant**

20.    2CM was awarded an Environmental and Climate Justice Community Change

Grant to support the renovation and construction of a 35,000 square-foot space to host a

community resilience hub designed to provide overnight shelter for 150 people, an independent

drinking water supply, an independent energy system, and social support to community members

during weather-related emergencies, including power outages during periods of extreme heat and

extreme cold. This award would also support 2CM in hosting emergency response, workforce development, and other trainings at the hub, as well as executing emergency response activities, in coordination with local emergency plans developed by Hinds County. The community resilience hub was planned to be located in West Jackson, where residents experience high levels of poverty, historic underinvestment, and deal with poor and unsafe infrastructure.

21.    Applying for the Environmental and Climate Justice Community Change Grant was a significant lift for my small team, which at the time consisted of just two full-time employees—myself, serving as President and CEO, and my Project Director—along with the part-time support of an accountant working only a few hours per week. We spent seven months dedicating at least 10 hours a week to preparing our application. We built several new partnerships and also worked with existing partners to collaboratively develop our program proposal.

22.    Although our award letter for this grant was issued January 16, 2024, it was withheld and not sent to us until February 6, 2025.

23.    Before our grant was terminated, we only had access to our Automated Standard Application for Payments (ASAP) account for a 3-4 day period in the beginning of March 2025 and then reopened on April 28 2025 and stayed opened for 5 days until the termination on May 2 2025

24.    On May 2, 2025, we received a letter from the EPA stating that it was terminating our Environmental and Climate Justice Community Change Grant.

25.    We sent a letter of disagreement with the termination decision to the EPA Regional Administrator Dispute Decision Official for Region 4 on May 20, 2025.

26.     On June 18, 2025, we received a letter from the EPA acknowledging receipt of this timely dispute.

27.     Before our grant was terminated, we took some preliminary steps, including submitting a compliance letter to EPA, holding inaugural meetings with partners, conducting community outreach, recruiting an architect to design the hub, and purchasing an HVAC and generator for the hub.

28.     We only had access to our grant funding for a few days between March 1, 2025 (our project start day) and May 2, 2025 (when we received a termination letter from the EPA).

29.     We had planned to triple our staff to implement our program, as agreed under our approved budget for the grant. We are unable to do this hiring now that our grant has been terminated.

30.     The community resilience hub would make the difference between people having shelter or not being exposed to extreme temperatures or not. People in the community do not have a place to go when the power is out or when their homes are being flooded. The community resilience hub would provide that place of safety and security.

**Overall impact**

31.     The termination of our Environmental and Climate Justice Community Change Grant and Environmental Justice Collaborative Problem-Solving Cooperative Agreement has put significant financial strain and hardship on 2CM. These two grants combined constituted 93% of our organizational budget. The loss of this funding has impacted the organization's ability to continue to pay staff. I have had to substantially reduce my salary, and expect to continue working fully pro-bono starting June 2025. I also had to reduce a full-time Project Director to a part time Community Coordinator (keeping the Project Director on per hour compensation

totaling up to $10,000). Another full-time staff (Project Director), whose salary was to be 50%

funded by our Environmental Justice Collaborative Problem-Solving Cooperative Agreement,

became a contract employ with per hour compensation totaling up to $10,000, while most of the

work was designated to a part time Community Coordinator with lower pay.  We are also having

to think about terminating our office-space lease early due to the reduction in revenue. I am

worried the financial constraints caused by the grant terminations will force 2CM to enter into a

period of institutional hibernation.

      32.    Now that we have had to reduce the capacity of our already small team, it is very

challenging to manage all of 2CM's administrative and programmatic workload. In have had to

take on a lot of accounting work that we were previously paying an accountant to do. We are no

longer able to pay our grant sub-recipients and are relying on volunteers to work on the projects.

Additionally, since the bulk of project work is now conducted by me, I have effectively no time

for fundraising to replace the lost funding. This basically eliminated our chances to move beyond

the funding we still have left and makes it very unlikely that we will be able to develop new

projects

      33.    If our Environmental Justice Collaborative Problem-Solving Cooperative

Agreement is reinstated, 2CM will be able to provide critical investments in the West Jackson

community by developing microparks to improve flood resilience and a community resilience

hub to provide essential and emergency services. We would put this funding to immediate use by

advancing the development of the microparks and establishing the first Resiliency Hub in

Jackson, MS. For the microparks, activities would include resuming data collection (interrupted

by the termination letter); hiring a contractor to grade and contour the project grounds;

developing a detailed planting map; conducting community meetings to approve the planting

plans; hiring a landscaping company to implement the approved design; developing and installing educational signage; conducting post-implementation data collection; analyzing and reporting the project's impact; celebrating the grand opening of the microparks; and providing support for park maintenance throughout the remainder of the project period.

34. For the Resiliency Hub, planned actions include hiring additional staff; engaging an architectural firm to co-design the building renovations through a community-driven process; installing a microgrid and independent water well; launching solar installation and green infrastructure workforce development programs to be hosted at the Hub; and developing a cooperative to support the Hub's long-term financial sustainability. The project will culminate in the grand opening of the Hub's emergency and office wings.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States, the foregoing is true and correct.
Executed this #_23_day of _June 2025.

Executed this __23____ day of _June_____ 2025.

_____
Dominika Parry

# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

APPALACHIAN VOICES, et al.

*Plaintiffs, on behalf of themselves and all others
similarly situated*

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY and LEE ZELDIN, in his
official capacity as Administrator of the United States
Environmental Protection Agency

        Defendants.

**DECLARATION OF STEPHEN STROTMEYER, PhD, MPH (Allegheny County)**

I, Stephen Strotmeyer, declare as follows:

1.     My name is Stephen Strotmeyer. I am the Chronic Disease Epidemiologist at the

Allegheny County Health Department ("ACHD"). I am over the age of eighteen and suffer from

no legal incapacity. I submit this declaration in support of Allegheny County, which, along with

other grant recipients, has been affected by the Trump administration's termination of the

Environmental and Climate Justice Block Grant program.

2.     This declaration is based on my personal knowledge, professional education, and

experience, except for those items stated to be based on information and belief. For those items

based upon information and belief, I have relied upon information typically used by professionals

in my field to inform our professional judgment and opinion, and to those matters, I am informed

and believe them to be true as expressly stated herein. If called to testify in the matters herein, I

would and could competently swear thereto.

3.      Allegheny County is a municipality established under the laws of the Commonwealth of Pennsylvania. It is the second most populous county in Pennsylvania and operates under a Home Rule Charter.

4.      I was hired as Chronic Disease Epidemiologist for ACHD on September 16, 2022. I hold a Doctor of Philosophy (PhD) Degree in Epidemiology and also a Master of Public Health Degree. As Chronic Disease Epidemiologist, my responsibilities include but are not limited to conducting epidemiological investigations, formulating public health policies, and offering expert consultation on disease control. I manage the chronic disease epidemiology and vital statistics analysis, establish ACHD's research framework, and undertake public health assessments. I develop the disease reporting and surveillance infrastructure for the County, which provides epidemiological training and advisory services to diverse stakeholders. Additionally, I communicate community social and environmental justice requirements as part of County initiatives.

5.      ACHD offers clinical services including dentistry, immunization, and reproductive healthcare to the more than 1.2 million residents of Allegheny County. Additionally, the ACHD is responsible for administering programs designed to protect and promote the safety and health of its citizens with a focus on air quality, lead exposure and environmental factors that negatively impact wellbeing and cause harm.

6.      The Chronic Disease Epidemiology program provides an epidemiologic understanding of prevention, management and control of chronic diseases in Allegheny County, and supports the surveillance, planning, targeting, and evaluation needs of a variety of departmental programs.

7.     ACHD's epidemiologists are active in several key focus areas such as chronic disease, injury, social determinants of health, family and child health and produce a wide range of surveillance and epidemiologic content for our residents.

8.     My predecessor successfully applied for and received numerous federal awards, including Targeted Airshed Grants ("TAG"), Air quality monitoring and particulate, and EPA grants for sustainability planning, climate resiliency, and greenhouse gas mitigation. Under my direction, ACHD was awarded an Environmental Justice Government-to-Government ("G2G") grant.

9.     In recent years, certain communities within the county, including Wilkinsburg and Wilmerding, Pitcairn, Munhall, White Oak, Dravosburg, and Glassport have experienced increased flooding. The affected communities—which are comprised in large part of lower-income households) have endured property damage, at times to the point that homes are uninhabitable for days to weeks at a time, as well as destruction of personal property, including irreplaceable items. Residents have also been harmed by exposure to sewage, environmental toxins, and subsequent mold after flooding events.

10.     On April 11, 2023, Allegheny County applied for a G2G grant to help address these challenges by mitigating stormwater and flood damage through projects that included infrastructure improvement of waterways and stormwater diversion, and modifications to topography through stormwater diversion and detention, including green scaping with native trees and plants.

11.     EPA awarded Allegheny County the G2G grant on April 1, 2024, with a three-year project period of March 2024 through February 2027. The total amount awarded for the term of

the project is $930,411.00. A true and correct copy of the Cooperative Agreement is attached as Exhibit A.

12.     Within Allegheny County are numerous boroughs, townships, and second- and third-class cities. Many municipalities participate in regional councils. In reliance on the G2G grant, Allegheny County initiated partnerships with various Councils of Governments, ("COGs") including the Turtle Creek Valley and Steel Rivers COGs. These COGs have the majority of Environmental Justice communities within Allegheny County according to the EPAs EJSCREEN Tool or ACHD's Environmental Justice Index.

13.     Allegheny County's partners commenced community engagement programming and entered into contracts with private businesses to perform construction work associated with the projects. For example, Landforce contracted with ACHD to undertake a water diversion project in Wilkinsburg, Pennsylvania, one of the communities that has recently been impacted by flooding. The project would help mitigate flooding by mimicking natural processes to manage stormwater runoff. The Green Stormwater Installation uses plants, soils, and permeable surfaces to capture, absorb, and filter stormwater, reducing the amount of runoff that enters the sewer system and waterways. This helps to prevent or lessen the severity of flooding, especially in urban areas during heavy rainfall.

14.     On March 26, 2025, Allegheny County received notice that the funding award was terminated effective immediately. A copy of the notice is attached as Exhibit B.

15.     The County also received a form Notice of Amendment generated on March 26, 2025, and mailed that date, stating, "this amendment is to stop work, terminate the agreement, reduce performance period duration, curtail scope of work; and waive certain reporting

requirements." The Notice of Amendment further reduced the award to "$0.00." A copy of this Notice of Amendment is attached as Exhibit C.

16.     In reliance on receipt of the G2G grant, Allegheny County was prepared to break ground on one the Wilkinsburg project on March 29, 2025. ACHD staff had to quickly communicate to construction vendors, the municipalities involved, and other community partners that the project was suspended immediately.

17.     In reliance on the G2G grant, ACHD had processed two invoices up through the termination of the G2G grant. ACHD paid Landforce $2,885.48, and the University of Pittsburgh $6,750.32.

18.     In reliance on the G2G grant, Allegheny County, ACHD, and numerous community partners, including Landforce, Allegheny Clean Ways, ALCOSAN, University of Pittsburgh, and Allegheny County Department of Sustainability have spent considerable time planning, gathering information from the community and assessing the most vulnerable neighborhoods. Allegheny County has also given assurances to the residents of Wilkinsburg that work on the project was imminent. Community engagement leading up to groundbreaking included attending meetings with the public at municipal council meetings, and enlisting students from the University of Pittsburgh School of Engineering's capstone course in sustainability to participate in presentations at these meetings.

19.     As a direct result of the termination of this funding, the residents have been left without a remedy for their increased flood risk and will likely continue to sustain such harm with regular frequency.

20.     Neither the residents nor the municipalities can remedy this situation on their own without a comprehensive plan as well as funding such as what was previously provided by Allegheny County through the now terminated award.

21.     Without this federal funding, Allegheny County cannot afford to move forward with this program, and residents will continue to suffer from water intrusion onto their property.

22.     Further, Allegheny County is home of three rivers: the Allegheny, the Monongahela, and the Ohio. Numerous streams and creeks that flow as tributaries into these rivers. These rivers and tributaries all carry high volumes of water, giving the region a uniquely high potential for flooding.  The cancelled G2G grant focused on mitigating stormwater and flood damage through infrastructure improvement and stormwater diversion, as well as greenscaping. The negative impact of termination is therefore a direct and continuing harm to the residents of Allegheny County and to communities downstream.

JA182

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on June 13, 2025.

*Stephen Strotmeyer*

Stephen Strotmeyer, PhD, MPH
Chronic Disease Epidemiologist
Allegheny County Health Department

# EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**DECLARATION OF NEAL MORRIS, STAY READY NOLA**

I, Neal Morris, declare as follows:

1. My name is Neal Morris, and I live in New Orleans, LA. This declaration is based on my personal knowledge and professional education and experience. I am over the age of eighteen and suffer from no legal incapacity. I submit this declaration in support of the Stay Ready NOLA, which is one of several grant recipients affected by the freeze and terminations of federal grant funding.

2. Stay Ready NOLA is a 501(c)(3) nonprofit organization that is headquartered at 2420 Saint Claude Avenue. Established in 2018, the Stay Ready NOLA mission is to build more sustainable and resilient communities in the New Orleans area - including the building of resiliency hubs, promulgation of clean energy resources, and advocating for the arts.

3. I am the Executive Director for Stay Ready NOLA. I have been affiliated with Stay Ready NOLA for 6 years. I have a Bachelor of Arts, a Masters of Business Administration, and a Juris Doctorate from Tulane University.  As Executive Director, I oversee all organizational operations and planning, managing workstreams across several program areas; I also help to develop the strategic vision for the organization.

4. Before Stay Ready NOLA became the organization it is today, we were originally an affiliate of an arts advocacy organization, the NOLA Mural Project. Stay Ready NOLA is now a 501(c)(3) organization in its own right that is staffed with leadership from Redmellon, LLC, a mission-driven real estate development company.  Redmellon, LLC is dedicated to ensuring high-density, bikeable neighborhoods that reduce environmental

impact. Stay Ready Nola applied for a Community Change Grant ("CCG") because we saw an opportunity to provide significant positive impact to the people of New Orleans. When Stay Ready Nola was awarded the CCG, Redmellon staff were laid off and hired by Stay Ready Nola  in order to successfully perform on this grant.

5.  We have a track record of doing critically important work in the Upper Ninth Ward and New Orleans more broadly.  As such, we have built trusting relationships in the community through our work, which this CCG grant would have amplified.

6.  On January 17, 2025, Stay Ready NOLA was awarded a CCG in the amount of $19,999,999.  The performance period was retroactively applied, such that the start date was November 1, 2024, with a three year performance period ending on November 1, 2027.

7.  In this CCG, our statutory partner was Metro Bicycle Coalition, d/b/a Bike Easy, a bicycle advocacy group that works to encourage safe road sharing between cars and bicycles, the development of holistic transit infrastructure, and coordinates education for adults and children about bike safety.

8.  The CCG was intended to fund a resilience hub and a 3 megawatt ("MW") solar farm. The community solar facility would generate electricity that would be sold to the utility and subsequently used as part of a program to reduce the energy bills of elderly, low-income New Orleans residents. The resilience hub would convert empty warehouses into facilities critically important to the well-being of the city's residents.  Over 2 ½ city blocks, Stay Ready NOLA planned to have a space that on a daily basis would house everything from a makers market, Bike Easy's rideshare and job training facility, a dog park, and an educational center.  During emergency events, the facility would convert to a gathering place for lineman and first responders who are providing support (up to 220

JA186

personnel) as well as a place for people to recover during electricity disruptions and be able to access back-up communications, food, water, and power.

9.  These projects would have benefitted the Upper Ninth Ward of New Orleans, an area of the city that is particularly susceptible to service interruptions.  When Hurricane Ida hit in 2021, the Upper Ninth Ward lost power for an entire month, leaving people without air conditioning and electricity.  The impacts of that were dramatic - elderly people passed away due to lack of air conditioning, and because of the decrepit infrastructure in New Orleans, old water pumps caused back-ups in the water system and disrupted the drinking water supply for days.

10.  February 7, 2025, was the first time that we had access to ASAP, when $19,999,999 was added to our account; from that we were able to draw down $3,367,794.31 to pay expenses.  Three days later, on February 10, 2025, our funds were frozen for the first time; when they were unfrozen again on February 19, we were able to down twice on February 19 ($129,957.27) and February 25 ($46,439.58) to cover eligible expenses.  On March 7th, our funds were frozen again until April 28th.  We then drew down on the grant  an additional  four times, once per day, due to the uncertainty of when our funds would be frozen again or terminated, for an additional amount of  $1,362,636.39 to cover eligible expenses  until our grant was officially terminated on May 1, 2025.  All told, we were able to draw down a total of $4.9M of our almost $20M grant funding. Our funds were opened the day of the termination and then abruptly shut down again the next day, May 2, and have remained so ever since.

11.  The termination memo stated vaguely that our grant was being terminated because "The objectives of the award are no longer consistent with EPA funding priorities."  No other

JA187

reasons for termination were provided.  (See Attachment A, Termination Memo, May 1, 2025.)

12. Our communication with our EPA project officer has been similarly inconsistent. Though we have consistently kept our project officer apprised of developments such as ASAP being frozen, response communications back from EPA have been sporadic.  We heard from our project officer on February 4, 2025, when he introduced himself and again on March 5 and 6, 2025.  We have sent at least eight  emails between our grant start date and today's date that have received no response from the agency or our project officer.  This lack of communication exacerbates our uncertainty, anxiety, and feeling of being in limbo.

13.  We have been able to spend $4.9 million dollars of our total funding to date.  This is slightly less than 25% of our total award.

14. Disruption and eventual termination means that underserved communities will continue to be deprived of life-saving services, as well as resources that would enable community gathering and key educational opportunities.

15. While we tried to be strategic with funds in order to avoid an untenable situation, there will be clear impacts to our project and to our internal operations.  This CCG is what keeps the lights on for Stay Ready NOLA organization and allows it to move forward with its key mission of reducing energy costs and building resilience.

16. Getting our solar farm up and running is time sensitive.  Construction would take approximately 4-6  months, but prior to construction we need to retain a qualified attorney to assist us with securing necessary permits and permissions, and consultants to design and engineer the system..  To the extent that we cannot pay for outside experts  to help execute all the necessary steps, we are likely to reach a point of no return where we

JA188

will not be able to finish the project within the three statutory timeline or at all if the grant funding is not restored.  Not only does this lead to some amount of sunk costs, but the community is deprived of a community solar project that has significant ability to reduce energy costs in a low-income community and to reduce air pollution from dirtier sources of energy that would otherwise be used.

17. In order to move this project forward, we have purchased two properties, signed a lease on another, and have made progress  on purchasing materials and equipment needed for the resilience hub and the solar facility.  We also had purchased equipment and started the procurement process for accounting, legal, architectural, and design professionals.  All of these efforts are  now in question.  The option to purchase the real property on which the solar facility will be located expires by the end of the Summer, forcing us to start a lengthy process all over again even if our funding were to be restored at some point in the future, if we are even able to find another suitable site.  As well, losing buildings on which we already have made a significant down payment would be wasteful and there is a high likelihood we would have to transfer ownership of those buildings.

18.  If this funding is not restored, all of our contracts would need to be cancelled. While there are no fees associated with cancellation, our contracts did require up front payments to allow the contractors to begin crucial work. If we are unable to restart payments in the near term, we will lose the contractors and we will not get to complete work based on the initial payments that we made.  In total, we have 10 contracts that cover everything from architectural services to landscape design to permitting and consultants - all necessarily halted.

19.  From an internal standpoint, we have not  been able to hire additional staff to take on work.  As the Executive Director and a member of the Board of Directors of the

Organization, I am partially floating the project with personal savings, and credit cards. When the last of our funds are depleted I will continue to work pro bono, as I did before the grant was awarded.   However, that is only tenable for so long.  Neither I nor the organization have sufficient funds to stay afloat for long.  If our funds are not restored in the near future, Stay Ready NOLA will need to shut down, alongside all the community-saving work we would have done - leaving our employees, not to mention the New Orleans residents that would have benefitted from this grant, at a distinct disadvantage.

20. Our statutory partner is also being harmed.  Bike Easy had moved out of their current office space, relying on being able  to move into the warehouse we were converting into a resilience hub.  They may now be without a home..

21. Both Bike Easy and Stay Ready NOLA had announced their projects to the community. As with many other communities across America, underserved residents are inherently and understandably distrustful of organizations that claim they want to help - and certainly don't trust that the government will provide reliable assistance.  All of that distrust is now justified; while we are working hard to try and get our funding restored, the fact is that the community and the contractors we agreed to work with are left with unreimbursed expenses and unfulfilled expectations.  I would be hard pressed to say that any of these individuals or organizations will want to work with us again - whether or not the blame can be laid on our doorstep.

22. If funding is restored, Stay Ready NOLA will be able to resume building resilience hubs that will act as emergency shelters for the residents of the Ninth Ward and beyond, in addition to being a community gathering place that will have a positive impact for

JA190

residents.  Our new facilities will also act as an organizational facility for Bike Easy,

more easily allowing them to carry out projects to enhance active transportation,

including a rideshare and job training program.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United
States, the foregoing is true and correct.

_____          _____

[*Name  and Title*]                                    Date

JA191

# EXHIBIT F

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| APPALACHIAN VOICES, et al., <br><br> *Plaintiffs, on behalf of themselves and all others similarly situated*, <br><br> v. <br><br> UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., <br><br> *Defendants*. | Civil Action No.  1:25-cv-01982-PLF |

**DECLARATION OF TILLY CHANG**
**(TREASURE ISLAND MOBILITY MANAGEMENT AGENCY)**

1

JA193

I, Tilly Chang, declare as follows:

    1.    I am the Executive Director of the Treasure Island Mobility Management Agency ("TIMMA") and the Executive Director of the San Francisco County Transportation Authority ("SFCTA"). The following facts are known to me personally, and if called as a witness, I would testify to them competently.

    2.    I have been the Executive Director of TIMMA since 2014. I have been the Executive Director of SFCTA since 2013 and was SFCTA's Deputy Director for Planning from 2003 to September 2013. Previously, I worked at the World Bank, the Metropolitan Transportation Commission, and a wireless technology startup. I have an M.S. in Transportation from the Massachusetts Institute of Technology and a B.A. from the University of California, Berkeley.

    3.    SFCTA is a transportation agency that plans, funds, and delivers transportation projects to improve travel choices for residents, commuters, and voters throughout San Francisco. It is a separate legal entity from the City and County of San Francisco.

    4.    Pursuant to State law, in 2014, the San Francisco Board of Supervisors designated SFCTA as the agency to act as the Treasure Island Mobility Management Agency ("TIMMA"). TIMMA is a transportation agency that is responsible for developing and implementing the Treasure Island Transportation Program, a comprehensive transportation program for Treasure Island, defined also to include Yerba Buena Island. Treasure Island and Yerba Buena Island are islands located within the City and County of San Francisco. TIMMA is a separate legal entity from SFCTA and from the City and County of San Francisco. The San Francisco Board of Supervisors acts as the Treasure Island Mobility Management Agency Board. As Executive Director of SFCTA, I am also the Executive Director of TIMMA.

JA194

5.     Treasure Island is a 390-acre man-made island in the San Francisco Bay, and Yerba Buena Island is a natural island connected to Treasure Island. As part of the redevelopment plan for Treasure Island, a former U.S. Naval Base, the Treasure Island neighborhood will grow by approximately 8,000 homes—27% of them offered at below-market rates—housing more than 20,000 new residents by 2042. This will result in tens of thousands of additional trips to and from the island each day.

6.     Treasure Island currently has approximately 2,000 residents. It is one of San Francisco's lowest income neighborhoods, with 42.1% of its residents below the federal poverty level, as well as one of San Francisco's most racially and ethnically diverse neighborhoods. A critical challenge facing Treasure Island residents is the lack of affordable and environmentally clean transportation options. More than two-thirds of residents do not have access to a vehicle for off-island trips. The only public transportation option on Treasure Island is a Muni bus that has one stop in downtown San Francisco. There is also a privately operated diesel ferry service to San Francisco that is open to the public. There is a bike/pedestrian path on the east span of the Bay Bridge, but no bus service or any other public transportation option between Treasure Island and the East Bay cities of Berkeley and Oakland. Treasure Island residents are also challenged by poor air quality resulting from living adjacent to the Bay Bridge, which carries 260,000 vehicles per day. Treasure Island has a pollution score higher than that of 85-90% of all census tracts in California.

7.     In May 2024, TIMMA applied for a grant through the U.S. Environmental Protection Agency's ("EPA") Community Change Grant Program to fund a project called Treasure Island Connects ("TI Connects"). As described in the grant proposal, TI Connects will benefit disadvantaged communities living on Treasure Island by expanding clean public

3

transportation resources serving the area, reducing exposure to harmful pollutants and promoting equitable access to education, employment, and health facilities. TI Connects comprises six complementary projects: (1) a microtransit pilot connecting Treasure Island residents to key resources on mainland San Francisco; (2) a community circulator shuttle providing Treasure Island residents improved access to more locations on Treasure Island and Yerba Buena Island; (3) enhancements to the existing Muni bus service and the purchase of an additional Battery Electric Bus for use on the Muni line; (4) electric ferry charging infrastructure to support conversion to zero-emission ferry service; (5) implementation of bikeshare on Treasure Island; and (6) a Transportation Resource Center to provide high quality jobs, training and affordable transit planning for low-income Treasure Island residents. TI Connects was developed from a community-based planning process in partnership with One Treasure Island ("One TI"), a local nonprofit community-based organization.

8.      On November 25, 2024, TIMMA was awarded a $19,965,495 grant for the three-year project period January 1, 2025 to December 31, 2027. A true and correct copy of the Grant Agreement is attached as Exhibit A.

9.      As set forth in the Grant Agreement, TIMMA's "statutory partner" under the grant is One TI. Under the Grant Agreement, One TI is to lead the community engagement work. It will also implement the workforce development components of the initiative and will be the implementing agency for the Transportation Resource Center.

10.     The Grant Agreement also provides that TIMMA will subcontract with other public agencies on the project funded by the grant. Under the Grant Agreement, the San Francisco Municipal Transportation Agency ("SFMTA"), a constituent department of the City and County of San Francisco, will be responsible for implementing the enhanced Muni Fixed

4

Route Service, including procuring an additional (electric) bus, evaluating ridership, and evaluating performance trends. The San Francisco Bay Area Water Emergency Transportation Authority ("WETA") will be responsible for implementing the electric ferry charging infrastructure, including procuring a qualified contractor, constructing terminal electrification, and evaluating operating impacts.

11.    In January 2025, TIMMA began work under the grant, including drafting subaward agreements.

12.    On January 28, 2025, however, the EPA notified TIMMA that the grant was "paused." Due to the uncertainty around the funding, TIMMA slowed its work on the project, and did not send out subaward agreements to its partners. TIMMA learned in February 2025 that the online funding portal for the grant was accessible.

13.    On May 1, 2025, however, the EPA informed TIMMA by email that the grant was terminated "effective immediately." True and correct copies of the Termination Memorandum and Assistance Amendment are attached as Exhibit B.

14.    The loss of this funding has been devastating. Without this federal grant funding, key transportation service improvements for Treasure Island may be significantly delayed, curtailed or not implemented at all, leaving residents without access to sufficient transportation and making development of additional housing more challenging. Without the clean transportation improvements from this project, TIMMA will be less able to avoid harmful tailpipe emissions from motor vehicles and ferry vessels, impacting Treasure Island's residents.

15.    This project is very important to TIMMA, its partners, and the Treasure Island community. TIMMA is currently evaluating whether it might be able to implement certain aspects of the proposed project, including the on-island shuttle and bikeshare programs, and has

5

begun exploring alternative funding opportunities. One TI has a small amount of private philanthropic funding to develop the Transportation Resource Center, and TIMMA is exploring whether it can leverage that private funding to obtain additional funding for that component of the project. That said, TIMMA has not yet identified any viable alternative funding sources. Moreover, these fundraising efforts take time and resources away from other projects. TIMMA's annual budget includes only confirmed funding, and now that this grant has been terminated, TIMMA does not have any funds in its proposed budget for the upcoming fiscal year (starting on July 1, 2025) for this project.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 16th day of June, 2025 in San Francisco, California.

Tilly Chang

6

JA198

# EXHIBIT G

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**DECLARATION OF CHRISTINA TRUJILLO, BESSEMER HISTORICAL SOCIETY
(D/B/A STEELWORKS CENTER OF THE WEST)**

I, Christina Trujillo, declare as follows:

1. I am the Executive Director at Bessemer Historical Society, Inc., which does business as Steelworks Center of the West ("Steelworks"). I have been in this role for over 6 years. If called as a witness, I could and would competently testify to the information below.

2. As Executive Director, I am responsible for the financial stability of Steelworks, ensuring we have funds to fulfill our 501(c)(3) mission. I'm in charge of our staff, run our day-to-day operations, help ensure we're on track for our strategic plan, and curate exhibits for our museum. I also assist with Steelworks's educational programming, museum tours, and work with school groups.

3. Steelworks has been an active participant in the development of this lawsuit and has remained in regular communication with Plaintiffs' counsel about this case. We are willing and able to take an active role in this litigation and to protect the interests of all members of the Class.

4. Our organization exists on land that used to belong to the Colorado Fuel and Iron Company ("CF&I"). CF&I was one of the largest mining companies in the early 1900s and related to the site of the Ludlow Massacre following a mine workers' strike.

5. Bessemer Historical Society, Inc. was formed in 2000 to care for CF&I's archival collection, artifacts, and historic buildings. In 2007, we opened the Steelworks Museum, the interpretive center for CF&I history. In 2014, we established the Steelworks Center

1

JA200

for the West to integrate our museum, archives, and education programs, and our organization now does business under that name.

6. Steelworks implements its mission in part by promoting Science, Technology, Engineering, and Mathematics educational activities for grades K-12. We also host a public speaker series where every other month our curator hosts a talk about a topic related to CF&I, and offer museum tours.

7. In recent years, our work has expanded to meet the Bessemer community's needs such as combating food deserts, addressing lack of public transportation, and building community resilience to disasters. For example, we have worked with the Pueblo Department of Public Health and Environment ("DPHE") to promote access to fresh food. The DPHE developed a monthly mobile food pantry that we hosted on our property. At these events, Steelworks would provide children's books, activity booklets with crayons, and free museum passes for families, along with the food funded by the DPHE. This program ran for several years and just ended a few months ago.

8. While Steelworks gets some funding from rental income, memberships, fundraising events, and private donors, federal grants have been important for us to expand our program work to address community needs. Most federal funds we've received in the past have been through the National Endowment for the Humanities. In 2020 we received our first grant from EPA—$50,000 to develop and implement above-ground garden beds in the in the area that used to be contaminated due to CF&I's operations. Part of the project was to provide healthy and nutritious food for residents here to combat malnutrition due to food deserts.

9. When I learned about the Environmental Justice Collaborative Problem Solving
   ("EJCPS") grant opportunity I was looking for opportunities to help the Bessemer
   community, which is low-income and deals with food deserts, lack of education, lack of
   public transportation, and contains the Colorado Smelter Superfund Site from the CF&I
   mining operation. At the time, the City of Pueblo (where Bessemer is located) had just
   finished a contract with a company that provided scooters in the City. I thought that the
   EJCPS grant was a way to fill the gap in affordable transportation left from that program
   ending.

10. We applied for the EJCPS grant in April 2023. I proposed providing e-bikes to Bessemer
    community members and, by doing so, improving transportation access and food access,
    creating employment opportunities for people who otherwise would not be able to get to
    and from their workplaces during off hours, and lowering greenhouse gas emissions. We
    would build a storage facility for the e-bikes on our land, and make that building
    available for bike repairs as well. As part of the project, Steelworks would collect data to
    share with the City of Pueblo about where people were riding the e-bikes and how to
    make the city safer for bicycling. We planned to run an anonymous survey of program
    participants throughout the project's implementation.

11. Outside of the EJCPS grant, part of Steelworks's strategic plan is to build a community
    resilience hub in the neighborhood. Our plan is for the building to be a space to promote
    nutrition education, health and wellness, and collaborate with other community groups to
    offer services. The space will also serve as an emergency evacuation center, as the only
    evacuation center in the area is outside of Pueblo's city limits and is inaccessible for

many community members. I hoped the EJCPS e-bike program would increase access to our future community resilience hub.

12. On September 9, 2024, our application for the EJCPS grant was approved. EPA approved a total funding amount of $500,000. Ex. 1.

13. Initially, EPA seemed very invested in our project. Steelworks was invited to showcase our project during an event in Denver, Colorado, in October 2024 that celebrated the launch of the EPA Region 8 Thriving Communities Technical Assistance Centers and highlighted current federally-funded work underway in Colorado.

14. After receiving notice that we were selected, it took about 11 months to get through the pre-award certification process with EPA. We finally finalized the grant project last fall, and so our official award date is October 1, 2024.

15. Steelworks began work on the grant project in 2025. We notified our partners, sent out Requests for Proposals, formed a committee to review the responses and select awards, and began prep work for the e-bike storage facility site. We also contracted with a company to build the storage facility. We dedicated time from our existing staff to make the grant project happen.

16. Steelworks had some issues getting connected to the Automated Standard Application for Payments ("ASAP") System after we were awarded our grant. As of late January 2025, we still had not been granted ASAP access.

17. On January 28, 2025, I received an email from EPA stating that "EPA is working diligently to implement President Trump's *Unleashing American Energy* Executive Order issued on January 20 in coordination with the Office of Management and Budget" and that the agency "has paused all funding actions related to the Inflation Reduction

4

Act." Ex. 2. Because Steelworks did not yet have ASAP access, this change did not affect our grant project.

18. The next day, our Project Officer emailed me saying that "[w]e don't have any updated information at this time . . . . So sorry for all this confusion and uncertainty." Ex. 3. He also told me he'd "been advised to not have check-in meetings or anything until that clarification is given," and canceled our meeting that had been scheduled for the next day. *Id.*

19. On February 5, 2025, our Project Officer emailed again, apologizing "for all of the delays and confusion and temporary silence on our end. We have had ever changing guidance over here and things have been quite confusing." He said that they "received word that we can continue as normal on our CPS grant. This may change at any time based on the situation in DC, so let's make hay while the sun is shining!" Ex. 4.

20. We finally gained access to our ASAP account in February 2025. EPA entered our banking information on February 11, and told us that access would be available February 21. Ex. 5. By February 24, 2025, I was at last able to draw down funds.

21. I drew down funds twice after beginning program work: $29,000 on February 24, 2025, to pay our contractor the initial costs for the e-bike storage facility, and second on February 27, 2025, to cover about $3,700 worth of staff time we'd dedicated to the grant. I assumed we would maintain access to the $467,280.75 remaining of our funds.

22. On March 26, 2025, we received notice from EPA that our EJCPS grant was terminated. The Termination Memo claimed that "[t]he objectives of the award are no longer consistent with EPA funding priorities . . . . this priority includes ensuring that the Agency's grants do not conflict with the Agency's policy of prioritizing merit, fairness,

5

and excellence in performing our statutory functions . . . . it is vital that the Agency assess whether all grant payments are free from fraud, abuse, waste, and duplication." Ex.6.

23. I had planned to do another drawdown for salaries on that day before we received the termination letter. I was not able to do so because our grant number had already been removed from ASAP. The grant number is now back in the system, but I cannot draw down any funds.

24. Because of the EJCPS program termination, I had to tell our contractor to stop work on the e-bike storage facility. I already paid the contractor 50% of the cost, and Steelworks has nothing to show for it.

25. I also have concerns about our ability to continue paying staff if the EJCPS program is not reinstated. We have one staff member, our Administrative Assistant, who is currently working 29 hours; I think we are going to have to reduce her down to 15-20 hours per week. We had planned for her to help me implement the grant and be the primary community contact for the work. Now, we don't have the funding to maintain her job at its current level for much longer without the EJCPS funding.

26. Steelworks has also canceled two programs that we planned to put on due to the termination.

27. Before the termination notice, our local bike shops were getting phone calls asking about the e-bike program and expressing interest in participating. I feel horrible that we told community members we would have this program up and running soon and now it is not happening. Many Bessemer community members mistrust local elected officials and other authorities because of the area's history of officials making promises to the

6

JA205

community but not following through. Working through that mistrust was one of our biggest hurdles when planning the grant project. Now, I have seen people raise our e-bike program in City Council meetings as just another example of a false promise to get the community's hopes up that things will change. When people hear that the grant is terminated, they often think that it's something Steelworks did wrong or due to malice on our part. The termination is also impacting trust in our partnering agencies, who often worked to help us build relationships with parts of the Bessemer community. Residents here don't realize that this decision came from the government and does not have anything to do with Steelworks's actions.

28. I have been putting a lot of time into trying to find other funding sources to make the program happen. There is one foundation that has expressed interest, but it has already allocated all its funds for 2025, so we won't get any money from them until next year. At most, I think I might be able to find $29,000 for this program, which is nowhere near the amount we had anticipated having from EPA to get a robust program up and running.

29. I am now aware that Steelworks is just one of the many organizations impacted by EPA's termination of the entire EJCPS program, as well as other programs funded by the Inflation Reduction Act.

30. I had planned to apply for the next round of the Thriving Communities program to try to get funding to support our community resilience hub. I heard that that program was also on the chopping block, and so decided not to apply for those funds.

31. I had also planned on applying for EPA grants to help with lead and asbestos abatement. Those funding opportunities are no longer available as of May 2, 2025.

JA206

32. While I am invested in continuing Steelworks's EJCPS project, I am also concerned that these grants were terminated uniformly across the country. The termination of our grant has a huge impact on us; I can only imagine the ripple effect that hundreds of these grant terminations is having on communities across the United States.

33. If the EJCPS program is reinstated and Steelworks is able to move forward, I could have the first 15-20 community members on e-bikes within a month. I already have the Request For Proposals out for someone who could teach how to safely operate the bikes. The storage facility will take longer to build, but the first group of e-bikes we planned to release is small enough that we could do it before the facility is finished. I would also move forward with the storage facility construction, pay our contractor, and get the word out into the community that the program is back on.

34. This month, June, is Colorado's bike month. We had planned to have a huge celebration with the City of Pueblo to launch the program on June 27th. We were going to promote the program and the use of e-bikes not only in Bessemer but throughout Colorado. EPA representatives had planned to attend. Ex. 7. Now, it is too late to make that plan come true. But if the EJCPS program were reinstated soon, we at least could reassure community members that e-bikes are on the way, rebuild some lost trust, and quickly improve Bessemer residents' access to not only transportation, but also healthy food and employment opportunities thanks to access to the e-bikes.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Date: 6-20-2025

Christina Trujillo

8

# EXHIBIT H

JA208

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

APPALACHIAN VOICES, et al.

*Plaintiffs, on behalf of themselves and all others similarly situated*

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY and LEE ZELDIN, in his
official capacity as Administrator of the United States
Environmental Protection Agency

        Defendants.

## DECLARATION OF JODY LONDON
### (County of Contra Costa, California)

I, Jody London, declare as follows:

    1.    My name is Jody London. This declaration is based on my knowledge, professional

education, and experience. I am over the age of eighteen and suffer from no legal incapacity. I submit

this declaration in support of the County of Contra Costa ("Contra Costa County" or "County"), which

is one of many grant recipients that has been affected by termination of federal grant funding.

    2.    Contra Costa County is a political subdivision of the State of California.

    3.    I am the Sustainability Coordinator for Contra Costa County, a role I have held since

2016. I oversee a team of four, and I report to the Director of the Department of Conservation and

Development, John Kopchik. My team works across county departments to implement the County's

Climate Action and Adaptation Plan. We develop policies and strategies that advance climate

resilience and sustainability and seek to correct the historic underinvestment in our Impacted

Communities, which are located near large industrial facilities and carry a disproportionate burden of

1

JA209

adverse health and socioeconomic outcomes. I have a Master of Public Administration with an emphasis on energy and environmental policy. Before joining Contra Costa County, I worked as a consultant to the U.S. Environmental Protection Agency in the Superfund program; worked on the staff of the California Public Utilities Commission; and was an advocate for local governments and non-profit organizations on policy issues before the California Public Utilities Commission, the California Energy Commission, and the California Legislature. I also served for 12 years as an elected member of the Oakland School Board.

4.      In September 2024, Contra Costa County applied for a grant through the U.S. Environmental Protection Agency's ("EPA") Community Change Grant Program to lead the North Richmond Community Resilience Initiative, a collaborative project in North Richmond, a community in an unincorporated area of the County that is located near a refinery, a landfill, a freeway, a railroad, and numerous warehouses, which draw heavy vehicle traffic. I oversaw the application process, and the application was submitted under my direction. On January 6, 2025, Contra Costa County was awarded a grant of $19,076,843. A true and accurate copy of the Grant Agreement, which also served as the notice of award, is attached as Exhibit A.

5.      The project outlined in the grant application is designed to be a collaboration between the County and four community-based organizations: Urban Tilth, Richmond LAND, The Watershed Project, and the Community Housing Development Corporation.

6.      I oversee the leadership team for the project, which has representatives from each of the five partner organizations (including the County). In my role overseeing the project, I manage the County's contracts with each of these organizations and I manage federal grant drawdowns with assistance from my department's finance group. I either led or participated in this grant process from application to grant agreement to management of the grant.

7.      The project aims to increase community resilience to the impacts of extreme weather; improve access to affordable, healthy, and energy-efficient homes; improve air quality at the local

JA210

elementary school; plant trees throughout the community; create community gardens and green spaces; establish an e-bike lending library; and leverage these projects for workforce development. To meet the project's goals, each of the five participating organizations will contribute its unique expertise.

8.      Contra Costa County will provide overall project management and grant administration, implementation of clean energy home retrofits, and creek restoration. Urban Tilth is a cornerstone in the community for resilience, health, and justice, working to build a more sustainable, local food system and connecting community-focused initiatives, including the North Richmond Community Resilience Initiative. Urban Tilth is the fiscal sponsor for Rich City Rides, which brings experience operating projects like the e-bike lending library to facilitate equitable access to safe, healthy, and vibrant neighborhoods. Richmond LAND is focused on removing land from the speculative market in order to protect homes for working-class families and conserve land for long-term community needs. The Watershed Project has a long history in North Richmond and neighboring communities of connecting residents to local watersheds through education, community-driven restoration projects, and green infrastructure projects, including a tree plan for North Richmond, which will be advanced through the North Richmond Community Resilience Initiative. The Community Housing Development Corporation (CHDC), based in North Richmond, provides a broad range of affordable housing opportunities and services to enable low- and moderate-income residents to gain better housing and financial stability. CHDC has a track record of renovating abandoned houses and converting them for the benefit of local residents.

9.      Urban Tilth is the Statutory Partner for this grant and works with the County in managing the grant activities and leading community engagement. Each community group partner will conduct targeted engagement to achieve the goals of the program segment for which it is the lead.

10.      Urban Tilth will lead three projects in the North Richmond Community Resilience

JA211

Initiative. The first project is the establishment at the Urban Tilth farm of a fully operational

Community Resilience Center that offers emergency response support, food access, job training, and

wellness programs. When not experiencing a disaster, the Community Resilience Center will provide a

new farm store, the only location in North Richmond where residents can access fresh local and

sustainably grown produce 7 days a week. The Community Resilience Center also will include a

community commercial kitchen, and a Children's Garden for after-school programs and education on

nutrition and other health topics.

11.    The second project for Urban Tilth will be the transformation of the Verde Elementary

yard by removing nearly 12,000 square feet of asphalt, replacing it with green infrastructure and

fixtures that facilitate physical activity and STEM education, planting over 65 new trees, and installing

a school garden. This will help mitigate emissions from a regional distribution center that is currently

being built across the street from the school, as well as from other nearby industrial and warehouse

facilities. It also will reduce the effects of urban heat, increase food security and biodiversity, reduce

flooding and fire risk, and improve water quality.

12.    The third project for Urban Tilth will be implemented by its fiscally sponsored

project Rich City Rides, which will acquire 120 previously used e-bikes, at cost only to transport the

bikes to North Richmond, and refurbish them for use by community members through an e-bike

lending library. Community members will be able to check out bikes, take free classes, and get help

and support on using e-bikes for transportation in a community that is isolated from public

transportation and experiences high levels of air pollution from heavy-vehicle traffic and industrial

facilities.

13.    In addition to providing overall project management and administration, Contra

Costa County will provide clean energy upgrades to up to 40 homes in North Richmond, thereby

saving residents money on energy bills, improving indoor air quality, and cutting pollution. The

County will perform home upgrades for up to 40 qualified electric home improvement projects,

JA212

including the installation as needed of MERV 13 air filtration systems, solar panels with battery,

cutoff luminaires, electric heat pump, energy efficient appliances, water conserving plumbing

fixtures, sustainable building materials, building insulation, fire sprinkler systems, energy efficient

windows, and central heat and air.

14.    Contra Costa County also will resurface one mile of Wildcat Creek Trail leading from

Verde Elementary to the Richmond Parkway, providing an off-road path through the community for

walking and bicycling, reducing the effects of urban heat, reducing air pollution, and reducing

flooding and fire risk. These trail upgrades improve transportation access to Verde Elementary and help

connect the North Richmond community safely and directly to the San Francisco Bay shoreline and the

regional Bay Trail.

15.    The Community Housing Development Corporation will use its expertise as an

affordable housing developer to partially demolish and renovate four former Las Deltas public housing

units with appliances that run on clean energy, rooftop solar, and drought tolerant landscaping. The

homes will be offered to eligible first-time homebuyers, with special outreach to former residents of

the Las Deltas campus. This will help address housing insecurity.

16.    Richmond LAND will demolish ten blighted and abandoned former public housing

units (five duplexes) and replace them with a community garden of 20 planter boxes with native

and pollinator plants and other amenities, and green gathering spaces. These spaces will offer

opportunities for environmental education, workforce development, and community engagement.

The community garden will serve a connected housing development project called the Tiny Home

Eco Village that will bring 16-22 new affordable housing units to North Richmond residents. The

housing development project will serve households with an average 50% AMI. The community

garden will produce air quality and urban heat benefits, store carbon emissions in the land, and

reduce flooding and fire risk.

17.    The Watershed Project will plant 100 trees within the North Richmond Community;

5

JA213

create two rain gardens; restore Wildcat Creek; remove invasive vegetation and plant riparian native

plants; and host ten workshops for adults each year (30 total), programs for youth each year; and ten

community workdays each year (30 total). This will scale up existing efforts to increase North

Richmond's urban forest by adding to the neighborhood's tree canopy in yards and on public right-

of-way strips along these streets. This will increase walkability and reduce heat islands and air

pollution in North Richmond, and address an important inequity in tree canopy in Contra Costa

County.

18.    The project will leverage the activities described above to facilitate workforce

development opportunities through existing programs operated by partners Urban Tilth and The

Watershed Project.

19.    After receiving notice on January 6, 2025, that the grant was awarded, the County

and its partners began preparing for a project start date of February 1, 2025, by developing contracts

and other agreements and operating procedures between the parties. Each party also began initial

work on its projects in the North Richmond Community Resilience Initiative.

20.    Also in January, the County was developing the final project budget and project

narrative in collaboration with the EPA Region 9 project officers.

21.    On January 23, 2025, the EPA project officers notified the County of additional

corrections needed to the budget.

22.    Also on January 23, 2025, an EPA financial specialist notified the County that

enrollment for the grant in the ASAP payment portal was complete and the County could begin

drawing down funds.

23.    On January 31, 2025, the County submitted a final revised budget and workplan, as

directed by EPA.

24.    On February 6, 2025, the County attempted to draw down funds and received a

message "3 accounts not shown because they are unavailable for payment or already selected."

JA214

25.     On February 10, 2025, the County began checking the grant status daily in the ASAP portal. While the grant appeared with an available balance of $19,076,843, the grant status was "Suspended."

26.     On February 14, 2025, the County sent an email to the EPA Project Officers informing them of inability to execute drawdowns and "Suspended" status. No response has been received to date.

27.     On February 19, 2025, the account status in the ASAP portal changed to "Open."

28.     On February 27, 2025, the County successfully made a drawdown of $30,666.94 for County costs incurred in the first two weeks of February.

29.     On March 10, 2025, the grant status in ASAP was listed as Suspended.

30.     On March 17, 2025, the County emailed EPA Region 9 (Acting Regional Administration, Director of grant program, Supervisor of grant program, and last known project officers) asking for assistance with moving grant status back to "open," template(s) for the upcoming quarterly report, authorization to proceed with budgets for sub-awardees, and minor corrections to budgets for Urban Tilth, The Watershed Project, and Las Deltas Housing Project. No response has been received to date.

31.     On March 25, 2025, the County sent the same email to a person identified at EPA Headquarters as lead for grants. No response has been received to date

32.     On April 16, 2026, EPA Grant Info sent to County staff the April 15, 2025, court order from Federal Judge Mary McElroy. This is the only communication the County has received directly from EPA regarding the grant since January.

33.     On April 17, 2025, the County sent an email to EPA (Region 9 Contracts and Grants Manager, grant specialist, last known project officers, and director of grant program) to obtain access to funds legally obligated to Contra Costa County by EPA.

34.     On April 21, 2025, Congressmen John Garamendi and Mark DeSaulnier sent a letter

JA215

to EPA Administrator Lee Zeldin asking EPA to rescind the grant termination and conduct a comprehensive investigation into the lack of transparency and due process in EPA's termination process.

35.     On April 29, 2025, the County's grant status appeared as Open in the ASAP payment portal. The County was able to make a drawdown for the time period covering mid-February through end of March. Funds were received in the County bank account on April 30.

36.     On April 30, 2025, the County submitted a quarterly report to EPA for the period February 1, 2025, through March 31, 2025.

37.     On May 1, 2025, the County was able to make a drawdown for April 2025. The drawdown was made at 1:45 p.m. Funds were received in the County bank account on May 1.

38.     On May 1, 2025, at 9:08 p.m., the County received a Notice of Termination Award from EPA.

39.     On May 20, 2025, the County sent EPA a Notice of Disagreement and Dispute regarding the Termination Award.

40.     On June 4, 2025, the County received an email from Kerry Drake, Director, Mission Support Division, EPA Region 9. The email acknowledged receipt of the County's dispute of EPA's decision and notice of disagreement. It informed the County that EPA will consolidate the two in one written decision which it intends to issue within 180 calendar days from date EPA received it (May 20, 2025). EPA directed the County not to submit any additional documents unless EPA asks the County to do so.

41.     Terminating this grant creates contractual problems for the County. The County has been developing contractual agreements with Urban Tilth, Richmond LAND, The Watershed Project, and the Community Housing Development Corporation. Because of the uncertainty regarding the grant status, these agreements have not yet been executed.

42.     Additionally, the EPA required the County to identify a "statutory partner" in the

JA216

grant application. On August 6, 2024, the County entered into a Statutory Partnership Agreement with Urban Tilth, as required by the EPA.  The County indicated in the budget documents it submitted to EPA in January 2025, and revised slightly in March 2025, that it would award $10,181,875 to its statutory partner, Urban Tilth. The County will not be able to honor its "Statutory Partnership Agreement" with Urban Tilth if the grant is terminated.

43.     Without funding, the partners to the North Richmond Community Resilience Initiative have not been able to commence their projects. These projects will create employment opportunities, workforce training, and economic benefits for North Richmond, as well as benefits in the form of resilience to extreme weather events, energy and bill savings, housing, locally grown fresh food, active transportation, recreation, cleaner air, mitigation of extreme heat, reduced flood risk, and improved water quality.

44.     EPA requires that Community Change Grants be completed within three years. The Grant Agreement specifies that the project and budget period extend only until January 31, 2028. The grant suspension and subsequent notice of termination make it challenging, if not impossible, for the County and its partners to meet our project goals during the three-year window.

45.     If the North Richmond Community Resilience Initiative is not able to meet its project goals, it will mean this historically underserved community will not have a place to gather during extreme weather events. New, energy-efficient housing for first-time homebuyers will not be built to replace abandoned public housing. Existing homes will not be retrofit, thereby losing the benefits of lower electricity bills and improved indoor air quality. Residents of these homes will continue paying unnecessarily high utility bills every month, wasting money that they could be saving or spending in North Richmond. The schoolyard at Verde Elementary will not be improved to better protect children from the pollution created by nearby industrial and warehouse facilities. A primary walking and bicycling facility, the Wildcat Creek Trail, will not be improved to better facilitate movement through the community. A community garden and a school garden at which residents can grow their own food and gather, will not replace abandoned housing. An e-bike lending

9

JA217

library will not be established. And residents of North Richmond will lose job training opportunities.

46.    Terminating this grant will also have direct and indirect impacts on the economy. Through the high-quality workforce training and contractor outreach that the project would provide, residents of North Richmond would have greater access to jobs and stronger connections to employers and programs in sectors that deliver building energy retrofits, green infrastructure, food resilience, active transportation, community resilience, and construction. Delays in funding prevent these economic benefits.

I declare under penalty of perjury under the laws of the United States, the foregoing is true and correct. Executed this 23rd day of June, 2025, in Martinez, California.

_____ _Jody London_ _____

Jody London, Sustainability Coordinator
County of Contra Costa

JA218

# EXHIBIT I

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

APPALACHIAN VOICES, et al.

*Plaintiffs, on behalf of themselves and all others
similarly situated*

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY and LEE ZELDIN, in his
official capacity as Administrator of the United States
Environmental Protection Agency

        Defendants.

**DECLARATION OF TAYLOR VAN WINKLE, KALAMAZOO COUNTY**

I, Taylor Van Winkle, declare as follows:

1. My name is Taylor Van Winkle, and I live in Kalamazoo, Michigan. This declaration is based on my personal knowledge and professional education and experience. I am over the age of eighteen and suffer from no legal incapacity. I submit this declaration in support of Kalamazoo County, which is one of several grant recipients affected by the freeze and terminations of federal grant funding.

2. Kalamazoo County is a municipal government in southcentral Michigan.

3. I am the Climate Sustainability Coordinator for Kalamazoo County. I have worked in Kalamazoo County for 2 years. I have an undergraduate degree in Biology and History from Kalamazoo College and a Master's Degree in Urban and Regional Planning from Michigan State University. As the Climate Sustainability Coordinator, I am responsible for developing a climate action plan that will position the County to combat climate change, promote sustainable practices, and reduce climate injustice. I

1

JA220

am the first person to hold this position, which was funded in part by the United States

Environmental Protection Agency (EPA).

4.    Kalamazoo County partners with several local non-profit organizations and academic

institutions on its climate and environmental work, including the Kalamazoo Climate

Crisis Coalition, the Kalamazoo Valley Community College Food Hub, and the Office

for Sustainability office at Western Michigan University.

5.    In my role as the Climate Sustainability Coordinator, I am co-chair of the Climate

Action & Climate Justice Advisory Council ("CACJAC"). The CACJAC is putting

together a Climate Action and Climate Justice Plan that is predicated on 4 key

principles: the creation of a resilient economy that expands opportunity and diversity,

infrastructure that is prepared for climate hazards, healthy populations that are

supported by sustainable practices, and protection of natural resources, ecosystems,

and agriculture.

6.    In formulating the Climate Action and Climate Justice Plan, the CACJAC collaborated

and coordinated with community residents, stakeholders, and government staff in

order to ensure an inclusive and comprehensive decision-making process.

7.    Kalamazoo County was awarded a Community Change Grant ("CCG") in the amount

of $18,898,518 on December 4, 2024, and formally accepted by the Board of

Commissioners on December 17, 2024. The executed grant agreement for the CCG

provided for a performance period starting on January 1, 2025, and ending on

December 31, 2027.

8.    Kalamazoo County is the lead applicant for this CCG, working with statutory partner

Kalamazoo Climate Crisis Coalition ("KCCC").

9.    With KCCC, Kalamazoo County intended this CCG to fund a project entitled "Holistic

JA221

Healthy Homes in Kalamazoo County: Delivering Energy Efficiency Measures, Increasing Resiliency, and Improving Air Quality in Existing Housing Stocks." Within this project, the County intended to: develop climate resiliency hubs and an associated training program for disaster preparedness; ensure energy efficient housing; enhance local green industry workforce development, including home energy audits and weatherization; and deploy air quality monitors. With these project components, the County expected that they would see a lower consumption of electricity and lower energy bills; community resiliency hubs in communities deeply impacted by increasingly severe weather and climate change, as well as a better understanding of how to prepare and adapt to these extreme climate change events; and a better understanding on the availability of green industry jobs, as well as a better awareness of public and environmental health. In addition, this CCG funding would have helped to fulfill key aspects of the Climate Action and Climate Justice Plan, including reducing greenhouse gas emissions and health-harming air pollution, as well as a reduction in vulnerability to climate risks.

10. The community that would be served by this CCG is in close proximity to former and current industrial facilities along the riverbank that run through downtown Kalamazoo. Much of the aging housing stock in this area has lead pipes, poor weatherization, and other flaws. As a result, the area covered by this CCG ranks very highly - in the 89th percentile - for factors such as asthma rates, cardiovascular disease, and air toxicity. This area is also economically disadvantaged - with low-income, low educational attainment, and low employment rates compared to the rest of the state.

11. Our funding was frozen initially on January 28, 2025 - indeed, our funding was completely taken out of the Automated System for Administrative Payment ("ASAP")

JA222

system. Our funding was temporarily restored and on February 19, 2025, we were able to draw down $40,103.00. Our ASAP funding was frozen again on March 7, 2025, and remained frozen until April 29, 2025. On that day, we were able to process outstanding invoices and enter a request into ASAP for those funds; as of the date of this filing, we have only been reimbursed for $150,777.27. On May 2, 2025, we received a termination notice, with the EPA stating that the County's CCG project was no longer in "alignment with EPA priorities." Despite the County taking pains to remain in compliance with all federal regulations and all workplan deliverables until the termination, we have only been able to access 0.7% of our promised funds.

12. With the funding that we have been able to draw down, we have been able to meet 95% of Q1 goals and outcomes, including hiring staff, setting up operations, beginning educational and informational material development for enrollment set to begin in Q2. The only Q1 goal not met was we were unable to hire the 5th staffer, due to the termination letter. In short, despite all the uncertainty, we took great pains to remain in compliance and be judicious with resources.

13. The uncertainty of funding and subsequent termination of our CCG has led to numerous adverse consequences. We have not been able to fulfill our promises to the community we intended to serve with this CCG, due to the fact that we have not been able to build resiliency hubs, put in air monitors, or facilitate more energy efficient homes. Given that the beneficiaries of this funding would ultimately have been low-income, pollution-burdened, and climate insecure communities, the resulting impact is significant. As a quantification of what this disruption has meant, we have not been able to move forward with 50 enrollments for our two 8-week workforce development programming in the first fiscal year of our grant, which came with stipends and travel

4

expenses of about $3,250 per person upon completion of the program. We also had to stop enrollment of about 100 homes for repairs - our programming was ready, and we could have hit the ground running if we had funding. At $40,000 per home, this is a significant loss for the community.

14. The program was designed to build trust through working directly with and empowering community members.  Halting work after announcing our projects and creating anticipation surrounding the benefits of our project threatens public trust for Kalamazoo -- both with residents and potential contractors.

15. Beyond the immediate repairs of 300 homes, this investment enhances safety, security, health, and energy efficiency—while also creating jobs and expanding opportunities in the skilled trades. This grant isn't just about fixing homes; it's about strengthening the construction and local trades workforce, revitalizing communities, and laying the foundation for long-term economic growth.

16. In addition, the County's internal operations have suffered. With a signed CCG grant agreement, our statutory partner hired four employees to increase our capacity and ensure that we were fulfilling all of our workplan components and milestones; with the disappearance of that funding, we are unable to pay that new staff. Many of them may have to seek other employment. Even if we do receive our funding, we may need to spend time rebuilding our team to get back on track as quickly as possible.

17. We were unable to hire a 5th staffer (a compliance officer) that was funded by the CCG. In fact, we had to cancel interviews which were in process that were already set up out of an abundance of caution when we received our termination letter on May 2nd, 2025.

18. The uncertain nature of our CCG funding has disrupted contracts with our partners by

5

JA224

interfering with the agreement but also with subsequent payments that they were relying on. Such disruptions detrimentally impact their operations. Such a sudden halt to our contracts threatens Kalamazoo's goodwill in the community.

19. If funding is restored, Kalamazoo County will be able to carry on the work of creating a more energy independent and resilient community. More specifically, we will be able to carry out key components of our climate plan, including building resiliency hubs, putting in air monitors, or facilitating more energy efficient homes. The beneficiaries of this funding will ultimately be low-income, pollution-burdened, and climate insecure communities.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States, the foregoing is true and correct.

Taylor Van Winkle

Climate Sustainability Coordinator

Date 6/23/2025

6

# EXHIBIT J

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

APPALACHIAN VOICES, et al.

*Plaintiffs, on behalf of themselves and all others similarly situated*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and LEE ZELDIN, in his official capacity as Administrator of the United States Environmental Protection Agency

Defendants.

## DECLARATION OF MALIK D. EVANS (CITY OF ROCHESTER, NEW YORK)

I, Malik D. Evans, declare as follows:

1.      My name is Malik D. Evans.  This declaration is based on my own personal knowledge, professional education, and experience.  I am over the age of 18 eighteen and suffer from no legal incapacity.

2.      I submit this declaration in support of the City of Rochester, New York ("City"), which is one of the recipients of funding provided pursuant to the Inflation Reduction Act and Section 138 of the Clean Air Act, which was provided to the City in the form of a grant which was subsequently revoked unilaterally by the Environmental Protection Agency ("EPA") for reasons which are not easily ascertained.

3.      The City of Rochester is a municipal corporation existing pursuant to the laws of the State of New York.

JA227

4.    I am the Mayor of the City of Rochester, a role in which I have served the City since January 1, 2022. Prior to becoming Mayor, I was a member of the Council of the City of Rochester ("Council") since January 1, 2018.

5.    Environmental justice is an area of great importance to the City, is the subject of resolutions adopted by Council outlining the importance of investing in related programs, and is the subject of significant investment and attention by the City through its Division of Environmental Quality ("DEQ").

6.    The City applied for, and was awarded, funding from EPA, in the amount of one million dollars ($1,000,000), through the Environmental Justice Government-to-Government program, for a budget period extending from December 15, 2024 through December 14, 2027. The Cooperative Agreement is attached hereto as **Exhibit A**.

7.    With the funding from EPA, the City sought to carry out a Home Electrification and Revitalization Opportunity program ("Program"), to serve as a replicable model to achieve meaningful and measurable environmental and public health results. Specifically, the City sought to fund energy audits and the installation of electric appliances, rooftop solar, electrical panel upgrades, and EV charging to support the creation of sustainable housing that reduces exposure to asthma and other respiratory illnesses, provides residents with access to sustainable technologies and renewable energy, reduces community-wide greenhouse gas emissions, and reduces energy cost burdens.

8.    Intended beneficiaries of the Program included lower-income and disadvantaged homebuyers and residents of an estimated twenty homes rehabilitated in connection with other programs that could not otherwise fund these activities.

JA228

9.     The City engaged three community partners to assist in carrying out this very important work: the Rochester Land Bank Corporation (a local authority), Greater Rochester Housing Partnership through its subsidiary, the Rochester Housing Development Fund Corporation, and Greater Rochester Habitat for Humanity; these organizations planned to incorporate program administration, energy audits and electrification in the form of rooftop solar, electric appliances, electric vehicle charging, and required panel upgrades into their work scopes for their existing home rehabilitation programs for an estimated three, twelve, and five homes, respectively.

10.     The City applied for the funding with these community partners in mind.

11.     Once the City received an award notification and executed an agreement with EPA, these partners were notified, and were told that this work should be included in scope; specifically, the City represented, based on EPA's representations, that the Project would be funded.

12.     The City distributed subagreements to these community partners, which were signed by these organizations, and were in the process of being routed to me for my signature, as Mayor.

13.     On May 2, 2025, I received notice from EPA that the Project grant was being unilaterally terminated, and no fact-based, specific rationale was given. The termination notice is attached hereto as **Exhibit B**.

14.     The City was forced to notify its community partners that funding may not actually be available, despite having previously represented to these organizations that the work would be funded.

15. The City will be unable to proceed with the Program in the absence of this funding, to the detriment of its intended recipients, who are low-income and most at risk of environmental harms.

16. These residents of the City, as a result of the termination by EPA, will be deprived of the opportunity to reduce their energy costs in the long term.

17. Construction schedules for the programs, which would have benefitted from this added funding, are tight and cannot be delayed the many months likely required to reach final judgment.

18. The Program, generally, therefore, will need to be abandoned if an injunction is not promptly issued in favor of the plaintiffs.

19. In addition, this funding would have benefitted skilled laborers in that additional work, and jobs by extension including expansion of capacity in the City of clean energy workforce, would have been created, to the benefit of the City's economy and general welfare.

20. The City will also lose the opportunity to demonstrate to the public the benefits of electrification and implementation of renewable energy technology as a result of this termination.

21. The net result of EPA's unilateral termination is that the Project cannot proceed, and the City and its residents will be harmed as a result.


[Signature on Following Page]


JA230

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury under the laws of the United

States, that the foregoing is true and correct.


Executed this 23rd day of June, 2025.


Malik D. Evans
Mayor of Rochester, New York

# EXHIBIT K

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

### DECLARATION OF STEVEN RIDINI, HEALTH RESOURCES IN ACTION

I, Steven Ridini, declare and state as follows:

1. I am the President and CEO of Health Resources in Action ("HRiA"). I started as President and CEO on March 1, 2016, and have served in the position for nine years. I am familiar with HRiA's organization, policies, practices, and programs, and am over the age of eighteen. If called as a witness, I could and would testify competently to the matters set forth below.

2. As CEO and President, I lead the organization and partner with the HRiA Board and staff to develop a vision and strategic direction rooted in addressing critical public health issues. This includes building strategic partnerships to advance HRiA's mission and maximize our community impact.

3. In my role as CEO, I oversee and hold programmatic and fiduciary responsibility across the programs affected by the grant terminations. I work with the appropriate staff to ensure that all programmatic deliverables are effectively met, fiscal management is sound, and the organization is in compliance with the terms outlined in the grant awards.

4. In addition to my role as CEO, I serve as a Board member or contributing member to numerous public health organizations, such as the American Public Health Association, the Massachusetts Public Health Alliance (past Board Chair), and the National Network of Public Health Institutes (Board member). Prior to my current position, I served as Vice President of Programs at HRiA for 18 years, overseeing community health initiatives. Prior to HRiA, I worked for local, national, and international non-profits focused on

1

JA233

alcohol, tobacco, and other drug prevention efforts. I am also a former faculty member of Harvard University's Graduate School of Education.

5. Health Resources in Action is a nonprofit national public health organization with a vision of healthy people thriving in equitable and just communities. Founded in 1957 and now with over 300 staff across the country, HRiA partners with individuals, organizations, and communities to transform the practices, policies, and systems that improve health and advance racial equity.

6. HRiA was founded in 1957 as a biomedical grantmaking institution and expanded our work to focus on public health, including community health grantmaking and many other services. HRiA's grantmaking approach directs funds where they are most needed, recognizing that organizations led by and based in the most impacted communities are often also the most effective in addressing public health and/or environmental harms. This often includes organizations that may not have resources or experience in applying for or securing grant opportunities.

7. As part of our work, HRiA applied for and received two grants through the Environmental and Climate Justice Block Grant program: the Thriving Communities Grantmaking Program ("TCGM") and the Environmental Justice Collaborative Problem-Solving Cooperative Agreement Program ("EJCPS"). Exs.1-3.

8. HRiA typically applies for grants through EPA every year or nearly so. Most recently, we had an application pending for an EPA Region One Healthy Communities grant for $40,000 when that program was also cancelled. We also currently hold an award for an Enhanced Air Quality Monitoring for Communities grant that ends in November 2025.

2

JA234

Finally, we had another EPA Region One Healthy Communities award that was terminated on April 22, 2025.

9. HRiA has been an active participant in the development of this lawsuit and has remained in regular communication with Plaintiffs' counsel about this case. HRiA is willing and able to take an active role in this litigation and to protect the interests of all members of the Class.

**Thriving Communities Grantmaking Program:**

10. In June 2023, HRiA applied for the TCGM program through EPA, in collaboration with our Core Partners – Alternatives for Community and Environment ("ACE") and New England Grassroots Environment Fund ("Grassroots Fund"). We were excited to apply for this grant because we wanted to use our organization's resources, expertise, and experience to help community-based organizations and Tribal Nations build capacity to address climate and environmental risks and harms in their communities. Through the program, we would distribute grants to Tribes and community-based organizations to address local and regional needs such as flooding/stormwater planning, heat resilience, transportation access, forever chemicals, and job training. Grant categories include: 1) Seed – to support community-based organizations with limited capacities; 2) Assessment – for projects that assess a local community's environmental justice landscape; 3) Planning – to support plan formulation and partnership development activities to address identified environmental justice concerns; and 4) Implementation – to support implementation projects informed by community planning and research. The grants, ranging from $75,000 to $350,000, were also meant to break down systemic barriers, making it easier for community-based groups to access federal funds. The funds would

3

JA235

also provide support to manage the new environmental grants, through quality assurance project plans, budget management, and reporting. This grant funding would have created jobs, boosted energy independence, strengthened the economy, and reduced pollution exposure.

11. In December 2023, EPA informed HRiA that we were selected for a $50 million award to serve as the Grantmaker for EPA Region One. When we met with EPA Region One staff in February 2024, they informed us that we would have a bifurcated award, with each award being for three years and no opportunity to extend. Award #1 would be for $8 million, and Award #2 would be for $42 million (in December 2024, EPA increased the award to $52 million for all TCGM programs). Exs.1-2.

12. The structure we proposed for the Region One TCGM program designated HRiA as the prime award holder, working in close collaboration with two Core Partners (ACE and Grassroots Fund) for the design and implementation of the Environmental Justice for New England ("EJforNE") program. The three organizations (HRiA, ACE, and Grassroots Fund) are hereafter referred to as the "Core Partnerships," with ACE and Grassroots Fund referred to as HRiA's "Core Partners." To extend the Core Partnership's reach into each of the six New England states in our region, we solicited Anchor Organizations that would each receive $150,000 per year for three years. Anchor Organizations would lead outreach and engagement strategies across Region One, including playing a coordination role for funding opportunities, conducting outreach for the TCGM program to recruit potential applicants, providing support and resources for groups applying for TCGM funding, and building relationships across the respective state and with Tribal communities. In total, the Core Partnership selected six Anchor

Organizations to work with on the TCGM program, and increased their funding based on the additional $10 million for Award #2 that EPA added in December 2024.

13. The $8 million award from EPA was designated for operations (of HRiA, our Core Partners, and our six Anchor Organizations); honoraria for different bodies such as grant readers, the Grantmaking Committee, and the Governance Council; and other programmatic expenses – such as a graphic designer, website development, the grant application platform, and translation services.

14. The $52 million award included $48 million for the sub-grants and $4 million for the Core Partnership and Anchor Organizations for additional outreach to rural and other difficult-to-reach communities, as well as operating and management costs.

15. As noted above, the EPA notified HRiA in December 2023 that we were awarded this grant. Though we had not yet received our Award, starting in January 2024 HRiA began assigning internal staff to the project due to the needs and complexities of preparing to launch the TCGM program. From January through the end of June 2024, 16 staff contributed staff time, jointly equating to a full-time equivalent staff person. This work included preparing and submitting a significant number of required documents to EPA to be reviewed by OMB as part of the Emergency and Main Information Collection Request Process, which at some point the EPA informed us were due in July 2024. Throughout, we had weekly check-in meetings with our Program Officer and attended many other meetings with EPA staff. Along with our Core Partners, we recruited members for the Governance Council and the Anchor Organizations. In May 2024, we started recruiting for a full-time Senior Program Officer and Budget, Analysis, & Reporting Senior Grants Associate. We continued to reassign staff internally to meet the growing demands of the

JA237

project, including environmental justice program staff and staff specializing in

grantmaking, research and evaluation, finance, contracting, and communications.

16. Our Core Partners also put in substantial work to implement the project. ACE and

Grassroots Fund both started working with us in February 2024, establishing the

foundation for our collaborative working relationships and decision-making processes.

We all began work prior to the official award because initially EPA expected all TCGM

awardees to launch our first Requests for Proposals in July 2024. To prepare, Core

Partners needed to design the grantmaking process, determine roles and criteria for our

Governance Council members and Anchor Organizations, and conduct recruitment,

among other tasks. ACE hired a subcontractor in October 2024 to expand its capacity.

Throughout this early phase of the project work, we assumed that we would receive our

award in due time.

17. This early work on the grant award by the Core Partnership of HRiA, ACE, and

Grassroots Fund included negotiating with EPA, developing all documents to be

submitted for OMB approval (e.g., Requests for Proposals, which we then had translated

into multiple languages, questionnaire forms for readers and the Grantmaking

Committee, focus group questions for grantees, budget and reporting templates);

developing contracts, descriptions and processes to bring on Anchor Organizations,

Governance Council members, readers, and Grantmaking Committee members;

designing our logo and website; and conducting outreach and recruitment efforts. We

also convened and trained Anchor Organizations, worked together to develop a Quality

Management Plan, held numerous informational webinars and open office hours,

responded to questions via emails, developed extensive FAQs about the program, and

JA238

sent out regular newsletters. We began seeking nominations for Anchor Organizations in

May 2024, and notified the six selected in August. Finally, we contracted for the

following services to help with the above: graphic design, translation and interpretation,

including ASL, and some other small contracts.

18. Until January, HRiA's operating procedure was to draw down funds on a quarterly basis.

These requests were generally paid the next business day. After January 20, 2025, we

moved to monthly draw downs and sometimes did additional advanced projection

requests for partners due to the unpredictability of access to the Automated Standard

Application for Payments ("ASAP") System.

19. Since January 2025 and prior to the termination of these grant programs, there has been

tremendous harm to our TCGM project in multiple layers. Our funding via the ASAP

System was accessible and then not accessible for a few weeks in January/February, and

has been permanently inaccessible since March 6, 2025. In addition, we have had

minimal access to our program officers at EPA, with the vast majority of office hours and

regular check-ins cancelled, and very little communication except inconsistent

confirmation of receipt of requests and documents.

20. In January 2025, we received a Pause EPA Grants email stop work order from EPA. Ex.

4. This order was then reversed and later reinstated. We relayed that order to our partners,

which caused a lot of confusion, uncertainty, stress (for us all), and an erosion of trust

between HRiA and our partners

21. After the funding freeze began, HRiA received many questions from potential applicants

about the stability of the program and if we thought funding would be available. With so

little communication and guidance from EPA, we frequently were not sure whether or

how to reassure potential TCGM applicants and spent a significant amount of time
navigating and fielding these questions.

22. Because of the funding freeze, we extended our first grant deadline from February 14th to
March 7, 2025. We shared the rationale behind this decision publicly: "Due to the recent
confusion and uncertainty sown by the funding freeze, we are extending our first
grantmaking deadline from February 14 at 5PM ET to March 7 at 5PM ET." Ex. 5.

23. The lack of responsiveness from EPA led to tangible consequences for our Anchor
Organizations. EPA needed to approve our Statutory Partnership Agreements for the
Anchor Organizations before we could pay them for their work. While EPA approved our
second TCGM Award in January 2025, which specifically named our selected Anchor
Organizations, the EPA was unresponsive to our request to approve Anchor Organization
Statutory Partnership Agreements, which were collectively submitted in January 2025.
When we were finally able to meet with EPA Region One and EPA Headquarters in
March, they recommended new and approved language aligning with the current
administration's priorities; we submitted the approved and signed versions of all the
Anchor Organizations Statutory Partnership Agreements on March 14th. However, at this
point, our access to funding via ASAP was permanently frozen even though our contracts
were still active.

24. HRiA attempted to draw down funds twice a day, with no access to the ASAP portal.
HRiA, ACE, Grassroots, and our Anchor Organizations have expended $725,673 that we
could not draw down.

25. Since we could not access funds, we also could not commit to paying honoraria to our
grant readers and Grantmaking Committee members. As a result, some individuals

JA240

dropped out, leaving us with 127 readers and 9 Grantmaking Committee members, which is less than ideal for the participatory review process than we had developed given the volume of applications received.

26. On April 25, 2025, HRiA received a Termination Memorandum from EPA terminating the $8 million TCGM grant. The grounds stated for the termination were that "[t]he grant ... provides funding for programs that promote initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is inconsistent with, and no longer effectuates, Agency priorities." Ex. 6. The agency did not provide any further information to support its termination decision.

27. Five days later, we received a Termination Memorandum for the $52 million TCGM grant. Similar to the first notice, this Memorandum stated that "[t]he objectives of the award are no longer consistent with EPA funding priorities," which include "ensuring that the Agency's grants do not conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions. In addition to complying with the law, it is vital that the Agency assess whether all grant payments are free from fraud, abuse, waste, and duplication, as well as to assess whether current grants are in the best interests of the United States." Ex. 7.

28. At the time of the termination of the $8 million award, HRiA had $6,773,468.44 remaining in awarded funds, not including expenses that we were not able to draw down. We had just started expending funds from the $52 million Award, so prior to termination

9

JA241

we spent only $13,000. We were unable to draw down any of the funds from the $52 million Award.

**Environmental Justice Collaborative Problem-Solving Cooperative Agreement Program:**

29. In April 2023, HRiA applied for the EJCPS Program. The goal for the grant proposal was to build knowledge and capacity to improve environmental health conditions in Massachusetts schools by improving indoor environmental quality and supporting healthy childhood development. The plan was to focus on the school districts where students are most burdened by asthma and extreme heat. HRiA already ran a program, in partnership with our Massachusetts Asthma Action Partnership ("MAAP") program, called Healthy Environments Advance Learning: Building Capacity for Resilient Schools in Massachusetts ("HEAL"). We applied for the EJCPS grant hoping to expand the work we were already doing through the HEAL Program.

30. In August 2024, HRiA's application for the EJCPS grant was approved, with a total funding amount of $500,000 over three years. Ex. 3. We planned to work with two non-profit subawardees and several school districts to implement the program.

31. Because this project built on a pre-existing project funded by the EPA, we did not hire additional staff. There were three staff assigned to the project – approximately the equivalent of a half-time employee each year for three years. They drew up descriptions and recruited school districts from the participating HEAL cohort to apply to participate in this initiative. Three school districts applied to participate and were included in this second capacity building and implementation cohort. Each of these school district subawardees was to develop plans to address environmental concerns and/or extreme heat in their respective district and would receive $65,000 to implement the plan in 2025-

2026. HRiA conducted environmental scans to identify experts who could present to the school districts at regular convenings to help build capacity. We were also planning a statewide Summit focused on environmental health in schools, to be held in 2026.

32. As of January 2025, we had processed one invoice for $2,500 for one subrecipient (from a $5,000 Award). We were in contract negotiations with another subrecipient for $45,000, and discussing contracts with school districts. Negotiations took longer than a typical process, as we were waiting for months for EPA approval to provide this funding in fixed cost amounts; in March 2025 our EPA Program Officer informed us that they would not allow fixed cost awards for another project. We were scheduled to speak to this same Program Officer on March 20th about our continual request for fixed cost awards for the EJCPS project for the sub-recipient and the school districts; our Program Officer cancelled this meeting on March 18th without providing a response.

33. On March 27, 2025, we received notice from EPA that our EJCPS grant was terminated. The Termination Memorandum claimed that our work under this grant "provides funding for programs that promote initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is inconsistent with, and no longer effectuates, Agency priorities." Ex. 8.

34. At the time of termination, we had not yet entered into contracting with the three school districts for their funding, as we were also seeking approval from EPA to provide this as fixed cost awards.

35. At the time of the freeze and the termination, we only had one signed contract with a subrecipient for $5,000 (half had already been paid). They were informed verbally about the freeze, and formally via email when we received the termination. The other subrecipients were not yet under contract and were informed via email about the termination of the contract.

36. HRiA has $461,946.38 remaining in our award that had not yet been expended, with $1,478.77 due to us that we have not been able to draw down.

***

37. It was HRiA's understanding that the TCGM and EJCPS funds would be available throughout the grant period and that EPA could terminate the grants only if HRiA failed to comply with the terms and conditions of the awards. It was not HRiA's understanding that EPA could terminate these grants based on that agency's blithe assertion that the awards no longer effectuate agency priorities.

38. Until March 2025, HRiA has never had a federal award terminated; there is no precedent for this in our history. HRiA has managed $92 million in federal award expenditures over the past 10 years. Throughout HRiA's history, the organization has received direct federal awards from 10 programs of three federal agencies and has served as a pass-through recipient of dozens of other federal programs.

39. I am now aware that HRiA is just one of hundreds of organizations impacted by EPA's wholesale termination of grant programs created under Section 138 of the Clean Air Act and funded by the Inflation Reduction Act.

**Harms Due to the Termination of the Environmental and Climate Justice Block Grant Programs:**

JA244

Harm to HRiA:

40. HRiA expected that EPA would continue to administer the Environmental and Climate Justice Block Grant Programs for as long as they were congressionally mandated. HRiA relied on the continued existence of the TCGM and EJCPS grants, hiring new staff; assigning existing staff to design and implement effective programming aligned with these awards; and building partnerships and executing sub-contracts with our Core Partners, Anchor Organizations, and consultants to carry out the work to design and publicize widely the community investment opportunities across New England afforded by this funding. HRiA also relied on these programs by building its internal infrastructure to manage large federal grants and support community-based organizations and Tribal Nations to do the same.

41. The termination of HRiA's awards created immediate harm and impact to HRiA's ability to maintain business and programmatic operations.

42. As a result of the termination of the TCGM and EJCPS grant programs, HRiA must make cuts in its operating budget to offset the loss of funding, which has already included cutting the budgets of programs tasked with carrying out the grant awards, suspending subawards that assist HRiA in carrying out the mission of this work, and cutting funding for other programs and staff.

43. HRiA has reassigned staff to other projects short-term through June 30th and is looking for new funding opportunities to offset the funding losses and instability caused by the terminations. However, absent immediate relief, we anticipate that there will be layoffs in Fiscal Year 2026, which begins on July 1, 2025.

JA245

44. HRiA has been using reserves to cover our continued efforts for programmatic work for the TCGM project, and for legal and advocacy actions.

45. EJCPS work has stopped entirely. One staff person working on our EJCPS project accepted a new position in May 2025 due to the contract terminations and the instability of our funding environment.

46. Staff morale had already been severely impacted due to the chaos in the federal landscape leading to the terminations and the uncertainty of whether and how this work could move forward. With the funding freezes and then the terminations, there are deep feelings of loss and anger for the way these actions impact both our own organization, as well as our Core Partners, Anchor Organizations, selected school districts, and communities across New England who worked hard to develop proposals to address important issues in their communities.

47. EPA's termination of these grants creates immense uncertainty for HRiA organizationally and has required HRiA employees—including executive leadership, administration staff, finance staff, and HRiA's Board of Directors—to spend significant amounts of time working on responding to that disruption. We have spent substantial time attempting to quantify and mitigate the effects of these grant terminations—time that could have been spent working to improve the public's health and wellbeing.

48. This uncertainty is especially pronounced for the 34 members of HRiA's staff working directly on these initiatives. The TCGM grant awards covered 100% or close to that for four HRiA staff salaries, and varying percentages (between 5% to 60%) of 27 other HRiA employees over three years. EJCPS covered three HRiA staff, varying from 10% to 25% per year for two years. The terminations have created extreme stress among staff

14

JA246

about the possibility of losing their jobs in a specialized, underfunded Environmental and Climate Justice field that already has lost $3 billion in federal funding and has seen a reduction in the workforce given EPA's abrupt termination of the entire Environmental and Climate Justice Block Grant Programs.

Harm to HRiA's Partners and Applicants:

49. The termination of the entire TCGM program harms not only HRiA, but also our Core Partners, Anchor Organizations, and the organizations we had selected for funding. HRiA had to terminate its contracts with partner organizations and was not able to award funds to selected TCGM awardees. These changes have immediately impacted plans for 45 different organizations (HRiA, ACE, Grassroots Fund, 6 Anchor Organizations, and 36 first round grantees) to date. There are also future impacts to organizations that would have been eligible for future rounds of funding, as our plan was to continue inviting and reviewing applications quarterly to make awards until our grant funding was expended.

50. Similar to HRiA, The Core Partners have dealt with the same kind of impacts on staff morale and community relationships. Each are weighing the reputational damage for their organizations, recognizing that the federal chaos has deeply compromised the work intended by the TCGM program; led to confusing and mixed messages as the partnership navigated this uncertain terrain; and prevented each from fulfilling its obligations to Anchor Organizations and organizations who placed their trust in them. Core Partners also expended significant social and relational capital representing the goals of the EPA across New England, promoting EJforNE to organizations that typically have not engaged in or been able to access federal funding opportunities. They encouraged groups

15

to invest time and resources to prepare for this funding opportunity that has now been terminated; this has also resulted in significant reputational and relational damage.

51. Our Core Partner ACE has instructed their subcontractor to do no work due to the TCGM program termination.

52. HRiA's inability to pay the federal funding promised to our partners creates and exacerbates financial insecurity, making organizational sustainability difficult. This is particularly acute for our Anchor Organizations. The delay by EPA to approve Anchor Organizations' Statutory Partnership Agreements coupled with the ongoing freeze in access to ASAP since March 7, 2025, resulted in HRiA's inability to pay Anchor Organizations for work they have completed since October 2024. When we had a meeting with EPA on March 10, 2025, they promised to send us updated and approved language for the Statutory Partnership Agreements, which they did on March 14th. We sent back the six approved executed versions on March 19th. Unfortunately, this all happened after the freeze of funds via ASAP on March 7th, so we have not been able to draw down funds to pay our Anchor Organizations since the Statutory Partnership Agreements were approved.

53. Some of these organizations now face layoffs and even closure due to the lack of payment. At HRiA, we have struggled with how to support these Anchor Organizations when we do not have access to the EPA funds; this has created a loss of trust with many of these organizations.

54. As a direct result of EPA's funding freeze and then grant program termination, one Anchor Organization experienced a $90,000 shortfall due to nonpayment for already completed work. If the termination is not undone or other funding secured, the

JA248

organization will be forced to lay off staff and is at risk of shutting down their organization.

55. Many of our other Anchor Organization partners have also experienced serious harms due to the program termination. Because HRiA has been unable to pay them for work they've done over the last 8 months—going back to October 2024—many of these organizations are at risk of having to furlough or lay off staff. Some are concerned that their organization will not survive if they are not paid soon.

56. There has been harm to the morale across all the Anchor Organizations and their networks, as they invested time and energy to drive interest and applications for the TCGM program and built hope for funds to address serious community problems such as severe flooding and the need for clean drinking water, energy efficiency and indoor air quality improvements, disaster preparedness and community resilience, and local sustainable food systems.

57. For HRiA, Core Partners, and Anchor Organizations, there were lost opportunity costs to participate in TCGM. The demands of participating in this federal opportunity were immense; yet, these partners persisted, spending significant time, resources, and energy because of their commitment to the mission of EJforNE and the promise of deeply needed investments to build livable and healthy communities across New England. Because they invested time and energy in this work, building trust across their respective states, they were unable to pursue other opportunities that may have ultimately led to more impactful and sustainable change.

58. Furthermore, the chaos sewn since January 2025, the perceived and real instability of the funding, and ultimately the termination and loss of investments in community have had a

17

chilling effect on organizations who were previously interested and engaged in seeking funding and technical assistance through EJforNE. Broadly, organizations are unsure whether there could be a positive payoff to work with HRiA and our partners. Even more concerningly, organizations have worried and may continue to worry about the impact of sharing their information with our partnerships due to the overt antagonism of the federal administration towards environmental justice and climate resilience causes.

59. The 36 organizations that the Grantmaking Committee selected for the first round of TCGM funding have not received their funds. The first round of funding totals nearly $9 million and work was to start in June and July of this year. These funds should be distributed across New England communities, yet we can no longer make these awards as we had planned.

60. The applicant organizations, much like HRiA, our Core Partners, and Anchor Organizations, also rely on building and maintaining trust in their communities. There has also been an opportunity cost for developing a proposal to EJforNE that did not pay off due to the contract termination, and these organizations could have spent their already constrained time, resources, and energy elsewhere for greater impact to support dire community needs.

61. The projects HRiA selected to receive funding in this first batch of awards were set to deliver tangible, needed benefits to their communities. One applicant planned to conduct water sampling in a body of water in the region where there is pollution from nearby landfills. They would then provide guidance to community members about how to reduce exposure, while maintaining access to traditional and cultural food and water resources. A second recipient was going to conduct planning to eventually place on-site solar panels

18

JA250

and batteries that would create and store power for a designated EJ Heat Island Neighborhood, serving low-income residents most vulnerable to extreme heat. This would support health and savings for these tenants and homeowners. Their plan was to focus on building community partnerships, identifying potential sites for the panels and batteries, and conducting feasibility studies.

62. For the EJCPS award, in addition to the impact to HRiA, we had a partner that was to receive $45,000 and three large school districts in Massachusetts that were to receive in-depth technical assistance and capacity building support, as well as $65,000 each for projects that address environmental health issues, including extreme heat. So long as the program termination continues, they will not receive that expected funding and students will continue to experience health risks in their schools that could have been mitigated by this work and this funding.

63. The three districts were just beginning to engage their school communities to develop their plans. However, we know that one district planned to address flooding that required them to move a Kindergarten class each time it rained hard. Another was considering broader tree planting projects for their schools where there was little shade/tree canopy – a proven strategy to reduce heat.

Harm to the Broader Community:

64. This disinvestment and loss of staff and community-based infrastructure destabilizes the communities these programs were designed to support and undermines the work of public health. Prematurely ending our programmatic work and stopping funding to our partners has dangerous consequences, including prolonged exposure to public health hazards such as heat and asthma triggers for school children.

19

65. While HRiA and our Partners are collectively and individually brainstorming ways to continue supporting this work, realistically there is no way for us to replace the level of funding that has been lost. Without the program restored, we cannot make the grant awards we anticipated, and the TCGM and EJCPS efforts will fully dissolve.

66. At the time our TCGM awards were terminated, HRiA was poised to announce the first round of grant funding to communities across New England. We received almost 400 applications, with proposed projects ranging from stormwater planning and flood resilience to sustainable farming and PFAS/water quality testing, to transportation access, extreme heat mitigation, and youth job training. Each of these projects would have benefited communities across the region. Now, they cannot move forward to the detriment of the public's health.

67. The terminations are deeply damaging for our region. If EPA's termination of the Environmental and Climate Justice Block Grants Programs is allowed to stand, HRiA, our Core Partners, Anchor Organizations, awardees, and the New England region will lose out on all the benefits these programs were in the process of creating, from reduced pollution exposure to job creation to heightened energy independence in our region. From the first tranche of awards that HRiA was set to release alone, New England communities are being denied nearly $9 million in promised funds. At HRiA, we feel the harm most in New England. But EPA's termination of this funding hurts working families and local communities across the country.

*** 

68. If EPA is ordered to reinstate the Environmental Justice and Climate Block Grant Programs, required to provide staff sufficient to administer these programs successfully,

and we are guaranteed the remainder of our funding, we will be able to: a) for TCGM, pay the Anchor Organizations and our Core Partners funding owed to them (as well as to ourselves), thus avoiding layoffs; make grants to the 36 selected organizations for the first round of funding awards; and provide honoraria to our readers and Grantmaking Committee, helping rebuild community trust and assure that important projects are implemented across the region. We would also be able to open future funding rounds to select additional subawardees until we have awarded the full $48 million in grants. For b) EJCPS, we will be able to reengage the three school districts, providing much needed technical assistance, capacity building, and funding to address environmental asthma triggers in schools, air quality, and/or to prepare for extreme heat, improving conditions for both students and staff that ultimately support academic achievement.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Steven Ridini

Date: 6/23/2025.

# EXHIBIT L

JA254

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**


**DECLARATION IN SUPPORT OF THE MOTION FOR PRELIMINARY INJUNCTION
OF TARA STAFFORD OCANSEY, CHILDREN'S ENVIRONMENTAL LITERACY
FOUNDATION**

I, Tara Stafford Ocansey, declare as follows:

1.  I am the Executive Director at the Children's Environmental Literacy Foundation ("CELF"). As Executive Director, I run our small but mighty team of seven people in New York and Texas and help lead the strategic vision, program design, and partnership cultivation for the organization. I am also our main fundraiser. I take the lead in identifying sources of funding, working with our board of directors to secure conversations with prospective donors, writing grant proposals, and fine-tuning grant plans. I work closely with our educator team to set our program goals and meet teachers' evolving needs.

2.  I have worked at CELF since 2022. Prior to joining CELF, I worked at the Center for Sustainable Development at Columbia University for ten years, where we dealt with numerous government grants. When I began working at CELF, I was familiar with the federal grant process.

3.  Established in 2003, CELF was founded with the mission to establish sustainability as an integral part of every child's K-12 learning experience. We engage educators, students, families, and community leaders through professional development, experiential learning programs, and curriculum-aligned content to ignite a passion for and commitment to sustainability and environmental stewardship. Since its founding, CELF programs have trained over 16,000 teachers in over 5,000 schools, reaching over 1.5 million students.

1

JA255

Six of the schools we have worked with have gone on to win the United States Department of Education's Green Ribbon Award in recognition of their achievements in whole-school sustainability. Since launching in Houston in 2019, CELF Texas has reached over 1,250 teachers and over 50,000 students in Texas.

4. CELF's core programs include: Annual Summer Institutes - multi-day immersive training programs for K-12 educators that explore ways of bringing sustainability concepts to life through hands-on Science, Technology, Engineering, Arts, and Math ("STEAM") activities, case studies, and fieldwork; Civic Science: Inquiry-to-Action, where teachers are trained to engage students in hands-on learning to identify, analyze, and solve real-world environmental issues that impact their schools and communities; a Green Careers Speaker Series that connects classrooms with industry professionals to discuss sustainability in career planning; and Professional Learning services that provide teachers with consultation and training to integrate sustainability across school curricula, culture, and community;

5. When I began working at CELF, I started looking for opportunities for the organization to apply for federal funding. Historically, CELF received funding primarily from local community foundations, individuals, corporate donors, and state and local government grants. I thought that adding federal funding could help CELF increase its visibility and impact while also contributing to a healthy balance of different types of donors and funding streams. Federal funding opportunities also often provide the stability of multi-year commitments not always available in other funding opportunities, allowing for deeper program engagement, growth, and community impact.

JA256

6.  In April 2023, CELF applied for an Environmental Justice Collaborative Problem Solving ("EJCPS") grant. We planned to use the funding to grow Civic Science: Inquiry-to-Action, one of CELF's core programs. Civic Science engages teachers and students in exploring their communities to identify strengths as well as areas where sustainability challenges exist that they might want to do something about. Through this program, students build their STEAM skills, develop action plans to address sustainability issues, and engage with industry experts and community leaders. CELF works with Title I schools that typically have tight budgets and lack funding for field trips or special projects. Our plan for the EJCPS grant was to offer stipends for teachers, equip them with project supplies, and fund field trip opportunities for students to explore nature and build their data literacy skills. We would work with teacher cohorts each year of the three-year project period, prioritizing teachers in communities that are especially impacted by air and water quality concerns. We concentrated our proposal on schools near the Houston ship channel, an industrial area populated with numerous petrochemical plants and refineries, exposing nearby communities to airborne carcinogens like volatile organic compounds, Benzene, and 1-3 butadiene. A 2024 report by Amnesty International referred to these communities as "sacrifice zones" due to their proximity to these harmful toxins, which lead to the average life expectancy in some affected neighbourhoods being up to 20 years lower than in communities just 15 miles away. *United States: Lives devastated and human rights sacrificed by fossil fuel-related pollution from petrochemical plants in Texas and Louisiana*, Amnesty International (Jan. 25, 2024), https://www.amnesty.org/en/latest/news/2024/01/united-states-lives-devastated-and-huma

3

JA257

n-rights-sacrificed-by-toxic-fossil-fuel-related-pollution-from-petrochemical-plants-in-te
xas-and-louisiana/. The EPA's EJSCREEN, prior to being removed, ranked Channelview
in the 90th percentile for Particulate Matter 2.5 pollution and 95th percentile for
wastewater discharge proximity, contributing to elevated asthma rates as well as
respiratory and other illnesses.

7.  One of CELF's major goals is cultivating students' workforce readiness via place- and
project-based learning, equipping students with the tools they need to qualify for
real-world jobs within the sustainability sector in the future. Our EJCPS program in
particular was designed to encourage students to develop their own plans to improve their
local watersheds and build resilience to environmental harms in their communities. In a
2023 study, 94% of companies "acknowledge[d] a lack of talent needed to meet their
Environmental, Social, and Governance (ESG) goals," and highlighted the need for
investment in training and development to grow "green skills" such as long-term systems
thinking and monitoring skills for key sectors such as energy, transportation, and finance.
*The Green Revolution at Work: New ManpowerGroup Study Reveals "Urgent Need" for
Sustainable Workforce*, ManpowerGroup (Sep. 14, 2023),
https://investor.manpowergroup.com/news-releases/news-release-details/green-revolution
-work-new-manpowergroup-study-reveals-urgent.

8.  Rice University and Galveston Bay Foundation would help co-facilitate educational
opportunities, such as leading a teacher workshop at Rice where teachers tour the labs of
faculty members who are doing cutting-edge research related to sustainability. Galveston
Bay Foundation planned to lead a Summer Institute at their Trinity Bay Discovery
Center, where teachers would learn about water quality testing and how to weave it into

their lesson plans. In year three, we planned to hold a big student symposium at Rice University, where students would present their projects and receive feedback and guidance from field experts and decision-makers in the community, such as university faculty, industry leaders, community organizations, as well as agency representatives and elected officials from the City of Houston and Harris County.

9. In April 2024, CELF received its Cooperative Agreement from EPA, approving a total funding amount of $425,616 over a three-year project period. Ex. 1. EPA approved our plan to work with Rice University and Galveston Bay Foundation as subawardees. *Id.* This award was CELF's first federal grant.

10. I was really proud that our organization received this EJCPS grant. A government grant represents the will of the people. It represents the importance of the work that we do, not just for one community or one company, but for the nation at large. Receiving the grant from EPA was a major validation of CELF's work and growth. It showed that we represent the highest standards of transparency and accountability, worthy of this federal grant money. I was so excited to put the money to use on behalf of students and teachers in Houston.

11. Because this was CELF's first time receiving federal funding, we had to put new systems and policies in place to comply with EPA's requirements. We created tools to help our subawardees ensure their financial reporting complied with requirements as well. We spent time going back and forth with our Project Officer to fine-tune the budget and work plan. In order to get the project going, we re-allocated the time of our two Texas-based staff to prioritize this project. We also worked with EPA Region 6 to plan a kickoff press event that a staffer from one of our Congressional offices attended.

12. I thought that having this multi-year grant would give CELF a little more stability than what we usually have as a small organization.

13. Until January 2025, CELF would submit requests for reimbursement on a more or less quarterly basis. We did not have any issues with the process. When federal funds started being frozen in late January, we began requesting reimbursement on a monthly basis.

14. Our last successful disbursement was on February 25, 2025. In total, CELF drew down only $76,210.13 of the over $425,000 that we were awarded. We have as yet been unable to draw down subawardee expenses incurred prior to our termination date of March 25, 2025 by Rice University and Galveston Bay Foundation of $10,359.65 and $12,968.53, respectively.

15. On March 25, 2025, we received notice from EPA that our EJCPS grant was terminated. The Termination Memorandum claimed that the money was "promot[ing] initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is inconsistent with, and no longer effectuates, Agency priorities." Ex. 2.

16. Since receiving the termination notice, CELF has been working hard to find alternate funding and churn out grant proposals. Luckily, we've gotten enough yeses to tide us through the short-term. But because the grant was supposed to cover three years of work, the termination creates a funding shortfall for the entire length of the project. I have spent more of my time fundraising due to the termination. It's hard for me to devote time to other pressing matters such as our programmatic work or ensuring my staff are supported when facing this huge funding shortfall.

6

JA260

17. CELF had applied for other sources of federal funding such as a USDA Farm to School grant that we submitted in early January. That program was also cancelled, and we were notified that USDA would not review our application, which means we devoted significant staff time to preparing a major grant application that won't even be read. CELF was also going to lead a program in Arizona this summer funded through a Community Change Grant that has now been cancelled due to the Environmental and Climate Justice Block Grant terminations.

18. I had hoped to apply for other sources of federal funding. Now, we are not applying for any federal grants due to lack of faith that those projects will be funded.

19. Our staff morale is also hurting following the termination. Our Texas staff and the teachers we work with at CELF were directly and significantly impacted by natural disasters last year. As we approach the one-year anniversary of Hurricane Beryl, our government is saying that the work we do to try to prevent harm from climate change—harm that our staff experience directly and is projected to get worse—cannot move forward.

20. The timing of the EJCPS program termination is especially harmful because Elementary and Secondary School Emergency Relief funding all ended this past school year, which means that a lot of the schools CELF works with are cutting their budgets. We had planned to offer programming and resources that would help make up for some of that gap. Now, we have to go back on that promise.

21. Our subawardees also cannot move forward with their plans due to the termination. Galveston Bay Foundation planned to make improvements to their space so that it would be usable for teacher trainings and events in the summer, when teachers are most

available. This loss doesn't just impact this cohort of teachers, but all that would have used that space over the years.

22. If EPA restarts the EJCPS program and we are guaranteed the remainder of our funding, we would be able to offer programming to a larger number of teachers, fund field trips for students, and disseminate more tools and supplies for schools for the upcoming 2025-26 school year and the 2026-27 school year after that. The timing matters a lot for us—the sooner the grant termination is declared unlawful, the more quickly we can begin talking with teachers and working with them to integrate our resources into their teaching plans for the year.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Tara Stafford Øcansey

Date: 6/23/25

8

JA262

# EXHIBIT M

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**DECLARATION OF DOROTHY DARR, SOUTHWEST RENEWAL FOUNDATION**

I, Dorothy Darr, declare as follows:

1.    My name is Dorothy Darr, and I live in High Point, North Carolina. This declaration is based on my personal knowledge and the knowledge I have acquired in my duties. I am over the age of eighteen and suffer from no legal incapacity. I submit this declaration on behalf of Southwest Renewal Foundation, a nonprofit organization affected by the federal grant terminations.

2.    I serve as the Executive Director of Southwest Renewal Foundation of High Point, Inc. ("Southwest Renewal Foundation" or "SWRF"). The Southwest Renewal Foundation is a 501(c)(3) community development nonprofit organization whose mission is to promote economic development through environmental enhancement, while also building upon the momentum of existing revitalization and reinvestment initiatives in High Point, North Carolina.

3.    I am SWRF's Executive Director. I have worked at SWRF since 2012. In my role as Executive Director, I work with the Board of Directors, assist in grant writing, oversee compliance, and pair external fund administration with on-the-ground community development, historic preservation, and environmental initiatives.

**Community Change Grant Project: "From Grey to Green"**

4.    On December 4, 2024, The Southwest Renewal Foundation was selected to receive an $18,490,240 award from EPA under the Environmental and Climate Justice Community Change Grant program. This award would have funded the "From Grey to Green: Climate Resilience and Environmental Justice for Southwest High Point, North Carolina" project to revitalize communities suffering from historic disinvestment, as well as fund multiple projects for 8 partners for a three-year period from January 1, 2025, until December 31, 2027.

5.      SWRF is the lead applicant and planned to use $2.36 million to fund multiple projects to improve the quality of the air, water, and land in Southwest High Point. These critical projects included several infrastructure investment programs. For instance, we were planning to install stormwater controls to stop trash and pollutants from entering the headwaters of the regional water supply. These headwaters supply the drinking water for over 500,000 regional residents. Through our From Grey to Green project we planned to plant 1,000 native trees and shrubs, including preparing sites and establishing and caring for trees and other vegetation in the community. We also planned to reconnect disadvantaged communities with green infrastructure by investing in street planning, greenway sidewalks, EV charging stations, a solar array, and 1200 recycling toters.

6.      We planned our critical projects in collaboration with our statutory partner, as well as 8 sub awardees who include local partners, local and state government agencies, educational institutions, and other nonprofit organizations.

7.      The City of High Point, North Carolina is our statutory partner and was supposed to receive $5.1 million to assess and repair sewer lines leaking into Richland Creek in Southwest High Point.

8.      Guilford Technical Community College ("GTCC") was supposed to receive $5.4 million for new workforce development and student recruitment programs. This grant was supposed to fund the renovation of an existing building into a new workforce training site on the GTCC High Point campus, establish new transportation networks to allow students better access to training and create a new career navigator for the region.

9.      Guilford County Schools ("GCS") was supposed to receive $3.5 million for multiple energy efficient and clean air facility upgrades to district's public elementary school, including

JA265

new HVAC systems to reduce operating costs. The upgrades were designed to significantly improve health and safety conditions for students, families, and staff, and decrease energy consumption with the replacement of older systems while delivering long term utility cost savings.

10. North Carolina State University ("NC State") was supposed to receive $651,600 for water quality testing in the district and downstream to track and evaluate project impacts. The planned repair and replacement of portions of the City of High Point municipal sewer system addressed a multi-decade long issue that has limited the use of Richland Creek in High Point as a community resource.

11. CleanAIRE NC was supposed to receive $518,000 to conduct outdoor and indoor air quality testing throughout the district. This data collection would ensure an accurate understanding of potential solutions to the high pollution burden in High Point.

12. Macedonia Family Resource Center was supposed to receive $303,835 for new energy-efficient HVAC systems for clean air in this important neighborhood resource center.

13. The Piedmont Conservation Council was supposed to receive $142,217 to assist new air, water, and land projects among the nine partners, as well as facilitate internships from NC State and GTCC using the grant projects as training ground for education and field experience.

14. The Piedmont Triad Regional Council ("PTRC") was our internal controls partner who was supposed to receive $518,000 to conduct critical work on compliance and operations management.

JA266

15.     Taken as a whole, these Community Change Grant funded projects would have improved the quality of life for Southwest High Point residents, fostered public and environmental health, attracted business, created jobs, and increased climate resilience.

**Pause of Granting Funding Without Notice**

16.     We received funding under this agreement under a reimbursement model, which means that our organization spends our own funds in compliance with our agreements, and in return, we expect reimbursement for those expenses. Reimbursement requests are submitted through ASAP.gov. ASAP.gov is an electronic system used by federal agencies to transfer funds to recipient organizations. SRWF was enrolled in ASAP.gov on January 24, 2025.

17.     On January 29, 2025, EPA emailed SWRF that a temporary pause was in place for "all activities related to the obligation or disbursement of EPA Federal financial assistance" in accordance with Office of Management and Budget ("OMB") memo distributed on January 27, 2025.

18.     Shortly thereafter, on February 7, 2025, EPA notified us that we would have access to the ASAP.gov system to make a drawdown in 7-10 business days.

19.     On February 21, 2025, SWRF made a successful drawdown of $3,957.75 to cover personnel expenses, as well as CCG project preparations and planning expenses. Although SWRF and partners were excited to have access to some of our program funds, we were anxious to move forward with our subaward contracts and projects as quickly as possible because we had already lost nearly two months of critical program work.

20.     In the following months, access to federal grant funds was erratic and unpredictable, leading to widespread confusion among SWRF and our partners. SWRF attempted several unsuccessful drawdown requests including:

JA267

a.  On March 12, 2025, SWRF attempted to drawdown $7,585.62 to cover personnel costs incurred from January 20, 2025, through March 7, 2025.

b.  After March 12, 2025, we checked our status on ASAP twice a week.

21.  Grant projects were interrupted because the ASAP system showed our grant as "suspended" from January 29, 2025, until April 28, 2025, despite multiple attempts to access funds, except for the one successful drawdown on Feb. 21, 2025.

22.  SWRF's only other successful drawdowns occurred after April 28, 2025: on April 29, 2025, and April 30, 2025.

23.  Without funding, grant projects could not go beyond the organizational work of completing subaward contracts, scheduling and holding regular meetings with partners, and creating and submitting reports in compliance with EPA guidelines and statutes.

**Termination of Granting Funding Without Notice**

24.  On May 2, 2025, Southwest Renewal Foundation's CCG assistance agreement was abruptly terminated by EPA.

25.  On May 22, 2025, Southwest Renewal Foundation and the City of High Point submitted a timely formal dispute of EPA's terminations of our community change grant.

26.  EPA acknowledged receipt of the SWRF's timely dispute on June 10, 2025.

27.  Several of our partners wrote to EPA in support of retaining our grant award for the From Grey to Green project, including Piedmont Triad Regional Council, Guilford Technical Community College, Guilford County Schools, the Macedonia Family Resource Center, and CleanAIRE NC.

**Harm Resulting from Award Termination**

28.    SWRF and its partners spent approximately 14-15 months of work developing the "Grey to Green" project and applying for the highly competitive community change grant. In addition, we spent about 4 months aligning our budget with EPA's internal grant procedures and EPA training on grant management. This grant was the culmination of a complex, competitive process that required months of planning and collaboration with our community partners.

29.    The funding freeze and termination has disrupted our regular workflows. As the Executive Director and the sole employee of SWRF, I have dedicated 30 percent more of my time to work on responding to the sudden loss of our grant funding. This is in addition to meeting the usual demands of managing the organization, leading to increased hours. The time spent responding to the termination could be spent on the critical programs that serve our community.

30.    We have been unable to secure alternative funding despite best efforts.

31.    The termination of the community change grant led to immediate impacts to our 8 sub awardees, who we have been unable to pay.  For example, Guilford County Schools substantially relied on community change grant funding to implement the urgent infrastructure upgrades at Fairview Elementary School. The abrupt termination of the program poses several threats to the students and faculty, including:

        a. Instructional disruption: As of May 2025, two HVAC units slated for replacement with grant funds are no longer operable, significantly affecting the instructional environment for students and staff by hindering learning and staff performance.

        b. Health and safety risks: The indoor air quality will be adversely affected if work is canceled, and the school sits over the summer without functional HVAC systems.

        c. Budgetary strains and delays: The district budgeted the HVAC replacement expenses at Fairview Elementary based on the grant award. Withdrawing the funding will force our district to redirect money from other critical, scheduled repairs at additional school sites to address the

JA269

urgent HVAC requests at Fairview Elementary, further straining already limited funding.

d. Stewardship of public funding: Energy costs for the school, which were expected to decrease with the installation of new HVAC systems and a more energy efficient roofing system, are now likely to increase due to the continued use of outdated and inefficient equipment. Ordering units is also subject to supply chain delays of up to 30 weeks. As the district schedules and cancels work, these timelines and cost increase. The district, acting in good faith on the awarded grant, now faces these unexpected challenges, which undermine public confidence and trust.

32.    Guilford Technical Community College also stands to lose an opportunity to expand its critical Workforce Training program on its High Point campus. The college planned to renovate an old warehouse space into a skilled trades center, where students will gain skills for clean energy jobs and access financial and academic support systems on campus that they need to be successful.

33.    Similarly, Guilford County Schools will be unable to upgrade interior and exterior systems at a 68-year old school building to improve safety and indoor air quality and reduce environmental impact. This will affect the lives of 412 students who attend the school, 94.9% of whom identify as students of color, and 79.2% who qualify for free or reduced meals, a common indicator of poverty.

34.    Not only has the loss of funding harmed our partners and interrupted programs, but the emotional toll has been significant. The loss of funding has also led to anxiety, fear, and uncertainty about the future of the programs funded under the Grey to Green community change grant program. This degree of stress is harmful to job performance, productivity, and the overall sense of belonging within our organization, among partners and the broader High Point community.

35.    After months of hard work, and a brief period to celebrate our accomplishment, the rug was pulled out from under us when EPA abruptly terminated our award at no fault of our

JA270

own. The government's chaotic actions over the past few months have left us with feelings of disheartenment and whiplash.

36.    If the grant is restored, we will be able to provide critical investments to encourage economic development, increase environmental benefits, and improve the overall quality of life across High Point, North Carolina communities.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States, that the foregoing is true and correct.

Executed this 17th day of June, 2025.

Dorothy Darr

8

JA271

# EXHIBIT N

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**


**DECLARATION OF ANNA TSOMO LEIDECKER,**

**SIXTH STREET COMMUNITY CENTER**


I, ANNA TSOMO LEIDECKER, declare as follows:

1. My name is Anna Tsomo Leidecker, and I live in Brooklyn, New York. This declaration is based on my personal knowledge and professional education and experience. I am over the age of eighteen and suffer from no legal incapacity. I submit this declaration in support of Sixth Street Community Center ("SSCC"), which is one of several grant recipients affected by the freeze and terminations of federal grant funding.

2. SSCC is a 501(c)(3) nonprofit organization that is headquartered at 638 E. 6th St., New, NY 10009. Established in 1978, SSCC's mission is to advance social, environmental, housing, economic, and racial justice in the East Village and Lower East Side community through education, advocacy, and community organizing.

3. I am the Community Programs Director. I have worked at SSCC since 2023, when I started as SSCC's Teen Climate Justice Program Director. I have a Bachelor of Science in Anthropology and Public Health from CUNY Baccalaureate and Macaulay Honors College, and a Masters of Community Health from CUNY School of Public Health.  In my role at SSCC, I assist in developing and operating SSCC's programs and I prepared the application for the grant at issue in this matter.

1

JA273

4. Since its founding, SSCC has fostered economic and community development through a variety of programs, including after school and summer programs, tenants' rights and entitlement advocacy, and life skills and career development for teens and adults. As early as 1996, SSCC initiated projects that brought youth and community residents together around issues of sustainable urban living, sustainable agriculture, environmental advocacy, and health and nutrition through SSCC's Community Supported Agriculture program, Seeds to Supper, and SOS Food Programs.

5. SSCC receives funding from individual contributions, governmental and non-governmental grants, and its services. SSCC has not previously received a federal grant.

6. In the course of its work, SSCC has successfully launched and operated the following programs:

    1. <u>Sixth Street Youth Program</u> – The Sixth Street Youth Program is an after-school program for local students in kindergarten through eighth grade. The program includes education and direct-action learning experiences regarding climate justice, urban sustainability, urban farming, racial justice, social justice, food justice, youth-based activism, and the arts. The students are involved in workshops and are active in gardening.

    2. <u>Teen Climate Justice Program</u> – The Teen Climate Justice Program is an after-school program that has reached over 200 high school students in the past three (3) years in the community. The program includes education and direct-action learning experiences regarding climate justice, urban sustainability, urban farming, racial justice, social justice, food justice, youth-based activism, and the arts. Hands-on workshops focus on legislative climate advocacy,

JA274

greenspace stewardship, environmental monitoring, and mutual aid for food justice. The students engage in community gardening, assist other local non-profit organizations, distribute food in the community, and help maintain SSCC's community fridge.

3. <u>Community Supported Agriculture</u> ("CSA") Program – For over 25 years, SSCC has provided fresh organic fruits and vegetables to the Lower East Side community using sliding scale fees, and allowing low-income households to use SNAP and EBT benefits for payment.

4. <u>Mutual Aid Kitchen Project</u> - Starting in June 2020, SSCC's commercial kitchen and café has been operating as a Mutual Aid Kitchen and partnering with other mutual aid groups to cook and prepare meals for food-insecure community members.  SSCC prepares 2,000 free meals every week, totaling more than 200,000 free meals prepared to date.

5. <u>Climate Justice Campaign & Advocacy</u> – SSCC engages in a number of environmental campaigns involving statewide coalitions to push for policy that will help achieve New York's climate goals.

6. <u>Emergency Food Distribution</u> – SSCC provides an on-site program that has provided thousands of families with access to free fresh produce and groceries. SSCC has distributed over 80,000 boxes of fruits and vegetables free of cost to food insecure families.

7. <u>Community Fridges</u> – SSCC operates a community fridge that provides free access to fresh food to all community members.  One of the community fridges is located on-site, in partnership with another community-based organization. After

3

JA275

three other local community fridges closed in the past six months, the community has been directed to SSCC's remaining fridge.

7. On or about August 21, 2024, SSCC was awarded EPA an Environmental Justice Collaborative Problem Solving Grant in the amount of $150,000 for its Citizen Science for Environmental Health & Climate Resiliency program (the "Grant").

8. The funds from the Grant are to be used to: (i) host public workshops for community learning on local climate impacts, air quality monitoring, flood sensing, and data analysis; (ii) expand SSCC's Teen Climate Justice Program to provide day-long programming up to four (4) days per week during the Summer; (iii) train four (4) or more program participants to undergo training as Community Facilitators to assist in future workshops and cultivate more local subject matter experts on climate resilience and citizen science for future community needs; and (iv) install air quality ("AQ") sensors and develop community outreach for existing flood sensors in multiple sites throughout the community (collectively, the "Grant Programs").

9. More specifically, the Grant funds are to be used to: (i) enable SSCC to hire and/or increase the hours of staff members to develop, oversee, and administer the Grant Programs; (ii) provide a stipend to Community Facilitators for training in workshop facilitation; (iii) purchase and install one (1) stationary AQ monitor at SSCC, one (1) stationary AQ monitor at a local community garden, and one (1) stationary AQ monitor at a site to be identified through the SSCC community workshops; and (iv) purchase equipment necessary for air quality monitoring and analysis.

10. As a result of the foregoing work, SSCC anticipates the following benefits for the disadvantaged community that is to be served: (i) help community members better vocalize unique climate vulnerability and air quality issues on the Lower East Side; (ii)

provide access to and interpretation of public data via air quality and flood data online platforms; (iii) identify trends and hazardous conditions from data sets; and (iv) learn how to use a handheld Airbeam air quality monitor.

11. SSCC's ASAP.gov account was funded on or about October 10, 2024.  To date, SSCC has drawn down $63,502.48 from the Grant fund, which was used to purchase equipment used for air quality monitoring and analysis, reimburse SSCC for staffing and administrative costs, and purchase workshop supplies.

12. The Grant was terminated by the EPA on or about March 28, 2025. Since on or about March 7, 2025, SSCC has not had access to any funds under the Grant.

13. As a result of the EPA's termination of the Grant, (i) SSCC had to reduce the hours of a part-time community outreach coordinator hired to work on the Grant Programs from up to twenty (20) hours per week to up to only six (6) hours per week, resulting in the employee planning on resigning; (ii) SSCC may have to eliminate my job within the next few months; (iii) SSCC has to reduce the number of public workshops; (iv) SSCC cannot train Community Facilitators or compensate them with the allocated funding for stipends; (v) SSCC had to reduce the Teen Climate Justice Program during the Summer from day-long programming up to four (4) days per week to a total of eight (8) to (10) workshops only 2 hours in length; and (vi) SSCC will not be able to participate in any flood monitoring activities.

14. The Lower East Side community is a disadvantaged Environmental Justice community and is in the 99th percentile nationally for adult asthma rates in the United States.  It is located next to the FDR Drive and a Consolidated Edison Plant, and the East River Park is in the process of being demolished. Moreover, the community faced significant

JA277

flooding from Superstorm Sandy. There is still no interim flood protection despite the substantial risk of future flooding.

15. Even a delay in SSCC's access to the Grant funds will cause irreparable harm. Since SSCC is going to lose a staff member that was hired specifically for the Grant Programs due to lack of funding, even if funding were to later be restored, it will take a long lead time for SSCC to hire and train a replacement, resulting in fewer and lower quality Grant Programs. The momentum for the Grant Programs already achieved through a few community meetings with robust attendance will be stalled and will be difficult to restart in the future given the uncertainty created by the termination. Moreover, without immediate community organization and training, the community members will not know how to monitor air quality and collect and analyze data to demonstrate environmental harms in the community and potential solutions. The flood monitoring component of the project had to be completely abandoned, resulting in a lack of awareness of flood sensor resources and less local preparedness of flood emergencies. As a result, the community will have less power and input into local projects, such as the use of the demolished East River Park or what flood protection measures should be put in place. Students in the Teen Climate Justice Program who depend on SSCC to provide summer programming consistently, as has been offered for the past 3 summer semesters, were left without a daily program to attend, and lost the opportunity to engage with community science skills in a robust way. Overall, without immediate access to the Grant funds, SSCC's future is uncertain.

16. The termination of the Grant, and SSCC's resulting inability to perform the work promised, will also cause reputational harm to SSCC and will likely make communities and other entities less likely to partner with SSCC on future projects. The disadvantaged

JA278

community served by SSCC is already skeptical of the government and the impact that local organizations can have. SSCC publicized the Grant Programs, but without the funds, it will be unable to offer them. As a result, the community's skepticism will increase and its willingness to partner with SSCC and other similar organizations will be diminished.

17. If SSCC's access to the Grant funds is not immediately restored, it will be impossible for SSCC to comply with the Grant requirements within the Grant timeframe.

18. Moreover, SSCC is not able to replace the Grant funding from other sources because many grant cycle deadlines have already passed and SSCC did not pursue these other grants based on its three-year reliance on the Grant.

19. However, the injuries to SSCC, its sub-awardees, and the community and their interests would be redressed by an order from this Court to preliminarily and permanently enjoin the Defendants from implementing, applying, or enforcing any freeze, rescission, or termination of funding of SSCC's Grant. Without such an order, SSCC will continue to be unable to reliably access its awarded EPA Grant funds and to be irreparably harmed.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Date:   6/26/2025

Anna Tsomo Leidecker, Community
Programs Director for Sixth Street
Community Center

7

JA279

# EXHIBIT O

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**DECLARATION OF REBECCA KADURU, INSTITUTE FOR SUSTAINABLE
COMMUNITIES**

I, Rebecca Kaduru, declare as follows:

1. My name is Rebecca Kaduru, and I live in Nashville, TN. This declaration is based on my personal knowledge and professional education and experience. I am over the age of eighteen and suffer from no legal incapacity. I submit this declaration in support of the Institute for Sustainable Communities (ISC), which is one of many grant recipients affected by the freeze and terminations of federal EPA's environmental and climate justice grant programs.

2. ISC is a 501(c)(3) nonprofit organization that is headquartered at Montpelier, VT. Established in 1991, ISC's mission is to develop practical, lasting solutions that address environmental, economic, and safety challenges while strengthening communities in the U.S. and across the world. Through strong partnerships, we help create cleaner environments, safer workplaces, and resilient communities and infrastructure, while improving access to affordable, reliable energy—contributing to a healthier, more secure future for all.

3. I am the President of ISC. I have worked at ISC for almost 2 years (on September 1, 2025). I  have an advanced degree in Political Science with a focus on International Relations and have been in non profit leadership for over 15 years. As ISC's President, I manage overall organizational strategy and compliance, as well as the financial health of the organization–both budget management and fundraising. I am also responsible for coordinating and interfacing with our Board of Directors.

1

JA281

4. With a global footprint, ISC addresses real challenges people face, including every human's right to live on a clean earth, have a healthy environment, and work in safe conditions. We achieve this by co-creating solutions with locally led organizations and connecting them with the resources needed to drive lasting improvements in communities facing the greatest environmental and economic challenges.

5. ISC co-creates and shares practical and cost-effective approaches to addressing local challenges, focusing on the most pressing threats to environmental and community well-being. Through collaboration with local leaders and organizations, we support projects that improve living conditions, strengthen local economies, and create safer, healthier environments. By providing expertise, resources, and connections, we help communities build resilience and drive lasting, meaningful change. Our work with manufacturing facilities, urban, and rural areas is key to creating widespread, positive and lasting impact.

6. In the United States, ISC has spearheaded and provided support to numerous community-led climate adaptation and resilience projects, including facilitating the development of resilience hubs, fostering equitable climate policy development, and providing technical assistance and small grants to local governments and grassroots organizations.

7. ISC possesses a deep understanding of systems transformation, cross-sector collaboration, and community empowerment. It prioritizes local knowledge and leadership, ensuring that solutions are responsive to community needs and contribute to long-term, systemic transformation. Through this approach, ISC has facilitated the advancement of hundreds of communities toward a more sustainable, just, and resilient future.

8.  While ISC initially focused internationally and was primarily funded through the U.S. Agency for International Development, over the past decade it has pivoted toward domestic climate equity efforts.

9.  In recent years, ISC's federal funding portfolio shifted away from USAID and toward domestic climate equity efforts, particularly through new partnerships with the U.S. Environmental Protection Agency (EPA). As of the time of this Declaration, ISC is no longer receiving USAID support and has pivoted to scaling up operations under EPA's various grant programs.

10. In 2023, ISC was selected by EPA to serve in two significant roles under the agency's environmental justice initiatives funded through Section 60201 of the Inflation Reduction Act (IRA): 1) as a national Thriving Communities Technical Assistance Center (TCTAC) awardee;  and 2) as a national Thriving Communities Grantmaking Program (TCGM or EJTCGM) awardee. That section of the IRA added a new section 138 to the Clean Air Act titled "Environmental and Climate Justice Block Grants." ISC was one of only two organizations in the country selected to serve as both a TCGM and TCTAC grantee. We were also responsible for coordinating between Grantmakers of the TCGM program and TCTACs, serving as the central hub for both programs.

11. These awards were part of the EPA's effort to distribute federal climate and environmental justice funding to underserved communities, particularly those historically marginalized or disproportionately burdened by pollution.

12. ISC was funded as a TCTAC to support a national technical assistance network intended to help local communities apply for and manage federal climate funding. ISC's TCTAC award totaled approximately $8 million, of which $1.6 million was IRA-funded and the remaining $6.4 million came from EPA "superbudget" allocations. ISC's role included coordinating

3

between regional TCTACs, developing centralized technical resources, and directly
supporting communities through events, training, and outreach.

13. In parallel, as a TCGM grantee, ISC was awarded a total of $60 million through two
awards to distribute through a national subawarding program focused on building capacity
in environmental justice communities.

14. We were 1 of 12 "Grantmakers" selected by the EPA under the TCGM program and 1 of
only 2 such designated as National Grantmakers. Our first grant ("TCGM-1") was $12
million, awarded primarily to fund our administrative and program set up costs, while the
second grant ("TCGM-2") of $48 million, was awarded to fund national-level impact
measurement and storytelling support for all TCGMs and subawards.

15. While ISC was notified of its award in December 2023, the initial $12 million installment
was not provided until late 2024 to support program setup and infrastructure, while the
subsequent $48 million was awarded shortly thereafter to begin full-scale grantmaking. ISC
was given the go ahead to begin activity on this award as of March 2024 with the ability to
reimburse itself for expenses upon receipt of the initial award installment. ISC, in
combination with EPA Regions 1-3 regional grantmakers, received over 1,300  subaward
applications through this program and invested heavily in systems, staffing, and outreach
capacity.

16. To fulfill our roles in both TCGM and TCTAC programs, we planned to develop central
websites for each. The TCTAC website, ejtctac.org,  was launched in February 2024 and
hosts a grants and funding database, access to regional TCTACs for national technical
assistance support, and a centralized events and notice board. Between May 2024 - March
2025 this website earned 43,570 page views and had an overall engagement rate of 40.7%.
Additionally, this website hosted an internal TCTAC Community Platform which served as

4

JA284

a resource repository and networking platform for TCTACs across the country to reduce duplication and increase collaboration, maximizing efficiency across the program. Between January 2024 and March 2025, this platform had over 100,000 page views a month and hosted 445 active members who collectively made over 600 posts.

17. The TCGM website has been designed and was supposed to be launched live in June 2025, however has stalled due to funding interruptions. It would feature a Data Visualization Hub linked to the National Evaluation and Tracking System to show the impact of these EPA grants across the US. It has public-facing grantmaking information, data tracking, and evaluation tools for the Regional Grantmakers.

18. Additionally, all technical assistance requests received by regional TCTACs across the nation are housed on ISC's platform and undergo ISC's internal review system before being disseminated back to the respective regional TCTACs. In total, ISC processed over 100 technical assistance requests from Region 1 and the Regional TCTACs, producing learning sessions, collaboration roadmaps, a post award toolkit, and more.  In February 2024, ISC hosted a symposium in Puerto Rico that convened all TCTACs and provided training to ensure each region was properly prepared to meet the goals of their respective programs.

19. Further, ISC served - uncompensated - as the interim TCTAC for EPA Region 1 and conducted five roadshows from New England to Alaska, as well as an event at New York Climate Week in partnership with the EPA Region 6 Administrator, helping communities understand and access IRA funding opportunities.

20.  In January 2025, ISC began to experience substantial disruptions in access to its funds through the Automated Standard Application for Payments (ASAP) system. On January 27, 2025 our TCTAC ASAP account was frozen, and we received an email the next day describing the reasoning for the freeze as related to President Trump's Unleashing

American Energy Executive Order. On February 3, 2025, following the Temporary

Restraining Order (TRO) issued in *State of NY v. Trump* ISC sent a formal request to its

Program Officers at EPA to demand access to its ASAP accounts as the court order

required. While access to our TCTAC ASAP accounts was reinstated on February 7, 2025,

by February 12, 2025, our TCGM grant access to ASAP was frozen.

21. This on-again-off-again pattern of accessibility continued for several weeks. Access was

finally restored to both grants on February 21, 2025; yet the very same day, we received a

grant termination notice for our TCTAC grant. Following the termination the NY Post

wrote an article about us, naming us the "biggest loser" of the Administration's Department

of Government Efficiency's (DOGE) deep cuts to environmental justice programs.[1] Yet,

they incorrectly stated that the grant issued was worth $16 million, when in fact it was only

worth $8 million and had only $5.5 million remaining. Lee Zeldin retweeted the article

with the incorrect information, claiming his actions had, "rack[ed] up $67M more in

savings!"[2] Just two days later, on February 24, 2025, our TCTAC's ASAP account was

frozen again, and on the same day, we filed a dispute with the EPA Disputes Decision

Official, Phillip Schindel, in accordance with 2 CFR 1500.15. This termination came on the

heels of a fantastic year for the TCTACs where over 1800 technical assistance requests

were processed through the network resulting in over $373M in funds secured and over

$1.2B in funds applied for to support community-based work.

22. As our rollercoaster experience of frozen and then unfrozen funds went on, we continued to

demand that the EPA reinstate our grants and sought reimbursement for costs already

incurred as legally required under the awards. On February 5, we issued two separate

---

[1] *https://nypost.com/2025/02/22/us-news/doge-cuts-67-m-in-epa-grants-for-environmental-justice-groups/.*
[2] *https://x.com/epaleezeldin/status/1893377875220332772.*

invoices to EPA leadership for unreimbursed expenses incurred on our TCGM grants through ASAP totaling $127,578. On March 6, we issued an invoice to EPA leadership for TCTAC expenses incurred totaling $68,316.57. We received no responses to any of these invoices, and by the next day, all of our grants were frozen. We continued to communicate our demands for reimbursement, to no avail. Our TCTAC Program Officer Darlene Byrd communicated on March 11 that "due to recent developments" she would have to cancel standing weekly meetings with us. Finally on April 16, we sent official communication to Forte, Burney, and our TCGM Program Officer, Amy Kenyon, emphasizing that the freeze on our funds was in direct violation of the (then) recent preliminary injunction granted by the court in *Woonasquatucket River Watershed Council v. Department of Agriculture*.

23. ISC believed it had a breakthrough on April 17, 2025, when it's TCTAC ASAP account was opened for two hours. However, it later became clear that this had only occurred so that EPA could change this grant status to liquidated, update ISC's performance end-date to that day (April 17, 2025), and update ISC's close-out date to June 24, 2025 (which was 120 days after ISC's final account shut down after receiving its termination letter noting a 120 day closeout period).

24. After sending an additional demand for funds to be reinstated, ISC received a termination notification for its TCGM-1 award on April 22, 2025.

25. Despite a declaration in the *Woonasquatucket* case by Daniel Coogan, Deputy Assistant Administrator for the EPA, that "EPA leadership" made an individualized assessment when determining which grants would be cancelled, neither ISC's Program Officer nor her superior, Jacob Burney, were aware that ISC's grant was slated to be terminated at all. In fact, just the day before, on April 21, 2025, we received a vacation notice from our Program Officer, Amy Kenyon. The email noted that Kenyon would be "out [that] week

Tuesday-Friday and [wouldn't] be online at all." This was confirmed through email when on April 25, 2025, Burney emailed ISC under the guise that our grants were still active, noting that "you all have continued to work and incur allowable costs"..."required by your active grants." After I let him know that our grant was actually terminated, Burney responded stating, "I was not aware that this termination action went out on your initial Grantmaker award while Amy and I were out." Kenyon followed up on April 28, 2025 with an email stating, "I haven't gotten any other information regarding the termination, the rationale, or the next steps...." Kenyon further emphasized her own confusion at the termination due to her belief that ISC had "been diligently carrying out the award agreement from the beginning." ISC filed a response to the termination of the initial $12 million Grantmaking award with Mr. Phillip Schindel, Disputes Decision Official, on May 12, 2025, explaining that the termination was improper and a violation of the terms and conditions of the original agreement. Email communications between ISC and EPA's Burney and Kenyon are attached hereto as Exhibit 1.

26. On April 30, 2025, our TCGM-2 grant was terminated as well, and ISC subsequently filed a similar response claiming improper termination with Schindel on May 21, 2025.

27. The abrupt pause and subsequent termination of EPA funding caused severe disruptions to ISC's operations and programming. ISC had structured its entire 2025-2029 strategic plan (our FY 2025 started Oct 1, 2024) around its roles as a national TCTAC and TCGM grantee. Based on these multi-year federal commitments, ISC entered into contracts, hired specialized staff, and expanded its organizational infrastructure. When access to the funds for TCTAC was frozen on January 27, 2025, ISC was forced to temporarily suspend technical assistance services, which were subsequently permanently paused upon the February 21, 2025 termination. When funds for TCGM were frozen on February 12, 2025,

the funding fluctuations meant we were delayed in launching our grant application, and had to eventually halt the rollout of subgrants. The uncertainty made it nearly impossible to execute the core activities of both grants.

28. ISC had planned to hire 14 additional staff members in 2025 to support the national scope of the TCTAC and TCGM programs and scale up operations. Instead, due to the lack of accessible funds, ISC has laid off or furloughed approximately 50% of its workforce, reducing its team from 37 to 22 people. The expertise and team cohesion lost through these cuts cannot be instantly recovered, and the impact on ISC's internal systems—particularly those designed to scale for federal grantmaking—has set the organization's trajectory back by months, if not years. As such, the damage to ISC's core capacity is extreme, and ISC is on the verge of having to make permanent restructuring changes if the grants are not reinstated. This would include closing out our grant compliance team which was built up specifically to manage the volume of subgrants we intended to make through TCGM, and drastic reductions to our operations staff, M&E capacity, the majority of our program communications team, and our Vice President of Finance and Operations. We can still avoid these permanent restructuring changes if our grants are reinstated.

29. The funding freeze has led to massive disruptions in our organizations' day-to-day operations, causing slowdowns and budgetary challenges. The disruption and termination of EPA funding has caused ISC to cancel or suspend dozens of planned technical assistance and grantmaking activities that were designed to directly benefit underserved communities.

30. The EPA's funding freeze and subsequent termination forced ISC to curtail multiple lines of programming that had been designed, resourced, and launched in reliance on EPA's multi-year awards. The inability to deliver these planned services—and to meet the expectations set by the federal government—represents a structural loss to ISC's mission

9

and an irreparable injury to the field of equitable climate funding that can only be redressed by reinstatement of this critical funding.

31. For example, ISC had launched national outreach campaigns, engaged consultants to assist almost 200 grassroots leaders with grant writing, and scheduled a series of roadshow events to help local organizations understand and access IRA-funded programs. When the funding was frozen, all these initiatives were immediately paused. These are not simple delays; many of the community-based organizations we were working with have since moved on or lost capacity, and trust has been severely damaged. The lost momentum and fractured relationship with community based organizations, many of whom are deeply skeptical of federal programs, may not  be fully repaired even if funding is later restored.

32. Right now, more than 90 projects sit in delay due to the disruption of our grants. If reinstated, we would be able to fund necessary projects in big cities and rural towns alike, and irrespective of political makeup, all across the country - immediately. For example, in Springfield, MA, a project to increase awareness of air quality status and actions that residents can take to reduce exposure is ready to expand but lacks the necessary funding. A community in rural Vermont plans to provide training and leadership for youth focused on the weather and its impacts on various topics, including agriculture and water quality. Additionally, one project that remains true to EPA's pillar of "Clean Air, Land, and Water for Every American," is in rural Alabama where there are plans to install onsite wastewater treatment systems for 350 households that lack adequate wastewater management while also creating additional certification and workforce development opportunities for wastewater professionals. Grassroots leaders have spent time, energy, and funds to develop plans to address the environmental harms their community faces and right at the moment their plans could come to fruition, the federal government has pulled the rug out. Their

public health needs are urgent and the only way for them to be met in a timely manner is with the reinstatement of the funding they were promised to see their work through.

33. One example of the devastating impact of the funding freeze and termination is the experience of SustainEnergyFinance (SEF) from Salt Lake City, Utah. On August 8, 2024 SEF attended a roadshow in Salt Lake City that was sponsored through a co-partnership with ISC and The White House. I personally met SEF's CEO and was able to set her up with resources from the Region 8 TCTAC. SEF submitted a proposal through the Region 8 TCGM, MAPEJ Grants Hub, and was notified of their award on February 27, 2025. Through this project, SEF aimed to engage over 60 participants—including at least 20 Westside Salt Lake City residents, 10 affordable housing developers, and 5 community-based organizations—in a roundtable series to co-design financial products that support sustainable, affordable housing. Community members were notified, and began preparing for this much needed initiative, but funding never came. Not only did this project and its application process show how well integrated these EPA programs were by design and how efficiently they were working together, it laid the groundwork for Utah's first community-informed green bank model, targeting long-term climate resilience and health improvements in marginalized neighborhoods by reducing environmental hazards and expanding access to clean energy financing. It also set the community up, as seed funding, to qualify for larger debt based funding through other IRA programs. The SEF team is ready to kick these projects off upon immediate notice of funding.

34. Beyond staffing and program delays, ISC also made substantial financial commitments in reliance on the EPA grants. For example, ISC entered into multi-year technology contracts to expand its Salesforce platform and internal systems, designed specifically to manage technical assistance tracking and subgrant coordination. These upgrades were essential to

tracking requests across the national TCTAC network and facilitating equitable subgrant distribution through the TCGM program. Now, ISC is burdened with long-term financial liabilities that are disconnected from any viable funding source. This is not just a financial inconvenience; it has impaired ISC's digital infrastructure in a way that jeopardizes its future capture capacity to manage complex federal programs, a harm that cannot be remedied through damages alone.

35. The injury to ISC and its interests would be redressed by reinstating both our TCTAC and TCGM grants and by preventing EPA from enforcing any future freezes or rescission of funding to the TCTAC and TCGM grants without clear cause. For example, were funding restored, ISC would be able to immediately bring back all furloughed staff, restart technical assistance services, and reopen our grant application portal. We would also be able to immediately make the seven grant awards that had moved to the signed contract stage. Within 4 weeks, with approval of our Quality Management Plan, we would be able to offer capacity building to those seven grantees to meet clean air and water standards and increase energy access across the region. Within 6 weeks our TCTAC Community Platform would be back online. With approval of our Information Collection Request application, we would be able to complete our first round of 14 subawards to communities and keep our grant application portal open to make the remaining 90 total. Within two months our TCGM website would be launched with the prototype of the Data Visualization Hub, and we will have restarted our nationwide roadshows to showcase the impact these programs are having on clean air, water, affordable housing, and energy access across the United States. Without such an order, we will continue to be unable to reliably access our awarded EPA grant funds and to be harmed.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States, the foregoing is true and correct.

_Rebecca Kaduru_

Rebecca Kaduru, President
[*Name and Title*]

_June 16, 2025_

Date

13

USCA Case #25-5333     Document #2156180     Filed: 01/27/2026     Page 155 of 378
Case 1:25-cv-01982-PLF     Document 29-17     Filed 06/27/25     Page 14 of 24

# EXHIBIT P

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**DECLARATION OF PEGGY SHEPARD, WE ACT FOR ENVIRONMENTAL JUSTICE**

I, Peggy Shepard, declare and state as follows:

1. I am the Executive Director and co-founder of West Harlem Environmental Action, Inc. (also known as WE ACT for Environmental Justice or "WE ACT"). In my role, I run the entire organization, manage the fundraising and oversee all programming and financial operations of the organization.

2. I have worked at WE ACT for 36 years. I am familiar with WE ACT's organization, policies, practices, and programs.

3. Established in 1988, WE ACT works to build healthy communities by ensuring that people of color and/or low-income people participate meaningfully in the creation of sound and fair environmental health and protection policies and practices.

4. One way WE ACT works to implement its mission is by running programs focused on (1) participatory engagement, where we educate people of color and low-income people about the tools available to them to engage in our city, state and federal political process; (2) environmental health and education, where we inform our communities of color and low-income people about the environmental and health concerns that they may encounter in their daily lives, and what can be done to address them; and (3) workforce development, where we provide workforce training to our community members to ensure they are not left behind as our society transitions to new industries.

5. A majority of WE ACT's funding to pay for these programs comes from private foundations. A minor portion of our funding comes from New York City and State

1

governments. For this most recent fiscal year, however, 30% of our budget was made up by now-terminated grants awarded to WE ACT by the EPA.

6. In 2022, WE ACT applied for an Environmental Justice Thriving Communities Technical Assistance Center (EJ TCTAC) Grant from EPA to support and expand our environmental and energy justice work throughout EPA Region 2. The funding would allow WE ACT to create a Technical Assistance Center to engage other grassroots organizations throughout the Region in capacity-building by improving their grant writing and increasing their knowledge of environmental and energy justice.

7. In September 2023, WE ACT's application for an EJ TCTAC grant was awarded. EPA awarded an initial total funding amount of $5,000,000, and by January 16, 2025, the award amount had been increased to $8,000,000. Ex. 1.

8. Once we were awarded the TCTAC grant, WE ACT began taking steps to ensure that we could properly implement the funds once they were made available. We entered into Memoranda of Understanding with four subrecipient organizations and spent several months establishing scope of work agreements with each. We also contracted with a project consultant and entered into contracts with eighteen subawardee groups to serve as Community Voices participants.

9. The organizations who participated as Community Voices underwent a rigorous application and review process to be selected, with the goal of serving as regional outreach and engagement arms for the TCTAC. WE ACT trained a total of 35 people from these 18 organizations.

2

JA296

Case 1:25-cv-01982-PLF    Document 29-18    Filed 06/27/25    Page 4 of 22

10. Additionally, we purchased three-year subscriptions to a learning management system and a customer relations management software system and purchased a website domain for the TCTAC.

11. Finally, WE ACT hired four full-time employees, whose salaries were to be fully paid for by the TCTAC grant funds.

12. On May 6, 2025, we received notice from EPA that our EJ TCTAC grant was terminated. The only reason listed on the termination letter was that "the remaining portion of the Federal award will not accomplish the EPA funding priorities for achieving program goals," and that "the objectives of the award are no longer consistent with EPA funding priorities." Ex. 2.

13. Separate from the TCTAC Grant, WE ACT also applied for a CCG Grant from EPA in 2024. The funding from the CCG grant was meant to fund the work of a steering committee of several New York City-based community organizations participating in the EJNYC Initiative—a project meant to guide the New York City government's future efforts to advance environmental justice.

14. Our work on the steering committee and with the city government was meant to serve as a model for public engagement in the municipal planning process.

15. Local Law 64 of 2017 required New York City to develop an environmental justice report that would identify the environmental justice issues faced by different communities throughout the city.

16. Following the issuance of the report, members of the EJNYC Initiative Steering Committee would take the environmental injustices highlighted in the report and work

3

with their respective communities to help community members identify workable solutions.

17. The EJNYC Steering Committee would have used the CCG grant funds to cover the costs associated with community outreach and with designing strategies for the City to engage local communities on a neighborhood-by-neighborhood basis. The strategy recommendations would then be compiled and shared with the City to inform its approach to remedying the issues identified by the report.

18. In November 2024, WE ACT's application for a CCG Grant was approved. WE ACT was awarded a $3,000,000 grant under the program.

19. Once we were awarded the CCG grant, WE ACT devoted substantial resources in staff time to entering into a service contract with one of our subawardees and negotiating partnership agreements with several other members of the Steering Committee.

20. On May 2, 2025, we received notice from EPA that our CCG Grant was terminated. The only reason listed on the termination letter was that "the remaining portion of the Federal award will not accomplish the EPA funding priorities for achieving program goals," and that "the objectives of the award are no longer consistent with EPA funding priorities." Ex. 3.

21. It is our understanding that New York City intends to move ahead with the EJNYC initiative in fulfillment of its statutory obligations, but it will be doing so now without the level of input from community members that would have been made possible had the CCG grant program not been terminated.

22. Since we received the termination notices for our TCTAC and CCG grants, we have experienced a significant negative impact on our operations and on our budget. First, of

4

the four new full-time employees who were meant to have their salaries covered by the TCTAC grant funds, one left the organization due to concerns over how their salary would be funded after the TCTAC grant was terminated. The remaining three employees are still with the organization, but WE ACT was forced to divert existing funds within our budget to cover their salaries.

23. WE ACT has had to divert additional funds within our budget to cover overhead costs that were meant to be paid for by the TCTAC and CCG grant funds, and we are still working to implement aspects of both programs—albeit on a much more limited scale— despite no longer having access to the funds.

24. The organization also now needs to dedicate additional hours to fundraising activities in an attempt to cover some of the lost funds from the terminated grants.

25. Under the TCTAC Grant, we had planned out 72 events over the coming years with external partners, and after receiving the termination notice we have been forced to cancel these events. I am concerned that after this experience, some of our partner organizations may have increased doubts about trusting our commitments going forward.

26. If the TCTAC and CCG grant programs are not restored soon, I am concerned that our operational capacity will continue to suffer. Each day that we go without the TCTAC funds is another day in which we must continue to divert funds within our own budget to cover the salaries of our three new full-time employees. Without the TCTAC or CCG funds being reinstated, we will continue to devote increased working hours to fundraising to make up a small portion of the deficit—a diversion of staff resources that would otherwise be spent on core operational work.

Case 1:25-cv-01982-PLF    Document 29-18    Filed 06/27/25    Page 7 of 22

27. If the Community Change Grant Program is restored soon and our awarded grant is reinstated, WE ACT will be able to restart the work of the EJNYC Initiative Steering Committee, allowing the coalition of organizations on the Committee to engage their community members to shape the city's environmental justice policy solutions in ways that maximally benefit individual communities. The longer we are forced to wait for these funds, the more work gets done at the city government level without community input. If we are forced to wait several months for the CCG funds to be made available, we will need to spend substantial resources to reconfigure the project timeline and renegotiate old agreements to meet the changed circumstances. Moreover, our community members and EJ residents will miss out on this rare opportunity to shape the New York City government's response to environmental injustice.

28. I am also concerned that after entering into agreements with partner organizations in anticipation of receiving these funds, and then being forced to cancel after the grants were terminated, WE ACT's reputation will be harmed in the eyes of some of our partner organizations. Prominent environmental justice and civic engagement experts and leaders in the movement may not find WE ACT reliable to partner with in future grants.

29. If the CCG and TCTAC grant programs are restored and our awarded grants are reinstated, WE ACT will be able to re-allocate our internal budget items for their intended use, we will be able to honor our payment agreements with subawardees, our senior staff will be able to refocus on core operational work and away from fundraising activities to make up the lost grant funds, the Technical Assistance Center will be able to assist and empower community organizations throughout Region 2 as originally intended, the EJNYC process will receive stronger assistance from a fully funded Steering

6

Committee, community members will have a greater say in how their city government responds to environmental injustices, and WE ACT can begin to rebuild its reputation as a trustworthy, reliable community partner.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Date: 6/27/25

Peggy Shepard, Executive Director and Founder

7

# EXHIBIT Q

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

### DECLARATION OF ILYSSA MANSPEIZER, LANDFORCE

I, Ilyssa Manspeizer, declare as follows:

1.     My name is Ilyssa Manspeizer, and I live in Pittsburgh, Pennsylvania. This declaration is based on my personal knowledge, professional education and experience. I am over the age of eighteen and suffer from no legal incapacity. I submit this declaration on behalf of the Pittsburgh Conservation Corps d/b/a Landforce, a nonprofit organization affected by the federal grant terminations.

2.     Landforce is a 501(c)(3) nonprofit organization that collaborates with public and private agencies to build a network of greenspace experts. Landforce recruits, trains, educates, employs, and supports adults who faced structural barriers to stable employment due to race or personal history. Employees work on a variety of land stewardship services such as trail building, erosion control, reforestation, and garden bed installation to make Pittsburgh communities more sustainable and healthy places to live.

3.     I am the CEO of Landforce. I have worked at Landforce for 10 years. In my role, I am responsible for overseeing the organization's overall performance, functions, employees, and volunteers. I oversee and ensure Landforce's financial stability while also driving the organization's mission, maintaining company direction, and helping create and implement strategic planning to benefit and promote the organization.

**Community Change Grant Project: "Leveraging Pittsburgh/Philadelphia Workforce Development Partnerships to Multiply the Impact of Decarbonization, Pollution Remediation, and Circular Economy through Woody Biomass Utilization"**

4.     Landforce applied for a Community Change Grant ("CCG") in February 2024. The grant process was highly competitive and required several months of staff time and resources to develop a comprehensive and successful application.

1

5.      Landforce was awarded $15,309,845 for their workforce development program focused on urban wood reuse. The 3-year project is in collaboration with our partner PowerCorpsPHL, as well as several subawardees, to create and expand two woody biomass workforce development campuses, strengthen the urban lumber and biochar market, and deploy soil-remediation biochar in both Pittsburgh and Philadelphia.

6.      Pittsburgh and Philadelphia are two examples of communities across the United States that struggle to effectively manage their wood waste. By creating and implementing our wood reuse project, Landforce will be able to create opportunities for disadvantaged residents and increase neighborhood access to materials that increase soil health and mitigate pollution. 20 jobs will be created for Project Area residents and the program will allow people to stay employed for a full year where they otherwise would not have been able to.

**Pause of Grant Funding Without Notice**

7.      On January 27, 2025, the Office of Management and Budget ("OMB") issued a memorandum directing agencies to freeze spending on all federal loans and grants.

8.      Shortly thereafter, on January 28, 2025, we were advised by partners to drawdown as much funding as possible. When making a drawdown in the ASAP system, grant recipients have five days to spend the money. Our team worked around the clock strategizing the best use of our drawdown because we were unsure if we would have another opportunity to access our award.

9.      Between January and April, Landforce made four successful drawdowns: $15,844.00 on January 16, 2024, $481,080.40 on January 28, 2025, $380,997.89 on February 19, 2025, and $126,076.49 on April 29, 2025. We currently have one outstanding request for $172,233.77 that we were unable to drawdown.

2

JA304

10.     On April 25, 2025, I emailed EPA staff requesting $123,906.00 in reimbursements for costs incurred prior to and during EPA's suspension of our grants in the ASAP system. This request was for expenses incurred from February 20 through March 31, in addition to expenses incurred by one of our subawardees between January and February. We received no response.

11.     On April 30, 2025, we submitted our Quarterly Report and SF-425 (federal financial reporting) to EPA as evidence that we continued to make remarkable progress on meeting and exceeding our metric for the quarter despite impacts to our funding.

12.     Throughout the funding pause, we were unable to meaningfully get in touch with our project officer despite multiple attempts to communicate. Communications with our project officer, in the rare instances that we receive a reply, were limited to one word answers or canned responses.

13.     As the CEO, my workload increased significantly during this period. I was working 18 hour days 5 days per week to ascertain the status of our funding. The chaotic and dysfunctional nature of the pause forced us to make strategic decisions about the future of our organization in a vacuum with no guidance from EPA.

**Termination of Grant Funding Without Notice**

14.     On May 1, 2025, Landforce was notified via email that its CCG award was terminated. The termination was a form letter document with no individual insight into why EPA terminated our particular award.

15.     On May 19, 2025, Landforce submitted a formal notice of disagreement to EPA for its unilateral termination of our grant award. No response was received.

16.     On May 20, 2025, Landforce submitted a timely dispute to EPA for the wrongful termination of our Assistance Agreement. No response was received.

JA305

17.     On June 1, 2025, I emailed EPA Region 3 Administrator reiterating our dispute and that we continue to suffer irreparable harm because of EPA's arbitrary termination of our award.

18.     EPA provided notice of receipt of the dispute on June 3, 2025. The agency also notified Landforce that we would be able to complete a final drawdown for all allowable costs incurred up to the date of termination. However, we did not make a final drawdown because we no longer had access to our funding within the ASAP account, and we were concerned that doing so would be tantamount to accepting the termination.

**Harm Resulting from Award Termination**

19.     As the CEO, 80 to 90 percent of my time has been redirected towards federal grant response. This work includes outreach to elected officials in Washington, D.C., constant communication with our partners and board of directors, as well as dedicating time to advocating on behalf of the grant.

20.     Landforce signed a lease in reliance on the community change grant. In November 2024, we began renting a warehouse to be used in our urban wood reuse program. The Mill is a 10,000 square feet warehouse one block from our training center that will be our base of operations for milling and drying lumber, manufacturing lumber byproducts, making biochar, and instructing trainees in all of these skills. Despite the pause in funding, our successful drawdowns allowed us to purchase all the equipment needed for the Mill to be operational. Our intention is to find and secure funding from other sources to cover the expense of the lease so that we can keep the program operational. However, if we are unable to find alternative funding and must break the lease, we will need to pay $18,000 out of pocket.

21.    Landforce also built its budget around the EPA award. In the past, we made sure that our income was diverse, meaning we derived income from various funding sources to ensure financial stability and protect ourselves from external changes. Then, only about 30-40% of Landforce's income was sourced by federal grants. However, now, because the CCG award was so substantial, about 60 percent of Landforce's annual budget for FY2025 is sourced by the federal award.

22.    Due to the loss of funding, Landforce staff has dedicated significant time to cranking out grant applications to make up for the budget shortfall. However, much of the funds raised are going towards supporting staff salaries and indirect costs of the organization. We have minimal financial resources to put towards our critical program work.

23.    For example, Landforce cancelled two contracts: one with our technical advisor's urban reuse wood production facility and the other with a consultant for the alumni program.

24.    Our alumni program provided a community for former crewmembers to meet monthly with one another. The program helped to cultivate meaningful relationships among Landforce's past and present participants while contributing to ongoing professional development for former participants. As a result of the loss of funding, this program has been temporarily suspended.

25.    Budget constraints have also led to the temporary suspension of our 2025 workforce program. In the past, Landforce trained about 20 people per year. Recently, we were able to increase that number to 40 people per year with 2 trainings offered. As a result of the loss of funding, these numbers decreased to 18 people per year and only 1 training offered for 2025. The decision to downsize the training program was incredibly difficult, but it became necessary in order to keep our full time staff on payroll.

26.    Although we have managed to keep most of our staff on payroll, about 30 full time employees were supported by the CCG award. We worry about the viability of our workforce if funding is not swiftly restored. Not only that, but several subawardees have already experienced hiring freezes and furloughs. The impacts of the termination have filtered through to our partners and communities.

27.    For example, we are constantly doing damage control with partners, donors, and funders. We spend significant time reassuring our partners that the critical work of our organization is not dead. While we have done our best to keep our foundation partners apprised of our progress and the impact of the terminations, we are deeply concerned that if we are unable to report positive progress on our programming that our reputation among our partners and funders will take a significant hit.

28.    Moreover, Landforce has earned a longstanding reputation for being well-trusted in the communities it serves. Trust is critical to the success of our programs, so significant disruptions to our programming make it impossible to estimate how long it may take to repair those relationships.

29.    In all, the emotional toll of the termination has been substantial. The entire process has been chaotic and illogical, causing significant stress on everyone involved. The terminations have been a mental drain on myself, my staff, and my community.

30.    Despite all this, we feel we have no other choice but to continue to advocate for our organization, our partners, and our community who depend on our critical programs. Immediate grant funds are needed to resume this project and restore momentum toward environmental justice, resilience, and long-term sustainability.

JA308

31.    If the grant is restored, across the three years of the grant we will be able to hire a second staff member to work with trainees in wood reuse and support the Director of Wood Reuse to ensure we can begin earning revenue from the operations of The Mill, train 15 to 20 individuals in advanced manufacturing skills and support their transition to future employment, deploy 56 MT of biochar to reduce soil contaminants like lead and improve soil conditions for agriculture in our region, sequester 214 MT of $CO_2e$ in wood-based products, and mill 52,000 Board Feet of lumber for resale. In addition, we will be able to pay our subawardees so that they may move forward with their plans to accomplish similar goals across Philadelphia.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States, that the foregoing is true and correct.

Executed this 17th day of June, 2025.

Ilyssa Manspeizer

# EXHIBIT R

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**DECLARATION OF ALICE BRIDGES, PARKS ALLIANCE OF LOUISVILLE, INC.**

I, Alice Bridges, declare as follows:

1.      My name is Alice Bridges, and I live in Louisville, Kentucky. This declaration is based on my personal knowledge and professional education and experience. I am over the age of eighteen and suffer from no legal incapacity. I submit this declaration in support of the Parks Alliance of Louisville, Inc. ("Parks Alliance of Louisville"), which was awarded an Environmental Justice Collaborative Problem-Solving Cooperative Agreement under Clean Air Act Section 138.

2.      I want to be a named plaintiff in this case. I understand that, as a class representative, it would be my responsibility to represent the interests of all the class members in this lawsuit, and not just my own personal interests. I also understand the need to stay informed about what is happening in the case. I understand that I agree to represent other nonprofit groups with terminated Environmental Justice Collaborative Problem-Solving Cooperative Agreements.

3.      I am the Director of Special Projects at the Parks Alliance of Louisville. I have held this position since 2024 and worked with the Parks Alliance of Louisville since 2020.

4.      The Parks Alliance of Louisville is a 501(c)(3) nonprofit organization based in Louisville, Kentucky. The mission of the Parks Alliance of Louisville is to drive equitable investment in Louisville's public parks to improve the health and wellbeing of the entire community. The Alliance attracts charitable investments to support more than 100 parks and community centers—most located in under-resourced neighborhoods.

1

5.      On April 27, 2024, the Parks Alliance of Louisville was awarded an EPA $500,000 Environmental Justice Collaborative Problem-Solving Cooperative Agreement under Clean Air Act Section 138. Under the terms of our grant Agreement, the Parks Alliance of Louisville agreed to complete the project over a 3-year period ending in January 2027.

6.      The Parks Alliance of Louisville was awarded this grant to engage residents of Louisville's California Neighborhood and surrounding neighborhoods in the planning, programming, and stewardship of the new 20-acre Alberta O. Jones Park. The 20-acre area that is being transformed into Alberta O. Jone Park is a low-lying, flood-prone site that was once a residential neighborhood. In 2009, Louisville experienced historic rainfall that flooded and severely damaged the homes in this area with both rain and combined sewer overflows. To improve public health and safety, Louisville's Metropolitan Sewer District secured a FEMA Hazard Mitigation Grant that enabled homeowners in the highest-risk areas to sell their property at pre-flood value and relocate. Once purchased, the flooded homes were razed, and all 114 properties were permanently conserved as greenspace—significantly reducing impervious surfaces and creating more open ground for the absorption of rainfall.

7.      The nearly seven city blocks of vacant lots were unusable to the public and plagued by illegal dumping and homeless encampments. In 2020, the Parks Alliance began a community-driven planning and fundraising process that ultimately enabled completion of the first five acres of Alberta O. Jones Park in 2023. The park serves a predominantly Black community in an urban heat island where less than 1% of land is dedicated to parks and greenspace.

8.      The grant funding was awarded to build upon that progress by providing funding for the Parks Alliance of Louisville to perform a Health Impact Assessment to engage the

2

JA312

community in identifying core strategies through which the park's programming and infrastructure can impact residents' physical and mental health and wellbeing. The primary outcome of the project is the creation of a new model of community-driven park leadership that can be replicated in other Louisville public parks, particularly those in historically underserved and disadvantaged neighborhoods.  According to the Louisville Metro Department of Public Health and Wellness, this is the first Health Impact Assessment it has conducted in Louisville to examine the impact on health and wellbeing of a physical space.

9.      The CEO of the Parks Alliance of Louisville and I spent over 100 combined hours preparing this grant application. The grant application process also involved the time and investment of several other community partners and stakeholders.

10.      In addition to the time and resources spent applying for the grant, my colleagues and I worked with EPA grant officials for six months after we received a Notice of Selection in October 2023 to comply with EPA's terms and conditions required to secure the award agreement.

11.      The Parks Alliance of Louisville has been fully compliant with all reporting requirements. We were informed by our EPA Grant Officer during monthly meetings that we were exemplary in our progress reporting and drawing down of funds. Our organization's reporting and record-keeping actions were featured as a best practice for complying with EPA's requirements during an EPA webinar in November 2024.

12.      We received funding under this agreement through a reimbursement model, which means that our organization spends our own funds in compliance with our agreements, and in return, we expect reimbursement for those expenses.

JA313

13.     Access to our awarded funding was disrupted starting on January 30, 2025 when our Automated Standard Application for Payments (ASAP) account was suspended and reactivated twice in the course of 21 days.

14.     On February 21, 2025, Brooke Pardue, the CEO of the Parks Alliance of Louisville, received an email with an attached letter stating that the Environmental Protection Agency is terminating our Environmental Justice Collaborative Problem-Solving Cooperative Agreement. The letter stated that the "objectives of the award are no longer consistent with EPA funding priorities" and "[t]he grant specified above provides funding for programs that promote or take part in DEI initiatives or environmental justice initiatives or other initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States."

15.     On March 21, 2025, the Parks Alliance of Louisville submitted a dispute of our assistance agreement termination. EPA has since confirmed receipt of the dispute and responded on May 30, 2025 requesting that the EPA Region 4 Dispute Decision Official uphold and affirm its termination of the grant award.

16.     We are owed $9,509.70 from the EPA to reimburse approved project expenses prior to the termination. We have been unable to draw down these funds from our ASAP account since we received the termination letter.

17.     Upon termination of this grant, we were forced to let a full-time staff member go, whose salary and benefits were provided by the grant funding. As laid out in our grant agreement, we hired a Park Superintendent to oversee the stewardship and ongoing programming of the Alberta O. Jones Park, to form and operationalize the Park Community Council, perform a

4

JA314

Health Impact Assessment, conduct community outreach events, survey residents' experience, acquire parcels of land for Phase II of the park, and incorporate planning and engineering best practices to mitigate risk of exposure to flooding and combined sewer overflows. We brought this individual on after a four-month hiring process that involved multiple staff and board members. The Park Superintendent began work in April 2024. We were forced to eliminate this position after we received notice that our grant was terminated.

18.    The loss of this critical funding has prevented the Parks Alliance of Louisville from continuing work that serves important community needs. This grant represented approximately 95% of our programming budget for the park and 50% of our operating budget for the park.

19.    We have had to significantly reduce environmental educational programming planned at the park this summer and cancelled all such programming for 2026 which included, among other items, children's story times, family movie nights, and gardening workshops.

20.    Since our grant was terminated, we have been forced to find alternative funding sources to continue the Health Impact Assessment and roll back plans to disseminate Health Impact Assessment findings to the community. The Health Impact Assessment would identify the core strategies through which park design and programming can impact residents' health and wellbeing.

21.    Upon notice of the award termination, we had to cancel phase 2 of a biodiversity study to measure changes in the biodiversity of plants and animals at the park over time as a result of building the park on formerly vacant land.

22.    The Parks Alliance of Louisville has had to pick up the cost of stipends for the Park Community Council. The Council plays a key role in the Health Impact Assessment by

JA315

informing core strategies through which park design and programs can impact residents' health and wellbeing to guide decisions that optimize positive outcomes. This group is now in the final phase of the Health Impact Assessment. We previously used our grant funding to provide stipends to participants for each meeting and are now covering these costs with funds from our general operating budget.

23.    Community members have volunteered their time and energy to participate in the Council, but now our ability to carry this work forward is jeopardized. The Parks Alliance of Louisville worked for many years to earn the trust of community members in the California Neighborhood and surrounding neighborhoods which have experienced decades of broken promises from government-sanctioned redlining and urban "renewal." The community's trust in our organization is diminished by the termination of our grant.

24.    The termination of our grant has also disrupted and delayed progress on future planned work we agreed to carry out under the 3-year grant agreement. The grant included funds to acquire private property within the park planning boundary to complete Phase II of park construction. We will be forced to find another source of funding to proceed with these acquisitions.

25.    If our Environmental Justice Collaborative Problem-Solving Cooperative Agreement is reinstated, the Parks Alliance of Louisville will be able to continue to make Alberta O. Jones Park a space that supports the health and wellbeing of the California Neighborhood and surrounding neighborhoods. We would put this funding to use immediately to reactivate the Park Community Council, reinstate environmental educational programming, complete the biodiversity study, move forward with property acquisitions, and widely disseminate the findings of the Health Impact Assessment.

6

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United

States, the foregoing is true and correct.

Executed this _19th_ day of _June_ 2025.

Alice Bridges

7

# EXHIBIT S

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

### DECLARATION OF DR. BEVERLY WRIGHT, DEEP SOUTH CENTER FOR ENVIRONMENTAL JUSTICE

I, Dr. Beverly Wright, declare and state as follows:

1. I am the Founder and Executive Director of Deep South Center for Environmental Justice (DSCEJ). In my role as Executive Director, I oversee the strategic direction of the organization.

2. I have worked at DSCEJ for 33 years. I am familiar with DSCEJ's organization, policies, practices, and programs.

3. Established in 1992, DSCEJ's mission is to provide opportunities for communities, decision-makers, and scientific researchers to collaborate on programs and projects that promote the rights of all people to be free from environmental harm as it impacts health, jobs, housing, education, and general quality of life.

4. One way that DSCEJ works to implement its mission is by running programs like the Environmental Career Worker Training Program and the Hazardous Waste Worker Training Program, which prepare residents of fence-line communities for jobs in remediation, construction, HAZWOPER, and disaster response. We also run the Gulf Water Justice Strategic Planning Project in collaboration with Texas Southern University, where we engage in community science and advocacy around salt-water intrusion and flooding throughout the Gulf Coast Region. DSCEJ also created the Navigate NOLA initiative to provide social-emotional curricula in New Orleans schools, girls' leadership circles, and wellness groups for Black women – linking mental health to environmental stressors.

JA319

5. These programs, and the many other programs run by DSCEJ, are funded through a mix of federal competitive grants, state and local grants, and private and corporate philanthropy.

6. In November 2022, we applied for an Environmental Justice Thriving Communities Technical Assistance Center (EJ TCTAC) grant from EPA to fund the creation of the Community Investment Recovery Center (CIRC).

7. The goal of CIRC is to enhance the capabilities of tribal communities and community-based organizations in rural, remote, or underserved communities throughout EPA Regions 4 and 6 in securing vital grants from the EPA, DOE, and other governmental and non-governmental sources. Through a rigorous and holistic training process, organizations that work with CIRC are meant to leave the program better equipped to advocate on behalf of their communities and to build up local resilience.

8. In September 2023, DSCEJ's application for an EJ TCTAC grant was approved. EPA approved a funding amount of $8 million, which in December 2024 was increased via an EPA amendment to $11 million. Ex. 1.

9. Since receiving approval for the TCTAC grant, we hired multiple staffers, entered into multiple contracts, and engaged nearly 70 community organizations throughout EPA Regions 4 and 6 in the CIRC training process.

10. Between the time that the grant was awarded and February 21, 2025, DSCEJ was able to log into the Automated Standard Application for Payments (ASAP) system and make four successful drawdowns of our TCTAC grant funds, for a total of $2.47 million.

11. On February 21, 2025, we received notice from EPA Award Official Alfred Burch that our EJ TCTAC grant was terminated. By way of explaining the cancelation, EPA stated

that the award "no longer effectuates the program goals or agency priorities," and that "the objectives of the award are no longer consistent with EPA funding priorities." Ex. 2.

12. The notice from EPA further stated that it is the EPA's priority to ensure "that the Agency's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives, 'environmental justice' initiatives, and conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions." Because the TCTAC grant "provides funding for programs that promote or take part in DEI initiatives or environmental justice initiatives ... the grant is therefore inconsistent with, and no longer effectuates, Agency priorities." *Id.*

13. DSCEJ is no longer able to access the ASAP system. Prior to the program's termination, DSCEJ incurred certain costs spent on CIRC that can no longer be submitted for reimbursement given the inaccessibility of the ASAP system. These costs currently total $132,635.40.

14. Since we received the termination notice for our TCTAC grant, we have experienced a significant negative impact on our daily operations and on our budget. Most critical to our own operations, we have been forced to terminate three full-time employees and two contractors due to lack of funds in our budget. We have been forced to divert funds within our budget to cover payroll costs for two additional project staffers and two other cross-functional team members. The funds to cover those payroll costs were taken from our general support donations fund. If the grants program were not terminated, these funds would have covered costs associated with certain core initiatives like our HBCU internship program and the HBCU Climate Change Conference.

15. Additionally, the termination of our grant funding forced DSCEJ to suspend two RFP processes that had already begun, and we were forced to halt the hiring process for four full-time employees to fill critical roles within CIRC, including the Deputy Program Director role, a Government and External Affairs Manager, a Community Engagement Coordinator role for Region 4, and a Community Engagement Coordinator role for Region 6.

16. I am also concerned about the impact that this grant program termination will have on the communities that DSCEJ has been able to serve through the TCTAC. Prior to the termination of the grant program, CIRC was in the process of serving approximately 70 grassroots partner organizations working across 13 states. These organizations were engaged at various steps of the overall training process, and are now unable to receive coaching on grant application strategies that would make them more effective advocates for their own communities. The now-terminated funds would have supported the creation of jobs, the lowering of energy costs, and the construction of community-driven resiliency projects within these organizations' communities; terminating the TCTAC program directly undermines this progress and threatens their long-term impact.

17. In an attempt to fill the gap in our budget left by the decision to terminate the grant program, we have increased our fundraising and grant application efforts at DSCEJ. This shift toward fundraising has taken focus away from many of my other core duties as Executive Director, and has required additional working hours from several staff members. Thus far, however, our increased efforts have not resulted in any new grants to fill the gap.

18. This experience has had an impact on DSCEJ's standing within our community. There is a well-founded and hard-earned skepticism within our community regarding the federal

government, and it is one that DSCEJ has worked for several years to change. Our organization has consistently made the case that the federal government has a genuine interest in promoting the health and well-being of communities like ours. With the funding we received through this grant program, we made a promise to our community and to our partner organizations that the federal government was acting on that interest. With the EPA's decision to terminate the grant program, this is the first time in our organization's 35-year history that we cannot deliver on a promise made to our community.

19. If the TCTAC grant program is restored soon and we are able to access our funding, DSCEJ will be able to hit the ground running to restart CIRC's programming in the manner it had been running up to the grant program's termination and fulfill our promise to the community. We will also be able to hire back the three full-time employees and two contractors who were terminated for lack of funding.

20. I am concerned, however, that the longer DSCEJ goes without these funds, the greater the risk that the employees and contractors we intend to rehire will move on to different roles.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Date: 6/23/25

Dr. Beverley Wright

# EXHIBIT T

JA324

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

### DECLARATION OF RODLY MILLET, LOWCOUNTRY ALLIANCE FOR MODEL COMMUNITIES

I, Rodly Millet, declare as follows:

1.     My name is Rodly Millet, and I live in Mount Pleasant, South Carolina. This declaration is based on my personal knowledge and professional education and experience. I am over the age of eighteen and suffer from no legal incapacity. I submit this declaration in support of Lowcountry Alliance for Model Communities, which was awarded an Environmental Justice Collaborative Problem-Solving Cooperative Agreement under Clean Air Act Section 138.

2.     I want to be a named plaintiff in this case. I understand that, as a class representative, it would be my responsibility to represent the interests of all the class members in this lawsuit, and not just my own personal interests. I also understand the need to stay informed about what is happening in the case. I understand that I agree to represent other nonprofit groups with terminated Environmental Justice Collaborative Problem-Solving Cooperative Agreements.

3.     I am the CEO of Lowcountry Alliance for Model Communities. I have held this position since July 1, 2024. Previously, I served as the chair of the organization's board.

4.     Lowcountry Alliance for Model Communities is a 501(c)(3) nonprofit located in North Charleston, South Carolina. It was founded in 2005 with the purpose of advocating for environmental justice and promoting community development, education, employment, quality housing, and community involvement. Its work focuses on sustainable development through meaningful community engagement that leads to local community action.

JA325

5.      On November 11, 2024, the Lowcountry Alliance for Model Communities was awarded a $500,000 Environmental Justice Collaborative Problem-Solving Cooperative Agreement under Clean Air Act Section 138. Under the terms of our grant agreement, Lowcountry Alliance for Model Communities agreed to complete the project over a three-year period ending in December 2027.

6.      We secured this grant after working for 4 months to prepare our application. After we received notice that our application was selected, I worked with EPA grant officers to create a manual demonstrating how Lowcountry Alliance for Model Communities would comply with the terms and conditions of the awarded grant. Throughout this time, I also met regularly with the subrecipients under the grant to plan budgets and programming.

7.      We chose not to apply for other grant opportunities while pursuing an Environmental Justice Collaborative Problem-Solving Cooperative Agreement, such an EPA Thriving Communities Grant.

8.      Lowcountry Alliance for Model Communities was awarded this grant to work with community, academic, non-governmental and governmental organizations to increase civic engagement, address environmental and public health concerns in Environmental Justice communities throughout the Southeast. Specifically, this effort targets organizations that work with predominantly Black and low-wealth communities in the eight states that make up EPA Region IV. We planned to offer a series of trainings to better prepare communities and develop leaders to locally prepare for, respond to, and recover from disasters while strengthening community capacity to lower vulnerabilities to environmental hazards.  Each training offers various modules that are used to teach participants about the roles of local, state, and federal government; conflict resolution; problem identification and prioritization; policy; developing a

2

better understanding of environmental and public environmental concerns and terminology; leadership and capacity building in a community, and other topics. At the end of the training, participants will be well positioned to understand the project area profile for the impacted communities and an action plan that will guide their future community improvement activities. The final goal is to create a network of community resiliency hubs in order to increase community capacity to build climate resilience.

9.    Lowcountry Alliance for Model Communities has been fully compliant with all grant terms and conditions and reporting requirements.

10.    We received funding under this agreement under a reimbursement model, which means that our organization spends our own funds in compliance with our agreements, and in return, we expect reimbursement for those expenses.

11.    We did not have access to our award funding when our award became active because the EPA did not properly submit documentation regarding our grant to Automated Standard Application for Payments (ASAP). After this was initially resolved, access to our awarded funding was disrupted at the end of January 2025 when our ASAP account was repeatedly suspended and reactivated.

12.    On April 10, 2025, my colleague and I had a meeting with our EPA grant officer in which we were asked to amend our work plan to remove words listed on keyword list that are disfavored or are not considered to be in alignment with the administration's priorities. Our EPA grant officer sent us revised version of our work plan with suggested changes to remove words including "environmental justice", "Black", "climate change", "underserved", "planet",

3

"inequities", "socioeconomic indicators", "inclusive", "racial injustice", "marginalized", and "racism".

13.    We were in the process of working with our EPA grant officer to revise our workplan based on these suggested changes when we received an amendment to our assistance agreement on May 2, 2025 unilaterally terminating our Environmental Justice Collaborative Problem-Solving Cooperative Agreement.

14.    The program was set to begin on March 1, 2025, but was disrupted by pauses in access in funding and uncertainty of the continuation of the award. I did not want to reach out to communities and potential partner organizations to begin to form relationships and work together when our funding was not reliably available. I did not want to start building hope in case the funding went away. Instead, during this period before our grant was terminated, I began conversations with potential partner organizations that I had existing relationships with.

15.    This termination has prevented us from passing on subawards to organizations that agreed to support work leading to community-led data collection and monitoring of environmental hazards and public health impacts and to facilitate environmental justice trainings.

16.    The sudden termination of this grant funding has harmed Lowcountry Alliance for Model Communities' relationships with community members. One community leader made an announcement to the community that this funding was coming only to later learn it was not. Now that we have had this experience, I am hesitant to share with community members about programs we are working on until I know the money is secure.

17.    The loss of this grant funding has harmed the financial health of Lowcountry Alliance for Model Communities. We had to revise our budget for this year after the grant was

4

JA328

terminated. Our projected annual revenue decreased by 43%. I stopped taking a salary at the end of May to avoid laying off employees.

18.    Since our grant was terminated, my team and I have been forced to direct much of our attention and time to pursuing other grant opportunities with the hopes of being able to find funding to continue this work. We have not found other grant opportunities that would offer comparable amounts of funding to the $500,000 we were granted through our Environmental Justice Collaborative Problem-Solving Cooperative Agreement. Additionally, this administration's cancellation and termination of grant programs has meant that my organization is competing with a larger pool of applicants across the country for private grant opportunities.

19.    If our Environmental Justice Collaborative Problem-Solving Cooperative Agreement is reinstated, Lowcountry Alliance for Model Communities will be able to continue our work to address environmental and public health concerns in Environmental Justice communities throughout the Southeast. We would provide a series of training courses to better prepare communities and develop leaders to prepare locally for, respond to, and recover from disasters while strengthening community capacity to lower vulnerabilities to environmental hazards

JA329

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States, the foregoing is true and correct.

Executed this #__ day of _June 2025.

Executed this __24__ day of _June_ 2025.

Rodly Millet

JA330

# EXHIBIT U

JA331

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

## DECLARATION OF LAUREL HUNT,
## DAY ONE

I, Laurel Hunt, declare as follows:

<u>Background</u>

1. My name is Laurel Hunt, and I live in Los Angeles, California. This declaration is based on my personal knowledge and professional education and experience. I am over the age of eighteen and suffer from no legal incapacity. I submit this declaration in support of Day One, which is one of several grant recipients affected by the freeze and terminations of federal grant funding.

2. Day One is a non-profit organization with a mission to build vibrant, healthy cities by advancing public health, empowering youth, and igniting change. We are exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code.

3. Day One has been serving the San Gabriel Valley for 38 years.  We have many environmental and social justice programs serving residents of the San Gabriel Valley in California. The San Gabriel Valley is roughly 20% of the population and five percent of the land area of Los Angeles County, encompassing the cities of Altadena, a portion of unincorporated Los Angeles County, Pasadena, Pomona, and San Gabriel, to name a few.

4. Our programs address a diverse range of social and environmental needs. In the last two months alone we partnered to hold an event for high school students affected by the

JA332

Eaton Fire. The Eaton Fire, which started near Altadena in January 2025, killed 18 people and destroyed 9,400 homes. At our event, high school students, whose families had all lost their homes and belongings, been displaced, or otherwise seriously been impacted by the Eaton fire, participated in workshops on college readiness, drug and alcohol safety, and financial literacy to ensure that they could remain on track. Each student also received a $250 gift card from one of the event sponsors so that they could pick out clothes for graduation, since they had lost so much in the fire. In addition, we support communities as a whole affected by the Eaton Fire in the following ways:

    a. Holding a free pop-up twice a week where residents can pick up essential items at no cost.

    b. Co-sponsoring a fentanyl awareness event in Pomona where over 200 attendees received free Narcan, fentanyl test strips, hygiene kits, haircuts, and groceries.

    c. Co-sponsoring a bike ride in Pasadena.

    d. Co-sponsoring a 16 day Summer SKILLZ intensive summer learning experience this month designed for at-risk youth and comprised of interactive life skills and math reinforcement sessions.

    e. Day One has received numerous awards for our public service, and was selected by State Senator Susan Rubio to be honored this month as a California Nonprofit of the Year.

5. Day One applied for and was awarded a Community Change Grant from the United States Environmental Protection Agency ("EPA") (the "Grant"). Per the agreement with the EPA, the Grant was awarded to "develop and implement green infrastructure, clean water infrastructure, transportation options for preventing air pollution, energy efficient

and healthy housing and buildings, and pollution management and reduction strategies."
A copy of the Grant Agreement is attached hereto as Exhibit 1. The Grant was for three
years starting January 1, 2025.

6. I am the Project Manager for greenSGV (Green, Resilient, Energy Efficient
Neighborhoods San Gabriel Valley), which is a collaborative project of Day One and five
other non-profits in the San Gabriel Valley who were to be subawardees on the Grant. I
was newly made full time to administer the Grant. My responsibilities on the grant are to
ensure project fidelity, conduct project meetings, review plan progress, and ensure work
plan timelines are met. I work closely with the Grant Administrator that Day One hired
specifically to help support this EPA Grant.

<u>The Grant Award and Purported Termination Timeline</u>

7. On November 26, 2024, the EPA awarded the Grant to Day One in the amount of
$20,452,614.00. A copy of the Notice of Award and Grant Agreement is attached hereto
as Exhibit 1.

8. On February 7, 2025 we were able to draw down money for the first time from the Grant
to implement the project objectives. However, just five days later, on February 12, 2025,
the account portal said the funds were suspended, and as a result we could not use the
Grant money to pay our subawardees or initiate Grant projects. Subsequently, we were
briefly able to access the Grant money before the EPA Office of Mission Support
formally notified Day One that its Grant was terminated by memorandum dated May 1,
2025. That memorandum says in part:

   This EPA Assistance Agreement is terminated effective immediately on the grounds
   that the remaining portion of the Federal award will not accomplish the EPA funding

priorities for achieving program goals. The objectives of the award are no longer

consistent with EPA funding priorities.

A copy of that memorandum is attached hereto as Exhibit 2.  The EPA confirmed the

termination of the Grant in a May 1, 2025 "Assistance Amendment" which amended the

Grant by reducing the award to zero.  A copy of the "Assistance Amendment" is attached

hereto as Exhibit 3.

9. Day One promptly disputed the Grant termination on May 21, 2025, pointing out that the

grounds for termination were invalid, and reserving its right to litigate.

<u>Work Under the Grant</u>

10. The work to be done under the Grant includes seven environmental and community

initiatives. These are directly aligned with the EPA's Climate Action Strategies.  All these

have been brought to a stop by the EPA Grant termination:

    a. Led by subawardee Tree People, the "Tree Planting" project is to mitigate the rise

        in extreme heat and build community resilience by planting 1,000 trees in

        parkways and public places and distributing 1,500 fruit trees free of cost.  The San

        Gabriel Valley averages 32 days per year when daytime temperatures exceed

        95°F, and is projected to reach 74 days per year by 2050.  Tree planting and

        distributions will be done strategically to help communities both mitigate and

        adapt to climate change. Tree species will be selected based on their suitability for

        the specific site, and their ability to sequester carbon. Planting areas will address

        impacts being felt by the community, such as extreme heat and flooding, by

        providing shade and cooling, and by slowing the landfall of rain, among other

        benefits.

b.  The "Green Schoolyards" initiative aims to reduce methane emissions, capture and clean stormwater, improve biodiversity, and clean the air by implementing composting, rain gardens, and native plants in school yards.  Installing rain gardens and planting native trees on public school campuses will reduce the pollutant load of runoff from impervious surfaces like parking lots, roofs, and walkways, capture and clean stormwater, reduce ambient temperature, and clean polluted air. The project lead on this initiative is subawardee Sustainable Claremont.

c.  The "Electric Family/Cargo Bike Incentives and Bicycle Repair Stations" initiative aims to reduce vehicle miles traveled and accelerate the adoption of healthy, zero-emission technology through distributing 300 vouchers of up to $2,500 each towards the purchase of electric-assist, zero-emission family/cargo bikes and installing 30 bike repair stations at public schools and facilities.  The project lead is subawardee ActiveSGV.

d.  The "Clean Casas" project aims to reduce methane dependence and emissions, improve indoor and outdoor air quality, and improve public health by installing rooftop solar, battery storage, cool roofs, and induction stove technology, and implementing related community engagement and education campaigns. The project includes installing solar panels and battery energy storage systems at approximately 30 homes. An additional 22 homes will have roof repairs and cool roofs installed to help reduce ambient air temperature. The subawardee GRID Alternatives is a project co-lead on Clean Casas.  Day One will assist this project by installing zero-emission induction stovetops in 60 homes.

JA336

e.  The "Clean Water Refill Stations" project aims to reduce single-use plastic water
    bottle waste and support the use of free, healthy water and reusable bottles by
    installing 60 public water stations in public places and schools.  Day One is the
    project lead on this initiative.

f.  The "Rain Gardens" project aims to reduce flooding, and decrease local reliance
    on imported water from the Colorado River, as well as reduce the pollutant load
    of runoff from impervious surfaces like parking lots, roofs, and walkways, by
    installing 60 rain gardens made of native trees and plants.  The subawardee
    ActiveSGV is set to be the project lead on this initiative.

g.  The "Multi-Benefit Stormwater Capture Greenway (Merced Avenue Greenway)"
    project aims  to capture and clean stormwater while creating a safe space for
    active mobility in South El Monte.  It is a 1.1-mile project, half of which was
    completed in 2024, to improve the area for walking and biking while also
    incorporating features to manage rainwater- such as bioswale planters and porous
    concrete, native trees and plants, pedestrian safety improvements, and a protected,
    multi-use path.  Bioswale planters capture water traveling down the street when it
    is raining. The captured water infiltrates through special soils, rocks, and
    underground reservoirs, seeping deeper into the ground at a rate of 20 to 100
    inches of rainwater per hour. The bioswale planters can capture 10.27 acre-feet of
    rainwater per year. Porous concrete allows water to pass through, unlike
    traditional concrete. These features prevent rain runoff from overflowing sewers.
    Subawardee Council for Watershed Health is to be the project lead on this
    initiative.

JA337

11. To implement our grant deliverables, greenSGV has a Community Engagement Plan. The Community Engagement Plan included six community workshops, 50 presentations, and 100 pop-ups at community events to share information and gather feedback. For example, the Tree Planting project will build community resilience through local hiring, training community members as volunteer leaders, and building awareness of other initiatives in the community. The Green Schoolyard project will be a vehicle for environmental education and outreach, ultimately establishing a program that will be run in the long-term by the host schools. The Rain Garden project will include inviting the general public to support rain garden implementation via 'Rain Garden Ranger' days, which will educate, inform, and train residents on how to construct a rain garden in a hands-on manner, in real-time, on project sites. In addition, a Community Advisory Committee will meet 24 times throughout the project duration.

12. Before our funding was cut off, Day One and our subawardees laid the groundwork for our projects. In addition to preparing to hire staff, we engaged in a variety of activities to get ready for execution of our main projects, including meeting with municipalities and school districts, preparing educational materials to distribute to the community and stakeholders, and purchasing e-family/cargo demonstration bikes and bike repair stations.

13. As described above, our project has five subawardees. Three of the subawardees had accepted their subawards, Sustainable Claremont, ActiveSGV, and Council for Watershed Health prior to our funding being frozen.

   a. ActiveSGV and their staff of 13 were fully prepared to implement their Grant projects, purchasing equipment necessary to enable commencement of work. In

addition, they reviewed and vetted more than 370 applicants for the
E-Family/Cargo Bike Voucher program.  When their Grant was terminated, they
were forced to move 1 staff member to part-time regular status and 5 staff
members were reclassified as part-time on-call status. The remaining staff
members were reassigned to work on other grants and initiatives.

b.  Sustainable Claremont also purchased equipment for their project in anticipation
of commencement.  They had (5) five part-time staff that reasonably relied on a
transition to full-time work as a result of the Grant; but when the Grant was
terminated they had to remain part time employees. Sustainable Claremont was
also planning on hiring two more fulltime staff and to work solely on this grant
and they were unable to hire those employees. Sustainable Claremont was also
slated to host (3) three California Climate Corps members to work on the grant
and they have had to be redirected to other programs due to the loss of funding.

c.  The fact that the Council for Watershed Health cannot access funds means that
their organization and the community in South El Monte will suffer far-reaching
negative impacts.  From an organizational standpoint, current staff that would
have worked on a project funded by this grant had to be reassigned to another
program, barring the hire of a new full time employee. The fact that this project
cannot move forward also puts $9 million in match grant funding is at risk.  From
a community standpoint, pedestrian and cyclist safety will remain at risk while the
.5 mile gap in bike lane improvements and high visibility crosswalks, as well as
other mobility safety improvements, remain incomplete.

JA339

14. Neither GRID Alternatives nor Tree People have accepted their subawards because they could not take the financial risk of having the EPA withdraw the funds without cause. While it is our hope that these organizations will sign if the grant is re-instated, they are within their rights to move their project forward with other partners. If they do so, Day One will lose the depth of expertise that GRID Alternatives and Tree People would have brought.

15. At Day One, we are also quickly approaching the point of exhausting our financial reserves to pay salaries of existing staff, and of course we are unable to hire new staff needed to launch critical projects. We were also preparing to hire ten full-time additional staff members to execute the Grant projects, but that had to be stopped when the funding was withdrawn.

16. Day One also has suffered reputational damage from the termination of the grant. When we received our award, we put together a list of Community Advisory Committee members that we could invite to join, which we vetted with our partners. Though the invitations were ready to go out, we were forced to hold them when the EPA terminated the Grant. We also began the process of reaching out to the community through social media, creating expectations in the community that we would provide timely support and services. The Grant termination has made our partners and our community skeptical about our ability to manage projects and has eroded trust in our organization. We also have lost momentum with the community. We fear that it will take significant time and effort to win back the trust of the community.

17. The 2025 Los Angeles wildfires devastated communities throughout the San Gabriel Valley, with impacts extending far beyond the immediate burn areas. Residents face

JA340

cascading impacts from wildfire smoke, economic disruption, heightened vulnerability to future climate disasters, and displacement. Part of the wildfire-affected region in the San Gabriel Valley is in the greenSGV focus area. The failure to strengthen the community after that devastating fire will adversely affect residents' trust in government. Terminating Day One's funding is diverting funding away from a region that is recovering from the fires.

18. Restarting the Grant funding will allow Day One and our subawardees to move forward with the seven Grant projects. This funding will support environmentally beneficial projects that will prevent or mitigate anticipated environmental harm.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States, the foregoing is true and correct.

June 26, 2025

Laurel Hunt, Climate Resilience Director, Day One

# EXHIBIT V

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**DECLARATION OF JENNIFER HADAYIA, AIR ALLIANCE HOUSTON**

I, Jennifer Hadayia, declare as follows:

1. I am the Executive Director at Air Alliance Houston ("AAH"). I started in this role in November 2021.

2. As Executive Director, I am responsible for leading the organization's overall programming and people. This includes strategic planning, program management and prioritization, partnerships, public relations, operational functions, development, direct supervision of 5 managers, and coordination of our governing board. I also serve as AAH's primary grant writer, including for federal grants.

3. The seed for AAH was planted back in 1988, when an all-volunteer group formed to address ozone pollution in the Houston area. In 1996, another Texas nonprofit for clean air formed. In 2008, these two groups merged and, in 2010, rebranded as Air Alliance Houston. We are the longest running advocacy nonprofit in the Houston/Harris County area dedicated exclusively to air quality.

4. Air Alliance Houston believes that everyone has a right to breathe clean air and that where you live, work, learn, and play should not determine your health. Our organization works to reduce the public health impacts from air pollution through research, education, and advocacy. We also support many smaller environmental, transportation, climate, and community-based advocacy organizations and coalitions. The majority of our staff live in the same neighborhoods where AAH works, and many of us are directly impacted by the health harms of air pollution.

1

JA343

5. AAH implements its mission by, among other things, operating the area's largest community air monitoring network, providing rapid communications responses to petrochemical disasters, and empowering residents through education and advocacy trainings to take action for their health and the environment. In our last fiscal year alone, we notified nearly 40,000 households about opportunities to comment on air permits affecting their neighborhoods and educated over 4,000 residents on the health impacts of air pollution through block-walking campaigns, community events, and workshops. Our team produced 34 original research products, conducted 131 media interviews, published 57 newsletters and blog posts, and reached an average of 87,000 people each month through our social media channels.

6. Our work is having a real impact: in a recent evaluation, 60% of Houston residents surveyed who attended a permit meeting said they were informed by AAH's outreach about the meeting. Ex. 1.

7. Air Alliance Houston has been an active participant in the development of this lawsuit and has remained in regular communication with Plaintiffs' counsel about this case. We are willing and able to take an active role in this litigation and to protect the interests of all members of the Class.

8. In June 2024, we applied for a Community Change Grant ("CCG") from EPA. Our plan for the grant was to create a permit engagement project throughout ten counties in Texas, enabling residents to meaningfully contribute to permitting decisions for pollution sources in their neighborhoods. We would work closely with community organizations to create tools and trainings and to provide technical assistance to identify polluters in the

permitting process, submit comments, attend permitting meetings, and make their voices heard as the permitting decisions were made. We planned to work with four subawardees.

9.  We know that our CCG Grant project proposal works and will achieve the CCG Track II goal of improving environmental decision-making. AAH began using the tools and programming incorporated in the grant in the summer of 2022. Since then, we have notified 190,000 households about their opportunities for public participation; of those, about 2% provided comments on the permits, and about 1% attended a permit meeting. The results have included stopping new concrete facilities completely from being built in already over-polluted neighborhoods, slowing air permit renewals that would have allowed more toxic air emissions, and inspiring EPA to object to federal operating permits for major polluting sources in Houston. These changes help reduce the amount of air pollution in the air, which has direct health benefits. A recent report from our county health department found a high prevalence of asthma, COPD, cancer, and heart disease in local zip codes with the most air pollution. *Health Impacts of Air Pollution in Harris County, TX*, Harris County Public Health (2024), https://publichealth.harriscountytx.gov/Portals/hcph/Documents/Reports/REPORT_AirPollution-PROOF6.pdf. These same zip codes also have the lowest life expectancy. *Id.* at 22.

10. Given our success in reaching people in the Houston area and fighting for cleaner air, we wanted to expand our work to new areas and new partners. I designed the project concept for the CCG grant, convened partners, wrote the grant application and attachments, oversaw budget development, and managed the grant submission process. We thought that applying for federal funds would allow us to grow our impact and start creating a

3

coordinated regional approach to environmental decision-making throughout the Texas Gulf Coast.

11. In October 2024, EPA notified us that we had been selected as a CCG recipient. We were awarded just over $3 million, with a project period of three years. We received our notice of award from the EPA in December 2024. Ex. 2.

12. After being awarded the CCG grant, we shifted AAH employees' work in order to spend time managing grant negotiation, compliance, partner coordination, and project startup. This primarily impacted myself and our Director of Finance & Operations. We also hired a new staff member in April 2025, as per our approved budget.

13. Since being awarded the grant, I have overseen compliance certification and subaward monitoring (including processing requests for reimbursements), written and otherwise overseen completion of our Quality Management requirements, managed all contract negotiations with EPA and with subawardees, overseen procurement and hiring offers, provided guidance on AAH's project components, and convened the subawardees for monthly updates and regular training sessions.

14. Problems with the CCG grant first began in February 2025. On February 18, our access to EPA's Automated Standard Application for Payment ("ASAP") System was suspended. It was reinstated the following day. On March 9, 2025, our access was again suspended.

15. Due to the suspension, I told our subawardees to stop work on the project because I would not be able to reimburse them.

16. On March 10, 2025, I contacted EPA to ask about the status of our grant, and seek guidance on what to do following the second ASAP suspension. EPA responded: "We

4

have been dutifully seeking additional clarity about these issues. We are anticipating additional guidance and information about the ASAP statuses this week. We will update you as soon as we receive additional information." Ex. 3. I did not receive any additional information.

17. On March 25, 2025, the Senate Committee on Environment and Public Works published an internal EPA document listing over 400 grants the agency had targeted for termination. Minority News, *Whitehouse, Blunt Rochester Lead EPW Democrats in Demanding EPA Reverse Unlawful Termination of Grants for Clean Air and Water*, U.S. Senate Committee on Environment & Public Works (Mar. 25, 2025), https://www.epw.senate.gov/public/index.cfm/2025/3/whitehouse-blunt-rochester-lead-epw-democrats-in-demanding-epa-reverse-unlawful-termination-of-grants-for-clean-air-and-water. AAH's CCG grant was included on that list. Ex. 4 at 20.

18. On March 31, 2025, I emailed EPA asking when we would receive final notification about the status of our grant given that we were on the agency's cancellation list. Ex. 5 at 2. Our Project Officer responded, "I am not aware that your grant is being considered for termination. From my understanding, this grant is still 'active' and you should still have access to ASAP." *Id.*

19. At that point, our access to the ASAP System had been suspended for over a month. *Id.* at 1. When I reported this to EPA, I was told that, "[a]s with any change in Administration, the agency is reviewing its awarded grants .... The agency review is ongoing." *Id.*

20. It was not until April 28, 2025, that AAH's ASAP System access was reinstated. We successfully drew down on April 30 to reimburse for some expenses that had incurred under the grant up until that time.

5

JA347

21. Just three days after our reinstatement, we received notice from EPA that our CCG grant was terminated. Ex. 6.  Due to this short timeframe, we were not able to draw down all submitted expenses.

22. The stated grounds for the termination were "that the remaining portion of the Federal award will not accomplish the EPA funding priorities for achieving program goals. The objectives of the award are no longer consistent with EPA funding priorities . . . . this priority includes ensuring that the Agency's grants do not conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions . . . . it is vital that the Agency assess whether all grant payments are free from fraud, abuse, waste, and duplication." *Id.*

23. Thus far, we have been reimbursed $61,878.42 from EPA for our work on the grant project. We expected to have access to the roughly $2,950,000 in funding that remained for the grant.

24. We submitted a Notice of Disagreement with the termination on May 21, 2025, and a demand letter to EPA on May 30, 2025.

25. Since we received the termination notice, AAH has been doing a lot of uncompensated in-kind work. Even when we received the grant, I knew that our Director of Finance and I would put a lot of uncompensated work into administering the grant. We thought that investment was worth it because of the benefit the program would have for Houston and the surrounding areas, as well as our partner organizations. But to now have to put in so much uncompensated time and energy to navigate the termination, while the groups we intended to partner with see no benefit, is extremely disheartening and emotionally draining. It feels like all of our work over the past months has been literally for nothing.

JA348

26. The elimination of the CCG program would have forced us to lay off the staff member
    we had hired under the grant, except that a different staff member left around that time
    and so we were able to move the CCG hire into that other funding stream to keep her
    employed. Three of our subawardees have not been able to hire the people they planned
    to, which means six total compensated full-time positions that were supposed to have
    been created do not exist. Some of our subawardees had identified people for these
    positions and then had to withhold offers due to the CCG program termination, or those
    individuals have been working uncompensated.

27. The worst part of this is the impact on the community. AAH applied for these funds in
    the first place because we thought we could help fight back against the decades of legacy
    pollution in these communities that harms people's health. Encouraging people to
    participate in decision-making has been part of AAH's work since its founding. We know
    it produces better permits and better health protections. Now, tax-paying community
    members will not benefit from these funds.

28. Our subawardees are smaller than AAH, have less capacity, and often are doing the work
    in a volunteer capacity. Applying for the CCG grant was a way to support their work,
    support their staff, and ultimately improve situations for community members in those 10
    counties, which cover almost the entire Texas Gulf Coast. Now, we have no way to
    support our partners since we cannot deliver on the promised federal funds.

29. I do worry that the termination puts a target on AAH from politically opposed
    individuals. We pursued a completely legal, transparent grant application process,
    advertised by the federal government. Now, in some circles, we're being viewed as
    among a class of organizations that has "discriminated against people" by trying to fight

JA349

back against air pollution in partnership with overburdened communities. I'm worried that this could have credibility and reputational damages for the long term.

30. If EPA's termination of the CCG program continues, AAH will do our best to continue our community engagement and environmental decision-making work, but it will be at a lower capacity. I have been spending more of my time fundraising to make up for this unexpected funding gap. Some of our subawardee partners will be able to continue some of the work, again at a reduced or in a volunteer capacity. This means that the status quo of ongoing air pollution exposure will continue in these counties.

31. If the CCG grants were reinstated, we would immediately re-start our expansion work in the 10 Texas counties. We would issue our contracts for services, and our subawardees would hire their new staff or finally be able to compensate those who work as volunteers. We have identified 30+ different priority air permit decisions pending across the region that we would work on. I would personally feel relieved that we again have the resources we need to make change in the community and that our subawardees would have the capacity they need to sustain their vital services. If reinstatement happens soon, it would save us staff time and make it easier for us to resume work. Our "shovel-ready" (planning) period was 4 months. As more time elapses, procurement bids become outdated, available new hires take other jobs, and comment periods for permits pass. The sooner the CCG program is reinstated, the more quickly and more efficiently AAH will be in resuming its work under the grant.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

*Jennifer Hadayia*
Jennifer Hadayia

Date:    June 20, 2025

8

JA350

# EXHIBIT W

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**DECLARATION OF CLAYTON KINCHELOE, THE INTER-TRIBAL COUNCIL OF MICHIGAN, INC.**

I, Clayton Kincheloe, declare as follows:

1. My name is Clayton Kincheloe, and I live in Brimley, Michigan. This declaration is based on my personal knowledge and professional education and experience. I am over the age of eighteen and suffer from no legal incapacity. I submit this declaration in support of the Inter-Tribal Council of Michigan, Inc. ("the ITC"), which represents twelve federally recognized tribes in Michigan, and is one of several grant recipients affected by the freeze and termination of federal grant funding.

2. The ITC is a 501(c)(3) nonprofit organization that is headquartered at 2956 Ashmun Street, Suite A, Sault Sainte Marie, Michigan, 49783. Established in 1968, the ITC's mission is to act as a forum for member tribes, advocate for member tribes in the development of programs and policies which will improve the economy, education, and quality of life for Michigan's Native Americans, and provide technical assistance to member tribes, assisting in the development of tribal regulations, ordinances, and policies applicable to health and human services.

3. I am the Executive Director for the Inter-Tribal Council of Michigan, Inc. I have worked at the ITC for more than four years. I have a Bachelor's Degree in Business Administration with a minor in Marketing from Lake Superior State University. As Executive Director, I oversee all organizational operations and planning, managing

workstreams across several program areas. In addition, I act as an implementor of the policies and procedures on behalf of the Board of Directors.

4. The ITC was established as a joint Tribal organization seeking to conserve common property, develop common resources, and promote the common welfare of participating tribes. By joining together multiple tribes, many of which had small population numbers, the ITC could negotiate with Federal, State, and Local governments to improve the socio-economic status of Michigan Indians, as well as combining financial efforts to better generate fundable programs for important services to tribal members. ITC was the frontier consortium that allowed the four original member tribes to work for self-sufficiency and better services for their people.

5. Comprising twelve member tribes, the ITC is currently divided into several divisions that address multiple issues: health services; behavioral services; environmental services; child, family, and education services, and administration. The ITC works throughout Michigan, with some programs extending into Indiana via reservation borders that cross U.S. state lines.

6. The ITC is funded by approximately 60 grants, a mix of federal, state, and private funding. The ITC receives federal funding from multiple entities, including the Substance Abuse and Mental Health Services Administration ("SAMHSA"), the Administration for Community Living ("ACL"), and the Department of Education's Headstart program, among others.

7. The ITC employs 130 employees throughout Michigan, including 35 at the ITC's central office in Sault Ste. Marie.

8. The ITC works with multiple governmental entities, including, for example, the Bureau of Indian Affairs to implement social services programs and Indian Health Service to

2

JA353

both assist tribal members receive healthcare and to establish an Indian Health Field office. The ITC also obtained Home Improvement funds from the Track I Community Change Grant, and provides various other services to its tribal members.

9. On December 4 and 5, 2024, the ITC was awarded two separate Community Change Grants, totalling $23 million. Grant agreements were signed on those same two days.

10. The Track I Community Change Grant, for $20 million, was to fund the Making Michigan Tribal Homes and Buildings Efficient, Healthy, and Resilient program, which seeks to provide weatherization assistance, heat pump/geothermal installation, solar installation and electrification to 280 homes and 14 community buildings across seven federally recognized Tribes in Michigan, all of which qualify as disadvantaged communities. The ITC's statutory partner on the grant is the Grand Traverse Band of Ottawa and Chippewa Indians.

11. The Track I grant funding would help increase energy efficiency and resiliency of homes and buildings, improve indoor air quality, reduce greenhouse gas emissions, reduce reliance on fossil fuels for heat and energy production, and lower energy bills for homeowners and Tribes, while also providing financial support for increasing Tribal capacity and training for Tribal staff. The Track II Community Change Grant, for $3 million, was to fund the Michigan Tribal and State Wild Rice Stewardship, which focuses on providing foundational support for the Michigan Wild Rice Initiative ("MWRI") and implementation of the Stewardship Plan process.

12. The Stewardship Plan is a living document, developed with the University of Michigan Water Center and combined with lessons learned from Wisconsin and Minnesota. The Stewardship Plan was crafted based on interviews with traditional ricers, and knowledge keepers, members of the MWRI, and representatives of non-Indigenous organizations

3

whose activities potentially impact (good and bad) Manoomin/Mnomen (wild rice) well-being.

13. The Track II grant funding would allow the ITC to serve as a facilitator for subcommittee meetings and annual convenings to advance the goals and milestones of the Manoomin Stewardship Plan and the MWRI. It would further provide financial support for all twelve member tribes of the ITC, which all qualify as disadvantaged, to build capacity and attend the stewardship meetings.

14. Since January 20, ITC has had intermittent access to the Automated Standard Application for Payments ("ASAP") system that the EPA uses to allow grantees to access funds; indeed, the ITC has only been able to access funds a handful of days at a time until our official termination on May 1, 2025 for our Track 2 Community Change Grant and May 2, 2025 for our Track 1 Community Change Grant.

15. As a result of the intermittent access to funding, we have only been able to draw down limited amounts of funds. For our Track 1 grant, we have been able to draw down approximately $30,000. For our Track 2 grant, we have been able to draw down approximately $6,000.

16. The amount that we have been able to access is a small fraction of the combined award of $23,000,000. The erratic and unpredictable nature of access to funding, in addition to the termination, has led to uncertainty and other adverse consequences both for the ITC and our partners.

17. The ITC has been unable to move forward with key aspects of our programmatic work as a result of the funding freezes and subsequent termination - and there has been clear harm to internal operations, as well as to our relationship with partners and the larger community. As the Executive Director, I had hoped to bring on additional staff in the

4

coming months with this funding, so that I could expand the scope of the organization and focus my efforts on other matters. With this termination and inability to access funding, I have had to retreat from that objective. Moreover, while I haven't had to lay people off because of a lack of funding as of yet, it is hard to say that that will still be the case if circumstances remain the same in September and beyond.

18. Aside from the direct harm to the program work that has been caused by this disruption, several time sensitive items have been significantly impacted. In Northern Michigan, where a lot of our work takes place, the construction season is very short as a result of the long winter season. At this stage, even if we are able to access all of our funding, it is too late in the year to hire contractors to complete the work before winter weather sets in. That being said, if the preliminary injunction was to be granted with funds, some work could be done, though certainly not to the same extent as would otherwise have been possible with consistently available funding.

19. The result of this interruption and uncertainty of funding is that the first year of our program has been totally upended. In addition, the money is not likely to go as far even if we are able to resume operations next year; with the Trump Administration's tariffs, everything is likely to cost more. We consequently need to access our funding as soon as possible to have any chance of performing our grant in a way that meets all the original project plan's milestones, putting us at future risk of non-compliance if we can't cover costs in other ways.

20. We have eight subawardees in our Track 1 award, which covers the biggest tribal geographic area in Michigan. Because of everything that has happened with our Community Change Grant funding, those subawardees haven't signed all the contracts necessary to move forward with their projects. While I think if the funding were to come

5

back, we could resume that forward momentum with our subawardees, they are now at an affirmative disadvantage - because there is a 3 year statutory timeline, they are significantly behind where they would otherwise have been at this point in our grant period. That calls into serious question whether they would have adequate time to finish everything; as such, there is an inherent and understandable level of reticence from subawardees in undertaking work that they may not be able to reasonably complete in a shortened amount of time.

21. In addition, there is clear harm to the reputation of the ITC and local tribal governments in the community. Predicated on the assumption that we would have reliable, sustained access to funds as a result of this grant award, we made promises to tribal nation members and subawardees that we now cannot keep. Given that tribes have a fraught and often tragic history with the federal government, there is a healthy associated distrust; the fact that the federal government - and by extension the ITC - makes promises that they don't deliver perpetuates and exacerbates that distrust. Because tribal governments are often not privy to the details and specifics of behind the scenes work with funding, all they see is that failed promise of delivery, which makes them much more wary in the future of partnering with us and other organizations. For example, the ITC was supposed to train agents in tribal nations to execute retrofitting and weatherization projects, thereby building capacity for clean energy projects in those communities, which would pay dividends many times over; that work is effectively lost now - which means a loss of autonomy and trust in tribal nations, as well as the positive impacts that increased clean energy projects can create, such as deep reductions in air pollution, building the local economy, and lowering energy bills in underserved communities.

JA357

22. Restarting these grants would enable ITC and its partners to move forward on cultural

and clean energy projects that have economic and environmental benefits for Tribal

Nations across the state of Michigan. By allowing ITC and its partner organizations to

continue promulgating clean energy projects that have economic and environmental

benefits for tribal nations across the state of Michigan, it will go a long way to addressing

and mitigating long-standing and detrimental impacts to these underserved and

marginalized communities.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United
States, the foregoing is true and correct.

6-18-2025

Date

Clayton Kincheloe
Executive Director
Inter-Tribal Council of Michigan, Inc.

# EXHIBIT X

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| APPALACHIAN VOICES, et al. |
| *Plaintiffs, on behalf of themselves and all others similarly situated* |
| v. |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and LEE ZELDIN, in his official capacity as Administrator of the United States Environmental Protection Agency |
| Defendants. |

## DECLARATION OF TINA QUAGLIATO-SULLIVAN
### (City of Springfield, Massachusetts)

I, Tina Quagliato-Sullivan declare as follows:

1.    My name is Tina Quagliato-Sullivan. This declaration is based on my personal knowledge, professional education, and experience. I am over the age of eighteen and suffer from no legal incapacity. I submit this declaration in support of the City of Springfield ("Springfield"), which is one of many grant recipients that have been affected by the termination of grant programs under Clean Air Act section 138.

2.    Springfield is a municipal corporation existing by virtue of the laws of the Commonwealth of Massachusetts.

3.    Springfield is the third largest city in the Commonwealth of Massachusetts and the fourth largest in the New England Region. Springfield is a diverse city, with a demographic mix as of the 2020 Census of 47.4% Latino/Hispanic Residents, 20% African American/Black

JA360

residents, 40.8% White residents and 2.8% Asian residents. Springfield is also an economically disadvantaged city, with a median household income of $51,339, whereas the median household income in Massachusetts is $101,341, and the national median household income is $80,020. Additionally, Springfield has an unemployment rate well above the state and national average (i.e. Springfield's unemployment rate is 6.8%, and the Commonwealth of Massachusetts unemployment rate is 4.6% and the U.S. unemployment rate is 4.2%). Springfield is considered a "disadvantaged community" under the EPA's definition of that term as it applies to the grant at issue.

4.      According to the Asthma and Allergy Foundation of America, Springfield is currently ranked the #4 asthma capital in the United States by metropolitan region, based upon asthma prevalence, emergency department visits due to asthma, and asthma related fatalities. As a result of significant public health initiatives, including initiatives funded through federal HUD and EPA grants, the City has improved its overall asthma rates from 2018 and 2019, when Springfield was ranked the #1 asthma capital in the United States.

5.      The City of Springfield has a significantly increased risk of childhood lead exposure and poisoning, which can be linked directly to the aging housing stock within the city and the prevalence of lead paint in such houses. The most recent report from the Massachusetts Department of Public Health (2023) ranks Springfield #2 in the Commonwealth of Massachusetts for highest risk of childhood lead poisoning.

6.      According to data from the Commonwealth of Massachusetts Department of Transportation and a 2023 report issued by WalkBike Massachusetts the City of Springfield ranked #2 in the state for pedestrian fatalities. Additionally, when analyzing the data on a per capita basis, Springfield ranks #1 in Massachusetts for pedestrian fatalities.

7.      Hampden County, which encompasses the City of Springfield, received a "D"
grade from the American Lung Association in the "State of Air' 2025 report for air quality and
Hampden County has experienced an increase of 2.34 degrees annual summer temperatures
between 1970 and 2024, and current forecasts project that temperatures will rise by more than 8
degrees Fahrenheit in the next 76 years, going from the current 61.2 degrees to 69.4 degrees by
2099.  The Massachusetts Department of Environmental Protection 2023 Air Quality Report
found that Springfield (Liberty Street monitor) had the highest particulate matter (PM) 2.5 rating
in the state based on the FEM Arithmetic Mean of 8.91 μg/m3.

8.      Between 2011 and 2013 the City of Springfield experienced five presidentially
declared natural disasters. The most severe were an EF3 tornado that occurred on June 1, 2011,
and an early snowstorm on October 31, 2011, that occurred while trees were fully leafed-out.
These disasters decimated the City's tree canopy, resulting in an approximately 30% reduction in
the City's tree cover. This contributes to increased urban heat island effect in the city, decreased
air quality and increased energy usage and cost for residents. The EPA website indicates that the
"heat island effect results in daytime temperatures in urban areas about 1-7 degrees higher than
temperatures in outlying areas and nighttime temperatures about 2-5 degrees higher," and that
"planting trees and other vegetation" is an effective way for communities to address urban heat
islands. While the City has made progress utilizing state and federal grant funding to replace lost
tree canopy, this still remains an ongoing, long-term recovery need.

9.      I am employed by the City of Springfield as the Deputy Development Officer for
Housing, Community Development & Neighborhood Services, I have held this position since
June, 2024. I oversee a team of 28 staff members and report directly to the Chief Development
Officer of the City. Prior to this position, I served as the City's Director of Disaster Recovery &

JA362

Compliance from April 2014 until June 2024, and have served in varying capacities for the City of Springfield since July, 2005. I have a Bachelor's Degree in Political Science and Public Administration from Western New England University and a Master's Degree in Public Administration from Westfield State University.

10.     The duties of my job include submitting grant applications to various federal agencies, and overseeing various grant awards within the City of Springfield, which are primarily federal grants.  In that capacity I have responsibility for oversight, reporting obligations, and compliance with federal grants issued by the Department of Housing and Urban Development (HUD), the Environmental Protection Agency (EPA), Department of the Treasury, and the Federal Emergency Management Agency (FEMA) as well as other Federal Agencies.  I have worked directly and successfully in submitting grant proposals, administering and accounting for federal grant funds that are directly related to climate resiliency, pollution reduction, energy independence, sustainability and environmental justice.  I have also worked directly and successfully in administering and accounting for federal grant funds directly related to environmental health issues, including reducing asthma rates in the City of Springfield.

11.     On or about April 4, 2024, the City of Springfield submitted a Community Change Grant Program Application to the Environmental Protection Agency. I was directly involved in the grant application and submittal process, leading or participating from application to grant agreement to management of the grant.

12.     On or about November 27, 2024, the City of Springfield was awarded a Community Change Grant from the Environmental Protection Agency. On or about December 3, 2024, the City received a signed Grant Agreement and Formal Award email from the

JA363

Environmental Protection Agency. A true copy of the Grant Agreement and notice of award have been attached hereto and incorporated herein as Exhibit A.

13.     The projects outlined in the grant application are designed to accomplish a number of important goals, including the following:

a.  completion of two geothermal projects in public buildings that would support Springfield's energy independence and reduce government utility costs;

b.  two measurable workforce development programs that will provide unemployed and under-employed Americans in general and residents of Springfield in particular decent paying job opportunities;

c.  infrastructure upgrades to a highly trafficked roadway that would make it safer for vehicular and pedestrian travel;

d.  a Healthy Homes home repair program that would assist low-income and elderly homeowners with eliminating mold in their homes and would reduce the risk of childhood lead poisoning;

e.  a Home Energy Retrofit Program partnered with a Community Solar Program and Benefits Navigator that would help reduce low-income homeowners' energy reliance and utility costs, while also directing them to pre-existing financial incentives/benefit programs to help maximize homeowner savings and improve indoor air quality; and

f.  planting of 1500 street trees and installation of air quality sensors to protect and improve clean air.

14.     Due to the three year completion timeline specified in the grant, Springfield made significant efforts to include projects that would have minimal roll-out time and could be

JA364

completed within the three-year grant funding deadline. Our contract with the Public Health Institute of Western Mass is fully executed. We attempted to utilize competitively bid "on-call" vendors that were bid prior to grant agreement to carry out projects or portions of projects, enabling work to begin immediately. Additionally, the construction projects being funded by the grant in question are shovel-ready projects, and many of the other initiatives are expansions of existing efforts and thus ready for rollout. These include:

   a. The Community Resilience Hubs are in final engineering design with an already-procured vendor. The Resilience Hubs further the utilization of geothermal technology, improving Springfield's energy independence and reduce government utility costs.

   b. The West Street Corridor Improvement Project is at 95% designed with a competitively procured design vendor and the construction portion is imminent. This project will increase both vehicular and pedestrian safety in a highly traveled roadway.

   c. Healthy Homes rehabilitation is an expansion of existing programs, and are thus ready for roll out. This project is a repair program that would assist low-income and elderly homeowners with eliminating mold in their homes and would reduce the risk of childhood lead poisoning;

   d. Home Energy Retrofit Program is also an expansion of an existing project, and thus ready for roll out. The program will be partnered with a Community Solar Program and Benefits Navigator that would help reduce low-income homeowners' energy reliance and utility costs, while also directing them to pre-

JA365

existing financial incentives/benefit programs to help maximize homeowner savings;

e. Street tree planting is also an expansion of existing work which was begun after multiple presidentially declared natural disasters in 2011. Tree planting is a cost effective and science based approach to mitigate urban heat island effects and improve air quality.

f. The Community bike share is a reintroduction of a previously paused project; and designed to meet several goals, including improved air quality, increasing energy independence, and adding to affordable public transportation options.

g. Air quality monitoring expands the existing network. The network is designed to identify areas for intervention to decrease asthma and other respiratory issues throughout the City.

h. The HVAC-R workforce development program and the Green Skills Job Training program are continuations of work done with development non-profit and educational collaborating partners that have previously collaborated with the City to administer comparable federally funded programing.

15.    The grant in question will accomplish the purposes for which it was made by the U.S. Congress and the EPA, which include community led air and other pollution monitoring, prevention and remediation, investment in low and zero emission and resilient technologies and related infrastructure and workforce development, which will in turn help reduce greenhouse gas emissions and other air pollutants. The intended and evidence-based outcomes from projects funded by the grant in question will further the goals of mitigating climate and health risks from urban heat islands and extreme heat, as well as improving climate resiliency and adaptation,

7

JA366

reducing indoor toxins and indoor air pollution, and facilitating engagement of disadvantaged communities in public processes.

16.    On January 1, 2025, the City of Springfield's Community Change Grant Project Period began, under the terms of the signed grant agreement between the City and the EPA.

17.    On January 20, 2025, President Donald Trump issued an Executive Order titled, "Unleashing American Energy."

18.    On January 21, 2025, I sent an email correspondence to the City's EPA Project Officer, inquiring as to whether the "Unleashing American Energy" Executive Order applied to the City's Community Change Grant. I received a response from the EPA Project Officer, stating that he received the following response from EPA Headquarters "We have not received any directives yet. To my knowledge these EO are not retroactive, and typically apply moving forwards. I do not believe this affects ongoing grant projects since the funds have already been disbursed. This is just how I am understanding it, and not an official ruling." The EPA Project Officer then went on to state "I will reach out if we get an updated directive from HQ.  However, in the meantime, we have not received any direction about halting or pausing ongoing Community Change grants."

19.    At approximately 4:30 pm on January 21, 2025, I received a phone call from the EPA Project Officer advising the City of Springfield to pause all activities related to the grant and await further guidance from EPA Headquarters. This began a several month period during which the grant funding was intermittently frozen and EPA staff were unable to provide substantive answers to many of my questions regarding the status of the grant.

JA367

20.     On March 13, 2025, the subrecipient partnership agreement between the City of Springfield and the Public Health Institute of Western Massachusetts for an amount not to exceed $1,583,674 in Community Change Grant funding was executed.

21.     On April 8, 2025, City of Springfield staff held a regular monthly check-in meeting with EPA Staff (Joshua Dibble, Monique Lloyd, Kristi Rea, Kira Mol and Juan Perez). During the meeting, Kristi Rea stated that as far as the office was concerned there were no compliance concerns about Springfield's grant and Springfield was in compliance with the grant terms and conditions.

22.     On May 1, 2025, Brian Tocci from EPA emailed Sacoy Malone and Tina Quagliato-Sullivan from the City of Springfield and provided a Termination memo and OMB Form 00A01540-1. The EPA Termination Memo dated April 30, 2025, has been attached hereto and incorporated herein as Exhibit B.

23.     On May 9, 2025, the City of Springfield received an invoice totaling $8,109.74 from the Public Health Institute of Western Massachusetts for work completed to date on the project.  That invoice remains unpaid.

24.     On May 11, 2025, the Springfield Republican newspaper ran a story about Springfield's high rates of asthma and EPA Grant terminations. EPA spokesperson provided a comment stating "Maybe the Biden-Harris Administration shouldn't have forced their radical agenda of wasteful DEI Programs and preferencing on the EPA'S core mission of protecting human health and the environment.  Partisan actors can spin this grant any which way they choose, this an 'environmental and climate justice grant', not about asthma."

JA368

25.     Due to its inability to access the grant funds in question, the City of Springfield has delayed the commencement of the projects set forth in the grant application, and if said grant funds are not restored, the City will be unable to undertake said projects.

26.     Consequences of the City's inability to access its grant funds include but are not limited to the following:

  a.  Ongoing and significant public health concerns including lack of progress in abating the asthma rates in the City of Springfield; In addition to the public health concerns, asthma is linked to adverse health effects on children and adults, up to and including death.  The effects of asthma in the City increase the burden and health care costs to our local hospitals and other medical providers, burden our Medicaid and Medicare systems, and increase our special education expenses in Springfield Public Schools.  These effects are long-term and chronic, as the effects of asthma can be irreversible.

  b.  After being awarded the grant, the City advertised for a Community Change Grant administrator position.  Applications were reviewed, and four (4) candidates were interviewed.  A candidate was selected, but due to the loss of the grant, we did not extend the offer.  The City intended to transition three existing staff to this grant, and those employees now face employment uncertainty.

  c.  Loss of economic benefit to the City of Springfield and its residents as a result of the loss of income for contractors, vendors and their employees; The grant in question anticipates designating local non-profit organizations as subrecipient partners and hiring local businesses as contractors and vendors, so the termination

JA369

of the grant has already caused real and measurable harm to the subrecipients and contractors and vendors in the loss of the work associated with the grant projects.

d.   Loss of economic benefit to the City of Springfield and its residents as a result of the loss of income for partner subrecipient non-profits and their employees, and a real and demonstrable harm to the community due to the loss of the economic "ripple effect" of the work.   Springfield's median income is substantially lower than the median income for the state as a whole, and further delays will result in continuing significant direct harm to Springfield citizens.   Increasing business activity with local businesses and non-profits generates more disposable income in the community, benefitting businesses across the City, such as grocery stores, restaurants, entertainment venues, and retail establishments.

e.   Loss of economic benefit to the City of Springfield and its residents as a result of the loss of job training programs;  As noted above, Springfield's unemployment rate is substantially higher than both the state and national average, and the median income is about half of the state-wide average.   The loss of the job training programs impose continuing hardship and damage on the City and its residents.

f.   Ongoing and significant public health issues surrounding childhood lead exposure and poisoning.   As noted above, Springfield has the second highest lead poisoning rates in the Commonwealth of Massachusetts.   In addition to the public health concerns, childhood lead exposure and poisoning is linked to adverse health effects on children, up to and including brain damage and even death.   The effects of lead exposure and poisoning in the City increase the burden and health care

11

JA370

costs to our local hospitals and other medical providers, burden our Medicaid and Medicare systems, and increase our special education expenses in Springfield Public Schools.  These effects are long-term and chronic, as the effects of lead poisoning once it occurs are not reversible.

g.  Elderly and low-income home owners will be denied the benefit of using solar energy in their homes, with the loss of the reduction in energy costs.  As Springfield is one of the poorest communities in the Commonwealth of Massachusetts, the residents are especially burdened by high energy costs coupled with low median incomes.

h.  An increased risk of both pedestrian and automobile accidents, with attendant injuries and economic fall-out, due to the City's inability to complete infrastructure upgrades included in the grant funded projects.  Springfield currently has the second highest pedestrian death rates in the state.

i.  Ongoing and significant public health and environmental concerns, including lack of progress addressing urban heat island effect and continuing increased air temperatures.  The impact of urban heat islands in the City result in higher daytime temperatures and reduced nighttime cooling, increasing the risk of heat-related illnesses like heat exhaustion and heat stroke and increasing resident energy costs.  Urban heat island effect also exacerbates air pollution, contributing to respiratory illnesses. These medical needs increase the burden and health care costs to our local hospitals and other medical providers, burden our Medicaid and Medicare systems, and increase our special education expenses in Springfield Public Schools.  Springfield has made concerted and continual efforts to replace

12

JA371

lost tree coverage, which was lost during two significant federally declared disasters in 2011. The loss of the grant funding will undermine if not curtail the reforestation efforts.

j.   Undermining community trust; recognizing how critical trust between residents and government is in emergency situations and disaster recovery, in the aftermath of several catastrophic natural disasters the City has invested significant time and capital building trusted relationships and channels of two-way communications with residents in preparation for future disasters. Community based organizations, including but certainly not limited to sub-recipients, as well as residents rely on the City of Springfield to deliver on promises, and abrupt termination of grant funding and inability to honor programmatic commitments, undermines and erodes the trust the City has worked to build within the community and jeopardizes future emergency communications with residents.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States, the foregoing is true and correct. Executed this 24th day of June, 2025, in Springfield, Massachusetts

Tina Quagliato-Sullivan
City of Springfield

13

JA372

# EXHIBIT Z

JA373

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**DECLARATION OF JONATHAN GREEN,**

**STEPS COALITION**

I, Jonathan Green, declare as follows:

1.  My name is Jonathan Green, and I live in Biloxi, Mississippi. This declaration is based on my personal knowledge and professional education and experience. I am over the age of eighteen and suffer from no legal incapacity. I submit this declaration in support of the Steps Coalition, which is one of several grant recipients affected by the freeze in federal grant funding.

2.  The Steps Coalition was founded in 2006 in the aftermath of Hurricane Katrina and is a community development corporation.  Today, we are a coalition of about 15 non-governmental organizations and community members, with the goal of advocating for frontline and Black, Indigenous, and People of Color ("BIPOC") communities.  We have a reputation for fighting as hard as we can for the community, even if it means taking on the federal government.  Over the years, we have partnered with community members and community based organizations ("CBOs") to ensure that the communities we represent have a voice in the recovery and redevelopment process on the Mississippi Gulf Coast following Katrina and other natural and manmade disasters including the BP oil spill. To date, we have intervened with varying degrees of success in HUD's relocation of $500 million in affordable housing funds to redevelop the Port of Gulfport and the Mississippi Public Service Commission's resistance to implement favorable regulations for community owned solar including virtual net metering, interconnection rules, and reimbursement rates.

3.  I started working as a consultant with the Steps Coalition in the fall of 2017 at the request of the board to help the organization develop a strategic plan. While I was scheduled to work with Steps for four to six weeks, I quickly realized that they had a unique vision and I wanted the opportunity to work for a mission-focused organization that was doing good for the community.  In February 2019, I joined the organization full time as Executive Director. As such, I am responsible for the organization's day to day operations, program development, planning activities, fund development, grants management and compliance, and coordinating compliance with federal anti-discrimination laws. Though I am relatively new to the non-profit space, I have deep corporate experience in finance and management that I leverage to ensure that Steps Coalition can successfully achieve its social improvement objectives.

4.  The Steps Coalition has a broad remit which includes community development (affordable housing, economic development, and preservation of historical communities), human rights (civic engagement and voter rights), and climate and environmental justice (environmental stewardship and a just transition to renewable energy sources). Organizationally, we work across 6 coastal counties - George, Hancock, Harrison, Jackson, Stone, and Pearl River - with a significant emphasis on Harrison, Hancock, and Jackson counties on the Mississippi Gulf Coast.  In 2021, we acquired a 3-acre undeveloped parcel of land in East Biloxi to build a 36 unit affordable, resilient, housing development and wellness center.  The predevelopment work for this project has been funded by two Enterprise Community Partners HUD Section-4 grants. We also have a 5-year grant from the National Academies of Science Gulf Research Program in partnership with the University of Southern Mississippi (USM). This grant was awarded in 2022, to enable us to teach students at four Boys & Girls Clubs of the Gulf Coast about

2

JA375

the natural sciences at the intersection of climate and environmental justice - the Environmental Justice STEMM Leadership Academy ("EJSLA"). Currently in its fourth year, the program has averaged 50 middle school students per semester since its inception. Finally, we have been awarded a National Fish and Wildlife Foundation - Emergency Coastal Resilience Fund grant to assess and plan the restoration of two bayous (Bayou August and Keegan Bayou) in East Biloxi in partnership with the Gulf Coast Community Design Studio ("GCCDS") - an architecture and landscape design program which is a division of Mississippi State University's Extension Center.

5. We also undertake a variety of activities related to civic engagement: We teach residents on the Mississippi Gulf Coast effective ways to engage with the local, state, and federal government, host town hall meetings to provide information on local issues, and host nonpartisan forums so that political candidates from both sides of the isle can present their platforms and what they believe they can do to benefit our community.

6. The Steps Coalition was awarded a $500,000 Environmental Justice Collaborative Problem Solving ("EJCPS") Grant on April 1, 2024. The primary purpose of the EJCPS grant is to provide our subawardee community benefit organizations with technical assistance and funding for capacity building across a range of priorities. This includes affordable housing, food security, workforce development, and remediation of environmental hazards. The grant was split into two buckets: $300,000 for capacity building subgrants and $200,000 for technical assistance programming and administration.

7. Our EJCPS grant was slated to fund an expansion of our "Resilient East Biloxi" program, which provides training and capacity-building assistance to other community based organizations that have an interest in resilient development and redevelopment in East

3

JA376

Biloxi.  East Biloxi is a persistent poverty, BIPOC community on the Mississippi Gulf Coast.  The neighborhood, which is located on the far east end of the Biloxi peninsula,  is a Federal Emergency Management Agency-designated flood zone that is vulnerable to frequent, climate-related events like sea level rise, tropical storms, and hurricanes.

8.  The capacity-building grants are sorely needed.  Over the years, the community has been devastated by natural and man-made disasters, including urban renewal, hurricanes (including, but not limited to Camille, Katrina, and Zeta), the 2009/2010 economic collapse, the Deepwater Horizon British Petroleum oil spill, and general long-term underinvestment by the municipal government and the state.  As a result of these collective impacts, residents of East Biloxi find themselves living in a food and banking desert with limited access to healthy foods, financial services, affordable quality healthcare, affordable quality housing, good-paying and stable jobs, and reliable transportation infrastructure.

9.  Within the budget, we allocated ten (10) $30,000 capacity building grants to pass through to local organizations.  In addition, we had set aside an additional $60,000 for two co-applicants - The Program for Local Adaptation to Climate Effects | Sea Level Rise ("PLACE|SLR"), which is a division of Mississippi State University's extension program, and the Water Institute of the Gulf, and applied research institution - to provide technical assistance over 3 years in the areas of federal grant proposal development, post-award federal grants management, climate change and sea level rise research, and strategic planning to name just a few. Additionally, we allocated another $30,000 over 3 years to hire a consultant with expertise in the creation of community land trusts ("CLT") so that the Resilient East Biloxi cohort could assess the feasibility of a CLT in the neighborhood which would help the community begin to address the dire shortage of

4

JA377

affordable, resilient, quality housing. Supplemental to this, we budgeted $28,875 to conduct a CLT model city tour (to pay for lodging, airfare, and meals for 15 participants) in order to learn first-hand from CLT practitioners about how they have successfully implemented a CLT strategy in their community. Finally, we budgeted $36,868 to fund salaries and fringe benefits for Steps Coalition Staff and $44,257 for indirect costs at the allowable 10% de minimis rate.

10. We had identified six subawardee partners for capacity-building grants, each working in a different way to address core priorities in the community.  Each of these existing organizations planned to use the pass-through funds to scale and build capacity in the following ways:

    a. Trying to open a co-operative market in the neighborhood, in order to provide fresh, healthy, affordable food in what is currently a food desert.

    b. Working with farmers to provide healthy, nutritious food to public schools.

    c. Serving unhoused individuals and planned to expand their weatherization and retrofitting program to additional home owners in East Biloxi to make their residences more livable and efficient.

    d. Purchasing  farming and gardening equipment with an eye to expanding its community garden program.

    e. Serves the Hispanic community in East Biloxi to conduct remediation of bedbugs in the homes of its constituents for free.

    f. Starting  a workforce development program to train community members how to conduct resilience inspections and to complete a resilience certification, in addition to expanding their current construction and electrician apprenticeship programs.

JA378

g. Our two technical assistance co-applicants, both well established education and research institutions, were using the funding to cover staff time in support of the Resilient East Biloxi program; Each contributed two to three staff members to assist with program development and implementation for several hours each week.

11. Our plan to provide ten (10) $30,000 capacity building grants had the potential to drastically improve the quality of life for these residents. However, given funding freezes and subsequent termination, we were only able to spend about $122,518. The funding freeze has had a variety of negative impacts, as described more in detail below.

12. Though our EJCPS grant was not terminated officially until March 28, 2025, our Automated Standard Application Payment ("ASAP") account was cut off in early February, leaving us unable to draw down funds for invoices.

13. At the Steps Coalition, we have a small but mighty staff - myself and 2 program managers.  We are lucky to be primarily foundation funded - and have thus been able to work through not having money to fund staff time and indirect costs.  However, if a private funder were to drop out of providing support, this would be detrimental to our organization.  It would be extremely difficult for us to survive.

14. The impacts on subawardees is a much different story.  Rather than being able to provide capacity grants to ten (10) organizations, we were only able to provide partial grants to the six (6) organizations described in Paragraph 10 of $15,000 each.  Four additional organizations were left in the application stage when the funding was abruptly turned off in February of this year. These ten impacted organizations will have to pivot to replace funds - while they are dedicated to continue moving forward with their community projects, given the critical nature of their work, they need to shift and figure out how to

JA379

realign themselves to keep forward momentum. This money would have been a catalyst

to scale and build capacity - and would have set them up to seek out other funding

opportunities, having proven their capacity and capability to do good work. In short, this

would have set the stage for much more significant work in a community that is in dire

need of this type of intervention.

15. Our subawardees were all affected in different ways.  For example:

    a.  A local food co-operative had hired an Executive Director to get them from the

        start-up phase to the next level.  That new leader may have to be laid off if they

        don't receive this or alternative funding. They now have to figure out how to

        sustain their momentum; in the near-term, their progress has been necessarily

        slowed significantly.

    b.  An established organization of over a century, while not in danger of folding, can

        no longer expand their home fortification and weatherization program, to the

        detriment of the community.

    c.  Two other community-based organizations can no longer expand their network; as

        such, their respective ability to provide healthy food to schools and reach more

        immigrants through their clinic is severely stunted.

16. In addition, we have had to step back from our discussions with contractors.  Fortunately,

    we have long-standing relationships with companies that can provide these services and

    had not executed contracts as of yet. However, because we issued requests for

    performance that we then had to quickly rescind, there may be damage to our ability to

    engage these contractors in the future.  Similarly, we had spoken with five (5) potential

    consultants to work on our Community Land Trust; about one week before finalizing

    agreements with our selected candidate, we had to tell them that the freeze of our  funds

JA380

made it impossible to move forward. Given the talent of these individuals, I would be surprised if they were still available if our funds become available again; as such, we will likely be back to square one.

17. While the community is savvy enough to understand that the Steps Coalition is not to blame for the actions of the federal government, there is no way to avoid a sense of disappointment and frustration. This community has seen consistent underinvestment for decades; this latest slight from the federal government just provides further evidence that the government cannot be trusted. While this is understandable, it is also heartbreaking, because being able to rely on federal dollars could do so much good here.

18. Restarting the grant funding would enable the Steps Coalition and our subawardees to execute a variety of projects designed to directly benefit East Biloxi - including alleviating a food desert, providing education on healthy foods, supporting unhoused individuals, providing for safer, more energy efficient homes, and ensuring more livable, bed-bug free conditions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Jonathan Green
Executive Director, Steps Coalition

06 - 25 - 2025
Date

8

JA381

# EXHIBIT AA

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

APPALACHIAN VOICES, *et al.*

*Plaintiffs, on behalf of themselves and all
others similarly situated*

*v.*

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY and LEE ZELDIN,
in his official capacity as Administrator of the
United States Environmental Protection
Agency

*Defendants.*

**DECLARATION OF LEYNE MILSTEIN,
INTERIM CITY MANAGER, CITY OF
SACRAMENTO**

I, Leyne Milstein, declare:

1. I am currently employed by the City of Sacramento as the Interim City Manager.  I officially assumed the role on January 14, 2025.  I have personal knowledge of the facts set forth herein and if called upon to do so, I can and will testify to these facts.

2. I began working for the City of Sacramento in 2005 as a Principal Budget Analyst, assumed the role of Budget Manager in 2006, and in 2008 I was appointed as the Director of the Finance Department.  In 2017, I became an Assistant City Manager, overseeing the Finance, Human Resources, and Information Technology Departments.  I held this position until I was appointed the Interim City Manager in January 2025.

3. Sacramento's City Manager is the Chief Executive Officer of the City and is responsible for the leadership and direction of all operations, programs, and services, per the Sacramento City Charter.  As the Interim City Manager, I oversee all City operating and support services departments, consisting of 6,000 full-time, part-time, and seasonal employees; manage the City's

1

annual operating budget; and facilitate the implementation of the Sacramento City Council's policies and priorities.

4.    On or about April 14, 2023, the City of Sacramento applied for $981,042.00 from the Environmental Protection Agency (EPA) to mitigate the effects of climate change in the City's Meadowview, Stockton Boulevard, and Del Paso Heights neighborhoods.

5.    The Sacramento City Council approved the application on April 4, 2023, via Resolution 2023-0089.

6.    On or about April 22, 2024, the EPA awarded the City of Sacramento $981,042.00, via Grant Number 98T89701, using funds from the Inflation Reduction Act, to carry out this project. The budget period and project period both run from June 1, 2024, until May 31, 2027.  A true and correct copy of EPA Grant Number 98T89701 is attached hereto as **Exhibit A**.

7.    The federal funds awarded to the City of Sacramento via Grant Number 98T89701, fund almost half of the Sacramento Equitable and Resilient Urban Forest project – a collaborative, community-based campaign to accelerate equitable expansion of urban tree canopy and tree benefits in low canopy, under-resourced neighborhoods within the City (the "Project").  The Project is managed by the City of Sacramento's Office of Climate Action & Sustainability, which is housed within the Department of Public Works.

8.    The City of Sacramento intends to increase its citywide tree canopy from 19 percent to 35 percent by 2025.  The award of Grant Number 98T89701 is integral to this process.

9.    It was the City's intention to utilize subawards to enable:  (1) Habitat for Humanity to install indoor air filters and portable air purifiers in over forty (40) low-income homes; (2) the Sacramento Tree Foundation to plant two trees at each of the participating homes, and (3) the Sacramento City Unified School District, in conjunction with the Sacramento Tree Foundation,

to plant over thirty (30) trees at designate schools and collaborate with homeowners to plant additional trees along major walking routes to the schools.

10. While Sacramento is home to over one million trees, there are disparities in tree coverage throughout the City.  Unfortunately, for decades fewer trees were planted in disadvantaged communities.  The disparity in the City of Sacramento's tree canopy means the effects of climate change and air pollution are not experienced the same way across its neighborhoods.  For example, on average, neighborhoods with lower tree cover, such as the neighborhoods set to benefit from the Project, are projected to feel roughly 15 degrees warmer than other neighborhoods in the City with more tree canopy.  With the increase in temperatures in a City already known for hot summers – triple digit heat has become the norm - it is crucial the City of Sacramento increase its tree canopy because every resident and every neighborhood deserves shade.

11. The City of Sacramento was given access to the funds associated with Grant Number 98T89701 via the federal grant portal – www.asap.gov.

12. On January 17, 2025, the City of Sacramento made its only drawdown for the Project from Grant Number 98T89701 in the amount of $1,028.29.

13. On January 28, 2025, the City of Sacramento received an email indicating all EPA grants associated with the Inflation Reduction Act were paused.

14. Subsequently, the City of Sacramento was unable to access its federal grant portal.  Access to Grant Number 98T89701 has not been restored and the grant award is shown as unavailable for payment, making it impossible for the City to access the awarded funds and proceed with the Project.

JA385

15. On or about January 29, 2025, the City of Sacramento contacted the EPA requesting clarification and was told the EPA could not respond to its request. The City of Sacramento continued to request assistance from the EPA over the next several months to no avail.

16. On or about March 21, 2025, the City of Sacramento received a Memorandum from the EPA terminating Grant Number 98T89701. A true and correct copy of the Memorandum is attached hereto as **Exhibit B**.

17. The EPA's termination of Grant Number 98T89701 has been a great loss to the City of Sacramento. There is no alternative funding source available to the City to perform the Project's critical work. Without access to the funds, the City of Sacramento cannot move forward with the Project. It cannot plant trees to expand its urban tree canopy in under-resourced neighborhoods. Nor can it install air filters and purifiers in in over forty (40) low-income homes. Every day that goes by without access to these grant funds is one less day of tree growth and tree canopy – the impacts of which will be felt for generations to come.

18. The City of Sacramento has had to pay its subgrantees approximately $28,000.00 for work performed on the Project prior to the termination of Grant Number 98T89701. Because the City cannot access the funds awarded under Grant Number 98T89701, it has been forced to cover these expenses through its operating budget.

19. The termination of Grant Number 98T89701 has not only caused monetary and environmental damage to the City of Sacramento, but it has also harmed the City's reputation. The abrupt grant termination not only diminished the City of Sacramento's goodwill with its subgrantees, but also threatens future collaborative opportunities and reflects poorly on the City of Sacramento's reliability.

JA386

20. Furthermore, as part of the Project funded by Grant Number 98T89701, both the City and its subgrantees actively engaged with community members through extensive outreach regarding tree planting and maintenance on private property.  These efforts fostered trust and anticipation within the community.  Termination of the grant has brought the Project to a halt and severely impacted the City's standing with its residents, leading to a loss of public confidence and making future community‑based initiatives more challenging.

I declare under penalty of perjury according to the laws of the United States of America that the forgoing is true and correct to the best of my knowledge and recollection.

Respectfully submitted this <u>Jun 16, 2025</u>, at Sacramento, California.

<u>Leyne Milstein (Jun 16, 2025 16:30 PDT)</u>
**LEYNE MILSTEIN**
Interim City Manager, City of Sacramento

JA387

# EXHIBIT BB

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

APPALACHIAN VOICES, et al.

*Plaintiffs, on behalf of themselves and all others similarly situated*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and LEE ZELDIN, in his official capacity as Administrator of the United States Environmental Protection Agency

Defendants.

## DECLARATION OF AMY SHUMANN, MARTIN LUTHER KING, JR. COUNTY

I, Amy Shumann, declare as follows:

1.      This declaration is based on my knowledge, professional education, and experience. I am over the age of eighteen and suffer from no legal incapacity. I submit this declaration in support of Martin Luther King, Jr. County, Washington ("King County"), one of many grant recipients that have been affected by the blanket termination of U.S. Environmental Protection Agency (EPA) Environmental and Climate Justice Program (ECJ Program) block grants created by the Inflation Reduction Act (IRA) under Clean Air Act (CAA) Section 138.

2.      Public Health – Seattle & King County ("Public Health" or "PHSKC") is the public health department for King County. King County includes 39 cities, including the City of Seattle, and unincorporated areas. Public Health is one of the largest metropolitan health departments in the United States with about 1,600 employees. The department serves approximately 2.3 million people who reside in King County's urban, rural, shoreline, foothill,

1

and mountain communities with distinct environments and unique public health needs. King

County is an international port of entry, welcoming nearly 40 million visitors annually. Over 100

languages are spoken by King County residents.

3.      I am the Lead and Toxics Program Manager at PHSKC, a role I have held since

2018. I oversee a team of four, and I report to Ryan Kellogg, Assistant Division Director,

Environmental Health Services Division. My team works across county departments and with

community partners to develop policies and strategies that advance climate resilience,

sustainability, and environmental justice. I have a Master of Social Work (MSW) degree with a

focus on administration. I have 30 years of experience as a public health professional at King

County.

4.      On April 13, 2023, King County applied for a grant through the EPA ECJ

Program's Government-to-Government ("EJG2G") Program to coordinate a multipronged

approach to improving indoor environmental health and increasing climate resilience in South

Seattle and South King County communities. I oversaw the application process. On July 10,

2024, King County was awarded a grant of $1,000,000. A true and accurate copy of the

Cooperative Agreement, which also served as the Notice of Award, is attached as Exhibit A.

5.      The project outlined in the grant application is designed to be a collaboration

between King County (through both Public Health and the King County Department of Natural

Resources & Parks) and Puget Sound Clean Air Agency, the University of Washington ("UW")

Climate Impacts Group, and five community-based organizations: BrightSpark Early Learning

Services, Mother Africa, Community Network Council, Horn of Africa Services, and Seattle

Tilth Alliance.

6.    My team oversees the leadership team for the project, which has representatives from each of the partner organizations. We meet at least monthly. My team manages King County contracts with each of these organizations and initiates federal grant drawdowns with assistance from the PHSKC finance department. My team participated in this grant process from application to grant agreement to management of the grant.

7.    The project aims to improve the well-being of communities most impacted by poor housing, climate change, and their consequences, including poor indoor air quality, wildfires, flooding, extreme heat events, and other cumulative stressors that contribute to inequities in housing quality in King County.

8.    The project aims to empower communities to take a healthy active role in improving housing and health outcomes. Twenty-three Community Health Workers (CHWs) and twenty-five Early Learning Coaches (ELCs) will be trained to provide outreach and education to frontline communities and childcare providers in King County.

9.    The project builds community resilience to climate change and indoor air quality challenges. CHWs and ELCs will engage and educate 2,300 frontline community members, caregivers, and childcare providers on healthy homes and climate resilience. Additionally, 700 homes and childcare providers will receive in-home assessments to identify indoor air quality concerns, along with Healthy Homes Kits to support healthier indoor environments and practices.

10.    The project consists of three equity-centered initiatives: the Climate Resilience Action Group, Healthy Homes Project, and Healthy and Safe Early Learning Environments Project.

JA391

**The Climate Resilience Action Group**

11.    The Climate Resilience Action Group builds partnerships, raises awareness, promotes education, and integrates equity into planning and implementation to promote social equity in climate resilience.

12.    Members of the Action Group include community partners and the University of Washington ("UW") Climate Impacts Group, and a representative from Puget Sound Clean Air Agency. The group works to address the disproportionate impacts of climate change on frontline communities and actively challenge structural barriers.

13.    The Climate Resilience Action Group will meet quarterly and work with local stakeholders to identify strategies to help the community cope with climate change impacts, promote sustainable practices in the community, and develop emergency plans for climate-related events.

**The Healthy Homes Project**

14.    The Healthy Homes Project is an expansion of an EPA funded pilot project to improve indoor environmental determinants of health. It is a collaboration between PHSKC Staff and CHWs from Mother Africa, Horn of Africa Services, Community Network Council, and Seattle Tilth and aims to provide in-home assessments and education to diverse communities.

15.    Mother Africa will complete a minimum of 192 in-home assessments, develop an action plan with each household receiving an in-home assessment, distribute healthy homes kits (including items such as air purifiers), and conduct a pre-post survey on households receiving in-home assessments and healthy homes education. Horn of Africa Services will do the same for a minimum of 104 homes; Community Network Council for a minimum of 96 homes; and Seattle Tilth for a minimum of 130 homes.

**The Healthy and Safe Early Learning Environments Project**

16.    The Healthy and Safe Early Learning Environments Project develops training for childcare providers and caregivers to promote healthy and climate resilient communities.

17.    The activities of this project are performed by community partner BrightSpark Early Learning Services with support from PHSKC staff. BrightSpark Early Learning Services co-creates educational materials and will provide outreach and education to 885 families and caregivers on indoor air quality and climate resilience.

**Grant Award and Termination**

18.    After receiving Notice of Selection for an EJG2G grant award in October 2023, King County was instructed by our EPA Project Officer to get the project underway in accordance with the workplan submitted as part of our application, including initiating subcontracting with our project partners and grant subrecipients Mother Africa, Horn of Africa Services, Community Network Council, BrightSpark Early Learning Services, and Seattle Tilth Alliance. We were directed to submit each partnership agreement to EPA for processing before issuance of the Notice of Award. Once we had subrecipient agreements in place, we instructed our partners to begin recruiting and training community health workers, begin outreach to families, initiate co-creation of the community education curriculum, and participate in the Climate Resilience Action Group. The Notice of Award was not received until July 2024, but we were instructed by to begin work and back-bill through April 2024 for any approved grant expenses.

19.    On August 30, 2024, King County requested to draw down $49,967.13 for reimbursement of staff compensation and overhead cost. King County received payment in full on September 15, 2024.

JA393

20.    Between September 2024 and March 2025, King County submitted six additional drawdown requests for a total of about $168,000 for reimbursement of payment for staff time, overhead costs, payment to partners for their program costs and other program support. Each time, King County received full payment.

21.    On March 20, 2025, King County requested to draw down $93,000 for reimbursement of payment made to Mother Africa, Horn of Africa Services, Community Network Council, Seattle Tilth Alliance, and BrightSpark Early Learning Services for their program costs. King County was denied access to the ASAP.gov account for this awarded and obligated EJG2G grant. The ASAP.gov Account Profile Inquiry page for the grant, Account ID No. 5C02J57701, showed an Account Status Indicator entry of "Suspended."

22.    On March 21, 2025, King County received a memorandum from EPA Award Official Ann Manion announcing this grant was "terminated in its entirety effective immediately on the grounds that the award no longer effectuates the program goals or agency priorities." A true and accurate copy of the memo is attached as Exhibit B.

23.    The sudden termination of the grant has disrupted our partners' healthy homes and climate resilience work. They put time and effort into training CHWs and ELCs who are ready to engage and educate frontline communities and childcare providers. CHWs and ELCs have developed relationships with and recruited community members with the goal of providing education, conducting in-home assessments, and distributing healthy homes kits. The abrupt termination of the grant has impacted the trust and relationships that our partners have built with the communities they serve.

24.    The sudden termination of the grant has strained King County's relationships with partners, disrupted the County's ongoing efforts to improve community health, and hindered the

6

JA394

County's ability to establish and maintain trust with community-based organizations and their constituents.

25.    CHWs and ELCs have expressed deep concern and disappointment over the sudden termination of the grant. They believe, and the County agrees, that their work is a critical step in addressing long standing health impacts related to poor housing conditions and indoor air quality. The sudden termination and disruption of services left community members uncertain about future support and strained the trust built between the community, CBOs and King County.

26.    The sudden termination of the grant has had significant administrative, financial, and management impacts on King County. The County was not reimbursed for payroll expenses, payment to partners, and other project related costs already incurred. Staff included in the grant budget were assured of three years of funding for their positions and have experienced deep disappointment and stress about the instability of their employment. Termination of the grant has caused unexpected financial strain at multiple levels of our organization, disrupted staffing plans, and created uncertainty around future resource planning and contract management.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States, the foregoing is true and correct. Executed this 24th day of June, 2025, in Seattle, King County, Washington.

AMY SHUMANN
Lead and Toxics Program Manager
Public Health – Seattle & King County
Martin Luther King, Jr. County, Washington

7

# EXHIBIT CC

JA396

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**DECLARATION OF HAZEL APPLEWHITE,**
**IRONBOUND COMMUNITY CORPORATION**

I, Hazel Applewhite, declare as follows:

1. My name is Hazel Applewhite, and I live in Newark, New Jersey. This declaration is based on my personal knowledge and professional education and experience. I am over the age of eighteen and suffer from no legal incapacity. I submit this declaration in support of Ironbound Community Corporation, which is one of several grant recipients affected by the freeze and terminations of federal grant funding.

2. I am the Chief Executive Officer for Ironbound Community Corporation ("ICC"). I have worked at ICC for 15 years. I currently hold a BA in Business Management, MBA. I also will receive an EMPA in September 2025.

3. ICC works on a variety of issues and has different departments that address topics such as domestic violence, elder care, and environmental justice.  ICC also operates in effect as a community center that addresses the needs of the surrounding residents, such as providing free childcare.  ICC is in direct and frequent contact with the community and models its policies on what the community needs and demands.

4. In my role as the Chief Executive Officer, I focus heavily on environmental justice and help to oversee different sectors of the organization. My role focuses on strategy leadership, financial planning and vision setting, governance oversight, advocacy and public relations. ICC has been engaging with and aiding the community since 1969.  As such, we are a trusted and fundamentally important organization within the Ironbound neighborhood in Newark, New Jersey.

1

JA397

5. ICC was awarded a Community Change Grant ("CCG") in the amount of $19,318,594.00, with a signed agreement on January 6, 2025, and a statutory performance period of 3 years, ending on January 5, 2028.

6. ICC has been the recipient of other federal grants.  This includes an Environmental Justice Collaborative Problem Solving grant that was terminated similarly abruptly and would have increased tree plantings in the neighborhood, not only continuing to revitalize the neighborhood, but also provide canopy to mitigate the heat island effect that is causing harm in the Ironbound neighborhood.  With all of our grants, our employees work together to make sure that everything runs smoothly. We ensure that our finances are in order and that all our transactions are detailed and transparent.  We understand that audits are always a possibility, so we do our utmost to document everything, including ASAP transactions.  Our track record of compliance speaks for itself, as none of the grants we received have ever been terminated until now, and we have performed multiple grants over the years.

7. Since our CCG agreement was signed, our access to our account in the Automated System for Administrative Payment ("ASAP") and our project officer has been spotty at best. We first drew down on January 28, 2025, followed by a second draw down on February 9. On February 10, our ASAP account was unavailable for the first time.

8. We checked daily for updates on the status of our ASAP account. On February 11, when we searched for our payment account, the message "no accounts found matching that criteria" appeared. On February 12, we inquired as to the status of the grant, and information on our tree-planting grant (a separate, Environmental Justice Collaborative Problem Solving Grant) appeared in ASAP. We thought this was an indication that our Community Change Grant would be available, but we still could not find any information

2

JA398

on the funds for our microgrid project. This persisted until the evening of February 18, when we finally saw information on both of our grants in ASAP, and we were able to draw down again.

9. There were no further disruptions between February 18 and March 10, except a brief outage on February 26.

10. On March 10, we were able to view both of our grants in ASAP, but got an error message that "no accounts [were] found matching that criteria." On March 11, we received a call from our EPA project officer, who told us that funding was suspended until further notice. On April 25, we were able to draw down for our microgrid project for the last time.

11. On May 2, we received a termination notice, which stated that "the remaining portion of the Federal award will not accomplish the EPA funding priorities for achieving program goals" and suggested that our grant was being terminated because it was not free of "fraud, abuse, waste, and duplication."

12. This CCG would have enabled the building of a microgrid in the neighborhood sited alongside electric vehicle ("EV") charging, solar panels, and a battery storage system to capture the generated solar energy. The goal of the project was to enhance energy security, especially during extreme weather events by providing back power in emergency events like floods, hurricanes, and power outages. There were two main components to the project: the technical aspect, getting the microgrid and its associated components designed and operational; and creating an emergency plan to provide electricity to three hubs in order to provide the community with multiple spaces to go that would provide safety and energy during emergencies. We had three sites picked out: a kindergarten facility (the Early Learning Center), an ICC-owned education facility (the York Facility), and a location selected by the city (the Sharpe James Recreation Center).

In addition, the inclusion in the project of mobile battery systems would have allowed us to move power where most needed, based on the needs of the community, and could power critically important facilities like hospitals.  If we are able to continue unimpeded, this project would provide lasting benefits for decades.

13. ICC is the lead applicant for this CCG, working with a city department as our statutory partner, alongside three subawardees: a different city office, as well as an academic partner and an environmental justice partner.

14. Each of our partners had designated and well-defined roles in this project. In addition to providing us with a site for one of our three hubs, our statutory partner was going to develop a comprehensive contingency plan for the deployment of the microgrid power during emergencies.  We were also collaborating with the city to decide on how best to use the electrical infrastructure we planned to deploy. Our academic subawardee was going to support us on community outreach efforts and developing impactful story strategies around microgrids—in effect, providing context and information to the community so they could understand the benefits of this project.  Our environmental justice subawardee was supposed to help with workforce development initiatives to train local residents for roles related to building and maintaining the microgrid. Finally, our municipal subawardee would have helped lead broad outreach and education initiatives and develop a plan to figure out the best way to maximize usage of EV charging stations.

15. Due to the nature of the funding freezes and subsequent grant termination, we were able to draw down only approximately 1% of our total award–$28,653.01–before our May 2, 2025 termination.  Naturally, this drastically reduced the amount of work we were able to do.  Indeed, of the 7 project phases we had mapped out, we fully accomplished only the first of those phases: developing a work plan that mapped out the subsequent phases in

JA400

greater detail.  In addition, we were able to start on phase 2, identifying contractors and

getting subawardee contracts settled.  Of course, due to the upheaval at the EPA and the

fact that our project officer was summarily dismissed (a fact that we only found out after

the dismissal was already in effect), meant that we weren't able to get agency approval of

our subaward agreements.  We were not able to close on a site for the microgrid, and we

were unable to complete designing the actual microgrid project.

16. The effect of EPA's freezing and subsequent termination of our grant have been profound

for the project, the community, and ICC's internal operations.

17. This was a one-of-a-kind project for Newark and would have enabled us to effectively

fight back against a fourth polluting fossil fuel plant in our community by showing how a

battery storage facility and microgrid could present a viable—if not vastly superior—

alternative. The loss of this funding impacts not only the technical development of this

project, but also social and economic benefits tied to job creation, energy savings, and

emergency response capabilities.  This project delay also means that our timeline has

been significantly disrupted; because the interconnection process for projects like our

microgrid can be so protracted, we will need to figure out how to navigate that if our

original three-year period stands.

18. This project would have served one of the most marginalized neighborhoods in the

country and certainly with New Jersey.  Over a 4 square mile area, there are 58,000

residents, composed of Black, Indigenous, and People of Color ("BIPOC") families

(largely Hispanic and Black), with ⅔ of residents non-native English speakers.  The area

is marked by high poverty rates–more specifically, 48% of the Ironbound community is

considered low-income, per the federal definition, and 9% are unemployed as of 2022.  In

addition, this community faces severe and multiple challenges. The community has high

JA401

particulate matter, including from diesel vehicles, and ozone levels; community residents are also in close proximity to numerous Superfund and hazardous waste sites. All of this adds up to elevated asthma rates and poor air quality.

19. Given this disproportionate burden facing Ironbound, cancelling the microgrid project that decreases reliance on fossil fuels and impacts the energy resiliency plan undercuts the climate goals and environmental health that, until recently, the United States had promised its residents. Clean local jobs that would have bolstered the local economy and potentially mitigated the high unemployment and poverty rates are also similarly stalled.

20. After months of outreach with the community and local partners, this sudden termination risks undermining the trust of the community. This community has been consistently underserved, dealing with harmful redlining policies, and has abundant reason to distrust governmental bodies. The actions of the Trump Administration will only serve to cement that distrust. This will have knock-on effects: the community will be less likely to take part in future negotiations and regulatory matters, effectively closing the door to other types of environmentally just energy projects.

21. Even though the community understands that ICC is not to blame for these disruptions to the project, there remains a certain amount of distrust with us, despite our long history with the community. It takes a long time to build trust, but unfortunately, this trust can be broken quickly. At best, this has caused a loss of energy and time in our work with the community. A more likely outcome of this uncertainty is more trepidation from the community in engaging in this project if the funding should get turned back on - or other projects spearheaded by ICC in the future. This directly limits our capacity to institute energy resiliency in the community, which is sorely needed.

JA402

22. Internally, ICC was going to use the funding to hire a project coordinator, a microgrid coordinator, a community organizer, a communications specialist, and pay the salary of a program manager. The freezes and termination means that we could not hire for 4 of those positions. Additionally, although our program manager was supposed to have been paid with CCG funding, we have been forced to use other funding streams to cover his salary and figure out whether there is another capacity in which his talents can be used. That is a difficult, tenuous position for any staffer to be in.

23. Moreover, the time spent dealing with fighting the freezes and terminations presented an opportunity cost for me and others at the organization. Rather than furthering our mission to aid the Ironbound community, we were forced to write countless letters to the EPA and spend hours trying to keep up with federal funding and legal developments.

24. Finally, there were clear impacts on our partners in this project. Because we had just started to engage in discussions to execute subaward agreements when funds were first frozen, the uncertainty of our situation caused us to tread carefully on our engagement with our potential partners in order to avoid damaging our relationships; despite this cautiousness, trust was eroded between ICC and our partner organizations. All of our subawardees, contractors, and even our statutory partner remain in limbo. While we are in a fortunate position that many of these entities would still be likely to re-join discussions and negotiations if our funding is restored, it is not a certainty.

25. I can not state strongly enough that loss of this funding will have adverse consequences not just for ICC, but our relationship with the community and their trust in ICC and similarly situated organizations; whatever trust they had with the government has been severely diminished as well. However, perhaps most heartbreakingly is that this community will not be able to benefit from the energy resiliency and air quality impacts

JA403

this would have had.  And, because we have not been able to move forward, our work will not be replicable elsewhere.  The Ironbound neighborhood might be the most directly impacted by our CCG cancellation, but the consequences of the Trump Administration's actions are far more broad.

26. If funding is restored to ICC, we will be able to carry on with our work to create a more energy independent and resilient community. More specifically, we will be able to carry out key components of our microgrid project, including installation of EV charging stations and battery storage.  In ensuring that the lights can be kept on for three resilience hubs even when the main grid is suffering from an outage, we will be providing a critical resource for a community that has been historically underserved and is more likely to suffer life-threatening power outages.  The lower energy bills, job creation, and reduced air pollution that are byproducts of this project will also provide deep benefits for a low-income and disproportionately polluted area—and prove to residents that a fourth fossil fuel power plant is wholly unnecessary.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

*Hazel applewhite*

6/25/2025
_____        _____
Hazel Applewhite, Chief Executive Officer            Date

JA404

# EXHIBIT DD

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**DECLARATION OF DAQUETTA P. JONES-JOHNSON,**
**TRINITY ALLIANCE OF THE CAPITAL REGION**

I, Daquetta P. Jones-Johnson declare as follows:

1. My name is Daquetta P. Jones-Johnson, and I live in Cohoes, New York. This declaration is based on my personal knowledge and professional education and experience. I am over the age of eighteen and suffer from no legal incapacity. I submit this declaration in support of Trinity Alliance of the Capital Region, Inc., ("Trinity Alliance") which is one of eight grant recipients affected by the freeze and termination in federal grant funding.

2. Trinity Alliance is a 501(c)(3) nonprofit organization that *is* headquartered at 15 Trinity Place, Albany, NY 12202. Established in 1912, Trinity Alliance's mission is to strengthen and support our community by providing comprehensive, compassionate services in partnership with our neighbors. I am the Chief Executive Officer of Trinity Alliance. I was appointed to this role in December 2024 and officially began my tenure on Tuesday, January 21, 2025. I have dedicated my career to serving in significant frontline and leadership roles within the nonprofit, social services sector and State Government, primarily within this region. I am an alumna of Capital Region area schools - graduating from Albany High School, Hudson Valley Community College, The Sage Colleges and The Sage Colleges-Sage Graduate School of Management.

3. Trinity Alliance serves economically disadvantaged residents who live in neighborhoods in the inner-city of Albany and beyond. Trinity Alliance is a trusted community resource and is often the first stop for individuals troubleshooting challenges across a variety of

1

JA406

social need domains, such as food, childcare, transportation, employment, education, health care, housing utilities, and more.

4. Trinity Alliance was awarded a $20,000,000 Community Change Grant for the ALL(bany) Together Climate and Health Resilience Equity Project ("ALL(bany) Together") in December 2024. The ALL(bany) Together Project is designed to address community needs and enhance climate resilience in Albany's most disenfranchised neighborhoods. Trinity Alliance is the lead in a partnership of eight organizations, including one statutory partner and six collaborating entities, in the project. The grant has a 3-year project period.

5. The grant to ALL(bany) Together provides funding for each of the eight organizations to contribute to a cohesive solution that will address long-standing environmental issues in three underserved neighborhoods in Albany: South End, West Hill, and Arbor Hill. The grant funds the partner organizations to, collectively, promote climate resiliency, remediate indoor pollutants in homes, implement residential energy efficiency measures, provide workforce development for community resident clean energy jobs, support waste reduction and a circular food economy through community composting, and expand green infrastructure through tree planting and education.

6. The Albany neighborhoods that ALL(bany) Together will serve are designated as disadvantaged under the Environmental Protection Agency ("EPA") IRA Disadvantaged Community Map. Within these neighborhoods, 55% of residents are low-income, 75% are people of color, and 19% have disabilities. The unemployment rate is 11% and the median income is $29,993. The historic lack of environmental remediation in these communities has already led to serious consequences. West Hill, for example, has one of the highest concentrations of childhood lead poisoning in New York State.

JA407

7.  Trinity Alliance, as the Lead Applicant, receives the largest share of the funding at $10.9M to construct the Southern Community Resilience Hub, which will be a sustainable emergency resource center available to the public in the face of natural disasters, emergencies, or other crises, and Trinity will also serve as the grant's fiscal manager. A Collaborative Entity, will construct the Northern Community Resilience Hub, providing the same support across the city of Albany to increase accessibility for all residents. Both Hubs will maintain power, provide supplies such as food, and implement emergency response plans. These hubs will serve as disaster recovery centers where residents can access safe, comfortable resource centers in the face of all extreme weather, natural disasters, or other emergencies, including power outages.

8.  The first project to be developed will be the Southern Community Resilience Hub in the South End neighborhood, on property owned and operated by Trinity Alliance. The second to be developed will be the Northern Community Resilience Hub, on property owned by a Collaborating Entity, and will be based in the Arbor Hill neighborhood (the north end of the Project Area). These Community Resilience Hubs are designed to integrate various sustainability, green energy, and pollution reduction strategies, aligning with the EPA's vision for a healthier environment and enhanced community resilience within disadvantaged communities. This new construction and retrofit project will prioritize sustainability and energy efficiency, aimed at limiting greenhouse gas emissions and demonstrating climate resilient infrastructure for our neighborhoods and residents. Additionally, the Hubs will serve as disaster recovery centers when the need arises; both will utilize sustainable, climate resilient technologies such as solar and geothermal HVAC systems and backup battery-powered photovoltaic systems to ensure

JA408

Project Area residents have access to safe, comfortable resource centers in the face of all extreme weather, natural disasters, or other emergencies, including power outages.

9. The construction of the hubs will create 10 new jobs and provide workforce development opportunities, including green jobs. These are among the 90 jobs that ALL(bany) Together will create across the subprojects with this grant. This clean energy workforce development will train community members to take on clean energy jobs, and provide wraparound support - such as transportation, stipends, and professional development - to maximize the effectiveness of the program.

10. In addition to the construction of the two resilience hubs, the full project will support the community through the following activities: remediating radon and lead, supporting affordable housing, workforce training for skills in clean and green energy industries, home repairs to allow houses to be retrofitted for clean energy upgrades; air quality monitoring; and tree planting.

11. Between February 1, 2025 and May 2, 2025, Trinity Alliance drew down approximately $220,000.

12. Trinity Alliance has dedicated thousands of hours as well as space and administrative resources since the grant's start date of February 1, 2025, for a total of 19 weeks on the grant on behalf of the eight ALL(bany) Together partners.

13. Once the grant was announced, Trinity Alliance - as the grant lead- began coordinating amongst the ALL(bany) Together partners to administer the grant. Trinity Alliance hired three full-time staff members to administer the program: a Federal Fiscal Manager, Federal Compliance Manager and a Federal Grant Manager. In addition, Trinity Alliance set up a fiscal monitoring policy and program monitoring tool and drafted and executed subrecipient agreements with every partner before the EPA advised that they could not

move forward.  Trinity Alliance also spent hours working closely with the EPA to ensure that they were administering the grant compliantly.  In April 2025, for example, Trinity Alliance submitted a substantial progress report of activities to the EPA.

14. The funding freeze has led to massive disruptions in the organizations' day-to-day operations, causing slowdowns and budgetary challenges. As a result, all the partners have had to divert staff and other resources towards responding to manage the fallout.

15. Since May 2, 2025, Trinity Alliance personnel have spent hundreds of hours responding to the funding freeze and termination.  The three employees hired to administer the grant have taken on roles monitoring and mitigating the freeze, rather than progressing the projects funded by the grant.  Other staff have been forced to divert attention from their normal roles and work additional hours to keep Trinity Alliance's other projects moving forward, while keeping the organization best-positioned to execute on ALL(bany) Together's initiatives should funding - from the EPA or otherwise - become available. For example, the Chief Financial Officer has worked over 200 hours each month to address the impact of the freeze while also attending to her normal job responsibilities.

16. Those most impacted by the termination of the project are the historically underprivileged communities that ALL(bany) Together will serve.  Without funding for the project, these communities move days, weeks, and months further away from the disaster preparedness, food insecurity remediation, and access to safe shelters that would have been in progress if the funds were not frozen.  In the months since funds were initially frozen, Trinity Alliance's project manager has been unable to bring in a general contractor or commission a true-valued estimated cost of the project.  The project manager continues to review agreements needed to move the project forward, but Trinity Alliance is unable to execute any of these agreements without the EPA funding.

17. Similarly, continued suspension of project funding is straining the ability of Trinity Alliance's staff to serve their communities. Unless project funding is restored, staff may be terminated or moved to part-time positions.

18. After receiving the grant, ALL(bany) Together partners promoted the project to the community to encourage engagement and excitement. As the uncertainty of whether and when the project will proceed lingers, the community's faith in the ALL(bany) Togethers partners' ability to deliver on their promises - which they made in reliance on the confirmed EPA funding - will continue to erode the community's faith in these organizations.

19. Trinity Alliance has worked since its 1912 founding as a settlement house to build trust among the constituencies it serves. This trust is essential to the organization's mission, which requires active community participation. Even if some funding is ultimately replaced, extended delays in restoring funding will continue to erode community trust, which in tum will decrease the effectiveness of the programming.

20. Restoring funding would allow Trinity Alliance and its partners for the ALL(bany) Together - Climate and Health Resilience Equity Project - to resume work on construction of the two resilience hubs and to provide support to the vulnerable communities that the grant award was meant to serve.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States, the foregoing is true and correct.

JA411

6/16/2025

_Daquetta P. Jones-J.ohnson, CEO_
Trinity Alliance of the Capital Region, Inc.

Date

7

# EXHIBIT EE

JA413

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**DECLARATION OF CALEB ROBERTS, DOWNWINDERS AT RISK**

I, Caleb Roberts, declare and state as follows:

1. I am the Executive Director at Downwinders at Risk ("Downwinders").

2. I have worked at Downwinders for three years and am familiar with its organization, policies, practices, and programs.

3. In my role as Executive Director, I guide Downwinders at Risk's strategic direction and oversee the development and implementation of Downwinders' programming in education, advocacy, and community organizing. I represent the organization to the public, build relationships with community stakeholders, and promote Downwinders' mission.

4. Established in 1994, Downwinders' mission is to advocate on behalf of North Texas residents who are being harmed by air pollution. We do this by informing, connecting, and mobilizing citizens to become active participants in the decision-making that affects the air we breathe.

5. One way Downwinders works to achieve its mission is by running programs like the Neighborhood Self Defense Project, which provides assistance to neighborhood organizations in the creation, adoption, and implementation of grassroots land use plans, and SharedAirDFW, a first-of-its-kind network of air quality monitors throughout the Dallas-Fort Worth area that provides real-time information to residents about the air they breathe.

6. These and other Downwinders programs are funded by a mix of public and private dollars. Approximately 20% of our funding comes from individual local donors, with a majority of the remaining 80% coming from local and regional private foundations.

7. In April 2023, we applied for EPA's Environmental Justice Collaborative Problem Solving ("EJCPS") Grant to expand our local air quality monitoring system, known as SharedAirDFW, into new neighborhoods and engage residents on how to interpret air monitoring data to advocate for the health and safety of their communities.

1

8. On February 4, 2025, our application for the EJCPS grant was approved. EPA approved an award amount of approximately $500,000. Ex. 1.

9. Prior to receiving approval for the grant, Downwinders had a pre-existing partnership agreement with our subawardee, the University of Texas at Dallas (UT-Dallas) relating to the SharedAirDFW program. In the lead-up to officially receiving the grant award, Downwinders and UT-Dallas engaged in extensive prep work to ensure our work plan was aligned with the required deliverables under the terms of the EJCPS grant.

10. Once our grant application was officially approved, we hired a bilingual community organizer with the intention to expand our work into the Ft. Worth area. A portion of her salary was anticipated to be covered by funds from the grant award.

11. Additionally, after receiving the official award letter, we increased the salaries of all Downwinders employees.

12. Throughout February 2025, I made several unsuccessful attempts to log in to the federal government's Automated Standard Application for Payments ("ASAP") portal to access the grant funds. Despite exchanging several emails with an EPA grant program officer in an attempt fix the issue, at no point have I ever been able to access the ASAP portal.

13. On March 4, 2025, EPA informed Downwinders that our grant funds were being held in abeyance and that we would receive weekly updates on any changes in status. Ex. 2.

14. On May 1, 2025, only three months after receiving our award letter, Downwinders received notice from EPA that our EJCPS Grant was terminated. The letter from EPA informing us of the termination merely stated that "the objectives of the award are no longer consistent with EPA funding priorities." Ex. 3.

15. I am now aware that Downwinders was just one of many organizations affected by EPA's termination of all EJCPS grants, and that the agency terminated several other programs funded through the Inflation Reduction Act as well.

16. Despite our grant being cancelled before we were ever able to draw down any funds, Downwinders has honored the pay increases to its employees, and we have kept on the staffer whose salary was meant to be mostly covered by the grant award. These increased payroll costs that should have been paid for by the grant are coming from Downwinders' general operations budget. This money is being diverted from its intended core

2

operational use of program funding. Specifically, these funds were meant to cover costs associated with community events and with hiring an additional staff member.

17. Prior to receiving our termination letter, we received an invoice from our subawardee UT-Dallas relating to work done up to that point on the grant. The invoice is large enough that Downwinders cannot cover its cost with funds from our general operations budget, and the invoice remains outstanding today.

18. Downwinders has increased its fundraising efforts in response to this unexpected loss of funds. A major portion of our funding is raised during the annual North Texas Giving Day, and we spend a substantial amount of work hours crafting our message to potential donors. With the grant program being terminated, we have been forced to alter our messaging strategy to explain the unexpected change in our finances.

19. Prior to this grant program termination, it was very important to Downwinders that we maintain a consistent level of general funds in reserve to act as a "cushion" against financial precarity. Now that EPA has terminated the EJCPS grant program, we no longer have that cushion. Our timeline of guaranteed dollars has decreased from three years to eight months. A substantial portion of my working hours are now focused on finding replacement dollars.

20. Beyond the negative impacts to our operations, I am also concerned at how the grant program cancelation will impact the communities that we serve. Our communities expected us to be able to provide them with new air quality monitors, training on their use, and advice on where they should be located. Now that we can no longer do so at the scale allowed by the grant, communities are beginning to look elsewhere.

21. Specifically, I am aware of at least one company in Fort Worth that is offering to install air quality monitors in a community in exchange for a rezoning approval that would allow them to operate a polluting facility in a neighborhood not currently zoned to allow such usage. While we believe increased air quality data is a useful tool, it should not have to come at the expense of public health. If the EJCPS Grant program was not terminated, Downwinders would have been able to provide those air monitors to the community for free, and they would not have to consider such a difficult trade off.

22. Moreover, we anticipated that the EJCPS Grant funds would be used to replace existing air quality monitors that were nearing the end of their useful life. In addition to the funds

3

no longer being available, an increase in severe weather events in the North Texas area has resulted in many of our existing monitors being damaged and taken offline, and we no longer have the funds to repair or replace them. As a result, our community is losing access to information that could help them in their advocacy for cleaner air.

23. I have also learned that our subawardee, UT-Dallas, was relying on its share of the EJCPS Grant funds to pay the salary of a post-doctoral researcher who is an expert on how to construct and calibrate low-cost air quality monitors to the required EPA standards.

24. If the EJCPS Grant program is not restored soon, I am concerned that the post-doctoral researcher will need to find new, more secure employment and that our project will lose a valuable part of its brain trust, with no guarantee that we could find a suitable replacement.

25. I am also concerned about our organization's ability to maintain its current financial situation without serious changes to our budget.

26. Furthermore, I am concerned about potential harm to our organization's reputation. Downwinders made explicit promises to our community about expanding our air quality monitoring network. While many community members can understand that this decision was out of our control, our network of existing air quality monitors continues to deteriorate, and the SharedAirDFW map continues to become less useful. If we can't soon access the funds necessary to repair this network, let alone expand it, community trust in our ability to aid their advocacy is going to erode.

27. Before the grant program was terminated, Downwinders had planned to host meetings with community partners on air monitoring best practices. At these meetings, we would have led discussions about optimal locations, how to interpret particulate matter readings, and how to determine whether a spot is "downwind," among other topics. It would still be possible to convene these meetings today, but without funds to procure the actual air quality monitors, the impact of the meetings would be negligible.

28. If the EJCPS Grant program is restored and our awarded grant is reinstated, we could immediately start convening these meetings and building community resilience and knowledge, increasing the ability of North Texas residents to advocate for the health and safety of their communities.

4

JA417

29. Additionally, we could reallocate funds in our budget to their intended operational purposes, Downwinders could pay its outstanding invoice to UT-Dallas, UT-Dallas could secure funding for its post-doctoral researcher, and I could focus less on fundraising efforts and more on my other duties as Executive Director.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Date: 06/23/25

Caleb Roberts, Executive Director

5

# EXHIBIT FF

JA419

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**


**DECLARATION OF RACHAEL THOMPSON
THE GLYNN ENVIRONMENTAL COALITION**


I, Rachael Thompson, declare as follows:

1. My name is Rachael Thompson, and I live in Brunswick, Georgia. This declaration is based on my personal knowledge and professional education and experience. I am over the age of eighteen and suffer from no legal incapacity. I submit this declaration in support of the Glynn Environmental Coalition, which is one of several grant recipients affected by the freeze and terminations of federal grant funding.

2. The Glynn Environmental Coalition, Inc. ("GEC") is a 501(c)(3) nonprofit organization that is headquartered in Brunswick, GA. Established in 1990 by concerned citizens wanting to understand how their community came to be so polluted, our mission is to assure a clean environment and healthy economy for citizens of coastal Georgia. Our vision is to make Brunswick and the surrounding areas of Glynn County a safe and healthy place to raise our families.

3. I am the Executive Director for GEC and have worked at the organization since 2018. After obtaining my Bachelor of Science in Marine Biology from the University of Rhode Island in 2011, I traveled to Georgia to serve as a Marine Science Instructor for the University of Georgia on both Jekyll and Tybee Islands. I then served as a Naturalist at The Lodge on Little St. Simons Island and Watershed Outreach and Development Assistant with the Satilla Riverkeeper in Woodbine, Georgia. I started my tenure with GEC in January of 2018 to facilitate the first leadership transition since the organization's

1

JA420

inception. In 2019, I was promoted to Executive Director and have since continued to oversee GEC's daily operations and strategy. Perhaps most importantly, I ensure that we work closely with the community to elevate their voices and help advocate for the alleviation of environmental injustices.

4. GEC was formed as a way for residents in Brunswick and the surrounding areas of Glynn County to work together to understand the causes of pollution in their communities, what processes and mechanisms are in place that perpetuate health-threatening pollution, and how we could develop an action plan to correct the problem.

5. The need for this work is great, as Glynn County is home to 25% of Georgia's 16 nationally designated hazardous waste sites (also known as Superfund sites). Furthermore, Glynn County is home to 17 identified state-designated hazardous waste sites and multiple actively polluting industries. Progress on these issues is made through community organizing, educational presentations, technical assistance, submitting comments, and requesting public hearings. The focus of GEC has expanded to include governmental oversight and accountability.

6. Through our activities, programs and campaigns, GEC lobbies for protecting and preserving the environmental health of Brunswick and the surrounding areas of Glynn County based on scientific research, academic findings and perspectives of leading qualified professionals. These efforts are targeted toward local, state, and federal officials whose cumulative responsibility is to protect the environmental health of our families.

7. We have worked with the EPA to administer Technical Assistance Grants since 1994, empowering residents and providing answers through an independent review and analysis

JA421

of site documents. We also submit comments on clean-up plans and "permit to pollute" requests.

8. Since the inception of GEC, the focus has been on Brunswick and the surrounding areas of Glynn County. That focus remains, but we increasingly collaborate with local, state, and national organizations to work on addressing environmental concerns and quality of life for citizens in all of coastal Georgia.

9. GEC is 35 years old, and from early on in our history, we have been EPA grant recipients. One of the catalysts that spurred the formation of GEC was the recognition that we had multiple hazardous waste sites being designated in our area. Given that, we applied for and successfully received Technical Assistance Grants, part of the United States Department of Energy Superfund Program, which provides funds for communities for technical assistance. In our case, this meant hiring advisory personnel to translate technical data being released by the agency into digestible information for the community to facilitate their participation in decision-making processes. In our history, we have obtained four of these grants, one for each Superfund site in Brunswick and the surrounding areas of Glynn County.

10. Of those four grants, two have been closed out, in 2008 and 2019, respectively; the remaining two are still active today. Last year, we extended the open grants for another 3 years, and were awarded an additional $50,000 for each of these grants for the extended timeline.

11. In 2005, we were the recipients of a grant through EPA's Environmental Justice Small Grants Program in the amount of $16,666. We used this funding to create seafood advisories in the areas surrounding hazardous waste sites and raise awareness around the

JA422

safety of seafood consumption with the presence of chemicals in waterways and seafood populations. This program is still active today.

12. In 2022, we received a National Coastline Resiliency Fund Grant from the National Fish and Wildlife Foundation in the amount of $282,000 over a two year period in order to build a coastal resilience network that is entirely or almost entirely resident-run. We have established a resident committee, assembled a technical panel of experts, and built a broad network that includes stakeholders from academia, state agencies, municipalities, and others invested in local resilience. Now, our role has shifted to serving as a liaison, guiding residents through the process of project design and actuation, providing stipends for their work and participation. By compensating community members, we help remove barriers to their involvement and ensure their voices are heard. We are now approaching the last six to eight months of this grant, and just reapplied for the 2025 round of this same grant.

13. Since our foundation, GEC has championed a clean environment and work to clean up sites that release health-harming toxic chemicals. We do this through a number of avenues: technical assistance and Superfund site cleanups; water quality monitoring; air quality monitoring; public hearings and lobbying; community organizing and environmental justice that has led to sites being reclassified as Superfund or hazardous waste sites; and education and outreach.

   a. GEC collaborates with state and federal authorities to research and recommend solutions for these Superfund sites. Additionally, when needed, we challenge these agencies by advocating through detailed technical assistance reports and

JA423

comment letters for stronger protections, enhanced remedies, and increased investment.

b.  LCP Chemicals: This 813-acre site has been a hub of industrial activity from 1918 through 1994, once housing an oil refinery, a coal-fired power plant, and both chemical and paint/varnish manufacturing plants. These activities have led to extensive contamination of soil, groundwater, and adjacent surface waterways and marshland with polychlorinated biphenyls, mercury, lead, dioxins, and cancer-causing polycyclic aromatic hydrocarbons. GEC has been monitoring and educating the public on this site since before the site was nationally designated in 1994. Today, GEC continues to engage in conversations surrounding remediation efforts and informing the public on updates.

c.  Brunswick Wood Preserving: The Brunswick Wood Preserving Site housed wood treatment and preserving operations from 1958 to 1991. Regular use of chemicals such as creosote, pentachlorophenol, and copper chromium arsenate contaminated the site's groundwater and soil and continues to require long-term cleanup. Other chemicals of concern include dense non-aqueous phase liquids and sediment chemicals such as naphthalene, benzene, and semi-volatile organic compounds. Since before the site was designated in 1997, GEC has worked to inform the public of health risks from this site and has engaged in remediation efforts since. Over the years, we've worked with the EPA, the Georgia Environmental Protection Division, and government contractors at this location to perform inspections, propose, install, and monitor remedies, and even test marine life in the area for chemical levels and edibility.

JA424

d.  Terry Creek: From 1948 to 1980, the Hercules Brunswick pesticide production facility discharged their wastewater into Dupree Creek, which flows into Terry Creek. The wastewater contained manufacturing wastes and toxaphene, a pesticide, which is still present in the outfall ditch sediments, Terry and Dupree Creek sediments, and dredge disposal areas. GEC has been working on Terry Creek since as early as 1990, conducting in-person investigations of the area, submitting technical reports, comment letters, and recommendations to the EPA to conduct stronger remediation efforts. More recently, in 2019, we helped coordinate the largest response to a public comment period our community had ever seen. During a 120-day public comment period set out by the EPA, over 100 comments from Brunswick residents were submitted, most in opposition to EPA's proposed clean-up plan.

e.  Hercules 009 Landfill: The Hercules 009 Landfill Superfund Site was created out of a "borrow pit," or an excavated area where earth has been removed, and used to construct nearby Spur 25 highway. Manufacturing waste, called "sludge," was placed in the borrow pit, which contained high concentrations of toxaphene pesticide and toxaphene-related chemicals. The landfill was closed in 1980, but since then toxaphene has been found along the highway, in adjacent neighborhoods, and on unused school property (Altama Elementary School) near the landfill. This landfill is the earliest site the GEC has been involved in (and was the impetus behind the organization's founding), as early as 1990 - submitting technical reports, comment letters, and recommendations to the EPA. This was Glynn County's first designated hazardous waste site and led to significantly increased awareness in the community of how hazardous chemicals could lead to

JA425

negative impacts. GEC actively follows all updates regarding these hazardous waste sites so that we can inform local communities and advocate on their behalf, holding the EPA and other authorities responsible for maximum remediation efforts.

14.  GEC works to monitor, improve, and protect the quality of the fresh, salt, and brackish waters in Brunswick and the surrounding areas of Glynn County. Our work covers the County's shallow and deep water aquifers that are a source of drinking water for our community, and surface waters of our estuaries that sustain wildlife, provide sustenance for many members of our community and support our local industrial, commercial, and recreational economies. We test the water ourselves, but also host workshops to certify volunteers to monitor chemical and bacterial water quality. Once a volunteer is certified, they can sign out a water quality monitoring kit, and set up their own monitoring schedule at the site of their choosing. The goal is to collect baseline water quality data for Glynn County and detect impairments to promote restoration or remediation of water quality wherever necessary.

15.  GEC also works to monitor and improve air quality in Brunswick and the surrounding areas of Glynn County. Advocating for improved air quality is a foundational objective for many GEC initiatives, including monitoring the compliance (or lack thereof) of local industries with federal, state, and local clean air standards. We have an Air Quality Reporting Form, through which GEC has documented over 500 complaints since 2021. We help community members detail air quality conditions and submit them to the Georgia EPD. Community members can also choose to share their complaints with federal, state, and local elected officials to put the environmental injustices in Brunswick and the surrounding areas of Glynn County on their radar.

7

JA426

16. GEC is committed to community organizing and education to help engage locals in environmental justice and realize they can break the status quo. Such efforts have led to numerous improvements in the community, such as signs being reposted at Brunswick Wood Preserving Superfund Site to ensure that the danger of the site is clearly visible, and fences repaired to keep children and vehicles out. Also, monitoring wells - a way to ensure that groundwater contamination was not migrating into nearby residential wells - were installed between the Brunswick Wood Site and residential wells. The data from these monitoring wells collected in the 1990s led to residential wells being closed and homes put on a municipal system to protect them from contaminated drinking water. We continue to provide technical assistance and counseling to those living immediately near these environmentally compromised areas, including the four Superfund sites and 17 other hazardous waste sites.

17. As part of our community outreach, GEC spearheads several educational initiatives. Besides training residents on air quality reporting and water quality monitoring, we also host workshops on the Superfund sites in Brunswick and the surrounding areas of Glynn County. Called "TECH Talks," GEC launched this program in 2024 to introduce individuals to the numerous steps involved in the cleanup process, provide an update on each site in Brunswick and the surrounding areas of Glynn County, and provide action items for folks to get involved with the process.

18. On September 12, 2024, GEC received its long-awaited Notice of Award and accompanying assistance agreement for an EPA Collaborative Problem Solving Grant No. 5B-03D03024, in the amount of $500,000.00 (the "Grant").

JA427

19. The funds from the Grant were used to begin work on significantly expanding GEC's air quality monitoring initiative.

20. Brunswick and the surrounding area in Glynn County is a majority Black and low-income community with high social vulnerability. Brunswick is 61.6% Black or African, while Glynn County as a whole is 26.1% Black or African American; this area is also considerably less affluent - the poverty rate in Brunswick and the surrounding area is almost triple the national average (29.2% compared to 11.1%) and about double the average of the County as a whole (15.7%). The area has a long history of polluting industries and environmental injustices. It is home to over 2 dozen active or archived hazardous sites, including four Superfund sites. Local industries did not have air discharge permits until 2005 when a judge ordered the state to issue them in response to a 10-year lawsuit, some 30 years after the enactment of the Clean Air Act. Residents routinely complain about air quality and question what is in their air, but the answers they receive from the state and local authorities are all too often vague or unsatisfying. This project puts the power in the citizens hands to ask and answer their own questions. More specifically, the grant was intended to fund three primary activities to empower Brunswick residents to take charge of their air quality: identifying the air pollutants historically and currently discharged by local industries and the degree to which these contaminants pose health effects; collecting samples for air toxics and sulfur compounds at locations throughout the city including industry fencelines; and using sample results to advocate for further investigations or other permit or policy changes as appropriate.

21. We began the first step of this project in Spring of 2024 when we brought on interns to help GEC in conducting an extremely high level, in-depth overview of the environmental burden of Glynn County looking at both air, water, and land. We scoured compliance

JA428

history databases and permit databases, both state and federal, to get a list of all the

permitting facilities in Brunswick and the immediately surrounding areas in Glynn

County. The idea was to get a deep understanding of what is being released by who, and

where it goes. Then we were going to work with a committee composed of residents,

establish an air quality ambassador team to be able to communicate this information to

the public, and develop a GIS map to show people in real time how close to their home

air quality and other environmental concerns exist.

22. In the second phase of this project, we would deploy two types of air quality monitors

through a contract with a laboratory. We discussed fenceline monitoring with the

technical advisory committee that we formed (including a representative from the

Georgia Department of Health). However, disruptions to funding meant that we were

never able to actually make this cooperative functional.

23. The last phase of the project contemplated citizen monitoring. We have existing air

complaint data that has been crowdsourced over the last few years in partnership with the

state of Georgia. Through this phase, we hoped to empower residents to be able to test the

air and report data back to us so we could use that data as a way to build accountability.

Our strategy involved deploying both 15-minute and 24-hour air quality monitors to

detect a range of sulfur compounds. By using these two types of monitors, we could

capture detailed data on air quality during specific times and locations, as well as provide

a broader overview of air quality trends across the area over longer periods. Citizens who

frequently submit complaints would be trained to deploy a 15-minute air test kit to

capture an immediate snapshot of the air quality at that moment and place. Meanwhile,

the 24-hour monitors would be installed along fence lines throughout the county to track

air quality patterns and shifts affecting the entire community. This approach would allow

us to respond directly to resident concerns while also building a comprehensive picture of air quality over time. Finally, we were in the midst of figuring out how to track diesel emissions and particulate matter, and how to incorporate those into our monitoring strategy. However, our planning was unnecessarily halted along with our funding and we were never even able to derive a cost estimate to see what was financially feasible for GEC.

24. We initially applied for the Grant in 2023, and were awarded the Grant after a long nine-month negotiation process. Although the award was expected in March, we did not receive the signed paperwork until September due to a variety of factors. Our official project start date was October 1, coinciding with both hurricane season and winter holiday season, both of which delayed our ramp-up. Meaningful progress began in January, when we hired staff, organized our cooperative, engaged the community, and participated in local meetings.

25. Despite these efforts, we faced ongoing administrative challenges. Payment requests were delayed, and by March, our funding was suspended and ultimately terminated as of April 1. We managed to draw down some funds to cover project costs between March and September 2024, including intern stipends and pre-award expenses, totaling approximately $10,075.66. However, limited funding forced us to let go of a key staff member, and we were unable to hire a second full-time employee for the organization as originally planned. Having an additional full-time staffer dedicated to our air quality program would have significantly increased our capacity to serve the community and manage environmental monitoring efforts. Currently, I remain the only full-time staff member, supported by an outstanding part-time team. But the need for expanded capacity remains.

26. The delay in hiring a second full-time staff member, and ultimately having to let him go after only a few weeks, has been a major setback. Even if the grant is reinstated, we'll have to start the entire hiring and ramp-up process from scratch. Earlier this year, we were finally gaining momentum after months of preparation, but now we're back to square one. As the only full-time staff member, the burden of managing multiple projects, administrative tasks, and community engagement falls entirely on my shoulders. Without a second full-time team member, our efficiency and organizational capacity are lowered as we try to fulfill promises to our community as meaningfully as possible. This means that our other essential work takes longer to complete and our ability to respond quickly to community needs is compromised. The loss of additional staff not only slows down day-to-day operations but also creates a ripple effect that will delay current and future projects.

27. Right now, there are critical activities that should be happening in our community, but aren't. We're supposed to be communicating directly with residents, establishing committees, and meeting regularly to review the permit data we've collected. These conversations are essential to understand what is happening in our neighborhoods but also to figure out how to share this information with the wider community. Without these efforts, people remain in the dark about the environmental burdens they face. Many simply don't know what's in their own backyards, and without that knowledge, they can't take action to protect themselves or advocate for change. This lack of engagement has real consequences. When there are opportunities for public comment on environmental issues, our residents are left out of the process because they don't have the information they need to participate. Meanwhile, they continue to be exposed to harmful emissions from local facilities, sometimes without even knowing. For example, many harmful

12

JA431

contaminants in the air are odorless, but toxic or carcinogenic. The county has suffered from toxic air for decades, and because we still don't have a clear picture of where the pollution is coming from, we're unable to solve the problem. This ongoing exposure poses serious public health risks, from sulfur and particulate matter to diesel and other pollutants. The harm may be hard to quantify in the short term, but our community has already suffered enough. We needed answers thirty years ago, and it's painful to realize that, even now, we're still not getting them. The lack of progress only serves to benefit polluting industries, allowing them to continue unchecked.

28. Residents are still filing complaints about bad air quality, but our hands are tied. We have the tools and knowledge to collect data that could make a real difference, but without the necessary investment, we can't put those resources to use. The loss of this grant funding has drastically limited our capacity to serve the community. The expectations from residents are high—they look to us for answers and action—but we simply don't have enough to meet those needs.

29. As Executive Director, community member, and advocate, I am trying to fill as many gaps as I can to maintain trust and relationships with the communities most affected. Much of this work is now uncompensated, adding to the strain. The Urbana-Perry Park Neighborhood Planning Assembly, a resident-led civic group and made up primarily of Black residents, has always been central to our work. This community lives on the fence line of a hazardous waste site and active industry. Since 2018, I have attended nearly all their monthly meetings and spent a great deal of time building relationships. These residents are not just partners but friends and family; we know each other's lives and families well. From the very beginning, even before we applied for this grant, I made it a priority to engage them and keep them informed at every step. I wanted to ensure full

JA432

transparency and maintain their trust. I've attended countless hours talking with residents about the work we were going to accomplish together with this grant funding, just for the rug to be pulled out from under our feet and promises left unfulfilled. We have over three decades of history working with the EPA, so losing this grant funding blindsided us, and left us in hot water with community members who already have a distrust of the government. It's disheartening to see history repeat itself, and for this community to have another validation of their distrust for the federal government. Right now, our organization's reputation is on the line. I have made promises to this community, and I am fighting hard to secure the funding we need to fulfill those commitments. Walking away would be incredibly damaging to our credibility and our ability to serve. Maintaining our commitment to the community is absolutely essential. However, I worry that even if the community maintains their confidence in GEC, they will not participate in our programs as much in the future because of the trauma that having this funding terminated has caused.

30. The loss of grant funding has also negatively impacted our subawardees. Just as we were about to finalize and sign the agreements, the termination notice arrived. Navigating EPA subcontracts is a complex and demanding task. These documents are often about 30 pages long and filled with detailed language that must be carefully incorporated into all partner agreements. Preparing these subcontracts required significant effort from both our organization and our partners, including a thorough review and approval from everyone involved. After all this work, having the process halted so abruptly was a major setback. The anticipated funding was essential for our partner organizations, as it was meant to support key staff positions. For example, Georgia Interfaith Power and Light's coastal advocacy coordinator relied on this funding to cover her time and effort, and losing it

14

JA433

means a $15,000 annual shortfall for her salary. For nonprofits, the loss of expected funds like these creates real budgetary strain. Partnership for Southern Equity also planned to fund one staff member's participation in the coordinating committee through this grant. While these partner organizations are larger and may be better equipped to handle financial setbacks than we are, the loss of funding still has a significant impact on their budgets. Ultimately, this disruption benefits no one and undermines the important work all of our organizations are striving to accomplish.

31. Our ability to deliver to our community also depends on our partner organizations. We have an excellent relationship with Georgia Interfaith Power and Light, but our partnership with Partnership for Southern Equity is newer. We brought them in for their mission, vision, and expertise, which are critical to our program's success. I hope this setback does not jeopardize our relationship, but since it's still developing, there's uncertainty. Partnership for Southern Equity is understandably refocusing its efforts elsewhere for now. Each day our grant funding remains unavailable, and our partners are unable to access the pass-through funds, they lose the ability to make positive impacts in our communities - accordingly, residents of Brunswick and the surrounding area continue to face poor air quality, increasing the risk of long-term and compounding health impacts. If grant funding resumes and they do not return to the project, we will need to find a replacement. This would likely happen through a formal request for proposals, which would add another layer of administrative complexity and delay. These disruptions caused by the funding delays threaten not only our current plans but also the long-term strength of our partnerships, as well as the overall success of our program.

JA434

32. Reinstating the Grant funding will allow GEC to carry out the various phases of its air quality monitoring program. This will allow the community to have - and collect - data that will provide a way to advocate for themselves and hold lawmakers accountable. Ultimately, this project has the potential to have significant impacts on the air quality in Glynn County and, as a result, will mitigate the health impacts currently being faced by its residents. Every day that our grant funding is unavailable is a day that our communities are exposed to poor air quality, which could have long-lasting effects to compound over time. The injuries to the Glynn Environmental Coalition, its statutory partners, and the community and their interests would be addressed if the funding gets restored quickly, and if it's made clear to the community that the funding will stay. We could work as quickly as possible to hire additional staff, attempt to get our partners back on board the project, and order air quality monitoring equipment. The sooner we can gather more air quality data, the sooner we can collaborate with government agencies to develop remedies and create a healthier living environment for Glynn County and beyond.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States, the foregoing is true and correct.

*Rachael Thompson*

_____
Rachael Thompson, Executive Director
[*Name and Title*]

06/26/2025    _____

Date

16

JA435

# EXHIBIT GG

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**


**DECLARATION OF EMMA GERONA, ECOACTION PARTNERS**

I, Emma Gerona, declare and state as follows:

1. I am the Executive Director at EcoAction Partners.

2. I have worked at EcoAction Partners for five years and am familiar with its organization, policies, practices, and programs.

3. Established in 2007, EcoAction Partners is a 501(c)(3) non-profit that works to create sustainable communities in Colorado's San Miguel, San Juan, and Ouray counties. The organization implements its mission by providing data-driven climate action and working closely with regional governments, utility providers, schools, businesses, and residents. We run an income-certified weatherization program, which provides energy assessments and energy efficiency upgrades at no cost to participating households.

4. As Executive Director, I work with the Board to develop and implement our climate action efforts, manage the organization's staff, and represent the organization to legislators and donors.

5. In April 2023, we applied for the EPA's Environmental Justice Collaborative Problem-Solving ("EJCPS") Grant to enhance our income-qualified weatherization program, increase access to information about wildfire and drought resources, expand equitable access to the outdoors, and host community workshops on these topics throughout the year.

6. We planned to use the EJCPS grant funds to provide interpretation services so that Spanish speakers and other underserved community members could participate in the weatherization program and other climate action workshops and events.

1

JA437

7. Another goal of the grant was to develop concise documents related to wildfire and drought emergency response resources that were accessible to Spanish speakers and other underserved community members. Additionally, the grant was intended to support the expansion of our wildfire mitigation efforts, including education on resources available for emergency response, home evaluation and hardening, and connection to resiliency hubs in our communities. We would support one of our partner organizations to increase outreach in order to evaluate more homes for wildfire risks and provide resources to mitigate risks to homeowners. Since information was lacking around these wildfire mitigation services in Spanish and the services were underutilized, the grant funds would have helped close this gap.

8. On March 1, 2024, our application for the EJCPS grant was approved. EPA approved a total funding amount of $150,000 to EcoAction Partners, some of which we would distribute to two sub-awardees: Sheep Mountain Alliance and the Telluride Foundation. Ex. 1.

9. To assist in the grant efforts, our part-time Outreach and Education Coordinator transitioned into a full-time role. Three staff members also began working primarily on grant management efforts, and a significant portion of my day-to-day work revolved around administering and coordinating the grant projects.

10. Additionally, the grant expanded the work we were doing with our two sub-awardees in a major way. Because of the funding, the Telluride Foundation, through their partnership with the Collaborative Action for Immigrants group, was able to contract translators and interpreters and assist with outreach to the Latinx community, allowing us to meet our goal of making climate and outdoor programming more accessible and increasing the

number of Latinx attendees at our programs, workshops, and events. The grant funds also helped Sheep Mountain Alliance cover the salary of one of their staff members, allowing the organization to divert resources to host more outdoor community events including free skiing, hiking and climbing opportunities for the Latinx community, support for outreach and education around wildfire and drought, and workshops on engaging in the public process at the local, state, and federal level.

11. After receiving the EJCPS grant, we began hosting community workshops on various topics and brought presenters from different organizations. These workshops provided community members a space to learn about solar and energy efficiency opportunities, equitable access to the outdoors, as well as the wildfire and drought emergency response resources available to them. EcoAction Partners' Climate Action Coordinator and Outreach and Education Coordinator worked on organizing these workshops and prepared corresponding educational materials. The grant funds allowed us to host events at various times throughout the day so that people had greater opportunities to attend around their work schedules. We hosted a total of 21 events that saw a turnout of 520 people. Without the funds from the EJCPS Grant, our organization would not have been able to host workshops or offer entirely free opportunities for outdoor community engagement at this scale and could not have afforded to contract for interpretation or translation services.

12. For roughly nine months of grant implementation, we had consistent and reliable communications with EPA and did not have issues drawing down payments from the Automated Standard Application for Payments ("ASAP") system. Additionally, the EPA Project Officer ("PO") assigned to our grant was responsive and readily available to

3

JA439

answer any questions we had. We met with the PO monthly to discuss the progress of our grant projects and any challenges we faced.

13. On January 28, 2025, I received an email from EPA stating that the agency was working to implement the Executive Order issued by President Trump on January 20, and that all funding related to the Inflation Reduction Act and Infrastructure Investment and Jobs Act had been paused. Later that day, I was not able to access my organization's account in the ASAP system and draw down any payments. When I emailed the PO assigned to our grant about this issue, I did not receive a response. Ex. 2.

14. On February 4, 2025, I emailed the PO to flag that we were unable to access our obligated grant funding in the ASAP system, as the remaining $126,936.71 of the grant fund was no longer visible in our account. I asked for an explanation as to why our legally obligated funds were delayed for reimbursement. Ex. 3.

15. On February 5, 2025, I received a response to my February 4 email from a different PO who stated they would be taking over the grant. In response to my concerns about the inaccessibility of the grant funds, the new PO stated that the EPA's Office of Chief Financial Officer was working on the issue, but did not provide any additional details about why our funding was frozen or when we could expect to receive it. Ex. 4.

16. In early February 2025, I received an off-the-record phone call from a contact at EPA who stated they could not communicate with me through EPA channels, that one of the POs on our grant had been fired, and that they did not have any additional information at that time on the status of our grant funds.

17. On February 25, 2025, I received notice from an EPA Grant Specialist that our grant had been reassigned to a new PO for the second time, and that the new PO would reach out to

4

JA440

us in the coming weeks. Ex. 5. I ultimately did not receive any communication from the PO.

18. On March 3, 2025, we were able to successfully draw down a payment from the ASAP system but, two days later, the total EJCPS grant award of $150,000 was no longer visible in the account. Ex. 6, at 1.

19. On March 18, 2025, I lost access to my ASAP account again and emailed the Grant Specialist about how to proceed with an imminent financial reporting deadline that required me to reference information in the ASAP system. I did not receive any response. Ex. 7.

20. On March 26, 2025, over one year into EcoAction Partners' work implementing the grant project, we received notice that our EJCPS Grant was terminated. The termination letter stated that "the objectives of the award are no longer consistent with EPA funding priorities." Ex. 8. We did not receive any additional communications from EPA about the grant freeze.

21. I now am aware that EcoAction Partners was just one organization affected by EPA's termination of all EJCPS grants, and that the agency terminated several other programs funded through the Inflation Reduction Act as well.

22. On April 16, 2025, I emailed EPA to note our entitlement to reimbursement for costs incurred prior to and during EPA's suspension of our funds in the ASAP system. Ex. 6. The costs that we properly incurred prior to the date of the March 26 termination letter include $5975.75 that, to this date, remain unpaid.

23. Over the past several months, my staff and I have had to spend a significant amount of time dealing with the fallout of the funding disruption and award termination, which has taken away from our programmatic work.

24. EPA's withholding and termination of our award has also put a lot of our anticipated programming on hold. We were forced to cancel a program event around emergency response resources which we had already dedicated the time and resources towards planning. We were also halfway through the development of brochures, in both English and Spanish, about wildfire and drought resources which had to be paused because of the termination.

25. Because of the EJCPS program termination, I began spending more time fundraising to try to fill the gap in funding. Luckily, I was able to secure funding from a local foundation to cover a portion of the gap caused by the termination, which runs through the end of the calendar year. Without this temporary support from the local foundation, we would have had to scale our full-time Outreach and Education Coordinator role back to a part-time position.

26. The local foundation's support has been crucial in covering other payroll costs that were previously covered by the EJCPS Grant, including my compensation for work performed on the grant effort. With the funding from the local foundation running out at the end of this year, I have serious concerns about how to cover the organization's operating costs in the long term if the EJCPS program is not reinstated.

27. The EJCPS Grant would have provided two additional years of financial support, and its termination means we can now only guarantee support for our organization for the next six months.

28. The termination of the EJCPS program has been challenging to our subawardees as well. Both subawardees are very small organizations with Sheep Mountain Alliance having only two employees and Collaborative Action for Immigrants having exclusively contracted staff. The EJCPS funds allowed the organizations to expand their work in a meaningful way. Because of the termination, interpreters contracted by Collaborative Action for Immigrants have seen a loss in work available to them. While the local foundation has stepped in to cover Sheep Mountain Alliance's operating expenses associated with these programming efforts, this cannot be relied on as a long-term funding source.

29. If EcoAction Partners does not receive the money that EPA promised for the EJCPS Grant, our organization will struggle to meet our payroll obligations, pay our subawardee invoices, sustain longstanding relationships with our partner organizations, and maintain trust within our community by meeting the goals we set out to achieve through the grant. This would cause a great deal of harm to us and the communities we serve. A big part of our mission is showing up as a reliable resource for our community and cancelling events has made meeting this mission difficult. Expanded outreach for our income qualified weatherization program allowed EcoAction Partners to implement over $252,800 in weatherization upgrades in 34 income qualified households in 2024 alone. Without this funding, our outreach efforts have decreased, and our participation numbers have dropped. Through the first year of this grant, we were able to host 21 events including a workshop on wildfire and drought, how to submit public comments, wellness in the outdoors, sustainable tourism, and much more. These events were all made possible by EJCPS grant funding and will not continue at that scale without the return of this grant.

JA443

30. If the EJCPS Grant program is reinstated and, as a result, our grant is restored, we could

continue expanding our income-qualified weatherization program to lower utility bills,

energy use, and address safety concerns including gas leaks for low- and middle-income

households in our region. Further, reinstatement of the EJCPS Grant would allow us to

continue our community education work around lifesaving wildfire and drought

resources. Our subawardees could continue to benefit from the support the EJCPS Grant

has provided them, and I can guarantee that my staff members will continue to be

adequately compensated. Our organization could return to committing staff resources to

our core programmatic work, instead of worrying about our operational capacity.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true

and correct.

Emma Gerona                                         Date: 06/23/25

8

JA444

# EXHIBIT HH

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**DECLARATION OF MARCY HAMILTON,**

**SOUTHWESTERN MICHIGAN PLANNING COMMISSION**

I, Marcy Hamilton, declare as follows:

1. My name is Marcy Hamilton, and I live in St. Joseph, Michigan. This declaration is based on my personal knowledge and professional education and experience. I am over the age of eighteen and suffer from no legal incapacity. I submit this declaration in support of the Southwestern Michigan Planning Commission, which is one of several grant recipients affected by the freeze in federal grant funding.

2. The Southwestern Michigan Planning Commission ("SWMPC") was created in 1968 as a quasi-governmental regional planning commission to serve Berrien, Cass, and Van Buren Counties in the state of Michigan. We bring to the table expertise in planning for the future, an understanding of local needs, and a network of state and federal relationships. As an unbiased partner, we help communities define their collective visions, create actionable plans for and secure funding to maintain infrastructure, spur economic development, and preserve natural resources.

3. I am the Senior Planner and Deputy Executive Director of the SWMPC. I have worked at the SWMPC for 22 years, serving in my current role for the last 8 years. As Deputy Executive Director, I am involved in oversight of our operations and planning activities and manage project timelines, budgets, and deliverables.

4. SWMPC was awarded a $20,000,000 Community Change Grant to start on February 1, 2025. The grant agreement provides funding to transform the Bobo Brazil Community Center (a former federal armory acquired by the city that had fallen into disrepair due to

JA446

the city not being able to afford operational costs) and Garden House (a large historic house, now in disrepair) into resilience hubs with energy efficiency upgrades; to encourage alternative energy sources and community-driven programming; to develop a series of linked microgrids; to enable home energy audits, weatherization, electrification and indoor air quality improvements; to offer training in green construction and clean energy careers; and to establish a mobile recycling program with an educational campaign to reduce waste and illegal dumping.

5. The City of Benton Harbor is our statutory partner on the award, and we have three subawardees: The Benton Harbor Community Development Corporation ("BHCDC"), Let Us Rest, and the Workforce Development Institute ("WDI") (as a subawardee of the City of Benton Harbor). We drafted agreements with our subawardees when we received notice of the grant award.

6. We received our award agreement from EPA on January 7, 2025 - per an email communication from our Project Officer, we did not have to sign the award in order for it to go into effect. We completed training that was required for access to the Automated System for Administrative Payment ("ASAP") system, but we never obtained access to the system. We received an initial termination notice for the grant on March 25, 2025, and then that notice was rescinded on April 1, 2025. We received another termination notice on April 30, 2025 that has remained in place since that date.

7. The State of Michigan made a commitment of $1,000,000 to the project, contingent upon us receiving EPA funds. Because we have not received any federal funds under the grant, we have not signed a contract with the State.

8. The project is designed to benefit historically disadvantaged and low-income neighborhoods that are facing particular challenges from extremes in weather patterns:

2

JA447

extreme heat and extreme cold. Many homes in the communities targeted by the program are old and do not qualify for other state or regional energy efficiency upgrades because of maintenance problems. Our program is designed to provide funding for maintenance that would then allow improved electrification, weatherization and energy efficiency upgrades. Additional energy independence for the City of Benton Harbor would be transformational. The city was under emergency management several years ago, which depleted its financial resources and the ability to assist the city and its residents to lower their energy bills would be a significant benefit.

9.  Our program is also designed to support workforce development in the targeted communities. One of our activities under the award is to provide residents with high quality, long-term career pathways to sustainable jobs that help reduce greenhouse gas emissions.

10. In an effort to preserve the benefits of the program despite not having access to funds in the ASAP system, I have spent significant time seeking to clarify the status of the grant and communicating with subawardees. The uncertainty of the grant status has forced me to take time away from my other responsibilities and has negatively impacted other projects.

11. Even if funding is ultimately restored, an extended delay in the project could cause significant setbacks. In particular, two of the project sites - the Bobo Brazil Community Center and the Garden House (described in paragraph 4) - are in disrepair and need rehabilitation for the project. Extended delays will allow further deterioration of these sites. This lack of funding also calls into question whether they could ultimately be used for the project. Alternative funding may not be sufficient to renovate Bobo Brazil to the extent necessary to allow the building to be reopened - and the city does not own another

3

JA448

building that fits the bill for this community space/resiliency hub.  As well, while funds are being scraped together by BHCDC to carry out some limited improvements to the Garden House, not having access to the CCG funding means that the alternative energy installation that was a key component of the project will not be possible.  Not being able to move forward with these sites as planned, which are located in neighborhoods that desperately need the services that these projects can provide, will leave these communities at a significant loss.

12. Residents of Benton Harbor have historically been skeptical about outsiders and of the city government itself.  The city had publicized the CCG as a much needed investment by the EPA in meaningful improvements to our community's clean air, energy efficiency and climate resilience.  Instead of these positive impacts, the termination of the grant has only increased suspicion and negative views of the city and state governments and, by implication, of the Planning Commission.

13. Termination of the grant also has caused harm to SWMPC's subawardees.  Let Us Rest has been unable to launch a community recycling program that city residents sorely need and are angry about losing.  BHCDC had planned a homeowner grant repair program with training and employing community members  and WDI had planned workforce training, neither of which  is able to begin without funding from the grant.

14. Restarting the grant funding would immediately allow SWMPC and our subawardees to secure project sites, begin community center and home rehabilitation, begin workforce development and take steps to establish a community recycling program.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

4

JA449

Marcy Hamilton
Senior Planner and Deputy
Executive Director

6/25/2025

Date

# EXHIBIT II

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**APPALACHIAN VOICES, et al.**

***Plaintiffs, on behalf of themselves and all others
similarly situated***

**v.**

**UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY and LEE ZELDIN, in
his official capacity as Administrator of the United
States Environmental Protection Agency**

**Defendants.**

## DECLARATION OF CAROLYN OLSON, CITY OF NEW YORK

I, Carolyn Olson, declare as follows:

1.  I am the Assistant Commissioner of the Bureau of Environmental Surveillance and

Policy at the New York City ("City") Department of Health and Mental Hygiene (the "Health

Department"). The Health Department is the oldest and largest public health department in the

country, with more than two centuries of expertise, and is responsible for protecting and promoting

the health and wellbeing of everyone who lives in, works in, or visits New York City. In my role

as Assistant Commissioner, I lead a multi-disciplinary team working on environmental health

policies and programs through innovative health surveillance, legislative and regulatory action,

and informatics across topics ranging from food safety to climate health. I submit this Declaration

in support of the Plaintiffs' request for a preliminary injunction and/or temporary restraining order.

1

2.      The facts set forth herein are based on my personal and professional knowledge, conversations with relevant Health Department staff, and/or a review of records in the Health Department's possession.

3.      As part of my work at the Health Department, I have knowledge of grants and cooperative agreements that are applied for, awarded to, and administered by the Bureau of Environmental Surveillance and Policy at the Health Department.  These grants focus on monitoring and addressing issues that present health risks to New Yorkers, including heat.

**Background: Impact to New Yorkers from Exposure to Heat**

4.      Temperatures are rising, and heat waves are becoming more severe.  According to the New York City Panel on Climate Change, the average number of days per year above 90 degrees Fahrenheit could top 56 by the 2050s – approximately three times the average from 1971-2000.[1]

5.      In New York City and nationwide, extreme heat is the deadliest form of extreme weather.[2]  Increased exposure to heat puts extra stress on the body that can worsen chronic health conditions such as heart and lung disease.  From 2018 to 2022, there was an average of 525 heat-exacerbated deaths per year in New York City, with this number only expected to increase in the next several decades without focused heat mitigation in the face of continually warming temperatures.[3]

6.      The primary risk factor for heat-related morbidity and mortality in New York City is lack of residential cooling.  Between 2014-2023, 45% of people who died from heat-related

---

[1] Christian Braneon et al., *NYC Climate Risk Information 2022: Observations and Projections*, Annals of the New York Academy of Sciences (2023).
[2] NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE, 2025 NYC Heat-Related Mortality Report (2025) (accessible at https://a816-dohbesp.nyc.gov/IndicatorPublic/data-features/heat-report/) (last accessed June 17, 2025).
[3] *Id.*

2

JA454

stress were exposed in their home, and there was no record that any had functioning air conditioning at the time of death.  In addition, heat-exacerbated deaths are more likely to occur at home.[4]

7.    Citywide air conditioning access in homes hovers around 90%, but access in low-income communities can be as low as 71%.[5]

8.    The Health Department works in numerous ways to address the risk of extreme heat exposure to New Yorkers.  For example, in the summer of 2020, New York City agencies, including the Health Department, purchased and installed nearly 73,000 air conditioners in households with a low-income older (aged 60+) adult that did not have working home cooling. This effort reduced the risk of extreme heat exposure that New Yorkers faced when many cooling centers and other cool public spaces were closed because of COVID-19.

**The Health Department's AC Recovery Program**

9.    Another example of the Health Department's efforts to address the risk of extreme heat exposure to New Yorkers is its Air Conditioner ("AC") Recovery Program.  The Health Department's AC Recovery Program is a novel effort that seeks to recover AC units made redundant by the New York City Housing Authority's ("NYCHA") initiative "Clean Heat for All." That initiative is transitioning NYCHA housing to fossil-free heating sources by installing electric heat pumps to provide both heating and cooling to residents.  As heat pumps are installed, existing window AC units will become redundant.  The AC Recovery Program will either distribute these redundant window AC units for reuse by New Yorkers at risk of heat-related health impacts or responsibly recycle the units after reclaiming their refrigerants for proper disposal.

---

[4] *Id.*
[5] NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE,  Environment and Health Data Portal: Household Air Conditioning (accessible at https://a816-dohbesp.nyc.gov/IndicatorPublic/data-explorer/housing-safety/?id=2185#display=summary) (last accessed June 13, 2025).

JA455

10.     To identify geographic heat-vulnerable communities most in need of air conditioning for residential cooling for the AC redistribution, the Health Department will use a U.S. Environmental Protection Agency ("EPA") tool and the Health Department's New York City Heat Vulnerability Index ("HVI"). The HVI is derived from New York City mortality data, which means that neighborhoods identified as high risk are areas with elevated rates of heat-exacerbated mortality.[6]

11.     The Health Department anticipates that the AC Recovery Program will recover approximately 4,000 AC units from NYCHA, roughly half of which will be redistributed and half of which will be recycled.

**The Health Department's Grant Award and Termination**

12.     On January 10, 2023, the EPA issued a Notice of Funding Opportunity by which the EPA would accept grant applications for projects that support and/or create model state, tribal, local, and territorial government activities that lead to measurable environmental or public health results in communities disproportionately burdened by environmental harms or risks. The EPA's Notice of Funding Opportunity indicated that project proposals submitted should support the goals of the EPA's Environmental Justice Government-to-Government Program. These goals include: (1) achieving measurable and meaningful environmental and/or public health results in communities; (2) building results-oriented partnerships, particularly with community-based nonprofit organizations within disproportionately impacted areas, (3) establishing pilot activities in communities to create models that can be replicated in other geographic areas, and (4) strengthening the development and implementation of specific approaches to achieve environmental justice.

---

[6] NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE, Interactive Heat Vulnerability Index (accessible at https://a816-dohbesp.nyc.gov/IndicatorPublic/data-features/hvi/) (last accessed June 9, 2025)

JA456

13.     On April 13, 2023, the Health Department submitted its grant application for the AC Recovery Program in compliance with the procedures laid out in the EPA's Notice of Funding Opportunity.

14.     On October 19, 2023, the EPA notified the Health Department that it had been conditionally selected to receive a grant under FY 2023 Environmental Justice Government-to-Government Program.  The Health Department then spent nearly eleven months working with the EPA to finalize the workplan related to the Health Department's grant.

15.     On September 9, 2024, the Health Department received a Notice of Award, dated September 4, 2024, for $1,000,000.00 for its AC Recovery Program (Award No. 52 96263324) ("Grant Award").

16.     Without any prior notice or indication, and despite the New York City's compliance with the terms and conditions of Grant Award, the Heath Department received an amended agreement and memo of termination ("Termination Memo") dated March 28, 2025.  The Termination Memo noted that the grant was being terminated "on the grounds that the award no longer effectuates the program goals or agency priorities."  Exhibit A.

17.     Without further explanation, the Termination Memo announces: "The grant specified above provides funding for programs that promote initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States."  Exhibit A.

**Impacts of the Grant Award's Termination**

18.     The Grant Award's termination will irreparably harm the Health Department because the Health Department will not be able to implement the AC Recovery Program as

JA457

outlined in its grant application without dedicated funding from an outside source.  If the Health Department does not receive the Grant Award, its ability to effect the AC Recovery Program will be greatly diminished, as it will have to pare back – or possibly terminate – the Program.

19.    Failing to implement the AC Recovery Program will have cascading consequences on New York City and its residents.

20.    For example, without the funding, the Health Department will be unable to furnish approximately 2,000 AC units to households across New York City.  As such, residents of those households will remain at risk for extreme heat exposure.  Moreover, the Health Department will be unable to provide for the responsible recycling of approximately 2,000 additional AC units that cannot be reused.  Without the planned AC Recovery Program, the volume of those units entering New York City's waste stream will burden New York City's existing systems for refrigerant reclamation – a requirement under the EPA regulations and a potential environmental hazard in its own right.  Such waste management will result in costs to the City and inhibit the safe, responsible reclamation of AC units as well as the benefit of repurposing the remaining units as scrap metal.

21.    Additionally, the Health Department faces reputational harm because of the Grant Award's termination.  The Health Department has expended significant time and effort to partner with Big Reuse, a community-based organization focused on promoting environmental sustainability, to implement the AC Recovery Program.  Having secured the Grant Award, the Health Department negotiated a sub-award contract with Big Reuse.  The Health Department cannot maintain this contract without the Grant Award.  Losing this contract sets a negative precedent and raises concerns that both Big Reuse and other community-based organizations will decline to work with the Health Department on future projects.  Accordingly, the Health Department has experienced reputational harm, as its engagement with community partners,

6

JA458

namely Big Reuse, has been rendered obsolete and its standing in the community is marred by a broken promise.

22.     For the reasons discussed above, the termination of the Grant Award will reduce the Health Department's ability to fulfill its mission to protect and promote public health in New York City.  In so doing, this will cause irreparable harm to the Health Department, with long-term public health and environmental consequences that will be borne by New York City and its residents.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on June 24, 2025, at New York City, NY.

_____

Carolyn Olson

7

JA459

# EXHIBIT JJ

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**DECLARATION OF BRIANA DUBOSE, ECOWORKS**

I, BRIANA DUBOSE, declare as follows:

1. My name is Briana DuBose, and I live in the Metro Detroit area of Michigan. This declaration is based on my personal knowledge and professional education and experience. I am over the age of eighteen and suffer from no legal incapacity. I submit this declaration in support of EcoWorks, which is one of several grant recipients affected by the freeze and terminations of federal grant funding.

2. EcoWorks is a 501(c)(3) nonprofit organization that is headquartered at 122400 W. 7 Mile Rd., Detroit, Michigan 48219. Established in 1981, EcoWorks' mission is to provide education, green consulting, home energy assistance, climate advocacy, and workforce development to Black, Indigenous and People of Color ("BIPOC") communities in the State of Michigan, with a focus on the greater Detroit metropolitan area and Southeast Michigan.

3. I am the Executive Director of EcoWorks. As Executive Director, I work closely with our team across multiple program areas from clean energy and home electrification to workforce development and resilience planning. I also manage key relationships with partners, funders, and government agencies to help align our work with community needs and long term impact.

4. EcoWorks started with a focus on energy conservation, but in its more than forty (40) years of operation, it has grown to emphasize all aspects of sustainable development. We remain rooted in energy equity, but also emphasize affordable, energy-efficient housing, climate resilience, and community education. We work with homeowners, renters, and

1

JA461

communities across Southeast Michigan to make homes safer, healthier, and more sustainable.

5. EcoWorks receives funding from individual contributions, governmental and non-governmental grants, and the services that the organization provides. These services include energy audits, project management for retrofits, electrification planning, resilience hub design and implementation, and technical assistance to other nonprofits and local governments that want to build equity into their climate work. EcoWorks has previously received an Energy Futures Grant from the U.S. Department of Energy, which helped us develop and scale community-based decarbonization models, the Local Energy Action Program Grant, focused on neighborhood electrification and building local capacity, and the Solutions for Lasting, Viable Energy Infrastructure Prize through the U.S. Department of Energy, which we are using to co-develop energy solutions with local residents and trusted community partners. These federal investments have allowed us to expand our reach while staying grounded in our mission of environmental justice and community resilience.

6. In the course of its work, EcoWorks has successfully launched and operated the following programs:

   a. The Eco-Detroit Model Program ("Eco-D") – Eco-D has provided energy-saving workshops, in-home visits, and appliance upgrades for more than 57,000 residents, helping them lower their bills an average of 14% and save over $49 million collectively. Eco-D designed the first large-scale water conservation program in Southeast Michigan and provided 2,100 clients with in-home water audits, education and plumbing repair, resulting in an average savings of 20%, or $420 per household. Through the Eco-D Green Building Upgrade Clearinghouse,

2

JA462

EcoWorks provides neighborhood-scale assessments, contractor matchmaking, local workforce development, and collaborative decision-making to identify and implement green building enhancements for homes, businesses, places of worship, and community spaces.

b. Strategic Community Initiatives Program ("SCI") – SCI develops custom-fit climate and energy solutions for municipalities, school districts, health systems, small businesses and non-profit organizations. As part of developing those solutions, EcoWorks provides technical, project management, and engagement services. SCI has secured over $5 million in clean energy investments and $30 million lifetime savings for over 30 Michigan municipalities.

7. On or about December 4, 2024, EcoWorks was awarded an EPA Community Change Grant in the amount of $20,358,302.00 for its Detroit Community Resilience Hub Initiative (the "Grant").

8. The funds from the Grant are to be used to establish transform twenty (20) houses of worship and food assistance programs into community resilience hubs by investing in energy efficiency and electrification; solar energy with on-site storage facilities; green infrastructure such as rain gardens, bioswales, and permeable paving to reduce flooding; and electric vehicle ("EV") chargers/vehicles. These resources were designed to equip these houses of worship and food assistance programs with enduring energy autonomy and enable them to provide safety, security, and connection to their community members during times of extreme weather, power outages, and other emergencies. The first fifteen (15) hubs identified by EcoWorks were chosen based on the following criteria: (i) ability to operate or host a Detroit-based food panty or soup kitchen; (ii) location in United States Environmental Protection Agency ("EPA") Inflation Reduction Act

JA463

("IRA")-designated disadvantaged communities and low-income areas (as identified by the EPA EJ Screen); (iii) location in a racially diverse community and demonstration of a strong, ongoing commitment to equity; (iv) stable track record of operations for more than ten (10) years; (v) active promotion of environmental stewardship; and (vi) operation of strong, community-centered programs that meet urgent human needs.

9.  In order to create these community resilience hubs, the Grant funds were intended to be used to (i) retrofit buildings; (ii) establish EV rideshare programs to expand mobility and transportation options; (iii) deploy green infrastructure solutions to mitigate flooding; (iv) implement workforce development programs for occupations that reduce greenhouse gas emissions such as energy auditors, building electrification technicians, and solar installers, while also providing wraparound support like case management, job readiness training, and connections to long-term employment pathways; and (v) educate and engage residents in the surrounding neighborhoods about the benefits of clean energy and climate resilience.

10. More specifically, EcoWorks intends to use the Grant funds to (i) replace impermeable surfaces with vegetation and permeable pavement; (ii) deploy thirty (30) EVs at twenty (20) sites; (iii) replace natural-gas-fueled equipment with electric models; (iv) install solar energy systems; (v) provide on-the-job training for forty (40) to sixty (60) Detroit residents; and (vi) improve the envelopes to commercial buildings.

11. As a result of the foregoing work, EcoWorks anticipates the following benefits for the disadvantaged communities that are to be served: (i) increased resilience to extreme weather; (ii) reduced building flooding; (iii) reduced air pollution from transportation; (iv) decreased utility bills; (v) improved indoor and outdoor air quality; (vi) increased wages and benefits for participants in workforce development programs; (vii) decreased

JA464

incidence of asthma symptoms for Detroit residents; (viii) reduced exposure to mold and other co-pollutant emissions; and (ix) increased public environmental health literacy.

12. EcoWorks works with its statutory partner, Michigan Interfaith Power and Light ("MIPL"), who was brought on to provide community engagement services, as well as its collaborating entity, Solar Faithful, who would have overseen and executed construction work. EcoWorks also anticipates providing twenty (20) fixed amount subawards to food pantries and food assistance programs attached to houses or worship to engage clergy, staff, and community members. These subawards are designed to support hands-on engagement with hub leaders, clergy, staff, and community members. This engagement includes organizing resilience hub planning meetings, hosting community workshops on energy efficiency and emergency preparedness, supporting volunteer-led visioning sessions, conducting neighborhood needs assessments, and coordinating events like solar reveal celebrations and resilience fairs. We are intentional about making sure the engagement is not just about outreach, but is instead a product borne out of co-creation. We are supporting activities - such as faith-based framing around climate justice, incorporating youth voices, and ensuring multilingual and culturally relevant outreach in neighborhoods where English is not the primary language - that allow residents to help shape what these hubs look like, how they operate, and how they can be used year-round, not just during a crisis.

13. EcoWorks' grant was awarded on December 4, 2024. On March 27, 2025, our Grant was terminated and access to funding stopped. As of March 27, 2025, we had drawn down $7,538,367.44 from the Grant fund, which was used to purchase equipment, including solar panels and induction stoves; prepare scopes of work; conduct extensive inspections of potential hubs; and enter into agreements with contractors to perform construction

5

work on thirteen (13) of the twenty (20) sites that were previously identified to be prioritized in year one.

14. Due to the lack of access to funds, EcoWorks was not able to hire the staff it intended to fulfill the Grant requirements. In fact, EcoWorks will likely have to lay off three of its five full-time staff members because they reasonably relied on the Grant funding and missed the opportunity to apply for other grant funding necessary to keep the organization viable.

15. As a result of the EPA's termination of the Grant, much of the work performed to date in selecting hub sites, preparing scopes of work for thirteen of the hub sites, performing site inspections, purchasing materials and equipment for thirteen of the hub sites, and entering into contracts with contractors for construction work will no longer be of any value unless funding is restored without delay.

16. Delay in installation of materials that already have been purchased for these hubs runs the risk that the purchases will be wasted. In addition, with each day that materials and equipment cannot be purchased, the costs for these products rises, resulting in the inability of EcoWorks to deliver upon the scopes of work and results promised. Similarly, the delay in hiring contractors will likewise cause the cost of future work to dramatically rise, not only because of the increasing cost of labor and materials, but also because workforce development planned with the use of the Grant funds, the specialized labor needed to perform the work on the resiliency hubs will remain expensive and difficult to find.

17. Similarly, MIPL and Solar Faithful have been unable to hire the staff they intended and are in dire circumstances without the Grant funding.

6

JA466

18. Detroit has the highest percentage of power outages per year with 44.8% of households experiencing power outages in a 12-month period.  That is nearly double the national average of 25.4%.  These regular power outages result in spoiled food, extreme heat in the summer, and extreme cold in the winter.  The resiliency hubs to be created by EcoWorks with the Grant funds would have provided a refuge for community members experiencing power outages.  The use of food pantries and soup kitchens as resiliency hubs would also decrease the risk of food spoiling at these locations because there would be ways to keep the power running even in emergency situations.  Without these improvements, the community members will continue to experience the negative health and safety consequences associated with energy and food scarcity and unreliability.

19. Moreover, many of the resiliency hubs selected are currently experiencing regular electricity loss, flooding, roof leaks, and extremely high, and rising, energy and sewer costs.  Without the Grant funding, these sites will not receive energy independence from solar installations, roof repairs, and infrastructure to abate storm water runoff that they so desperately need.  Since these sites provide critical benefits to the community, if the sites continue to experience unreliable electricity, flooding, roof leaks, and exorbitant sewer and energy costs, they will be unable to deliver the benefits so desperately needed in their communities.

20. We have been fortunate enough to have significant community support for the Grant projects, and our community views us as a positive force.  We have sought to be transparent with our community members about the loss of the Grant funding to minimize the negative impacts of the funding cuts on our reputation in the community.  Nevertheless, the termination of the Grant, and our resulting inability to perform the work

JA467

promised will cause reputational harm to EcoWorks and will likely make communities and other entities less likely to partner with EcoWorks on future projects.

21. If EcoWorks' access to the Grant funds is not immediately restored, it will be impossible for EcoWorks to comply with the Grant requirements within the Grant timeframe if the funds are later restored because they will be behind in securing sites, executing contracts to fulfill key components of their project, and the need to figure out how to make their internal operations whole again, among other things.

22. Moreover, EcoWorks is not able to replace the Grant funding from other sources, meaning without the Grant, the resiliency hubs will not be completed, the community will not receive the intended benefits from the Grant, and the harmful economic and health consequences of the lack of skilled labor, lack of energy reliability, flooding, and food scarcity will be unabated.

23. Resuming the funding will allow EcoWorks to continue the work started under the grant of installation of solar panels and installation of energy efficient stoves.  It would also allow planning and construction to continue in relation to our resilience hubs, to prevent the harms from power outages described above.

JA468

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States, the foregoing is true and correct.

Date:    June 16, 2025

_____

Briana DuBose
Executive Director of EcoWorks

JA469

# EXHIBIT KK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**DECLARATION OF REBECCA LEWISON,**

**CENTER FOR COMMUNITY ENERGY AND ENVIRONMENTAL JUSTICE**

I, REBECCA LEWISON, declare as follows:

1. My name is Rebecca Lewison, and I live in San Diego, California. This declaration is based on my personal knowledge and professional education and experience. I am over the age of eighteen and suffer from no legal incapacity. I submit this declaration in support of the San Diego State University Research Foundation ("SDSU Research Foundation"), which is one of several grant recipients affected by the freeze and terminations of federal grant funding.

2. SDSU Research Foundation is a 501(c)(3) nonprofit organization that is headquartered at 5250 Campanile Drive, San Diego, CA, 92182 that serves as the lead organization for external grants and contracts conducted by San Diego State University ("SDSU") personnel and staff. Established in 1943, SDSU Research Foundation is an auxiliary organization of SDSU chartered to further the educational, research, and community service objectives of San Diego State University. Governed by a board of directors, SDSU Research Foundation provides grant lifecycle services including proposal budgeting and submission, award administration, human resources, payroll and purchasing services.  They also provide facilities to house research projects.

3. I am a Professor of Biology at SDSU, Director of the Institute of Ecological Monitoring and Management, and the Executive Director of the Center for Community Energy and Environmental Justice ("CCEEJ"), an academic center at San Diego State University, administered by SDSU Research Foundation.  I have a Bachelor's Degree from Vassar

1

JA471

College and a Doctorate in Ecology from the University of California, Davis. I have been at SDSU since 2006 and became Executive Director of CCEEJ in 2023. In my role, I have overseen all aspects of the programmatic operations of the CCEEJ grant project discussed in this declaration. I work closely with SDSU Research Foundation staff who oversee award finances, reporting, and compliance.

4. On June 1, 2023, SDSU Research Foundation was awarded, as the grantee recipient, an EPA Thriving Communities Technical Assistance Center ("TCTAC") Grant in the amount of $9,999,999 (the "Grant"). The Grant provided funding for CCEEJ, the TCTAC serving EPA Region 9.

5. Funded by the TCTAC grant, CCEEJ is a collaborative network of 11 organizations, led by SDSU and supported by:

    a. Environmental Protection Network ("EPN");

    b. Center for Creative Land Recycling, CA;

    c. University of San Diego's Energy Policy Initiatives Center, CA;

    d. Institute for Tribal Environmental Professionals, AZ;

    e. Desert Research Institute, NV;

    f. Climate Science Alliance, CA;

    g. Pacific Research on Island Solutions for Adaptation, HI;

    h. University of Guam's Center of Island Sustainability, GU;

    i. Public Health Alliance, CA; and

    j. Arizona State University, AZ.

6. CCEEJ began work under the Grant in June 2023, and provided technical assistance to communities who are seeking funds or expertise to support their community's priorities and projects. From the start of the grant to February 2025, CCEEJ worked with over 350

2

JA472

organizations to deliver critical, nonpartisan technical assistance to municipal governments, Tribes, non-profit organizations, faith-based organizations, and community-based organizations across California, Arizona, Nevada, Hawai'i, Guam, and American Samoa. CCEEJ helped communities to identify and access funding opportunities, develop plans for critical infrastructure, such as community heat resilience hubs and clean energy projects, connect with experts in clean water and air regulations and policies, establish green workforce development programs for underserved communities, initiate plans for brownfields redevelopment and land reuse projects, and broaden capacity on critical community issues, such as extreme heat and public health crises.

7.  CCEEJ's measures of impact are clear.  In the time the Grant was operational, CCEEJ:

    a.  Worked with more than 350 organizations  to support health and well-being;

    b.  Helped communities to apply for more than $6 million in grants (state, federal and foundation), with $4.3 million in grants awarded;

    c.  Provided grant writing training and capacity building to more than 250 participants from 141 organizations;

    d.  Attended local, regional and national community outreach events to connect with Tribal, rural, remote, and low-income communities;

    e.  Provided municipal governments, Tribes, non-profit organizations, faith-based organizations, and community-based organizations direct access to experts and expertise;

    f.  Identified more than $100 million in state, foundation and federal grant opportunities in key areas of interest for which communities could apply;

g.  Shared key resources for communities on extreme heat, land reuse and recycling, and sustainable energy futures.

8.  The following are specific examples of CCEEJ's impact:

a.  In Central California, CCEEJ assisted in securing a grant of over $350,000 from the California Air Resources Board to establish a PM 2.5 air quality sensor network and develop a community-based plan to improve air quality in disadvantaged communities.

b.  CCEEJ assisted an interdenominational faith-based organization in California to secure a $1,000,000 grant from the United States Department of Agriculture to fund a statewide community-led tree planting education program aimed at improving air quality and mitigating extreme heat in low-income communities.

c.  CCEEJ supported a Tribal representative of a Nevada Tribal Nation in a grant writing training program.  Through this program, they worked on a grant submission to address water quality in their community, particularly the impact of local mining operations, heavy metals contamination, and access to potable water.

d.  CCEEJ assisted a non-profit organization in Hawaii with grant writing training and grant submission to fund a local brownfield project.

e.  CCEEJ provided technical assistance to a Bay Area, California non-profit organization to secure a $100,000 grant from the California Department of Toxic Substances Control to study nuclear contamination levels of a Superfund site in their community.

9.  On February 13, 2025, our $9,999,999 allocation was frozen without explanation and we were forced to pause work.  Our funds were reinstated for two days on February 19, 2025, but we received a termination notice on February 21, 2025.  Since that day, we

4

JA474

have not been able to access Grant funds.  According to the SDSU Research Foundation records, drawdowns on the Grant total $1,880,133 and expenditures total $2,054,615. Accordingly, SDSU Research Foundation currently has $174,482 in unreimbursed expenditures.

10. The freezing of funds has caused significant disruption to ongoing, time-sensitive projects. Specifically:

   a. In Arizona, CCEEJ was working with the community and a water quality expert from EPN to provide guidance on next steps to address lead contamination, including notification to the Arizona Department of Environmental Quality and Department of Health Services.  The freezing of funding means this work is paused and community residents continue to experience the health risks of lead contaminated drinking water.

   b. In Northern California, CCEEJ was working with a non-profit to address concerns over high levels of water contamination that resulted from toxic cleanup sites. CCEEJ was working with the community and EPN to provide guidance on the Clean Water Act Section 303(d) listing process, site contamination testing, epidemiological studies on heavy metal contamination, and potential funding sources for this work.  The freezing of funding means this work is paused and community residents continue to experience the health risks of contaminated drinking water.

   c. In Nevada, CCEEJ was working with a school district, in partnership with a non-profit, to identify and organize data sources on school air quality in EPA census tracts.  Pausing this work means that risks of air pollution in the school district are not being remediated.

5

JA475

d.  In Los Angeles, CCEEJ was working with a non-profit organization to provide initial guidance on a new land revitalization project. While the guidance that was provided establishes a good baseline, the organization requires ongoing support to begin brownfield remediation necessary to renew the land. Lack of CCEEJ support for the revitalization project means that the brownfield remediation may be delayed or that its success will be negatively impacted.

e.  In Nevada, CCEEJ was working with a Tribal representative focused on developing a proposal for an EPA Tribal Response Program Grant to carry out a survey and inventory of brownfield sites within the reservation and implement environmental contamination remediation response efforts. Without CCEEJ's subject matter expertise, the survey and inventory are at risk, and the reservation continues to suffer the harms of brownfield contamination.

f.  In the Los Angeles area of California, CCEEJ helped a non-profit organization to identify and analyze data on major building polluters in the community to prioritize decarbonization efforts, including retrofits, affordability programs, and rental and labor protection. CCEEJ also provided insights on energy and greenhouse gas reduction impacts from solar and battery storage installations and building electrification retrofits. Freezing the Grant has meant that CCEEJ cannot provide ongoing support and creates the risk that the project will not continue.

g.  In California, CCEEJ provided subject-matter expertise to a non-profit organization on scaling up solar installations on affordable housing units and educational resources on energy conservation to improve affordability for low-income residents. Without ongoing support from CCEEJ, the project may not continue or be completed.

6

JA476

h. In Nevada, CCEEJ helped a non-profit organization to identify and summarize reports and data sources on clean energy and energy affordability in the Las Vegas area to support grant applications for a regional K-12 educational and workforce development program focused on disadvantaged and rural communities. Without ongoing support from CCEEJ, the project may not continue or be completed.

i. In Hawai'i, CCEEJ assisted with a grant submission to fund a local brownfield project and was providing critical technical assistance in brownfields to support their ongoing project.

11. The above-described projects show that CCEEJ's work to date has been efficient and effective, and CCEEJ has multiplied the effectiveness of funding it received. We have been able to leverage every grant dollar spent to raise additional funds, educate community organizations and support projects to achieve significant impact.

12. Continued delay in access to funding - including delays during the pendency of litigation to reinstate the Grant - will have a devastating impact on CCEEJ's ongoing projects. The organizations we have supported will lose technical assistance and subject matter expertise, putting the continued work of their projects at risk. If projects fail or are forced to be terminated, the organizations and their communities risk losing the benefit of the work that has been done to date. Delay is thus the worst of all worlds: not only will it mean that future work is at risk, but it also risks undoing the benefits of work done prior to the funding freeze.

13. Reinstating the Grant funding will allow CCEEJ to provide ongoing technical assistance to the projects described above and thus will prevent irreparable harm to the longevity of these programs and the organizations carrying them out.

JA477

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United

States, the foregoing is true and correct.

Date: 6/26/25

_____
Dr. Rebecca Lewison, Professor, San
Diego State University

# EXHIBIT LL

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**DECLARATION OF LATRICEA ADAMS, YOUNG, GIFTED & GREEN**

I, LATRICEA ADAMS, declare as follows:

1. My name is LaTricea Adams, and I live in Memphis, Tennessee. This declaration is based on my personal knowledge and professional education and experience. I am over the age of eighteen and suffer from no legal incapacity. I submit this declaration in support of the Young, Gifted & Green, which is one of several grant recipients affected by the freeze and termination in federal grant funding.

2. Young, Gifted & Green is a 501(c)(3) nonprofit organization that is headquartered at 100 Florida Ave. NE, 912, Washington, DC 20002 ("YGG"), and has an office at 655 S. Riverside Drive, Unit 504B, Memphis, TN, 38103. Established in 2016, YGG's mission is to bring like-minded organizations together to collectively take action and advocate against the crisis of lead exposure and environmental injustice in disadvantaged communities throughout the nation.

3. I am the Founder, CEO, and President of YGG. I have worked at YGG since its official founding in February 2016. I previously founded Black Millennials 4 Flint in February 2016, which became YGG on February 10, 2024. I have a Bachelors in Foreign Languages (Spanish), a Master of Arts in Teaching, an Education Specialist Degrees, and am currently a Doctoral Candidate (EdD) in Educational Administration and Supervision. As the CEO and President, I oversee the development of projects and all organizational operations and planning, managing workstreams across several program areas. As CEO, I have overall strategic and operational responsibility for YGG staff, programs,

1

JA480

expansion, and execution of its mission.  I have a deep knowledge of this field, core programs, operations, and business plans.

4.  I founded YGG to coordinate emergency relief efforts for the Flint Water Crisis by bringing together the resources of corporations and the management skills of regional Urban League Young Professionals chapters to provide bottled water to affected neighborhoods.

5.  YGG expanded its work to include training young BIPOC leadership to lead successful education, advocacy, and legislative initiatives designed to mitigate lead contamination and other environmental issues in Flint, Washington D.C., Baltimore, and Memphis. YGG has partnered with parents and schools, city councils, businesses, local agencies such as the City of Memphis Department of Housing, civic leaders, Environmental Defense Fund, the Department of Housing and Urban Development ("HUD"), the United States Environmental Protection Agency ("EPA"), the U.S. Congress, The White House, and Black Entertainment Television ("BET").

6.  For its work, YGG has received the following awards and formal acknowledgements: (i) Congressional Black Caucus Green Room Award of Excellence; (ii) Environmental Health & Equity Collaborative Inclusion & Diversity for Equitable Advancement in Environmental Health Awardee; (iii) Morehouse School of Medicine Public Determinants of Health (PDOH) Institute Champion; (iv) National Black United Front Umoja Community Award; (v) BET's Finding Justice Grant Awardee; (vi) Maudine Cooper Award for Community Excellence; (vii) Society for the Analysis of African American Public Health Issues 1st Place for Conference Presentation; (viii) Vice Climate Uprise Spotlight Organization; and (ix) Children's Environmental Health Network Advocacy Award.

7. On or about January 17, 2025, YGG was awarded an EPA Community Change Grant in the amount of $19,996,791.00 (the "Grant").

8. The funds from the Grant were to be used to establish a new Mid-South Environmental Justice Center to address critical community needs around energy efficiency, housing, indoor air quality, clean water infrastructure, and workforce development. The programs to be administered by the Mid-South Environmental Justice Center (collectively, the "Grant Programs") included:

   a. Implementing a Whole Home Model Initiative in Memphis, Tennessee to remove lead hazards and install energy efficiency upgrades in 150 low-income Memphis homes, with the work to be performed by YGG's statutory partner on the Grant, Green & Healthy Homes Initiative ("GHHI");

   b. Working with The Memphis Metropolitan Landbank Association ("MMLA") to administer a grant fund, the Energy Equity Grant Fund for Small Businesses, to support small businesses that want to invest in energy-efficiency updates, solar panel installation, appliance replacements, and other activities.

   c. Administering a workforce development program to provide support with paid certifications for plumbers, EPA lead assessors, inspectors, indoor air quality specialists, and mold specialists;

   d. Working with the government of Memphis, Tennessee to assist in its weatherization program by performing repairs on the houses identified on the city's deferral list in order to qualify those properties for participation in the city's weatherization program;

   e. Partnering with the MMLA and Black Seeds Urban Farms ("BSUF") to transform blighted parcels into greenspace through a new Resilient Community Initiative

3

JA482

Grants program.  One hundred percent (100%) of the target Memphis, Tennessee zip codes (38104, 38105, 38106, 38107, 38108, 38109, 38111, 38122, 38126, 38127) are considered Justice40 communities;

f.  Partnering with Protect our Aquifer ("POA") to provide education around water quality in a program called Water Warriors. The program targets people from frontline communities and students at the University of Memphis majoring in engineering to bring them together with communities to generate interest in improving water quality in communities and working in tandem with people in those communities to introduce them to jobs in water quality; and

g.  Developing a community advisory board with representatives from each of the districts in Memphis, Tennessee to provide information, insight, recruitment, and resources.

9.  YGG's ASAP.gov account was not funded until March 18, 2025 - while the balance was showing, the account was flagged as "suspended". YGG was able to draw down approximately $16,000.00 in funds prior to the EPA's termination of YGG's grant on May 1, 2025.  Of the $16,000.00 withdrawn by YGG, approximately $13,000.00 was used to pay the invoices issued by GHHI for staff time spent identifying and/or repairing properties under the Whole Home Model Initiative program.  Since May 2, 2025, YGG has not had access to any funds under the Grant.

10. To date, YGG has incurred unreimbursed costs in the amount of $16,647.08 incurred by YGG in connection with compliance with the Grant.

11. As a result of the EPA's termination of the Grant, and due to the continued erratic and unpredictable nature of the EPA's termination, there is widespread uncertainty within YGG, as well as within the statutory partner organization, GHHI, and sub-awardees

4

JA483

MMLA, POA, and BSUF.  Ultimately, YGG had to stop developing and administering the Grant Programs that were to be funded by the Grant.

12. Due to the lack of access to funds prior to March 18, 2025, YGG was not able to hire the staff it intended to in order to develop and administer the Grant Programs. Instead, YGG used its existing staff, who were already working on a variety of other projects, to undertake the work necessary to begin the development of the Grant Programs and to ensure compliance with the Grant requirements.  These staff members were already overburdened by existing work and expended a substantial amount of additional time on the Grant Programs.

13. To mitigate some of the damage caused by the termination of the Grant, YGG has used existing staff to maintain community engagement, including recurring canvassing campaigns and administrative oversight in order to remain engaged with the community and maintain compliance with the Grant requirement.

14. Similarly, although GHHI has not yet had to lay off any staff due to the termination of the Grant, that is likely to change in the future.  Without funding from the Grant, GHHI will likely have to lay off staff or even cease operations completely.

15. MMLA already hired one staff member in connection with implementing the Grant Programs but will likely have to lay off the staff member without funding from the Grant.

16. Although POA and BSUF had not yet hired additional staff to implement the Grant Programs, without funding from the Grant, they may be forced to cease operations completely.

17. YGG's inability to move forward with the Grant Programs has also caused reputational harm to YGG.  On January 23, 2025, Congressman Steve Cohen issued a press release

JA484

touting the Grant Programs to be developed and administered by YGG. As a result of this press release and the media attention to the Grant Programs, the Memphis community anticipated job growth, both as a result for the workforce development program as well as to fulfill the needs of YGG, GHHI, MMLA, POA, and BSUF in performing their Grant Program objectives.

18. Most significantly, the termination of the Grant will cause substantial harm to the Memphis community. For example:

   a. Residents on the city's weatherization deferral list will not be able to afford required repairs to their property to qualify for the weatherization program. Without this weatherization, these residents will continue to face harmful health impacts due to their exposure to extreme temperatures in the summer and the winter;

   b. Local trade schools will lose revenue that was anticipated from the workforce development program;

   c. Community members will lose out on the opportunity for free training in a number of trade fields and the higher wages associated with those trades;

   d. The community will have fewer plumbers, EPA lead assessors, inspectors, indoor air quality specialists, and mold specialists, which is not only detrimental to the health and safety of the community, but also leads to increased costs for any other projects that require such trades due to the lack of competition; and

   e. Memphis Light, Gas and Water ("MLGW") started a lead service line replacement program and was anticipating an increase in the local skilled workforce to help reduce the cost of this program because there is a shortage of such labor in the area. For example, MLGW already had to issue two (2) bids and

6

JA485

a rebid for one of its programs due to the high cost and/or lack of availability of qualified labor in the area. However, without the workforce development program that was to be created through the Grant, MLGW's costs to perform the lead service line replacement will remain unsustainably high and result in fewer lead service line replacement projects.

19. If YGG's access to the Grant funds is not immediately restored, it will be impossible for YGG to comply with the Grant requirements within the Grant timeframe - even if the funds are later restored. Moreover, MLGW's lead service line replacement project and the city's weatherization program is likely to benefit fewer residents and ultimately may cease if YGG is not able to provide residents on the weatherization deferral list with the necessary repairs or develop a local skilled workforce necessary to increase competition and drive down the costs of certain projects.

20. Moreover, YGG is not able to replace the Grant funding from other sources, meaning without the Grant, none of the Grant Programs will be developed, the community will not receive the intended benefits from the Grant and harmful economic and health consequences of the lack of skilled labor, lack of weatherization, and continued use of lead service lines will be unabated.

21. Resuming the funding under the award will allow YGG to continue work that was started under the Grant, including the time-sensitive replacement of lead service lines and the repair of homes to allow weatherization and mitigate the impact of extreme weather patterns.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States, the foregoing is true and correct.

JA486

Date:  6/24/25

LaTricea Adams, Founder, CEO, and
President of Young, Gifted & Green

JA487

# EXHIBIT MM

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

APPALACHIAN VOICES, et al.,

    *Plaintiffs, on behalf of*
*themselves and all others*
*similarly situated*,

      v.

UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY, et al.,

    *Defendants*.

Civil Action No. 1:25-cv-01982-PLF

**<u>DECLARATION OF TYRONE JUE</u>**
**<u>(CITY AND COUNTY OF SAN FRANCISCO)</u>**

1

JA489

I, Tyrone Jue, declare as follows:

1.      I am the Director of the San Francisco Department of the Environment ("SF Environment"), a constituent department of the City and County of San Francisco ("San Francisco"). The following facts are known to me personally, and if called as a witness, I would testify to them competently.

2.      I have been the Director of SF Environment since July 2023, and served as the Acting Director since April 2022. Before joining SF Environment, I held various positions in the past five San Francisco mayoral administrations, working on environmental and public health issues. I also have extensive experience in the water and energy utility space, working at the San Francisco Public Utilities Commission. I have a B.S. in Cell Biology and a B.A. in Psychology from the University of California, Davis.

3.      SF Environment advances climate protection and enhances quality of life for all San Franciscans. As Director, I lead San Francisco's efforts to advance climate action, environmental justice, and sustainability policies. I oversee a team of nearly 100 people who work on key issues such as clean energy, clean air, zero waste, clean transportation, toxics reduction, and biodiversity. I am also responsible for developing and implementing the City's ambitious 2021 Climate Action Plan, which aims to reach net-zero carbon emissions by 2040.

4.      In April 2023, SF Environment applied for San Francisco to receive a $1 million grant through the U.S. Environmental Protection Agency's ("EPA") Environmental Justice Government-to-Government Program ("EJG2G"). San Francisco is home to several communities that suffer greater environmental burdens than other neighborhoods in the city. San Francisco's Environmental Justice ("EJ") communities are designated geographic areas that have the highest pollution and are predominantly low-income. The project outlined in the grant application is to

JA490

engage San Francisco's EJ communities to recommend and implement community-led climate action and use this engagement to inform ongoing implementation of San Francisco's Climate Action Plan. The project goals are to increase EJ communities' capacity to understand and act on climate change, improve government response and services, and ultimately improve health outcomes and reduce greenhouse gas emissions in EJ communities. The grant activities include workshops, listening sessions, development of community engagement tools, and resources for the implementation of community-led climate justice projects. Prior to applying for this funding, in keeping with our commitment to bring resources into communities and ensure that use of the resources for climate action is community driven, SF Environment held a listening session with 19 participants from community-based organizations.

5.      On November 1, 2023, SF Environment was notified by the EPA that San Francisco was selected for an award, and was connected with an EPA project officer to schedule a "workplan negotiation call within the coming weeks." SF Environment staff actively engaged with the project officer and project support staff, and spent significant time over the subsequent seven months on negotiations with the EPA to finalize the proposed project and grant contract.

6.      On June 21, 2024, SF Environment received a notice of award of a $1 million grant to San Francisco for a three-year project period. A true and correct copy of the Cooperative Agreement is attached as Exhibit A.

7.      SF Environment subsequently began work on the project, the first part of which was focused on planning. As set forth in the grant application, $580,000 was committed to go to community partners: $250,000 was for environmental and climate justice grants to community-based organizations, another $200,000 was to go to subrecipients (including for coordinating listening sessions, community outreach, and stipends for participation to improve communication

3

JA491

and collaboration among participants), and another $130,000 was for providing building decarbonization incentives for low-income San Francisco renters (for installation of equipment such as induction stoves or electric water heaters) to be distributed to SF residents through a community partner.

8.    SF Environment prepared a subcontract with our statutory partner identified in the grant application, Bayview Hunters Point Community Advocates. We also prepared, issued, and reviewed responses to a Request for Proposals for community-based organizations to provide culturally competent outreach and education to EJ communities, including conducting a listening session in Spanish and a listening session in Chinese (Cantonese).

9.    SF Environment was ready to move from the planning phase to the execution phase when we received notification in late January 2025 that the grant funding was "paused." At that time, SF Environment's G2G grant was not accessible in EPA's Automated Standard Application for Payments ("ASAP") system, which is the electronic system that EPA grantees use to request and receive funds under EPA grants. Due to the uncertainty about the funding, we paused work under the grant. We did not execute the subcontract with Bayview Hunters Point Community Advocates or award subgrants in response to the RFP for outreach and community education.

10.    In late February 2025, SF Environment was once again able to access the grant in the EPA's ASAP system, and successfully requested reimbursement for work completed through December 31, 2024.

11.    On March 21, 2025, however, SF Environment received a notice from the U.S. EPA stating that the grant was terminated "effective immediately." True and correct copies of the Memorandum and Assistance Amendment are attached as Exhibit B.

4

JA492

12.     The loss of this funding has had a significant harmful impact. Without this federal funding, we will not be able to accomplish most of the goals of the project, and as a result, we will be serving fewer people in San Francisco's EJ communities. A key aspect of this project is partnering with and providing funding to community-based organizations to serve our mutual goals of reducing greenhouse gas emissions and indoor pollution in EJ communities. SF Environment deeply values our community partners, and we spend a lot of time working to build relationships with them. But we will no longer be able to move forward with the intended subcontract with Bayview Hunters Point Community Advocates or award smaller subgrants and stipends to other community-based organizations for their work. Without this funding, San Francisco will miss out on valuable community input that we want and need in order to implement our Climate Action Plan. In addition, we will not be able to provide the anticipated financial incentives to low-income households in San Francisco to switch from gas to electric heat pump water heaters. We also anticipate being unable to move forward with other activities under the grant, for example, conducting a Health Impact Assessment that would inform government decision-making on public health and climate policy.

13.     We are still in the process of evaluating what aspects of the project we might still be able to do without the federal funding, though at a significantly stripped-down level. For example, SF Environment held an Environmental Justice Workshop for the Climate Action Plan in May 2025, but it was a much smaller event than originally planned due to the termination of federal funding. We had some volunteer assistance from community-based organizations, but we were unable to pay community-based organizations to do outreach and to host the event as planned under the grant. We held an Environmental Justice leaders group meeting on June 11, 2025, after having spent more than 40 hours of staff time interviewing more than 20 community

leaders in preparation, but we were unable to pay stipends to the leaders for their participation as planned under the grant. We are still planning to host workshops in Spanish and Cantonese in June 2025, but again, those will be smaller than originally anticipated under the grant, because we will not be able to pay community-based organizations to work with us on outreach and to host the events.

14.    To date, SF Environment has drawn down $43,924.93 and currently has unreimbursed expenses of $39,651.38 from January 1, 2025 to March 21, 2025. From March 21, 2025 to May 23, 2025, SF Environment has incurred at least $18,742.25 in expenses that would otherwise be reimbursable under the grant. And SF Environment continues to incur expenses that would otherwise be reimbursable under the grant.

15.    We are looking for other funding opportunities for the project that was funded by the G2G grant, but we have not identified viable alternative sources of funding.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 13th day of June, 2025 in San Francisco, California.

Tyrone Jue

6

JA494

# EXHIBIT NN

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**DECLARATION OF ASENHAT GOMEZ, EL PUENTE**

I, Asenhat Gomez, declare as follows:

1. My name is Asenhat Gomez, and I live in Brooklyn, New York City, New York. This declaration is based on my personal knowledge and professional education and experience. I am over the age of eighteen and suffer from no legal incapacity. I submit this declaration in support of El Puente, which is one of several grant recipients affected by the freeze and terminations of federal grant funding.

2. El Puente de Williamsburg, Inc. is a 501(c)(3) nonprofit organization that is headquartered at 211 South 4th Street, Brooklyn, NY 11211. Established in 1982, El Puente's mission is to inspire and nurture leadership for peace and justice, while creating community-led movements of self-determination through a holistic leadership and membership model and high impact youth and community development programs.

3. I, Asenhat Gomez, am one of two interim Executive Directors for El Puente. I have worked at El Puente for over 30 years since I came to the United States from the Dominican Republic. I began my work here as a youth community leader in the community of Bushwick. Prior to becoming interim Executive Director, I was Deputy Director of Programs for El Puente, as well as a community organizer and coalition builder. I have worked in community development most of my career. In my formal education, I attended CUNY's Hunter College where I studied psychology. I also graduated from the Hispanic Leadership Institute, hosted by the Hispanic Federation, Fund for the City of NY, and NYU Steinhardt. Most recently, I am a graduate of Cornell

University's Union Leadership Institute, and during this time I developed new leadership guidelines for new members of El Puente who are now in the same position I once was when I first started with El Puente. As one of two Interim Executive Directors, I work collaboratively with Helen Colón to operate and run the organization. My duties primarily focus on the programmatic side of things, such as overseeing community development initiatives and engagement.

4.  El Puente is a non-profit, human rights, arts, and social justice organization. El Puente began as a community intervention coalition within the Williamsburg community of Brooklyn, New York to protect youth from gang violence; serving primarily Latine and Black low-income community members. The coalition also aims to also mitigate other youth health detriments, such as asthma caused by heavy air pollution in their communities.

5.  El Puente first became involved in environmental justice through a group called the Toxic Avengers. This was a group of youth leaders who successfully protested against environmental injustices in Brooklyn, such as a radioactive waste site which had its construction prevented in 1988. El Puente later continued this environmental justice work by partnering with United Jewish Organizations of Williamsburg (UJO) in 1991, blocking the construction of a 55 story incinerator.

6.  El Puente has also been a consistent and reliable first responder to community needs. During the COVID-19 Pandemic, El Puente's Wellness Hub founded in 2020 provided critical support to the community, raising over $400,000 for local families. We launched a new project in 2019, called Our Air or ¡Nuestro aire!, fighting for cleaner air and more green spaces in Los Sures, south Williamsburg.

7.  Today, El Puente engages in environmental justice initiatives in the communities of
    Williamsburg, Bushwick, and outside of the continental U.S. in Puerto Rico. El Puente
    focuses on: (i.) Air Quality and Public Health: supporting youth-led research that
    advocates for cleaner air and accountability in city infrastructure, (ii). Urban Greening
    and Food Sovereignty, which includes expanding access to green spaces, revitalizing
    community gardens, and providing environmental education programs across our
    leadership centers, (iii.) Climate Justice Education: Facilitating bilingual workshops,
    school partnerships, and youth campaigns on climate resilience and emergency
    preparedness, and (iv.) Sustainable Infrastructure Advocacy: Partnering with residents to
    push for just transit, equitable green building, and climate-safe housing solutions. Our
    environmental initiatives are designed to not only improve material conditions, but to
    strengthen belonging, interdependence, and community ownership in the face of
    environmental and economic transformation.

8.  In the course of our work, El Puente has successfully launched and operated several
    environmental programs that uplift the voices of the community, educate the youth
    community on environmental issues, and build resilience in the wake of climate disasters
    in Puerto Rico and other disadvantaged areas like Queens, Brooklyn, South
    Williamsburg, and Bushwick.

9.  In addition to amplifying community voices to advocate for solutions for issues that
    directly affect them, El Puente spearheads educational initiatives, a pillar of our mission.
    In the course of our work, El Puente has successfully launched and operated the
    following successful educational schools or programs:

    a.  The Williamsburg Leadership Center (WLC) in Brooklyn is the original
        headquarters where El Puente was founded. The WLC is El Puente's flagship,

holistic youth and community development program that began in 1982. The building is a renovated, former Catholic Church building in the south of Williamsburg. For more than four decades, the WLC has been the birthplace for most of El Puente's programs and advocacy initiatives. It was also home for the El Puente Academy for 13 years. It remains the home for El Puente's Arts and Cultural Center, with a professional dance studio, art room, and presenting stage for performances.

b. The El Puente Academy for Peace and Justice was founded in 1993 in south Williamsburg, Brooklyn, New York at the WLC. Today The Academy has its own location and is an awarded and reputable NYC public high school. As the first public school for human rights and Community School model in the nation, the school has received widespread recognition and awards. The school aims to foster a sense of community and belonging among students as well as fostering both individual and community growth by incorporating student's identities and experiences into the curriculum.

c. El Puente Beacon Leadership Center, at Middle School 50 in Brooklyn, opened in 1998. It is a multifaceted, comprehensive program that runs yearly and serves approximately 1,300 children, teens, and adults. This center offers a comprehensive and bilingual after school program for primarily middle school students, with a particular focus on the transition to high school for students and their families. The program offers an evening teen program that includes a PAL Teen Impact Basketball program and break dancing courses. Other classes include ballet, street jazz, acting, breaking and visual arts. The Beacon also runs a comprehensive skills based pre-professional summer arts day camp for youth ages 6-13.

d.  The Global Justice Institute (GJI) serves as the hub for training, development, and research. The GJI facilitates training and leadership development for the entire El Puente organization and hosts practitioners from across NYC, the United States, and the globe.  The Global Justice Institute publishes tools and frameworks to contribute to the wider field; focusing on education, arts for social justice, cultural organizing, community & youth development, environmental justice, and more.

e.  Cornerstones: El Puente is the CBO operating "Cornerstones" at three NYC Housing Authority developments in South Williamsburg: Independence Towers (started  in 2015), Taylor-Wythe Houses (2008), and Williams Plaza (2015). The Cornerstone project is a joint effort of the NYCHA and the NYC Department of Youth and Community Development (DYD) to operate community centers that engage community members to improve quality of life and overall wellbeing. There are 335 NYCHA development centers citywide, with 99 of these being identified as serving populations most vulnerable to social determinants of health, and three of these 99 being the Cornerstones El Puente operates. El Puente's Cornerstones operate daily, serving at least 415 youth in addition to their families. Our centers and their programs are designed to directly respond to youth and family identified needs as well as interests; including academic support, social-emotional learning, mentorship, arts instruction, exercise and sports, Youth Councils and clubs, civic engagement opportunities, technology support clinics, food access and nutrition education, and service referrals for other additional needs such as immigration, health and wellness, workforce training, and education.

10. Education is not the only medium by which El Puente advocates for its communities. The communities El Puente serves have always used art as a form of expression, advocacy, and liberation. The El Puente Arts program aims to collect and develop the skills of artists to grow in their mastery as professional artists and cultural organizers. Our artists grow in their capacities and skills to use their art to inspire others and educate them on campaigns and initiatives that are aligned with El Puente's mission.

11. In addition to being recognized by Congress, the state of New York, and city of Brooklyn for its work on the foregoing programs, initiatives, and services, El Puente and its founder have also received the following awards and formal acknowledgements: (i) The "Spirit of the City" award from the Cathedral of St. John the Divine; (ii) The Citizens Action and Public Works Awards; (iii) the "The Dream of Equality" award from Asian Americans for Equality; (iv) the Brooklyn Botanic Garden Forsythia Award; and (v) the "Celebrating Success" award from the Children's Defense Fund. El Puente co-founders Luis Garden Acosta and Frances Lucerna also received the 1998 Heinz Award for the Human Condition.

12. El Puente historically has operated using charitable donations from private funders and philanthropic entities as well as city funding to run its programs. However, the majority of our funding comes from federal government grants. For a large part of El Puente's existence, we previously received National Education Association (NEA) funding for our operations. We have also received other federal funding, such as an 18-month earmark from the Department of Education for $500,000 that finished in 2024.

13. On December 19, 2024, El Puente signed an agreement to be awarded an EPA Community Change Grant No. 5F 96273600 in the amount of $3,115,632.00 (the "Grant").

14. The funds from the Grant were used to start work on our first quarter of deliverables for a new project called El Puente Community Change (EPCC). This project aimed to

empower disadvantaged communities in North Brooklyn by creating 2 Environmental

Advisory Boards to promote community leadership and engagement in environmental

justice initiatives like improving air and water quality, reducing waste, enhancing green

spaces, and raising environmental awareness. EPCC also will integrate Environmental

Advisory Boards into district Community Boards, giving disadvantaged communities a

voice in zoning and development decisions that prioritize environmental justice.

15. Specifically, the Grant was meant to build capacity within community districts 1

(Williamsburg and Greenpoint) and 4 (Bushwick) in Brooklyn to participate in

government-led processes that involve climate and environmental justice. This includes

young people, the elderly, and BIPOC community members in general.

16.  These sustainability advisory boards were going to coordinate with various community

boards and their specific committees that work on climate justice, environmental justice,

transportation, and would give the community a stronger voice advocating for solutions

to issues directly affecting their communities.

17.  The first quarter of deliverables we had begun work on was outlined in the grant

application. This stage began by scheduling and coordinating meetings with our

stakeholders, our statutory partner in the grant, Newtown Creek Alliance, our other

partner outside of the grant, Sane Energy Project, various community boards, and

community leaders. These meetings were to perform outreach, develop educational

curriculum, review literature, and conduct research.

18.  We also planned to hire five new staffers to support this project, and we conducted an

extensive interview process. Our existing staff was already engaged in developing all of

the pieces of this project; from developing the curriculum, designing the civic

engagement piece, and the community engagement side.

19.  Although we signed the grant agreement on December 19, 2024, with the project positioned to begin on January 1, 2025, we were unable to receive funding until February 7, 2025 when our ASAP was finally funded. We were able to draw down $13,611.92 on this date.

20.  We lost the ability to draw down on our awarded funding just a few days later on March 11, 2025, when our grant was frozen for the first time.  We were then locked out of our ASAP account.

21. We gained access to the portal again on April 29, 2025, however we received a termination notice soon after on May 2, 2025.

22. In total, we were only able to draw down $69,007.50 of the total grant amount promised to us, although we had spent more than this on the project the grant was meant to fund. Our total expenditures for this project to date have been $92,587 of which $23,579.50 remains unpaid by the federal government.

23.  The sudden and inconsistent halt in funding has thrown our organization into a state of deep uncertainty as well as anxiety. We already had an excited and dedicated team working on this comprehensive project, which involved multiple components that we had been developing. For them to have to start and stop work on these initiatives has been significantly detrimental to our morale.

24. We started working on this grant application last spring, representing over a year of dedicated work. As a small organization who had never applied for a federal grant of this type before, this was a massive undertaking. This funding uncertainty has created significant disappointment not only among our internal staff but also among our community partners, severely impacting morale both within our organization and in the broader external community we serve.

25. El Puente devoted substantial time and effort to securing this grant, fully aware that applying came with significant opportunity costs for both our organization and the community. The hours we invested in the application process could have been directed toward other initiatives that directly benefit those we serve. We have been unable to hire the five staffers that we interviewed and have been unable to implement the project as intended to date.

26. We had to adopt a conservative approach to our expenditures because of the ongoing funding challenges and uncertainty we've been facing. A conservative strategy has become necessary as a result of the stop and start access to ourASAP account, the firing of our EPA program manager, and the subsequent lack of direct communication we've had with the EPA since March 24, 2025. However, having to be this cautious with using our grant severely delayed our progress and has significantly impacted our ability to implement these critical programs that protect youth in Brooklyn.

27. Due to the lack of access to funds, El Puente has been unable to hire the five individuals that would have properly supported the EPCC project. This was a major blow to our existing staff overburdened with this project, as well as resulted in major time being lost on the extensive interviewing process.

28. Furthermore, with the loss of this funding, we now face the very real possibility of layoffs for those whose positions are supported by the grant. Given the uncertainty of the funding and the potential for layoffs, staff morale has been at an all time low, and it is very likely that certain staff may leave during this stage of instability. The possibility of losing key personnel permanently is concerning on a fundamental level.

29. El Puente's inability to move forward with the Grant Program has also caused reputational harm to our organization. We conducted significant outreach to make sure

the community was made aware of the funding we had received from this Community Change Grant. We engaged with many community stakeholders to inform them of the promised funding and our plans for it to make sure we had community feedback on our strategy. We were even in the process of working with our congresswoman, Nydia Velazquez, to conduct a press release and to host a community wide celebration.

30. We have now made significant promises to our community and partners, and many of them have a lot at stake in this. People in our community were counting on improvements to air quality, more green spaces, new jobs, and workforce development opportunities. Now, with this setback, those hopes have been abruptly taken away. Our concern is this will prove to be a barrier in the future for the community to work with El Puente on projects that could benefit them and the community at large if this issue is not resolved.

31. Most significantly, the termination of the Grant will cause substantial harm to the Brooklyn community. This is a missed opportunity to ensure community representation within the government bodies that make decisions affecting us. These issues have a direct impact on our communities, and we firmly believe that those who are most affected are also the ones best positioned to develop meaningful, impactful solutions.

32. In Bushwick, for example, the Department of Environmental Protection and the Department of Transportation have been considering necessary flooding solutions that require community input. The project will bring in $390 million in infrastructure improvements aiming to mitigate flooding from extreme rain and enhance traffic safety across roughly 80 blocks. We were eager to bring the community together around this initiative because residents have been so deeply impacted by these floods. Bringing their

voices to the table would have helped ensure that these funds go precisely where they are needed most. Without this Grant, they will not have the same opportunity to work with their local agency to solve the problem.

33. Similarly, in Williamsburg, we're involved in external projects aimed at improving air quality and heating. Our EPCC project would have created the infrastructure for community leaders to engage with local leaders and to provide their unique perspective of those directly affected by these issues. These communities suffer from double the asthma rate as the rest of New York and the issue is not being addressed the way it needs to be because the communities themselves are not involved in the decision making process and are not given a voice to propose solutions. The EPCC project would have given a voice to the voiceless and broken the status quo for the better.

34. Unfortunately, it is impossible for El Puente to continue the EPCC project without access to the Grant. Although we do still receive funding from other sources, we cannot divert them to fund this project as it would risk our other projects and programs, such as our Academy and our middle school after school program keeping children off the street and safe.

35. We are doing our best to mitigate uncertainty and continue our programming, although at present, the project is completely halted.

36. If El Puente's access to the Grant funds is not immediately restored, it will be impossible for El Puente to comply with the Grant requirements within the Grant timeframe if the funds are later restored.

37. Moreover, El Puente is not able to replace the Grant funding from other sources, meaning without the Grant, none of the Grant priorities will be developed, the community will not

receive the intended benefits from the Grant, and harmful health consequences of the lack of clean air, lack of proper heating, and flooding, among other problems endemic to these communities, will remain, unabated.

38. There are currently several critical projects being conducted in the Bushwick and Williamsburg communities. The EPCC project would have given these communities the ability to partake in these projects and play an active role in devising solutions to major issues such as improving air quality and mitigating flooding. Without funding to continue the EPCC project, these communities would permanently lose the opportunity to advocate for themselves on these projects and the consequences of this may be felt for years to come.

39. The injuries to El Puente, its statutory partner and the community and their interests would be addressed if the funding gets restored quickly, and if it's made clear to the community that the funding will stay. We as a community could hire the five employees we interviewed and work on meaningful community engagement in addressing critical flooding, air quality, and heat island issues as we go into the Summer in New York.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States, the foregoing is true and correct.


_____        6-18-2025
_____        _____
*Asenhat Gomez, Interim Executive Director*        Date

# EXHIBIT Y

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

### DECLARATION OF ADAM WELLS, APPALACHIAN VOICES

I, Adam Wells, declare as follows:

1.      My name is Adam Wells, and I live in Abingdon, Virginia. This declaration is based on my personal knowledge and professional education and experience. I am over the age of eighteen and suffer from no legal incapacity. I submit this declaration in support of Appalachian Voices, which was awarded a Collaborative Problem-Solving Cooperative Agreement under Clean Air Act Section 138.

2.      I want Appalachian Voices to be a named plaintiff in this case. I understand that, as a class representative, it would be my responsibility to represent the interests of all the class members in this lawsuit, and not just my own personal interests or those specific to Appalachian Voices. I also understand the need to stay informed about what is happening in the case. I understand that I agree to represent other nonprofit groups like mine.

3.      I am the Regional Director of Community and Economic Development at Appalachian Voices. I have held this position since 2020 and have worked at Appalachian Voices since 2015. I first got involved with Appalachian Voices as a college student in 2004 in a volunteer capacity.

4.      Appalachian Voices is a 501(c)(3) nonprofit organization that works in Central and Southern Appalachian communities and has offices in North Carolina, Tennessee, and Virginia. Founded in 1997, Appalachian Voices brings people together to protect the land, air and water of Central and Southern Appalachia and advance a just transition to a generative and equitable clean energy economy. Through our New Economy Program, we work to advance

1

JA509

economic solutions that create community wealth and sustain Appalachia's communities and ecosystems.

    5.    On October 20, 2023, EPA notified Appalachian Voices that it had been selected to receive an EPA award under the FY2023 Environmental Justice Collaborative Problem-Solving Cooperative Agreement Program (opportunity # EPA-R-OEJECR-OCS-23-01). Following this announcement we began our negotiation period. On March 19, 2024, EPA issued a Cooperative Agreement to Appalachian Voices with an award amount of $500,000. Under the terms of our grant agreement, Appalachian Voices agreed to complete the project over a 3-year period ending in January 2027.

    6.    We secured this grant after working over the course of 4 months to prepare our application. During that time, we built a cohort of 5 communities to develop the project proposal and had over 25 meetings to work together to build a shared vision.

    7.    Appalachian Voices was awarded this grant to spur community engagement and cooperation to address legacy environmental and economic challenges across five small communities in Virginia's coalfield counties. Coal mining has been the lifeblood of these communities for generations, providing thousands of jobs and economic prosperity at the industry's peak. As the coal industry has declined, these communities have suffered economically and deal with environmental degradation from abandoned infrastructure and increased risk from extreme weather events. For example, flooding in the region has intensified as severe storms encounter degraded land lacking vegetation and creek and stream banks weakened by erosion and debris.

JA510

8.      With our awarded funding, we began working with five communities in the coalfield region of Southwest Virginia to build and model resiliency in the face of economic difficulties, weather-related disasters and other hurdles by helping them create shovel-ready projects in their areas, develop toolkits for other communities to replicate these efforts and produce meaningful, community-led projects for future funding opportunities.

9.      The project includes the creation of a Coal Community Resilience Planning Model and Toolkit, development of community engagement and planning, and sustainability measures. We hosted a series of listening sessions with community members from five Virginia communities in which community members collaboratively developed a vision for physical infrastructure projects such as emergency resilience hubs, flood-mitigating river walks, and public green spaces.

10.      With our grant funding, the Appalachian Voices New Economy team agreed to provide technical assistance, project support, and planning expertise to make these projects shovel-ready. This grant is meant to be the tip of the spear to do deeply impactful work with these communities over years to come. This EPA-funded investment in developing these projects is meant to situate these communities to be more competitive for future funding opportunities and have the capacity to receive transformative funding over the long term.

11.      We received funding under this agreement under a reimbursement model, which means that our organization spends our own funds in compliance with our agreements, and in return, we expect reimbursement for those expenses.

JA511

12.    Appalachian Voices has been fully compliant with all grant terms and conditions and reporting requirements. We received feedback from our EPA program officer speaking to our exemplary implementation.

13.    Access to our awarded funding was disrupted starting on January 31, 2025 when our Automated Standard Application for Payments (ASAP) account was frozen, later reactivated, and then resuspended.

14.    On February 22, 2025, we received an email and letter dated February 21, 2025 stating that the Environmental Protection Agency was terminating our Environmental Justice Collaborative Problem-Solving Cooperative Agreement. The letter stated that the "objectives of the award are no longer consistent with EPA funding priorities" and "[t]he grant specified above provides funding for programs that promote or take part in DEI initiatives or environmental justice initiatives or other initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States."

15.    On March 21, 2025, Appalachian Voices submitted a formal appeal disputing the termination of our assistance agreement.

16.    Before our grant was terminated, we invested significant organizational and partner resources into implementing our project in compliance with our grant agreement. Between February 2024 and February 2025, when our grant was terminated, Appalachian Voices organized and facilitated 10 listening sessions across five Virginia communities. As a result of these sessions, each community was in the process of selecting a physical infrastructure project.

4

JA512

We committed to working with the communities to get these projects shovel-ready by providing technical assistance, grant support, and planning expertise with our grant funding.

17.    This grant termination means that we will no longer have the funding to develop shovel-ready infrastructure projects in rural Virginia communities that suffer persistent poverty and are adversely and disproportionately affected by environmental and human health harms and risks. One of the five Virginia Communities, the unincorporated Town of Pound selected a project involving addressing dilapidated buildings with mold and asbestos that are impeding floodplain improvements and developing a flood-mitigating riverwalk. Now that the EPA funding has been terminated, these plans are in jeopardy. The uncertainty of this project is particularly dire for Pound, where there is an active debate about whether to remain a state-chartered town due to economic distress from the decline of the coal industry. Pound's ability to bring in tax revenue has been so diminished by economic decline that its ability to pay its bills is a continual struggle. The continuation of funding for this project would provide vital resources for the town at a time when its very existence is uncertain.

18.    Dante is a tiny coal camp and unincorporated community in Russell County with a population of 650. Parts of Dante are in the 97th percentile for flood risks and the town falls in the 99th percentile for unemployment rates. In 2016, community members formed the Dante Community Association, a group of residents, organizations, and businesses striving to transform the town. Appalachian Voices has worked closely with local leadership to actualize Dante's Downtown Master Plan. With our grant funding, we planned to support the planning and design of improvement to the Dante Depot, a historic community hub, in furtherance of the building's energy and emergency resilience.

JA513

19.     Now that our Environmental Justice Collaborative Problem-Solving Cooperative Agreement has been terminated, community members and leaders lack grant support, technical assistance, and planning expertise to develop critical infrastructure projects that would provide essential social, economic, and environmental services. At the time of termination, we were entering into the second phase of the project period which would have advanced approximately $300,000 toward these community-benefiting projects.

20.     In working with Appalachian communities that have experienced years of systemic underinvestment and have been left out of opportunities, I am mindful of the fatigue and distrust that community members can feel when well-meaning entities ask them to commit their time and energy to a project and later disengage when the federal government abruptly cuts off funding without reason or explanation. These cycles of broken commitments have resulted in the erosion of trust, a dynamic we have worked hard to restore. Despite receiving the news that our grant had been terminated, we made the organizational decision to proceed with the next phase of listening sessions. It was of critical importance that we uphold our commitment to each of the communities, even if those activities would not be supported by EPA funds. During the first of these sessions, community members expressed feeling like their time had been wasted now that the funding has been terminated by the EPA. I worry about the impact EPA's decision to terminate this grant will have on the trust we have spent years building with community members.

21.     Appalachian Voices has continued with listening sessions in the five Virginia communities, but is now having to fund this work with its general operating budget.

22.     Appalachian Voices has invested significant staff time and resources into implementing this project. Three staff members worked on program implementation

6

JA514

approximately 50% of their time, and four staff members have played supporting roles. In March

2025 a staff person who was part of the three-person program implementation team left the

organization. We still have a vacancy on our team due to this departure and have been hesitant to

fill the now-empty role due in part to the loss of this funding.

23.    Since our grant was terminated, my team and I have been forced to direct our

attention and time to navigating the programmatic and administrative impacts of the termination.

This has been a significant diversion that has slowed down other programmatic work.

24.    I am also concerned about the impact of this grant termination on Appalachian

Voices' ability to fundraise in the future. A key to successful fundraising is having impactful

work. If our grants are terminated, we risk not being able to successfully carry out our funded

programs.

25.    It has been challenging to lead my team through the loss of this grant. The

uncertainty of what comes next for this program has impacted morale. Staff have confided in me

that they are worried about the security of their jobs and whether there will be layoffs.

26.    If our Environmental Justice Collaborative Problem-Solving Cooperative

Agreement is reinstated, Appalachian Voices will be able to ensure the continuation of our work

with five towns in the coalfield region of Southwest Virginia to address legacy environmental

and economic challenges. We would put this funding to use immediately by completing the

remaining planning process and rapidly shifting to project implementation of the projects

communities have identified through the Environmental Justice Collaborative Problem-Solving

process.

JA515

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States, the foregoing is true and correct.

Executed this 23rd day of June 2025.

_____
Adam Wells

JA516