<u>**ORAL ARGUMENT SCHEDULED FOR MARCH 16, 2026**</u>

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

No. 25-5333

---

APPALACHIAN VOICES, et al.,
*Plaintiff-Appellants,*
*v.*
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,
*Defendant-Appellees.*
On Appeal from the United States District Court
for the District of Columbia
No. 25-cv-01982
The Hon. Richard J. Leon, Senior Judge

---

**DEFERRED JOINT APPENDIX VOL. III of III,
PAGES JA517-JA915**

---

Hana V. Vizcarra
Deena Tumeh
Molly Prothero
Andrew Saavedra
Linnet Davis-Stermitz
Earthjustice
1400 L St NW, Lobby 2
Unit 34117
Washington, DC 20005
(202) 667-4500
hvizcarra@earthjustice.org
dtumeh@earthjustice.org
mprothero@earthjustice.org

Ben Grillot
Kimberley Hunter
Irena Como
James Whitlock
Southern Environmental Law Center
122 C Street NW, Suite 325
Washington, DC 20001
Telephone: (202) 828-8382
Facsimile: (202) 347-6041
bgrillot@selc.org
kmeyer@selc.org
icomo@selc.org
jwhitlock@selc.org

asaavedra@earthjustice.org
ldavisstermitz@earthjustice.org

Toby Merrill
Graham Provost
Cassandra Crawford
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
(510) 738-6788
toby@publicrightsproject.org
graham@publicrightsproject.org
cassandra@publicrightsproject.org

David Chiu
San Francisco City Attorney
Yvonne R. Meré
Sara J. Eisenberg
1390 Market Street, 7th Floor
San Francisco, CA 94102
(415) 554-4274
yvonne.mere@sfcityatty.org
sara.eisenberg@sfcityatty.org

Gary DiBianco Lawyers for Good
Government
6218 Georgia Avenue NW, # 5001
Washington, DC 20011
(202) 258-6826
Gary@lawyersforgoodgovernment.org

Alison Holcomb[+]
Office of King County Prosecuting
Attorney Leesa Manion
Christopher Sanders*
401 5th Avenue, Suite 800
Seattle, WA 98104
(206) 477-9483
aholcomb@kingcounty.gov

[+] Notice of intent to withdraw (Jan. 12, 2026)
* Application for pro hac vice admission forthcoming, pending acceptance of e-filing registration

*Counsel for Plaintiff-Appellants*

**January 27, 2026**

# <u>TABLE OF CONTENTS</u>

## VOLUME 1 OF 3

Civil Docket, *Appalachian Voices v. EPA*, No. 25-1982 (RJL)(D.D.C) .............JA001

Complaint, Dkt. 1 ................................................................................JA019

Complaint, Ex. 1-A, Declaration of Travis Voyles, Dkt. 1-4..............................JA067

Complaint, Ex. 1-B, Declaration of Daniel Coogan, Dkt. 1-4 ...........................JA072

Complaint, Ex. 1-C, Email from T. Voyles re TCTACS, Dkt. 1-4.....................JA076

Complaint, Ex. 1-D, Email from Jacob Borney to ISC, Dkt. 1-4.......................JA096

Complaint, Ex. 1-E, Declaration of Michelle Roos, Dkt. 1-4 ...........................JA098

Complaint, Ex. 1-F, Email from D. Coogan to T. Voyles, Dkt. 1-4 ...................JA106

Complaint, Ex. 1-G, Email from M. Wise, Dkt. 1-4. ..........................................JA110

Complaint, Ex. 1-H, Email from D. Coogan, Dkt. 1-4 .......................................JA114

Complaint, Ex. 1-I, EPA Grant Termination SOP, Dkt. 1-4...............................JA118

Complaint, Ex. 1-J, Sample Termination Letter, Dkt. 1-4 ..................................JA120

Complaint, Ex. 1-K, CCG Grant Terms and Conditions, Dkt. 1-4 .....................JA123

## VOLUME 2 OF 3

Declaration of the Native Village of Kipnuk, Dkt. 29-3 ......................................JA145

Declaration of PUSH Buffalo, Dkt. 29-4 ...........................................................JA159

Declaration of 2C Mississippi, Dkt. 29-5 ..........................................................JA166

Declaration of Allegheny County, Pennsylvania, Dkt. 29-6...............................JA176

Declaration of Stay Ready NOLA, Dkt. 29-7 .....................................................JA184

Declaration of Treasure Island Mobility Management Agency, Dkt. 29-8 .........JA192

Declaration of Bessemer Historical Society d/b/a Steelworks Center of the West, Dkt. 29-9 .....................................................................................................JA199

Declaration of County of Contra Costa, California, Dkt. 29-10 ..........................JA208

Declaration of Kalamazoo County, Michigan, Dkt. 29-11. ................................JA219

Declaration of City of Rochester, New York, Dkt. 29-12....................................JA226

Declaration of Health Resources in Action, Dkt. 29-13......................................JA232

Declaration of Children's Environmental Literacy Foundation, Dkt. 29-14. ......JA254

Declaration of Southwest Renewal Foundation, Dkt. 29-15................................JA263

Declaration of Sixth Street Community Center, Dkt. 29-16. ...............................JA272

Declaration of Institute for Sustainable Communities, Dkt. 29-17......................JA280

Declaration of WE ACT for Environmental Justice, Dkt. 29-18 .........................JA294

Declaration of Landforce, Dkt. 29-19. ................................................................JA302

Declaration of Parks Alliance for Louisville, Dkt. 29-20 ...................................JA310

Declaration of Deep South Center for Environmental Justice, Dkt. 29-21..........JA318

Declaration of Lowcountry Alliance for Model Communities, Dkt. 29-22.........JA324

Declaration of Day One, Dkt. 29-23....................................................................JA331

Declaration of Air Alliance Houston, Dkt. 29-24 ...............................................JA342

Declaration of Inter-Tribal Council of Michigan, Inc., Dkt. 29-25.....................JA351

Declaration of City of Springfield, Massachusetts, Dkt. 29-26.. ........................JA359

Declaration of Steps Coalition, Dkt. 29-27 .........................................................JA373

Declaration of City of Sacramento, Dkt. 29-28...................................................JA382

Declaration of Martin Luther King, Jr. County, Dkt. 29-29 ...............................JA388

Declaration of Ironbound Community Corporation, Dkt. 29-30.........................JA396

Declaration of Trinity Alliance of the Capital Region, Dkt. 29-31.....................JA405

Declaration of Downwinders at Risk, Dkt. 29-32 .................................................JA413

Declaration of Glynn Environmental Coalition, Dkt. 29-33. ...............................JA419

Declaration of EcoAction Partners, Dkt. 29-34....................................................JA436

Declaration of Southwestern Michigan Planning Commission, Dkt. 29-35. .......JA445

Declaration of the City of New York, Dkt. 29-36.................................................JA452

Declaration of EcoWorks, Dkt. 29-37. .................................................................JA460

Declaration of the Center for Community Energy and Environmental Justice,
    Dkt. 29-38....................................................................................................JA470

Declaration of Young, Gifted, & Green, Dkt. 29-39............................................JA479

Declaration of City and County of San Franciso, Dkt. 29-40 ..............................JA488

Declaration of El Puente de Williamsburg, Dkt. 29-41 .......................................JA495

Declaration of Appalachian Voices, Dkt. 29-42. ..................................................JA508

## VOLUME 3 of 3

Plaintiffs' Reply in Support of Motion for Preliminary Injunction, Ex. 2, House
    Report No. 94-1656, Dkt. 77-2 ...................................................................JA517

Plaintiffs' Reply in Support of Motion for Preliminary Injunction, Ex. 3, Senate
    Report No. 996, Dkt. 77-3...........................................................................JA548

Plaintiffs' Reply in Support of Motion for Preliminary Injunction, Ex. 4, Testimony
    from Sovereign Immunity: Hearing on S. 3568, Dkt. 77-4 .......................JA581

Plaintiffs' Opposition to Defendant's Motion to Dismiss, Ex. 1, EPA Email re "Final Financial Report", Dkt. 87-1 ...........................................................JA844

Memorandum Opinion, August 29, 2025, Dkt. 98................................................JA851

Order, August 29, 2025, Dkt. 99. ..........................................................................JA873

Notice of Appeal, Dkt. 100....................................................................................JA874

Transcript of Preliminary Injunction Hearing, August 5, 2025. ..........................JA878

# EXHIBIT 2

| 94TH CONGRESS | HOUSE OF REPRESENTATIVES | REPORT |
|---|---|---|
| 2d Session | | No. 94–1656 |

## PROCEDURE FOR JUDICIAL REVIEW OF CERTAIN ADMINISTRATIVE AGENCY ACTION

SEPTEMBER 22, 1976.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. FLOWERS, from the Committee on the Judiciary, submitted the following

## REPORT

[To accompany S. 800]

The Committee on the Judiciary, to whom was referred the bill (S. 800) to amend chapter 7, title 5, United States Code, with respect to procedure for judicial review of certain administrative agency action, and for other purposes, having considered the same, report favorably thereon without amendment and recommend that the bill do pass.

### PURPOSE

The proposed legislation would amend section 702 of title 5, U.S.C., so as to remove the defense of sovereign immunity as a bar to judicial review of Federal administrative action otherwise subject to judicial review.

The bill would also eliminate the requirement of the $10,000 jurisdictional amount in federal question cases, that is, actions arising under the Constitution, laws or treaties of the United States, where the action is brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity.

Further, the bill would simplify technical complexities concerning the naming of the party defendant in actions challenging Federal administrative action by amending section 703 of title 5, to permit the plaintiff to name the United States, the agency or the appropriate officer as defendant. This will eliminate technical problems arising from plaintiff's failure to name the proper Government officer as defendant.

Finally, the bill amends section 1391(e) of title 28, U.S.C., to provide that, in actions against the United States, its agencies, or officers or employees in their official capacities, additional persons may be joined in accordance with the Federal Rules of Civil Procedures and

57-006

JA518

with other venue requirements which would be applicable if the United States, its agencies or one of its officers or employees were not a party.

STATEMENT

The Justice Department in its comments to the Senate committee on this bill indicated that it favors its enactment in the form in which it passed the Senate. This bill is also supported by the Administrative Conference of the United States.

The bill S. 800 contains a series of amendments to titles 5 and 28 of the United States Code which have been endorsed by the American Bar Association and by the Administrative Conference of the United States. The bill would first amend section 702 of title 5 of the United States Code. That section currently provides that a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereunder. S. 800 would not alter this provision; it would add to it. In so doing the bill would provide for abolishment of the defense of sovereign immunity in certain actions against the United States. More specifically, it would add to section 702 a provision that an action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. It would also provide that the United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States.

In considering these recommended additions, it is important to note that the amended section 702 would specifically provide that it would not affect other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground. Further, section 702 clearly would specify that it does not confer authority to grant relief if any other statute granting consent to suit expressly or impliedly forbids the relief which is sought.

This bill would also amend section 703 of title 5 of the United States Code to remove the current uncertainty as to who may be named as a defendant when the United States is sued. Specifically, the sentence to be added to section 703 would provide that if no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer.

The bill S. 800 also provides two amendments to title 28 of the United States Code. Section 2 of the bill would amend section 1331 to eliminate the current requirement that there be a $10,000 amount in controversy in order to establish the jurisdiction of a federal court over federal questions. The amendment provides that whenever a federal question is litigated in an action brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity, federal courts would have jurisdiction without regard to the amount in controversy.

JA519

Section 3 would amend section 1391(e) of title 28 to permit joinder of third parties in litigation in which the Federal government is a defendant.

The purpose of this bill is best summarized by stating that it would remove three technical barriers to the consideration on the merits of citizens' complaints against the Federal Government, its agencies or employees. The amendment made to section 702 of title 5 would eliminate the defense of sovereign immunity as to any action in a Federal court seeking relief other than money damages and stating a claim based on the assertion of unlawful official action by an agency or by an officer or employee of the agency. The amendment to section 702 would not affect other limitations on judicial review—such as that the plaintiff lacks standing to challenge the agency action, that the action is not ripe for review, or that the action is committed to unreviewable agency discretion. Similarly, the amendment would not confer authority to grant relief where another statute provides a form of relief which is expressly or impliedly exclusive. The amendment to section 702 is meant to eliminate only the doctrine of sovereign immunity as a bar to naming the United States. It is not addressed to the issue of proper parties defendant. That is treated in the second sentence added to section 703 by the bill.

As has been noted, section 1 of the bill would also amend section 703 of title 5, United States Code, by the addition of a new second sentence which would permit the plaintiff in actions for nonstatutory review of administrative action to name the United States, the agency, or the appropriate officer as defendant. This is intended to eliminate technical problems arising from a plaintiff's failure to name the proper Government officer as a defendant. The first clause of the new sentence is intended to preserve specific provisions regarding the naming of parties which have been or may in the future be established by Congress. Such provisions may be part of a fully developed review procedure or may be provisions which are even more narrowly directed only to the required naming of a particular defendant where such requirement has intended consequences such as the restriction of venue or service of process. An example of the latter is 16 U.S.C. 831c(b), which displays an intent that litigation involving actions of the Tennessee Valley Authority be brought against that agency only in its own name. See *National Resources Council v. Tennessee Valley Authority*, 459 F. 2d 255 (2d Cir. 1972).

Another problem which may arise in actions for judicial review of administrative action is that the right asserted cannot be valued in dollars and cents. Section 2 of the bill meets this problem by amending section 1331 (a) of title 28 by adding an exception to the requirement that there be at least $10,000 in controversy, so that when the action is brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity, the establishment of any such sum or value would not be required.

As has been indicated, the bill would remedy certain other technical problems concerning the naming of the United States, its agencies, or employees as parties defendant in actions challenging Federal administrative action, and also relating to the joinder of appropriate non-Federal parties.

JA520

BACKGROUND OF THE BILL

The bill S. 800 implements Recommendations 68–7, 69–1 and 70–1 of the Administrative Conference of the United States,[1] and the texts of the recommendations of the Conference are set out at the end of this report. This bill, and the companion House bill, H.R. 10199, are also supported by a wide range of organizations and agencies, including the American Bar Association,[2] the Federal Bar Association,[3] the Environmental Defense Fund,[4] the Judicial Conference of the United States,[5] and the Department of Justice.[6]

The bill H.R. 10199 was the subject of a subcommittee hearing before this committee's Subcommittee on Administrative Law and Governmental Relations on December 4, 1975 at which representatives of the Administrative Conference of the United States and the American Bar Association testified in support of the bill.[7] Hearings were held S. 800 in the Senate by the Subcommittee on Administrative Practice and Procedure of the Senate Committee on the Judiciary on April 28 and May 3, 1976.[8] On May 10, 1976 the Department of Justice submitted its written views on the bill S. 800 to the Senate committee. The Department supports the bill in the form passed by the Senate.[9]

A. SOVEREIGN IMMUNITY

Congress has made great strides toward establishing monetary liability on the part of the Government for wrongs committed against its citizens by passing the Tucker Act of 1875, 28 U.S.C. sections 1346, 1491, and the Federal Tort Claims Act of 1946, 28 U.S.C. section 1346(b).[10] S. 800 would strengthen this accountability by withdrawing the defense of sovereign immunity in actions seeking relief other than money damages, such as an injunction, declaratory judgment, or writ of mandamus. Since S. 800 would be limited only to actions of this type for specific relief, the recovery of money damages contained in

---

[1] See exhibit A, below, for text of the Conference recommendations.
[2] See statements of William Warfield Ross, Esq. and Francis M. Gregory, Jr., Esq., American Bar Association, in Hearings before the Subcommittee on Administrative Practice and Procedure on "Bills to Amend the Administrative Procedure Act," April 28, May 3, 1976, 94th Cong., 2d sess. (1976) (hereinafter cited as "1976 Hearings"). Also see statements of the same witnesses in Hearing Serial No. 29 of the House Judiciary Committee Subcommittee on Administrative Law and Governmental Relations, Dec. 4, 1975.
[3] See statement of Donald A. Rago, Esq., Federal Bar Association, 1976 Hearings.
[4] See statement of Jacqueline Warren, Esq., Environmental Defense Fund, 1976 Hearings.
[5] See letter from William E. Foley, Deputy Director, Administrative Office of the United States Courts, Nov. 3, 1970, exhibit B, below (hereinafter cited as "Foley letter"), supporting earlier version of bill, S. 3568.
[6] See letter from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel, May 10, 1976, exhibit C, below (hereinafter cited as "Scalia letter").
[7] House Committee on the Judiciary Hearing, Serial No. 29.
[8] Senate 1976 Hearings supra.
[9] Department of Justice letter of May 10, 1976.
[10] At the state level, the trend has also been toward the reduction or elimination of the sovereign immunity defense. For example, 21 states and the District of Columbia have by judicial decision overturned, in varying degrees, the sovereign immunity defense to tort actions. (Alaska, Arizona, Arkansas, California, Colorado, Florida, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Michigan, Minnesota, Nebraska, Nevada, New Jersey, Pennsylvania, Rhode Island, West Virginia, and Wisconsin.) Approximately ten other states (Connecticut, Delaware, North Dakota, Ohio, Oregon, Pennsylvania, South Carolina, South Dakota, Washington and Wyoming) have constitutional provisions which enable the legislature to prescribe the manner and venue in which a suit against the sovereign may be brought. Three jurisdictions of Iowa, New York, Oregon, and Utah have ended by statute the sovereign immunity defense to tort actions. Furthermore, the state of Montana has completely abrogated the doctrine by constitutional amendment. For further discussion, see Hjort, The Passing of Sovereign Immunity in Montana: The King-Is-Dead! 34 Montana L. Rev. 283 (1973); Comment, To Catch the Elusive Conscience of the King: The Status of the Doctrine of Sovereign Immunity in Alabama, 26 Alabama L. Rev. 463 (1974).

JA521

the Federal Tort Claims Act and the Tucker Act governing contract actions would be unaffected.

Courts can make a useful contribution to the administration of Government by reviewing the legality of official conduct which adversely affects private persons. The acceptance of judicial review is reflected not only in court decisions but in the many statutes in which Congress has provided a special procedure for reviewing particular administrative activity. For years almost every regulatory statute enacted by Congress has contained provisions authorizing Federal courts to review the legality of administrative action that has adversely affected private citizens.

Unfortunately, these special statutes do not cover many of the functions performed by the older executive departments, such as the Departments of State, Defense, Treasury, Justice, Interior ,and Agriculture. In addition, there are omissions and gaps in the application of special review statutes. In these instances, judicial review is available, if at all, through actions involving matters which arise "under the Constitution, Laws, or treaties of the United States" as provided in section 1331 (a) of title 28. These actions are referred to as "nonstatutory review" actions and jurisdiction for these review procedures is in United States district courts.

These actions usually take the form of a suit for injunctive, declaratory or mandamus relief against a named Federal officer on the theory he is exceeding his legal authority. In theory such actions are against the officer and not against the Government for whom he is acting and is a legal fiction developed by the courts to mitigate the injustice caused by strict application of the sovereign immunity doctrine. At the Senate hearings Richard K. Berg, executive secretary of the Administrative Conference of the United States, noted:

> * * * if this action were logical, easy to apply and did substantial justice, perhaps there would be no problem. But it does not. On the contrary, it has set lawyers and courts to chasing conceptual will-o'-the-wisps.[11]

there is no specific statute authorizing judicial review, the suit is dismissed on the basis of sovereign immunity.

Dean Roger Cramton of Cornell Law School, a former chairman of the Administrative Conference and Assistant Attorney General and a leading scholar on sovereign immunity, has described the effect of these wispy fictions on the judicial process:

The problem is that judges who are not familiar with the history of the fiction and its purpose attempt to make determinations whether the suit is actually directed at the Government rather than the named defendant. This practice in turn raises a number of complex questions involving the relationship between the official and his employer—the Government. If it is found that the Government is the actual defendant, and there is no specific statute authorizing judicial review, the suit is dismissed on the basis of sovereign immunity.

Dean Roger Cramton of Cornell Law School, a former chairman of the Administrative Conference and Assistant Attorney General and a

---

11 1976 Hearings, testimony of Richard K. Berg.

JA522

leading scholar on sovereign immunity, has described the effect of these wispy fictions on the judicial process:

> The basic problem with the sovereign immunity doctrine is that it has developed by fits and starts through the series of fictions. The resulting patchwork is an intricate, complex and not altogether logical body of law. The basic issue—balancing the public interest in preventing undue judicial interference with ongoing governmental programs against the desire to provide judicial review to individuals claiming that Government has harmed or threatens to harm them—is obscured rather than assisted by the doctrine of sovereign immunity in its present form.[12]

Representing the Department of Justice, which supports S. 800, Assistant Attorney General Antonin Scalia wrote:

> No one can read the significant Supreme Court cases on sovereign immunity, from *United States v. Lee*, 106 U.S. 196 (1882) to *Malone v. Bowdoin*, 369 U.S. 643 (1962), *Dugan v. Rank*, 372 U.S. 609 (1963) and *Hawaii v. Gordon*, 373 U.S. 57 (1963) (per curiam), without concluding that the field is a mass of confusion; and if he ventures beyond that to attempt some reconciliation of the courts of appeals decisions, he will find confusion compounded. Accepting the elimination of the doctrine of sovereign immunity is not, then, a case of exchanging the certain for the uncertain, or the known for the unknown.[13]

The Senate report referred to a number of cases which illustrate the problem referred to by Mr. Scalia. It was pointed out that the doctrinal confusion caused by sovereign immunity has been highlighted in recent courts of appeals decisions. In *Schlafly* v. *Volpe*, 495 F.2d 273 (7th Cir. 1974), the court described sovereign immunity as:

> one of the more ill-defined aspects of federal jurisdiction. Perhaps the only irrefutable statement that can be made regarding this doctrine is that it appears to offer something for everyone.[14]

The court then reviewed the leading Supreme Court cases and pertinent courts of appeals decisions in reversing in part a district court dismissal of a suit challenging the legality of suspended Federal highway funding. The court held that the Federal Government had waived sovereign immunity and, in any event, the ultra vires exception to the doctrine rendered it inapplicable.

Writing of the doctrine's exceptions, the *Schlafly* court noted:

> In anticipation of the government's cry that the sovereign cannot be sued without consent, complaints are drawn with a covetous eye on the doctrine's 'exceptions,' only to be confronted with assertions that the facts present an 'exception to the exception,' or 'qualify' the exceptions, or that enter-

---

[12] Report of the Committee on Judicial Review of the Administration Conference of the United States, 1 *Recommendations and Reports of the Administrative Conference* 101, 104 (1969) (hereinafter cited as "ACUS Reports").
[13] Scalia letter, exhibit C, below.
[14] 495 F.2d at p. 277.

JA523

tainment of the plaintiff's claim would create an 'intolerable burden on governmental functions, requiring use of the doctrine despite its otherwise applicable exceptions.' [15]

In *Littell* v. *Morton*, 445 F.2d 1207 (1971), the Court of Appeals for the Fourth Circuit reversed a district court dismissal of a suit on sovereign immunity grounds. The suit by an attorney for an Indian tribe sought review of the Secretary of the Interior's action in disallowing his claim for compensation for services. The court's opinion frankly recognized the problems in applying sovereign immunity:

> It must be recognized at the outset that an effort to establish logical consistency in the decisions dealing with sovereign immunity is bound to be frustrating. The authorities are not reconcilable, and there are conceptual conflicts in the various holdings with which an intermediate appellate court must grapple. Our task is magnified because we have been unable to find any case in which the Supreme Court has sought to reconcile the notion of sovereign immunity with the fundamental concept of the APA that a person adversely affected by administrative action is presumptively entitled to judicial review of its correctness. [16]

As Judge MacKinnon noted in *Knows Hill Tenants Council* v. *Washington*, 448 F.2d 1045 (D.C. Cir. 1971):

> The result of course is a condition of hopeless confusion in judicial opinions, and an invitation to Government attorneys to assert the applicability of the doctrine whenever the opportunity reasonably presents itself. A federal trial court is faced with a thankless task whenever it is called upon to decide whether the doctrine is applicable in a particular case. [17]

The doctrinal confusion is such that the courts are divided on the fundamental question of whether or not sovereign immunity bars actions for equitable relief. For example, in *American Federation of Government Employees, Local 1858* v. *Callaway*, 398 F. Supp. 176 (N.D. Ala. 1975), the court said:

> It is a well-recognized principle that the doctrine of sovereign immunity bars suits against government agencies or officials for monetary damages, but does not bar suits for injunctive or declaratory relief. [18]

On the other hand, in *Penn* v. *Schlesinger*, 490 F.2d 700 (5th Cir. 1974) reversed on other grounds 497 F.2d 970 (5th Cir. 1974) the court held that:

> A declaratory judgment (against the sovereign), if equivalent to a claim for injunctive relief, would be * * * barred by the doctrine of sovereign immunity. [19]

One area where misunderstanding of the sovereign immunity doctrine has perpetuated considerable confusion and injustice is that of

---

[15] 495 F.2d at p. 277 (citations omitted).
[16] 445 F.2d at pp. 1211–12.
[17] 448 F.2d at p. 1059.
[18] 398 F. Supp. at p. 181.
[19] 490 F.2d at p. 704.

employment discrimination or discharge suits against Federal officers. Reviewing these cases, one commentator noted that:

> Several federal courts of appeals, covering states where federal employment discrimination is greatest, have held that sovereign immunity prevented them from banning employment discrimination by federal officials, [thus ignoring or misapplying the recognized exception to the doctrine of ultra vires or unconstitutional action by Federal officers.] [20]

Based on the testimony presented to this committee and to the Senate committee, it appears that the consensus in the administrative law community among scholars and practitioners is strong with regard to the elimination of sovereign immunity.[21] Professor Cramton summarizes this when he notes that "the application of the doctrine of sovereign immunity to actions challenging the legality of Federal conduct is totally erratic, haphazard, unpredictable, unfair, inconsistent, and, in some situations, unjust." [22] To Professor Kenneth Culp Davis, enactment of S. 800 is "urgent" in order to remove "the unnecessary injustice caused by sovereign immunity." [23]

The application of sovereign immunity is illogical and one cannot predict in what case the injustice is likely to occur. The Senate report observed that more probably than not, an average person with a less experienced attorney will be thrown out of court by the sovereign immunity doctrine while the wealthy corporation with expensive, experienced counsel will be able to sidestep the doctrine. The fact remains that the injustice of sovereign immunity may occur in any case, with respect to any form of government conduct, unless there is a specific statute allowing judicial review.

Perhaps the only situation under recent case law, other than suits for damages, where it was fairly predictable—and intended by Congress—that a court would uphold a claim of sovereign immunity, involved disputed title to real property.[24] The results in these cases were so obviously unjust that in 1972 with the enactment of legislation also considered and reported by this committee,[25] Congress enacted legislation to permit actions to quiet title to be brought against the United States. 28 U.S.C. sections 1346(f), 1402(d), 2409(a).[26]

[20] Abernathy, *Sovereign Immunity in a Constitutional Government: The Federal Employment Discrimination Cases*, 10 Harvard Civ. Rights-Civ. Lib. L. Rev., pp. 322, 326–27, 367 (1975). See also *Bramblett v. Desobry*, 490 F.2d 405 (4th Cir. 1974) (suit by discharged employee of non-appropriated fund activity against commanding officer, alleging "arbitrary," "capricious," and "unconstitutional" action, dismissed because "the United States, as sovereign, is immune").

[21] See e.g., K. C. Davis, Administrative Law Treatise ch. 27 (1958, Supp. 1965); Cramton, *Nonstatutory Review of Federal Administrative Action: The Need for Statutory Reform of Sovereign Immunity, Subject Matter Jurisdiction, and Parties Defendant*, 68 Mich. L.Rev. 389 (1970); Scalia, *Sovereign Immunity and Nonstatutory Review of Federal Administrative Action: Some Conclusions from the Public-Lands Cases*, 68 Mich.L.Rev. 867 (1970); Currie, *The Federal Courts and the American Law Institute* (pt. II), 36 U.Chi.L. Rev. 268 (1969); Byse, *Proposed Reforms in Federal "Nonstatutory" Judicial Review: Sovereign Immunity, Indispensable Parties, Mandamus*, 75 Harv.L.Rev. 1479 (1962); Carrow, *Sovereign Immunity in Administrative Law—A New Diagnosis*, 9 J.Pub.L. 1 (1960); Abernathy, *Sovereign Immunity in a Constitutional Government: The Federal Employment Discrimination Cases*, 10 Harvard Civ. Rights-Civ. Lib.L.Rev. 322 (1975).

[22] 1970 Hearings at p. 46.

[23] Letter from Kenneth Culp Davis, to Senator Edward M. Kennedy, Apr. 12, 1976, 1976 Hearings (hereinafter cited as "Davis letter").

[24] See *Malone v. Bowdoin*, 369 U.S. 643 (1962); *Gardner v. Harris*, 391 F.2d 885 (5th Cir. 1968).

[25] Public Law No. 92–562, 92d Cong. 2d sess.

[26] The Senate Committee on Interior and Insular Affairs commented on the sovereign immunity doctrine in its report on this legislation:

Because of the common law doctrine of "sovereign immunity," the United States cannot now be sued in a land title action without giving its express consent. Grave inequity often

Just as there is little reason why the United States as a landowner should be treated any differently from other landowners in an action to quiet title, so too has the time now come to eliminate the sovereign immunity defense in all equitable actions for specific relief against a Federal agency or officer acting in an official capacity.

The importance of ameliorating the effect of the sovereign immunity doctrine in other areas besides quiet title actions is emphasized by the number and variety of cases in which the defense is still raised. The committee has been advised that the doctrine has been invoked in hundreds of cases each year concerning agricultural regulations, governmental employment, tax investigations, postal-rate matters, administration of labor legislation, control of subversive activities, food and drug regulation, and administration of Federal grant-in-aid programs.[27]

In each instance, the sovereign immunity doctrine diverts the court's attention from the basic issue concerning the availability or scope of judicial review. Sovereign immunity beclouds the real issue whether a particular governmental activity should be subject to judicial review, and, if so, what form of relief is appropriate. Its elimination as proposed in S. 800, in the words of Richard K. Berg, executive secretary, Administrative Conference, "would be a major step in rationalizing the law of judicial review of agency action. It might not change many outcomes, but it would force the courts to ask and to answer the right questions."[28] Where S. 800 would change the outcome of a suit, the committee believes that the result would be justified. For, as Senator Kennedy observed at the Senate hearings:

> A review of the cases—as confused as they are—reveals one certain conclusion: where sovereign immunity has been held to be a bar to suit, and where no other defenses * * * would have been applicable, unjust or irrational decisions have resulted.[29]

The committee does not believe that the partial elimination of sovereign immunity, as a barrier to nonstatutory review of Federal administrative action, will create undue interference with administrative action. Rather, it will be a safety-valve to ensure greater fairness and accountability in the administrative machinery of the Government.

Other methods found in the substantial and growing body of law governing availability, timing, and scope of judicial review provide a much more rational basis for controlling unnecessary judicial interference in administrative decisions than does the defense of sovereign immunity. Thus, a case is unreviewable if it involves actions "committed to agency discretion by law." Other defenses include (1) statutory preclusion; (2) lack of ripeness; (3) failure to exhaust administrative remedies; and (4) lack of standing. The availability of these defenses—all of which provide a sounder substantive basis

---

has resorted to private citizens who are thereby excluded, without benefit of a recourse to the courts, from lands they have reason to believe are rightfully theirs. * * * [T]he committee believes this principle is not appropriate where the courts are established, not for the convenience of the sovereign, but to serve the people.
S. Rept. 92–575, 92d Cong. 1st sess., at p. 1.
[27] See 1970 Hearings; authorities cited at note 22, *supra.*
[28] 1976 Senate Hearings, testimony of Richard K. Berg.
[29] 1970 Hearings at p. 3.

H. Rept. 94–1656—76——2

to control court review on the merits than the confusing doctrine of sovereign immunity—indicates that the policy against indiscriminate judicial interference with Government action would not be abandoned by eliminating the defense of sovereign immunity.

Further the modification of sovereign immunity will not overwhelm Federal courts and government lawyers with a flood of litigation. Apparently, the Judicial Conference of the United States shares this view, since it has endorsed identical legislation in the past.[20]

Since the application of sovereign immunity is unpredictable, it seldom deters the bringing of a suit though it may affect the result or induce an error which requires correction at the appellate level. As a practical matter, the usual economic costs of bringing suit and the defenses cited above will operate to prevent inundation of the courts.[21]

Also, any increase in litigation on the merits is likely to be offset by a decrease in litigation on the question of sovereign immunity. Presently, sovereign immunity is raised as an additional, complex issue in litigation which requires considerable judicial time and effort to resolve or circumvent. When the issue is the basis of decision in the first instance, it invites appeals and further litigation on the matter.[22] The elimination of the vexing and difficult preliminary question of sovereign immunity in a large number of cases would probably provide a net savings of time and money to the Federal Government even if a few more cases did proceed to a determination on the merits of the legality of Federal administrative action.

However, even if there is a slight increase in caseload, the time has finally come when the injustice and inconsistency resulting from the unpredictable application of the sovereign immunity doctrine should be remedied.

As Government programs grow, and agency activities continue to pervade every aspect of life, judicial review of the administrative actions of Government officials becomes more and more important. Only if citizens are provided with access to judicial remedies against Government officials and agencies will we realize a government truly under law. The enactment of section one of S. 800—the partial elimination of the sovereign immunity defense in actions for equitable relief—is an important step toward this goal.

*Amendment of 5 U.S.C. Section 702*

The portion of S. 800 that modifies the doctrine of sovereign immunity adds three new sentences to the existing language of 5 U.S.C. section 702, which deals with the right to judicial review of Federal administrative action.[23]

[20] Policy letter, exhibit B, below.
[21] See 1976 Hearings, testimony of Ralph Nader, Public Citizen, Inc.
[22] See 1970 Senate Hearings at p. 54.
[23] Some Federal courts of appeals have held that 5 U.S.C. section 702 (1970) ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.") constitutes a general waiver of sovereign immunity in actions seeking judicial review of Federal administrative action. See, e.g., *Kingsbrook Jewish Medical Center v. Richardson*, 486 F.2d 663, 668 (2d Cir. 1973); *Scanwell Laboratories v. Shaffer*, 424 F.2d 859, 874 (D.C. Cir. 1970); *Estrada v. Ahrens*, 296 F.2d 690 (5th Cir. 1961). But cf. *Colon v. Hickel*, 428 F.2d 1046 (5th Cir. 1970). In clear conflict, however, five other circuits have held that the APA does not constitute a waiver of sovereign immunity. See *Curss v. United States*, 278 F.2d 416 (1st Cir. 1965); *Littell v. Morton*, 445 F.2d 1207 (4th Cir. 1971); *Twin Cities Chippewa Tribal Council v. Minnesota Chippewa Tribe*, 370 F.2d 529, 532 (8th Cir. 1967); *State of Washington v. Udall*, 417 F.2d 1310 (9th Cir. 1969); *Motah v. United States*, 402 F.2d 1 (10th Cir. 1968). The Supreme Court has yet to resolve the circuit conflict regarding the impact of section 702 of the APA on the

JA527

The first of the additional sentences provides that claims challenging official action or nonaction, and seeking relief other than money damages, should not be barred by sovereign immunity. The explicit exclusion of monetary relief makes it clear that sovereign immunity is abolished only in actions for specific relief (injunction, declaratory judgment, mandatory relief, etc.). Thus, limitations on the recovery of money damages contained in the Federal Tort Claims Act, the Tucker Act, or similar statutes are unaffected. The consent to suit is also limited to claims in courts of the United States; hence, the United States remains immune from suit in state courts.

Since the amendment is to be added to 5 U.S.C. section 702, it will be applicable only to functions falling within the definition of "agency" in 5 U.S.C. section 701. Section 701(b)(1) defines "agency" very broadly as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency" except for a list of exempt agencies or functions: Congress, Federal courts, governments of territories or of the District of Columbia, mediation boards, courts-martial and certain other military, wartime and emergency functions.

The proposed amendment will also not affect the operation of the rule that review is not available "to the extent that * * * statutes preclude review * * * or * * * agency action is committed to agency discretion by law." 5 U.S.C. section 701(a). The case law concerning these two categories of review is thus untouched by the proposed amendment. The amendment *would* apply to bar the assertion of sovereign immunity and force the court to articulate the true rationale for a decision not to grant relief.

### Effect on the United States

Actions challenging official conduct are intrinsically against the United States and are now treated as such for all practical purposes. Thus, for example, the defense of Federal administrative action is conducted by the Department of Justice or, in some cases, by agency counsel. The second new sentence of section 702 allows the plaintiff to name the United States as a defendant in such actions and permits the entering of a decree against the United States.

At the request of the Department of Justice, the Senate amended the bill to provide "that any mandatory or injunctive decree shall specify the Federal officer or officers (by name or title) and their successors in office, personally responsible for compliance." This will assure clear definition of the particular individuals who will be per-

sovereign immunity doctrine. For general discussion, see *Littell v. Morton*, 445 F.2d 1207, 1212 (4th Cir. 1971); *Schlafly v. Volpe*, 495 F.2d 273, 280–82 (7th Cir. 1974).
On this problem Professor Davis notes that:
"As a matter of history, Congress clearly did not attend the APA to waive sovereign immunity. But judges of Federal courts of appeals have such a strong sense of justice that five courts of appeals have held that the APA constitutes a waiver of sovereign immunity. I can imagine that all the judges who have so held are somewhat uncomfortable in so holding, but their choice is between treating plaintiffs unjustly or straining the historical materials. Congress should relieve our good judges from such an unnecessary dilemma.
"... The case law as a whole is somewhat complex and confused. Congress should simplify and clarify it by amending the APA in accordance with the [sovereign immunity] proposal of the Administrative Conference and the American Bar Association." Davis letter, 1976 Hearings.

JA528

sonally responsible for compliance with the court decree. The new sentence would read:

> The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States, provided, that any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance.

As has been stated previously in this report, this provision is meant to eliminate only the doctrine of sovereign immunity as a bar to naming the United States. It is not addressed to the issue of proper parties defendant, which is treated in the second sentence of section 703 of title 5 as added by this bill.

### Law Other Than Sovereign Immunity Unchanged

S. 800 is not intended to affect or change defenses other than sovereign immunity. All other than the law of sovereign immunity remain unchanged. This intent is made clear by clause (1) of the third new sentence added to section 702:

> Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground.

These grounds include, but are not limited to, the following: (1) extraordinary relief should not be granted because of the hardship to the defendant or to the public ("balancing the equities") or because the plaintiff has an adequate remedy at law; (2) action committed to agency discretion; (3) express or implied preclusion of judicial review; (4) standing; (5) ripeness; (6) failure to exhaust administrative remedies; and (7) an exclusive alternative remedy.

Special doctrines favoring the United States as a litigant, such as the inapplicability of statutes of limitations to claims asserted by the United States, are unaffected. Statutory or rule provisions denying authority for injunctive relief (*e.g.*, the Anti-Injunction Act, 26 U.S.C. section 7421, and 28 U.S.C. section 2201, prohibiting injunctive and declaratory relief against collection of federal taxes) and other matters (*e.g.*, Rule 13(d), dealing with counterclaims against the United States) also remain unchanged. It should be noted in particular that 5 U.S.C. section 701(a) is unchanged and remains applicable.

### Other Exclusive Remedies or Statutory Limitations

Likewise, the amendment to 5 U.S.C. section 702 is not intended to permit suit in circumstances where statutes forbid or limit the relief sought. Clause (2) of the third new sentence added to section 702 contains a second proviso concerned with situations in which Congress has consented to suit and the remedy provided is intended to be the exclusive remedy. For example, in the Court of Claims Act.[34] Congress created a damage remedy for contract claims with jurisdiction limited

---

[34] February 24, 1855, 10 Stat. 612.

to the Court of Claims except in suits for less than $10,000. The measure is intended to foreclose specific performance of government contracts. In the terms of the proviso, a statute granting consent to suit, i.e., the Tucker Act, "impliedly forbids" relief other than the remedy provided by the Act. Thus, the partial abolition of sovereign immunity brought about by this bill does not change existing limitations on specific relief, if any, derived from statutes dealing with such matters as government contracts, as well as patent infringement, tort claims, and tax claims.[33]

The language of clause (2) of the proviso directs attention to particular statutes and the decisions interpreting them. If a statute "grants consent to suit" with respect to a particular subject matter, specific relief may be obtained only if Congress has not intended that provision for relief to be exclusive.

Clause (2) of the proviso does not withdraw specific relief in any situation in which it is now available. It merely provides that new authority to grant specific relief is not conferred when Congress has dealt in particularity with a claim and intended a specified remedy to be the exclusive remedy.

Clause (2) of the proviso, at the request of the Department of Justice,[34] has been amended to read as follows:

Nothing herein * * * (2) confers authority to grant relief if any other statute that grants consent to suit [for money damages ] expressly or impliedly forbids the relief which is sought. (Emphasis added.)

This language makes clear that the committee's intent to preclude other remedies will be followed with respect to all statutes which grant consent to suit and prescribe particular remedies. The proviso as amended also emphasizes that the requisite intent can be implied as well as expressed.

### B. JURISDICTIONAL AMOUNT

The amount in controversy requirement in subsection (a) of section 1331 of title 28 prevents an otherwise competent United States district court from hearing certain cases seeking "non-statutory" review of Federal administrative action. These cases "arise under" the Federal Constitution or Federal statutes, and the committee believes they are appropriate matters for the exercise of Federal judicial power regardless of the monetary amount involved.

The purpose behind the amount-in-controversy requirement was to reduce case congestion in the Federal courts by setting a figure "not so high as to convert the Federal courts into courts of big business nor so low as to fritter away their time in the trial of petty controversies." [35]

Yet Congress has substantially lessened the importance of the amount-in-controversy requirement with respect to section 1331 by passing many statutes that confer Federal question jurisdiction with-

---

[33] See, e.g., The Anti-Injunction Act, 26 U.S.C. section 7421, prohibiting suit "for the purpose of restricting the assessment or collection of any tax * * *" Cf. Bob Jones University v. Simon, et al., 416 U.S. 725 (1974) (action to enjoin revocation of letter ruling declaring qualification for tax-exempt status held to be within and barred by the Act).

[34] See Scalia letter, exhibit C, below.

[35] S. Rept. 1830, 85th Cong., 2d sess. pp. 3099, 3101 (1958).

-01982-RJL      Document 77-2      Filed 07/18/25      F

out such a requirement. In *Lynch v. Household Finance Corp.*, 405 U.S. 538 (1972), the Court noted:

> A series of particular statutes grant jurisdiction without regard to the amount in controversy in virtually all areas that otherwise would fall under the general Federal question statute. Such special statutes cover: admiralty, maritime, and prize cases, 28 U.S.C. section 1333; bankruptcy matters and proceedings, 28 U.S.C. section 1334; review of orders of the Interstate Commerce Commission, 28 U.S.C. section 1336; cases arising under any Act of Congress regulating commerce, 28 U.S.C. section 1337; patent, copyright, and trademark cases, 28 U.S.C. section 1338; postal matters, 28 U.S.C. section 1339; internal revenue and custom duties actions, 28 U.S.C. section 1340; election disputes, 28 U.S.C. section 1344; cases in which the United States is a party, 28 U.S.C. sections 1345, 1346, 1347, 1348, 1349, 1358, and 1361; certain tort actions by aliens, 28 U.S.C. section 1350; actions on bonds executed under Federal law, 28 U.S.C. section 1352; cases involving Indian allotments, 28 U.S.C. section 1353; and injuries under Federal law, 28 U.S.C. section 1357.[38]

On the other hand, there are a significant number of situations involving "nonstatutory" review in which a plaintiff must still ground his action on section 1331 and, therefore, must establish that "the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs." In some of these cases the jurisdictional amount requirement cannot be met because it is impossible to place a monetary value on the right asserted by the plaintiff.[39]

In other cases, the plaintiff's claim that he is entitled to a Federal grant or benefit such as Federal employment[40] or welfare[41] may be assigned a monetary value, but the amount in controversy may be $10,000 or less.

The resulting denial to litigants of a Federal forum for Federal claims considered incapable of dollars and cents valuation or too small in monetary amount and not permitted to be aggregated has been described as "an unfortunate gap in the statutory jurisdiction of the Federal courts."[42]

Section 2 of S. 800 would end the requirement of 28 U.S.C. section 1331 that more than $10,000 be in controversy in order for a Federal court to have jurisdiction of a Federal question case brought against the United States, an agency thereof, or an officer or employee thereof in his official capacity.

Accordingly, no jurisdictional amount requirement would apply to cases against the Federal Government, a Federal agency, or any

---

[38] 405 U.S. at p. 549.
[39] How can one value, for example, an individual's claim that he is entitled to remain free from continuous police surveillance, *Giancana v. Johnson*, 335 F.2d 366 (7th Cir. 1964), *cert. denied*, 379 U.S. 100 (1965), or military service, *Oestereich v. Selective Service System Local Board No. 11*, 393 U.S. 233 (1968), or to distribute political leaflets, *Goldsmith v. Sutherland*, 426 F.2d 1395 (6th Cir. 1970), *cert. denied*, 400 U.S. 960 (1970)? See also cases cited in Wright, Miller and Cooper, 13 Federal Practice and Procedure, section 3561 (1975).
[40] *See, e.g., Pinther v. McCarthy*, 177 F. Supp. 643 (S.D. N.Y. 1954), *aff'd on other grounds*, 218 F.2d 164 (2d Cir. 1954).
[41] *See, e.g., Randall v. Goldmark*, 495 F.2d 356 (1st Cir. 1974), *cert. denied*, 419 U.S. 879 (1975).
[42] *Wolff v. Selective Service Local Board No. 16*, 372 F.2d 817, 826 (2d Cir. 1967).

official or employee where the plaintiff alleges that the official or employee has acted in his official capacity or under color of law.

Like section 1 of S. 800, however, the partial elimination of sovereign immunity, the grant of subject matter jurisdiction without a required jurisdictional amount would not affect other limitations on the availability or scope of judicial review of Federal questions, including, for example, lack of standing, ripeness, or exhaustion of administrative remedies.

The factors relevant to the question whether a Federal court should be available to a litigant seeking protection of a Federal right have little, if any, correlation with the minimum jurisdictional amount.

Thus, as Assistant Attorney General Scalia in his comment in behalf of the Justice Department concluded:

> . . . the existence of monetary damages in cases involving agency action is an erratic factor to begin with, not necessarily related to either the private or public importance of the issue involved . . . the 'amount in controversy' provision of section 1331 is seen to have a very limited and virtually irrational application, at least as applied to judicial review of administrative action.[43]

Instead, the important considerations include whether there is need for a specialized Federal tribunal or whether there are defects in the state judicial system that might substantially impair consideration of the plaintiff's claim.[44] These factors have special force in cases in which specific relief is sought against a Federal officer because state courts generally are powerless to restrain or direct a Federal officer's action which is taken under color of Federal law.[45] The denial of a Federal forum for lack of the jurisdictional amount may therefore be a denial of any remedy whatsoever.[46] Justice clearly requires elimination of this deficiency.

*Impact on Federal caseload*

According to leading authorities, elimination of the amount-in-controversy requirement in Federal question cases, even if it were also to be eliminated in strictly private litigation, will have no measurable impact on the caseload of the Federal courts.[47] S. 800, as amended, would only eliminate the statutory requirement in suits against the United States, its agencies, or officers or employees.

Presently, the jurisdictional amount requirement is applicable, where aggrieved private persons are seeking nonstatutory review of Federal administrative actions in suits brought against Federal officers or agencies. This category provides the only significant instances in

---

[43] Scalia letter, exhibit C, below.
[44] See Wechsler, *Federal Jurisdiction and the Revision of the Judicial Code*, 13 Law and Contemp. Prob. 216, 225–26 (1948).
[45] See Arnold, *The Power of State Courts to Enjoin Federal Officers*, 73 Yale L.J. 1385 (1964).
[46] In *Fox v. Hillside Realty Corp.*, 79 F.Supp. 832 (D.-N.Y. 1948), a federal action challenging a rent increase allowed by federal officials was dismissed for lack of the jurisdictional amount. A subsequent suit in state court was unsuccessful because the state courts held that they lacked power to pass on the action of the federal officials. *Fox v. Hillside Realty Corp.*, 37 N.Y.S.2d 351 (1949) *aff'd.*, 95 N.Y.S.2d 598, 276 App.Div. 894 (1950)." Wright, Miller and Cooper, 13 Federal Practice and Procedure, section 3561, at p. 593, n. 21.
[47] *Id.*, C. Wright, *Law of Federal Courts*, p. 107 (2d ed. 1970) ; 1970 Hearings at pp. 53–54, Wright, Miller and Cooper, 13 Federal Practice and Procedure, section 3561 (1975).

which the jurisdictional amount requirement of 28 U.S.C. section 1331 is an effective limitation, either because the right cannot be valued or it is worth less than $10,000 and there is no special statute applicable without an amount-in-controversy provision. [48] Yet even in this situation, the limitation can be circumvented if the plaintiff brings his action in the District of Columbia or if he can cast his action in the form of a mandamus proceeding under 28 U.S.C. section 1361, the Mandamus and Venue Act of 1962.

The resulting situation is hardly a logical or defensible one. In 1962 Congress, disturbed by the inability of litigants to obtain mandamus relief in local courts distributed around the country, conferred such jurisdiction on all district courts without regard to the amount in controversy. The more traditional exercise of injunctive or declaratory authority, however, remains subject to the requirement of a minimum jurisdictional amount whenever no special Federal question statute is available—except in the District of Columbia. The same arguments that supported the Mandamus and Venue Act of 1962—the expense and inconvenience of forcing litigants from all over the country to bring their claims to a District of Columbia court—support the elimination of the remaining anachronism in injunction suits against Federal officers: the jurisdictional amount in controversy.

The number of additional cases that will be brought in Federal courts if section 1331 is amended to eliminate the jurisdictional amount requirement is likely to be quite small. According to Professor Wright:

> There is no risk that ending the amount in controversy requirement for federal question cases would open the federal courts to unpredictable numbers of unknowable kinds of cases. The terrain is well marked. The cases affected are those in which federal action is challenged and in which state action is challenged on grounds that do not come within section 1343(3). These are important cases for which a federal forum is especially appropriate. [49]

Elimination of the amount in controversy is not likely in itself to increase even the number of suits against Federal officers since some courts are already adopting a very lax interpretation of the requirement in such cases. [50] But elimination of the requisite jurisdictional amount will eliminate a technical barrier to judicial relief which many courts are avoiding or circumventing altogether in order to avoid in-

---

[48] The amounts-in-controversy requirement in this category of cases was reaffirmed in dictum in *Lynch v. Household Finance Corp.* 405 U.S. 538, 547 (1972) ("in suits against federal officials for alleged deprivations of constitutional rights, it is necessary to satisfy the amount-in-controversy requirement for federal jurisdiction"). The significance of this dictum, however, was recently questioned in Earnest. de Jurisdictional Amount in Controversy in Suits to Enforce Federal Rights, 54 Texas L. Rev.; 545, 557 566 (1976). (Hereafter cited as "Earnest".)

[49] 1976 Hearings at p. 239. More recently, Professor Wright has described as "rare and insignificant" some of the cases to which the amount requirement remains applicable. Thus, "a municipality cannot be sued under the civil rights provisions of 42 U.S.C.A. section 1983 and 28 U.S.C.A. section 1343(3) and thus a suit against a municipality on the basis of the Federal Constitution or laws must be brought under 28 U.S.C.A. section 1331 and more than $10,000 must be in controversy. *Cohen v. Coahia*, 267 F Supp. 476 (D. Ill. 1973). It remains an open question whether a suit challenging a state statute on the ground that it is inconsistent with a Federal statute may be brought without regard to amount in controversy under 28 U.S.C.A. section 1343(3). *Hagans v. Lavine*, 415 U.S. 528, 535 n. 5 (1974)." Wright, Miller and Cooper, 13 Federal Practice and Procedure, section 3561, at p. 392, n. 17 (1975).

[50] See Earnest, *supra* note 49; letter from Roger Cramton, May 24, 1976, 1976 Hearings.

justice.[51] Professor Davis noted in connection with the elimination of
the sovereign immunity defense in equitable actions, "Congress should
relieve our good judges from such an unnecessary dilemma." [52] It
should enact S. 800 and thus eliminate the jurisdictional amount-
in-controversy requirement in all Federal question cases where the suit
is against the United States, any agency thereof, or any officer or
employee thereof in his official capacity.

As with the partial elimination of the sovereign immunity defense,
the partial elimination of the jurisdictional amount requirement in
Federal question cases is likely to result in a more efficient use of
judicial resources, with courts and counsel no longer having to waste
time and energy on the question of amounts in controversy.

Caseloads and efficiency aside, a larger issue remains. For as Pro-
fessor Wright has written:

> We do nothing to encourage confidence in our judicial
> system or in the ability of persons with substantial griev-
> ances to obtain redress through lawful processes when we
> close the courthouse door to those who cannot produce $10,000
> as a ticket of admission.[53]

### C. PARTIES DEFENDANT

The size and complexity of the Federal Government, coupled with
the intricate and technical law concerning official capacity and parties
defendant, has given rise to numerous cases in which a plaintiff's claim
has been dismissed because the wrong defendant was named or served.[54]

Nor is the current practice of naming the head of an agency as de-
fendant always an accurate description of the actual parties involved
in a dispute. Rather, this practice often leads to delay and technical
deficiencies in suits for judicial review.[55]

The unsatisfactory state of the law of parties defendant has been
recognized for some time and several attempts have been made by
Congress to cure the deficiencies.[56]

Despite these attempts, problems persist involving parties defen-
dant in actions for judicial review. In the committee's view the ends

---

[51] Id. Such avoidance, however, abdicates a court's constitutional and statutory duties
"to ensure that each case before it falls within the limited jurisdictional power of the
Federal judiciary. Moreover, such evidence adds to the confusion surrounding the requisite,
calling on the Congress rather jurisdictional amount, especially in the lower courts, and
fosters arbitrary and haphazard application of jurisdictional standards." Id. at p. 583. See
also Wright, Miller and Cooper, 13 Federal Practice and Procedure, section 3561, at pp.
395–96, calling on the Congress rather than the courts to fill in the "unfortunate gap in
the statutory jurisdiction of the Federal courts."
[52] Davis letter, 1976 Hearings.
[53] 1970 Senate Hearings at p. 254.
[54] See, e.g., Clegy v. Treasury Department, et al.—— F. Supp. —— (D. Mass. 1976), 35
Pike and Fisher Ad. L. 2d 229 (March 16, 1976), (action against the Treasury Department
and the Secret Service for allegedly failing to provide Secretary Service protection to
plaintiff as a presidential candidate dismissed for lack of jurisdiction based in part on
misjoinder and failure to name the correct parties defendant).
[55] See statement of Francis M. Gregory, Jr., Vice chairman, Committee on Judicial Review,
Section of Administrative Law, American Bar Association, 1976 Hearings.
[56] First, Congress in 1962 amended section 1391(e) of Title 28 in order to allow broad-
ened venue and extra-territorial service of process in suits against Federal officers and thus
to circumvent the formerly troublesome requirement that superior officers be joined as par-
ties defendant. Second, Rule 25(d) of the Federal Rules of Civil Procedure was amended in
1961 to provide for the automatic substitution of successors in office. That rule also states
that "any misnomer not affecting the substantial rights of the parties shall be disregarded"
and that the officer may be "described as a party by his official title rather than by name."
Third, Rule 15(c) of the Federal Rules was amended in 1966 to deal with the plaintiff's
failure to name any appropriate officer or agency as defendant.

of justice are not served when government attorneys advance highly technical rules in order to prevent a determination on the merits of what may be just claims.

When an instrumentality of the United States is the real defendant, the plaintiff should have the option of naming as defendant the United States, the agency by its official title, appropriate officers, or any combination of them. The outcome of the case should not turn on the plaintiff's choice. S. 800 accomplishes this objective by including a new sentence between the first and last sentences of section 703 of title 5 to provide the plaintiff with this option in judicial review actions, providing no special statutory review proceeding is applicable. The new sentence would read:

> "If no special statutory review proceeding is applicable the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer."

The first clause of this sentence is intended to preserve specific provisions regarding the naming of parties which have been or may in the future be established by Congress. Such provisions may be part of a fully developed review procedure or may be provisions which are more narrowly directed only to the required naming of the particular defendant where such requirement has intended consequences such as the restriction of venue or service of process. The example previously cited in this report is 16 U.S.C. 831c(b), a statutory provision which provides that litigation involving actions of the Tennessee Valley Authority be brought against that agency only in its own name. *National Resources Council* v. *Tennessee Valley Authority*, 459 F.2d 255 (2d Cir. 1972).

*Joinder of Third Persons*

A related problem concerns joinder of third persons as parties defendant. When section 1391(e) of title 28, which governs venue of actions against Federal officers and agencies, was enacted in 1962, its broadened venue and extra-territorial service of process were limited to judicial review actions "in which *each* defendant is an officer or employee of the United States or an agency thereof." (emphasis added.)

This language can be interpreted to prevent a plaintiff from joining non-Federal third persons as defendants in actions under section 1391(e). For example, in *Chase Savings & Loan Association* v. *Federal Home Loan Bank Board*, 269 F. Supp. 965 (E.D. Pa. 1967), the court dismissed an action which had joined the Federal board and a local bank on the ground of improper venue. The court in *Town of East Haven* v. *Eastern Airlines*, 282 F. Supp. 507 (D. Conn. 1968), also dismissed an action on the same grounds but not before criticizing the requirements of section 1391(e).

More recent cases, cognizant of the awkwardness and inconvenience of the section, have held to the contrary. In *Green* v. *Laird*, 357 F. Supp. 227 (N.D. Ill. 1973), for example, the court held that an interpretation of section 1391(e) which excludes non-Federal defendants is inconsistent with the congressional intent.[47]

---

[47] *See also Macias* v. *Finch*, 324 F.Supp. 1252, 1254-55 (N.D. Cal. 1970) ; *People of Saipan* v. *Dept. of the Interior*, 356 F.Supp. 645, 651 (D. Hawaii (1973), *modified on other grounds*, 502 F.2d 90 (9th Cir. 1974).

JA535

There is no functional justification for this limitation on joinder. Moreover, it prevents relief in some situations in which the Federal courts can make a special contribution.[68]

Section 3 of S. 800 amends 1391(e) of title 28 to make it clear that a plaintiff may use the section's provisions for broad venue and extra-territorial service of process against Government defendants, despite the presence in the action of a non-Federal defendant.

The amendment substitutes the word "a" for the word "each," and adds a new sentence permitting joinder of non-Federal defendants who can be served in accordance with normal rules governing service of process. Other objections to such joinder, stemming from the discretion vested in the trial judge under the Federal Rules of Civil Procedure to control the dimensions of the law suit and to protect particular parties, would be unaffected.

The Department of Justice objected that section 3, as introduced, "would permit any plaintiff to obtain venue against any private defendant by simply joining as a party to the action a Federal official over whom venue may be obtained under 28 U.S.C. section 1391(e)." [69] To avoid any hardship or unfair disadvantage to private defendants that might result from subjecting them to plaintiff's broadened choice of venue under section 1391(e) as amended, the Senate amended the pertinent sentence of section 3 of S. 800 to read as follows:

> Additional persons may be joined as parties to any such action in accordance with the Federal Rules of Civil Procedure *and with such other venue requirements as would be applicable if the United States or one of its officers, employees or agencies were not a party.* (emphasis added.)

In effect, this will mean that a private defendant can only be sued in a venue where he could have been sued if the Government had not been a party. As a practical matter, it will usually mean that the plaintiff will have to bring suit in the district where the defendant resides rather than in his own district.

### CONCLUSION

The subjects of this bill are long overdue for reform. S. 800 contains limited, modest, and reasonable reforms in a carefully drafted bill.

Its principal provision, the partial elimination of sovereign immunity as a defense to actions for equitable relief, has the support of the most eminent scholars and practitioners of administrative law, as well as the Judicial Conference of the United States and the Department of Justice.

The partial elimination of sovereign immunity will facilitate non-statutory judicial review of Federal administrative action without

[68] "In many public land controversies, for example, three parties are involved—the official, a successful applicant, and an unsuccessful one. Effective relief cannot be obtained in an action in which the United States or its officer is not involved; but if the Government is named as defendant, 1391(e) prevents the joinder of the other private person as a defendant, and that person cannot be joined as a plaintiff because his interest is adverse to that of the plaintiff. Another common type of situation in which the limitation is troublesome is that in which the specific relief is sought against Federal and state officers who are cooperating in a regulatory or enforcement program.
"There are no sound reasons why the general principle that control party joinder in Federal courts should not be applicable in these situations." Statement of Roger Cramton, 1970 Senate Hearings at p. 39.
[69] Scalia letter, exhibit C, below.

JA536

affecting the existing pattern of statutory remedies, without disturbing the established law of judicial review, without exposing the Government to new liability for money damages, and without upsetting congressional judgments that a particular remedy in a given situation should be the exclusive remedy.

Like sovereign immunity, other anachronisms in the law of judicial review such as the jurisdictional amount in controversy and the naming and joinder of parties defendant have outlived their usefulness, continue to cause confusion and injustice, and are overdue for elimination or reform.

The adoption of S. 800, therefore, will make a substantial contribution to both administrative justice and judicial efficiency by promoting rationality in a complex and intricate field of Federal law. By removing artificial and outmoded barriers to judicial review of official action, S. 800 will also help restore public confidence in the responsiveness and accountability of the Federal Government.

For these reasons, the committee recommends that the bill be considered favorably.

CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3 of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman):

### § 702. Right of review

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action, within the meaning of a relevant statute, is entitled to judicial review thereof. *An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States, provided, that any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief or any other appropriate legal or equitable grounds; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.*

5 U.S.C. 703

### § 703. Form and venue of proceeding

The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable

JA537

form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. *If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer.* Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

### 28 U.S.C. 1331

#### § 1331. Federal questions

(a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States[,] *except that no such sum or value shall be required in any such action brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity.*

(b) Except when express provision therefor is otherwise made in a statute of the United States, where the plaintiff is finally adjudged to be entitled to recover less than the sum or value of $10,000, computed without regard to any setoff or counterclaim to which the defendant may be adjudged to be entitled, and exclusive of interests and costs, the district court may deny costs to the plaintiff and, in addition, may impose costs on the plaintiff.

### 28 U.S.C. 1391(e)

(e) A civil action in which [each] *a* defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, *or the United States,* may, except as otherwise provided by law, be brought in any judicial district in which[:] (1) a defendant in the action resides, or (2) the cause of action arose, or (3) any real property involved in the action is situated, or (4) the plaintiff resides if no real property is involved in the action. *Additional persons may be joined as parties to any such action in accordance with the Federal Rules of Civil Procedure and with such other venue requirements as would be applicable if the United States or one of its officers, employees or agencies were not a party.*

STATEMENTS UNDER CLAUSE 2(1)(2)(B), CLAUSE 2(1)(3) AND CLAUSE 2(1)(4) OF RULE XI AND CLAUSE 7(a)(1) OF RULE XIII OF THE HOUSE OF REPRESENTATIVES

COMMITTEE VOTE

(Rule XI 2(1)(2)(B))

On September 21, 1976, the Full Committee on the Judiciary approved the bill S. 800 by a record vote of 26 ayes and one no.

JA538

-01982-RJL    Document 27-2    Filed 07/18/25    F

### COST

The bill S. 800 is procedural in nature and clarifies the jurisdiction of Federal courts. The limited expansion of jurisdiction should not require additional appropriation of funds to either the judiciary or the agencies.

### OVERSIGHT STATEMENT

#### (Rule XI 2(1)(3)(A))

The Subcommittee on Administrative Law and Governmental Relations of this committee exercises the committee's oversight responsibility with reference to administrative law and procedure in accordance with Rule VI(b) of the Rules of the Committee on the Judiciary. The favorable consideration of this bill was recommended by that subcommittee and the committee has determined that legislation should be enacted as set forth in this bill.

### BUDGET STATEMENT

#### (Rule XI 2(1)(3)(B))

As has been indicated in the committee statement as to cost made pursuant to Rule XIII(7)(a)(1), the bill merely provides for amendments to procedural provisions in titles 5 and 28 of the U.S. Code relating to judicial review of administrative action. The bill does not involve new budget authority nor does it require new or increased tax expenditures as contemplated by Clause 2(1)(3)(B) of Rule XI.

### ESTIMATE OF THE CONGRESSIONAL BUDGET OFFICE

#### (Rule XI 2(1)(3)(C))

No estimate or comparison was received from the Director of the Congressional Budget Office.

### OVERSIGHT FINDINGS AND RECOMMENDATIONS OF THE COMMITTEE ON GOVERNMENT OPERATIONS

#### (Rule XI 2(1)(3)(D))

No findings or recommendations of the Committee on Government Operations were received as referred to in subdivision (D) of clause 2(1)(3) of House Rule XI.

### INFLATIONARY IMPACT

#### (Rule XI 2(1)(3))

In compliance with clause 2(1)(4) of House Rule XI it is stated that this legislation will have no inflationary impact on prices and costs in the operation of the national economy.

JA539

-01982-RJL    Document 77-2    Filed 07/18/25    F

## EXHIBITS

### EXHIBIT A

RECOMMENDATIONS OF THE ADMINISTRATIVE CONFERENCE OF THE
UNITED STATES

RECOMMENDATION No. 68–7—ELIMINATION OF JURISDICTIONAL
AMOUNT REQUIREMENT IN JUDICIAL REVIEW

Title 28 of the United States Code should be amended to eliminate
any requirement of a minimum jurisdiction amount before United
States district courts may exercise original jurisdiction over any action
in which the plaintiff alleges that he has been injured or threatened
with injury by an officer or employee of the United States or any
agency thereof, acting under color of Federal law. This amendment is
not to affect other limitations on the availability or scope of judicial
review of Federal administrative action.

{*Adopted December 10–11, 1968*}

RECOMMENDATION No. 69–1—STATUTORY REFORM OF THE SOVEREIGN
IMMUNITY DOCTRINE

The technical legal defense of sovereign immunity, which the Gov-
ernment may still use in some instances to block suits against it by its
citizens regardless of the merit of their claims, has become in large
measure unacceptable. Many years ago the United States by statute
accepted legal responsibility for contractual liability and for various
types of misconduct by its employees. The "doctrine of sovereign im-
munity" should be similarly limited where it blocks the right of citi-
zens to challenge in courts the legality of acts of governmental
administrators. To this end the Administrative Procedure Act should
be amended.

#### RECOMMENDATION

1. Section 702 of Title 5, United States Code (formerly section 10(a)
of the Administrative Procedure Act), should be amended by adding
the following at the end of the section:

An action in a court of the United States seeking relief other
than money damages and stating a claim that an agency or an
officer or employee thereof acted or failed to act in an official ca-
pacity or under color of legal authority shall not be dismissed nor
relief therein denied on the ground that it is against the United
States or that the United States is an indispensable party. The
United States may be named as a defendant in any such action,
and a judgment or decree may be entered against the United

(23)

JA540

-01982-RJL    Document 77-2    Filed 07/18/25    F

States. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

2. Section 703 of Title 5, United States Code (formerly section 10(b) of the Administrative Procedure Act), should be amended by adding the following sentence after the first full sentence:

If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer.

*(Adopted October 21–22, 1969)*

RECOMMENDATION No. 70–1—PARTIES DEFENDANT

The size and complexity of the Federal Government, coupled with the intricate and technical law concerning official capacity and parties defendant, have given rise to innumerable cases in which a plaintiff's claim has been dismissed because the United States or one of its agencies or officers lacked capacity to be sued, was improperly identified, or could not be joined as a defendant. The ends of justice are not served when dismissal on these technical grounds prevents a determination on the merits of what may be just claims. Three attempts to cure the deficiencies of the law of parties defendant have achieved only partial success and further changes are required to eliminate remaining technicalities concerning the identification, naming, capacity, and joinder of parties defendant in actions challenging federal administrative action.

RECOMMENDATION

1. The Federal Rules of Civil Procedure contain liberal provisions for substitution of parties and for amendment of pleadings and correction of defects as to parties defendant. The Department of Justice should instruct its lawyers and United States Attorneys to call the attention of the court to these provisions in cases involving technical defects with respect to the naming of parties defendant in any situation in which the plaintiff's complaint provides fair notice of the nature of the claim and the summons and complaint were properly served on a United States Attorney, the Attorney General, or an officer or agency which would have been a proper party if named. The Department of Justice should be responsible for determining who within our complex federal establishment is responsible for the alleged wrong and should take the initiative in seeking correction of pleadings or adding of proper parties. Since the Department of Justice has acquiesced in the substance of this recommendation, it would also be appropriate for the Department of Justice and the Administrative Conference of the United States to seek an amendment of the Federal Rules of Civil Procedure to provide that the Attorney General shall have the responsibility to correct such deficiencies.

2. Congress should enact legislation:

(a) Amending section 703 of title 5 to allow the plaintiff to name as defendant in judicial review proceedings the United

JA541

States, the agency by its official title, the appropriate officer, or any combination of them.

(b) Amending section 1391 (e) of title 28 to include within its coverage actions challenging federal administrative action in which the United States is named as a party defendant, without affecting special venue provisions which govern other types of actions against the United States.

(c) Amending section 1391 (e) of title 28 to allow a plaintiff to utilize that section's broadened venue and extraterritorial service of process in actions in which nonfederal defendants who can be served in accordance with the normal rules governing service of process are joined with federal defendants.

*(Adopted June 2-3, 1970)*

### EXHIBIT B

ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS,
*Washington, D.C., November 3, 1970.*

Hon. EDWARD M. KENNEDY,
*Committee on the Judiciary,*
*U.S. Senate, Washington, D.C.*

DEAR SENATOR KENNEDY: This is in further reference to your letter of May 1, 1970, to the Chief Justice requesting the views of the Judicial Conference on S. 3568,* relating to judicial review of administrative action and containing sections relating to venue and parties defendant.

The Judicial Conference of the United States met on October 29 and 30, 1970, and voted its approval in principle of S. 3568 and specifically endorsed Section 2 of the bill relating to the jurisdictional amount requirement and Section 3 providing for suit in the same judicial districts in which the federal official or agency may be sued.

Sincerely,

WILLIAM E. FOLEY,
*Deputy Director.*

### EXHIBIT C

DEPARTMENT OF JUSTICE,
*Washington, D.C., May 10, 1976.*

Hon. EDWARD M. KENNEDY,
*Chairman, Subcommittee on Administrative Practice and Procedure,*
*U.S. Senate, Washington, D.C.*

DEAR MR. CHAIRMAN: This is in response to your request at my testimony before your Subcommittee on April 28, 1976 that I submit the written views of the Department of Justice on S. 800, a bill "[t]o amend chapter 7, title 5, United States Code, with respect to procedure for judicial review of certain administrative agency action, and for other purposes."

SECTION 1—SOVEREIGN IMMUNITY

Section 1 of S. 800 would amend 5 U.S.C. 702 to eliminate the defense of sovereign immunity of the United States in actions in United States courts seeking relief other than money damages. The Department has in the past opposed such a change.

---

*Reintroduced on Feb. 22, 1975 as S. 800. See 121 Cong. Rec. 3415 (daily ed.).

JA542

In light of the tenacious and well reasoned support of this proposal by such knowledgeable and responsible organizations as the Administrative Conference of the United States and the American Bar Association, we have reconsidered that opposition, and are now prepared to endorse the concept in principle, and to support the text of S. 800, with two small but important changes and a number of caveats concerning its proper interpretation. The arguments in favor of this aspect of S. 800 have been described in testimony presented by others before your Subcommittee. Foremost among them, in my view, is the failure of the criteria for sovereign immunity, as they have been expressed in a long and bewildering series of Supreme Court decisions, to bear any necessary relationship to the real factors which should determine when the Government requires special protection which ordinary litigants would not be accorded.

The main argument against S. 800 is one that can be made against most statutes which seek to make a change in encrusted principles of the common law: the difficulty of obtaining complete assurance that no untoward result will be produced. The Department of Justice has been unable to identify any, assuming that the modifications and interpretations proposed in this letter are accepted. We are sure, however, that the Committee will give careful consideration to the submissions of other agencies on this point with respect to their particular areas of activity.

It should also be pointed out that the status quo itself is not without uncertainty. No one can read the significant Supreme Court cases on sovereign immunity, from *United States* v. *Lee*, 106 U.S. 196 (1882) to *Malone* v. *Bowdoin*, 369 U.S. 643 (1962), *Dugan* v. *Rank*, 372 U.S. 609 (1963) and *Hawaii* v. *Gordon*, 373 U.S. 57 (1963) (per curiam), without concluding that the field is a mass of confusion; and if he ventures beyond that to attempt some reconciliation of the courts of appeals decisions, he will find confusion compounded. Accepting the elimination of the doctrine of sovereign immunity is not, then, a case of exchanging the certain for the uncertain, or the known for the unknown.

Indeed, if the present bill is properly understood and properly applied by the courts, it is likely to produce a more stable and predictable system of immunity from suit than the present doctrine of sovereign immunity can ever attain—because it will be a system directly and honestly based upon relevant governmental factors rather than upon a medieval concept whose real vitality is long since gone and which we have tried vainly to convert to rational modern use. It is not the intent of the Department nor, as I understand it, the intent of the drafters of this bill, that all of the cases which have heretofore been disposed of on the basis of sovereign immunity would in the future be entertained and adjudicated by the courts. To the contrary, one of the very premises of the proposal is the fact that many (indeed, I would say most) of the cases disposed of on the basis of sovereign immunity could have been decided the same way on other legal grounds, such as: lack of standing; lack of ripeness; availability of an alternative remedy in another court; express or implied statutory preclusion of judicial review; commission of the matter by law to agency discretion; privileged nature of the defendant's conduct; fail-

JA543

ure to exhaust administrative remedies; discretionary power to refuse equitable relief;[1] and the "political question" doctrine.[2] As stated in the Administrative Conference Report:.

> The essential and sound policy underlying sovereign immunity—that courts should not engage in indiscriminate interference with governmental programs—is not abandoned merely because an artificial and outmoded doctrine is abolished. The same basic policy is inherent in the body of law that governs the availability and scope of judicial review. The doctrine of sovereign immunity is unnecessary to prevent courts from (a) entering fields which the Constitution or Congress has delegated to the executive, and (b) displacing executive or administrative judgment. (1 *ACUS Reports* at 925.)

In addition to the common law doctrines which afford certain governmental processes needed protection, it is also an important factor in our support for the bill that the waiver of immunity, since it is made via § 702, will only applpy to claims relating to improper official action; and will be subject to the other limitations of the Administrative Procedure Act, including that which renders review unavailable "to the extent that—(1) statutes preclude judicial review, or, (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). They also include the requirement that "the form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter," where such a proceeding exists and is not inadequate. 5 U.S.C. § 703. These features were considered of great importance by the Administrative Conference Committee which originally drafted this legislative proposal, and they are important elements of the Department's support for the bill.

In one respect, the proposed § 702 differs from the version recommended by the Administrative Conference, and we believe the change is undesirable. Clause (2) of the last sentence, as proposed by the Administrative Conference, would have provided that nothing in the legislation confers authority to grant relief "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." This has been changed to read: "If any other statute granting consent to suit *for money damages* forbids the relief which is sought." (emphasis added). The underscored phrase and the elimination of the phrase "expressly or impliedly" could be interpreted to limit the disclaimer in such a fashion as to raise serious questions concerning the scope of the new reviewability which would be created. We see no reason why a congressional intent to preclude other remedies should be honored only with respect to statutes for money damages, and otherwise ignored. Nor do we believe it should be left in any doubt that the requisite intent need not be express (which, in a prior system which assumed the existence of sovereign immunity, would be extremely rare) but can be found from all the circumstances normally available to assess legislative will. Because existing statutes have been

---

[1] See the cases on each of these points cited in the Report of the Commission on Judicial Review of the Administrative Conference of the United States, 1 *Recommendations and Reports of the Administrative Conference* (hereinafter "ACUS Reports") 191, 222–23.
[2] See, e.g., C. & S. Air Lines v. Waterman Corp., 333 U.S. 103 (1948).

enacted against the backdrop of sovereign immunity, this will probably mean that in most if not all cases where statutory remedies already exist, these remedies will be exclusive; that is no distortion, but simply an accurate reflection of the legislative intent in these particular areas in which the Congress has focused on the issue of relief. It would be unwise to upset these specific determinations by a general provision of this sort, without considering them individually, or even knowing precisely what they are. In the many areas where Congress has not acted, however, and when its action is not addressed to the type of grievance which the plaintiff seeks to assert, suit would be allowed. The Department of Justice strongly urges that the Administrative Conference's original and well considered recommendation on this point be reinstated.

Our second disagreement with the text of section 1 of the bill relates to the next to the last sentence of the revised § 702, which provides that "the United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States." This was part of the original Administrative Conference proposal. Its purpose was to eliminate the "technicalities of the law of parties defendant" and to assure the "binding effect of judgments" against the United States. (See 1 *ACUS Reports* 220–22.)

We have no quarrel with these objectives, nor with the text of the provision insofar as it provides for the initial naming of the United States. The provision for the entering of a judgment or decree against the United States, however, is inadvisable without some modification. In order to assure that the binding effect of a judgment will not lapse with the departure of the Federal officer who happens to have been named, it seems to us unnecessary to leave to the Justice Department— or perhaps to the Government as a whole—the task of deciding what individual has personal responsibility (presumably under pain of contempt) for compliance with a court's mandatory decree. Leaving the matter thus unspecified is either unfair to the individual who may be responsible or else destructive of the enforceability of the decree. We suggest that all the values sought to be achieved by this provision can be preserved, and the foregoing difficulty eliminated, by adding to the sentence in question the following proviso:

> provided, that any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance.

In connection with this provision, I may also note our understanding that the ability to name the United States in the initial pleading does not alter the degree of specificity with which the plaintiff must plead and establish his case. For example, where the plaintiff knows that particular officers of a particular agency caused the wrong alleged, he cannot merely plead that it was caused by unspecified officers of the United States, leaving it to the Department of Justice to circularize the entire Government in order to respond to the complaint. Such a pleading would be subject to a motion for more definite statement under Rule 12(e) of the Federal Rules of Civil Procedure.

With the revisions suggested above, the Department supports enactment of section 1 of S. 800.

JA545

### SECTION 2—AMOUNT IN CONTROVERSY

Section 2 of S. 800 would amend 28 U.S.C. section 1331 to eliminate the requirement that there be at least $10,000 in controversy, and thus provide federal court jurisdiction over all civil cases raising "federal questions" regardless of the monetary amount involved.

The Department of Justice has in the past supported removal of the "amount in controversy" requirement in cases alleging unconstitutional action by federal agents. The Administrative Conference of the United States has recommended the somewhat broader approach of eliminating the requirement with respect to cases in which the plaintiff alleges that he has been injured or threatened with injury by an officer or employee of the United States, or an agency thereof, "acting under color of Federal law." Conference Recommendation 68–7. Virtually all of the additional ground covered by the Conference proposal would be encompassed by existing law if section 10 of the APA, 5 U.S.C. §§ 701–03, were established to be an independent grant of jurisdiction. This is presently the law of the District of Columbia Circuit, *Pickus* v. *United States Board of Parole*, 507 F. 2d 1107 (D.C. Cir. 1974), though it is not universally accepted. Moreover, the jurisdictional amount requirement can be avoided if suit can be cast in the form of an action "in the nature of mandamus," so as to qualify under the Mandamus and Venue Act of 1962, 28 U.S.C. § 1361. *See* Report of the Committee on Judicial Review of the Administrative Conference, 1 *ACUS Reports* 170, 176–77. When these means of avoiding the requirement are added to the fact that the existence of monetary damage in cases involving agency action is an erratic factor to begin with, not necessarily related to either the private or public importance of the issue involved, the "amount in controversy" provision of § 1331 is seen to have a very limited and virtually irrational application, at least as applied to judicial review of administrative action. The Department therefore supports the Administrative Conference recommendation.

The amendment contained in S. 800, however, would go beyond the Conference proposal, and would remove the "amount in controversy" requirement not merely in suits for review of federal agency action but in all federal question cases. We do not know the volume and the character of cases which this further extension would add to federal court dockets. The Administrative Conference Committee report of course did not address the point, and we know of no other study which does. It is conceivable that the small volume of such cases, or their relatively high importance, renders the extension unobjectionable. If the Subcommittee has reliable information on the point, we will be pleased to examine it and provide our further views. Absent such data, however, we think it advisable to adhere to the carefully considered Administrative Conference recommendation, which would limit section 2 to the important category of suits seeking review of agency action.

### SECTION 3—VENUE

Section 3 of S. 800 would amend 28 U.S.C. § 1391(e) to permit additional persons to be joined as parties in actions against the United

JA546

States, its agencies, officers or employees, "without regard to other venue requirements." Presently, 28 U.S.C. § 1391(e), which grants venue not merely in the defendant's district but in the plaintiff's district, whether the cause of action arose or where real property which it involves is situated, applies to a civil action in which "each defendant" is an officer or employee of the United States or any agency thereof. The amendment proposed would make the presence of a single federal defendant sufficient.

While the question must be regarded as still open, the limitation on joinder set forth in § 1391(e) has been held by some courts to apply only to those individuals as to whom that section itself is the sole basis of venue. That is, additional defendants may be joined so long as an independent basis of venue with respect to them exists. *See National Resources Defense Council, Inc. v. Tennessee Valley Authority,* 459 F. 2d 255, 257 n. 3 (2d Cir. 1972). If the effect of the present proposal were merely to codify this interpretation of § 1391(e), the Department would support it. However, the amendment as written goes much further. It would permit any plaintiff to obtain venue against any private defendant by simply joining as a party to the action a federal official over whom venue may be obtained under 28 U.S.C. § 1391(e). The Department sees no reason why the facilitation of suits against the Government should lead to the imposition of hardships against non-Government defendants which the ordinary venue rules are designed to avoid. *See Town of East Haven v. Eastern Airlines,* 282 F. Supp. 507, 510–11 (D. Conn. 1968). We may note, incidentally, that the portion of the Administrative Conference Committee report which was the origin of this proposal did not address the point we have here raised, and indeed in all except its last sentence discussed the problem as though the only issue were permitting the joinder of persons as to whom independent grounds of venue existed. *See 1 ACUS Reports* 431–32.

The Department's objection would be met if the final phrase of section 3, "without regard to other venue requirements," were replaced by: "and with such other venue requirements as would be applicable if the United States or one of its officers, employees or agencies were not a party."

For the reasons stated above, the Department of Justice recommends enactment of this legislation with the suggested amendments.

The Office of Management and Budget has advised that there is no objection to the submission of this report from the standpoint of the Administration's program.

Sincerely,

ANTONIN SCALIA,
*Assistant Attorney General, Office of Legal Counsel.*

○

JA547

# EXHIBIT 3

Calendar No. 941

| 94TH CONGRESS 2d Session | SENATE | REPORT No. 94-996 |
|---|---|---|

# JUDICIAL REVIEW OF AGENCY ACTION

## REPORT

OF THE

## SENATE COMMITTEE ON THE JUDICIARY

ON

## S. 800

PROCEDURE FOR JUDICIAL REVIEW OF CERTAIN ADMINISTRA-
TIVE AGENCY ACTION, AND FOR OTHER PURPOSES



JUNE 26 (legislative day, JUNE 18), 1976.—Ordered to be printed

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1976

57-010

## COMMITTEE ON THE JUDICIARY

### JAMES O. EASTLAND, Mississippi, *Chairman*

JOHN L. McCLELLAN, Arkansas
PHILIP A. HART, Michigan
EDWARD M. KENNEDY, Massachusetts
BIRCH BAYH, Indiana
QUENTIN N. BURDICK, North Dakota
ROBERT C. BYRD, West Virginia
JOHN V. TUNNEY, California
JAMES ABOUREZK, South Dakota

ROMAN L. HRUSKA, Nebraska
HIRAM L. FONG, Hawaii
HUGH SCOTT, Pennsylvania
STROM THURMOND, South Carolina
CHARLES McC. MATHIAS, JR., Maryland
WILLIAM L. SCOTT, Virginia

FRANCIS C. ROSENBERGER, *Chief Counsel and Staff Director*

### SUBCOMMITTEE ON ADMINISTRATIVE PRACTICE AND PROCEDURE

### EDWARD M. KENNEDY, Massachusetts, *Chairman*

PHILIP A. HART, Michigan
BIRCH BAYH, Indiana
QUENTIN N. BURDICK, North Dakota
JOHN V. TUNNEY, California

STROM THURMOND, South Carolina
CHARLES McC. MATHIAS, JR., Maryland
HUGH SCOTT, Pennsylvania

THOMAS M. SUSMAN, *Chief Counsel*
WILLIAM A. COATES, *Minority Counsel*

(II)

JA550

| 94TH CONGRESS<br>2d Session | SENATE | REPORT<br>No. 94-996 |
|---|---|---|

## JUDICIAL REVIEW OF AGENCY ACTION

---

JUNE 26 (legislative day, JUNE 18, 1976.—Ordered to be printed

---

Mr. Kennedy, from the Committee on Judiciary, submitted the
following

## REPORT

[To accompany S. 800]

The Committee on the Judiciary, to which was referred the bill
S. 800, to amend chapter 7 of title 5, United States Code, with respect
to procedure for judicial review of certain administrative agency
action, and for other purposes, having considered the same, reports
favorably thereon with amendments, and recommends that the bill as
amended do pass.

### AMENDMENTS

The committee has amended the bill, as follows:

On page 2, line 8, strike the period and insert a comma and the
following:

"provided, the any mandatory or injunctive decree shall
specify the Federal officer or officers (by name or by title),
and their successors in office, personally responsible for com-
pliance."

On page 2, delete line 12 and insert in lieu thereof the following:

"other statute that grants consent to suit expressly or im-
pliedly".

On page 2, line 22, delete the word "of" and insert in lieu thereof
the word "or".

On page 3, strike lines 4 through 13, and the caption appearing
between lines 13 and 14, and add in lieu thereof the following:

Sec. 2. Section 1331(a) of title 28, United States Code, is
amended by striking the final period and inserting a comma
and adding thereafter the following:
"except that no such sum or value shall be required in any
such action brought against the United States, any agency
thereof, or any officer or employee thereof in his official
capacity.".

(1)

JA551

2

On page 4, delete line 5 and insert in lieu thereof the following:

"cedures and with such other venue requirements as would be applicable if the United States or one of its officers, employees, or agencies were not a party."

These amendments, which are consistent with recommendations of the Department of Justice, are explained below in the Discussion section of this report.

### PURPOSE AND SUMMARY

The purpose of S. 800 is to remove three technical barriers to consideration on the merits of a citizen's complaint against the Federal Government, its agencies or employees.

First, S. 800 would eliminate the defense of sovereign immunity in Federal court actions for specific relief claiming unlawful action by a Federal agency, officer, or employee.

Second, S. 800 would eliminate the required minimum $10,000 jurisdictional amount-in-controversy in a narrow category of Federal question cases brought in United States district courts.

Finally, S. 800 would remedy certain technical problems in the law concerning the naming of the United States, its agencies, or employees as parties defendant in actions challenging Federal administrative action.

Section 1 would amend section 702 of title 5, United States Code, to eliminate the defense of sovereign immunity with respect to any action in a court of the United States seeking relief other than money damages and based on the assertion of unlawful official action by a Federal officer or employee. The amendment would not affect other limitations on judicial review—such as that plaintiff lacks standing to challenge the agency action, that the action is not ripe for review, or that the action is committed to unreviewable agency discretion. Nor would the amendment confer authority to grant relief where another statute provides a form of relief which is expressly or impliedly exclusive. Section 1 would also amend section 703 of title 5, United States Code, to permit the plaintiff in actions for nonstatutory review of administrative action to name the United States, the agency, or the appropriate officer as defendant. This is intended to eliminate technical problems arising from a plaintiff's failure to name the proper Government officer as a defendant.

Section 2 would amend section 1331(a), of title 28, United States Code, the general "Federal question" provision, to eliminate the requirement that there be at least $10,000 in controversy where the jurisdiction of the United States district court is invoked on the ground that the matter arises under Federal law and the suit is against the United States, any agency thereof, or any officer or employee thereof in his official capacity. This would eliminate an obstacle to judicial review in situations where the right asserted cannot be valued in dollars and cents.

Section 3 would amend section 1391(e) of title 28, United States Code, the section governing venue of actions against Federal officers and agencies. The amendment allows a plaintiff to utilize that section's broad venue and extra-territorial service of process in actions against Federal defendants, despite the presence in the suit of a non-Federal defendant.

JA552

3

## BACKGROUND OF THE BILL

S. 800 would implement Recommendations 68–7, 69–1, and 70–1 of the Administrative Conference of the United States.[1] The bill is also supported by a wide range of organizations and agencies, including the American Bar Association,[2] the Federal Bar Association,[3] the Environmental Defense Fund,[4] the Judicial Conference of the United States,[5] and the Department of Justice.[6]

A previous version of the bill was introduced as S. 3568 by Senator Edward Kennedy during the 91st Congress. Hearings were held on this bill on June 3, 1970;[7] six witnesses representing the Administrative Conference of the United States, the American Bar Association, and the Department of Justice were heard. The bill was reported favorably by the subcommittee, but no action was taken by the committee.

S. 800 was introduced by Senator Kennedy for himself and Senator Charles McC. Mathias on February 22, 1975.[8] Hearings were held on S. 800 and related bills by the Subcommittee on Administrative Practice and Procedure on April 28 and May 3, 1976.[9] A number of witnesses were heard on the legislation, and the Department of Justice subsequently submitted detailed views on S. 800.[10]

## DISCUSSION

### A. SOVEREIGN IMMUNITY

#### 1. Need for reform

The doctrine of sovereign immunity probably descended from the tenet of medieval English law that the "King can do no wrong." Yet even today, 200 years after the American revolution, the doctrine stands as a barrier to the redress of just grievances against the United States Government. To the extent that this obsolete immunity doctrine prevents the orderly, rational review of actions of Federal officers, it is inconsistent with the principles of accountable and responsive Government.

Congress has made great strides toward establishing monetary liability on the part of the Government for wrongs committed against its citizens by passing the Tucker Act of 1875, 28 U.S.C. sections 1346, 1491, and the Federal Tort Claims Act of 1946, 28 U.S.C. section

[1] See exhibit A, below, for text of the Conference recommendations.
[2] See statements of William Warfield Ross, Esq. and Francis M. Gregory, Jr., Esq., American Bar Association, in Hearings before the Subcommittee on Administrative Practice and Procedure on "Bills to Amend the Administrative Procedure Act," April 28, May 3, 1976, 94th Cong., 2d sess. (1976) (hereinafter cited as "1976 Hearings").
[3] See statement of Donald A. Rago, Esq., Federal Bar Association, 1976 Hearings.
[4] See statement of Jacqueline Warren, Esq., Environmental Defense Fund, 1976 Hearings.
[5] See letter from William E. Foley, Deputy Director, Administrative Office of the United States Courts, Nov. 3, 1970, exhibit B, below (hereinafter cited as "Foley letter"), supporting earlier version of bill, S. 3538.
[6] See letter from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel, May 10, 1976, exhibit C, below (hereinafter cited as "Scalia letter").
[7] Hearings before the Subcommittee on Administrative Practice and Procedure, Senate Committee on the Judiciary, on "Sovereign Immunity," June 3, 1970, 91st Cong., 2d sess. (1970) (hereinafter cited as "1970 Hearings").
   The bill was reintroduced by Senator Kennedy in the 92d Congress as S. 598, and section 1 was incorporated in title III of S. 1421, introduced by Senator Kennedy in the 93d Congress. No action was taken on these measures.
[8] 121 Cong. Rec. 2416 (daily ed.). Section 1 of S. 800 is also embodied in S. 2407, introduced by Senator Dale Bumpers on September 24, 1975.
[9] 1976 Hearings.
[10] Scalia letter, exhibit C, below.

4

1346(b).[11] S. 800 would strengthen this accountability by withdrawing the defense of sovereign immunity in actions seeking relief other than money damages, such as an injunction, declaratory judgment, or writ of mandamus. Since S. 800 would be limited only to actions of this type for specific relief, the recovery of money damages contained in the Federal Tort Claims Act and the Tucker Act governing contract actions would be unaffected.

It is now generally accepted that courts can make a useful contribution to the administration of Government by reviewing the legality of official conduct which adversely affects private persons. This acceptance of judicial review is reflected not only in court decisions but in the many statutes in which Congress has provided a special procedure for reviewing particular administrative activity. For years almost every regulatory statute enacted by Congress has contained provisions authorizing Federal courts to review the legality of administrative action that has adversely affected private citizens.

Unfortunately, these special statutes do not cover many of the functions performed by the older executive departments, such as the Departments of State, Defense, Treasury, Justice, Interior, and Agriculture. In addition, there are omissions and gaps in the application of special review statutes. In these instances, judicial review is available, if at all, through so-called "nonstatutory review" actions in United States district courts.

These actions usually take the form of a suit for injunctive, declaratory or mandamus relief against a named Federal officer on the theory he is exceeding his legal authority. That such actions are against the officer and not against the Government for whom he is acting is a legal fiction developed by the courts to mitigate the injustice caused by strict application of the sovereign immunity doctrine. As Richard K. Berg, executive secretary of the Administration Conference of the United States noted:

> * * * if this fiction were logical, easy to apply and did substantial justice, perhaps there would be no problem. But it does not. On the contrary, it has set lawyers and courts to chasing conceptual will-o'-the-wisps.[12]

Thus, judges who are not familiar with the history of the fiction and its purpose attempt to make determinations whether the suit is actually directed at the Government rather than the named defendant. This practice in turn raises a number of complex questions involving the relationship between the official and his employer—the Government. If it is found that the Government is the actual defendant, and

---

[11] At the state level, the trend has also been toward the reduction or elimination of the sovereign immunity defense. For example, 21 states and the District of Columbia have by judicial decision overturned, in varying degrees, the sovereign immunity defense to tort actions. (Alaska, Arizona, Arkansas, California, Colorado, Florida, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Michigan, Minnesota, Nebraska, Nevada, New Jersey, Pennsylvania, Rhode Island, West Virginia, and Wisconsin.) Approximately ten other states (Connecticut, Delaware, North Dakota, Ohio, Oregon, Pennsylvania, South Carolina, South Dakota, Washington and Wyoming) have constitutional provisions which enable the legislature to prescribe the manner and venue in which a suit against the sovereign may be brought. The jurisdictions of Iowa, New York, Oregon, and Utah have ended by statute the sovereign immunity defense to tort actions. Furthermore, the state of Montana has completely abrogated the doctrine by constitutional amendment. For further discussion, see Hjort. *The Passing of Sovereign Immunity in Montana; The King is Dead!* 34 Montana L. Rev. 283 (1973) ; Comment, *To Catch the Elusive Conscience of the King: The Status of the Doctrine of Sovereign Immunity in Alabama,* 26 Alabama L. Rev. 463 (1974).
[12] 1976 Hearings, testimony of Richard K. Berg.

5

there is no specific statute authorizing judicial review, the suit is dismissed on the basis of sovereign immunity.

Dean Roger Cramton of Cornell Law School, a former chairman of the Administrative Conference and Assistant Attorney General and a leading scholar on sovereign immunity, has described the effect of these wispy fictions on the judicial process:

> The basic problem with the sovereign immunity doctrine is that it has developed by fits and starts through a series of fictions. The resulting patchwork is an intricate, complex and not altogether logical body of law. The basic issue—balancing the public interest in preventing undue judicial interference with ongoing governmental programs against the desire to provide judicial review to individuals claiming that Government has harmed or threatens to harm them—is obscured rather than assisted by the doctrine of sovereign immunity in its present form.[13]

Representing the Department of Justice, which supports S. 800, Assistant Attorney General Antonin Scalia wrote:

> No one can read the significant Supreme Court cases on sovereign immunity, from *United States* v. *Lee*, 106 U.S. 196 (1882) to *Malone* v. *Bowdoin*, 369 U.S. 643 (1962), *Dugan* v. *Rank*, 372 U.S. 609 (1963) and *Hawaii* v. *Gordon*, 373 U.S. 57 (1963) (per curiam), without concluding that the field is a mass of confusion; and if he ventures beyond that to attempt some reconciliation of the courts of appeals decisions, he will find confusion compounded. Accepting the elimination of the doctrine of sovereign immunity is not, then, a case of exchanging the certain for the uncertain, or the known for the unknown.[14]

The doctrinal confusion caused by sovereign immunity has been highlighted in recent courts of appeals decisions. In *Schlafly* v. *Volpe*, 495 F.2d 273 (7th Cir. 1974), the court described sovereign immunity as:

> one of the more ill-defined aspects of federal jurisdiction. Perhaps the only irrefutable statement that can be made regarding this doctrine is that it appears to offer something for everyone.[15]

The court then reviewed the leading Supreme Court cases and pertinent courts of appeals decisions in reversing in part a district court dismissal of a suit challenging the legality of suspended Federal highway funding. The court held that the Federal Government had waived sovereign immunity and, in any event, the ultra vires exception to the doctrine rendered it inapplicable.

Writing of the doctrine's exceptions, the *Schlafly* court noted:

> In anticipation of the government's cry that the sovereign cannot be sued without consent, complaints are drawn with

---

[13] Report of the Committee on Judicial Review of the Administrative Conference of the United States, 1 *Recommendations and Reports of the Administrative Conference* 191, 194 (1969) (hereinafter cited as "ACUS Reports").
[14] Scalia letter, exhibit C, below.
[15] 495 F.2d at p. 277.

6

a covetous eye on the doctrine's 'exceptions,' only to be confronted with assertions that the facts present an 'exception to the exception,' or 'qualify' the exceptions, or that entertainment of the plaintiff's claim would create an 'intolerable burden on governmental functions, requiring use of the doctrine despite its otherwise applicable exceptions.'[16]

In *Littell* v. *Morton*, 445 F.2d 1207 (1971), the Court of Appeals for the Fourth Circuit reversed a district court dismissal of a suit on sovereign immunity grounds. The suit by an attorney for an Indian tribe sought review of the Secretary of the Interior's action in disallowing his claim for compensation for services. The court's opinion frankly recognized the problems in applying sovereign immunity:

> It must be recognized at the outset that an effort to establish logical consistency in the decisions dealing with sovereign immunity is bound to be frustrating. The authorities are not reconcilable, and there are conceptual conflicts in the various holdings with which an intermediate appellate court must grapple. Our task is magnified because we have been unable to find any case in which the Supreme Court has sought to reconcile the notion of sovereign immunity with the fundamental concept of the APA that a person adversely affected by administrative action is presumptively entitled to judicial review of its correctness.[17]

As Judge MacKinnon noted in *Knox Hill Tenants Council* v. *Washington*, 448 F.2d 1045 (D.C. Cir. 1971):

> The result of course is a condition of hopeless confusion in judicial opinions, and an invitation to Government attorneys to assert the applicability of the doctrine whenever the opportunity reasonably presents itself. A federal trial court is faced with a thankless task whenever it is called upon to decide whether the doctrine is applicable in a particular case.[18]

The doctrinal confusion is such that the courts are divided on the fundamental question of whether or not sovereign immunity bars actions for equitable relief. For example, in *American Federation of Government Employees, Local 1858* v. *Callaway*, 398 F. Supp. 176 (N.D. Ala. 1975), the court said:

> It is a well-recognized principle that the doctrine of sovereign immunity bars suits against government agencies or officials for monetary damages, but does not bar suits for injunctive or declaratory relief.[19]

On the other hand, in *Penn* v. *Schlesinger*, 490 F.2d 700 (5th Cir. 1974), the court held that:

> A declaratory judgment (against the sovereign), if equivalent to a claim for injunctive relief, would be * * * barred by the doctrine of sovereign immunity.[20]

---

[16] 495 F.2d at p. 277 (citations omitted).
[17] 445 F.2d at pp. 1211–12.
[18] 448 F.2d at p. 1059.
[19] 398 F. Supp. at p. 191.
[20] 490 F.2d at p. 704.

JA556

7

One area where misunderstanding of the sovereign immunity doctrine has perpetuated considerable confusion and injustice is that of employment discrimination or discharge suits against Federal officers. Reviewing these cases, one commentator noted that:

> Several federal courts of appeals, covering states where federal employment discrimination is greatest, have held that sovereign immunity prevented them from banning employment discrimination by federal officials, thus ignoring or misapplying the recognized exception to the doctrine of ultra vires or unconstitutional action by Federal officers.[21]

The consensus in the administrative law community among scholars and practitioners is strong with regard to the elimination of sovereign immunity.[22] Professor Cramton summarizes it well when he notes that "the application of the doctrine of sovereign immunity to actions challenging the legality of Federal conduct is totally erratic, haphazard, unpredictable, unfair, inconsistent, and, in some situations, unjust." [23] To Professor Kenneth Culp Davis, enactment of S. 800 is "urgent" in order to remove "the unnecessary injustice caused by sovereign immunity." [24]

The application of sovereign immunity is so illogical that one cannot predict in what case the injustice is likely to occur. More probably than not, an average person with a less experienced attorney will be thrown out of court by the sovereign immunity doctrine while the wealthy corporation with expensive, experienced counsel will be able to sidestep the doctrine. The fact remains that the injustice of sovereign immunity may occur in any case, with respect to any form of government conduct, unless there is a specific statute allowing judicial review.

Perhaps the only situation under recent case law, other than suits for damages where it was fairly predictable—and intended by Congress—that a court would uphold a claim of sovereign immunity, involved disputed title to real property.[25] The results in these cases were so obviously unjust that in 1972 Congress enacted legislation to permit

[21] Abernathy, *Sovereign Immunity in a Constitutional Government: The Federal Employment Discrimination Cases*, 10 Howard Civ. Rights-Civ. Lib. L. Rev., pp. 322, 326–27, 367 (1975). See also *Bramblett* v. *Desobry*, 490 F.2d 405 (6th Cir. 1974) (suit by discharged employee of non-appropriated fund activity against commanding officer, alleging "arbitrary," "capricious," and "unconstitutional" action, dismissed because "the United States, as sovereign, is immune").
[22] See e.g., K. C. Davis, Administrative Law Treatise ch. 27 (1958, Supp. 1965) ; Cramton, *Nonstatutory Review of Federal Administrative Action: The Need for Statutory Reform of Sovereign Imunity, Subject Matter Jurisdiction, and Parties Defendant*, 68 Mich. L.Rev. 389 (1970) ; Scalia, *Sovereign Immunity and Nonstatutory Review of Federal Administrative Action: Some Conclusions from the Public-Lands Cases*, 68 Mich.L.Rev. 867 (1970) ; Currie, *The Federal Courts and the American Law Institute* (pt. II), 36 U.Chi.L. Rev. 268 (1969) ; Byse, *Proposed Reforms in Federal "Nonstatutory" Judicial Review: Sovereign Immunity, Indispensable Parties, Mandamus*, 75 Harv.L.Rev. 1479 (1962) ; Carrow, *Sovereign Immunity in Administrative Law—A New Diagnosis*, 9 J.Pub.L. 1 (1960) ; Abernathy, *Sovereign Immunity in a Constitutional Government: The Federal Employment Discrimination Cases*, 10 Harvard Civ. Rights–Civ. Lib.L.Rev. 322 (1975).
[23] 1970 Hearings at p. 46.
[24] Letter from Kenneth Culp Davis, to Senator Edward M. Kennedy, Apr. 12, 1976, 1976 Hearings (hereinafter cited as "Davis letter").
[25] See *Malone* v. *Bowdoin*, 369 U.S. 643 (1962) ; *Gardner* v. *Harris*, 391 F.2d 885 (5th Cir. 1968).

actions to quiet title to be brought against the United States. 28 U.S.C. sections 1346(f), 1402(d), 2409(a).[26]

Just as there is little reason why the United States as a landowner should be treated any differently from other landowners in an action to quiet title, so too has the time now come to eliminate the sovereign immunity defense in all equitable actions for specific relief against a Federal agency or officer acting in an official capacity.

The importance of ameliorating the effect of the sovereign immunity doctrine in other areas besides quiet title actions is emphasized by the number and variety of cases in which the defense is still raised. The doctrine has been invoked in hundreds of cases each year concerning agricultural regulations, governmental employment, tax investigations, postal-rate matters, administration of labor legislation, control of subversive activities, food and drug regulation, and administration of Federal grant-in-aid programs.[27]

In each instance, the sovereign immunity doctrine distracts the court's attention from the basic issue concerning the availability or scope of judicial review and diverts it toward sophistry and semantics. Sovereign immunity beclouds the real issue whether a particular governmental activity should be subject to judicial review, and, if so, what form of relief is appropriate. Its elimination as proposed in S. 800, in the words of Richard K. Berg, executive secretary, Administrative Conference, "would be a major step in rationalizing the law of judicial review of agency action. It might not change many outcomes, but it would force the courts to ask and to answer the right questions."[28] Where S. 800 would change the outcome of a suit, the committee believes that the result would be justified. For, as Senator Kennedy observed:

> A review of the cases—as confused as they are—reveals one certain conclusion: Where sovereign immunity has been held to be a bar to suit, and where no other defenses * * * would have been applicable, unjust or irrational decisions have resulted.[29]

The committee does not believe that the partial elimination of sovereign immunity, as a barrier to nonstatutory review of Federal administrative action, will create undue interference with administrative action. Rather, it will be a safety-valve to ensure greater fairness and accountability in the administrative machinery of the Government.

---

[26] The Senate Committee on Interior and Insular Affairs commented on the sovereign immunity doctrine in its report on this legislation:

Because of the common law doctrine of "sovereign immunity," the United States cannot now be sued in a land title action without giving its express consent. Grave inequity often has resulted to private citizens who are thereby excluded, without benefit of a recourse to the courts, from lands they have reason to believe are rightfully theirs. * * * (T)he committee believes this principle is not appropriate where the courts are established, not for the convenience of the sovereign, but to serve the people.
S. Rept. 92–575, 92d Cong., 1st sess., at p. 1.
[27] See 1970 Hearings; authorities cited at note 22, supra.
[28] 1976 Hearings, testimony of Richard K. Berg.
[29] 1970 Hearings at p. 3

9

Other methods found in the substantial and growing body of law governing availability, timing, and scope of judicial review provide a much more rational basis for controlling unnecessary judicial interference in administrative decisions than does the defense of sovereign immunity. Thus, a case is unreviewable if it involves actions "committed to agency discretion by law." Other defenses include (1) statutory preclusion; (2) lack of ripeness; (3) failure to exhaust administrative remedies; and (4) lack of standing. The availability of these defenses—all of which provide a sounder substantive basis to control court review on the merits than the confusing doctrine of sovereign immunity—indicates that the policy against indiscriminate judicial interference with Government action would not be abandoned by eliminating the defense of sovereign immunity.

The committee is also convinced that modification of sovereign immunity will not overwhelm Federal courts and government lawyers with a flood of litigation. Apparently, the Judicial Conference of the United States shares this view, since it has endorsed identical legislation in the past.[30]

The application of sovereign immunity is so unpredictable in the present state of the law that it seldom deters the bringing of a suit though it may affect the result or induce an error which requires correction at the appellate level. Rather, the usual economic costs of bringing suit and the defenses cited above will operate to prevent inundation of the courts.[31]

More positively, any increase in litigation on the merits is likely to be offset by a decrease in litigation on the question of sovereign immunity. At present, sovereign immunity depletes rather than saves judicial resources by raising an additional, complex issue which requires considerable judicial time and effort to resolve or circumvent. When the issue is the basis of decision in the first instance, it invites appeals and further litigation on the matter.[32]

The elimination of the vexing and difficult preliminary question of sovereign immunity in a large number of cases would probably provide a net savings of time and money to the Federal Government even if a few more cases did proceed to a determination on the merits of the legality of Federal administrative action.

Wholly apart, however, from a possible, slight increase in caseload, the time has finally come when the injustice and inconsistency resulting from the unpredictable application of the sovereign immunity doctrine should be remedied.

For as Government programs grow, and agency activities continue to pervade every aspect of life, judicial review of the administrative actions of Government officials becomes more and more important. Only if citizens are provided with access to judicial remedies against Government officials and agencies will we realize a government truly under law. The enactment of section one of S. 800—the partial elimination of the sovereign immunity defense in actions for equitable relief—is an important step toward this goal.

---

[30] Foley letter, exhibit B, below.
[31] See 1976 Hearings, testimony of Ralph Nader, Public Citizen, Inc.
[32] See 1970 Hearings at p. 54.

JA559

USCA Case #25-5333     Document #2156180          Filed: 01/27/2026        Page 50 of 405

ase 1:25-cv-01982-RJL     Document 77-3     Filed 07/18/25     Page 13 of ?

10

### 2. Amendment of 5 U.S.C. Section 702

The portion of S. 800 that modifies the doctrine of sovereign immunity adds three new sentences to the existing language of 5 U.S.C. section 702, which deals with the right to judicial review of Federal administrative action.[33]

#### a. Partial Elimination of Sovereign Immunity

The first of the additional sentences provides that claims challenging official action or nonaction, and seeking relief other than money damages, should not be barred by sovereign immunity. The explicit exclusion of monetary relief makes it clear that sovereign immunity is abolished only in actions for specific relief (injunction, declaratory judgment, mandatory relief, etc.) Thus, limitations on the recovery of money damages contained in the Federal Tort Claims Act, the Tucker Act, or similar statutes are unaffected. The consent to suit is also limited to claims in courts of the United States; hence, the United States remains immune from suit in state courts.

Since the amendment is to be added to 5 U.S.C. section 702, it will be applicable only to functions falling within the definition of "agency" in 5 U.S.C. section 701. Section 701(b)(1) defines "agency" very broadly as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency" except for a list of exempt agencies or functions: Congress, Federal courts, governments of territories or of the District of Columbia, mediation boards, courts-martial and certain other military, wartime and emergency functions.

The proposed amendment will also not affect the operation of the rule that review is not available "to the extent that * * * statutes preclude review * * * or * * * agency action is committed to agency discretion by law." 5 U.S.C. section 701(a). The case law concerning these two categories of review is thus untouched by the proposed amendment. The amendment *would* apply to bar the assertion of sovereign immunity and force the court to articulate the true rationale for a decision not to grant relief.

---

[33] Some Federal courts of appeals have held that 5 U.S.C. section 702 (1970) ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.") constitutes a general waiver of sovereign immunity in actions seeking judicial review of Federal administrative action. *See, e.g., Kingsbrook Jewish Medical Center v. Richardson*, 486 F.2d 663, 668 (2d Cir. 1973) ; *Scanwell Laboratories v. Shaffer*, 424 F.2d 859, 874 (D.C. Cir. 1970) ; *Estrada v. Ahrens*, 296 F.2d 690 (5th Cir. 1961). *But cf. Colson v. Hickel*, 428 F.2d 1046 (5th Cir. 1970). In clear conflict, however, five other circuits have held that the APA does not constitute a waiver of sovereign immunity. *See Cyrus v. United States*, 226 F.2d 416 (1st Cir. 1955) ; *Littell v. Morton*, 445 F.2d 1207 (4th Cir. 1971) ; *Twin Cities Chippewa Tribal Council v. Minnesota Chippewa Tribe*, 370 F.2d 529, 532 (8th Cir. 1967) ; *State of Washington v. Udall*, 417 F.2d 1310 (9th Cir. 1969) ; *Motah v. United States*, 402 F.2d 1 (10th Cir. 1968). The Supreme Court has yet to resolve the circuit conflict regarding the impact of section 702 of the APA on the sovereign immunity doctrine. For general discussion, see *Littell v. Morton*, 445 F.2d 1207, 1212 (4th Cir. 1971) ; *Schlafly v. Volpe*, 495 F.2d 273, 280–82 (7th Cir. 1974).

On this problem Professor Davis notes that:

"As a matter of history, Congress clearly did not intend the APA to waive sovereign immunity. But judges of federal courts of appeals have such a strong sense of justice that five courts of appeals have held that the APA constitutes a waiver of sovereign immunity. I can imagine that all the judges who have so held are somewhat uncomfortable in so holding, but their choice is between treating plaintiffs unjustly or straining the historical materials. Congress should relieve our good judges from such an unnecessary dilemma.

". . . The case law as a whole is somewhat complex and confused. Congress should simplify and clarify it by amending the APA in accordance with the [sovereign immunity] proposal of the Administrative Conference and the American Bar Association." Davis letter, 1976 Hearings.

### b. Effect on the United States

Actions challenging official conduct are intrinsically against the United States and are now treated as such for all practical purposes. Thus, for example, the defense of Federal administrative action is conducted by the Department of Justice or, in some cases, by agency counsel. The second new sentence of section 702 allows the plaintiff to name the United States as a defendant in such actions and permits the entering of a decree against the United States.

At the request of the Department of Justice, the provision has been amended to provide that any mandatory or injunctive decree shall specify the Federal officer or officers by name or title and their successors in office, personally responsible for compliance. The purpose of this amendment is to assure clear definition of the particular individuals who will be personally responsible for compliance with the court decree.

### c. Law Other Than Sovereign Immunity Unchanged

S. 800 is not intended to affect or change defenses other than sovereign immunity. All other than the law of sovereign immunity remain unchanged. This intent is made clear by clause (1) of the third new sentence added to section 702:

> Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground.

These grounds include, but are not limited to, the following: (1) extraordinary relief should not be granted because of the hardship to the defendant or to the public ("balancing the equities") or because the plaintiff has an adequate remedy at law; (2) action committed to agency discretion; (3) express or implied preclusion of judicial review; (4) standing; (5) ripeness; (6) failure to exhaust administrative remedies; and (7) an exclusive alternative remedy.

Special doctrines favoring the United States as a litigant, such as the inapplicability of statutes of limitations to claims asserted by the United States, are unaffected. Statutory or rule provisions denying authority for injunctive relief (*e.g.*, the Anti-Injunction Act, 26 U.S.C. section 7421, and 28 U.S.C. section 2201, prohibiting injunctive and declaratory relief against collection of federal taxes) and other matters (*e.g.*, Rule 13(d), dealing with counterclaims against the United States) also remain unchanged. It should be noted in particular that 5 U.S.C. section 701(a) is unchanged and remains applicable.

### d. Where Congress Has Provided an Exclusive Remedy

Likewise, the amendment to 5 U.S.C. section 702 is not intended to permit suit in circumstances where statutes forbid or limit the relief sought. Clause (2) of the third new sentence added to section 702 contains a second proviso concerned with situations in which Congress has consented to suit and the remedy provided is intended

JA561

to be the exclusive remedy. For example, in the Court of Claims Act,[34] Congress created a damage remedy for contract claims with jurisdiction limited to the Court of Claims except in suits for less than $10,000. The measure is intended to foreclose specific performance of government contracts. In the terms of the proviso, a statute granting consent to suit, *i.e.*, the Tucker Act, "impliedly forbids" relief other than the remedy provided by the Act. Thus, the partial abolition of sovereign immunity brought about by this bill does not change existing limitations on specific relief, if any, derived from statutes dealing with such matters as government contracts, as well as patent infringement, tort claims, and tax claims.[35]

The language of clause (2) of the proviso directs attention to particular statutes and the decisions interpreting them. If a statute "grants consent to suit" with respect to a particular subject matter, specific relief may be obtained only if Congress has not intended that provision for relief to be exclusive.

Clause (2) of the proviso does not withdraw specific relief in any situation in which it is now available. It merely provides that new authority to grant specific relief is not conferred when Congress has dealt in particularity with a claim and intended a specified remedy to be the exclusive remedy.

Clause (2) of the proviso, at the request of the Department of Justice,[36] has been amended to read as follows:

Nothing herein * * * (2) confers authority to grant relief if any other statute that grants consent to suit [for money damages] *expressly or impliedly* forbids the relief which is sought. (Emphasis added.)

This language makes clear that the committee's intent to preclude other remedies will be followed with respect to all statutes which grant consent to suit and prescribe particular remedies. The proviso as amended also emphasizes that the requisite intent can be implied as well as expressed.

### B. JURISDICTIONAL AMOUNT

#### 1. Need for Reform

An anomaly in Federal jurisdiction prevents an otherwise competent United States district court from hearing certain cases seeking "nonstatutory" review of Federal administrative action, absent the jurisdictional amount in controversy required by 28 U.S.C. section 1331, the general "Federal question" provision. These cases "arise under" the Federal Constitution or Federal statutes, and the committee believes they are appropriate matters for the exercise of Federal judicial power regardless of the monetary amount involved.

The chief congressional purpose behind the amount-in-controversy requirement was to reduce case congestion in the Federal courts by

---

[34] February 24, 1855, 10 Stat. 612.
[35] *See, e.g.,* The Anti-Injunction Act, 26 U.S.C. section 7421, prohibiting suit "for the purpose of restricting the assessment or collection of any tax * * *" *Cf. Bob Jones University v. Simon, et al.,* 416 U.S. 725 (1974) (action to enjoin revocation of letter ruling declaring qualification for tax-exempt status held to be within and barred by the Act).
[36] *See* Scalia letter, exhibit C, below.

13

setting a figure "not so high as to convert the Federal courts into courts of big business nor so low as to fritter away their time in the trial of petty controversies." [37]

Yet Congress has substantially lessened the importance of the amount-in-controversy requirement with respect to section 1331 by passing many statutes that confer Federal question jurisdiction without such a requirement. In *Lynch* v. *Household Finance Corp.*, 405 U.S. 538 (1972), the Court noted:

> A series of particular statutes grant jurisdiction without regard to the amount in controversy in virtually all areas that otherwise would fall under the general Federal question statute. Such special statutes cover: admiralty, maritime, and prize cases, 28 U.S.C. section 1333; bankruptcy matters and proceedings, 28 U.S.C. section 1334; review of orders of the Interstate Commerce Commission, 28 U.S.C. section 1336; cases arising under any Act of Congress regulating commerce, 28 U.S.C. section 1337; patent, copyright, and trademark cases, 28 U.S.C. section 1338; postal matters, 28 U.S.C. section 1339; internal revenue and custom duties actions, 28 U.S.C. section 1340; election disputes, 28 U.S.C. section 1344; cases in which the United States is a party, 28 U.S.C. sections 1345, 1346, 1347, 1348, 1349, 1358, and 1361; certain tort actions by aliens, 28 U.S.C. section 1350; actions on bonds executed under Federal law, 28 U.S.C. section 1352; cases involving Indian allotments, 28 U.S.C. section 1353; and injuries under Federal law, 28 U.S.C. section 1357. [38]

On the other hand, there are a significant number of situations involving "nonstatutory" review in which a plaintiff must still ground his action on section 1331 and, therefore, must establish that "the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs." In some of these cases the jurisdictional amount requirement cannot be met because it is impossible to place a monetary value on the right asserted by the plaintiff. [39]

In other cases, the plaintiff's claim that he is entitled to a Federal grant or benefit such as Federal employment [40] or welfare [41] may be assigned a monetary value, but the amount in controversy may be $10,000 or less.

The resulting denial to litigants of a Federal forum for Federal claims considered incapable of dollars and cents valuation or too small in monetary amount and not permitted to be aggregated has been described as "an unfortunate gap in the statutory jurisdiction of the Federal courts." [42]

---

[37] S. Rept. 1830, 85th Cong., 2d sess., pp. 3099, 3101 (1958).

[38] 405 U.S. at p. 549.

[39] How can one value, for example, an individual's claim that he is entitled to remain free from continuous police surveillance, *Giancana* v. *Johnson*, 335 F.2d 366 (7th Cir. 1964), *cert. denied*, 379 U.S. 100 (1965), or military service, *Oestereich* v. *Selective Service System Local Board No. 11*, 393 U.S. 233 (1968), or to distribute political leaflets, *Goldsmith* v. *Sutherland*, 426 F.2d 1395 (6th Cir. 1970), *cert. denied*, 400 U.S. 960 (1970)? *See also* cases cited in Wright, Miller and Cooper, 13 Federal Practice and Procedure, section 3561 (1975).

[40] *See e.g.*, *Fischler* v. *McCarthy*, 177 F. Supp. 643 (S.D.N.Y. 1954), *aff'd on other grounds*, 218 F.2d 164 (2d Cir. 1954).

[41] *See, e.g.*, *Randall* v. *Goldmark*, 495 F.2d 356 (1st Cir. 1974), *cert. denied*, 419 U.S. 879 (1975).

[42] *Wolff* v. *Selective Service Local Board No. 16*, 372 F.2d 817, 826 (2d Cir. 1967).

JA563

14

## 2. Amendment to 28 U.S.C. 1331

Section 2 of S. 800 would end the requirement of 28 U.S.C. section 1331 that more than $10,000 be in controversy in order for a Federal court to have jurisdiction of a Federal question case brought against the United States, an agency thereof, or an officer or employee thereof in his official capacity.

As introduced, the bill would have eliminated the minimum jurisdictional amount for all Federal question cases, regardless of whether the defendant was a private party, a state official or agency, or the Federal Government. Some concern was voiced by members of the committee that this broad elimination of the jurisdictional amount may possibly result in an unforeseeable increase of the caseload of the Federal courts. The committee adopted an amendment to narrow the scope of the provision accordingly, so that—consistent with the overall objectives of the bill—no jurisdictional amount requirement will apply to cases against the Federal Government, a Federal agency, or any official or employee where the plaintiff alleges that the official or employee has acted in his official capacity or under color of law. The committee has concluded not that a broader elimination of the requirement is inappropriate or would result in any added workload for Federal courts, but simply that it was unnecessary to achieve the purposes of the bill.

Like section 1 of S. 800, however, the partial elimination of sovereign immunity, the grant of subject matter jurisdiction without a required jurisdictional amount would not affect other limitations on the availability or scope of judicial review of Federal questions, including, for example, lack of standing, ripeness, or exhaustion of administrative remedies.

The factors relevant to the question whether a Federal court should be available to a litigant seeking protection of a Federal right have little, if any, correlation with the minimum jurisdictional amount.

Thus, as Assistant Attorney General Scalia concluded:

> . . . the existence of monetary damages in cases involving agency action is an erratic factor to begin with, not necessarily related to either the private or public importance of the issue involved . . . the 'amount in controversy' provision of section 1331 is seen to have a very limited and virtually irrational application, at least as applied to judicial review of administrative action.[43]

Instead, the important considerations include whether there is need for a specialized Federal tribunal or whether there are defects in the state judicial system that might substantially impair consideration of the plaintiff's claim.[44] These factors have special force in cases in which specific relief is sought against a Federal officer because state courts generally are powerless to restrain or direct a Federal officer's action which is taken under color of Federal law.[45] The denial of a

---

[43] Scalia letter, exhibit C, below.
[44] See Wechsler, *Federal Jurisdiction and the Revision of the Judicial Code*, 13 Law and Contemp. Prob. 216, 225–26 (1948).
[45] See Arnold, *The Power of State Courts to Enjoin Federal Officers*, 73 Yale L.J. 1385 (1964).

Federal forum for lack of the jurisdictional amount may therefore
be a denial of any remedy whatsoever.[46] Justice clearly requires elimi-
nation of this deficiency.

### 3. Impact on Federal caseload

According to leading authorities, elimination of the amount-in-
controversy requirement in Federal question cases, even in strictly
private litigation, will have no measurable impact on the caseload of
the Federal courts.[47] S. 800, as amended, would only eliminate the
statutory requirement in suits against the United States, its agencies,
or officers or employees.

Presently, the jurisdictional amount requirement is applicable,
where aggrieved private persons are seeking nonstatutory review of
Federal administrative actions in suits brought against Federal officers
or agencies. This category provides the only significant instances in
which the jurisdictional amount requirement of 28 U.S.C. section 1331
is an effective limitation, either because the right cannot be valued or
it is worth less than $10,000 and there is no special statute applicable
without an amount-in-controversy provision.[48] Yet even in this situa-
tion, the limitation can be circumvented if the plaintiff brings his
action in the District of Columbia or if he can cast his action in the
form of a mandamus proceeding under 28 U.S.C. section 1361, the
Mandamus and Venue Act of 1962.

The resulting situation is hardly a logical or defensible one. In
1962 Congress, disturbed by the inability of litigants to obtain man-
damus relief in local courts distributed around the country, conferred
such jurisdiction on all district courts without regard to the amount
in controversy. The more traditional exercise of injunctive or declara-
tory authority, however, remains subject to the requirement of a
minimum jurisdictional amount whenever no special Federal question
statute is available—except in the District of Columbia. The same
arguments that supported the Mandamus and Venue Act of 1962—
the expense and inconvenience of forcing litigants from all over the
country to bring their claims to a District of Columbia court—support
the elimination of the remaining anachronism in injunction suits
against Federal officers: the jurisdictional amount in controversy.

The number of additional cases that will be brought in Federal
courts if section 1331 is amended to eliminate the jurisdictional
amount requirement is likely to be quite small. According to Profes-
sor Wright:

> There is no risk that ending the amount in controversy
> requirement for federal question cases would open the federal

---

[46] "In *Fox* v. *Hillside Realty Corp.*, 79 F.Supp. 832 (D.-N.Y. 1948), a federal action
challenging a rent increase allowed by federal officials was dismissed for lack of the
jurisdictional amount. A subsequent suit in state court was unsuccessful because the state
courts held that they lacked power to pass on the action of the federal officials. *Fox* v.
*34 Hillside Realty Corp.*, 87 N.Y.S.2d 351 (1949) *aff'd.*, 95 N.Y.S.2d 598, 276 App.Div.
994 (1950)." Wright, Miller and Cooper, 13 Federal Practice and Procedure, section 3561,
at p. 393, n. 21.

[47] *Id.*, C. Wright, Law of Federal Courts, p. 107 (2d ed. 1970) : 1970 Hearings at pp. 53-
54 Wright, Miller and Cooper, 13 Federal Practice and Procedure, section 3561 (1975).

[48] The amount-in-controversy requirement in this category of cases was reaffirmed in
dictum in *Lynch* v. *Household Finance Corp.* 405 U.S. 538, 547 (1972) ("in suits against
federal officials for alleged deprivations of constitutional rights, it is necessary to satisfy
the amount-in-controversy requirement for federal jurisdiction"). The significance of this
dictum, however, was recently questioned in Earnest, *supra* note 49, at pp: 561-62.

16

courts to unpredictable numbers of unknowable kinds of
cases. The terrain is well marked. The cases affected are
those in which federal action is challenged and in which
state action is challenged on grounds that do not come within
section 1343(3). These are important cases for which a fed-
eral forum is especially appropriate.[49]

Elimination of the amount in controversy is not likely in itself to
increase even the number of suits against Federal officers since some
courts are already adopting a very lax interpretation of the require-
ment in such cases.[50] But elimination of the requisite jurisdictional
amount will eliminate a technical barrier to judicial relief which many
courts are avoiding or circumventing altogether in order to avoid in-
justice.[51] Professor Davis noted in connection with the elimination of
the sovereign immunity defense in equitable actions, "Congress should
relieve our good judges from such an unnecessary dilemma."[52] It
should enact S. 800 and thus eliminate the jurisdictional amount-
in-controversy requirement in all Federal question cases where the suit
is against the United States, any agency thereof, or any officer or
employee thereof in his official capacity.

As with the partial elimination of the sovereign immunity defense,
the partial elimination of the jurisdictional amount requirement in
Federal question cases is likely to result in a more efficient use of
judicial resources, with courts and counsel no longer having to waste
time and energy on the question of amounts in controversy.

Caseloads and efficiency aside, a larger issue remains. For as Pro-
fessor Wright has written:

> We do nothing to encourage confidence in our judicial
> system or in the ability of persons with substantial griev-
> ances to obtain redress through lawful processes when we
> close the courthouse door to those who cannot produce $10,000
> as a ticket of admission.[53]

### C. PARTIES DEFENDANT

#### 1. Naming the Proper Parties Defendant

The size and complexity of the Federal Government, coupled with
the intricate and technical law concerning official capacity and parties

---

[49] 1970 Hearings at p. 259. More recently, Professor Wright has described as "rare and
insignificant" some of the cases to which the amount requirement remains applicable.
Thus, "a municipality cannot be sued under the civil rights provisions of 42 U.S.C.A. section
1983 and 28 U.S.C.A. section 1343(3) and thus a suit against a municipality on the basis of
the Federal Constitution or laws must be brought under 28 U.S.C.A. section 1331 and more
than $10,000 must be in controversy. *Calvin v. Conlisk*, 367 F.Supp. 476 (D. Ill. 1973). It
remains an open question whether a suit challenging a state statute on the ground that it
is inconsistent with a Federal statute may be brought without regard to amount in con-
troversy under 28 U.S.C.A. section 1343(3). *Hagans v. Lavine*, 415 U.S. 528, 533 n. 5
(1974)." Wright, Miller and Cooper, 13 Federal Practice and Procedure, section 3561,
at p. 392, n. 17 (1975.)
[50] See Earnest, *supra* note 49; letter from Roger Cramton, May 24, 1976, 1976 Hearings.
[51] *Id.* Such avoidance, however, abdicates a court's constitutional and statutory duties
"to ensure that each case before it falls within the limited jurisdictional power of the
Federal Practice and Procedure, section 3561, at pp. 395–96, calling on the Congress rather
jurisdictional amount, especially in the lower courts, and fosters arbitrary and haphazard
application of jurisdictional standards." *Id.* at p. 585. *See also* Wright, Miller and Cooper, 13
Federal practice and Procedure, section 3561, at pp. 395–96, calling on the Congress rather
than the courts to fill in the "unfortunate gap in the statutory jurisdiction of the Federal
courts."
[52] Davis letter, 1976 Hearings.
[53] 1970 Hearings at p. 254.

17

defendant, has given rise to numerous cases in which a plaintiff's claim has been dismissed because the wrong defendant was named or served.[54]

Nor is the current practice of naming the head of an agency as defendant always an accurate description of the actual parties involved in a dispute. Rather, this practice often leads to delay and technical deficiencies in suits for judicial review.[55]

The unsatisfactory state of the law of parties defendant has been recognized for some time and several attempts have been made by Congress to cure the deficiencies.[56]

Despite these attempts, problems persist involving parties defendant in actions for judicial review. In the committee's view the ends of justice are not served when government attorneys advance highly technical rules in order to prevent a determination on the merits of what may be just claims.

When an instrumentality of the United States is the real defendant, the plaintiff should have the option of naming as defendant the United States, the agency by its official title, appropriate officers, or any combination of them. The outcome of the case should not turn on the plaintiff's choice. S. 800 accomplishes this objective by including a new sentence between the first and last sentences of section 703 of title 5 to provide the plaintiff with this option in judicial review actions, providing no special statutory review proceeding is applicable.

### 2. Joinder of Third Persons

A related problem concerns joinder of third persons as parties defendant. When section 1391(e) of title 28, which governs venue of actions against Federal officers and agencies, was enacted in 1962, its broadened venue and extra-territorial service of process were limited to judicial review actions "in which *each* defendant is an officer or employee of the United States or an agency thereof." (emphasis added.)

This language can be interpreted to prevent a plaintiff from joining non-Federal third persons as defendants in actions under section 1391(e). For example, in *Chase Savings & Loan Association* v. *Federal Home Loan Bank Board*, 266 F. Supp. 965 (E.D. Pa. 1967), the court dismissed an action which had joined the Federal board and a local bank on the ground of improper venue. The court in *Town of East Haven* v. *Eastern Airlines*, 282 F. Supp. 507 (D. Conn. 1968), also dismissed an action on the same grounds but not before criticizing the requirements of section 1391(e).

More recent cases, cognizant of the awkwardness and inconvenience of the section, have held to the contrary. In *Green* v. *Laird*, 357

---

[54] *See, e.g., Clegg* v. *Treasury Department*, et al. ——— F. Supp. ——— (D. Mass. 1976), 38 Pike and Fisher Ad. L. 2d 229 (March 16, 1976), (action against the Treasury Department and the Secret Service for allegedly failing to provide Secret Service protection to plaintiff as a presidential candidate dismissed for lack of jurisdiction based in part on misjoinder and failure to name the correct parties defendant).

[55] See statement of Francis M. Gregory, Jr., vice chairman, Committee on Judicial Review, Section of Administrative Law, American Bar Association, 1976 Hearings.

[56] First, Congress in 1962 amended section 1391(e) of Title 28 in order to allow broadened venue and extra-territorial service of process in suits against Federal officers and thus to circumvent the formerly troublesome requirement that superior officers be joined as parties defendant. Second, Rule 25(d) of the Federal Rules of Civil Procedure was amended in 1961 to provide for the automatic substitution of successors in office. That rule also states that "any misnomer not affecting the substantial rights of the parties shall be disregarded" and that the officer may be "described as a party by his official title rather than by name." Third, Rule 15(c) of the Federal Rules was amended in 1966 to deal with the plaintiff's failure to name any appropriate officer or agency as defendant.

JA567

18

F.Supp. 227 (N.D. Ill. 1973), for example, the court held that an inter-
pretation of section 1391(e) which excludes non-Federal defendants
is inconsistent with the congressional intent.[57]

There is no functional justification for this limitation on joinder.
Moreover, it prevents relief in some situations in which the Federal
courts can make a special contribution.[58]

Section 3 of S. 800 amends 1391(e) of title 28 to make it clear that a
plaintiff may use the section's provisions for broad venue and extra-
territorial service of process against Government defendants, despite
the presence in the action of a non-Federal defendant.

The amendment substitutes the word "a" for the word "each," and
adds a new sentence permitting joinder of non-Federal defendants who
can be served in accordance with normal rules governing service of
process. Other objections to such joinder, stemming from the discre-
tion vested in the trial judge under the Federal Rules of Civil Pro-
cedure to control the dimensions of the law suit and to protect par-
ticular parties, would be unaffected.

The Department of Justice has objected that section 3, as intro-
duced, "would permit any plaintiff to obtain venue against any private
defendant by simply joining as a party to the action a Federal official
over whom venue may be obtained under 28 U.S.C. section 1391(e)."[59]
To avoid any hardship or unfair disadvantage to private defendants
that might result from subjecting them to plaintiff's broadened choice
of venue under section 1391(e) as amended, the committee has
amended the pertinent sentence of section 3 of S. 800 to read as
follows:

> Additional persons may be joined as parties to any such
> action in accordance with the Federal Rules of Civil Pro-
> cedure *and with such other venue requirements as would be
> applicable if the United States or one of its officers, employees
> or agencies were not a party.* (emphasis added.)

In effect, this will mean that a private defendant can only be sued in
a venue where he could have been sued if the Government had not been
a party. As a practical matter, it will usually mean that the plaintiff
will have to bring suit in the district where the defendant resides
rather than in his own district.

### CONCLUSION

The committee believes that the subjects of this bill are long overdue
for reform. S. 800 does not contain new or radical proposals. Rather, it
contains limited, modest, and reasonable reforms in a carefully

---

[57] *See also Macias v. Finch,* 324 F.Supp. 1252, 1254–55 (N.D. Cal. 1970) : *People of
Saipan v. Dept. of the Interior,* 356 F.Supp. 645, 651 (D. Hawaii (1973), *modified on
other grounds,* 502 F.2d 90 (9th Cir. 1974).

[58] "In many public land controversies, for example, three parties are involved—the
official, a successful applicant, and an unsuccessful one. Effective relief cannot be obtained
in an action in which the United States or its officer is not involved ; but if the Govern-
ment is named as defendant, 1391(e) prevents the joinder of the other private person as a
defendant, and that person cannot be joined as a plaintiff because his interest is adverse to
that of the plaintiff. Another common type of situation in which the limitation is
troublesome is that in which the specific relief is sought against Federal and state officers
who are cooperating in a regulatory or enforcement program.
   "There are no sound reasons why the general principle that control party joinder in
Federal courts should not be applicable in these situations." Statement of Roger Cranton,
1970 Hearings at p. 39.

[59] Scalia letter, exhibit C, below.

19

drafted, thoroughly examined bill—nearly identical to the bill reported out of the Subcommittee on Administrative Practice and Procedure in 1970.

Its principal provision, the partial elimination of sovereign immunity as a defense to actions for equitable relief, has the support of the most eminent scholars and practitioners of administrative law, as well as the Judicial Conference of the United States and the Department of Justice.

The partial elimination of sovereign immunity will facilitate nonstatutory judicial review of Federal administrative action without affecting the existing pattern of statutory remedies, without disturbing the established law of judicial review, without exposing the Government to new liability for money damages, and without upsetting congressional judgments that a particular remedy in a given situation should be the exclusive remedy.

Like sovereign immunity, other anachronisms in the law of judicial review such as the jurisdictional amount in controversy and the naming and joinder of parties defendant have outlived their usefulness, continue to cause confusion and injustice, and are overdue for elimination or reform.

The adoption of S. 800, therefore, will make a substantial contribution to both administrative justice and judicial efficiency by promoting rationality in a complex and intricate field of Federal law. By removing artificial and outmoded barriers to judicial review of official action, S. 800 will also help restore public confidence in the responsiveness and accountability of the Federal Government.

For these reasons, the committee reports the bill, as amended, with the recommendation that it be adopted.

### Cost

The committee does not believe that enactment of S. 800, which is procedural in nature and clarifies the jurisdiction of Federal courts while marginally expanding it, will require additional appropriation of funds to either the judiciary or the agencies. The committee expects that any slightly expanded caseload will be more than compensated for by the bill's elimination of outmoded jurisdictional obstacles which currently consume needless amounts of judicial and Justice Department litigating energies.

### Changes in Existing Law

In compliance with subsection (4) of rule XXIX of the Standing Rules of the Senate, changes in existing law made by the bill as reported are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman):

### 5 U.S.C. 702

#### § 702. Right of review

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of

20

a relevant statute, is entitled to judicial review thereof. *An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States, provided, that any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title); and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief or any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.*

### 5 U.S.C. 703

### § 703. Form and venue of proceeding

The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. *If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer.* Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

### 28 U.S.C. 31

### § 1331. Federal questions

(a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States[.] *except that no such sum or value shall be required in any such action brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity.*

(b) Except when express provision therefor is otherwise made in a statute of the United States, where the plaintiff is finally adjudged to be entitled to recover less than the sum or value of $10,000, computed without regard to any setoff or counterclaim to which the defendant may be adjudged to be entitled, and exclusive of interests and costs, the district court may deny costs to the plaintiff and, in addition, may impose costs on the plaintiff.

JA570

28 U.S.C. 1331(c)

(e) A civil action in which ⟦each⟧ *a* defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, *or the United States*, may, except as otherwise provided by law, be brought in any judicial district in which⟦:⟧ (1) a defendant in the action resides, or (2) the cause of action arose, or (3) any real property involved in the action is situated, or (4) the plantiff resides if no real property is involved in the action. *Additional persons may be joined as parties to any such action in accordance with the Federal Rules of Civil Procedure and with such other venue requirements as would be applicable if the United States or one of its officers, employees or agencies were not a party.*

JA571

# EXHIBITS

## EXHIBIT A

### RECOMMENDATIONS OF THE ADMINISTRATIVE CONFERENCE OF THE UNITED STATES

#### RECOMMENDATION No. 68–7—ELIMINATION OF JURISDICTIONAL AMOUNT REQUIREMENT IN JUDICIAL REVIEW

Title 28 of the United States Code should be amended to eliminate any requirement of a minimum jurisdictional amount before United States district courts may exercise original jurisdiction over any action in which the plaintiff alleges that he has been injured or threatened with injury by an officer or employee of the United States or any agency thereof, acting under color of Federal law. This amendment is not to affect other limitations on the availability or scope of judicial review of Federal administrative action.

*(Adopted December 10–11, 1968)*

#### RECOMMENDATION No. 69–1—STATUTORY REFORM OF THE SOVEREIGN IMMUNITY DOCTRINE

The technical legal defense of sovereign immunity, which the Government may still use in some instances to block suits against it by its citizens regardless of the merit of their claims, has become in large measure unacceptable. Many years ago the United States by statute accepted legal responsibility for contractual liability and for various types of misconduct by its employees. The "doctrine of sovereign immunity" should be similarly limited where it blocks the right of citizens to challenge in courts the legality of acts of governmental administrators. To this end the Administrative Procedure Act should be amended.

##### RECOMMENDATION

1. Section 702 of Title 5, United States Code (formerly section 10(a) of the Administrative Procedure Act), should be amended by adding the following at the end of the section:

An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States. Nothing herein (1) affects other limitations on judicial review or

(22)

JA572

the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

2. Section 703 of Title 5, United States Code (formerly section 10(b) of the Administrative Procedure Act), should be amended by adding the following sentence after the first full sentence:

If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer.

(*Adopted October 21–22, 1969*)

### RECOMMENDATION No. 70–1—PARTIES DEFENDANT

The size and complexity of the Federal Government, coupled with the intricate and technical law concerning official capacity and parties defendant, have given rise to innumerable cases in which a plaintiff's claim has been dismissed because the United States or one of its agencies or officers lacked capacity to be sued, was improperly identified, or could not be joined as a defendant. The ends of justice are not served when dismissal on these technical grounds prevents a determination on the merits of what may be just claims. Three attempts to cure the deficiencies of the law of parties defendant have achieved only partial success and further changes are required to eliminate remaining technicalities concerning the identification, naming, capacity, and joinder of parties defendant in actions challenging federal administrative action.

#### RECOMMENDATION

1. The Federal Rules of Civil Procedure contain liberal provisions for substitution of parties and for amendment of pleadings and correction of defects as to parties defendant. The Department of Justice should instruct its lawyers and United States Attorneys to call the attention of the court to these provisions in cases involving technical defects with respect to the naming of parties defendant in any situation in which the plaintiff's complaint provides fair notice of the nature of the claim and the summons and complaint were properly served on a United States Attorney, the Attorney General, or an officer or agency which would have been a proper party if named. The Department of Justice should be responsible for determining who within our complex federal establishment is responsible for the alleged wrong and should take the initiative in seeking correction of pleadings or adding of proper parties. Since the Department of Justice has acquiesced in the substance of this recommendation, it would also be appropriate for the Department of Justice and the Administrative Conference of the United States to seek an amendment of the Federal Rules of Civil Procedure to provide that the Attorney General shall have the responsibility to correct such deficiencies.

2. Congress should enact legislation:

(a) Amending section 703 of title 5 to allow the plaintiff to name as defendant in judicial review proceedings the United States, the agency by its official title, the appropriate officer, or any combination of them.

JA573

(b) Amending section 1391 (e) of title 28 to include within its coverage actions challenging federal administrative action in which the United States is named as a party defendant, without affecting special venue provisions which govern other types of actions against the United States.

(c) Amending section 1391 (e) of title 28 to allow a plaintiff to utilize that section's broadened venue and extraterritorial service of process in actions in which nonfederal defendants who can be served in accordance with the normal rules governing service of process are joined with federal defendants.

(*Adopted June 2–3, 1970*)

## EXHIBIT B

ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS,
*Washington, D.C., November 3, 1970.*

Hon. EDWARD M. KENNEDY,
*Committee on the Judiciary,*
*U.S. Senate,*
*Washington, D.C.*

DEAR SENATOR KENNEDY: This is in further reference to your letter of May 1, 1970, to the Chief Justice requesting the views of the Judicial Conference on S. 3568,* relating to judicial review of administrative action and containing sections relating to venue and parties defendant.

The Judicial Conference of the United States met on October 29 and 30, 1970, and voted its approval in principle of S. 3568 and specifically endorsed Section 2 of the bill relating to the jurisdictional amount requirement and Section 3 providing for suit in the same judicial districts in which the federal official or agency may be sued.

Sincerely,

WILLIAM E. FOLEY,
*Deputy Director.*

## EXHIBIT C

DEPARTMENT OF JUSTICE,
*Washington, D.C., May 10, 1976.*

Hon. EDWARD M. KENNEDY,
*Chairman, Subcommittee on Administrative Practice and Procedure*
*U.S. Senate, Washington, D.C.*

DEAR MR. CHAIRMAN: This is in response to your request at my testimony before your Subcommittee on April 28, 1976 that I submit the written views of the Department of Justice on S. 800, a bill "[t]o amend chapter 7, title 5, United States Code, with respect to procedure for judicial review of certain administrative agency action, and for other purposes."

### SECTION 1—SOVEREIGN IMMUNITY

Section 1 of S. 800 would amend 5 U.S.C. 702 to eliminate the defense of sovereign immunity of the United States in actions in United States

---

*Reintroduced on Feb. 22, 1975 as S. 800. *See* 121 Cong. Rec. 2416 (daily ed.).

S. Rept. 94–996——4

courts seeking relief other than money damages. The Department has in the past opposed such a change.

In light of the tenacious and well reasoned support of this proposal by such knowledgeable and responsible organizations as the Administrative Conference of the United States and the American Bar Association, we have reconsidered that opposition, and are now prepared to endorse the concept in principle, and to support the text of S. 800, with two small but important changes and a number of caveats concerning its proper interpretation. The arguments in favor of this aspect of S. 800 have been described in testimony presented by others before your Subcommittee. Foremost among them, in my view, is the failure of the criteria for sovereign immunity, as they have been expressed in a long and bewildering series of Supreme Court decisions, to bear any necessary relationship to the real factors which should determine when the Government requires special protection which ordinary litigants would not be accorded.

The main argument against S. 800 is one that can be made against most statutes which seek to make a change in encrusted principles of the common law : the difficulty of obtaining complete assurance that no untoward result will be produced. The Department of Justice has been unable to identify any, assuming that the modifications and interpretations proposed in this letter are accepted. We are sure, however, that the Committee will give careful consideration to the submissions of other agencies on this point with respect to their particular areas of activity.

It should also be pointed out that the status quo itself is not without uncertainty. No one can read the significant Supreme Court cases on sovereign immunity, from *United States* v. *Lee*, 106 U.S. 196 (1882) to *Malone* v. *Bowdoin*, 369 U.S. 643 (1962), *Dugan* v. *Rank*, 372 U.S. 609 (1963) and *Hawaii* v. *Gordon*, 373 U.S. 57 (1963) (per curiam), without concluding that the field is a mass of confusion; and if he ventures beyond that to attempt some reconciliation of the courts of appeals decisions, he will find confusion compounded. Accepting the elimination of the doctrine of sovereign immunity is not, then, a case of exchanging the certain for the uncertain, or the known for the unknown.

Indeed, if the present bill is properly understood and properly applied by the courts, it is likely to produce a more stable and predictable system of immunity from suit than the present doctrine of sovereign immunity can ever attain—because it will be a system directly and honestly based upon relevant governmental factors rather than upon a medieval concept whose real vitality is long since gone and which we have tried vainly to convert to rational modern use. It is not the intent of the Department nor, as I understand it, the intent of the drafters of this bill, that all of the cases which have heretofore been disposed of on the basis of sovereign immunity would in the future be entertained and adjudicated by the courts. To the contrary, one of the very premises of the proposal is the fact that many (indeed, I would say most) of the cases disposed of on the basis of sovereign immunity could have been decided the same way on other legal grounds, such as: lack of standing; lack of ripeness; availability of an alternative remedy in another court; express or implied statutory preclusion of judicial review; commission of the matter by law to

agency discretion; privileged nature of the defendant's conduct; failure to exhaust administrative remedies; discretionary power to refuse equitable relief;[1] and the "political question" doctrine.[2] As stated in the Administrative Conference Report:

> The essential and sound policy underlying sovereign immunity—that courts should not engage in indiscriminate interference with governmental programs—is not abandoned merely because an artificial and outmoded doctrine is abolished. The same basic policy is inherent in the body of law that governs the availability and scope of judicial review. The doctrine of sovereign immunity is unnecessary to prevent courts from (a) entering fields which the Constitution or Congress has delegated to the executive, and (b) displacing executive or administrative judgment. (1 *ACUS Reports* at 225.)

In addition to the common law doctrines which afford certain governmental processes needed protection, it is also an important factor in our support for the bill that the waiver of immunity, since it is made via § 702, will only apply to claims relating to improper official action; and will be subject to the other limitations of the Administrative Procedure Act, including that which renders review unavailable "to the extent that—(1) statutes preclude judicial review, or, (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). They also include the requirement that "the form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter," where such a proceeding exists and is not inadequate. 5 U.S.C. § 703. These features were considered of great importance by the Administrative Conference Committee which originally drafted this legislative proposal, and they are important elements of the Department's support for the bill.

In one respect, the proposed § 702 differs from the version recommended by the Administrative Conference, and we believe the change is undesirable. Clause (2) of the last sentence, as proposed by the Administrative Conference, would have provided that nothing in the legislation confers authority to grant relief "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." This has been changed to read: "if any other statute granting consent to suit *for money damages* forbids the relief which is sought." (emphasis added). The underscored phrase and the elimination of the phrase "expressly or impliedly" could be interpreted to limit the disclaimer in such a fashion as to raise serious questions concerning the scope of the new reviewability which would be created. We see no reason why a congressional intent to preclude other remedies should be honored only with respect to statutes for money damages, and otherwise ignored. Nor do we believe it should be left in any doubt that the requisite intent need not be express (which, in a prior system which assumed the existence of sovereign immunity, would be extremely rare) but can be found from all the circumstances normally

---

[1] See the cases on each of these points cited in the Report of the Commission on Judicial Review of the Administrative Conference of the United States. 1 *Recommendations and Reports of the Administrative Conference* (hereinafter "ACUS Reports") 191, 222–23.
[2] See, *e.g.*, *C. & S. Air Lines* v. *Waterman Corp.*, 333 U.S. 103 (1948).

available to assess legislative will. Because existing statutes have been enacted against the backdrop of sovereign immunity, this will probably mean that in most if not all cases where statutory remedies already exist, these remedies will be exclusive; that is no distortion, but simply an accurate reflection of the legislative intent in these particular areas in which the Congress has focused on the issue of relief. It would be unwise to upset these specific determinations by a general provision of this sort, without considering them individually, or even knowing precisely what they are. In the many areas where Congress has not acted, however, and when its action is not addressed to the type of grievance which the plaintiff seeks to assert, suit would be allowed. The Department of Justice strongly urges that the Administrative Conference's original and well considered recommendation on this point be reinstated.

Our second disagreement with the text of section 1 of the bill relates to the next to the last sentence of the revised § 702, which provides that "the United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States." This was part of the original Administrative Conference proposal. Its purpose was to eliminate the "technicalities of the law of parties defendant" and to assure the "binding effect of judgments" against the United States. (See 1 *ACUS Reports* 220–22.)

We have no quarrel with these objectives, nor with the text of the provision insofar as it provides for the initial naming of the United States. The provision for the entering of a judgment or decree against the United States, however, is inadvisable without some modification. In order to assure that the binding effect of a judgment will not lapse with the departure of the Federal officer who happens to have been named, it seems to us unnecessary to leave to the Justice Department—or perhaps to the Government as a whole—the task of deciding what individual has personal responsibility (presumably under pain of contempt) for compliance with a court's mandatory decree. Leaving the matter thus unspecified is either unfair to the individual who may be responsible or else destructive of the enforceability of the decree. We suggest that all the values sought to be achieved by this provision can be preserved, and the foregoing difficulty eliminated, by adding to the sentence in question the following proviso:

> provided, that any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance.

In connection with this provision, I may also note our understanding that the ability to name the United States in the initial pleading does not alter the degree of specificity with which the plaintiff must plead and establish his case. For example, where the plaintiff knows that particular officers of a particular agency caused the wrong alleged, he cannot merely plead that it was caused by unspecified officers of the United States, leaving it to the Department of Justice to circularize the entire Government in order to respond to the complaint. Such a pleading would be subject to a motion for more definite statement under Rule 12(e) of the Federal Rules of Civil Procedure.

JA577

28

With the revisions suggested above, the Department supports enactment of section 1 of S. 800.

### SECTION 2—AMOUNT IN CONTROVERSY

Section 2 of S. 800 would amend 28 U.S.C. section 1331 to eliminate the requirement that there be at least $10,000 in controversy, and thus provide federal court jurisdiction over all civil cases raising "federal questions" regardless of the monetary amount involved.

The Department of Justice has in the past supported removal of the "amount in controversy" requirement in cases alleging unconstitutional action by federal agents. The Administrative Conference of the United States has recommended the somewhat broader approach of eliminating the requirement with respect to cases in which the plaintiff alleges that he has been injured or threatened with injury by an officer or employee of the United States, or an agency thereof, "acting under color of Federal law." Conference Recommendation 68–7. Virtually all of the additional ground covered by the Conference proposal would be encompassed by existing law if section 10 of the APA, 5 U.S.C. §§ 701–03, were established to be an independent grant of jurisdiction. This is presently the law of the District of Columbia Circuit, *Pickus* v. *United States Board of Parole*, 507 F.2d 1107 (D.C. Cir. 1974), though it is not universally accepted. Moreover, the jurisdictional amount requirement can be avoided if suit can be cast in the form of an action "in the nature of mandamus," so as to qualify under the Mandamus and Venue Act of 1962, 28 U.S.C. § 1361. *See* Report of the Committee on Judicial Review of the Administrative Conference, 1 *ACUS Reports* 170, 176–77. When these means of avoiding the requirement are added to the fact that the existence of monetary damage in cases involving agency action is an erratic factor to begin with, not necessarily related to either the private or public importance of the issue involved, the "amount in controversy" provision of § 1331 is seen to have a very limited and virtually irrational application, at least as applied to judicial review of administrative action. The Department therefore supports the Administrative Conference recommendation.

The amendment contained in S. 800, however, would go beyond the Conference proposal, and would remove the "amount in controversy" requirement not merely in suits for review of federal agency action but in all federal question cases. We do not know the volume and the character of cases which this further extension would add to federal court dockets. The Administrative Conference Committee report of course did not address the point, and we know of no other study which does. It is conceivable that the small volume of such cases, or their relatively high importance, renders the extension unobjectionable. If the Subcommittee has reliable information on the point, we will be pleased to examine it and provide our further views. Absent such data, however, we think it advisable to adhere to the carefully considered Administrative Conference recommendation, which would limit section 2 to the important category of suits seeking review of agency action.

SECTION 3—VENUE

Section 3 of S. 800 would amend 28 U.S.C. § 1391(e) to permit additional persons to be joined as parties in actions against the United States, its agencies, officers or employees, "without regard to other venue requirements." Presently, 28 U.S.C. § 1391(e), which grants venue not merely in the defendant's district but in the plaintiff's district, where the cause of action arose or where real property which it involves is situated, applies to a civil action in which "each defendant" is an officer or employee of the United States or any agency thereof. The amendment proposed would make the presence of a single federal defendant sufficient.

While the question must be regarded as still open, the limitation on joinder set forth in § 1391(e) has been held by some courts to apply only to those individuals as to whom that section itself is the sole basis of venue. That is, additional defendants may be joined so long as an independent basis of venue with respect to them exists. *See National Resources Defense Council, Inc.* v. *Tennessee Valley Authority*, 459 F.2d 255, 257 n. 3 (2d Cir. 1972). If the effect of the present proposal were merely to codify this interpretation of § 1391(e), the Department would support it. However, the amendment as written goes much further. It would permit any plaintiff to obtain venue against any private defendant by simply joining as a party to the action a federal official over whom venue may be obtained under 28 U.S.C. § 1391(e). The Department sees no reason why the facilitation of suits against the Government should lead to the imposition of hardships against non-Government defendants which the ordinary venue rules are designed to avoid. *See Town of East Haven* v. *Eastern Airlines*, 282 F. Supp. 507, 510–11 (D. Conn. 1968). We may note, incidentally, that the portion of the Administrative Conference Committee report which was the origin of this proposal did not address the point we have here raised, and indeed in all except its last sentence discussed the problem as though the only issue were permitting the joinder of persons as to whom independent grounds of venue existed. *See* 1 *ACUS Reports* 431–32.

The Department's objection would be met if the final phrase of section 3, "without regard to other venue requirements," were replaced by: "and with such other venue requirements as would be applicable if the United States or one of its officers, employees or agencies were not a party."

For the reasons stated above, the Department of Justice recommends enactment of this legislation with the suggested amendments.

The Office of Management and Budget has advised that there is no objection to the submission of this report from the standpoint of the Administration's program.

  Sincerely,

<div align="right">

ANTONIN SCALIA,
*Assistant Attorney General, Office of Legal Counsel.*

</div>

○

# EXHIBIT 4

# SOVEREIGN IMMUNITY

# HEARING

BEFORE THE

## SUBCOMMITTEE ON
## ADMINISTRATIVE PRACTICE AND PROCEDURE

OF THE

## COMMITTEE ON THE JUDICIARY
## UNITED STATES SENATE

## S. 3568

A BILL TO AMEND CHAPTER 7, TITLE 5, UNITED STATES CODE, WITH
RESPECT TO PROCEDURE FOR JUDICIAL REVIEW OF CERTAIN AD-
MINISTRATIVE AGENCY ACTION, AND FOR OTHER PURPOSES

### NINETY-FIRST CONGRESS

SECOND SESSION

PURSUANT TO

## S. Res. 333

JUNE 3, 1970

Printed for the use of the Committee on the Judiciary



U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1970

47-534 O

JA582

## COMMITTEE ON THE JUDICIARY

JAMES O. EASTLAND, Mississippi, *Chairman*

| | |
|---|---|
| JOHN L. MCCLELLAN, Arkansas | ROMAN HRUSKA, Nebraska |
| SAM J. ERVIN, Jr., North Carolina | HIRAM L. FONG, Hawaii |
| THOMAS J. DODD, Connecticut | HUGH SCOTT, Pennsylvania |
| PHILIP A. HART, Michigan | STROM THURMOND, South Carolina |
| EDWARD M. KENNEDY, Massachusetts | MARLOW W. COOK, Kentucky |
| BIRCH BAYH, Indiana | CHARLES McC. MATHIAS, Jr., Maryland |
| QUENTIN N. BURDICK, North Dakota | ROBERT P. GRIFFIN, Michigan |
| JOSEPH D. TYDINGS, Maryland | |
| ROBERT C. BYRD, West Virginia | |

---

### SUBCOMMITTEE ON ADMINISTRATIVE PRACTICE AND PROCEDURE

EDWARD M. KENNEDY, Massachusetts, *Chairman*

| | |
|---|---|
| PHILIP A. HART, Michigan | STROM THURMOND, South Carolina |
| BIRCH BAYH, Indiana | CHARLES McC. MATHIAS, Jr., Maryland |
| QUENTIN N. BURDICK, North Dakota | ROBERT P. GRIFFIN, Michigan |

JAMES F. FLUG, *Chief Counsel*
MICHAEL AND PULLIAM, *Minority Counsel*

(II)

# CONTENTS

## STATEMENT OF WITNESSES

|  | Page |
|---|---|
| Jerre S. Williams, chairman of the Administrative Conference of the United States | 6 |
| Ashley Sellers, attorney, Washington, D.C., chairman, Judicial Review Committee, Administrative Conference of the United States | 13 |
| Roger C. Cramton, professor, University of Michigan Law School, Consultant to the Administrative Conference of the United States | 45 |
| Dan M. Byrd, Jr., attorney, Fort Mill, S.C., chairman of the Administrative Law Section of the American Bar Association | 55 |
| Kenneth Culp Davis, professor, University of Chicago School of Law, chairman of the Committee on Judicial Review, American Bar Association, Administrative Law Section | 61 |
| Hon. William D. Ruckelshaus, Assistant Attorney General, U.S. Department of Justice | 64 |

## APPENDICES

| | Page |
|---|---|
| I. Administrative Conference Recommendations and Consultant's Memoranda: | |
|     (a) Elimination of Jurisdictional Amount Requirement | 76 |
|     (b) Statutory Reform of Sovereign Immunity | 92 |
|     (c) Parties Defendant | 155 |
| II. "Sovereign Immunity Must Go," by Prof. Kenneth Culp Davis | 201 |
| III. American Law Institute "Study of the Division of Jurisdiction between State and Federal Courts" | 224 |
| IV. Selected Statutory Provisions Related to Judicial Review and Federal Court Jurisdiction | 234 |
| V. Administrative Conference Transcript (edited and excerpted) From Plenary Session, Oct. 21, 1969: Sovereign Immunity Recommendation Discussed | 236 |
| VI. Correspondence Relating to Administrative Conference Recommendations and S. 3568: | |
|     (a) Letter from Deputy Attorney General Richard G. Kleindinst to Prof. Roger C. Cramton, Mar. 31, 1970 | 245 |
|     (b) Letter from Chairman Jerre S. Williams to Senator James O. Eastland, Mar. 31, 1970 | 245 |
|     (c) Letter from Prof. Kenneth C. Davis to Senator Edward M. Kennedy, Apr. 21, 1970 | 246 |
|     (d) Letter from Prof. Roger C. Cramton to Thomas M. Susman, May 20, 1970, with enclosures | 247 |
|     (e) Letter from Prof. Kenneth C. Davis to Senator Edward M. Kennedy, June 4, 1970 | 249 |
|     (f) Letter from Prof. Roger C. Cramton to Senator Edward M. Kennedy, June 5, 1970 | 251 |
|     (g) Letter from Prof. Charles A. Wright to Senator Edward M. M. Kennedy, June 12, 1970 | 252 |
|     (h) Letter from Secretary George P. Shultz to Senator Edward M. Kennedy, June 17, 1970 | 254 |
|     (i) Letter from Assistant Attorney General Ruckelshaus to Senator Edward M. Kennedy, July 8, 1970 | 255 |

(III)

## S. 3568, A BILL TO AMEND CHAPTER 7, TITLE 5, UNITED STATES CODE, WITH RESPECT TO PROCEDURE FOR JUDICIAL REVIEW OF CERTAIN ADMINISTRATIVE AGENCY ACTION, AND FOR OTHER PURPOSES

---

### WEDNESDAY, JUNE 3, 1970

U.S. SENATE,
SUBCOMMITTEE ON ADMINISTRATIVE
PRACTICE AND PROCEDURE,
COMMITTEE ON THE JUDICIARY,
*Washington, D.C.*

The subcommittee met, pursuant to notice, at 9:05 a.m., in room 3110, New Senate Office Building, Senator Edward M. Kennedy (chairman of the subcommittee) presiding.

Present: Senators Kennedy and Thurmond.

Also present: James Flug, majority counsel; Thomas M. Susman, assistant counsel; and Michael A. Pulliam, minority counsel.

Senator KENNEDY. The subcommittee will come to order.

The doctrine that "the King can do no wrong" may have gone unquestioned in medieval England. I believe that we would all agree, however, that it has no place in 20th-century America. Yet this seems to be precisely the basis of the judicial doctrine of "sovereign immunity," developed during the past two centuries in this country. To the extent that this immunity doctrine prevents the orderly, rational review of actions of Federal officers, it is inconsistent with the principles of accountable and responsible government.

Under the law as it presently stands—and I emphasize that this judge-made law, since Congress has never spoken directly on this issue—an officer of the United States Government can act arbitrarily, capriciously, discriminatorily, illegally, and yet the aggrieved or threatened citizen may have no recourse to the courts. For if he should bring suit against the officer, Justice Department lawyers will surely cry "sovereign immunity" and judges across the land may, with no further analysis or investigation, respond "Case dismissed."

Let me illustrate with a case that I know will be referred to again this morning. Just 2 years ago a civil servant of Italian descent charged that his superiors in the Army Corps of Engineers refused to provide him chances for promotion because of his ethnic origin. The Civil Service Commission rebuffed his charge, and the employee sued the Government, the Engineers, and the Commission. The Federal court dismissed his suit on the following grounds:

1. the United States could not be sued without its consent;

2. the Civil Service Commission could not be sued in its own name;

(1)

JA586

3. Sovereign immunity prevented judicial consideration of the plaintiff's claim.

S. 3568 would not require promotion of the civil servant involved in this case. It would allow the Federal court to decide whether substantial evidence existed to support the Civil Service conclusion that there was no discrimination in the case. In other words, elimination of sovereign immunity would allow courts to decide legal questions involving governmental action according to rational principles. The doctrine of sovereign immunity is not, and does not represent, a rational principle.

Our witnesses this morning will delve into the intricacies and technicalities of the present law and the effect of S. 3568 on that law. It should immediately become clear that the immunity doctrine, as presently applied, is illogical, artificial, erratic, and confusing. In some cases where there may have been strong arguments against judicial intervention, astute lawyers and judges have had little difficulty sidestepping the sovereign immunity doctrine.

In other cases, where the Government may have had no substantive interest at stake, summary application of the doctrine has been a source of frustration, uncertainty, and injustice.

Basically, S. 3568 would do three things:

1. Eliminate the defense of sovereign immunity in suits for specific relief against the Federal Government.

2. Eliminate the present requirement of a minimum jurisdictional amount in United States district courts where a Federal question is involved.

3. Simplify and clarify the law relating to naming the United States, its agencies, or officers as parties defendant.

The latter two objectives appear somewhat technical, but they provide needed reforms in two important areas of the law. Citizens who are thrown out of Federal court because they cannot place a monetary value on their claims to remain free of punitive selective service reclassification, to travel abroad, or to be free from invasions of privacy, do not view the legal doctrines applied to them as trivial technicalities. A citizen whose case is dismissed because he sued the Social Security Administrator instead of the Social Security Administration, or the Civil Service Commission instead of the members of the Commission individually is not impressed by the classification of the Government's defense as technical. And so I believe that these objectives of the bill are important and are not to be slighted.

But most important is the first section of S. 3568, and a most revealing aspect of this section is what it does not do.

The bill does not apply to monetary damages and will not open the United States to any further liability for such damages.

The scope of judicial review is in no way expanded. It remains limited by section 706 of title 5, United States Code, to questions involving constitutionality or legality of administrative action, propriety of procedures used, abuse of agency discretion, and whether agency findings are supported by substantial evidence.

S. 3568 will not open to judicial review in Federal district courts agency actions expressly or impliedly precluded from judicial re-

view by other statutes. For example, if the Government breaches a contract, the aggrieved party cannot under this bill bring an injunction for specific performance against the United States; he is limited by law to monetary damages under the Tucker Act.

The bill will not affect any other defense of the Government. For example, Congress, in the Administrative Procedure Act, and the judiciary have set down requirements prerequisite to judicial review, like standing, exhaustion of administrative remedies, ripeness, and nondiscretionary nature of agency action. Other equitable considerations involved in judicial intervention into the administrative realm remain applicable.

Sovereign immunity has never been an absolute bar to judicial intervention in cases of nonstatutory review of administrative action. Courts have in case after case prohibited enforcement of Federal laws or regulations, halted official action, and required official action. But a review of the cases—as confused as they are—reveals one certain conclusion: Where sovereign immunity has been held to be a bar to suit, and where no other defenses retained by S. 3568 would have been applicable, unjust or irrational decisions have resulted.

We are pleased to have with us today representatives from the Administrative Conference of the United States, the American Bar Association, and the Department of Justice. The bill we are considering is the result of extensive deliberations by the Administrative Conference and the ABA, and contains one section likewise endorsed by the American Law Institute. Since the printed version of the bill contains an omission and transposed numbers, I would like to place in the record at the end of my remarks a corrected version of S. 3568.

Sovereign immunity has been around for centuries. But it cannot withstand the test of time. It has taxed the resources of the courts, rather than relieved them of burdens. It has often proved a barrier to justice, rather than a vehicle for insuring reasonable and just results. It obfuscates, it confuses, it confounds. It directs court attention away from, not toward, the merits of the case. We have been doing a lot of talking about Government responsiveness to the citizenry lately. It's time to do something about it.

(Corrected version of S. 3568 follows:)

[S. 3568, 91st Cong., Second Sess.]

A BILL to amend chapter 7, title 5, United States Code, with respect to procedure for judicial review of certain administrative agency action, and for other purposes

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That sections 702 and 703 of title 5, United States Code, are amended to read as follows:

"§ 702. **Right of review**

"A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a

JA588

defendant in any such action, and a judgment or decree may be entered against the United States. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute granting consent to suit for money damages forbids the relief which is sought.

"§ 703. Form and venue of proceeding

"The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence of inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.".

SEC. 2. (a) Section 1331, title 28, United States Code, is amended to read as follows:

"§ 1331. Federal questions

"The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States.".

(b) The item relating to section 1331, title 28, United States Code, contained in the section analysis of chapter 85, title 28, United States Code, is amended to read as folows: "1331. Federal questions."

SEC. 3. The first paragraph of section 1391(e) of title 28, United States Code, is amended to read as follows:

"(e) A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States, may, except as otherwise provided by law, be brought in any judicial district in which: (1) a defendant in the action resides, or (2) the cause of action arose, or (3) any real property involved in the action is situated, or (4) the plaintiff resides if no real property is involved in the action. Additional persons may be joined as parties to any such action in accordance with the Federal Rules of Civil Procedure without regard to other venue requirements.".

Senator KENNEDY. Senator Thurmond.

Senator THURMOND. Mr. Chairman, we are considering today, legislation which could quite possibly have certain effects beyond the contemplation of those who sponsor it. As you have noted S. 3568 would basically do three things:

1. Eliminate the defense of sovereign immunity in suits for specific relief against the Federal Government.

2. Eliminate the present requirement of a minimum jurisdictional amount in United States district courts where a Federal question is involved.

3. Simplify and clarify the law relating to naming the United States, its agencies or officers as parties defendant.

While these three provisions sound fine, I am not sure that they will accomplish the objectives sought without creating problems, which are worse than those this bill attempts to solve.

I am not at all sure that it is necessary or advisable that the courts be given a mandate to decide disputes which could just as easily be decided by the agency in question.

In my judgment, there should be a line drawn between those cases which should be decided by the judiciary and those which should

JA589

be decided by agency action with a view toward a solution that would not overburden our Federal courts.

We have several witnesses who will testify here this morning, including a distinguished attorney from South Carolina, Dan Byrd, Jr. Mr. Byrd is also chairman of the American Bar Association Section of Administrative Law.

He has a reputation of being a very able attorney.

I regret that I will have to leave shortly to meet in executive session with the Armed Services Committee, but I have read the statements of several of the witnesses and I will again review the testimony later. I am sure that the testimony presented today will aid this subcommittee in the consideration of S. 3568.

Thank you, Mr. Chairman.

Senator KENNEDY. Our first witness this morning is Chairman Jerre Williams, who has headed up the Administrative Conference since its inception.

Chairman Williams has just announced his intention to return to teaching at the University of Texas Law School, and he will be missed on both ends of Pennsylvania Avenue.

Chairman Williams was appointed by the President in 1967, and as a teacher, scholar, and labor arbitrator he brought to the Administrative Conference those qualities of leadership, imagination, and perseverance that were required for him—almost singlehandedly—to set up a permanent independent agency of the United States.

Under his leadership the conference has initiated scores of studies and as of this morning has formulated 22 recommendations relating to improvement of the administrative processes.

Some of these are legislative recommendations, and I know firsthand of the thorough work that the consultants, the committees, the council, and the conference membership put into these recommendations. I have introduced bills relating to six of them, and we have every expectation that these will be favorably considered by Congress.

When Chairman Williams was sworn in on January 25, 1968, the President presided over the ceremony and set out in one sentence the goals of the Administrative Conference:

We want the Administrative Conference to be the vehicle through which we can look at the administrative process and can see how it is working and how it could be improved and how it could best serve the public interest.

S. 3568, the bill we are considering this morning, reflects the conclusions of the Administrative Conference membership on three areas where reform and improvement is needed to "best serve the public interest."

The Conference was joined in portions of its conclusions by the American Bar Association and the American Law Institute.

A brief scanning of the legal literature of the past two decades shows unanimous concurrence by legal scholars, including Professors Clark Byse, Louis Jaffee, Herbert Wechsler, Henry Hart, Robert Kramer, and two of our witnesses here today—Professors Roger Cramton and Kenneth Culp Davis.

Chairman Williams, we are delighted to have you here, and look forward to your testimony.

JA590

### STATEMENT OF JERRE S. WILLIAMS, CHAIRMAN OF THE ADMINISTRATIVE CONFERENCE OF THE UNITED STATES

Mr. WILLIAMS. Thank you, Mr. Chairman.

Senator KENNEDY. I would just mention before Mr. Williams starts, as we start our hearings this morning, we look forward to working with our able colleague from South Carolina. I know he has given thought to this question, as has the Conference and bar association, and all of us here. We are looking forward to the input of as many different thoughts and proposals as we can on the problems we are considering.

I think we want to establish at the outset that we welcome suggestions and ideas and recommendations. This has been characteristic of our full committee, and I am sure our able friend from South Carolina will have valuable suggestions that will strengthen the proposal we have before us.

Mr. Williams.

Mr. WILLIAMS. Mr. Chairman, my name is Jerre Williams and I am chairman of the Administrative Conference of the United States.

I have submitted a brief written statement which I would like to ask be put in the record.

Then I would like to shorten it for my verbal presentation today, to save the time of the committee, and because the details, the nature of the recommendations of the Administrative Conference, will be given by Mr. Ashley Sellers, who is the chairman of our judicial review committee, and by Prof. Roger Cramton, who was the consultant who worked with the committee in developing our recommendations which are related to this bill.

Senator KENNEDY. Your statement will be printed in its entirety in the record. You may summarize it and emphasize what parts of it you desire.

(The statement follows:)

TESTIMONY OF JERRE S. WILLIAMS, CHAIRMAN OF THE ADMINISTRATIVE CONFERENCE OF THE UNITED STATES, BEFORE THE UNITED STATES SENATE SUBCOMMITTEE ON ADMINISTRATIVE PRACTICE AND PROCEDURE TO THE COMMITTEE ON THE JUDICIARY

I appreciate the opportunity of testifying today in support of S. 3568, a bill which I consider to be a very important step in the direction of fairer procedures for the people of the United States. This is a particularly significant occasion for us at the Administrative Conference, because it is the first time that our young organization has had the privilege to appear before a Congressional Committee in support of legislation designed to effectuate recommendations of the Conference.

I would like to say at the outset that we have worked with your staff in preparing S. 3568. It has been a most satisfactory arrangement, and I look forward to more of this kind of cooperative effort on other legislative matters in the future.

S. 3568 would (1) limit the application of the doctrine of sovereign immunity in certain areas; (2) eliminate any requirement of a minimum jurisdictional amount in United States District Courts where a federal question is involved and (3) eliminate certain technical deficiencies in the law relating to naming the United States, its agencies or employees as parties defendant. All of these purposes have been the subject of recommendations of the Administrative Conference. I have supplied the Committee with copies of the texts of the Recommendations and I would like to request that they be included as part of

the record. They were developed in our Judicial Review Committee, under the Chairmanship of Mr. Ashley Sellers. Professor Roger C. Cramton, of the University of Michigan Law School, assisted the Committee in its work on these Recommendations and wrote basic research documents on all of them. Both of these gentlemen are here and will testify for the Conference; so I will make my remarks brief.

Sections 1 and 3 of the Bill deal with the sovereign immunity question and with designation of the United States as a party defendant in cases where the suit is one essentially against the United States. The Administrative Conference supports these sections fully.

Removal of the technical legal defense of sovereign immunity, which the Government may still use in some instances to block suits against it by its citizens, regardless of the merits of their claims, is long overdue. We should no longer adhere to the outmoded theory that the "King can do no wrong." Many years ago the United States adopted statutory means for the establishment of federal monetary liability with regard to contracts and torts, thereby eliminating the defense of sovereign immunity in those cases. S. 3568 would accomplish the same purpose with regard to claims challenging official action or non-action by Government agencies and seeking relief other than money damages such as injunction, declaratory judgment, mandatory relief, quiet title, and ejectment.

Since S. 3568 would be limited only to actions for such specific relief, the limitations on the recovery of money damages contained in the Federal Torts Claims Act, and the Tucker Act would be unaffected.

The Bill would also amend section 703 of title 5 and section 1391(e) of title 28, United States Code, to eliminate deficiencies in the law which now permit dismissal of suits against the United States because technically the United States or one of its agencies or officers lacked capacity to be sued, was improperly identified, or could not be joined as a defendant. These amendments are consistent with a recommendation adopted by the Conference in its current plenary session. As is the case with sovereign immunity, they would serve the ends of justice lby eliminating artificial, illogical defenses which could deprive a worthy cause of a trial on the merits.

Government defenses other than those specifically eliminated by the Bill would remain unaffected. I believe that these defenses, and the other procedural tools available to the Government are adequate to protect against frivolous actions or "crank suits." Certainly the possibility that a few frivolous actions may be brought, which could be disposed of by the defense of sovereign immunity, cannot justify the maintenance of a doctrine which Senator Kennedy has properly characterized as "illogical, artificial, erratic, and confusing." The government should not use overly technical and tricky defenses. It must meet a citizen in court in open and honest confrontation.

Section 2 of the bill deals with elimination of the $10,000 original jurisdictional amount for cases involving a Federal question in the United States District Courts. The Administrative Conference has recommended elimination of any requirement of a minimum jurisdictional amount where a "plaintiff alleges that he has been injured or threatened with injury by an officer or employee of the United States or any agency thereof, acting under color of law." To the extent that this recommendation is encompassed by Section 2 of S. 3568, the Conference supports it.

Today a litigant seeking resolution of a clearly Federal controversy for which there is no specific statutory review procedure may find himself without an adequate forum because of his inability to prove that the amount in controversy is $10,000 or because it is impossible to place a monetary value on his right. Certainly we should have no price tag on the court house door when the relief sought, more often than not, cannot be measured in money damages. S. 3568 would remedy this anomoly.

The bill is broader than the recommendation of the Administrative Conference. It would eliminate the $10,000 jurisdictional amount in all federal question cases in Federal District Courts. Therefore, I have no authority from the Conference to state its support for the bill in its full scope, although the Conference recommendation encompasses part of its scope and moves in the direction of this legislative proposal.

In closing I wish to emphasize that the Administrative Conference did not casually endorse the proposals which are before you today. Our recommendations were preceded by a great deal of discussion, correspondence, debate, con-

JA592

sultation, drafting, re-drafting, and, of course, painstaking legal research.
At every step in this process efforts were made to obtain the views of agency
and departmental officials, judges, scholars, practitioners, and bar associations.
Each recommendation was considered first by our Committee on Judicial
Review, then by our eleven-member Council, and finally by the full 82 member
Assembly meeting in plenary session. We acted only after we were confident
that our proposals would meet the highest standards of professional com-
petence, and would appeal to a broad range of responsible opinion in and
out of Government.

The very structure of the Conference operates to guarantee that result,
since we bring together many of the leading administrative law experts from
both public and private life. Among our members we have high officials from
33 agencies and departments, attorneys from many areas of practice and from
all regions of the country, and distinguished scholars from likewise distin-
guished centers of learning. Because of the diversity of learning and experience
that the Conference draws upon, I can, and do, submit that the reforms we
advocate enjoy the support of a representative cross-section of individuals
involved deeply and continuously in administrative law.

Mr. WILLIAMS. Thank you, Mr. Chairman.

I appreciate the opportunity of testifying today in support of S.
3568, as the spokesman for the Administrative Conference of the
United States. The bill is a very important step in the direction of
fair procedures for the people of the United States.

I would like to take particular note of this occasion as it relates
to the Administrative Conference because this is the first time that
our young organization has had the privilege to appear before a
congressional committee in support of legislation designed to effec-
tuate recommendations of the Conference.

I would like to say at the outset that the Conference has worked
with the staff of this committee in preparing S. 3568. It has been
a most satisfactory arrangement, and I look forward to more of
this kind of cooperative effort on other legislative matters in the
future.

The chairman has mentioned the three basic elements of S. 3568.
I do not want to go into them again, except to state specifically that
all three have been the subject of official recommendations of the
Administrative Conference of the United States:

Recommendation No. 7 having to do with the minimum jurisdic-
tional amount in the United States district courts;

Recommendation 9 having to do with limiting the application of
the doctrine of sovereign immunity; and

Recommendation No. 18, just adopted by the Administrative
Conference yesterday in plenary session, having to do with eliminat-
ing certain technical deficiencies in the law relating to naming the
United States, its agencies or employees as parties defendant.

With respect to sections 1 and 3, those sections dealing with sov-
ereign immunity and with the designation of the United States as a
party defendant, the Administrative Conference is in full support
of these sections officially in its recommendations.

I would emphasize first the removal of the technical legal defense
of sovereign immunity, which the Government may still use in some
instances to block suits against it by its citizens, regardless of the
merits of their claims. We should no longer adhere to the outmoded
theory, as the chairman mentioned, that "the King can do no wrong."

Many years ago the United States adopted statutory means for
the establishment of Federal monetary liability with regard to con-
tracts and torts. S. 3568 would accomplish the same purpose with
regard to claims challenging official action or nonaction by Govern-

9

ment agencies and seeking relief other than money damages such as injunction, declaratory judgment, mandatory relief, quiet title, and ejectment.

I think it is well to emphasize that S. 3568 is limited only to actions for such specific relief. It has no effect on the recovery of money damages.

Then this bill also amends Section 703 of title 5 and section 1391(e) of title 28, United States Code, to eliminate deficiencies in the law which now permit dismissal of suits against the United States because technicallly the United States or one of its agencies or officers lacked capacity to be sued, was improperly identified, or could not be joined as a defendant.

As I say, these amendments are consistent with the recommendation adopted just yesterday, which has become official recommendation No. 18 of the Administrative Conference of the United States.

Again, I think it is well to emphasize here that Government defenses, other than those specifically eliminated would remain unaffected. I believe that these defenses, and the other procedural tools available to the Government, are adequate to protect against frivolous actions or "crank suits."

The possibility that frivolous actions may be brought which could be disposed of by the defense of sovereign immunity cannot justify the maintenance of a doctrine which Senator Kennedy, in introducing this measure, and again in his statement a few minutes ago, properly characterized as "illogical, artificial, erratic, and confusing."

The Government should not use overly technical and tricky defenses. It must meet a citizen in court in open and honest confrontation.

These principles clearly underlay the discussion of the recommendation on the floor of the assembly of the Administrative Conference in the adoption of the recommendation to eliminate sovereign immunity in these matters.

I think you could argue that a private citizen could use whatever technical defenses may be available to him. He does not have the funds, perhaps, or the manpower, to fight more broadly if he can get out of it easily, but there is no justification for the Government to do this.

The Government can afford to be open and honest with its citizens and not use technical and tricky means of trying to keep a citizen from being effective with whatever rights he has in his dealings with the Government.

The other section of the bill, section 2, deals with elimination of the $10,000 original jurisdiction amount for cases involving a Federal question in the United States district courts.

The Administrative Conference's recommendation on this point is narrower, because it recommends the elimination only where a plaintiff alleges that he has been injured or threatened with injury by an officer or employee of the United States or any agency thereof, acting under the color of law.

To the extent that this recommendation is encompassed by section 2 of S. 3568, obviously the Conference officially supports it, but obviously the Conference cannot officially go beyond and support or not support the broader scope of section 2 of S. 3568.

JA594

I do not think I need to go into the details of the impact of elimi-
nating the jurisdictional amount. The chairman did that effectively
in his statement a few moments ago.

So in closing, I would like to emphasize that the Administrative
Conference did not casually endorse the proposals which are before
you. Our recommendations were preceded by a great deal of dis-
cussion, correspondence, debate, consultation, drafting, redrafting,
and, of course, painstaking legal research.

At every step efforts were made to obtain the views of agency and
departmental officials, judges, scholars, practitioners, and bar asso-
ciations.

Each recommendation was considered first by our Committtee on
Judicial Review, then by our 11-member Council, and finally by the
full 82-member assembly meeting in plenary session.

We acted only after we were confident that our proposals would
meet the highest standards of professional competence, and would
appeal to a broad range of responsible opinion in and out of
Government.

With all of this consultation and consideration, there is one other
point I think ought to be made. I have always taken the position
that the Administrative Conference does not have to get approval
of the agencies involved for all of its proposals in advance of adopt-
ing them as official recommendations, approval from all of the
affected agencies and departments, because this would make us
simply a rubber stamp organization. The Administrative Confer-
ence is not such a rubber stamp organization. We are an organiza-
tion to advance the cause of fair administrative practice and proce-
dure and efficient administrative practice and procedure, and we must
move ahead.

The very structure of the Conference operates to guarantee a
broad range of acceptance of our proposals, since we bring together
many of the leading administrative law experts from both public and
private life.

Among our members we have high officials of 32 agencies and de-
partments, attorneys from many areas of practice and from all
regions of the country, and distinguished scholars from likewise dis-
tinguished centers of learning.

Because of the diversity of learning and experience that the Con-
ference draws upon, I can and I do submit that the reforms we advo-
cate enjoy the support of a representative cross-section of indivi-
duals involved deeply and continuously in administrative law.

That concludes my basic statement, Mr. Chairman.

Senator KENNEDY. Thank you very much, Mr. Williams. Your
statement was excellent, as always, and we appreciate having the
comments that you have made in addition this morning.

I would like to pursue just a couple of areas of inquiry. Of course,
one of the points raised consistently is that if we abolish sovereign
immunity we will really open up the floodgates of litigation and
would overburden the courts and Government lawyers.

This is certainly one of the popular expressions in terms of re-
sistence to change. Do you feel, on the basis of the Conference in-
quiry and study, that this would be the case?

Mr. WILLIAMS. I would give two answers to this: The first answer
is on the basis of all of the studies that Professor Cramton made—

11

and he can go into this in more detail—the indication is that there would be no additional serious burden. It is quite true we have had some recent court decisions which broadened the standing, the right to sue and the right to participate in lawsuits, of American citizens. To some extent this would increase the litigation. But there have not been enough of these cases to indicate that this would be a serious burden.

But then I would give the second answer, and the second answer is that the Government of the United States must be willing to assume the responsibility to play fair and openly with its citizens.

And if it gets crank suits, as it will, if it gets frivolous suits, it should deal with those suits with the honest defenses to those suits, whatever they are. And it should take whatever effort, whatever time, whatever money is necessary, to deal fairly with its citizens.

Senator KENNEDY. I gather from what you say that the evidence which has been collected would indicate—I am sure we will develop this further later on—that there would not be a significant increase in cases. Even if there was some increase, in considering the legitimate interests of those that might bring these suits—in terms of attempting to do justice to those individuals and their rights—we should readily shoulder the small additional burden that the Government might have to assume to respond more equitably to protect individual rights.

Mr. WILLIAMS. I think this is quite an accurate statement of the thinking of the Administrative Conference in its plenary session in adopting these recommendations.

Senator KENNEDY. Let me ask about another area which is of interest to us. I understand the Administrative Conference has undertaken the study of the area of land disputes involving the United States.

Mr. WILLIAMS. Yes, it is just beginning that study.

Senator KENNEDY. Is there anything that you can tell us about it now? We have legislation that is up before the Senate, introduced by the Senator from Idaho, and cosponsored by a number of other Senators. It is not unrelated to some of the provisions of this legislation, and I am sure as we move on through the committee and even with floor action, that there will be some interest in this. I am wondering if there are any observations that you would like to make at this time.

Mr. WILLIAMS. I would say the status of this at the moment is that we are receiving the information that we get from the legislation that has been introduced. We rather expect to have a report on this before the Conference by next December. It is a relatively slow, deliberative process for us. Actually, Professor Cramton is involved in this and he can tell you something about how far along we are.

Senator KENNEDY. Finally, as I understand, various governmental agencies participate in the decisionmaking process of the Administrative Conference.

Mr. WILLIAMS. That is correct.

Senator KENNEDY. And there is a fair representation.

Mr. WILLIAMS. By statute it is an agency and departmental conference. The majority at all times must be representatives of Government agencies and departments.

Senator KENNEDY. Over the period when the issue of sovereign immunity was being considered by the Conference, and even in the

plenary session, would it be fair to assume that there was a significant absence of expressions of reservations about the adoption of this recommendation? Wasn't this an almost unanimous recommendation, though I realize there were some negative votes.

Mr. WILLIAMS. That is correct, the recommendation was not unanimous. It was thoroughly discussed on the floor, the vote was fairly close to being unanimous.

However, we do not have recorded votes, we have voice votes, and the voice vote I would think it is fair to say, was close to overwhelming, although there was some dissent.

In the process of deliberations, the representatives of the various agencies and departments took part. Obviously, in final vote a substantial number of them voted in favor of the recommendation.

Senator KENNEDY. Do you have a minority report, if there is an issue of sufficient controversy.

Mr. WILLIAMS. There is a statutory right to a minority report and we have had one recommendation in which minority reports were filed. There were none filed in this particular recommendation.

Senator THURMOND. Mr. Williams, do you think the Federal courts are overburdened at the present time?

Mr. WILLIAMS. Speaking broadly and generally, I think the answer yould be "Yes," Senator Thurmond.

Senator THURMOND. Do you think it is absolutely necessary for the Federal courts to decide disputes concerning agency action?

Mr. WILLIAMS. I think that they ought to play a role in the review of agency action. I think it is obvious that the agency should make its own decisions in the initial instance, and as to most of those decisions we would hope there is no cause for review.

Senator THURMOND. Do you feel it would be possible to provide further review of agency decisions by the agency itself, and thereby accomplish the same objectives?

Mr. WILLIAMS. I think that it would be possible to increase the finality of agency action, which would cut down to some extent on judicial review.

I think that there are many instances, however, and many areas, where we would have to say if we did this, we are cutting down on the rights of American citizens to have judicial review and appeal from agency action.

Senator THURMOND. If this bill passes the Congress, how many more court cases do you expect would be initiated? Do you care to venture an estimate?

Mr. WILLIAMS. I cannot venture a close estimate. I think probably Professor Cramton can do a more accurate job on this, and I doubt that anyone can know particularly. I would like to answer your question by saying I would anticipate very few additional cases being initiated because of the elimination of sovereign immunity, very few being initiated because of the clearing up of the problem of who shall be denominated the party defendant, a substantial number being initiated because of the elimination of the jurisdictional amount.

But it seems to me that this particular increase in caseload is justified because we are simply saying that the poor citizen who has the smaller claim is also entitled to the judicial review that the more financially able citizen with a larger claim already is entitled to.

Senator THURMOND. Do you feel that the provision eliminating sovereign immunity is essential to the bill's effectiveness?

Mr. WILLIAMS. Of course, I have to speak as a spokesman for the Administrative Conference, I must remind you. And I would have to say it was the view of the Administrative Conference that it is essential to the effectiveness of the overall purpose of the bill. Now, I think that obviously each of these three items could be separated and made the subject of a separate bill, and each would accomplish its own objective insofar as it went. But all of these objectives are salutary ones and they are directed at the same goal, which is to make the Government deal openly and fairly with the citizens in court.

Senator THURMOND. Would you support S. 3568 if a section eliminating sovereign immunity was deleted?

Mr. WILLIAMS. Yes. the Administrative Conference would obviously support any one of the three elements of the measure, because each is the subject of a separate recommendation of the Conference.

Senator THURMOND. Thank you, Mr. Williams.

Thank you, Mr. Chairman.

Mr. WILLIAMS. Senator, you have Chairman Sellers here and Professor Cramton, and I think it would be useful if Chairman Sellers were called on first. I would like to ask if I may be excused.

Senator KENNEDY. I understand the Conference is continuing and your absence is sorely missed. We appreciate very much your appearance here this morning and your responsiveness to these questions.

We want to once again thank you, We hope that even though your time of service with the Conference is reaching a close, that the members of this committee will feel free to call upon you for guidance and expertise as we weave our way through these extremely intricate and complex questions. You have been extremely rsponsive in the past and we have benefited a great deal from your expertise. We feel like we can call on you in the future as well.

Mr. WILLIAMS. Thank you very much.

Senator KENNEDY. Thank you very much.

Mr. Sellers is an attorney here in Washington. He comes here today as chairman of the Judicial Review Committee of the Administrative Conference.

Mr. Sellers, we welcome you here.

## STATEMENT OF ASHLEY SELLERS, ATTORNEY, WASHINGTON, D.C., CHAIRMAN OF THE JUDICIAL REVIEW COMMITTEE OF THE ADMINISTRATIVE CONFERENCE

Mr. SELLERS. I appreciate the opportunity to appear before this distinguished committee. We, together with all lawyers who are concerned with problems of administrative law and procedure, have a great interest in this subcommittee because it is the principal forum to which we come with our problems.

The Committee on Judicial Review of the Administrative Conference of the United States, of which I am the current chairman, is authorized to study and make recommendations concerning judicial review of the Federal Administrative Act. Shortly after the committee began work in mid-1968, its attention was drawn to proposals encountered when individuals brought suit in the United States district court, seeking injunctive or declaratory relief against Federal administrative action.

47–534 O—70——2

14

An initial proposal was the application of the $10,000 jurisdictional amount requirement of 28 U.S.C., section 1331, to bar suits seeking judicial review of Federal administrative action.

The committee's recommendation on this subject, that is that the jurisdictional amount requirement be eliminated in cases of this type, was adopted by the Administrative Conference on September 12, 1968. That was recommendation 7 of the Conference.

It was evident from the beginning that the frequent application of the sovereign immunity doctrine in judicial review action was a more important barrier to availability of judicial review.

The committee's consultant, Professor Cramton, who is here today in support of S. 3568, prepared a substantial report on the subject. And the committee gave extensive consideration to the matter.

The subject is a complicated one because any legislation on this subject must be carefully drawn to avoid exposing the Government to increased monetary liability, or depriving the Government of proper defenses.

At every step of the way the committee work was communicated to the Department of Justice and to the Judicial Review Committee of the American Bar Association Section on Administrative Law.

Exchange of views contributed greatly to the development of the Committee's thinking. In October 1969, the committee product was approved by the Administrative Conference and that is recommendation 9 of the Conference, as Chairman Williams has already stated to you this morning.

In the course of considering the undesirable effects of the sovereign immunity doctrine on the availability of judicial review of Federal administrative action, it became apparent that problems in the identification and naming of parties defendant needed attention.

The committee gave further consideration to this subject, again in consultation with the Department of Justice, and I am happy to report, as you have been already advised, that its recommendation on this aspect of the subject was approved yesterday by the Administrative Conference as Conference recommendation No. 18.

I believe copies of that recommendation, action by the Administrative Conference, have been supplied to the committee by Chairman Williams. And if I may do so, since I notice he did not do so, I ask that the Conference recommendation on this subject be made a part of this record.

SENATOR KENNEDY. It will be included in the record. (See appendix I.)

Mr. SELLERS. The Committee on Judicial Review is elated that the Subcommittee on Administrative Practice has undertaken hearings on these subjects. Although it is a somewhat technical topic, not easily communicated to laymen, it has important implications for the quality of Federal justice. No principle is more vital to the maintenance of confidence in our form of government that a citizen, no matter how lowly, who is aggrieved by the actions of Federal agencies, should be able to invoke the aid of the courts to determine the legality of official action.

S. 3568, by eliminating confused and outworn doctrines that stand in the way of a prompt and adequate judicial remedy, will achieve this goal.

I thank you.

JA599

15

Senator KENNEDY. Thank you very much, Mr. Sellers.

I know you have practiced law for many years, privately and as a Government lawyer. Would you say, from your own experience, that the application of sovereign immunity ever results in injustices?

Mr. SELLERS. I think it does. Frequently the defense of sovereign immunity obviously prevents the case from getting tried on its merits. But the extent, the volume of such cases, is very difficult to forecast because in so many of these cases where the defense of sovereign immunity is put forward, other governmental defenses would be able to be interposed. Because this is the simplest one, it is frequently used by the Government as a very convenient defense and one that has an appeal to the court as an easy way to get rid of the problem. Yet, if it were not in effect, there would be other defenses that would prevent the matter from going to hearing, also.

I think it is very difficult to determine the precise quantitative results that would take place if this defense were eliminated.

Senator KENNEDY. Well, as you point out, the Government uses this defense even in areas where other defenses would be legitimate. But if we were to take the one issue of sovereign immunity, stripped bare of the other kinds of defenses, do you, as a practicing attorney and a person who has been in the pit many times, think that this one defense does work injustice against legitimate causes and individuals who are suffering injustices?

Mr. SELLERS. Well, I think that is right. I think that virtually all those who have traced the history of this defense have concluded that it no longer has any modern application, that it should not have any modern application.

It grew up in a time when we had simple government under the king, and the doctrine that the king could do no wrong which, of course, is no longer the case in this modern society. Most every other government has long abandoned this doctrine, if it ever existed. I think it would continue to make for injustice if this defense were permitted to remain in effect.

Senator KENNEDY. Thank you very much, Mr. Sellers.

Senator Thurmond.

Senator THURMOND. I have no questions, Mr. Chairman.

Senator KENNEDY. Thank you very much.

Our next witness is Prof. Roger Cramton of the University of Michigan.

Let me say, Mr. Cramton, that I bring to you the very warm wishes of our colleague on this committee, Senator Hart, who wanted to be remembered to you. As an active member of the full committee, he regrets he is unable to be with us this morning.

Professor Cramton has submitted comments on sovereign immunity and other issues involved in the bill under discussion this morning. We will be including his papers in the appendix to this hearing. I am sure they will be helpful to all of us in the Congress interested in this area. (See Appendix I.)

Professor Cramton, you have submitted an excellent statement. You may read it or summarize it. We will include it in its entirety in the record.

(The statement follows:)

JA600

COMMENTS ON S. 3568 OF ROGER C. CRAMTON

My name is Roger C. Cramton and I am Professor of Law
at the University of Michigan.  I served as consultant to the
Committee on Judicial Review of the Administrative Conference
of the United States in the development of the recommendations
that are embodied in S. 3568.  I am here to testify in support
of the bill.

Briefly stated, the bill provides that an action in a
federal court for other than money damages claiming improper
conduct by a federal agency, officer or employee "shall not be
dismissed nor relief therein denied on the ground that it is
against the United States or that the United States is an
indispensable party."  This language would eliminate sovereign
immunity as a barrier to suits seeking judicial review of
Federal administrative action, while leaving other limitations
on judicial review unchanged.  Existing limitations on tort
and contract damages against the United States also would
remain unaffected.

JA601

Second, the bill will eliminate the vexing problems
encountered by a plaintiff who makes an error in naming or
serving the Federal officer or agency that he is suing.  If
the plaintiff has given adequate notice of the nature of his
action to the Attorney General, defects in naming parties
defendant will not defeat his action.

Finally, elimination of the jurisdictional amount
requirement from the general federal-question provision of the
Judicial Code, 28 U.S.C. § 1331, will prevent that requirement
from standing in the way of judicial review actions.

My comments will discuss (1) the need for reform in each
of these areas and (2) the provisions of the bill that would
accomplish these salutory changes.

### I.  SOVEREIGN IMMUNITY

A.  Need For Reform of Sovereign Immunity

Our first Chief Justice, John Jay, observed in 1793:

"I wish the state of society was so far
improved, and the science of Government
advanced to such a degree of perfection,
as that the whole nation could in the
peaceable course of law, be compelled to do
justice, and be sued by individual citizens."

JA602

Today, nearly two centuries later, the wishes of the
first Chief Justice remain unfulfilled. For while Congress
has made great strides in establishing--through the Tucker
Act and the Federal Tort Claims Act--systems of federal
monetary liability for contract and tort, the doctrine of
sovereign immunity stands as a barrier to the redress of just
grievances against the United States Government.

It is now generally accepted that courts can make a useful
contribution to the administration of Government by testing the
legality of official conduct which adversely affects private
persons. This acceptance of the institution of judicial review
is reflected not only in court decisions but in a plethora of
statutes in which Congress has provided a special procedure for
reviewing particular administrative activity. With rare exceptions,
every new regulatory statute enacted by Congress has contained
provisions authorizing Federal courts to review the legality of
administrative action that has adversely affected private citizens.

It is an accident of history that these special statutes
do not cover many of the functions performed by the older executive
departments, such as the Departments of State, Defense, Treasury,
Justice, Interior, and Agriculture. In addition, there are
omissions and gaps in the application of special review statutes.
Judicial review in these two situations has been provided in
so-called "nonstatutory review" actions in United States district

JA603

courts. Injunction, declaratory judgment, mandamus, and other writs are available to determine the legality of official action that has harmed the plaintiff or threatens him with harm.

Some common examples of such nonstatutory review are: an attack by a postal user on a fraud order issued by the Post Office Department; a challenge by a rejected applicant to a public land determination of the Department of Interior; a review by a member of the Federal civil service of the legality of his removal from that service. In each of these cases and many others a convenient remedy--usually injunction, declaratory judgment, or mandamus--is available to determine the legality of official action.

Why is it that actions of this type traditionally have not been barred by sovereign immunity? Clearly they involve the legality of official conduct. It is also obvious that the interests of the United States are affected by such suits: if the plaintiff is successful, the Government will be prevented from taking contemplated action or required to take the action requested by the plaintiff. In fact, though not in name, the suits are against the United States.

The answer to this puzzle is that the hoary doctrine of sovereign immunity--the notion that the United States could not be sued by name without its consent--has been held inapplicable to actions brought against federal officers to review the legality of their official conduct. The law presumes that an officer who

JA604

is acting illegally cannot avail himself of the cloak of sovereign immunity.  This fiction--the false pretense that the suit against the officer is not against the sovereign--has allowed judicial review of Federal administrative action which is not subject to specific review provisions.

The theory and operation of nonstatutory review are that the officer who has committed a harm to a private individual is answerable for his conduct unless he can establish that federal law justified his action.  Although the theory rests on a fictional base, the result is sound.  In a society in which the rule of law has meaning, it would be intolerable if private persons harmed by official conduct were  without any remedy whatsoever.

Thus the officer's suit--despite its fictional character-- performed a useful role.  Its mystical transformation of a high government official, acting under cover of his authority, into an ordinary private citizen, allowed the courts to administer a flexible and discriminating control of the burgeoning activities of Government.

Reliance on fiction, however, has entailed some long-run costs.  The pursuit of rationality is strained by pretenses that force judges to treat things other than as they are.  When the sovereign immunity doctrine itself is commonly phrased in terms of whether "the suit, in effect, is against the sovereign," a conscientious judge, unfamiliar with the vagaries of history and the fictional character of the rhetoric, is induced to make a

determination as to whether the case involves important
governmental interests.  Nearly every case challenging official
conduct may be thought to fall within this more realistic
formulation, for in truth all such actions are suits against the
Government.  The officer is not acting as a private person but
as a Federal official.  In every case the officer claims the
authority to act as he did.  Finally, the interests of the
Government are threatened by the law suit,

JA606

a circumstance that justifies the defense of the suit by
government lawyers.

      Confusing notions about the nature of the sovereign
immunity doctrine add to the difficulty.  Is sovereign immunity
a matter affecting the subject matter jurisdiction of federal
courts or a defense on the merits or both?  Is the rule that
the United States is an indispensable party in certain actions
a separate rule or merely a corrollary of sovereign immunity?
Is the officer's authority determined in relation to his
particular action or by reference to his general competence
to deal with the broad subject matter?  A series of Supreme
Court decisions in recent years has created so much confusion
that clear answers to these questions are not possible.  The
resulting patchwork is an intricate, complex, and illogical
body of law.

      Law that is confused, artificial, and erratic is likely
to produce unjust results as well as wasted effort.  The
doctrine of sovereign immunity fulfills these unpleasant
expectations by distracting attention from the real issues of
whether judicial review or specific relief should be available
in a particular situation and by directing attention to the
sophistries, false pretenses, and unreality of present law.
If problems related to sovereign immunity arose infrequently,
it would be possible to regard the defects and wastefulness

JA607

of the doctrine with a degree of equanimity. The litigating
practice of the Department of Justice, however, insures that
sovereign immunity arguments are presented in hundreds of cases
each year.

Cases in which the doctrine has been invoked have
included challenges to agricultural regulations, governmental
employment, tax investigations, postal-rate matters, administra-
tion of labor legislation, control of subversive activities, food
and drug regulation , administration of federal grant-in-aid
programs, and many others. Here are a few examples of the many
cases in which sovereign immunity was partially or wholly
responsible for the dismissal of the plaintiff's claim: A farmer's
claim that officials had erred in determining that he was not in
compliance with a feed grain program administered by the
Department of Agriculture an importer's challenge to an F.D.A.
determination that coffee beans could not be imported because
adulterated an employer's claim, asserted after he had been
warned by Labor Department officials that he was violating the
Fair Labor Standards Act, that he was exempt from the Act; a
civil servant's claim that the Civil Service Commission had
erred in determining that he had not been the victim of ethnic
discrimination in violation of executive orders. In each of
these cases, and many others of similar nature, the sovereign

JA608

immunity doctrine distracted the court from basic issues
concerning the availability or scope of judicial review.

Many other cases could be cited in which, on similar
facts, the sovereign immunity doctrine was ignored or not
applied.  The confusion is so great that it is impossible to
tell when the doctrine will be invoked and when it will not.
The right of a citizen to obtain a limited scrutiny of the
validity of governmental conduct which adversely affects him
is placed in jeopardy by the doctrine as presently administered.

Government lawyers are not unlike other lawyers in that they
like to win cases in which they are involved.  The very confusion
and ambiguity that surrounds the sovereign immunity doctrine make
it a handy tool for dismissal of claims, expecially those brought
by small people who are less likely to be informed concerning the
intricacies of the doctrine.  Large corporations, represented by
experienced Washington lawyers, encounter little difficulty in
circumventing the doctrine of sovereign immunity.  But others
are unable to obtain a determination of the merits of their claims.

Another area in which the doctrine of sovereign immunity
produces injustice involves property disputes between the United
States and private persons.  Federal law does not contain any
general provision authorizing quiet title suits involving land
claimed by the United States.  In the absence of such a provision,

JA609

attempts to obtain specific relief against a federal officer in possession of disputed land have foundered on the sovereign immunity doctrine. In Gardner v. Harris, 391 F.2d 885 (5th Cir. 1968), for example, an owner of land adjacent to a federal parkway claimed a right of access to the parkway. The federal officer in charge of the parkway erected barricades across the existing right of way. In an injunction suit seeking removal of the barricades, it was held that sovereign immunity barred the action. Cases of this type allow a government officer unlawfully to seize private land, leaving the owner without relief except for a damage remedy under the Tucker Act for an unconstitutional taking.

The invocation of the sovereign immunity defense in these land dispute cases works an unnecessary injustice on private persons holding bona fide claims against the United States. Specific relief is a highly appropriate remedy in these situations. The uniqueness of land favors the application of equitable remedies when there is a dispute over possession. Yet the sovereign immunity defense operates to foreclose the possibility of specific relief, and relegates the private plaintiff to a damage remedy under the Tucker Act. If the value of the disputed property exceeds $10,000, the plaintiff must bring his action in the Court of Claims, a distant and unfamiliar

tribunal and one more expensive and time-consuming than a local
federal district court. A local federal district court is
ideally suited for determining the issues which arise in these
cases, which usually involve a blend of state land law and
federal public land law.

Moreover, the government should not be able to seize
private land without following eminent domain procedures.
Government officers, whether high or low in the bureaucratic
hierarchy, do not possess a general authority to seize private
property. Condemnation of private land should be accomplished
in accordance with the policies and procedures established by
Congress, rather than being carried out by the unilateral
decision of a government officer, perhaps a subordinate one,
in claiming the land or taking possession of it.

The elimination of sovereign immunity in these property
dispute cases would also end the gamesmanship involved in the
only present method of circumventing sovereign immunity--getting
Federal officials to take the initiative in bringing court
suits. Sometimes government lawyers are unwilling to take this
step merely because they do not want to shoulder the plaintiff's
burden. I understand that such impasses also give rise to
frequent requests for congressional intervention to urge the
Department of Justice to initiate suit to resolve disputed

questions involving ownership of land. The ability of the private claimant to initiate suit on his own would remedy these problems.

I do not need to inform this Subcommittee that there is a crisis of confidence in American institutions. The credibility of Government is at stake. When sovereign immunity is invoked to bar consideration on the merits of a citizen's claim against official action that has harmed him, credence is given to the view that Government is unresponsive and that the citizen is without remedy. What are government officials afraid of? If their actions are justified, the courts will uphold them. Must we assume lawlessness on the part of the Federal courts? A private citizen should not be denied the satisfaction of having his claim considered on the merits, or at least having the court focus on the question whether judicial review is available at this time.

The partial elimination of sovereign immunity as a barrier to nonstatutory judicial review of Federal administrative action will not expose the Government to undue judicial inter-ference with administration. The substantial and growing body of law that governs the availability, timing, and scope of judicial review offers a more discriminating and rational solution to that objective. Many of the cases decided on

JA612

sovereign immunity grounds in fact involve the question whether
a particular activity is unreviewable because "committed to
agency discretion by law." Others are situations in which it
is arguable that "statutes preclude judicial review" in whole
or in part. Some others involve problems of the timing of suit--
prematurity, ripeness, or failure to exhaust administrative
remedies--or of the plaintiff's lack of standing. All of the
cases could be decided with greater ease and better results if
attention were directed to these questions and not to the
confusing metaphysics of sovereign immunity. The essential and
sound policy underlying sovereign immunity--that courts should
not engage in indiscriminate interference with governmental
programs--is not abandoned merely because an artificial
doctrine is modified. The same basic policy is inherent in
the body of the law that governs the availability and scope
of judicial review.

  Nor will the modification of sovereign immunity overwhelm
Federal courts and government lawyers with a flood of litigation.
It is true that sovereign immunity is a handy vehicle for
getting rid at the threshold of "crackpot" suits without the
inconvenience and expense of a defense on the merits. "Crackpot"
suits, however, have deficiencies other than that they are
directed against the United States or its officers. In nearly

29

every such case there are other grounds for dismissal on the
pleadings (most often because the plaintiff lacks standing,
because the issue is inappropriate for judicial determination,
because the action is committed to agency discretion or
precluded from review, or because the complaint fails to state
a claim for relief). The volume of such litigation is heavy
now and there is no reason to believe that the modification of
sovereign immunity would have a significant effect upon it.
Arguments put in terms of "opening the flood gates" often rest
on no more than a fear of the unknown and tend to exaggerate
potential problems. The experience of agencies that are now
fully subject to judicial review under statutory review
provisions suggests that the level of litigation is not crippling
or burdensome, and that judicial review has many advantages,
even from the agency's point of view. The heavy expense of
litigation also serves as a pragmatic limit on the volume of
suits that can be brought. Other limiting doctrines, already
discussed, will allow a threshold disposition of unmeritorious
cases.

    In the final analysis, however, if some additional cases
do reach the merits because of the curtailing of sovereign
immunity, the additional burden on government lawyers can be
justified on the same basis as is judicial review in general--

JA614

the desirability of a judicial determination of the legality of official action. The ideal of a Government under law can be realized only if persons are provided with an adequate set of judicial remedies against that Government, its officials, and its agencies.

B. Amendment to 5 U.S.C. § 702.

The portion of S. 3568 that modifies the doctrine of sovereign immunity consists of three new sentences added to the existing language of 5 U.S.C. § 702, which deals with the right of judicial review of Federal administrative action. Although the first sentence of § 702, which originated in the Administrative Procedure Act of 1946, might be viewed as constituting a general waiver of sovereign immunity in actions seeking judicial review of Federal administrative action, the Federal courts have held to the contrary. Thus it is necessary for Congress to deal with the problem.

1. Modification of sovereign immunity. The first of the three sentences to be added to § 702 limits the application of the doctrine of sovereign immunity. Claims challenging official action or non-action, and seeking relief other than money damages, should not be barred by sovereign immunity. The explicit exclusion of monetary relief makes clear that sovereign immunity is abolished only in actions for specific relief (injunction,

JA615

declaratory judgment, mandatory relief, quiet title, and ejectment). Thus limitations on the recovery of money damages contained in the Federal Tort Claims Act, the Tucker Act or similar statutes are unaffected. The consent to suit is also limited to claims in Federal courts; hence the United States would remain immune from suit in state courts. The waiver of immunity extends only to actions challenging the legality of Federal action (or non-action); it would not extend to proceedings in which Federal officers or agencies are not acting in their "official capacity or under color of legal authority." The quoted language is taken from 28 U.S.C. § 1391(e), which would govern venue and service-of-process in actions falling within the purview of the amendment.

Although the bill does not use the term "specific relief," the principal effect of the amendment will be to cut off the defense of sovereign immunity in suits for specific relief. Perhaps ninety per cent of the cases affected will be suits for injunction or declaratory judgment or for both, and perhaps most of the rest will be suits for relief in the nature of mandamus. Other forms of specific relief (e.g., quiet title, ejectment, habeas corpus) are included. Recovery of money damages, however, is excluded from the bill.

JA616

Because the amendment is to be added to 5 U.S.C. § 702
(a provision of the Administrative Procedure Act entitled
"right of review") it will be applicable only to functions
falling within the definition of "agency" in 5 U.S.C. § 701.
Section 701(b)(1) defines "agency" very broadly as "each
authority of the Government of the United States, whether or
not it is within or subject to review by another agency"
except for a list of exempt agencies or functions: Congress,
federal courts, governments of territories or of the District
of Columbia, mediation boards, courts-martial and certain other
military, wartime and emergency functions.  The proposed
amendment will also not apply "to the extent that . . .
statutes preclude judicial review . . . or . . . agency action
is committed to agency discretion by law."  5 U.S.C. § 701(a).
The case law concerning the two categories of review precluded
by statute and action "committed" to agency discretion is thus
untouched by the proposed amendment.

2.  Effect on United States.  Actions challenging official
conduct are intrinsically against the United States.  Clarity
is served by allowing the plaintiff to name the United States
as a defendant in such actions.  The third sentence of § 702
as amended by the bill, withdraws the defense of sovereign
immunity in actions not seeking monetary relief in which the
legality of Federal administrative action is challenged.  The

JA617

plaintiff is permitted but not required to name the United
States a defendant.  Existing law concerning legal representation
on behalf of the United States or Federal agencies is unchanged.

The bill does not in express terms deal with the
conclusiveness of a judgment in a suit against an officer or
agency.  Under existing law, however, when the Attorney General
or other authorized legal officer of the United States defends an
officer or agency acting in his official capacity or under color
of legal authority, the United States is bound by the resulting
judgment or decree unless under the circumstances it would be
unfair to bind the United States.  The courts may be relied upon
to handle this matter sensibly.

3.  <u>Law other than sovereign immunity unchanged</u>.
Government defenses other than sovereign immunity remain unaffected
by the proposed amendment to § 702.  Indeed, all law other than
the law of sovereign immunity is unchanged. A very large proportion
of all cases that have been disposed of on the ground of sovereign
immunity, perhaps as many as nine-tenths, might have been won by
the government on some ground other than sovereign immunity,
including the merits.  Because nothing is changed except the law
of sovereign immunity, and because all other constitutional law,
statutory law, and common law remains unchanged, the government
may still win cases on such grounds as unreviewability, standing,
ripeness, exhaustion, primary jurisdiction, or any other legal
or equitable principle.  Yet to the extent that the proposed

JA618

34

amendment will remove the defense of sovereign immunity, a larger proportion of the cases brought will be decided on their merits.

The lack of effect on law other than sovereign immunity is not left to implication; the final sentence of amended § 702 contains two explicit provisos. The first proviso (clause (1)) makes clear that other limitations on judicial review are unaffected and that all other legal and equitable grounds for dismissal of actions for specific relief are preserved. These grounds include, but are not limited to, the following: (1) extraordinary relief should not be granted because of the hardship to the defendant or to the public ("balancing the equities") or because the plaintiff has an adequate remedy at law; (2) action committed to agency discretion; (3) express or implied preclusion of judicial review; (4) standing; (5) ripeness; (6) failure to exhaust administrative remedies; and (7) an exclusive alternative remedy. Special doctrines favoring the United States as a litigant, such as the inapplicability of statutes of limitations to claims asserted by the United States, are unaffected. Statutory or rule provisions denying authority for injunctive relief (e.g., 26 U.S.C. § 7421 and 28 U.S.C. § 2201, prohibiting injunctive and declaratory relief against collection of federal taxes) or other matters (e.g., Rule 13(d), dealing with counterclaims against the United States) remain unchanged.

JA619

35

4. <u>Where Congress has provided an exclusive remedy</u>.
The second proviso of amended § 702 (clause (2)) is concerned
with situations in which Congress has consented to suit and the
remedy provided is intended to be the exclusive remedy.  The Tucker
Act and the Court of Claims Act provide apt illustrations. Congress,
by creating a damage remedy for contract claims, with jurisdiction
limited to the Court of Claims except in suits for less than
$10,000, intended to foreclose specific performance of government
contracts.  In the terms of the proviso, a statute granting
consent to suit, <u>i.e.</u>, the Tucker Act, "impliedly forbids" relief
other than the remedy provided by the Act.  Thus the partial
abolition of sovereign immunity brought about by the proposal
does not change existing limitations on specific relief, if any,
derived from statutes dealing with such matters as government
contracts, Indian claims, patent infringement, tax claims, and
tort claims.  Statutes providing an exclusive method of judicial
review of particular administrative action also remain unaffected.
The intent of the proposal, however, is to overrule <u>Malone</u> v.
<u>Bowdoin</u>, 369 U.S. 643 (1962), which held that sovereign immunity
barred specific relief for an alleged unconstitutional taking.

The language of clause (2) of the proviso directs attention
to particular statutes and the decisions interpreting them.  If
a statute "grants consent to suit" with respect to a particular

JA620

subject matter, specific relief may be obtained only if Congress has not intended the provision for monetary relief to be the exclusive remedy.

Clause (2) of the proviso does not withdraw specific relief in any situation in which it is now available. It merely provides that new authority to grant specific relief is not conferred when Congress has dealt in particularity with a claim and intended a monetary remedy to be the exclusive remedy.

## II. PARTIES DEFENDANT

The size and complexity of the Federal Government, coupled with the intricate and technical law concerning official capacity and parties defendant, has given rise to innumerable cases in which a plaintiff's claim has been dismissed because the wrong defendant was named or served. A recent civil service case is illustrative. A civil servant who charged that he had been the victim of ethnic discrimination sought to obtain judicial review of a civil service commission determination in a suit in which he named as defendants the United States, the employing agency, and the Civil Service Commission. The court held that the United States could not be sued without its consent at the employing agency could also cloak itself in the mantle of the sovereign; and that existing decisions required that actions attacking determinations of the Civil Service Commission be

brought not against the Commission but against its individual
members. The opinion, written by as astute a jurist as Judge
(now Justice) Blackmun, failed to note that Rule 15(c) of the
Federal Rules of Civil Procedure allows a plaintiff to amend
at any time to correct mistakes of this kind.

 The unsatisfactory state of the law of parties defendant
has been recognized for some time and three attempts have now
been made to cure the deficiencies. First, Congress, in 1962,
amended § 1391(e) of Title 28 in order to allow broadened venue
and extraterritorial service of process in suits against federal
officers and thus to circumvent the formerly troublesome requirement
that superior officers be joined as parties defendant. Second,
Rule 25(d) of the Federal Rules of Civil Procedure was amended in
1961 to provide for the automatic substitution of successors in
office. That rule also states that "any misnomer not affecting
the substantial rights of the parties shall be disregarded" and
that the officer may be "described as a party by his official
title rather than by name." Third, Rule 15(c) of the Federal Rules
was amended in 1966 to deal with the plaintiff's failure to name
any appropriate officer or agency as defendant.

 Despite these changes, problems involving parties defendant
in judicial-review actions continue to arise. The ultimate goal
has been clearly stated by the Supreme Court: modern procedure

"reject[s] the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept[s] the principle that the purpose of pleading is to facilitate a proper decision on the merits." What is true of ordinary civil litigation is even more true when a citizen is attempting to obtain redress from his Government. The ends of justice are not served when government attorneys advance highly technical rules in order to prevent a determination on the merits of what may be just claims.

When an instrumentality of the United States is the real defendant, and an authorized legal representative of the United States has been served, the names on the pleading should be irrelevant. The plaintiff should have the option of naming as defendant the United States, the agency by its official title, appropriate officers, or any combination of them, and the outcome should not turn on the plaintiff's choice. S. 3568 will accomplish this objective by amending § 703 of Title 5 to provide the plaintiff with this option in judicial-review actions, providing no special statutory review proceeding is applicable.

A related problem concerns joinder of third persons as parties defendant. When § 1391(e) of Title 28 was enacted in 1962, the availability of the extraterritorial service of process and broadened venue was limited to judicial-review actions "in

39

which each defendant is an officer or employee of the United
States or an agency thereof." This language prevents a plaintiff
from joining nonfederal third persons as defendants in actions
under § 1391(e). There is no functional justification for this
limitation, for it prevents relief in some situations in which
the Federal courts can make a special contribution. In many
public land controversies, for example, three parties are
involved--the official, a successful applicant, and an unsuccessful
one. Effective relief cannot be obtained in an action in which
the United States or its officer is not involved; but if the
Government is named as defendant, § 1391(e) prevents the joinder
of the other private person as a defendant, and that person
cannot be joined as a plaintiff because his interest is adverse
to that of the plaintiff. Another common type of situation in
which the limitation is troublesome is that in which the specific
relief is sought against Federal and state officers who are
cooperating in a regulatory or enforcement program.

There are no sound reasons why the general principles
that control party joinder in Federal courts should not be
applicable in these situations. Thus, S. 3568 would amend § 1391(e)
by substituting the word "a" for the word "each", and by adding a new
sentence permitting joinder of nonfederal defendants who can be
served in accordance with normal rules governing service of process.
Other objections to such joinder, steming from the discretion

JA624

vested in the trial judge under the Federal Rules to control
the dimensions of the law suit and to protect particular parties,
would be unaffected.  Since the plaintiff would be required to
state a substantial claim against Federal officers, use of this
special venue provision as a sham to circumvent normal venue
requirements will not be a problem.

### III.  JURISDICTIONAL AMOUNT

An anomaly in the law relating to Federal-court jurisdiction
deprives a United States district court, otherwise competent,
from entertaining certain cases involving non-statutory review of
Federal administrative action in the absence of the jurisdictional
amount required by § 1331 of the Judicial Code, the general
"federal question" provision.  These cases "arise under" the
Federal Constitution or Federal statutes, and--subject to the
various limiting rules of standing, exhaustion of remedies,
finality, ripeness, and the like--they are appropriate matters
for the exercise of Federal judicial power.

A large number of special statutes grant jurisdiction,
without regard to amount in controversy, in most areas that
otherwise would fall under the general federal question statute.
There are, however, a significant number of situations involving
nonstatutory review in which a plaintiff must ground his action
on § 1331 and, therefore, must establish that "the matter in

JA625

controversy exceeds the sum or value of $10,000, exclusive of interest and costs." In some of these cases the jurisdictional-amount requirement cannot be met because it is impossible to base a monetary value on the right asserted by the plaintiff. How is one to value an individual's claim that he is entitled to remain free from military service, to travel abroad, or to be free from continuous police surveillance? In other cases the plaintiff's claim that he is entitled to a Federal grant or benefit, such as Federal employment or the use of public lands, may be assigned a monetary value, but the amount in controversy may be $10,000 or less. Although judicial review of these and similar claims may be unavailable or limited in scope for other reasons, judicial consideration of the plaintiff's claim should not be foreclosed solely because of a lack of the jurisdictional amount.

The factors relevant to the question of whether a Federal should be available to a litigant seeking protection of a Federal right has little, if any, correlation with the minimum jurisdictional amount. Instead, they involve such considerations as whether there is need for a specialized Federal tribunal and whether there are defects in the state judicial system that might substantially impair consideration of the plaintiff's claim. These factors have special force in cases in which specific relief

is sought against a Federal officer, because state courts
generally are powerless to restrain or direct a Federal officer's
action which is taken under cover of Federal law.  Thus the denail
of a Federal form for lack of the jurisdictional amount may be
a denial of any remedy whatsoever.

     Elimination of the jurisdictional-amount requirement
in federal-question cases need not be limited to action seeking
judicial review of Federal administrative action but can and
should be done across the board.  The American Law Institute
has so recommended.  There are only three categories of cases
that may be subject to the jurisdictional-amount requirement:
(1) Jones Act cases; (2) suits contesting the constitutionality
of state  action ; and (3) some cases, not falling under special
subjectmatter-jurisdiction provisions, involving judicial review
of Federal action.  Informed commentators such as Professor
Charles A. Wright assert that the Jones Act is an act regulating
commerce and hence that personal-injury actions under that Act
may be maintained under 28 U.S.C. § 1337 without regard to
jurisdictional amount.  In any event, the jurisdictional-amount
requirement is not a meaningful limitation in personal-injury
actions, since a plaintiff may always conscientiously allege pain
and suffering in excess of $10,000.

JA627

Similarly, it is argued that most suits contesting the constitutionality of state action may be brought under 28 U.S.C. § 1343(3), which gives jurisdiction, without regard to amount in controversy, of actions to redress the deprivation, under cover of any state law, of any right, privilege, or immunity secured by the Federal Constitution, or by any Federal civil rights statute.

The third category--cases in which persons aggrieved by Federal administrative action are seeking nonstatutory review in an action brought against the officer--may be the only significant cases in which the jurisdictional amount requirement of 28 U.S.C. § 1331 is an effective limitation.  Even in this situation the limitation can be circumvented if the plaintiff brings his action in the District of Columbia or if he can cast his action in the form of a mandamus proceeding under 28 U.S.C. §§ 1361.  The resulting situation is hardly a logical or defensible one. Congress, in 1962 disturbed by the inability of litigants to obtain mandamus relief in local courts distributed around the country, conferred such jurisdiction on all district courts without regard to the amount in controversy.  The more traditional exercise of injunctive or declaratory authority, however, remains subject to the requirement of a minimum jurisdictional amount whenever no special federal-question statute is available--except in the District of Columbia!  The same arguments that supported the

JA628

Mandamus and Venue Act of 1962--the expense and inconvenience of
forcing litigants from all over the country to bring their claims
to a District of Columbia court--support the elimination of the
remaining anachronism in injunction suits against Federal officers.

The number of additional cases that will be brought in
Federal courts if § 1331 is amended to eliminate the jurisdictional·
amount requirement is likely to be quite small.  Nearly all of
these cases, as has been already pointed out, may already be
brought in some Federal court somewhere.  Elimination of the
jurisdictional amount requirement, therefore, will merely shift
such litigation to a district court where the plaintiff resides
or where the cause of action arose.

IV.  CONCLUSION

Compared to the great problems of our age--racial conflict,
nuclear war, environmental quality, and so on--sovereign immunity
and the other matters dealt with in  S. 3568      are relatively
trivial and unimportant.  Yet they are subjects that cry out for
reform.  The doctrine of sovereign immunity has long since outlived
its usefulness.  An expansion of federal jurisdiction to broaden
the opportunities of citizens to obtain judicial review would also
be beneficial.  Finally, the remaining problems associated with the
law of parties defendant are overdue for total elimination.
Congress, by adopting S. 3568, can make a substantial contribution
to society by promoting rationality in a complex and intricate
specialty of federal law.

JA629

45

### STATEMENT OF PROFESSOR ROGER CRAMTON, UNIVERSITY OF MICHIGAN LAW SCHOOL, CONSULTANT TO THE ADMINISTRATIVE CONFERENCE

Mr. CRAMTON. Thank you very much, Mr. Chairman.

Since my statement will be included in the record, I will direct my remarks this morning to the central points, particularly those raised by the statement made available later yesterday by the Department of Justice.

After providing some general background on the sovereign immunity problem, I will talk about the areas of injustice that result from the application of sovereign immunity to cases seeking judicial review of Federal administrative action, and then briefly touch upon some of the objections raised by the Department of Justice.

Since the statement of the Department of Justice seems to raise some question about the general utility of the courts being available to decide the legality of governmental action and conduct, I begin with a brief restatement of the purposes and function of judicial review. I think it clear that some access to Federal courts leads to greater fairness in the administrative machinery of the Government. The mere fact that a case may be looked at by a dispassionate outside person encourages the fair treatment of private persons in all cases, not only in those cases in which judicial review is in fact sought. Officials cannot tell in advance when judicial review will occur; hence fairness and propriety are necessary in all cases. The old dictum that "absolute power tends to corrupt" is no less true of bureaucracies and government agencies now that it was in the past; and the mere fact that someone scrutinizes, even minimally, what officials do is a basic element of our system that needs to be encouraged.

Judicial review also serves as a window to the outside world. We have all heard of captive agencies, of bureaucracies that are so internalized in dealing with themselves and their own problems that they fail to take into account other interests, other views, other values, other principles which are embodied in the law and in the broader society. If an agency is totally insulated from judicial review, if it is cut off from outside scrutiny—contemplating its own navel all of the time—the result is rigidity, unresponsiveness, and poor decisions. Such an agency has tunnel vision from preoccupation with its own particular mission and activity; and it is likely to be unresponsive to changes in society. An opportunity for judicial review in fact leads to a more responsive, more open, more satisfactory government.

Finally, judicial review has great advantages for the agencies and departments themselves. It is a great burden for a Government official to shoulder if he in fact has the last word in deciding the legality of his own conduct—conduct that in fact harms private persons. The official obtains satisfaction when an outside official, a Federal judge, looks at what he does and in 99 cases out of 100 says that what he did was not only lawful but was reasonable. Judicial review thus legitimatizes what Government has done and makes its action more acceptable to the citizenry. In doing so it makes the operations of the agencies themselves more effective.

47-534 O—70—4

These are the major purposes and functions of judicial review. They have been accepted by the Congress in literally hundreds of statutes. Every new regulatory or enforcement statute that Congress passes that affects private rights automatically includes a special provision for judicial review. Why is there any problem if Congress has been so concerned with facilitating the access to courts of private citizens? The answer is that in the 19th century very important functions of Government located in the older executive departments— State, Treasury, Department of Justice, Post Office, and Defense— grew up that were not governed by statutes specifically providing for court review.

Judicial review was made available in these situations by what became known as the officer's suit—a suit against the individual officer in which plaintiff claimed that since the officer had acted illegally, he had acted outside of his authority and hence that he was no longer acting as a governmental officer. Since his conduct was harmful to private rights, a Federal court could enjoin him. The officer's suit in so-called nonstatutory review actions brought in Federal district courts has been the vehicle by which a very large and important category of governmental conduct has in fact been scrutinized, at least minimally, by the Federal courts. Let me give a few examples.

When the Post Office determines that a particular individual is not entitled to the use of the mails because he has committed some fraud, judicial review has been available by means of an injunction suit in a United States district court. When a Federal landowning agency such as the Department of the Interior, while determining applications for very important mineral rights, timber rights, and so on on those public lands, determines such an application or grant, the matter has been traditionally reviewed in the United States district court in an officer's suit. Immigration orders for exclusion or deportation also came to be reviewed initially in this manner.

The availability of review was complicated by a series of Supreme Court decisions starting in the late 1940's, and extending into recent years. These decisions have thrown great confusion upon the traditional availability of the officer's suit. I think it is fair to say that if we take the language of the *Larson* case, which the Department of Justice relies upon, seriously and literally, it would produce judicial review except for constitutional questions in all of the cases that I have mentioned—the postal fraud case, the public land determination case, immigration orders, and the like.

It is an accident of history, in my view, that the many special statutes providing for judicial review did not cover the whole waterfront. The confusion that recent Supreme Court cases have created about the availability of nonstatutory review has proved to be very troublesome to Federal courts, particularly the United States district courts. Cases in those courts cannot be examined without reaching the conclusion that the application of the doctrine of sovereign immunity to actions challenging the legality of Federal conduct is totally erratic, haphazard, unpredictable, unfair, inconsistent, and, in some situations, unjust.

Here are some recent examples of injustice—examples of some of the many cases in which sovereign immunity was partially or wholly responsible for dismissal of the plaintiff's claim:

JA631

47

A farmer's claim that officials had erred in determining that he was not in compliance with a feed grain program administered by the Department of Agriculture.

An importer's challenge to a Food and Drug Administration determination that coffee beans could not be imported because adulterated.

An employer's claim, asserted after he had been warned by Labor Department officials that he was violating the Fair Labor Standards Act, that he was exempt from the act.

A civil servant's claim that the Civil Service Commission had erred in determining that he had not been the victim of ethnic discrimination prohibited by Executive orders.

In each of these cases, and in many other of similar nature, the sovereign immunity doctrine distracted the court from basic issues concerning the availability or scope of judicial review.

No one can say that injustice always results in these areas, because other cases involving exactly the same subject matter could be cited in which sovereign immunity was not applied. My point is that the application of the doctrine is so haphazard and erratic and unpredictable that you cannot say in what area injustice is likely to occur. It may occur anywhere, with respect to any form of governmental conduct, unless there is a specific statute providing for judicial review.

There is one area, however, that I would like to single out for special attention. This is an area where the doctrine of sovereign immunity is most likely to be applied today and which in fact does lead to injustice to a large number of citizens of the United States.

These are cases that involve property disputes between private persons and the United States. Federal law does not contain any general provision authorizing quiet title suits involving land claimed by the United States. In the absence of such a provision, attempts to obtain specific relief, that is, to keep the land, have foundered on the sovereign immunity doctrine. Here is one recent example:

A private land owner owned land adjacent to a Federal parkway. He had a right-of-access to the parkway. One day a Federal officer came along and erected barricades obstructing his access to the parkway and hence his access to his own land. He objected, he complained, he pursued administrative channels, but he was turned down. The question involved was whether in fact he did have a right-of-access to the parkway. Who owned this interest in the land?

There was no way in which he could get that question litigated. When he brought suit, the suit was dismissed on the ground of sovereign immunity. His only remedy would be a suit in the court of claims to recover damages from the United States for a unconstitutional taking of property.

I think it is clear that injustice results in these situations. Specific relief is highly appropriate in these situations because of the uniqueness of land and the considerable private interest involved. There is no reason why the United States as a landowner should be treated any differently than other landowners. No important regulatory programs ordinarily are involved, or, if they are, the condemnation power is available to the United States to take the land and to pay compensation for it.

JA632

48

Moreover, Government officials do not have any general authority to seize private property in the absence of congressional authorization. There is no general authority of public officials to just go out and seize the property of private persons. Condemnation of private property should be accomplished in accordance with policies and procedures established by Congress, rather than being carried out by the unilateral decision of a Government officer.

The elimination of sovereign immunity in this area would also take an unpleasant burden off the backs of Members of Congress. The mere fact that no remedy is available, unless the Government in fact initiates a lawsuit to determine title, means that many private individuals beseech their Congressmen to intervene on their behalf to get the Department of Justice to initiate suit, because that is the only way that the title can now be tried.

I do not need to inform this subcommittee that there is a crisis of confidence in American institutions. The credibility of government is at stake. When sovereign immunity is invoked to bar consideration on the merits of a citizen's claim against official action that has harmed him, credence is given to the view that Government is unresponsive and that the citizen is without remedy.

What are Government officials afraid of? If their actions are justified, the courts will uphold them. Must we assume lawlessness on the part of the Federal courts? A private citizen should not be denied the satisfaction of having his claim decided on the merits, or at least of having a court focus on the question whether judicial review is available and what the scope of that judicial review should be.

At this point I would like to deal briefly with some of the objections that are made to the bill by the Department of Justice. A principal objection is that the modification of sovereign immunity will lead to undue interference with Government programs and with the legitimate performance by the Government of its many tasks.

I have a great deal of sympathy for many of the points made by Assistant Attorney General Ruckelshaus in his prepared statement. The courts should not decide all issues, they should not take over the operation of society. There is a strong and legitimate place for the effective operations of the agencies themselves. But the Department of Justice has picked the wrong villain. The villain is not sovereign immunity. The villain, if there is one, is occasional excess on the part of some courts in applying the law of standing, or in substituting judgment rather than merely reviewing the reasonableness of agency action.

The Department of Justice and the courts ought to direct their attention not to the metaphysics and bugaboo of sovereign immunity—which no one really understands and which only confuses the issue—but to the simpler problems whether agency action has been committed to agency discretion and is therefore nonreviewable in the particular instance. That question of congressional intent is a valid defense; it remains unaffected by this bill.

Does the plaintiff have standing to seek judicial review? Has he exhausted his administrative remedies? What is the scope of review? Is it limited to examining arbitrary or capricious action or does

49

it extend to an examination of the merits to see whether or not there is substantial evidence?

These are the issues under present law that protect the Government from improper interference; and those doctrines are unchanged by this bill. The protective doctrines are well understood and they in fact direct the mind and focus attention on the real policy questions that are involved, whereas sovereign immunity merely distracts and confuses.

In short, while the Government has a legitimate concern about courts going too far in reviewing, and particularly in substituting judgment upon, the actions of officials, this bill will not have that result. The Department of Justice, however, worried about a few court decisions that have gone too far, has the wrong villain. The villain is not sovereign immunity, it is occasional error in the application of these other doctrines that are more precise and rational.

The second major argument of the Department of Justice is the "floodgates" argument. Modification of sovereign immunity, it is said, will give rise to a flood of litigation which will overwhelm the Federal courts and put a heavy burden on Government lawyers. There is always a tendency, of course, for opponents of a measure to exaggerate the implications and effects that it will have. My position is in agreement with that stated by Senator Kennedy in response to a question to Mr. Williams. Some additional litigation may result from the modification of sovereign immunity, but most of these cases can be already brought in some Federal court. If in fact the plaintiff's lawyer is well informed, if he is acquainted with this intricate specialty of Federal law, he will be able to sidestep the sovereign immunity doctrine.

It is the small person, the person who is least informed about the intricies of sovereign immunity, and who is likely to come from some remote part of the country removed from the center of power here in Washington, who will be thrown out on the ground of sovereign immunity.

Senator KENNEDY. Have you examples of that? Do you have cases that are almost identical in nature where sovereign immunity is used as a defense, and where, if they are drafted in slightly different terms, or perhaps are filed in different parts of the country, parties got different results? Are there some rather typical, obvious kinds of examples?

Mr. CRAMTON. I mentioned in my remarks just a few minutes ago a case in which a small importer on the west coast wanted to bring some coffee beans into the country, and the Food and Drug Administration made an administrative determination that they were adulterated and refused to allow the importation. The importer's attempt to get judicial review of the legality of that order was denied on the ground of sovereign immunity.

In a very similar case, however, Abbott Laboratories, a large pharmaceutical concern, sought to attack a regulation of the Food and Drug Administration which had not even gone into effect to obtain an advance declaration of its legality. Abbott had very high-priced Washington and New York counsel who were familiar with these matters, and when the Government raised the sovereign im-

50

munity objection, as it did, as eminent a jurist as Judge Friendly, of the Court of Appeals for the Second Circuit, scolded the Government lawyers for taking the time of busy judges by making such a spurious argument.

And yet, before a district court judge, not well informed in these matters, Government lawyers, who as institutional litigants have special knowledge and access and familiarity with the complexity of this area and who talk in broad rubrics of "action which affects the Government," or "requires the Government to take action," and so on, the case will often be held barred by sovereign immunity. A small person with a less experienced attorney will be thrown out of court, while the wealthy corporation will be able to sidestep the sovereign immunity doctrine.

In conclusion, I would emphasize that the fears of the Department of Justice are very much exaggerated—this is really a minor modification and amelioration of existing law. It is not a matter of major consequence. The monetary liability of the United States is left totally unchanged, all of the defenses to the availability of judicial review, the scope of judicial review that now exists, are totally untouched.

Moreover, if the Congress has in a particular situation expressed an intent that a particular remedy be the exclusive remedy, that remains unchanged. Let me give an example of that, because it is, I think, typical of the kind of unjustified fears that some Government lawyers have. They raise the question of whether or not a Government contractor should be able to rush in to a Federal court every time he does not get a contract or his contract is revoked to obtain declaratory or injunctive relief against the United States. It is very clear that Congress has expressed the intent, and the courts in a long line of decisions have said in such situations, that the only remedy that is available is the damage remedy in the court of claims or in the United States district court. You cannot get specific performance of a Government contract; injunctive and declaratory relief are unavailable.

The bill makes it entirely clear that this situation is not affected in the slightest. The second proviso to section 702 of the bill, speaks very clearly. It says that "nothing herein * * * confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." If the Department of Justice does not think that this language is crystal clear, suggestions for its improvement would be appreciated. I want to make it very clear, as part of the legislative history of this enactment, that the Tucker Act is in fact an act consenting to suit which impliedly forbids injunctive and declaratory relief.

If the Department of Justice has particular matters that they wish to raise, that would improve the language of the bill, that would clear up any uncertainties and so on, I stand ready to assist the subcommittee in drafting a bill that would meet any legitimate objections that the Department has.

Thank you very much.

Senator KENNEDY. Thank you, Professor Cramton. Your full testimony is enormously helpful in our consideration of this legislation, and your exposition this morning was likewise so.

JA635

I would like to go over some of the points which you have touched on and have you nail down a few a bit tighter. I would like to be as explicit as I can on these questions.

Would the abolishing of sovereign immunity actually result in disruptive and costly and time-consuming responsibility by the courts? This is without regard to the merits of judicial review in any given case.

Mr. CRAMTON. Any reader of the newspaper reports on the decisions of the Supreme Court of the United States knows that the Supreme Court of United States is all of the time considering the legality of major programs of the United States Government, and in fact sometimes it enjoins their continuance. Examples could be drawn from recent cases involving issuance of passports and discharge of soldiers from the military and regulatory and enforcement actions in a variety of areas.

These cases are merely illustrations of the fact that well-informed attorneys, who know the loopholes and the ways around sovereign immunity, can get their cases heard now, and do get them heard. The small people—people who are less well represented and who are confused by the mysteries of this strange cult—have trouble, however, and many of them have the disagreeable feeling of being thrown out of Federal court on grounds that they cannot understand while at the same time they read in the newspaper about all of these other lawsuits which are in fact being brought against the United States and affect the interest of the United States in much more important ways than theirs.

Senator KENNEDY. If we are going to permit even all of these little people, so to speak, to bring their cases into these courts, and we strike down one of these barriers, are we going to be flooding the courts which are already overburdened?

Mr. CRAMTON. I think not.

Senator KENNEDY. Isn't this suggested by everything you said, that if we strike down this defense we are going to be letting in thousands of additional cases. If trying to balance the inequity is going to mean courts are going to have to act more expeditiously on other cases, therefore the overburdened court system may actually provide greater injustice for a whole range of cases rather than just for one group?

Mr. CRAMTON. It is clear, of course, that the Federal courts do have a heavy burden. We have to be cognizant of the effects of any new measure upon the workload of the Federal courts. But several things ought to be borne in mind. One is that litigation is very expensive. Only persons who have the financial ability to support that litigation will in fact challenge governmental action in the courts.

Secondly, to the extent that citizens who are in fact hurt do have the resources to bring a lawsuit, many of them are bringing lawsuits now. When such people feel strongly about what Government has done to them, they go to court anyway. When they do so, the court spends a great deal of time and energy in passing upon the doctrine of sovereign immunity. In many situations, the case could be more easily and simply disposed of by getting to the real issue, which may be a standing question, or exhaustion of administrative

remedies, or whether the action is committed to agency discretion, or, in some cases, the merits, such as whether or not the statute allows the officer to do what he did.

The Government, if you look at its pleadings in these cases, really argues the merits and all of the other questions as well. There is very little saving in time and energy on the part of Government attorneys and of the court because of the application of sovereign immunity. In fact, it just throws in an additional complicating issue.

So, although there may be some additional litigation—and no one can tell how much—the amount is likely to be fairly small. Moreover, the elimination of one complex issue from a large number of lawsuits will save a lot of time and energy of Government lawyers, of private lawyers, and certainly of the Federal courts.

Senator KENNEDY. You mentioned earlier in your testimony about the narrowing of these other defenses, which may already permit an increased number of cases. If we are really going to try to do something about limiting the number of cases or controversies that are brought, perhaps these areas might be more carefully defined. Would you develop that further?

Mr. CRAMTON. I think the major problem is in the standing area, the tendency of some Federal courts to allow a general public action on the part of citizens who have a public-spirited interest in a problem but who have not in fact been hurt by the administrative decision. The problem is bothersome to the Department of Justice because it creates the possibility of a much larger volume of litigation—litigation in which the court is essentially giving advisory opinions to two parties who have a very limited or remote interest.

I do not want to get into the merits of the standing problem other than to say that it is a complicated area which merits separate study. It is the kind of problem on which the Administrative Conference of the United States might well help out the Department of Justice with a cooperative study leading to an amendment of the Administrative Procedure Act which would try to clarify the law. But it is a separate problem—it is not today's business, it is the work of another day, and requires a great deal of time and attention.

Senator KENNEDY. Could you address yourself to the land problem, the question of these land disputes and quiet title cases, as it applies to S. 3568? As you know, there is presently pending before the Congress a bill to provide district court jurisdiction to a quiet title action against the United States. Would you like to comment on the effects of S. 3568 in this area.

Mr. CRAMTON. Yes, I would like to, because I think that is a very important issue. S. 3568 will have some important benefits in making available a forum for injunctive and declaratory relief in situations involving land disputes between private persons and the United States. There is a risk it may not accomplish the whole job that needs to be done. It is for that reason that I have supported a special quiet title bill, which would in fact do the whole job and provide special procedures for dealing with that type of case.

Until we get quiet-title legislation, this bill will go part of the way, although not the whole way. To get into why it will go only part of the way involves some very complex, historical problems

JA637

with respect to subject matter jurisdiction of the Federal courts and with respect to the remedial powers of a Federal district court to grant an injunction or declaratory judgment. Suppose that a private person has been occupying for some time what the United States considers to be public land, and the private person has some color of title but the United States views him as a squatter although it has taken no steps to oust him from possession. In this situation there is a problem as to whether injunctive or declaratory relief—essentially a suit to quiet title—may be brought without special authorization when the Government is passive and inactive. The reason is that a plaintiff cannot seek to enjoin the Government from doing anything, because the Government is not really taking any action against him and he is not being threatened with the imminent harm that one needs to get injunctive relief from a United States district court. Congress has not authorized a general quiet-title procedure or remedy in this situation.

The point is an arguable one. The question turns in part on whether or not this is "administrative action" within the meaning of the Administrative Procedure Act. I would draw the attention of the subcommittee to the fact that this bill will amend the judicial review provisions of what is known as the Administrative Procedure Act, and therefore it is only applicable to judicial review of "administrative action." Where the Government is totally passive or inactive, there is at least a plausible argument that that is no administrative action subject to such review.

There are other suits, of course, when the Government is actively claiming possession or is seeking to oust the plaintiff from possession, where the suit to enjoin a constitutional taking would in fact supply the subject matter jurisdiction. Since the court possesses remedial power to enjoin such harm, this bill, by making the doctrine of sovereign immunity unavailable to the United States, would in fact allow that suit to proceed and allow the court to determine who owns the land.

So S. 3568 would do most of the job in the land field, but not all of it. For that reason I hope the Department of Justice will push ahead on legislation it now has under consideration which would provide a general quiet-title remedy and procedure.

Senator KENNEDY. In terms of the $10,000 amount in controversy requirement, could you tell us what your view would be as to whether or not this might open court doors to large numbers of cases?

Mr. CRAMTON. The effect of eliminating the $10,000 jurisdictional amount from section 1331 of title 28 would be almost totally insignificant. The insignificance of this is demonstrated by the fact that some academic colleagues, such as Professor Davis, who is going to testify today, think that the number of cases that are involved is so small that the problem is not even worth talking about.

Now, I disagree with him on that. I think there is a small number of cases in which you cannot value the right, or in which the right is worth less than $10,000, if valued, in which the jurisdictional-amount problem is a barrier. Scholars and commentators and lawyers have identified only three kinds of cases that arguably are ever subject to the jurisdictional-amount limitations of the general

Federal question provision. First, Jones Act cases, but it is now generally thought that the Jones Act is a statute regulating commerce and hence that no jurisdictional amount is required. In any event, the minimum amount is not a practical limitation because plaintiffs can always allege pain and suffering in personal injury cases of more than $10,000.

A second category of case is the suit to enjoin unconstitutional State action. Most of those suits can also be brought under a special Federal question provision in the civil rights area, section 1343(3) of title 28, which does not contain a jurisdictional amount requirement. The Department of Justice concedes that that is the case.

So the only category of cases involved is a limited category in which private persons are challenging Federal administrative action, and either the right cannot be valued or it is worth less than $10,000, and there is no special Federal question provision. That is, the case does not deal with the Post Office, it is not a statute regulating commerce, it is not a civil rights matter, and so on. Because all of those special statutes do not require any jurisdictional amount.

I have identified a small number of such cases, such as *Clark* v. *Boyd*, involving a Selective Service matter—the right to be free from induction when the Government is not empowered to induct one. That is a right that is somewhat difficult to value. And a three-judge Federal district court dismissed such a case for lack of jurisdictional amount.

There may be some others, but surely the number is going to be very, very small. The American Law Institute, which has also recommended the elimination has made a very substantial study of this question, and it is desirable in its own right, even though it is somewhat broader than just the Federal administrative action area we are primarily concerned about today.

Senator KENNEDY. To your best knowledge, there are no additional really broad areas, other than these three? There are no fourth or fifth classes of cases to be let in Federal court under our bill?

Mr. CRAMTON. There are none.

Senator KENNEDY. As I understand your position, the sovereign immunity doctrine does not provide a real deterrent to the institution of litigation and in fact adds an issue which requires considerable judicial effort to resolve or circumvent, and that when the issue is the basis of decision below, it invites appeals and further litigation on the matter?

Mr. CRAMTON. That is true.

I might add that in the course of writing a substantial article on this subject, I asked for comments from a number of Federal judges and law professors that I knew had some special experience in this area. I got back a whole sheaf of letters in which they stated very strongly the confusing nature of existing law, the difficulty that they had dealing with it, its complexity, and their tremendous desire to have Congress step in and resolve this particular uncertainty.

Senator KENNEDY. Thank you very much, Professor Cramton. Your comments and testimony have been very helpful. We appreciate your appearance here this morning.

Mr. CRAMTON. I appreciate the opportunity of being here.

55

Senator KENNEDY. Mr. Dan Byrd is the present chairman of the Administrative Law Section of the American Bar Association. He practices law in South Carolina.

It is a great pleasure to welcome you here today as a representative of the American Bar Association.

Senator Thurmond regrets he is not here, because he wanted to add a word of welcome to you.

## STATEMENT OF DAN M. BYRD, JR., ATTORNEY, FORT MILL, S.C., CHAIRMAN OF THE ADMINISTRATIVE LAW SECTION OF THE AMERICAN BAR ASSOCIATION

Mr. BYRD. Thank you, Mr. Chairman.

Mr. Chairman and members of the subcommittee, I have the honor of having associated with me a member of the council of the section of administrative law, Prof. Kenneth Culp Davis, who has worked extensively and written voluminously on the subject you are considering today. I really feel much safer having Professor Davis at my side answering any questions which I cannot handle in this complicated field of law.

Mr. Chairman and members of the committee, I appear before you today in my capacity as chairman of the section of administrative law of the American Bar Association, to testify with regard to S. 3568 which this committee is considering.

For the record, the section of administrative law is composed of those lawyer-members of the American Bar Association who are interested in the conduct of State and Federal administrative proceedings.

The American Bar Association has delegated five areas of responsibility for the section.

First, to promote the sound development of local, State and Federal administrative law, procedure and practice.

Second, to advance the principles and gains made under the Administrative Procedure Act and to seek improvements thereof.

Third, to bring about improvements in the operations and procedures of local, State, and Federal administrative agencies.

Fourth, to bring about improvements in Government personnel procedures, selection and operations; and finally,

Fifth, to promote scholarly research in the field of administrative law and provide for the publication of such research and other helpful information, or otherwise provide for its dissemination to the bar.

As early as 1950, a resolution of the House of Delegates of the American Bar Association, the governing body of the association, directed the section "by all necessary means, including appearances before legislative committees" to "preserve the gains made by the adoption of the Administrative Procedure Act as the law of the land" and to "develop and seek the adoption of improvements thereof as well as additional measures to like purposes." The section has regarded the 1950 resolution as part of its basic charter.

Since the Administrative Procedure Act covers the whole gamut of Federal administrative procedure, it is evident that a section charged with bringing about improvements in such procedure will constantly

JA640

56

be concerned with the administration of the act and possible changes in it.

It is my pleasure to appear before you and on behalf of the American Bar Association to support S. 3568, insofar as it would eliminate the defense of sovereign immunity as a general bar for suits against the Government. On the recommendation of the section of administrative law the house of delegates, the governing body of the American Bar Association, at its Atlanta, Ga., meeting on February 23 and 24, 1970, adopted a resolution endorsing and supporting legislation which would amend the Administrative Procedure Act to restrict the use of the defense of sovereign immunity by the Government. The doctrine, as we have studied it, is a holdover from ancient Anglo-American law, prohibits the Government from being sued by its citizens without its express consent, on the theory that the king can do no wrong. Recognizing that this is an outmoded rationale, the Government has already eliminated much of the scope of the doctrine by authorizing suits for money damages under the Federal Tort Claims Act and in cases under the Tucker Act involving breach of public contracts.

The legislation which you are considering and which the American Bar Association endorses and supports will eliminate one of the remaining vestiges of the doctrine by amending the Administrative Procedure Act. The proposal would simply preclude the arbitrary dismissal, solely on the grounds of sovereign immunity, of cases seeking injunctive or mandatory relief against unlawful Federal action or inaction.

The section's proposal was originally presented to the 1969 Annual Meeting of the American Bar Association but the board of governors recommended that action be deferred so that the section could continue to coordinate its consideration of the problem with the Administrative Conference.

Prof. Roger Cramton, reporter for the Administrative Conference, and Prof. Kenneth Culp Davis, a member of the Council of administrative law section, worked out precise statutory language to accomplish the objectives and both the Administrative Conference and the House of Delegates of the American Bar Association have approved that language. And I might add, Mr. Chairman, that the section adopted this language unanimously and the house of delegates did likewise.

Accompanying the recommendation of the section to the house of delegates was a report, a copy of which is attached to my statement. That report outlines in greater detail the considerations which lead the section to recommend that the American Bar Association support the pending legislation.

Mr. Chairman, in conclusion, let me say as an advocate, I understand the reluctance on the part of any advocate such as the Department of Justice, to give up any possible defense to lawsuits. But I think that as a matter of sheer justice. But it is only fair that the Government, even if it means an increase in litigation in the Federal courts, should provide its citizens with an opportunity to have decided those issues which the courts have historically settled, and which they are competent to settle.

(The report follows:)

JA641

57

REPORT TO AMERICAN BAR ASSOCIATION HOUSE OF DELEGATES TO ACCOMPANY
RECOMMENDATION ON SOVEREIGN IMMUNITY PROPOSAL

*The broad perspective.* The judge-made doctrine of sovereign immunity has
been largely abolished by Congress. An enormous chunk of it was abolished in
1855 through the Court of Claims Act, and another big chunk in 1946 through
the Federal Tort Claims Act. Governmental responsibility in contract for more
than a hundred years and in tort for more than twenty years has been wholly
successful. No movement has developed to restore the chunks of sovereign
immunity that have been abolished; instead, Congress has many times enlarged
the jurisdiction of the Court of Claims and of other courts to award judg-
ments against the government, and in 1966 it legislated to facilitate payment
of tort claims against the government, even without judicial determinations.
The largest remaining area of federal sovereign immunity relates to specific
relief. The main purpose of the proposed amendment is to reach that area.

*The basic ideal.* In 1882 the Supreme Court stated an ideal that has been
largely realized by other governments around the world and toward which
the American government is still striving: "Courts of justice are established,
not only to decide upon controverted rights of the citizens as against each
other, but also upon rights in controversy between them and the government."
*United States v. Lee,* 106 U.S. 196, 200 (1882). The proposed amendment is
designed to move toward that ideal. Perhaps the United States Government
has already gone about two-thirds of the way toward achievement of the
ideal. The proposed amendment will move nearly all of the remaining third of
the way.

*The proposal's specific purposes.* The two main purposes of the proposed
amendment are to allow the plaintiff in any suit for relief other than money
to name the United States as defendant and to authorize the court to enter a
judgment or decree against the United States irrespective of sovereign
immunity.

*Inadequacy of the present law.* Complete immunity of the United States
from suits for specific relief would be intolerable, as the courts have long
recognized. To a considerable extent, the existing system permits suits against
the government in the form of suits against officers. A plaintiff may often
circumvent sovereign immunity by naming an officer as defendant, even when
the reality is that the suit is against the United States. Since 1908, the
Supreme Court's theory has been that an officer who acts unconstitutionally,
or pursuant to an unconstitutional statute, is "stripped of his official or repre-
sentative character and is subjected in his person to the consequences of his
individual conduct." *Ex parte Young,* 209 U.S. 123, 159–60. In 1912 the Supreme
Court extended the same theory to an officer who acts in excess of statutory
authority. *Philadelphia Co. v. Stimson,* 223 U.S. 605. If the theory of these two
foundation cases were consistently applied so that an officer would be stripped
of his representative character whenever he illegally encroaches upon a plain-
tiff's legal rights, the system could be reasonably satisfactory. Sometimes the
theory is so applied and sometimes not. The Supreme Court has often acknowl-
edged that its case law on sovereign immunity is inconsistent; in 1941 it said:
"As this Court remarked nearly sixty years ago respecting questions of this
kind . . . it is not 'an easy matter to reconcile all the decisions of the court in
this class of cases.' The statement applies with equal force at this day (1941)."
*Brooks v. Dewar,* 313 U.S. 354, 359, quoting from *Cunningham v. Macon &
R. R. Co.,* 109 U.S. 446, 451 (1883). In the key case of *Larson v. Domestic &
Foreign Commerce Corp.,* 337 U.S. 682, 698 (1949), the Court made the same
assertion and added: "The ensuing years have not made the task less difficult."
The Court seems to realize, as Mr. Justice Frankfurter once pointed out, that
the doctrine "of governmental immunity from suit . . . does not have the sup-
port of any principle of justice," *Kennecott Copper Corp. v. State Tax Commis-
sion,* 327 U.S. 573, 582 (1946), and it acknowledges "the current fadfavor of the
doctrine of governmental immunity from suit," *United States v. Burr,* 309 U.S.
242, 245 (1940), but the holdings continue to move in variant directions.
Contrast *Land v. Dollar,* 330 U.S. 731, 738 (1947) (allowing a suit when officers
seized a citizen's property, because "the dominant interest of the sovereign is
then on the side of the victim") with *Larson, supra* (denying such a suit on
the theory that "the crucial question is whether the relief sought in a suit
nominally addressed to the officer is relief against the sovereign.") 337 U.S.

JA642

at 687. In the Larson case, the plaintiff and the officers disagreed over the law of contracts, sales, and property concerning ownership of particular coal; even though the questions of law and fact were clearly appropriate for judicial determination, the Court held that sovereign immunity prevented it from deciding the case on its merits. In its latest opinion on the subject, the Supreme Court has declared: "The general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter." Hawaii v. Gordon, 373 U.S. 57, 58 (1963). The Court accordingly denied a declaratory judgment on the question whether the officers were violating a statute designed to benefit the plaintiff. The reality of the case is that sovereign immunity prevented the federal courts from resolving a controversy between the plaintiff and government officers over a question of statutory interpretation that was clearly appropriate for judicial determination. A recent lower court case, Simons v. Vinson, 394 F.2d 732 (5th Cir. 1968), illustrates how the doctrine of sovereign immunity prevents courts from deciding issues that are especially appropriate for judicial determination. The question was one of real property law—ownership of accreted land on which oil was being produced—but the court dismissed the suit to quiet title, brought by private parties against government officers, because the relief sought "would of necessity operate against the government." The question of who owned the accreted oil land thus could not be resolved on the basis of law through the processes of a court. Even if the private parties could collect damages in the Court of Claims, they should have been constitutionally entitled to keep the property if it was theirs, unless and until the government used its power of condemnation, as it probably would not do to obtain oil land. Probably sovereign immunity is today a larger barrier to justice than it was twenty-five years ago.

*Does sovereign immunity serve a useful purpose?* Seldom does a court give a reason in favor of sovereign immunity. The Supreme Court acknowledged in 1882 that sovereign immunity "has always been treated as an established doctrine" without judicial discussion of pros and cons. United States v. Lee, 106 U.S. 196, 207. The later judicial custom has been to go on assuming that the doctrine is justified. During the nineteenth century, perhaps courts properly forbade themselves from awarding specific relief against the sovereign, for they were seeking ways to avoid undue judicial interference with governmental programs, and the concept of a limited scope of judicial review of administrative action, now a mainstay, did not develop until the early twentieth century. The present tools for avoiding undue judicial interference are now more than ample, including not only the limited scope of review as marked out by 5 U.S.C. § 706 but also the law about unreviewability, standing, ripeness, justiciability, case or controversy, political questions, and various lesser restraints. Today's courts are not wanting either in doctrine or in ingenuity to keep themselves out of areas inappropriate for judicial entry.

*Specific relief.* Although the proposed amendment refrains from using the term "specific relief," the principal effect of the amendment will be to cut off the defense of sovereign immunity in suits for specific relief. Perhaps ninety per cent of the cases affected will be suits for injunction or declaratory judgment or for both, and perhaps most of the rest will be suits for relief in the nature of mandamus. But all other specific relief is covered, including specific performance, quieting title, ejectment, habeas corpus, and all other forms of specific relief; the amendment reaches all remedies except those "concerning monetary relief and specific relief in lieu thereof."

*The meaning of the exception about monetary relief.* All suits seek either monetary or non-monetary relief. Because the present law concerning sovereign immunity in suits for monetary relief is reasonably satisfactory on account of such legislation as the Court of Claims Act, Tucker Act, and Federal Tort Claims Act, the proposed amendment does not affect suits for monetary relief. It applies only to suits for non-monetary relief. The exception of "existing law concerning monetary relief and specific relief in lieu thereof" is designed to make clear that not only suits for money but also substitutes for suits for money are unaffected by the proposed amendment. Examples of specific relief in lieu of monetary relief include a suit for specific performance of an agreement to pay money, a suit for a declaratory judgment that the United States is legally obligated to pay money to the plaintiff, and a suit for an injunction against action which interferes with payment.

JA643

*Officers as defendants.* Although the proposed amendment does not change the law concerning suits against the government in the guise of suits against officers, such suits are subject to many uncertainties, including a possible holding that an officer who has not been named is indispensible or that the suit is barred by sovereign immunity. Because suits against the United States pursuant to the proposed amendment will be free from such uncertainties, suits against officers may be expected to decline and perhaps virtually disappear as parties and their representatives learn the advantages of naming the United States as a defendant.

*Applicability of proposed amendment.* Because the amendment is to be added to 5 U.S.C. § 702 (a provision of the Administrative Procedure Act entitled right of review) it will be applicable only when that provision is applicable. This means that the exceptions stated in § 701(b)(1)(H) will apply (relating mostly to specified wartime subjects); more importantly, it means that the proposed amendment will not apply "to the extent that . . . statutes preclude judicial review . . . or . . . agency action is committed to agency discretion by law." The case law concerning the two categories of review precluded by statute and action "committed" to agency discretion is thus untouched by the proposed amendment.

*Law other than sovereign immunity unchanged.* Government defenses other than sovereign immunity remain unaffected by the proposed amendment. Indeed, all law other than the law of sovereign immunity is unchanged. A very large proportion of all cases that have been disposed of on the ground of sovereign immunity, perhaps as many as nine-tenths, might have been won by the government on some ground other than sovereign immunity, including the merits. Because nothing is changed except the law of sovereign immunity, and because all other constitutional law, statutory law, and common law remains unchanged, the government may still win cases on such grounds as unreviewability, standing, ripeness, exhaustion, primary jurisdiction, or any other legal or equitable principle. Yet to the extent that the proposed amendment will remove the defense of sovereign immunity, a larger proportion of the cases brought will be decided on their merits.

*More government by judges?* The proposed amendment will not mean a larger proportion of government by judges or a smaller proportion of government by executives and administrators. Courts will still be limited to deciding issues appropriate for judicial determination, and they will still be limited by the limitations on scope of judicial review prescribed by the Administrative Procedure Act in 5 U.S.C. § 706. Clearly, the courts will continue to develop and apply their own law about what the Supreme Court calls "the appropriateness of the issues for judicial determination." Gardner v. Toilet Goods Ass'n, 387 U.S. 167, 170 (1967). The lines between issues which are or are not appropriate for judicial determination will not be affected by the proposed amendment. To the extent that some issues may come to court that have heretofore been barred by sovereign immunity, the usual principles as to what issues are appropriate for judicial determination will apply. And the established limitations on scope of review will be fully applicable. The courts will thus have no authority to remake administrative policy or to exercise the discretionary power that statutes have conferred upon administrators. Courts will continue to be normally limited to such strictly legal questions as constitutionality, statutory jurisdiction, proper administrative procedure, substantiality of evidence, abuse of administrative discretion, and conformity to law. The proposed amendment will mean only that when a party who is hurt by governmental action seeks relief other than money, sovereign immunity will not be a bar to judicial determination of such strictly legal questions.

*Summary.* This resolution was first proposed by the Judicial Review Committee of the Section, under the Chairmanship of Professor Kenneth Culp Davis. The resolution was considered at the Midwinter meeting, was later modified and reconsidered at the May meeting of the Council, and adopted at the Annual Meeting of the Section.

At the Annual Meeting in Dallas the Board of Governors recommended that action be deferred until the 1970 Midyear meeting so that the Section might have the opportunity to coordinate its activities with the Administrative Conference of the United States.

At the Administrative Conference's third plenary session the Conference adopted a resolution which with minor exceptions would accomplish the same results as those advocated by the Section. Upon further consideration by the

Council of the Section of Administrative Law, the Council concurred with the resolution as adopted by the Administrative Conference of the United States.

Senator KENNEDY. Thank you very much, Mr. Byrd.

Let me ask you, as a practicing attorney, do you think most of the cases are already being brought with the hope that judges will be persuaded to find a way around the immunity defense? Or do you find a number of lawyers are just waiting in the wings to flood the courts and Government lawyers with suits if our bill passes?

Mr. BYRD. I do not think so. I do not think the courts will be flooded. Professor Davis, who is sitting adjacent to me, has made a much closer study and estimate of what he thinks would result by way of increased litigation, if any.

If you would like a guess from me, I would estimate that nine-tenths of the cases in which the doctrine of sovereign immunity was raised could have been disposed of on the merits and probably in favor of the Government. I would guess that at most cases involving sovereign immunity would not be more than one in four or five hundred, in the whole Federal system.

That is merely a guess, and therefore I cannot think in terms of flooding the courts when the numbers are so small.

Senator KENNEDY. Most lawyers have looked at sovereign immunity as sort of a technicality, as bothersome, but not insurmountable in most cases.

Mr. BYRD. I think that is exactly right.

Mr. PULLIAM. Mr. Byrd, I would like, on behalf of Senator Thurmond, to again express his regret he will not be able to personally hear your testimony, which he values quite highly. I might add that Senator Thurmond has many times expressed his high regard for you, both as an individual and as a practicing attorney, and will quite carefully go over your testimony, after it is printed in the record.

Mr. BYRD. Thank you.

Mr. PULLIAM. I have no questions at this time. We are pleased that you took the time to come before this subcommittee to give us your views.

Mr. BYRD. Thank you.

Senator KENNEDY. Thank you very much. We hope you will be able to remain with us a while this morning. But if you have to go, we understand.

Mr. BYRD. Thank you.

Senator KENNEDY. Every student of government and the administrative process knows the name of Kenneth Culp Davis. Professor Davis' "Administrative Law Treatise" remains the leading reference book in the field. In that treatise he discussed, in 1958, most of the matters we are concerned with this morning, and observed: "Sovereign immunity is today sometimes a defense in suits against [Government] officers and sometimes not."

This seems to summarize accurately the state of the law, in all its illogic and confusion. Perhaps Mr. Davis will bring new light to the subject and to the committee.

Professor Davis teaches at the University of Chicago Law School and has been a driving force of the ABA and the Administrative Conference.

You may proceed.

JA645

61

## STATEMENT OF PROF. KENNETH CULP DAVIS, UNIVERSITY OF CHICAGO SCHOOL OF LAW, CHAIRMAN OF THE COMMITTEE ON JUDICIAL REVIEW, AMERICAN BAR ASSOCIATION ADMINISTRATIVE LAW SECTION

Mr. DAVIS. Thank you, Mr. Chairman.

I think I should say that I am here as a representative of the American Bar Association, whose house of delegates, as Mr. Byrd has said, has unanimously adopted this proposal in principle.

This is the fourth appearance I have made before this committee, although my previous appearances were when the committee was under the old management. In each of those instances, it is interesting to reflect, I was opposing measures that were sponsored by the American Bar Association. Some of my friends have persuaded me to get into the bar association and work on problems of administrative law, as I have been doing, and one consequence is that now I am representing the bar association in a measure which I enthusiastically believe in.

Now, I have no prepared statement. I have just published a little article called "Sovereign Immunity Must Go," copies of which I will be glad to present to the committee. I received copies just yesterday here in Washington.

Senator KENNEDY. We will make that a part of the record. I think it will be very helpful to us to include it.

(The article is reproduced in Appendix II.)

Mr. DAVIS. Thank you.

I am wondering how to proceed, in that what I have to say affirmatively has in substance been so well presented by Mr. Williams, Mr. Sellers, Mr. Cramton, and Mr. Byrd. I think that with some very slight exceptions, I am in complete agreement with what has been presented. I shall not duplicate what has been said. Instead I shall try to find some little areas that have not been covered, and try to add to what has been said.

I think we can look at the whole perspective of sovereign immunity which, of course, we inherited from medieval England, where it was originated. We have moved sharply away from sovereign immunity in this country.

The first big move was in 1855, with the adoption of the first Court of Claims Act, which made the Government liable on its contracts.

And then the Congress of the United States did not retreat from that position. Instead the subsequent history over more than a century has been constantly adding to the capacity of litigants to sue the United States on contracts.

The second largest chunk of soverign immunity was abolished in 1946 in the Federal Tort Claims Act, and the movement since has been one of further enlarging the Government liability in tort since the enactment in 1946.

For example, in 1966, with full approval of the Department of Justice, the Federal Tort Claims Act was strengthened, giving additional authority to administrative officers to settle tort claims without judicial proceedings.

In the State courts it is very interesting to see what has happened in the last decade. Beginning in 1959, 18 State courts, by judicial

47–534 O—70——5

JA646

62

action, have abolished big chunks of sovereign immunity. I have a list of those States, and the citations to the key cases in this article which will be a part of the record.

The problem in the State courts has not been whether it is desirable to get rid of sovereign immunity. The problem in the State courts has been whether the action should be taken by judges or whether the problem should be left to the legislative bodies. I think it quite significant that of all of the judicial opinions that have been written in the State courts, hardly a word has been written by anyone in favor of the doctrine of sovereign immunity.

Now, let me take one case and go into it rather fully, to illustrate the sort of thing that is involved. What the previous witnesses here have said has to do with mainly the substantive injustice that results from sovereign immunity. I think there are two other facets that are almost as important. One is the procedural injustice that results from the doctrine of sovereign immunity, and the other is the misallocation of functions as between courts and administrative agencies.

By taking this one case as an example, I think I can bring out those two major ideas.

The case I choose is *Simons* v. *Vinson*, 1968 in the fifth circuit (394 F.2d 732). The river which forms the boundary between Texas and Oklahoma changed its course. Land was eroded on one side of the river and accreted on the other. The problem was who owned the accreted land of approximately 1,000 acres. This land was worth about $6 million, because oil was being produced on it.

The Government owned land on one side of the river, the private party on the other side.

The problem is peculiarly one of land law about the change in the course of the river. The private party thought he owned the land and thought he could demonstrate that in court and he brought his action in a suit to quiet title. The fifth circuit held that sovereign immunity was a bar to the suit, and that was the end of that case.

Now, what happened procedurally in that case? The question was decided by some officers in the Department of the Interior. The question was decided by officers who were representing the Government's proprietary interest. The effective decision in the case was made by the very officers who were parties to the dispute without a trial type hearing on issues of fact, without opportunity for the private party to present oral argument before the decision was made, without a systematic set of findings of fact, without a reasoned opinion, without opportunity for a decision by a tribunal that is or even pretends to be impartial, and without opportunity for judicial review.

What we have done in this country is to build a magnificent body of administrative law to provide procedural protection to parties who are dealing with the Government. What happened in the case of *Simons* v. *Vinson* is that all that beautiful system of procedural law was bypassed because of the doctrine of sovereign immunity. Ordinarily we would require that issues of fact be resolved by a trial-type hearing.

In that case issues of fact were not resolved by a trial-type hearing. Ordinarily we require that systematic findings be stated. No such findings were made. Ordinarily we require that decisions be supported by a reasoned opinion. No such opinion was written.

JA647

63

Ordinarily we allow judicial review of an administrative determination involving $6 million worth of land. No such judicial review was available on account of sovereign immunity. Ordinarily we do not allow parties who are parties to the dispute to make the final decision. In this case we did allow the Government officers, who were the parties to the dispute, to make the final decision.

This is the manner in which procedural injustice is created by the doctrine of sovereign immunity.

Now, on the problem of allocation of functions, we have a very elaborate system of determining what questions are appropriate for courts and what questions are appropriate for administrators. I think that our system is especially well developed. This is one of the strong points of American law. We allocate to judges the kind of questions on which judges are especially qualified.

We allocate to administrators the kinds of questions that they may best decide. And there is no question in our whole system that is more appropriate for a court, than a question of who owns a particular piece of land and what are the facts about that land.

Senator KENNEDY. Let me ask you at this point, Mr. Davis, is it your impression that the courts in fact have gone a little far in some areas in interfering with the administration of Government programs—in areas that should be discretionary—or do you think they have not really gone far enough?

Mr. DAVIS. I would say in general we have a very good system. Occasionally a judge will do too much, occasionally a judge will do too little. The general nature of the system is one that is exceedingly good, in my opinion.

Senator KENNEDY. You are not distressed they have gone too far in some areas, have broadened, for example, the concept of standing in court?

Mr. DAVIS. Well, Mr. Chairman, for two decades I have been advocating a liberalization of the law of standing. And I am much pleased to say this spring, in March, the Supreme Court decided two cases that have done almost exactly what I would like to have done. I have long had the opinion when parties are injured in fact by governmental action, they should have standing to challenge the legality of the governmental action that has hurt them. And I have thought that there has been injustice by barring those parties under the doctrine of standing.

I think that we should welcome the broadening of the law of standing. This will, it is true, to some slight extent, increase the number of cases that courts will decide. But this is what the courts are for, to do justice when there are questions of legality that are raised by someone who is hurt in fact by governmental action.

I think that it is exceedingly important that we have a system of allocation of power between courts and agencies that is based upon the comparative qualifications of each. We have a legal doctrine known as issues appropriate for judicial determination. My opinion is that the statement prepared for the Department of Justice has failed to take into account the reality that we are keeping out of the courts in general, with occasional lapses by human beings, the cases that are inappropriate for judicial determination.

64

Senator KENNEDY. Mr. Davis, you are awfully kind in coming. We have Mr. Ruckelshaus here, and since we have a vote at half past 11, I want to give him a chance to develop his testimony. If I could interrupt you now and call on him, perhaps you would be kind enough to stand by. After he talks, you might bring out some additional points. You might be able to address yourself to them today, or if not today, you could submit your comments to the subcommittee. We will leave the record open.

Mr. DAVIS. I appreciate that very much, Mr. Chairman. I think what I have to say which would be useful to the committee would be largely by answering Mr. Ruckelshaus.

Senator KENNEDY. Mr. Ruckelshaus, do you feel we have sort of warmed the griddle for you?

We want to express our appreciation to you. I know you have appeared before the Judiciary Committee on other occasions and have always been forthright and helpful to the committee.

I know you head up the Civil Division in the Department of Justice and bring the Department of Justice's views on S. 3568.

I realize that the Justice Department usually leads off these hearings, but our other witnesses are from out of town and we may have to continue our hearing at a later time if the vote on the floor comes soon.

Also, since our other witnesses had an opportunity to read your statement before they testified, I thought you ought to have an opportunity for rebuttal.

We welcome you this morning. You may read or summarize your statement.

We have your testimony here. We can make that a part of the record. You can summarize it or respond to some of the points that have been raised in the earlier testimony, whichever you feel most comfortable with.

## STATEMENT OF HON. WILLIAM D. RUCKELSHAUS, ASSISTANT ATTORNEY GENERAL, U.S. DEPARTMENT OF JUSTICE

Mr. RUCKELSHAUS. Mr. Chairman, I will read the statement and at the end respond to one or two questions that have been raised by the previous witnesses.

As you mentioned, my name is William D. Ruckelshaus. I am the Assistant Attorney General in charge of the Civil Division. I have with me Harland F. Leathers, the Chief of the General Litigation Section in that Division. Mr. Leathers has been with the Government some 26 years, dealing with the precise kind of questions that are raised by this legislation. It is that section to which cases are assigned in which the issue is a challenge to agency or other official action. We have thousands of such challenges every year. It is out of the experience of these cases that I make the following comments on the bill before this subcommittee, S. 3568. Before examining the provisions of the bill, I would like to make some general observations to indicate how my approach to the issues we are discussing differs from that of the witnesses you have just heard.

The problem of who may sue the Government or its officials and under what conditions is a complex affair with sometimes varying

legal results and at all times extremely important policy considerations.

Officials of the Federal Government in the course of their duties make millions of decisions every year. A decision like one not to prosecute may not leave an aggrieved party; but one canceling a contract or assessing a penalty almost certainly will produce some kind of injury. The number and variety of such actions creates a most important question before our society as to the limit of judicial review of executive decisions.

To prevent the possibility that every action of a Government official may be challenged, the judiciary developed a number of words, phrases of art, and legalisms such as standing to sue, justiciability, political question, and sovereign immunity. Many of these concepts are now in a transitional period and have not the certainty they once had.

It is my belief that what is needed is more certainty with respect to these defenses. Indeed there may be a need for less judicial interference with governmental decisionmaking than in the past. The Government today is so all-pervasive that no attempt to review all its decisions without regard to their importance would place an impossible burden on the courts.

Every day the Department of Justice is meeting challenges in court that would have been inconceivable a few decades ago. Challenges are made to Government aid to education, food stamp programs, urban redevelopment programs, taking the census, and to a host of social and economic programs mandated by Congress and administered by our major departments and agencies.

Now, on principle, nobody denies that the function of the courts is to define and protect the individual rights of our citizens. But the courts are not the only forum for redress of grievances. It is not an imperative that the courts must decide every dispute in our society. The problem is to draw some clear lines where judicial action on agency decisions is appropriate.

Many authorities in this field conclude that a judicial trial on the merits is the best way to see that our citizens secure justice. I do not necessarily agree with this conclusion.

On the contrary, it is my conviction that the long-run health of the judiciary of this country and the assurance of justice to its citizens is dependent upon reducing the number of litigated cases and confining the court's jurisdiction to those areas most appropriate for judicial consideration. A debate is now underway in several of the States to halt automobile negligence cases and to have injuries and deaths compensated pursuant to some insurance arrangement. In the Federal Government, the President has just signed a bill that has two primary objectives the strengthening of the administrative process in the Bureau of Customs to encourage importers to be satisfied with administrative decisions and to discourage them from seeking judicial review.

In 1966, the Department of Justice sponsored amendments to the Federal Tort Claims Act which allowed the responsible agencies to settle all claims arising out of the torts of their employees. Prior to this enactment, administrative settlement had been limited to $2,500. We simply believed this to be the most expeditious and ef-

66

fective way of handling these claims. I think that avoiding litiga-
tion is in everybody's interest and that it can be done with justice
in an overwhelming percentage of the cases.

For example, there is no judicial review at all from the hundreds
of thousands of decisions made annually in the Veterans' Admin-
istration. Yet there has been no sustained outcry about injustice in
these decisions. And to the people needing a pension to sustain life
or family, a pension can be as important as the larger economic in-
terests described by Professor Cramton in his articles.

Even in judicial review of agency decisions, the usual practice is
not to allow a trial on the merits. The review most often allowed
is on the record made in the agency hearing with the agency head's
findings of fact being conclusive if supported by substantial evi-
dence or some other formula such as the absence of arbitrary and
capricious treatment of a petitioner.

I believe there is a need in our society for reducing the number
of cases that get litigated. In view of this belief, I am opposed to
opening up for litigation on the merits of large numbers of cases
incapable of being accurately classified. This to me is what S.
3568 does.

Senator KENNEDY. Let me interrupt you there. The reason you
want to maintain sovereign immunity is to keep a reduced number
of cases that come before the Federal courts? Is this the reason?

Mr. RUCKELSHAUS. No, that is one of the considerations, Mr.
Chairman. It seems to me in spite of what has been said here this
morning about the floodgates argument, that we do have a judiciary
today that is overburdened with cases; we have in particular in
the criminal field a very difficult problem of backlog and the trying
of criminal cases. Instead of typing it as the "king can do no wrong"
and pointing out it emanates from medieval England as a reason for
opposing this doctrine, what sovereign immunity really says is that
the Congress shall decide what action and decisions of the admin-
istrative branch are judicially reviewable. And I think this is pre-
cisely what Congress has done in the past in the Tucker Act, the
Court of Claims Act, in the Federal Court Claims Act, and we
believe this is precisely what Congress should do now.

One of the questions you addressed to me in your letter of last
week was our opinion on quiet title cases. This is not in my state-
ment but it has been alluded to by several of the witnesses here this
morning. I believe Senator Church's bill, is precisely the kind of
approach that should be taken to the problem of sovereign immunity.

In the Department of Justice the Lands Division has a recom-
mendation, now in the Deputy's Office, to support in principle the
Church bill, the Senate bill that is pending before the Judiciary
Committee—I do not know whether it is this subcommittee or not.
The idea of sovereign immunity should not be raised as a defense
by the Government in an action to quiet title, to determine who owns
land. And I think that that is the kind of approach that we would
favor in this area. What we are afraid of is that if you open up the
whole decisionmaking process of the administrative branch to judi-
cial review by the courts by removing the defense of sovereign im-
munity, we are likely to get a flood of cases in spite of what has
been said.

JA651

Mr. Williams cited Professor Cramton's studies of what would happen, what the results would be, of removing sovereign immunity as a defense in terms of increased cases in court. I have read very carefully Professor Cramton's excellent articles in the area of sovereign immunity, and I do not remember seeing any discussion where studies have been made on the numbers of cases that would be filed if sovereign immunity were removed as a defense.

It seems to me this is one of the complaints of the sponsors of the bill, that the plaintiff cannot get a hearing on the merits because of the defense of the doctrine of sovereign immunity. We are likely to have more cases going to trial, going to a hearing on the merits, as opposed to being disposed of through a motion to dismiss. And in addition, those who are inhibited now from filing cases because of the fact they would be dismissed under the doctrine of sovereign immunity, will no longer be so inhibited. Since I have been in the Justice Department a little over a year and four months, in the General Litigation Section, which handles these cases, and which Mr. Leathers is in charge of, the number of cases of an injunctive nature, have increased from 3,400 to 7,800. This is in just a little over a year. It seems to me the trend in our society and among our citizens is toward a more litigious attitude as far as governmental decisions are concerned, and I think a bill of this sweeping nature passed by Congress would be an invitation to citizens and to courts to review the kinds of decisions which I think should be peculiarly in the province of the executive branch.

Senator KENNEDY. As I would gather then, you are expressing some serious reservations about the potentiality of opening up the floodgate to additional kinds of cases which have not been carefully described under statutes by the Congress. Even though with the best information, the Administrative Conference and the American Bar Association have been unable to conclude that there would be the extraordinary additional numbers of cases involved.

I would think that the Justice Department would be able to give us some information based upon their expertise and experience, just as to what these numbers would actually be.

Mr. RUCKELSHAUS. Well, Senator——

Senator KENNEDY. Those who have studied this problem and have given it considerable thought, for the reasons I know you are aware of, having attended the hearings early this morning, certainly draw different conclusions from yours. And if the Justice Department has different conclusions in terms of the numbers, I think we ought to have that information as well.

Mr. RUCKELSHAUS. Senator, I listened to what was said this morning by the witnesses about the floodgates argument, and what their estimate is. It is pure speculation, just as mine would be, and as would be the Justice Department's estimate. What I can cite to you is what I cited a moment ago and that is, since I have been in the Justice Department the number of cases of this nature, of an injunctive nature, that are in Mr. Leathers section, have more than doubled. It seems to me if Congress is going to say to the courts we think that some of the jurisdictional inhibitions that you have felt necessary in the past, because of the doctrine of sovereign immunity, should no longer be considered by you, that this will be an

JA652

68

encouragement to the courts, as well as to the litigants and lawyers to file more cases.

So the experience I can garner from the time I have spent at Justice, and from what seems to me to be a tendency within our society to become more litigious leads me to the conclusion that we will have a considerable increase in cases. We are going to open up whole classifications of cases, and we really cannot determine at this point what they might be. And I think instead of using a shotgun a rifle would be a better approach to this area——

Senator KENNEDY. In spite of the fact that a number of the attorneys who had some practical experience in the practice of the law in this area feel that this is really only a hindrance which has to be circumvented, that it does not really serve as a sufficient hindrance on many of them to defer bringing these kinds of cases. And you say that in spite of the fact, as well, that serious if not extraordinary injustice will be the result.

Mr. RUCKELHAUS. Well, in the area in which an injustice occurs, obviously Congress or the Justice Department, every branch of Government, should attempt to do something about it. Let's take the case which has been alluded to several times this morning, the discrimination against an individual in Government employment because of his Italian descent. If Congress should decide that any time an individual in Government employment alleged that discrimination has kept him from being advanced in employment, it should be reviewed by the courts and not subject to the defense of sovereign immunity, then I think this may be an area in which Congress could legislate. These individual injustices can be cured as a class of cases which are now barred. If quiet title cases are not being heard by the courts because of the doctrine of sovereign immunity, then this doctrine should be waived by Congress.

Senator KENNEDY. What do you really feel is the basis for sovereign immunity, philosophically, other than just sort of a shorthand way to reduce the number of cases?

Mr. RUCKELHAUS. I think the real basis is that in our tripartite form of government, we have a balance of power, at least purportedly a balance of power, between the executive, the legislative, and the judicial branches. There should be a balance on the judicial side by Congress delineating certain areas in which the actions and decisions of the executive branch should be reviewed by the judicial branch. I think this is precisely what the Congress has done in areas like the Tucker Act and the Federal Tort Claims Act. They decided these are things that should be reviewed, decisions and actions by the executive branch, by the judiciary. And I think this is what the doctrine of sovereign immunity philosophically means and I think Congress should maintain it. I think Congress should continue to tell the judicial branch which actions by the executive branch they think the judiciary should have the power to review actions.

Senator KENNEDY. Do you think we are going to be able, with all of our marvelous wisdom and brilliance, to identify every possible kind of area in which these injustices can be anticipated? For example, Professor Cramton's example of that fellow down in Alabama who had an easement to the public highway. Are we supposed to be able to anticipate every possible potential injustice or abuse?

69

Mr. RUCKELSHAUS. No, of course not. But where Congress finds—

Senator KENNEDY. And why are there not sufficient kinds of protection which have been identified by these various existing defenses? For example, the absence of case of controversies, agency action by law committed to agency discretion, or additional available administrative remedies not exhausted, and a whole host of other rational existing defenses. Why isn't there sufficient protection for the Federal Government already? Don't these other defenses create the balance? Why do you have to injure the individual whose particular case might not have been thought about until after the fact, and how are we going to anticipate all of the other kinds of potential controversies that are going to be created by the myriad of different legislation that the Congress is?

Mr. RUCKELSHAUS. Well, as a matter of fact, as far as legislation is concerned, if it is unconstitutional or if there is a claim an officer acted beyond his authority under that legislation, an individual now has the right to test that legislation. In most acts passed by the Congress of recent vintage, there are rights to judicial review written into the acts. Congress obviously cannot anticipate every wrong, but I would think, before Congress would say that the doctrine of sovereign immunity as has developed over many years in this country should be just eradicated, there should be a clear demonstration of widespread wrong being done, and I think the case simply has not been made.

In certain areas such as quiet title cases, we are perfectly willing to admit, and I think it should have been admitted a long time ago, that this is an area in which sovereign immunity should not apply. The courts should be allowed to decide the ownership of land. And I think the wiser course for Congress, rather than opening up judicial review of executive decisions, without the interposition of the doctrine of sovereign immunity ever taking effect, is to deal with these classes of cases in which injustice is clear.

There are going to be unjust decisions of courts in certain instances which are not going to be handled by Congress. There are many statutes which might create injustice, but if the statute itself has a valid purpose the injustices that would occur are overridden. The statute of limitations is such a statute, under which maybe a man has a very justifiable claim but after 2 years, many legislators in their wisdom have decided, the case simply has not been brought soon enough and there should be laid to rest these kinds of litigable issues. And I think the doctrine of sovereign immunity, based on Congress's authority to tell the courts just in which areas they should examine executive decision, is that same kind of policy.

Senator KENNEDY. Of course, in the statute of limitation, the defendant has some control over it, does he not? His rights are there. They are there for a prescribed period of time, but they are preserved for that period of time. In this you are not even giving him any kind of right at all, ever.

Mr. RUCKELSHAUS. Well, we have to get into specific cases.

Senator KENNEDY. Look at Professor Cramton's case, the example of that easement. I think if we go in terms of illustration, there are a number of cases that we could use.

70

Mr. RUCKELSHAUS. It would seem to me, Senator, that under any examination of a defense you could point to judicial misinterpretation of the defense or to a wrong done to an individual by the judicial acceptance of that particular defense. That does not necessarily mean that the whole defense should fall. I think any of the defenses that you have mentioned, exhaustion of remedies, ripeness, or standing, any of them you can point to individual cases where injustice has been done. The question is whether you should wipe out that defense because of an individual injustice.

Senator, I would want to point out one thing that has been mentioned several times this morning, and that is——

Senator KENNEDY. Earlier witnesses observed that the whole question of sovereign immunity is merely a hurdle that the clever lawyer can bypass in the preparation of his case, and that it serves as a bothersome element but does not really inhibit them from moving in to pursue their client's rights. Thus the doctrine works to the disadvantage of the country lawyer so to speak. What is your response to this?

These are attorneys who are practicing; these are people who have had considerable experience, and have put in a good deal of study. Why isn't this an equal justice question?

Mr. RUCKELSHAUS. It works to the disadvantage sometimes of other than country lawyers. In a sense, I suppose, I am a country lawyer, coming from the provinces, and that does not necessarily mean I am not able to study the problem with sufficient diligence to be able to properly represent my client that I have.

I know they can point to individual cases in which a lawyer will have mishandled the case to the detriment of his client, who had a justifiable claim. I think that is bound to be true in the adversary system. The adversary system of justice we have postulates equal representation on both sides and from which will come a just decision by the judge sitting and listening. The trouble with that theory is you never have equal representation on both sides. Usually there is a better lawyer on one side than on the other. And I do not believe that to say that any defense which worked to the detriment of somebody who had a bad lawyer necessarily means that should knock out the defense. Because this is going to be true of any defense.

Senator KENNEDY. No, I think the record shows quite clearly, there are a variety of different kinds of interpretations. There are long lists of cases that are decided one way because they are prepared to circumvent the question of sovereign immunity, while others prepared another way fail because the defense of sovereign immunity is used. It is quite obvious from the list of cases that have been prepared by Professor Cramton, you get two entirely different kinds of results in the same types of cases.

Mr. RUCKELSHAUS. I do not think it is possible for Congress to eliminate all of those kinds of inequities that might exist. In the Selective Service cases, there are some jurisdictions in the country which will dismiss the Selective Service case on the $10,000 jurisdictional limitation and other jurisdictions in the country which won't. You are going to get varying interpretations of statutes throughout the country by courts, and second, I do not believe that

71

the Supreme Court decision is so vague and ambigious as to be subject to the kind of misinterpretation which admittedly has been given it by some lower courts.

Senator KENNEDY. You do not think we have a responsibility to try to eliminate those inequities?

Mr. RUCKELSHAUS. Well, of course, assuming that the interpretation given by one court is wrong and an interpretation given by another court is right, and the one that is wrong has effected an inequity, it should be righted. There are means of appeal of that to remove the wrong decision by the lower court. I do not know that Congress can involve itself in attempting to rectify every inequity of the judicial branch because of a particular interpretation of a defense available to a defendant that has been given by a particular court. If the Congress attempted to do that, then I think you could make the same argument about virtually any defense available to the Government or any defendant.

Senator KENNEDY. You are not suggesting in your testimony that S. 3568 does not leave the other defenses intact?

Mr. RUCKELSHAUS. No, but I do question, as I started to say a minute ago, whether the Tucker Act would not—the standard for that being exclusive remedy for the wrong done under Government contract—be eradicated by this act. I think it would be, at least it is arguable that it would be. In the Administrative Conference report that was attached to the suggested legislation, there is a section on page 3 of the report which indicates nothing herein, No. 2, confers authority to grant relief if any other statute expressedly or impliedly forbids the relief which is sought.

The Administrative Conference report makes a great deal of the word "impliedly" being in there. Where the courts have interpreted the Tucker Act you cannot bring an injunction against the operation of Government contract. But the statute as introduced takes out the word "impliedly." The statute as introduced says "nothing herein confers authority to grant relief if any other statute granting consent and substitute for money damages forbids the relief which is sought." This is not true of the Tucker Act. There is no specific language in the act which forbids the bringing of specific relief and so it is our fear that specific relief would be available under S. 3568— Professor Cramton states if any language could be worked out that would put to rest any fears we might have in this area, he would be willing to work with us. And I think on that basis we are willing to accept this was not put in here with malice aforethought.

Senator KENNEDY. As you are aware, that was a vote, so we have to conclude the hearing this morning. What we would like to do is to give you some additional time for questions. Professor Davis indicates he is going to respond. We want to keep this record as open on this question as long as we can. We would like to try and look through the responses to these questions which we have asked today and then to make a decision whether we want to request you to come back and respond further, depending upon both your own disposition as well as the information that we are able to develop.

Is this a satisfactory way for you to proceed?

Mr. RUCKELSHAUS. Yes, Senator, that is fine. I also point out that we do have no objection to the other primary purposes of the bill, the jurisdictional limit and making the United States a party.

(The complete statement follows:)

STATEMENT OF WILLIAM D. RUCKELSHAUS, ASSISTANT ATTORNEY GENERAL, DEPARTMENT OF JUSTICE

My name is William D. Ruckelshaus. I am the Assistant Attorney General in charge of the Civil Division. I have with me Harland F. Leathers, the Chief of the General Litigation Section in that Division. It is that section to which cases are assigned in which the issue is a challenge to agency or other official action. We have thousands of such challenges every year. It is out of the experience with these cases that I make the following comments on the bill before this subcommittee, S. 3568. Before examining the provisions of the bill, I would like to make some general observations to indicate how my approach to the issues we are discussing differs from that of the witnesses you have just heard.

The problem of who may sue the Government or its officials and under what conditions is a complex affair with sometimes varying legal results and at all times extremely important policy considerations.

Officials of the Federal Government in the course of their duties make millions of decisions every year. A decision like one not to prosecute may not leave an aggrieved party; but one cancelling a contract or assessing a penalty almost certainly will produce some kind of injury. The number and variety of such actions creates a most important question before our society as to the limit of judicial review of Executive decisions.

To prevent the possibility that every action of a Government official may be challenged, the judiciary developed a number of words, phrases of art, and legalisms such as standing to sue, justiciability, political question, and sovereign immunity. Many of these concepts are now in a transitional period and have not the certainty they once had.

It is my belief that what is needed is more certainty with respect to these defenses. Indeed there may be a need for less judicial interference with govmental decision making than in the past. The Governmental today is so all-pervasive that to attempt to review all its decisions without regard to their importance would place an impossible burden on the courts.

Every day the Department of Justice is meeting challenges in court that would have been inconceivable a few decades ago. Challenges are made to Government aid to education, food stamp programs, urban redevelopment programs, taking the census, and to a host of social and economic programs mandated by Congress and administered by our major Departments and agencies.

Now, on principle, nobody denies that the function of the courts is to define and protect the individual rights of our citizens. But the courts are not the only forum for redress of grievances. It is not an imperative that the courts must decide every dispute in our society. The problem is to draw some clear lines which judicial action on agency decisions is appropriate.

Many authorities in this field conclude that a judicial trial on the merits is the best way to see that our citizens secure justice. I do not necessarily agree with this conclusion.

On the contrary, it is my conviction that the long-run health of the judiciary of this country and the assurance of justice to its citizens is dependent upon reducing the number of litigated cases and confining the court's jurisdiction to those areas most appropriate for judicial consideration. A debate is now underway in several of the states to halt automobile negligence cases and to have injuries and deaths compensated pursuant to some insurance arrangement. In the Federal Government, the President has just signed a bill that had as two primary objectives the strengthening of the administrative process in the Bureau of Customs to encourage importers to be satisfied with administrative decisions and to discourage them from seeking judicial review.

In 1966, the Department of Justice sponsored amendments to the Federal Tort Claims Act which allowed the responsible agencies to settle all claims arising out of the torts of their employees. Prior to this enactment, adminis-

73

trative settlement had been limited to $2,500. We simply believed this to be the most expeditious and effective way of handling these claims. I think that avoiding litigation is in everybody's interest and that it can be done with justice in an overwhelming percentage of the cases.

For example, there is no judicial review at all from the hundreds of thousands of decisions made annually in the Veterans Administration. Yet there has been no sustained outcry about injustice in these decisions. And to the people needing a pension to sustain life or family, a pension can be as important as the larger economic interests described by Professor Cramton in his articles.

Even in judicial review of agency decisions, the usual practice is not to allow a trial on the merits. The review most often allowed is on the record made in the agency hearing with the agency head's findings of fact being conclusive if supported by substantial evidence or some other formula such as the absence of arbitrary and capricious treatment of a petitioner.

I believe there is a need in our society for reducing the number of cases that get litigated. In view of this belief, I am opposed to opening up for litigation on the merits large numbers of cases incapable of being accurately classified. This to me is what S. 3568 does.

Section 1 of S. 3568 would amend 5 U.S.C. 702 to hold that an action against a Federal officer in which relief other than money damages was sought could not be dismissed on the grounds either that it was really an action against the United States or that the United States was an indispensable party. This is intended to dispose of the conventional defense that the suit is an unconsented suit against the United States.

Section 2 of S. 3568 would remove the jurisdictional amount requirement from 28 U.S.C. 1331 and would give the district courts original jurisdiction in all civil actions in which the matter in controversy arises under the Constitution, laws, or treaties of the United States.

With respect to neither of these proposals is it possible to calculate with any degree of accuracy how many cases are involved nor what new issues they will raise. We are simply certain that the bill, if passed, would greatly increase the caseload of the already overburdened Federal courts.

It does not seem to me that blanket legislation of this type offers any assurance of justice. It does guarantee that more cases will be reached by the courts only after undue delay.

Many legal scholars assure us that abolishing sovereign immunity would nevertheless leave intact all other legal and equitable defenses against inappropriate actions brought to test agency decisions—including defenses on the merits.

In the first place it is evident that the judiciary is fast eroding many defenses such as standing to sue. See *Flast* v. *Cohen*, 392 U.S. 83 (1967) ; *Assoc. of Data Processing Service Organizations v. Camp*, 397 U.S. 150 (1970). What some have termed archaic defenses are, along with sovereign immunity, part of a framework of law developed to determine how, when, and by whom the Government, its agencies, and officials may be challenged. Secondly, how many and what governmental decisions should be reviewed *on the merits* is the real question. The sweeping nature of this bill determines that most, if not all, governmental decisions are judicially reviewable.

Before all this happens, I believe that we ought to reflect on what it is we really want from judicial review. Are there actually areas in which justice is persistently denied because of refusal to have a judicial review of the facts? If so, obviously that injustice should be rectified.

My point is that we should decide precisely where a full judicial review is needed and legislate concerning that area only. This is a fair and orderly way to handle this problem without contributing to other existing problems. It seems to me, given the necessity for swifter institutional response to our Nation's needs, there is a large public interest to be served in not having Government programs halted by judicial action prompted by challenges made by one or a few citizens.

The Government has long since agreed to respond in money damages for certain types of injuries done in the course of executing a Government program. This proposal may subject the Government to other types of relief, primarily in the form of restraining orders or mandatory injunctions. The consequences of these proposed remedies should be carefully scrutinized.

Under present law, a suit against a Government official seeking an injunction to require him to perform a Government contract is deemed a suit against the Government and consequently may not be brought absent some statute granting consent to suit. *Larson* v. *Domestic & Foreign Commerce Corp.*, 337 U.S. 682. The effect is to remit the plaintiff to an action for damages under the Tucker Act. This result should, we believe, be preserved; public procurement officers should, for example, be free to cancel contracts and place their orders with other contractors if they believe the public interest to require it, without fear that the procurement involved may be delayed for months or years by an injunctive suit. The injured contractor has a damages remedy under the Tucker Act, and he should be restricted to that remedy. A contrary result "would cause intolerable interference with public administration." *Larson* v. *Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 705 (Douglas, J., concurring).

Further, to some extent injunctive remedies are already available. The constitutionality of any program can be challenged. The authority within the program of an official to act may be tested. However, I believe that there must be a demonstration of considerable magnitude to justify this proposed threat of sweeping review to hang over every official decision.

You have suggested that we direct our comments on the proposed deletion of the jurisdictional amount requirement of section 1331 regarding the effect this amendment would have on three types of cases—(1) suits challenging the constitutionality of state statutes; (2) Jones Act cases; and (3) suits against officers of the Federal Government.

In our view the proposed amendment is not likely to open the doors of the Federal courts to any significant number of suits challenging the constitutionality of state statutes. Virtually all, if not all, such suits can presently be brought in Federal courts without regard to the amount in controversy pursuant to 28 U.S.C. 1343(3).

Similarly, we are not aware of any potential problems with Jones Act cases. Usually, the $10,000 jurisdictional amount requirement is not a barrier to such cases since plaintiffs either allege injury, pain, and suffering in excess of $10,000 or they premise jurisdiction of their cause of action (usually including counts other than the Jones Act) on 28 U.S.C. 1333(a) which contains no jurisdictional amount requirement.

As to "Federal question" actions brought against Federal officers and agencies, the Department has considerable sympathy for the person alleging a violation of his constitutional rights who is barred from a Federal court because these rights are not capable of valuation, or where the valuation is less than $10,000. This same plaintiff may likewise be barred from a remedy in state courts because those courts cannot issue an effective decree against the offending Federal officials or agency. In such cases the $10,000 jurisdictional requirement does not define a proper class upon which to deny a constitutional claim. Accordingly, the Department of Justice supports this provision of the bill which would remove what the Department sees as an unreasonable classification.

At the same time, the Department strongly urges the Subcommittee to undertake additional study and evaluation of the number and types of new cases that this amendment of section 1331 will admit to the Federal courts. While the Department will not support a test for Federal jurisdiction which does not make a valid classification between persons whose cases are appropriate for judicial review, it continues to be fearful of the constant proliferation of Federal cases and the eagerness with which some courts review administrative decisions no matter how insignificant.

I would like to make two further comments on the bill.

1. The Department has no objection to amending 5 U.S.C. 703 to permit the United States to be a named defendant in a suit against its officers and agents. This would have the effect of avoiding the frustrating experience of a suit being lost for want of an appropriately named defendant. I must emphasize however that this change should have no effect upon the defense that the suit is an unconsented one against the United States. This latter issue should be settled on its merits and cannot be accomplished merely by adding a new named defendant.

2. The proposed amendment of 28 U.S.C. 1391(e) would apparently permit local defendants to be joined in a suit brought by one party against a Federal

75

official residing outside of the court's jurisdiction. It seems to be intended to permit the settling of private disputes in the same proceeding as the one against the Federal official. Undoubtedly, the original purpose of Sec. 1391(e) was to allow suit against the Federal official in district courts other than that in the District of Columbia. I do not believe that we can object to this proposal if it be understood that no other jurisdictional or venue requirements are being affected.

This closes my statement. I shall be happy to answer any questions.

Senator KENNEDY. This has been a most informative and stimulating hearing, and I want to thank all of our witnesses for coming in and for giving us such concise and pointed statements. I am glad that there was agreement on at least some portion of the bill under consideration, and I think the Justice Department has done a good job of pointing out its objections to the first section of the bill.

However, I do not believe that those objections outweigh the benefits to be derived from the passage of the bill. I am sympathetic to the argument that our Judiciary faces great burdens already, but the principle of judicial review, as a check on official actions, is central to our system of shared and balanced powers, and a priority activity of the Federal judicial system. Thus, court orders protecting the rights of American citizens cannot be considered intermeddling or interfering in the sacrosanct domains of Federal officials, but rather represent an integral dimension of our constitutional form of government.

Certainly there is a basic injustice in refusing even to consider judicial relief when Government officers infringe the legal rights of a private party. For the Federal courts are particularly suited to dealing with disputes between private parties and the Government, and in many cases if the courts do not provide a forum for resolving these disputes there will be no available forum at all.

To the extent that statutory and judicial limitations on judicial review are reasonable and necessary, they exist without reference to sovereign immunity, and these limitations will continue to prevent abuses or usurpation by courts of executive authority, even if this bill is passed.

As for judicial economy and efficiency, the fact is that the confusions and irrationalities of applying sovereign immunity generate rather than eliminate litigation. Since there are so many exceptions and circumventions of the defense, it provides no deterrent to litigation, but necessarily provides a complication and additional issue in every suit.

In short I continue to believe that our institutions must become more hospitable to the orderly resolution of complaints against them if we want to have a peaceful and orderly society, and I believe that the removal of artificial and unjustifiable barriers to such resolutions is therefore vital. I think S. 3568 is an important and symbolic step in this direction and will help restore public confidence in the responsiveness and accountability of the Federal Government.

The subcommittee stands in recess, subject to call of the Chair.

(Whereupon, at 11:35 a.m., the committee recessed, subject to call of the Chair.)

APPENDIX I

Administrative Conference Recommendations and Consultants Memoranda

A. Recommendation No. 7 - Elimination of Jurisdictional Amount
       Requirement in Judicial Review

### RECOMMENDATION

Title 28 of the United States Code should be amended to
eliminate any requirement of a minimum jurisdictional amount
before United States district courts may exercise original
jurisdiction over any action in which the plaintiff alleges
that he has been injured or threatened with injury by an
officer or employee of the United States or any agency
thereof, acting under color of Federal law.  This amend-
ment is not to affect other limitations on the availability
or scope of judicial review of Federal administrative action.

JA661

October 1968

COMMITTEE ON JUDICIAL REVIEW

Memorandum in support of the recommendation to eliminate
the jurisdictional amount requirement in judicial review

(by Roger C. Cramton

An anomaly in the law relating to federal-court juris-
diction deprives a United States district court, otherwise
competent, to entertain certain cases involving "nonstatutory"
review of federal administrative action in the absence of the
jurisdictional-amount requirement of 28 U.S.C. § 1331 (1964)
(the general "federal question" provision). These cases
"arise under" the federal Constitution or federal statutes
and--unless barred by the doctrine of sovereign immunity and
subject to the various limiting rules of standing, exhaustion
of remedies, finality, ripeness, and so on--they are appro-
priate matters for the exercise of federal judicial power.
The purpose of this recommendation, as it plainly states, is
to correct this anomaly by conferring original jurisdiction
on district courts of "any action in which the plaintiff al-
leges that he has been injured or threatened with injury by
an officer or employee of the United States or any agency
thereof, acting under color of federal law."

47-534 O - 70 - 6

Nonstatutory review of federal administrative action has recently been summarized by Professor Byse:

> The litigant who seeks judicial review of a federal administrative determination must, of course, bring his action in a court which Congress has authorized to hear the controversy. If the petitioner can show that he is "aggrieved" or "adversely affected" by an "order" of one of the major regulatory agencies, the jurisdictional hurdle will easily be surmounted, for most regulatory statutes specifically authorize such persons to secure judicial review in a named court or courts. If the statute from which the agency derives its powers does not contain a specific review provision, the necessary congressional authorization may appear in another statute, such as the Review Act of 1950 [5 U.S.C. §§ 1031-42 (1964)], or, possibly, section 10 of the Administrative Procedure Act [5 U.S.C. §§ 701-06 (Supp. II, 1967)]. Whether an action for review is brought pursuant to a specific or general statutory review provision, the theory is the same: Congress has directed the judiciary to review the administrative determination; so long as the statute does not transgress constitutional limitation, it is the court's duty to comply with the congressional directive.

> If the litigant is unable to ground his action on either a specific or a general statutory review provision, judicial relief is not necessarily foreclosed, for he may still be able to institute a "nonstatutory" review action. . . .

> The litigant who seeks review under this theory will institute an action in a federal district court against the individual whose action or inaction as a government official allegedly invades his legal rights. The remedy usually sought is an injunction, often

accompanied by a request for relief under
the Declaratory Judgment Act [28 U.S.C.
§§ 2201-02 (1964)].  Sometimes the litigant
will base his action upon a specific juris-
dictional provision enacted as a part of a
substantive statute, such as section 279 of
the Immigration and Nationality Act of 1952,
which states that district courts shall have
jurisdiction of "all cases, civil and criminal,
arising under any provision of this title."
[8 U.S.C. § 1329 (1964).]  More often, the
nonstatutory review action is based upon a
jurisdictional section of title 28 of the
United States Code, such as section 1331,
the general "federal question" jurisdictional
grant (which is subject to the requirement
of the $10,000 jurisdictional amount) or
sections 1337 and 1339, which confer "original
jurisdiction" without regard to jurisdictional
amount on the district courts of any civil
action "arising under" any act of Congress
"regulating commerce" or "relating to the
postal service."

Byse & Fiocca, Section 1361 of the Mandamus and Venue Act of
1962 and "Nonstatutory" Judicial Review of Federal Adminis-
trative Action, 81 Harv. L. Rev. 308, 321-23 (1967) [footnotes
omitted].

     Under present law there are a significant number of
situations involving "nonstatutory" review in which a plain-
tiff must ground his action on the "general federal question"
section of the Judicial Code, 28 U.S.C. § 1331, and must be
prepared to establish not only that the action arises under
the Constitution, laws or treaties of the United States but
also that "the matter in controversy exceeds the sum or value
of $10,000, exclusive of interests and costs."  In some of
these cases the jurisdictional-amount requirement cannot be
met because it is impossible to place a monetary value on the
right asserted by the plaintiff.  How is one to value an in-
dividual's claim that he is entitled to remain free from mili-
tary service, to travel abroad, or to remain free from con-
tinuous police surveillance?  In other cases the plaintiff's
claim that he is entitled to a federal grant or benefit (e.g.,
federal employment, use of public lands) may be assigned a

monetary value, but the amount in controversy may be $10,000
or less.  Judicial review of these and similar claims may be
unavailable or limited in scope for other reasons, but judi-
cial consideration of the plaintiff's claim should not be
foreclosed solely because of lack of jurisdictional amount.

The problem is illustrated by the recent case of Boyd
v. Clark, ___ F. Supp. ___ (S.D.N.Y., June 26, 1968), in
which four Selective Service registrants challenged the con-
stitutionality of college-student deferments provided by the
Military Selective Service Act of 1967, 50 U.S.C. § 456(h)(1)
(Supp. 1967), on the ground that student deferments arbitrarily
discriminate against persons who are economically unable to
attend college.  The three-judge district court, in an opinion
by Judge Hays, granted the government's motion to dismiss for
lack of jurisdictional amount:

> . . . The injury claimed is an increased
> likelihood of induction, because, so the plain-
> tiffs allege, registrants who are deferred as
> students thereby ordinarily postpone their in-
> duction for several years and in many cases
> escape service entirely by acquiring other
> deferments.  . . .

> . . . Jurisdiction of this suit is claimed
> under 28 U.S.C. § 1331, the general federal
> question statute, which requires that "the mat-
> ter in controversy" exceed "the sum or value of
> $10,000."  Plaintiffs' counsel concedes that he
> cannot prove that any of the plaintiffs will
> suffer a monetary loss of more than $10,000 by
> reason of the injury alleged.

> It is firmly settled law that cases in-
> volving rights not capable of valuation in
> money may not be heard in federal courts where
> the applicable jurisdictional statute requires
> that the matter in controversy exceed a certain
> number of dollars.  The rule was laid down in
> Barry v. Mercein, 46 U.S. (5 How.) 103 (1847),
> a child custody case.  The "right to the custody,
> care, and society" of a child, the court noted,

"is evidently utterly incapable of being reduced to any pecuniary standard of value, as it rises superior to money considerations." 46 U.S. at 120. Since the statute permitted appeals only in those cases where the "matter in dispute exceeds the sum or value of two thousand dollars," the court concluded that it was without jurisdiction: "The words of the act of Congress are plain and unambiguous. . . . There are no words in the law, which by any just interpretation can be held to . . . authorize us to take cognizance of cases to which no test of money value can be applied." 46 U.S. at 120. Subsequent decisions have followed this reasoning. See Kurtz v. Moffitt, 115 U.S. 487, 498 (1885); Youngstown Bank v. Hughes, 106 U.S. 523 (1882); Giancana v. Johnson, 335 F.2d 366 (7th Cir. 1964), cert. denied, 379 U.S. 1001 (1965); Carroll v. Somervell, 116 F.2d 918 (2d Cir. 1941); United States ex rel. Curtiss v. Haviland, 297 Fed. 431 (2d Cir. 1924); 1 Moore, Federal Practice ¶ 0.92[5] (2d ed. 1964).

Judge Edelstein dissented, arguing that the plaintiffs' allegation that the matter in controversy exceeded $10,000 should not be scrutinized, at least where the defendant did not move to dismiss on that ground, or, alternatively, that the court should "assume that freedom from an unconstitutional discrimination exceeds the sum or value of $10,000.00." He suggested that the jurisdictional-amount requirement was an unconstitutional one in situations, such as this, in which the action, because it is against federal officers, could not be brought in a state court.

The reasons for objecting to the absence of federal jurisdiction in a case like Boyd v. Clark are readily apparent. The factors relevant to the question of whether or not a federal court should be available to a litigant seeking protection of a federal right have little, if any, correlation with minimum jurisdictional amount. Instead they involve such considerations as whether there is a need for a specialized federal tribunal and whether there are defects in the state judicial system that might substantially impair consideration of the plaintiff's claim. These factors have special force in the

type of case with which this recommendation is concerned--
where specific relief is sought against a federal officer--
because state courts generally are powerless to restrain or
mandamus the action of a federal officer taken under color
of federal law. See Arnold, The Power of State Courts To
Enjoin Federal Officers, 73 Yale L. J. 1385 (1964). Unlike
other federal-question cases subject to the jurisdictional-
amount requirement, such as cases attacking state statutes
on federal constitutional grounds, denial of a federal forum
for lack of jurisdictional amount may be a denial of any re-
medy whatsoever. As Judge Edelstein pointed out in his dis-
sent in Boyd v. Clark, jurisdictional provisions which deny
a litigant any opportunity to present federal constitutional
claims may themselves present constitutional difficulties.

The lack of a state forum in actions against federal
officers serves to distinguish this recommendation from other
and more general proposals to eliminate the jurisdictional-
amount requirement in federal-question cases. The American
Law Institute, for example, has tentatively recommended that
the jurisdictional amount requirement be abandoned in federal
question cases. ALI, Study of the Division of Jurisdiction
Between State and Federal Courts § 1311 and pp. 78-81 (Tent.
Draft No. 6, 1968). Whether or not these broader proposals
are accepted, the narrower problem with which this recommenda-
tion is concerned needs correction.

It is unclear why Congress, when it increased the juris-
dictional amount in diversity-of-citizenship cases in 1958
from $3,000 to $10,000, also raised the minimum jurisdictional
amount in federal question cases arising under 28 U.S.C. § 1331.
The legislative history merely asserts that the effect of the
change is insignificant because the only cases affected are
those involving the constitutionality of state statutes and
those arising under the Jones Act. Virtually all other cases
were said to fall within one of the special federal question
statutes which require no minimum jurisdictional amount. See,
e.g., 104 Cong. Rec. 11508 (June 30, 1958). If this were the
case it is difficult to see why the provision was enacted,
since the only purpose of increasing the jurisdictional amount
was to reduce the workload of the federal courts, a purpose
which would not be advanced if federal-question cases were
unaffected. See Friedenthal, New Limitations on Federal Juris-
diction, 11 Stan. L. Rev. 213, 216-18 (1959).

The assertion, however, that the significant cases which
arise under section 1331 are limited to the two categories
mentioned is misleading and erroneous.  There is an important
third category, with which this recommendation is concerned,
in which persons aggrieved by federal administrative action
are seeking nonstatutory review in an action brought against
the officer.  In these cases the plaintiff must follow one of
the following courses:  (1) satisfy the minimum jurisdictional
amount required by 28 U.S.C. § 1331; (2) bring his action in
the District of Columbia; (3) cast his action in the form of
a mandamus proceeding, thus qualifying under the provisions
of the Mandamus and Venue Act of 1962, 28 U.S.C. §§ 1361,
1391(e) (1964); or (4) persuade the court that section 10
of the Administrative Procedure Act, 5 U.S.C. §§ 701-04
(Supp. II, 1967), provides an independent jurisdictional
basis for judicial review of federal administrative action,
a proposition that is much in doubt.  Brief consideration
will be given to the unsatisfactory nature of each of these
alternatives.

    1.  _Satisfying the minimum jurisdictional amount_.  The
principles for determining whether the amount in controversy
satisfies statutory requirements are well-established.  The
plaintiff has the burden of alleging and proving jurisdictional
facts.  The plaintiff's ad damnum is ordinarily taken at face
value unless it appears not to have been made in good faith
or the court believes as a matter of legal certainty that the
value of the right in controversy is less than the minimum
amount.  St. Paul Mercury Ind Co. v. Red Cab Co., 303 U.S.
283, 288-89 (1938).  There is no guarantee, however, that the
court will not examine in detail the value of the plaintiff's
claim.  In Carroll v. Somervell, 116 F.2d 918 (2d Cir. 1941),
for example, where a federal employee sought to enjoin his dis-
missal for failure to sign a non-Communist affidavit, the em-
ployee alleged loss of standing in the community in excess of
$3,000.  Nevertheless, the case was dismissed for lack of
jurisdictional amount on the ground that the value of the claim
was measured by the maximum compensation--less than $3,000--
that the employee would be entitled to receive during the en-
suing year.

    As the Carroll case indicates, the methods of valuation
in injunction suits are conservative.  In McNutt v. General
Motors Acceptance Corp., 298 U.S. 178 (1936), it was held

that in an attack on a regulatory statute the amount in con-
troversy is not the value of the business or other activity
regulated but the difference between its value regulated and
unregulated.  See also Healy v. Ratta, 292 U.S. 263 (1934)
(the amount in controversy in tax litigation is measured by
the amount of the tax rather than of the penalty).  Although
some cases ignore these principles by treating the plaintiff's
ad damnum as conclusive, e.g., Flast v. Cohen, 392 U.S. 83
(1968) (federal taxpayer's attack on federal grants to religious
schools); Townsend v. Zimmerman, 237 F.2d 376 (6th Cir. 1956)
(attack on selective service classification), a plaintiff
seeking judicial review of federal administrative action can-
not rely on this approach being taken.

Although many nonstatutory review actions can be based
upon special jurisdictional provisions such as 28 U.S.C.
§ 1337 (arising under acts "regulating commerce"), there is
a significant residue in which jurisdiction must be predicated
upon § 1331, the general federal question provision which
requires a jurisdictional amount in excess of $10,000.  Cases
against federal officers in which the jurisdictional-amount
requirement was in issue are listed below.

Reputational or intangible interests that
cannot be expressed in money terms:  Oesterreich
v. Selective Service System Local Board No. 11,
280 F.Supp. 78 (D. Wyo. 1968), aff'd, 390 F.2d
100 (10th Cir. 1968), cert. granted, 391 U.S.
912 (freedom from induction resulting from
selective service reclassification); Giancana
v. Johnson, 335 F.2d 366 (7th Cir. 1964), cert.
den., 379 U.S. 1001 ("Courts may not treat as a
mere technicality the jurisdictional amount
essential to the 'federal question' jurisdiction,
even in this case where there is an allegedly
unwarranted invasion of plaintiff's privacy
[by continuous FBI surveillance]"); Jackson v.
Kuhn, 254 F.2d 555 (8th Cir. 1958) (constitu-
tionality of military presence at Little Rock
High School; jurisdictional-amount requirement
held not satisfied); Vorachek v. United States,
337 F.2d 797 (8th Cir. 1964) (disclosure of
confidential information concerning plaintiff
by federal officers).

Employment interests: Neustein v. Mitchell,
130 F.2d 197 (2d Cir. 1942) (loss of state of-
fice because of federal enforcement of Hatch Act
prohibitions on political activity); Carroll v.
Somervell, 116 F.2d 918 (2d Cir. 1941) (value
of federal employment measured by lost wages);
Fischler v. McCarthy, 117 F.Supp. 643 (S.D.N.Y.
1954), aff'd on other grounds, 218 F.2d 164
(2d Cir. 1954) (bare allegation that value of
federal employment exceeded $3,000 not accepted).
Cf. Friedman v. International Ass'n of Machinists,
220 F.2d 808 (D.C.Cir. 1955) (value of member's
explusion from union measured by loss of wages).
One line of cases that formerly were troubled by
the jurisdictional-amount requirement involved
the preferential employment rights of veterans.
See Christner v. Poudre Valley Co-op. Ass'n,
134 F.Supp. 115 (D.Colo. 1955), aff'd, 235 F.2d
946 (10th Cir. 1956). This particular problem
has now been cured by a statute specifically
providing for federal jurisdiction in such cases
without regard to jurisdictional amount.

Freedom from regulatory interference:
Quinault Tribe of Indians v. Gallagher, 368 F.2d
648 (9th Cir. 1966) (freedom of Indian reserva-
tion from state civil and criminal authority);
Gavica v. Donaugh, 93 F.2d 173 (9th Cir. 1937)
(enforcement of regulations governing grazing
on public lands); Dewar v. Brooks, 16 F.Supp.
636 (D.Nev. 1936) (same); Wyoming v. Franke,
58 F.Supp. 890 (D.Wyo. 1945) (creation of national
monument). Cf. Empresa Hondurena de Vapores, S.A.
v. McLeod, 300 F.2d 222,      (2d Cir. 1962) (em-
ployer's suit to enjoin NLRB regional director
from conducting a representation election).

Property rights: Cameron v. United States,
146 U.S. 533 (1892) ("It is not, however, the value
of the property in dispute in this case which is
involved, but the value of the color of title to
this property, which is hardly capable of pecuniary
estimation, and if it were, there is no evidence
of such value in this case"); Helvy v. Webb, 36
F.Supp. 243 (S.D.Calif. 1941) (value of grazing
lands).

JA670

<u>Military status</u>: Jones, Jurisdiction of
the Federal Courts to Review the Character of
Military Administrative Discharges, 57 Colum.
L. Rev. 917, 937-41 (1957): ". . . the juris-
dictional amount may prove an insurmountable
obstacle since the plaintiff-veteran [in
military discharge situations] probably would
not be able to establish that the requisite
$3,000 is involved in the controversy over
the character of his discharge, a matter as
to which he has the burden of proof." See
also Meador, Judicial Determinations of
Military Status, 72 Yale L. J. 1293, 1298
n. 27 (1963).

2.  <u>Litigating in the District of Columbia</u>.  The district
court for the District of Columbia has long been viewed as
inheriting the inherent and common-law powers of the Maryland
courts.  Prior to 1962 this meant that, alone of federal
courts, those in the District of Columbia possessed the power
to issue original writs of mandamus as a general matter.  The
mandamus problem was taken care of by the Mandamus and Venue
Act of 1962, 28 U.S.C. §§ 1361, 1391(e), which conferred power
on district courts everywhere to entertain "any action in the
nature of mandamus to compel an officer or employee of the
United States or any agency thereof to perform a duty owed
to the plaintiff."  In addition to its mandamus power, how-
ever, the district court for the District of Columbia also
"has a general equity jurisdiction," <u>Stark</u> v. <u>Wickard</u>, 321
.U.S. 288, 290 (1944), which it may exercise without regard
to the amount in controversy.  D.C. Code Ann. §§ 11-521,
11-961, 11-962 (Supp. IV, 1965).

The resulting situation is hardly a logical or defensible
one.  Congress, disturbed by the inability of litigants to ob-
tain mandamus relief in local courts distributed around the
country, conferred such jurisdiction on all district courts,
without regard to amount in controversy, in 1962.  The more
traditional exercise of injunctive or declaratory authority,
however, remained subject to the requirement of minimum juris-
dictional amount whenever no special federal question statute
was available--except in the District of Columbia!  The same
arguments that supported the Mandamus and Venue Act of 1962--
the expense and inconvenience of forcing litigants from all

over the country to bring their claims to a District of
Columbia court--support the elimination of the remaining
anachronism with respect to jurisdictional amount in in-
junction suits against federal officers.

    3.  Relief "in the nature of mandamus." As has already
been indicated, the Mandamus and Venue Act of 1962, 28 U.S.C.
§§ 1361, 1391(e), was intended to provide litigants with a
convenient local forum in actions to require a federal of-
ficer to perform a duty owed to the plaintiff. No juris-
dictional amount is required in actions coming within 28
U.S.C. § 1361. In situations where the federal officer
does not "owe a duty" to the plaintiff but has unlawfully
interfered with the plaintiff's rights--the traditional
situation giving rise to injunctive relief--, § 1361 cannot
provide the basis for federal jurisdiction. Moreover, since
an action under § 1361 is "in the nature of mandamus," there
is a risk that the court will hold that a negative decree can-
not be issued or that the ministerial-discretionary distinction
and other technicalities of mandamus law will significantly
narrow the scope of review. These problems are ably discus-
sed by Byse & Fiocca, Section 1361 of the Mandamus and Venue
Act of 1962 and "Nonstatutory" Judicial Review of Federal
Administrative Action, 81 Harv. L. Rev. 308 (1967), who conclude
that the present existence of the mandamus remedy does not take
care of all of the troublesome limitations on the availability
of nonstatutory review.

    4.  Section 10 of the Administrative Procedure Act as an
independent source of federal jurisdiction. Section 10 of
the Administrative Procedure Act provides, subject to some
qualifications, that "a person suffering legal wrong because
of agency action . . . is entitled to judicial review thereof"
and that "final agency action for which there is no other
adequate remedy in a court is subject to judicial review."
5 U.S.C. §§ 701-03 (Supp. II, 1967). It also provides that
"[t]he form of proceeding for judicial review" may be brought
"in a court of competent jurisdiction." Although the section
does not in terms confer jurisdiction on federal courts and
was generally viewed as restating the existing law of judicial
review, some courts in more recent years have concluded that
section 10 is an independent grant of jurisdiction to review
"final agency action." Brennan v. Udall, 379 F.2d 803 (10th
Cir. 1967) (Interior determination which adversely affected

landowner's title); Coleman v. United States, 363 F.2d 190
(9th Cir. 1966), adhered to on rehearing, 379 F.2d 555 (1967)
(Interior determination concerning the validity of a mining
claim); Cappadora v. Celebrezze, 356 F.2d 1 (2d Cir. 1966)
(refusal of Social Security Administration to reopen claim
for survivors' benefits) (alternative holding); Estrada v.
Ahrens, 296 F.2d 690 (5th Cir. 1961) (Immigration and Naturali-
zation Service action excluding an alien from entry). It is
not clear that the jurisdiction of the district court needed
to be rested on section 10 of the Administrative Procedure Act
in any of these cases: special federal-question provisions
existed in Cappadora and Estrada; and it is probable that the
minimum jurisdictional amount under § 1331 could have been
satisfied in Brennan and Coleman. None of the cases contains
an extensive or reasoned discussion of the question whether
section 10 is in fact an independent ground of subject-matter
jurisdiction in federal courts.

   A number of cases have reached the conclusion that the
Administrative Procedure Act is not a source of jurisdiction:
Twin Cities Chippewa Tribal Council v. Minnesota Chippewa
Tribe, 370 F.2d 529 (8th Cir. 1967) (attack on manner of
holding tribal election); Chournos v. United States, 335
F.2d 918 (10th Cir. 1964) (Interior determination concerning
the validity of placer mining claim); Local 542, Operating
Engineers v. NLRB, 328 F.2d 850 (3d Cir. 1964) (NLRB refusal
to hold representation election); Ove Gustavsson Contracting
Co. v. Floete, 278 F.2d 912 (2d Cir. 1960) (termination of
government contract); Kansas City Power & Light Co. v. McKay,
225 F.2d 924 (D.C.Cir. 1955) (federally-supported power pro-
gram). These decisions are no more satisfactory than those
going the other way. The Chippewa case merely states a con-
clusion that section 10 "does not confer jurisdiction upon
federal courts. Its purpose is to define the procedures and
manner of judicial review of agency action rather than confer
jurisdiction." Chournos really involves the separate problem
of whether section 10 waives sovereign immunity, while the
Kansas City Power case involves standing and not subject-matter
jurisdiction. The other two cases appear to be correctly de-
cided on other grounds: nonstatutory review of NLRB matters
under the doctrine of Leedon v. Kyne, 358 U.S. 184 (1958), takes
place in district courts rather than, as was urged in the
Local 542 case, in a court of appeals; and district court juris-
diction of claims arising out of government contracts, the
matter at issue in Ove Gustavsson, is precluded because of the
existence of an adequate statutory remedy.

The Supreme Court has not yet spoken on the question, despite the conflict of circuits, although in <u>Rusk</u> v. <u>Cort</u>, 369 U.S. 367, 371-72 (1962) (passport issuance), the Court appears to have assumed that section 10 is a grant of jurisdiction. Thus the question remains an open one.

If the Supreme Court were to hold that section 10 of the Administrative Procedure Act is an independent ground of federal jurisdiction, that holding would go far to ameliorate the problems with which this recommendation is concerned. Cases seeking judicial review of federal administrative action would be entertained by federal courts without regard to jurisdictional amount, except in those situations exempt from the Administrative Procedure Act or included within the qualifying phrase of section 10: "except to the extent that--(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law. . . ."

The Committee on Judicial Review, believing that it is not its function to interpret federal statutes, takes no position on whether section 10 now provides for federal jurisdiction in cases involving final action of federal officers or agencies. The Committee merely states a conclusion of policy--there should be no jurisdictional-amount limitation on suits against federal officers seeking injunctive and declaratory relief. Since it is at least doubtful whether this objective can be reached by interpretation of existing legislation, the Committee urges enactment of specific legislation to handle the problem.

It should be noted again that the grant of subject-matter jurisdiction without regard to jurisdictional amount would not impair the doctrine of sovereign immunity or affect any of the other rules and doctrines that limit the availability and scope of judicial review of official action: (1) the plaintiff's lack of standing; (2) the absence of a matured controversy; (3) the availability of an alternative remedy in another court; (4) the express or implied preclusion of judicial review; (5) the commission of the matter by law to the defendant's discretion; (6) the privileged nature of the defendant's conduct; (7) the plaintiff's failure to exhaust his administrative remedies; and (8) the discretionary authority of a court to refuse relief on equitable grounds.

JA674

B. Recommendation No. 9 - Statutory Reform of the Sovereign
   Immunity Doctrine.

The technical legal defense of sovereign immunity, which
the Government may still use in some instances to block suits
against it by its citizens regardless of the merit of their
claims, has become in large measure unacceptable. Many years
ago the United States by statute accepted legal responsibility
for contractual liability and for various types of misconduct
by its employees. The "doctrine of sovereign immunity" should
be similarly limited where it blocks the right of citizens to
challenge in courts the legality of acts of governmental
administrators. To this end the Administrative Procedure
Act should be amended.

RECOMMENDATION

1.  Section 702 of title 5, United States Code (formerly
section 10(a) of the Administrative Procedure Act), should be
amended by adding the following at the end of the section:

"An action in a court of the United States seeking
relief other than money damages and stating a
claim that an agency or an officer or employee
thereof acted or failed to act in an official
capacity or under color of legal authority shall
not be dismissed nor relief therein denied on
the ground that it is against the United States
or that the United States is an indispensable party.
The United States may be named as a defendant in
any such action, and a judgment or decree may be
entered against the United States. Nothing herein
(1) affects other limitations on judicial review or
the power or duty of the court to dismiss any
action or deny relief on any other appropriate
legal or equitable ground; or (2) confers auth-
ority to grant relief if any other statute that
grants consent to suit expressly or impliedly
forbids the relief which is sought."

JA675

    2.  Section 703 of title 5, United States Code (formerly section 10(b) of the Administrative Procedure Act), should be amended by adding the following sentence after the first full sentence:

> "If no special statutory review proceeding is appli-
> cable, the action for judicial review may be brought
> against the United States, the agency by its official
> title, or the appropriate officer."

Sebtember 1969

COMMITTEE ON JUDICIAL REVIEW

Memorandum in support of the recommendation relating to
statutory reform of the sovereign immunity doctrine

(by Roger C. Cramton)

JA677

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| INTRODUCTION. . . . . . . . . . . . . . . . . | | 1 |

I. SOVEREIGN IMMUNITY PRIOR TO LARSON. . . . . . . 4

    A.  In General: Restraining Harmful Conduct . . . 4
    B.  Enforcement of Contracts Against the
       United States . . . . . . . . . . . . . 6
    C.  Orders Directing Payment of Public
       Moneys. . . . . . . . . . . . . . . . 6
    D.  Orders Directing the Transfer of
       Government Property . . . . . . . . . . . 7

II. DEFECTS OF PRESENT LAW . . . . . . . . . . . 8

    A.  The Larson Case . . . . . . . . . . . . 8

        1.  "Error" distinguished from "authority". . 10
        2.  Reliance on "normal rules of agency". . . 13
        3.  Whether a suit is "in effect, a suit
           against the sovereign". . . . . . . . 14
        4.  Whether affirmative relief may be
           granted . . . . . . . . . . . . . 15

    B.  The Malone Case--Property Disputes. . . . . 15

    C.  Hawaii v. Gordon--Affirmative Relief. . . . 18

    D.  Dugan v. Rank--Interference with Govern-
       mental Programs . . . . . . . . . . . . 19

III. OBJECTIVES OF THE COMMITTEE'S RECOMMENDATION. . . 20

    A.  Eliminate Artificialities, Uncertainties
       and Injustices of Present Law . . . . . . . 23

    B.  Provide Specific Relief in Cases Involving
       Public Land . . . . . . . . . . . . . . 30

        1.  Judicial review of administrative
           determinations in the public land field . 30
        2.  Property disputes between the United
           States and private persons. . . . . . . 32

47-534 O - 70 - 7

Page

C.  Allow the United States To Be Named as
    Defendant in Cases Challenging Govern-
    mental Action. . . . . . . . . . . . . . . .34

    1.  Fictional character of the suit
        against the officer. . . . . . . . . . .35
    2.  Technicalities of the law of
        parties defendant. . . . . . . . . . . .36
    3.  Binding effect of judgments. . . . . . .36

D.  Law Other Than Sovereign Immunity
    Unchanged. . . . . . . . . . . . . . . . . .37

    1.  Undue judicial interference with
        governmental programs? . . . . . . . . .40
    2.  Inconvenience to the government
        from burdensome litigation?. . . . . . .44

E.  Retain Present Exclusions on the Avail-
    ability of Monetary or Alternative Relief. .44

IV.  OTHER NEEDED REFORMS . . . . . . . . . . . . .46

A.  Gaps in Tucker and Tort Claims Acts. . . . .46

B.  Subject Matter Jurisdiction of Federal
    District Courts. . . . . . . . . . . . . . .47

C.  Quiet Title Statute. . . . . . . . . . . . .48

D.  Service of Process and Venue Problems. . . .48

    1.  Service of process and parties . . . . .48
        defendant
    2.  Venue. . . . . . . . . . . . . . . . . .52

CONCLUSION. . . . . . . . . . . . . . . . . . . .53

Appendices

A.  Text of Recommendation of The Committee
    on Judicial Review . . . . . . . . . . . . .54

B.  Text of Administrative Procedure Act
    as Amended by the Recommendation . . . . . .55

C.  Quiet Title Statute. . . . . . . . . . . . .59

INTRODUCTION

The doctrine of sovereign immunity is merely one piece in the complicated puzzle of remedies against the United States and its officials. The general pattern of which sovereign immunity is but a piece may be described as follows:

It is now generally accepted that courts make a useful contribution to administration by testing the legality of official action which adversely affects private persons. This premise, often referred to as the "presumption of reviewability", is discussed and elaborated by L. Jaffe, Judicial Control of Administrative Action c. 9 (1965), and by K. Davis, 4 Administrative Law Treatise c. 28 (1958). The presumption of reviewability is reflected not only in court decisions but in a plethora of statutes in which Congress has provided for judicial review of federal administrative action by creating remedies of special or general application. Probably most administrative action is reviewable under these "statutory review procedures." Moreover, two traditional areas in which sovereign immunity was especially powerful--actions to recover tort and contract damages from the United States--are now covered by detailed statutory enactments: (1) contract actions against the United States have been handled since 1855 by the Court of Claims, and, since the enactment of the Tucker Act in 1887, also by federal district courts when the amount of the claim does not exceed $10,000 (see 28 U.S.C. §§ 1346, 1491); and (2) tort actions against the United States may be entertained pursuant to and subject to the limitations of the Federal Tort Claims Act of 1946 (see 28 U.S.C. §§ 1346(b), 1402(b), 1504, 2110, 2401, 2402, 2411, 2412, 2671-80). Although there are gaps in each of these statutes that need reexamination (e.g., the Tort Claims Act is subject to exceptions, some of which are questionable), consideration of sovereign immunity should proceed on the assumption that review of the adequacy of tort and contract remedies against the United States is a matter of another day.

When the existence of these statutory remedies is taken into account, sovereign immunity comes into play primarily in those situations in which an individual complains that the Government or its officer has violated or intends to violate a duty which the Constitution, a statute, or the common law imposes upon the Government and no statutory remedy has been provided. The individual must invoke the special or

-2-

general federal-question jurisdiction of a United States
district court in a nonstatutory review proceeding seeking
injunctive, mandatory, or declaratory relief. It is in
these situations that sovereign immunity may be invoked by
the Government as a limitation upon the court's jurisdiction
and power. This is the area with which this recommendation
is concerned.

The rule that the United States cannot be sued without
its consent developed slowly during the nineteenth century as
a tacit assumption rather than a reasoned doctrine. Federal
courts were not given general federal-question jurisdiction
until 1875 and there was therefore little occasion for square
holdings on the matter. Most of the early dicta on the subject
came in cases advocating a strict construction of the Court
of Claims Act to preclude other contract remedies. As late
as 1882, Justice Miller--striving to interpret the scope of
the immunity in the light of the reasons for it--observed
that "while the exemption of the United States and of the
several States from being subjected as defendants to ordinary
actions in the courts has . . . been repeatedly asserted here,
the principle has never been discussed or the reasons for it
given, but it has always been treated as established doctrine."
United States v. Lee, 106 U.S. 196, 207 (1882).

At various times it has been stated that the basis of
the doctrine is (1) the traditional immunity of the English
sovereign, surviving by implication the grant of judicial
power in Article III (see Hamilton, The Federalist, No. 81);
(2) the inability of the courts to enforce a judgment (see
Jay, C. J., in Chisholm v. Georgia, 2 U.S. (2 Dall.) 419, 478
(1793); and (3) the "logical and practical ground that there
can be no legal right as against the authority that makes the
law on which the right depends" (see Holmes, J., in Kawananakoa
v. Polyblank, 205 U.S. 349, 353 (1907)). These conceptual
arguments for sovereign immunity are now totally discredited.
The only rationale for the doctrine that is now regarded as
respectable by courts and commentators alike is that official
action of the Government must be protected from undue inter-
ference. See Larson v. Domestic and Foreign Commerce Corp.,

JA681

-3-

337 U.S. 682, 705 (1949) (Douglas, J., concurring); Block,
Suits Against Government Officers and the Sovereign Immunity
Doctrine, 59 Harv. L. Rev. 1060 (1946); Byse, Proposed Re-
forms in Federal "Nonstatutory" Judicial Review: Sovereign
Immunity, Indispensable Parties, Mandamus, 75 Harv. L. Rev.
1479, 1484-93 (1962); Carrow, Sovereign Immunity in Adminis-
trative Law--A New Diagnosis, 9 J. Pub. L. 1-23 (1960); Davis,
3 Administrative Law Treatise c. 23 (1958 and 1965 Pocket
Part); Jaffe, Judicial Control of Administrative Action 197-231,
348-53 (1965); Note, Remedies Against the United States and
Its Officials, 70 Harv. L. Rev. 827-64 (1957). The articles
and materials cited above constitute a basic bibliography on
the subject.

The doctrine of sovereign immunity has never had the ef-
fect of insulating official conduct from judicial scrutiny
and control. Through one device or another federal courts
have always entertained suits which were directed against
the sovereign in the sense that the proceeding challenged
official conduct and required officials to do or not do
particular things. Although not always perceived in this
fashion, largely because of the direction in which develop-
ing doctrine channelled thinking, sovereign immunity has
always been a question of whether particular conduct should
be reviewable in the courts and not whether the sovereign
has consented to suit.

Professor Byse has summarized the fictional metamorphosis
which allowed private individuals to obtain judicial review
of "sovereign" acts:

"In light of the failure of Congress to pro-
vide a statutory method of review during the forma-
tive era of administrative law, a literal applica-
tion of the sovereign immunity doctrine often would
have left the citizen remediless against harsh and
illegal acts of his government. Such a result could
not be tolerated. The courts were equal to the
challenge. They reasoned that although the sovereign
principal might be immune from suit, the privilege
of the principal could not be claimed by the agent,
who therefore could be restrained from committing
the wrongful act. In the words of a leading case,
a public official who acts under an unconstitutional

JA682

-4-

statute or outside his statutory authority is
'stripped of his official or representative
character and is subjected in his person to
the consequences of his individual conduct.'
[Ex parte Young, 209 U.S. 123, 160 (1908). . . .]
Thus a controversy that was in fact between a
private person and the federal government was
transmuted into a controversy between two private
persons.  By means of this fiction the courts
were able to exert a significant measure of con-
trol over the bureaucracy." Byse, Proposed Re-
forms in Federal "Nonstatutory" Judicial Review,
75 Harv. L. Rev. 1479, 1484-85 (1962).

The basic problem with the sovereign immunity doctrine
is that it has developed by fits and starts through a series
of fictions.  The resulting patchwork is an intricate, com-
plex and not altogether logical body of law.  The basic issue--
balancing the public interest in preventing undue judicial
interference with ongoing governmental programs against the
desire to provide judicial review to individuals claiming
that Government has harmed or threatens to harm them--is
obscured rather than assisted by the doctrine of sovereign
immunity in its present form.

### I. SOVEREIGN IMMUNITY PRIOR TO LARSON

One effect of the sovereign immunity doctrine was to pre-
vent suits against the United States eo nomine except as Con-
gress had authorized such suits.  A complicated body of case
law, however, separated situations in which an individual could
obtain relief against the Government by suing its officer and
situations in which such relief would be unavailable.  The law
before Larson v. Domestic & Foreign Commerce Corp., 337 U.S.
682 (1949), cast new gloom into this dark corner of the law,
however, was tolerably clear and could be stated in a general
way as follows:

#### A.  In General:  Restraining Harmful Conduct

The most clearly permissible type of action against
a government official was that in which (a)  the plaintiff
sought to enjoin conduct or threatened conduct which, if
not officially justified, would constitute a common-law
tort, and (b)  the relief sought could be given by simply
directing the defendant to abstain from what he was do-
ing or threatening to do.  Once the plaintiff alleged facts

-5-

that would entitle him to equitable relief against a private
citizen, the fact that the defendant was a government officer
did not provide a complete defense but merely an opportunity
for justification. The sovereign-immunity doctrine failed to
provide official justification in two well-recognized kinds
of cases: (1) when the officer was held to have exceeded the
authority delegated to him by Congress (e.g., Land v. Dollar,
330 U.S. 731 (1947) (alternative holding); Philadelphia Co.
v. Stimson, 223 U.S. 605, 619-20 (1912); American School of
Magnetic Healing v. McAnnulty, 187 U.S. 94, 109 (1902)); and
(2) when the statute that purported to authorize the officer's
act was found to be unconstitutional (e.g., Georgia R.R. &
Banking Co. v. Redwine, 342 U.S. 299, 304-06 (1952); Ex parte
Young, 209 U.S. 123, 155-60 (1908); Osborn v. Bank of the
United States, 22 U.S. (9 Wheat.) 738, 836-37 (1824)).

When the defendant (a government officer) sought to justify
an alleged tort by showing statutory authority, the court could
not dispose of the case on the ground of sovereign immunity
without deciding the issue of statutory authority thus pre-
sented. No distinction was attempted between an allegation
of error in the performance of generally authorized duties
and an allegation of violation of a statute. Error would
support a charge of action in excess of statutory authority
unless the action was committed to the defendant's discretion.
For example, in Philadelphia Co. v. Stimson, 223 U.S. 605
(1912), a statute authorized the Secretary of War to fix a
harbor line beyond which the building of piers or other works
was a misdemeanor. A property owner sued to enjoin the Secre-
tary from prosecuting him on account of construction of a
wharf beyond the line the Secretary had fixed. The Court,
in a unanimous opinion by Hughes, J., granted relief against
tortious interference with plaintiff's use of his land:

"The exemption of the United States from suit
does not protect its officers from personal liability
to persons whose rights of property they have wrong-
fully invaded. . . . The principle has frequently
been applied with respect to state officers seeking
to enforce unconstitutional enactments. . . . And
it is equally applicable to a Federal officer act-
ing in excess of his authority or under an authority
not validly conferred." 223 U.S. at 619-20.

JA684

-6-

These general ideas were modified by special sensitivity to judicial interference when the relief sought fell into any of three special categories: (1) enforcement of contracts against the United States; (2) directing government officers to pay over public moneys; and (3) directing officials to give over property which is in the possession of the United States and to which the United States unquestionably has legal title. Each of these situations deserves some special comment.

B.  Enforcement of Contracts Against the United States

The immunity of the United States from suit developed in the context of the similar immunity of the states under the Eleventh Amendment.  The central notion underlying the Eleventh Amendment was that a court cannot without consent enforce a contract against the sovereign.  The provision of a statutory contract remedy against the United States in the Court of Claims was properly viewed as an exclusive remedy. A long line of cases held that federal courts cannot give specific performance of a contract against the United States. E.g., Wells v. Roper, 246 U.S. 335 (1918); United States ex rel. Goldberg v. Daniels, 231 U.S. 218 (1913); Louisiana v. Jumel, 107 U.S. 711, 721, 727 (1882).  The damage remedy in the Court of Claims (or in certain instances in the district court pursuant to the Tucker Act) is the only remedy.

C.  Orders Directing Payment of Public Moneys

A case in which the plaintiff seeks to order a government officer to pay over public funds in his possession presents a special problem.  Whether the remedy sought is mandamus or in-junction, the plaintiff seeks affirmative relief of a partic-ularly delicate kind.  Effective government is dependent upon an ample provision of funds, and an order requiring the public treasury to disgorge poses a substantial threat.  Consequently, the circumstances under which a court may compel the payment of public moneys are restricted to those in which the official lacks discretion and there is a statutory duty owed to the plaintiff.  In Mine Safety Appliances Co. v. Forrestal, 326 U.S. 371 (1945), for example, a government contractor sought to "restrain" the Secretary of Navy from withholding pay-ments allegedly due on a contract.  The Secretary had with-held payments pursuant to the Renegotiation Act on the ground that the plaintiff had made excessive profits; the plaintiff contended that the Secretary's conduct was unauthorized and unconstitutional.  The Court dismissed the action as one against the United States to which it had not consented.  Although framed as a suit for a prohibitory injunction, the plaintiff in fact sought to compel the payment of government funds in a

JA685

-7-

situation in which Congress had not directed that such payments
be made. Plaintiff's contract remedy in the Court of Claims
was a perfectly adequate one. See also Morrison v. Work,
266 U.S. 481, 488 (1925) (suit to require officers to sell
Indian reservation lands and distribute proceeds to various
claimants barred by sovereign immunity).

On the other hand, where a statute imposes a clear duty
upon a government officer to pay a claimant, mandatory relief
is available in the federal courts. E.g., Miguel v. McCarl,
291 U.S. 442 (1934) (mandatory injunction against disbursing
officer requiring him to pay retirement allowance to which
plaintiff was entitled by law); Roberts v. United States, 176
U.S. 221 (1900) (mandamus directing Treasurer to make certain
payments which an Act of Congress, as construed by the Court,
required him to make); Clackamas County, Oregon v. McKay, 219
F.2d 479 (D.C.Cir. 1954), vacated as moot, 349 U.S. 909 (1955)
(mandamus directing Secretary of Interior to distribute to
certain counties in Oregon the monetary proceeds received by
him from the sale of land which had reverted to the United
States after certain grantee railroads had forfeited their
rights to it; the only action required of the Secretary,
according to the court's construction of the statute, was
"ministerial" rather than "discretionary").

    D. Orders Directing the Transfer of Government Property

Apart from cases in which the United States is named as
a party defendant, the clearest class of cases which were open
to the defense of sovereign immunity under the pre-Larson law
were actions to establish an interest in, or satisfy a claim
out of, property of the United States, where the United States
unquestionably had title and the property was in possession
of its officers or agents. E.g., Maricopa County v. Valley
Nat. Bank, 318 U.S. 357, 362 (1943); Minnesota v. United
States, 305 U.S. 382 (1939); Oregon v. Hitchcock, 202 U.S.
60, 69 (1906); The Siren, 74 U.S. (7 Wall.) 152, 154 (1868).
Even in this situation, however, mandatory relief is avail-
able if a statute imposes a clear duty on the officer in favor
of the claimant. E.g., Wilber v. United States ex rel. Krushnic,
280 U.S. 306 (1930) (mandamus granted directing the Secretary
of the Interior to issue a mining patent); Payne v. Central
Pac. Ry., 255 U.S. 228 (1921) (Secretary of the Interior en-
joined from interfering with railroad's selection of indemnity
lands when Secretary was under a "plain official duty" without
discretion "to substitute his judgment for the will of Congress");
Lane v. Hoglund, 244 U.S. 174 (1917).

JA686

-8-

One situation in which the law was unclear prior to Malone v. Bowdoin, 369 U.S. 643 (1962), discussed at pp. 15-17, infra, was that in which the plaintiff claims title to specific property and the officer defends on the ground that title is in the United States. A venerable earlier case granted relief in this situation, United States v. Lee, 106 U.S. 196 (1882), but other cases had refused to do so, asserting that the action was against the United States if the property is in its possession. E.g., Goldberg v. Daniels, 231 U.S. 218, 221-22 (1913) ("the United States is the owner in possession of the vessel"); Oregon v. Hitchcock, 202 U.S. 60, 70 (1906) ("again, it must be noticed that the legal title to all these tracts of land is still in the Government"); cf. West Coast Exploration Co. v. McKay, 213 F.2d 582, 596 (D.C.Cir. 1954).

## II.  DEFECTS OF PRESENT LAW

Professors Hart and Wechsler have suggested that "the Supreme Court in modern times has . . . tended actually to enlarge the scope of sovereign immunity, out of misapprehension of its historical foundations, while at the same time professing to regard it with disfavor as an anachronism which should be narrowly confined." Hart & Wechsler, The Federal Courts and the Federal System 1151 (1953). This comment, made in 1953, is even more true today. A series of Supreme Court decisions, beginning with Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682 (1949), and culminating in Hawaii v. Gordon, 373 U.S. 57 (1963), have strengthened the hold of the sovereign immunity doctrine, created widespread confusion, and directed attention to fictions rather than real problems. If the law of sovereign immunity is in need of reform it is largely because Supreme Court decisions of the last two decades have further complicated a subject that was already confused.

### A.  The Larson Case

In Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682 (1949), the War Assets Administrator contracted to sell coal to the plaintiff, but after disagreement over a term of the contract he arranged to sell the coal to a third person. The plaintiff sought to enjoin sale of the coal to anyone but himself, charging that, since title to the coal had passed under the contract of sale, the Administrator was guilty of

JA687

-9-

conversion. The Court denied injunctive relief in a cloudy
opinion by Vinson, C.J., that attempted to restate the law of
sovereign immunity applicable to suits for nonmandatory injunc-
tion against government officers. A suit may be brought against
an officer if the officer has acted "unconstitutionally" or
"ultra vires his authority." But the mere allegation that the
officer, "acting officially" wrongfully holds plaintiff's
property, while establishing a wrong to plaintiff, does not
establish "that the officer . . . is not exercising powers
delegated to him by the sovereign." 337 U.S. at 693. And,
again, "a suit may fail . . . if the relief requested cannot
be granted by merely ordering the cessation of the conduct
complained of but will require affirmative action by the
sovereign or the disposition of unquestionably sovereign
property." Id., at 691, n. 11.

The case itself fell squarely between two conflicting
lines of authority, one, stemming from United States v. Lee,
106 U.S. 196 (1882), and Land v. Dollar, 330 U.S. 731 (1947),
in which injunctive relief had been granted for tortious
withholding of property now in the possession of the Govern-
ment, and the other, as in Goldberg v. Daniels, 231 U.S. 218
(1918), denying relief when the property that the plaintiff
complained he had contracted for was in the possession of the
Government. The Court could have reached the same result
that it did reach by treating the case as an impermissible
attempt to obtain specific performance against the Govern-
ment, or on the ground that plaintiff's proper and adequate
remedy was a suit for damages in the Court of Claims.

It is surprising that the Larson opinion has had so much
influence. The case was decided by a divided Court (6-3)
with Rutledge, J., concurring only in the result and Douglas,
J., concurring on the narrow ground that an injunction in the
situation presented would interfere with the surplus property
program. Vinson's opinion, which was confused and rambling,
thus had the support of only four members of the Court. It
purported to overrule or narrowly limit several well-established
lines of cases, including Land v. Dollar, 330 U.S. 731 (1947),
decided only two years before. Nevertheless, the Larson opinion
has been taken as the modern keystone of the sovereign immunity
doctrine.

The Larson opinion has four fundamental defects. (1) It
holds that the official's conduct, although wrongful, may not
be enjoined if he is acting within the general sphere of his

-10-

authority. (2) It determines the application of the sovereign
immunity doctrine by a wholly irrelevant test--whether the
Government, if a private principal, would be liable for the
acts of its agent. (3) The application of sovereign immunity
is said to turn on whether the suit is "in effect, a suit
against the sovereign" "stopping the Government in its tracks".
And (4) the opinion states that affirmative relief may not
be granted against a Government officer.

    1. "Error" distinguished from "authority." The Larson
opinion limits suits to enjoin officers to:

> "[W]here the officer's powers are limited by
> statute, his actions beyond those limitations are
> considered individual and not sovereign actions
> . . . . His actions are ultra vires his authority
> and therefore may be made the object of specific
> relief. It is important to note that in such
> cases the relief can be granted, without implead-
> ing the sovereign, only because of the officer's
> lack of delegated power. A claim of error in the
> exercise of that power is therefore not suffi-
> cient. . . ." 337 at 689-90.

At a later point in the opinion the Court again dis-
tinguishes between action which is erroneous or wrongful
("error") and action which is within the officer's general
competence ("authority"):

> "It is argued that an officer given the power
> to make decisions is only given the power to make
> correct decisions. . . . There is no warrant
> for such a contention in cases in which the de-
> cision made by the officer does not relate to the
> terms of his statutory authority. Certainly the
> jurisdiction of a court to decide a case does not
> disappear if its decision on the merits is wrong.
> And we have heretofore rejected the argument that
> official action is invalid if based on an incor-
> rect decision as to law or fact, if the officer
> making the decision was empowered to do so."
> 337 U.S. at 695.

Congress, of course, may commit administrative action to
agency discretion, thus foreclosing judicial review except
for arbitrary or capricious action. "The vice of Larson,"

-11-

however, as Professor Byse has stated, is that it permits--
perhaps even encourages--"courts to shirk the hard task of
determining the limits of official power":

"It is perfectly possible for a court to hold
that an official has authority to make erroneous
as well as correct determinations. Such a holding,
of course, should rest on a reasoned determination
that Congress intended to confer so broad a dis-
cretion. But under Larson [and its progeny] the
courts seem to interpret the statutes cursorily to
authorize the defendant official to act in the
'general' area in question; so long as the offi-
cial remains within the 'general' area, his er-
roneous acts are unreviewable whether or not the
statute properly construed was intended to con-
fer such an unreviewable discretion. This, I
submit, is an abdication of judicial responsi-
bility." Byse, Proposed Reforms in Federal "Non-
statutory" Judicial Review, 75 Harv. L. Rev.
1479, 1490-91 (1962).

The Larson opinion is thus susceptible to the interpreta-
tion that the existence of "statutory authority" need not de-
pend upon a careful construction of the statute in question,
but that the case should be dismissed on sovereign immunity
ground if the officer is acting within his general sphere of
authority even though the particular action is prohibited by
the statute properly interpreted.

Numerous decisions of lower federal courts support the
proposition that Larson's distinction between "error" and
"general authority" has been applied to deprive litigants
of judicial consideration of the merits of their claim that
an officer's conduct is unlawful. In Doehla Greeting Cards,
Inc. v. Summerfield, 227 F.2d 44 (D.C.Cir. 1955), users of
the parcel post service brought an action against the Post-
master General to enjoin him from enforcing increased parcel
post zone rates. Plaintiffs alleged that the Postmaster
General had failed to comply with a statutory requirement and
that the rate order was arbitrary and capricious. The court
dismissed on the ground that the suit was "one against the
United States to which no consent had been given." The opinion
seems to state, relying on Larson, that erroneous performance
of a statutory duty is the act of the sovereign and cannot be

-12-

enjoined. Unlike the situation in Larson, however, the basic
postal law sets forth standards to be observed by the Post-
master General when fixing rate changes of the sort in ques-
tion in Doehla. To say that the defendant may not be enjoined
despite a departure from those standards is to flout their
very existence. The statute was not construed but ignored.
The official is given a wholly unchecked discretion where such
discretion was probably denied to him by statute and without
inquiry into whether Congress intended such discretion.

    Manhattan-Bronx Postal Union v. Gronouski, 350 F.2d 451
(D.C.Cir. 1965), is to much the same effect, although the
court did undertake in an alternative holding to consider
the merits of the claim that the Postmaster General had mis-
construed an executive order dealing with collective bargain-
ing by postal employees.

    Another troublesome case along similar lines is Kennedy
v. Rabinowitz, 318 F.2d 181 (D.C.Cir. 1963), aff'd on other
ground, 376 U.S. 605 (1964), in which the court refused to
consider plaintiffs' argument that under the terms of the
Foreign Agents Registration Act the Attorney General could
not require them to register. The general power of the At-
torney General "to construe the individual statutes and apply
them to the facts before him" was sufficient to authorize his
action and to shield it behind the sovereign-immunity defense.
A dissenting opinion pointed out the weakness of the majority's
opinion. On certiorari, the Supreme Court ignored its own
repeated holdings that sovereign immunity is a jurisdictional
issue and proceeded to decide the case against the plaintiffs
on the merits.

    Other cases in which the court failed to construe the
statute to determine whether Congress intended the officer to
exercise unchecked discretion include Fay v. Miller, 183 F.2d
986 (D.C.Cir. 1950) (United States attorney has authority to
request the telephone company to discontinue service to a
plaintiff suspected of gambling, even though the attorney's
action might be tortious and taken without sufficient evi-
dence); Interstate Reclamation Bureau v. Rogers, 103 F.Supp.
205 (S.D.Tex. 1952) (local officials of Department of Labor
held to have "authority" to investigate, and even harass, an
employer in attempts to induce compliance with the Fair Labor
Standards Act, even though the court admitted that the em-
ployer's business might eventually be found not to be within
the operation of the Act).

JA691

-13-

2. <u>Reliance on "normal rules of agency."</u>  A related
defect of the <u>Larson</u> opinion has also had the effect of in-
creasing greatly the plaintiff's burden of demonstrating an
official departure from statute.  The Court in <u>Larson</u> in-
sisted that a showing of illegality under general law is not
sufficient, the determinative question being whether the
agent's act is that of the United States.  When injunctive
relief is sought the answer to this question was said to de-
pend on whether the officer has "authority" in the sense that
his actions would be regarded as those of a private principal
under the normal rules of agency.

As Professor Byse has said:

"The weakness of [the <u>Larson</u>] reasoning is
its failure to deal with a practical problem in
practical terms.  The basic issue is whether the
judiciary should review alleged errors by ad-
ministrative officials.  Because Congress failed
to provide a general mechanism for such review,
the courts developed the fiction that suits to
restrain unconstitutional or ultra vires acts
were not suits against the government.  The rea-
son for the fiction was the practical judgment
that although courts should not generally inter-
fere with governmental operations, they should
be available to correct administrative excesses.
The issue in any doubtful case should be resolved
with those practical considerations in mind.  In-
stead of analyzing the problem in these terms,
the <u>Larson</u> opinion resolves the issue by re-
ference to the 'normal rules of agency.'  But
the reasons which have caused courts to impose
liability on private principals for the acts of
their agents have little if any relevance to the
question whether allegedly unlawful administrative
actions should be subject to judicial review.  The
incongruous result of the <u>Larson</u> case is that to
the extent the normal rules of agency impose
liability on private principals, governmental
officials are immunized from injunctive or de-
claratory relief.  As private liability expands,
official responsibility decreases." Byse, Proposed
Reforms in Federal "Nonstatutory" Judicial Review,
75 Harv. L. Rev. 1479, 1487-88 (1962).

JA692

-14-

Despite the incongruity of having Government nonliability turn on whether a private principal would be liable, and vice versa, lower federal courts have sometimes followed the Larson approach. In Hudspeth County Conservation & Reclamation Dist. No. 1 v. Robbins, 213 F.2d 425 (5th Cir. 1954), for example, the court cited Larson and then concluded: "Applying that test, it seems clear to us that if the dams . . . had been owned by a private corporation whose managers and agents had violated the rights of the plaintiffs in the manner contended in this suit, the private corporation could not escape liability for damages on the ground that its employees were acting outside the scope of their authority." 213 F.2d at 432.

3. Whether a suit is "in effect, a suit against the sovereign." Legal fictions may occasionally serve a useful purpose in hastening a transition to sounder rules of law. In emphasizing the fictional aspects of the sovereign-immunity doctrine, however, the Larson opinion merely obfuscates the underlying policy considerations. The Court stated that in each injunction suit "the question is directly posed as to whether, by obtaining relief against the officer, the relief will not, in effect, be obtained against the sovereign" because "the compulsion . . . may be compulsion against the sovereign, although nominally directed against the individual officer. If it is, then the suit is barred . . . because it is, in substance, a suit against the Government." 337 U.S. at 688. The problem with this formulation is that all injunction suits against government officers are designed to provide judicial control of administrative excesses. In Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123 (1951), the plaintiff organization sought a declaratory judgment and in-junctive relief against the Attorney General for having placed its name on the subversive list without a hearing. The Court held that, for purposes of a motion to dismiss, the Attorney General's act would be treated as unauthorized since it was alleged to be purely arbitrary. The injunction surely "stopped the Government in its tracks" and, in that sense, was directed against the sovereign. Hosts of similar injunction proceedings have been brought against federal officers. In recent years, for example, the Court has ordered the Government to reinstate an employee, Vitarelli v. Seaton, 359 U.S. 535 (1959), in effect ordered the Government to restore a revoked security clearance, Greene v. McElroy, 360 U.S. 474 (1959), and in effect ordered the Government to carry particular mail, Manual Enterprises, Inc. v. Day, 370 U.S. 478 (1962).

-15-

    4. <u>Whether affirmative relief may be granted</u>. A foot-
note to the <u>Larson</u> opinion contained a troublesome dictum:

> "Of course, a suit may fail, as one against
> the sovereign, even if it is claimed that the
> officer being sued has acted unconstitutionally
> or beyond his statutory powers, if the relief re-
> quested cannot be granted by merely ordering the
> cessation of the conduct complained of but will
> require affirmative action by the sovereign or the
> disposition of unquestionably sovereign property."
> 337 U.S. at 691, n. 11.

If "may" is read as "may" rather than "must", this sentence
is not especially confusing. But since the sentence does not
indicate any factors to be considered in determining whether
affirmative relief is appropriate it suggests that mandatory
relief cannot be granted. This erroneous notion has been
picked up in subsequent decisions (see the discussion of
<u>Hawaii</u> v. <u>Gordon</u>, <u>infra</u>, pp. 18-19).

    B.   <u>The Malone Case--Property Disputes</u>

    <u>Malone</u> v. <u>Bowdoin</u>, 369 U.S. 643 (1962), was an action to
eject an officer of the United States Forest Service from
land claimed by plaintiffs. The Court held that sovereign
immunity barred the action. Under <u>Larson</u>, the Court said,
an officer may not be sued even for the return of property
wrongfully taken or held unless the action is "not within
the officer's statutory powers, or, if within those powers,
only if the powers, or their exercise in the particular case,
are constitutionally void." There was no such allegation in
<u>Malone</u>. <u>Larson</u>, the Court added, had limited <u>United States</u>
v. <u>Lee</u>, 106 U.S. 196 (1882), to cases where there is a claim
that the holding constituted "an unconstitutional taking of
property without just compensation." Moreover, <u>Lee</u> had been
decided when there was no money remedy for the taking; in the
present case the Court of Claims was open. See <u>United States</u>
v. <u>Causby</u>, 328 U.S. 256, 267 (1946).

    If Congress had authorized federal officers to seize
private property and limited the owner's remedy to a damage
action in the Court of Claims, the procedure would be con-
stitutional even though harsh. But Congress has not authorized

47-534 O - 70 - 8

-16-

Forest Service officers to seize private land; and the damage
remedy in a distant forum is not a totally adequate remedy.
The presumption that an officer who takes or withholds land
which is admittedly the plaintiff's is acting without authority
in absence of an affirmative showing of authority is more
consistent with the general preference for judicial control
of administrative excesses.

Professor Davis's criticism of Malone as "patently un-
sound" is cogent:

"The Malone opinion seems patently unsound.
The case came up on motion to dismiss the action,
and the Court assumed the facts to be as stated--
that the fee was in the plaintiff and that the
government's claim to the land rested only on a
life tenant's transfer of a fee to the government.
On these facts, the Court should have assumed, in
absence of clear congressional intent to the con-
trary, that of course government officers are not
authorized to withhold land from its lawful owner,
and that of course the courts are the proper tri-
bunals to determine who is the lawful owner.  But
instead of making these obvious assumptions, the
Court made the opposite assumptions, by saying
merely that the plaintiff had not asserted that
the officer was exceeding his delegated powers.

"Mr. Justice Douglas, in an opinion with
which Mr. Justice Harlan agreed, asked in dissent:
'If legal title is actually in the claimant, if
the action of the official in taking possession
under authority of the United States is ultra
vires, what objectionable interference with govern-
mental functions can be said to exist?'

"The majority of the Court did not answer the
question.  The answer is that a judicial determina-
tion of title to land is not an objectionable in-
ference with governmental functions, even if the
determination is that the private party is the
owner of the land and is entitled to its possession.
What are courts for if they are barred from adjudica-
ting disputes about land ownership and possession?
Who in the entire society is better qualified to re-
solve a dispute about land titles than the courts?"
Davis, Administrative Law Treatise § 27.01 (1965
Pocket Parts, p. 147).

-17-

In a number of recent cases Malone has been applied to deny district courts jurisdiction to consider land disputes between the United States and adjacent property owners. In Gardner v. Harris, 391 F.2d 885 (5th Cir. 1968), plaintiff's predecessor-in-title had sold land to the United States subject to an easement providing a right-of-way across the conveyed land to abutting property. The conveyed land became part of the Natchez Trace Parkway and the federal officer in charge of the parkway erected barricades across the right-of-way. In an injunction suit seeking removal of the barricades, it was held that sovereign immunity barred the action. Judge Brown reasoned that the judgment would compel the government to act and would interfere with public administration; hence suit could be brought only if the superintendent had exceeded his statutory powers. And the statute authorizing the superintendent to administer and maintain the Natchez Trace Parkway did not contain any express limitation on the superintendent's powers of administration. "Merely because the Superintendent may have been acting wrongfully in interfering with plaintiff's access to the highway, either as a matter of violation of property rights under the deeds or as a tort under principles of general law, does not amount to circumstances fulfilling the exception that the officer must be acting beyond his statutory powers." 391 F.2d at 888.

The Gardner decision is the logical stepchild of Larson and Malone, but the result is indefensible. When government officers mistakenly seize or hold private property, such mistakes both deprive persons of specific property and subject the United States to liability. The relevant question is whether Congress has authorized the seizure or condemnation of private property under the circumstances that existed; and in the absence of such authorization (and the limitation of the property owner to a damage remedy in the Court of Claims) the injunctive remedy should be provided. The courts should assume that Congress intends that officers who deal with property should keep within their powers in taking and withholding property that is claimed by private persons. Unless a vital regulatory program is involved (see discussion of Dugan v. Rank, infra, pp. 19-20), Congress would probably prefer a prohibitory injunction to a grant of compensation after the fact.

A substantial number of cases follow Malone in barring district court suits to resolve property disputes between the United States and private persons. Switzerland Co. v. Udall, 337 F.2d 56 (4th Cir. 1964) (similar to Gardner v. Harris);

JA696

-18-

Simons v. Vinson, 394 F.2d 732 (5th Cir. 1968) (title to land formed by accretion along river which formed boundary between land owned by United States and land owned by plaintiffs; action barred by sovereign immunity); Andrews v. White, 121 F.Supp. 570 (E.D.Tenn. 1954), aff'd per curiam, 221 F.2d 790 (6th Cir. 1955) (suit by landowner to enjoin federal officers from enforcing hunting regulations in what might have been part of a national park barred by sovereign immunity); cf. Zager v. United States, 256 F.Supp. 396 (E.D.Wis. 1966) (quiet title action to determine whether mistake had been made in original land survey not barred by sovereign immunity).

Regardless of whether broad proposals to reform sovereign immunity are accepted, the doctrine should be waived to permit property disputes between the United States and private persons to be entertained by district courts.  Lawyers in the Department of the Interior, the federal agency having the greatest interest in the matter, do not oppose such a limited reform.

C.  Hawaii v. Gordon--Affirmative Relief

A recent Supreme Court decision has strengthened the erroneous notion, earlier advanced in Larson, that affirmative relief may not be granted against government officers. Hawaii v. Gordon, 373 U.S. 57 (1963), involved the provisions of the Hawaii Statehood Act, which directed the President, if he should decide that certain federal properties were no longer needed by the United States, to convey them to the State of Hawaii.  The Director of the Bureau of the Budget, acting for the President, advised federal agencies that this authorization related only to lands that had been ceded to the United States by Hawaii.  The State filed an original action in the Supreme Court to compel the Director to withdraw his advice, to determine whether certain property he had excluded was "needed", and, if it was not needed, to convey it to Hawaii.  The Supreme Court dismissed the suit: "Relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter [citing Dugan v. Rank, Malone v. Bowdoin, and Larson].  Here the order requested would require the Director's official affirmative action, affect the public administration of government agencies and cause as well the disposition of property admittedly belonging to the United States."

JA697

-19-

Professor Davis argues that the "issue was not whether the lands should be conveyed--for that question was solely for the President--but whether a report should be made to the President with respect to designated lands. . . . Thus, the sole question was one of statutory interpretation." Davis, Administrative Law Treatise § 27.01 (1965 Pocket Parts p. 148).

A federal officer, of course, cannot be ordered by a court to exercise discretion in a particular way. But if a statute requires an officer to exercise discretion and the officer refuses to make the discretionary determination, a court can interpret the statute and require him to exercise discretion. Mandatory relief has been granted against federal officers for many years under such circumstances; and the Hawaii case muddies the waters by suggesting that affirmative relief is always barred by sovereign immunity.

D.  Dugan v. Rank--Interference with Governmental Programs

Fictions aside, the application of the sovereign immunity doctrine should rest on whether the benefits of judicial review of administrative action are outweighed by the possible interference with governmental programs that may result from the grant of relief. Dugan v. Rank, 372 U.S. 609 (1963), involves this question and was correctly decided. Dugan was a suit to enjoin the United States and officers of its Bureau of Reclamation from impounding water behind Friant Dam, part of the Central Valley Project in California, on ground that this action interfered with plaintiffs' rights to the use of the water downstream. The Supreme Court held that the United States had not consented to this kind of suit despite the McCarran Amendment, 43 U.S.C. § 666, and that the suit against the Reclamation officers must be dismissed as in substance one against the United States. To enjoin storage of water would require the abandonment of much of the project and "the Government would, indeed, be 'stopped in its tracks'"; to order construction of subsidiary dams to meet the plaintiffs' needs would "not only 'interfere with the public administration' but also 'expend itself on the public treasury.'" The only exceptions to the rule against suits producing these effects, as announced in Larson and Malone, were inapplicable, for the Government "had the power, under authorization of Congress, to seize the property of the respondents . . . , and this power of seizure was constitutionally permissible."

JA698

-20-

Unlike the other recent Supreme Court opinions, the
Dugan opinion did interpret and resolve the statute, holding
that Congress had authorized physical seizure of the water
and limited affected persons to damage actions under the
Tucker Act.  Moreover, this conclusion is supported by the
practical interference with reclamation projects that would
result if the contrary argument had been accepted.

The language of the Dugan opinion, however, like that of
Hawaii v. Gordon and Malone v. Bowdoin, goes beyond this nar-
row ground, suggesting that sovereign immunity is applicable
whenever "the judgment sought would expend itself on the pub-
lic treasury or domain, or interfere with the public adminis-
tration, . . . of if the effect of the judgment would be 'to
restrain the government from acting or compel it to act.'"
As Professor Davis has stated, "This so-called general rule
never has been the general rule and is not likely to become
the general rule.  Judgments of courts have often expended
themselves on the public treasury or domain, have often
interfered with the public administration, and have often
restrained the government from acting or compelled it to act,
and judgments of courts will surely continue to do these
things in the future."  Davis, Administrative Law Treatise
§ 27.01 (1965 Pocket Part, p. 149).

III.  OBJECTIVES OF THE COMMITTEE'S
RECOMMENDATION

As the foregoing recital indicates, the Supreme Court
has been remarkably receptive to the sovereign immunity
doctrine in recent years.  The Court now seems to regard it
as settled that the general contours of the doctrine were
established in Larson v. Domestic & Foreign Commerce Corp.,
337 U.S. 682 (1949).  Since there is no discernible pressure
for change emanating from the Supreme Court, the impetus for
reform must come from Congress.  Important questions of policy,
calling for legislative judgment, are involved and a legisla-
tive approach to the problem is not only appropriate but de-
sirable.

Dissatisfaction with the present doctrine of sovereign
immunity is widespread.  Professors Byse and Davis have
argued persuasively that the sovereign immunity doctrine
constitutes a barrier to proper judicial analysis; each
has proposed a remedial statute.  Byse, Proposed Reforms
in Federal "Nonstatutory" Judicial Review:  Sovereign Immunity,

115

-21-

Indispensable Parties, Mandamus, 75 Harv. L. Rev. 1479 (1962);
Davis, 3 Administrative Law Treatise c. 27 (1958 and 1965
Pocket Part). Professor Jaffe has demonstrated the flimsi-
ness of the doctrine's historical underpinnings and agreed
with Byse and Davis that legislative reform is desirable.
Jaffe, Judicial Control of Administrative Action 197-98,
213-31, and n. 123 (1965). Milton Carrow, a prolific writer
on administrative law subjects, concludes that "The doctrine
of sovereign immunity has long fulfilled the requirements
for 'full abandonment.'" Carrow, Sovereign Immunity in
Administrative Law--A New Diagnosis, 9 J. of Pub. L. 1,
22 (1960). He quotes Professor Walter Gellhorn as stating
that

> "today the doctrine may be satisfactory to
> technicians but not at all to persons whose
> main concern is with justice. . . . The
> trouble with the sovereign immunity doctrine
> is that it interferes with consideration of
> practical matters, and transforms everything
> into a play on words." Id.

Professor David Currie, in a recent article, states that
"Some day Congress should . . . make a more rational and more
liberal reconciliation of individual protection and govern-
ment elbow-room in suits to enjoin federal officers than that
established by the benighted Larson decision and its sequels."
Currie, The Federal Courts and the American Law Institute
(Part II), 36 U. Chi. L. Rev. 268, 290 (1969). No scholar,
so far as can be ascertained, has had a good word for
sovereign immunity for many years.

This rare unanimity of legal scholarship, however, has
not been echoed in court opinions except for recurrent ad-
missions that the subject is a confusing one and that it is
not "an easy matter to reconcile all of the decisions of the
Court in this class of cases." See Cunningham v. Macon &
Brunswick R.R. Co., 109 U.S. 446, 451 (1883); Brooks v.
Dewar, 313 U.S. 354, 359-60 (1941); Malone v. Bowdoin, 369
U.S. 643, 646 (1962). Judicial dissatisfaction with current
law was expressed by Judge Brown in his recent opinion in
Gardner v. Harris, 391 F.2d 885 (5th Cir. 1968), holding
reluctantly that sovereign immunity barred a landowner's
claim that a federal officer was wrongfully denying him
access to his land:

JA700

-22-

"With so much done . . . to give the citizen
access to a home-based Federal Court, fre-
quently in cases that involve millions of
dollars or which affect comprehensive pro-
grams, the persistence with which the Govern-
ment successfully asserts immunity as to
property claims . . . [is] unusual. . . .
[T]hat Congress does not ameliorate these
hardships appears even more unusual. . . .
And not even equity -- the King's conscience --
can help." 391 F.2d at 886-87 and n. 3.

The Committee on Judicial Review has given careful
consideration to the sovereign immunity problem. The Com-
mittee decided to study the problem at one of its early meet-
ings in 1968. During the summer of 1968 the Committee's con-
sultant, Professor Cramton, interviewed lawyers in five
federal departments that have had considerable experience
with sovereign immunity cases: the Departments of Justice,
Treasury, Agriculture, Interior, and Health, Education &
Welfare. In September 1968 the Committee asked the Depart-
ment of Justice to comment informally on the Byse and Davis
proposals. Helpful memoranda expressing individual rather
than official viewpoints were prepared for the Committee's
use by the Solicitor General and by the Assistant Attorneys
General in charge of the Civil Division and the Land &
Natural Resources Division. Later in 1968 the Committee con-
sultant prepared a memorandum on sovereign immunity for the
Committee. Another memorandum on the subject, prepared by
Professor Davis for an American Bar Association committee,
was also made available to the Committee. On December 13,
1968, the chief legal officers of six federal departments
(Treasury, Defense, Post Office, Agriculture, Interior, and
Health, Education & Welfare) were asked to comment on a
specific legislative proposal. Informal responses were re-
ceived from four of the six departments. In May and July
of 1969 the Committee submitted its present proposal (sub-
sequently changed in minor particulars) to the Department
of Justice for advice and comment. Helpful advice and
comment was received from many individual lawyers in the
Department of Justice, from Judge Oscar Davis of the Court
of Claims, and from Professors Byse and Davis. In struggling
with matters that the Committee has found to be difficult and
complex, the cooperation and assistance noted above has proved
invaluable. Needless to say, none of the individuals or
groups listed are responsible for--nor do they necessarily
agree with--the conclusions that the Committee has reached.

-23-

The Committee's recommendation, reproduced as Appendix A of this report, is designed to achieve five objectives: (1) to eliminate the artificialities, uncertainties, and occasional injustices of the present case law; (2) to provide a local remedy for the resolution of land disputes between the United States and private persons; (3) to allow the United States to be named as defendant in cases challenging governmental action and to bind the United States by the judgment in an action against an officer when the action challenges official conduct and the Attorney General has controlled the defense; (4) to retain present limitations on the availability and scope of judicial review, thus preventing unwarranted judicial interference with governmental programs; and (5) to retain the present exclusions on the availability of monetary or alternative relief that are embodied in such statutes as the Tucker Act and the Federal Tort Claims Act. Each of these objectives will be considered on the following pages.

### A.  Eliminate Artificialities, Uncertainties and Injustices of Present Law

The ideal of a government under law can be realized only if persons are provided with an adequate set of judicial remedies against that government, its officials, and its agencies.  Earlier portions of this report have argued that remedies against the United States are impeded by the unsatisfactory case law relating to the doctrine of sovereign immunity--law that is confused, illogical, and sometimes leads to unjust results.  There is need for a limited statutory reform that will

> "rid the law of sovereign immunity of the artificialities and rationalizations, particularly those expressed in the <u>Larson</u> case, that have produced an irreconcilable body of case law and have permitted--indeed perhaps encouraged--courts to avoid the difficult task of determining whether, in light of all the relevant considerations, the purposes of the applicable substantive statute would better be served by granting or by denying judicial review." Byse, Proposed Reforms in "Nonstatutory" Judicial Review, 75 Harv. L. Rev. 1479, 1525 (1962).

JA702

-24-

Part (1) of the Committee's recommendation, by pro-
hibiting dismissal of certain actions on the ground that
the action was in substance against the United States or
that the United States was an indispensable party, with-
draws sovereign immunity as a defense in certain actions
challenging the legality of federal administrative behav-
ior. Suits challenging official action or non-action,
and seeking relief other than money damages, should not
be barred by sovereign immunity. The explicit exclusion
of monetary relief makes clear that sovereign immunity is
abolished only in actions for specific relief (injunction,
declaratory judgment, mandatory relief, quiet title, and
ejectment). Thus the limitations on monetary relief con-
tained in the Federal Tort Claims Act, the Tucker Act or
similar statutes are unaffected. The consent to suit is
also limited to claims in federal courts; hence the United
States would remain immune from suit in state courts. The
waiver of immunity extends only to actions challenging the
legality of federal action (or non-action); it would not
extend to proceedings in which federal officers or agencies
are not acting in their "official capacity or under color
of legal authority." This language is taken from 28 U.S.C.
§ 1391(e), which would govern venue and service of process
in actions falling within the purview of the recommendation.

Although the recommendation does not use the term "speci-
fic relief," the principal effect of the amendment will be to
cut off the defense of sovereign immunity in suits for speci-
fic relief. Perhaps ninety per cent of the cases affected
will be suits for injunction or declaratory judgment or for
both, and perhaps most of the rest will be suits for relief
in the nature of mandamus. But all other specific relief
is covered, including specific performance, quieting title,
ejectment and habeas corpus. All forms of monetary relief,
however, are excluded from the recommendation.

The recommendation is cast in the form of an amendment
to the judicial review provisions of the Administrative
Procedure Act, 5 U.S.C. §§ 701-706, rather than as an
amendment to Chapter 161 of the Judicial Code, 28 U.S.C.,
which is concerned with actions in which the United States
is a party. This choice limits the effect of the recom-
mendation in important respects:

First, an APA amendment is subject to the exceptions con-
tained in 5 U.S.C. § 701, as well as the exclusions specified
in a number of other statutes. The § 701 exceptions include

-25-

the Congress, the federal courts, territorial governments,
District of Columbia government, labor mediation boards,
certain military functions, and certain wartime and emergency
functions. Other statutes that contain provisions exempting
a function from the judicial review sections of the APA in-
clude the following: export of scarce materials (50 App.
U.S.C. § 2027); selective service proceedings (50 App. U.S.C.
§ 463(b)); employment and discharge of National Security
Agency personnel (50 U.S.C. § 835); renegotiation of defense
contracts (50 App. U.S.C. § 1221); certain mine inspection
functions (30 U.S.C. § 483); and certain water resource land
acquisition functions (33 U.S.C. § 597). The question is
whether these indications of congressional desire to fore-
close judicial review should be fully respected or whether
the abolition of sovereign immunity should be used as a
vehicle for providing specific relief in situations in which
Congress has placed a function outside of the provisions of
the APA (assuming that no other barrier to specific relief
exists). The Committee's view is that the category of re-
viewable action should not be broadened in this manner. Re-
tention of the APA exceptions, unless and until they are
abandoned as a general matter, is more consistent with the
narrow purposes of our proposal.

Incorporation of the reform proposal in the judicial
review provisions of the APA has a second advantage. As is
evident from prior discussion, abolition of sovereign immunity
cannot be considered except in relation to the general law
governing the availability and scope of judicial review.
That law is now codified in 5 U.S.C. §§ 701-06; and in-
corporating the abolition of sovereign immunity in §§ 702
and 703 draws on the broader context. The whole matter,
for example, is clearly subject to the prefatory language
of § 701(a), "except to the extent that--(1) statutes pre-
clude judicial review; or (2) agency action is committed
to agency discretion by law." The same conclusion would
probably be reached in any event, but the APA context lends
clarity to the limited nature of the proposal.

The only valid office served by sovereign immunity--pre-
venting undue judicial interference with governmental programs
that should not be subjected to judicial review--would be per-
formed by the more discriminating and intelligible doctrines
governing the availability of judicial review, especially
the nonreviewability of action expressly or impliedly pre-
cluded from review or committed to agency discretion, and
by the equitable considerations that control the grant of
specific relief.

JA704

-26-

    An argument occasionally made in defense of sovereign immunity is that it has been so undermined by the suit against the officer that, except in cases involving treasury liability for damages or the disposition of government property--cases perhaps deserving of special treatment--, it no longer serves as a barrier to judicial review. It is true that lawyers and judges who have had considerable experience with sovereign immunity usually have little difficulty in sidestepping sovereign immunity in situations in which governmental regulatory or enforcement activity is challenged. These lawyers read <u>Larson</u> narrowly as essentially concerned with the forced disposition of property held by the Government where the particular conduct of official, though it may be tortious or wrongful toward the private claimant, <u>is</u> authorized by the statute. So read, <u>Larson</u> does not stand in the way of the suit against an officer engaged in a regulatory or enforcement activity not involving government property, where the claim is that the officer is acting unlawfully.

    This narrow reading of <u>Larson</u>, even if correct, is by no means universally accepted. In part II of this report some of the many cases in which the broader <u>Larson</u> formulations have led lower courts astray were discussed. Narrower and more refined formulations are necessary; and legislation is probably required to do the job.

    It should be emphasized that the application of the artificialities of <u>Larson</u> is not restricted to cases involving government property or funds. The cases discussed on pp. 11-12, <u>supra</u>, involve regulatory matters, not government property or funds. A partial sampling of recent cases reveals that sovereign immunity has been a serious issue in numerous suits challenging government regulatory and enforcement activity:

        <u>Agricultural regulation</u>: <u>Garvey</u> v. <u>Freeman</u>, 263 F.Supp. 573 (D.Colo. 1967), aff'd 397 F.2d 600 (10th Cir. 1968) (sovereign immunity did not bar judicial review of determination of normal wheat yields per acre); <u>Gregory</u> v. <u>Freeman</u>, 261 F.Supp. 362 (N.D.N.Y. 1966) (sovereign immunity barred claim that officials had erred in determining that petitioner was not in compliance with feed grain program); <u>Moon</u> v. <u>Freeman</u>, 245 F.Supp. 837 (E.D.Wash. 1965), aff'd on other grounds, 379 F.2d 382 (9th Cir. 1962) (sovereign immunity barred suit by wheat processors to enjoin wheat marketing export program and to recover funds already paid).

-27-

Food and drug regulation: American Dietaids
Co., Inc. v. Celebrezze, 317 F.2d 658 (2d Cir.
1963) (sovereign immunity barred action to re-
cover tapes of a concealed tape recorder used
by FDA inspectors during an inspection); Durovic
v. Palmer, CCH FDC Law Reports ¶ 40,099 (N.D.
Ill.), aff'd on other grounds, 342 F.2d 634 (7th
Cir. 1965) (sovereign immunity barred suit to
enjoin FDA inspection of facility producing
Krebiozen); Toilet Goods Ass'n, Inc. v. Gardner,
360 F.2d 677, 683 (2d Cir. 1966), aff'd on other
grounds, 387 U.S. 158 (1967) (sovereign immunity
does not bar a pre-enforcement challenge by
cosmetic manufacturers of FDA color additive
regulations); Sugarman v. Forbragd, 267 F.Supp.
817 (N.D.Cal. 1967) (sovereign immunity barred
challenge of FDA determination that coffee beans
could not be imported).

Administration of federal grant-in-aid pro-
grams: Lee County School Dist. No. 1 v. Gardner,
263 F.Supp. 26 (D.S.C. 1967) (sovereign immunity
did not bar challenge of HEW deferral of payment
of federal funds to school district); Dermott
Special School District v. Gardner, 278 F.Supp.
687 (E.D.Ark. 1968) (sovereign immunity did not
bar school district's challenge of HEW guide-
lines establishing requirements for federally
aided programs). Cf. Congress of Racial Equality
v. Social Security Administration, 270 F.Supp.
537 (D.Md. 1967) (suit to require agency to
establish an administrative procedure pursuant
to an executive order concerning equal oppor-
tunity in federal employment barred by sovereign
immunity).

Subversive activities: Kennedy v. Rabinowitz,
318 F.2d 181 (D.C.Cir. 1963), aff'd on other
grounds, 376 U.S. 605 (1964) (sovereign immunity
barred action by attorneys representing Cuba for
a declaration that Foreign Agents Registration
Act did not require them to register); Indus-
trial Workers of World v. Clark, 385 F.2d 687
(D.C.Cir. 1967) (sovereign immunity did not
bar organization's challenge to its listing in
"Attorney General's List").

JA706

122

-28-

Enforcement of Fair Labor Standards Act:
Wohl Shoe Co. v. Wirtz, 246 F.Supp. 821 (E.D.
Mo. 1965) (sovereign immunity barred action
seeking a declaration that employer, warned by
officers that it was violating the Act, was
within designated exemptions); Capital Coal Sales
v. Mitchell, 164 F.Supp. 161 (D.D.C. 1958), aff'd
282 F.2d 486 (D.C.Cir. 1960) (sovereign immunity
did not bar challenge of blacklisting of govern-
ment contractor for alleged violation of Walsh-
Healey Act); Rogers v. Skinner, 201 F.2d 521
(5th Cir. 1953) (sovereign immunity barred action
to determine whether plaintiff's employees were
covered by FLSA); Interstate Reclamation Bureau
v. Rogers, 103 F.Supp. 205 (S.D.Tex. 1952) (same).

Government employment: Leber v. Canal Zone
Central Labor Union, 383 F.2d 110 (5th Cir. 1967),
rev'g 246 F.Supp. 998 (D.Canal Zone 1965) (attack
on regulations decreasing overseas differential
pay barred by sovereign immunity); Manhattan-Bronx
Postal Union v. Gronouski, 350 F.2d 451 (D.C.Cir.
1965) (sovereign immunity barred suit challenging
Postmaster General's refusal to recognize the
plaintiff union as exclusive bargaining representa-
tive of certain postal employees); Mulry v. Driver,
366 F.2d 544 (9th Cir. 1966) (validity of Veteran
Administration regulation prohibiting physicians,
dentists and nurses from engaging in outside
practice; since regulation was authorized,
sovereign immunity barred suit). See also
American Guaranty Corp. v. Burton, 380 F.2d
789 (1st Cir. 1967) (sovereign immunity barred
a challenge of the validity of a regulation fix-
ing the fees for salaries and expenses of ref-
erees in bankruptcy).

Parcel post rates: Doehla Greeting Cards,
Inc. v. Summerfield, 227 F.2d 44 (D.C.Cir. 1955)
(sovereign immunity barred challenge of validity
of increased parcel post rates); Summerfield v.
Parcel Post Association, 280 F.2d 673 (D.C.Cir.
1960) (same).

JA707

-29-

Tax investigations: Reisman v. Caplin, 317
F.2d 123 (D.C.Cir. 1963), aff'd on other grounds,
375 U.S. 440 (1964) (sovereign immunity barred
suit by taxpayer's attorneys seeking injunctive
and declaratory relief from an IRS summons calling
for production of allegedly privileged matter, in-
cluding the workproduct of the attorneys); Balistrieri
v. United States, 303 F.2d 617 (7th Cir. 1962)
(sovereign immunity barred taxpayer from obtaining
a declaration that he was entitled to examine docu-
ments relevant to tax liability which IRS had sub-
poenaed from an accountant); Smith v. United States,
250 F.Supp. 803 (D.N.J. 1966) (sovereign immunity
did not bar taxpayer's motion to suppress evidence
obtained from them by IRS agent, allegedly in viola-
tion of constitutional rights).

The catalog above is an illustrative rather than ex-
haustive list of recent regulatory and enforcement cases in
which the government has urged dismissal--often successfully--
on sovereign immunity grounds.  Cases in other fields, in-
volving such matters as rural electrification loans, welfare
benefits, federal alcohol regulation, correction of military
records, and a number of other subjects, might also be cited.
Indeed, the Department of Justice appears to assert sovereign
immunity, usually as one of a number of grounds for dismissal
of the plaintiff's complaint, in a substantial portion of
the cases involving nonstatutory review of federal adminis-
trative action.  Only if tradition or holdings make it clear
that the suit against the officer is an appropriate form
of judicial review, as in the case of Post Office fraud
orders, is the defense not asserted.  This practice was
recently criticized by Judge Friendly in Toilet Goods Ass'n
v. Gardner, 360 F.2d 677, 683 n. 6 (2d Cir. 1966), aff'd
387 U.S. 158 (1967):

"[The Government makes] the surprising contention
that an action for a declaration that federal
regulatory officers have acted in excess of their
authority constitutes an unconsented suit against
the United States. . . .  [L]aw officers of the
Government ought not to take up the time of busy
judges or of opposing parties by advancing an
argument so plainly foreclosed by Supreme Court
decisions."

JA708

-30-

One wonders whether the confusion in the case law does not
lead district judges, less familiar with the intricacies of
nonstatutory judicial review than Judge Friendly, to deny
a hearing on the merits to some litigants who should receive
it.

No claim is made, of course, that each of the cases
in which sovereign immunity has been invoked reached an
unjust result. Alternative grounds for dismissal were
mentioned or were present in many of these cases; and it
is likely that the government would have prevailed in most
of the cases if the merits had been reached. But it cannot
be asserted with confidence that all of the results were
just; some meritorious claims may have been rejected out-
of-hand by dismissals based on sovereign immunity grounds.

It is time to reassert the fundamental proposition stated
in United States v. Lee, 106 U.S. 196, 220 (1882):

"Courts of justice are established, not
only to decide upon controverted rights of the
citizens as against each other, but also upon
rights in controversy between them and the
government. . . ."

B.   Provide Specific Relief in Cases Involving
Public Land

Sovereign immunity has played a large role in cases in-
volving the use or disposition of land claimed by the United
States. The Committee's recommendation is intended to provide
a local judicial remedy in two related but distinct situations:
(1) judicial review of administrative determinations involving
public land questions; and (2) property disputes between the
United States and private persons.

1.   Judicial review of administrative determinations
in the public land field. Unlike more recently created
administrative agencies, the older administrative activity
involved in the use or disposition of public lands is not
subject, with rare exceptions, to specific statutory review
provisions. Consequently, a litigant challenging an ad-
ministrative determination in the public land field is re-
quired to seek "nonstatutory" review under the general law
governing the federal judicial system. In order to avoid

JA709

-31-

the sovereign immunity doctrine, the suit must be brought
against the official rather than against the government
itself by name.  But even that may not suffice when the
judgment sought would directly provide for the disposition
of government property.  Larson v. Domestic & Foreign Com-
merce Corp., 337 U.S. 682 (1949).  A literal application
of this prohibition would foreclose all suits against pub-
lic land officials, a result that would be unjust as well
as inconsistent with a long history of limited judicial re-
view in the public land area.  See, e.g., West Coast Ex-
ploration Co. v. McKay, 213 F.2d 582 (D.C.Cir. 1954);
Clackamas County v. McKay, 219 F.2d 479 (D.C.Cir. 1954),
vacated as moot, 349 U.S. 909 (1955).  The absence of
statutory review provisions also has created pressure to
view § 10 of the Administrative Procedure Act as a juris-
dictional provision and as a consent to suit.  Adams v.
Witmer, 271 F.2d 29 (9th Cir. 1959).  The result is a great
deal of confusion.  A recent study of "Administrative Pro-
cedures and the Public Lands," prepared for the Public Land
Law Review Commission by a group of scholars headed by
Professor McFarland of the University of Virginia, stated
that:

> ". . . suits in the nature of review actions
> [against public land officials] often have been
> permitted. . . .  When they are permitted not-
> withstanding, and when forbidden because of, the
> sovereign immunity doctrine is admittedly diffi-
> cult if not impossible to determine on the basis
> of the court opinions. . . .  [T]he precedents
> baffle lawyers, tempt government counsel, and
> feed the despair of commentators."  [Pp. 187-88.
> Footnotes omitted.  Footnote 279 adds that
> "Despite Larson . . . no public land case"
> of the traditional type has been decided by
> the Supreme Court on the basis of sovereign
> immunity."]

The study concludes that "a simple statutory affirmation of
the right to court review would seem to be a dire necessity
and should pose no threat to legitimate public land ad-
ministration." (P. 305.)  The report cautions that "because
court review is severely limited at best," under the general
law of judicial review codified in the Administrative Pro-
cedure Act, abolition of sovereign immunity will not be
"disruptive, costly, and time consuming in operation."

47-534 O - 70 - 9

JA710

-32-

"But it could operate to firm up administrative procedures, instill confidence in those who have or seek rights to develop public land resources, and afford at least a theoretical protection for the small operator who traditionally has difficulty in dealing with officialdom." (Pp. 305-06.)

Although the Public Land Law Review Commission will not submit its final report until mid-1970, there is every indication that the Commission will accept the recommendations of its study staff. The Committee's recommendation will effectuate this highly desirable reform.

2. _Property disputes between the United States and private persons._ Federal law does not contain any general provision authorizing quiet title suits involving land claimed by the United States. In the absence of such a provision, attempts to obtain specific relief against the federal officer in possession of disputed land have foundered on the sovereign immunity doctrine. Malone v. Bowdoin, 369 U.S. 643 (1962), discussed extensively at pp. 15-18, _supra_, invoking sovereign immunity to bar a suit to try title, denies specific relief to the private landowner, leaving him a damage remedy for an unconstitutional "taking" under the Tucker Act.

The Committee believes that specific relief (injunction or declaratory judgment) is appropriate in these land dispute cases. The uniqueness of land is a factor favoring specific relief and distinguishing this situation from other property situations (the coal involved in the Larson case had no unique or unusual qualities; hence money damages was a totally adequate remedy). The nonstatutory suit for specific relief may be brought in the district court where the land is located, 28 U.S.C. § 1391(e), providing the landowner with an easily accessible and inexpensive local forum (the Court of Claims has exclusive jurisdiction of the claim for money damages if the value of the property exceeds $10,000). The issues likely to be involved in these cases, a blend of state land law and federal statutory law, are peculiarly appropriate for judicial determination.

Moreover, the government should adhere to prescribed processes of decision-making in exercising, whether in form or substance, the power of eminent domain. In some situations, such as that involved in Simons v. Vinson, 394 F.2d 732 (5th Cir. 1968), in which sovereign immunity was held to bar a

JA711

-33-

claim of accreted land formed along a river which divided land owned by the United States from that of the plaintiffs', eminent domain may be inapplicable because no public use could be shown--apparently the government's only purpose was to collect royalties from oil produced on the disputed land.  In other cases, such as Malone itself or Gardner v. Harris, 391 F.2d 885 (5th Cir. 1968), where the disputed land was part of a larger parcel devoted to a public purpose, eminent domain is available if the land found to belong to the claimant is desired by the United States.  Is it too much to ask that condemnation of private land be accomplished in accordance with the policies and procedures established by Congress, rather than by the unilateral decision of a government officer, perhaps a subordinate one, in claiming the land or taking possession of it?

A partial abolition of sovereign immunity would open the door to suits for injunctive or declaratory relief in land disputes cases, at least in situations where the plaintiff frames his complaint so as to meet federal-question requirements (enjoining what would otherwise be an unconstitutional taking of private property).  See White v. Sparkhill Realty Corp., 280 U.S. 500 (1930), stating that a suit to enjoin unconstitutional conduct comes within the federal-question jurisdiction but an ejectment complaint, "without anticipating possible defenses, would not present a case arising under the Constitution or a treaty or law of the United States." Because of jurisdictional problems (even suits stating a federal question would need to satisfy the $10,000 minimum jurisdictional amount of 28 U.S.C. § 1331) and because some procedural aspects of quiet title suits deserve special treatment, an amendment to the Judicial Code authorizing quiet title proceedings in federal district courts to resolve land disputes between the United States and private persons is probably desirable in addition to the recommendation proposed at this time.  See part IV, infra, and Appendix C of this report.

The Committee has encountered little opposition to its view that federal courts should be authorized to resolve land disputes involving the United States.  The McFarland report to the Public Land Law Review Commission, for example, stated that "There seems to be somewhat general agreement that there

JA712

128

-34-

should be statutory provision for suits to try title. . . ."
(P. 305.) There is gamesmanship involved in getting federal
officials to take the initiative in bringing court suits--
the only present method of circumventing sovereign immunity.
Sometimes government lawyers are unwilling to take this step
merely because they do not want to shoulder the plaintiff's
burdens; the ability of the private claimant to initiate
suit would remedy that problem.  Remedial legislation on
this subject has been drafted by the Department of Justice
but has thus far not received priority on the department's
legislative program.

    C.  Allow the United States To Be Named as
    Defendant in Cases Challenging Governmental
                 Action

Actions challenging official conduct are intrinsically
against the United States.  Clarity is served by allowing
the plaintiff to name the United States as a defendant in
such actions.  Part (1) of the recommendation withdraws the
defense of sovereign immunity in actions not seeking monetary
relief in which the legality of federal administrative action
is challenged.  The plaintiff is permitted but not required
to name the United States a defendant.

Moreover, the recommendation provides that "a judgment
or decree may be entered against the United States whether
or not the United States is named as a defendant" in an
action of the type permitted by the recommendation.  When
the Attorney General or other authorized legal officers of
the United States defend an officer or agency acting in his
official capacity or under color of legal authority, the
United States should be bound by the resulting judgment or
decree to the extent that and in the manner that it would
be if it had been named as a party.

Part (2) of the Committee's recommendation allows a
nonstatutory review action to be brought "against the United
States, the agency by its official title, or the appropriate
officer."  Insertion of this sentence in 5 U.S.C. § 703,
dealing with the "form and venue of [review] proceedings
makes it clear that the form and venue of existing statutory
review proceedings is unaffected.  Thus if a "special
statutory review proceeding" provides for exclusive juris-
diction in a particular court, a form of proceeding, and

JA713

-35-

special venue, such provisions must be complied with. Only
if no special statutory review proceeding is applicable may
a nonstatutory review proceeding be brought "against the
United States, the agency by its official title, or the
appropriate officer."

  There are three reasons for allowing the United States
to be named as defendant in nonstatutory review actions:
(1) to avoid the fictional subtleties of the suit against
the officer; (2) to eliminate the possibility that an other-
wise meritorious claim would be defeated on the technicality
that a wrong defendant was named; and (3) to ensure that the
resulting judgment is binding on the United States.

  1. Fictional character of the suit against the officer.
The suit against the officer, challenging his official con-
duct, served a useful purpose as a device for circumventing
the sovereign immunity doctrine. Once sovereign immunity is
tamed, however, requiring the plaintiff to cast his suit in
the form of a suit against the officer performs no useful
function. The fictional character of the suit against the
officer is merely misleading and deceptive. Everyone rec-
ognizes that the suit is in fact against the United States,
or one of its agencies, and involves the legality of govern-
mental action.*

_____

  *The essentially nonpersonal nature of the nonstatutory
review action is recognized explicitly in connection with the
"substitution" of successors where a defendant official "sued
in his official capacity" dies or resigns. At the trial
level since 1961 "his successor is automatically substituted
as a party" and "he may be described as a party by his of-
ficial title rather than by name." Rule 25(d), Federal Rules
of Civil Procedure; and see also the similar Rule 48(3) and
(4) of the Supreme Court Rules and Rule 43(c) of the Federal
Rules of Appellate Procedure for the Courts of Appeals. Al-
though the rule speaks in terms of public officials sued in
their "official capacity," the Notes of the Advisory Commit-
tee on Rules concerning the basic 1961 Rule describe it as
one applicable "to any action brought in form against a named
officer, but intrinsically against the government or the of-
fice or the incumbent thereof," and state that it is designed
to "encourage the use of the official title without any men-
tion of the officer individually, thereby recognizing the
intrinsic character of the action."

-36-

2. <u>Technicalities of the law of parties defendant</u>. Requiring the plaintiff to sue an officer, when everyone recognizes that the action is against the United States, perpetuates some troublesome technicalities of the law of parties defendant. Even though Rule 25(d) of the Federal Rules of Civil Procedure provides that "When a public officer sues or is sued in his official capacity, he may be described as a party by his official title rather than by name," courts occasionally dismiss because the wrong officer was named, other officers were not joined, or service of process was made on an agency rather than the officer. See, <u>e.g.</u>, <u>Congress of Racial Equality</u> v. <u>Commissioner</u>, 270 F.Supp. 537, 542 (D.Md. 1967) (action against the chairman of the Civil Service Commission dismissed because the other commissioners were indispensable parties); <u>Bell</u> v. <u>Groak</u>, 371 F.2d 202 (7th Cir. 1966) (service made on Commission rather than upon <u>each</u> commissioner). Allowing the plaintiff to sue the officer, the agency by name, or the United States should eliminate decisions on such technical procedural grounds. If the plaintiff names the United States as defendant, process would be served in accordance with Rule 4(d)(4) of the Federal Rules of Civil Procedure--by delivery to the United States attorney for the district in which the action is brought, with a copy mailed to the Attorney General, and "in any action attacking the validity of an officer or agency of the United States not made a party, by also sending a copy of the summons and of the complaint by registered mail to such officer or agency."

3. <u>Binding effect of judgments</u>. The theory of the officer's suit is that the officer, by acting unconstitutionally or in excess of his authority, is no longer acting in his official capacity, and hence may be enjoined in his personal capacity. This fiction allowed circumvention of sovereign immunity, but raised questions concerning the binding effect of the judgment on the United States, which was not made and could not be made a party. A long line of cases states the rule that the United States is not bound by a judgment in an unconsented <u>in personam</u> action against one of its officers. See <u>Carr</u> v. <u>United States</u>, 98 U.S. 433 (1878); <u>Hussey</u> v. <u>United States</u>, 222 U.S. 88 (1911); <u>Sunshine Coal</u>

JA715

131

-37-

Co. v. Adkins, 310 U.S. 381, 402-03 (1940); but cf. United
States v. Candelaria, 271 U.S. 432, 444 (1926) (United
States bound by a judgment when its lawyers controlled the
litigation). Moreover, sovereign immunity is an objection
that is available on collateral attack even if government
lawyers did not raise it in an earlier proceeding. United
States v. United States Fidelity & Guarantee Co., 309 U.S.
506 (1940). Government counsel now ordinarily defend even
personal actions against federal officers arising out of
their official duties. It is unconscionable that the United
States not be precluded by a judgment in a litigation in
which its interests are involved and in which it has con-
trolled the defense. The recommendation, by providing that
"a judgment or decree may be entered against the United
States whether or not the United States has been named a
defendant" draws on general principles of res judicata and
insures that the United States will be bound by the judg-
ment when it has controlled the defense in a suit against
an officer.

    D.  Law Other Than Sovereign Immunity Unchanged

    The Committee's recommendation, after forthrightly
abolishing sovereign immunity as a defense in nonstatutory
review actions, provides that

    "Nothing herein (1) affects other limitations
    on judicial review or the power or duty of the
    court to dismiss any action or deny relief on
    any other appropriate legal or equitable ground;
    . . . ."

This important protective language insures that the abolition
of sovereign immunity will not result in undue judicial
interference with governmental operations or a flood of
burdensome litigation. Grounds for dismissal or denial
of relief under present law include but are not limited to:

    (1) The plaintiff's lack of standing (e.g., Perkins
v. Lukens Steel Co., 310 U.S. 113 (1940); Pennsylvania R.
Co. v. Dillon, 335 F.2d 292 (D.C.Cir. 1964)).

    (2) The absence of a matured controversy (e.g.,
International Longshoremen's Union v. Boyd, 347 U.S. 222
(1954)).

-38-

(3) The availability of an alternative remedy in another court (e.g., American President Lines, Ltd. v. Federal Maritime Board, 235 F.2d 18 (D.C.Cir. 1956)).

(4) The express or implied statutory preclusion of judicial review (e.g., Schilling v. Rogers, 363 U.S. 666 (1960) (implied preclusion); Barefield v. Byrd, 320 F.2d 455 (5th Cir. 1963) (express preclusion)).

(5) The commission of the matter by law to the defendant's discretion (e.g., Panama Canal Co. v. Grace Line, Inc., 356 U.S. 309 (1958)).

(6) The privileged nature of the defendant's conduct (e.g., Barr v. Matteo, 360 U.S. 564 (1959); United States v. Reynolds, 345 U.S. 1 (1953)).

(7) The plaintiff's failure to exhaust his administrative remedies (e.g., Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41 (1938)).

(8) The discretionary authority of a court to refuse relief on equitable grounds (e.g., Morrison v. Work, 266 U.S. 481, 490 (1925)).

As Professor Byse has commented:

"None of these principles is precise or self-executing, and it is not difficult to criticize the manner in which they have been applied in some instances. But unlike the sovereign immunity doctrine, they require or at least tend to require the court to direct attention to the considerations that are relevant to the question whether the action should be reviewed.[157] Rather

_____

"[157]If, for example, the Larson case . . . had been decided under [a proposed statute abolishing sovereign immunity], the action could not have been dismissed on the ground that it was against the United States, or that the United States was an indispensable party. But the action might have been dismissed on the ground (1) that the plaintiff had an adequate legal remedy for money damages under the Tucker Act, or (2) that to allow suits for specific performance of contracts that are part of a national program to dispose of surplus war goods would constitute an unwarranted disruption

JA717

-39-

than being able to rely upon the conceptualism
of the Larson case or upon other 'empty fictions
which have thus far largely controlled the ap-
plication of the sovereign immunity doctrine in
suits against government officers,' the court
would be forced to consider--and hopefully to
articulate in its opinion--precisely why relief
should be granted or denied. Such a process not
only should result in more intelligent decisions
but should provide the profession with sounder
bases for prediction and constructive criticism
than are possible in the present morass.

"Although I cannot pretend to an encyclopedic
knowledge of governmental regulation or to the
prescience needed to foretell judicial reaction
to ingenious efforts of resourceful counsel to
extend any statute to its utmost, I am confident
that the various doctrines and principles that
govern the availability of judicial review are
sufficiently comprehensive and flexible to pre-
vent an undue increase in the availability of
judicial review and to avoid improper judicial
interference with federal regulatory action.
. . . ." Byse, Proposed Reforms in "Nonstatutory"
Judicial Review, 75 Harv. L. Rev. 1479, 1529-30
(1962).

———————————

157(continued)
of the government's sales program, or (3) that the statute
in question gave the War Assets Administrator authority to
make erroneous as well as correct determinations. Deciding
the Larson case on any of these grounds would require the
court to direct attention precisely to the considerations
which are relevant to the issue whether the administrative
action should be reviewed by the court. If the court should
conclude (1) that the plaintiff did not have an adequate legal
remedy and (2) that specific performance of the contract would
not unduly interfere with the program to dispose of surplus
war supplies and (3) that the Administrator's authority did
not extend to making erroneous decisions, I cannot see that
any sound policy would be served by refusal to adjudicate the
plaintiff's contentions."

JA718

-40-

Special doctrines favoring the United States as a plaintiff are unaffected by the Committee's recommendation. The exemption of the United States from statutes of limitations is not based on sovereign immunity but on the separate ground that the public interest should not suffer because of the negligence of public officers. United States v. Summerlin, 310 U.S. 414 (1940). Moreover, the Committee's recommendation is applicable to situations in which the action is against the United States, not to those in which the United States is a plaintiff.

Nor does the Committee's recommendation affect the long-standing immunity of the United States from garnishment process. FHA v. Burr, 309 U.S. 242 (1940). In these cases, in which an employee of the United States allegedly owes money to a creditor, who attempts by means of state garnishment process to reach wages due the employee from the United States, the action does not involve a claim that "an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority." Moreover, the action seeks money relief.

Government lawyers who have expressed opposition to an abolition of sovereign immunity fear that two harmful consequences may result: (1) undue judicial interference with governmental programs; and (2) a flood of burdensome litigation causing expense and inconvenience to the government. Although complete assurance on each of these matters is impossible, the Committee has reasons to believe that these in terrorem consequences will not result from an adoption of its proposal.

1. Undue judicial interference with governmental programs? It must be borne in the mind that the sovereign immunity doctrine became established about one hundred years ago, long before the modern law of judicial review had developed. The courts at that time assumed that they must choose between performing executive tasks and refusing review; it was understandable that they took the latter course. With the development in the twentieth century of a sophisticated body of law governing the availability, scope and limits of judicial review, this choice is no longer presented. American experience amply demonstrates that a limited judicial review of governmental actions produces fairer administrative procedures, sounder substantive results, and better government.

JA719

135

-41-

The essential and sound policy underlying sovereign im-
munity--that courts should not engage in indiscriminate inter-
ference with governmental programs--is not abandoned merely
because an artificial and outmoded doctrine is abolished.  The
same basic policy is inherent in the body of law that governs
the availability and scope of judicial review.  The doctrine
of sovereign immunity is unnecessary to prevent courts from
(a) entering fields which the Constitution or Congress has
delegated to the executive, and (b) displacing executive
or administrative judgment.

The Committee's recommendation is an amendment to the
Administrative Procedure Act; and its clear language retains
the existing limitations on the availability of judicial re-
view.  Section 10 of the APA, now 5 U.S.C. § 701, provides
that "This chapter applies . . . except to the extent that--
(a) statutes preclude judicial review; or (2) agency action
is committed to agency discretion by law."  Sovereign im-
munity and unreviewability are two separate ideas; and un-
reviewability is clearly retained.  Thus it is fanciful to
suppose that abolition of sovereign immunity will allow the
courts to decide issues about foreign affairs, military
policy, and other subjects inappropriate for judicial action.
Courts are not unaware of their capabilities and limits;
much of the law of unreviewability consists of marking out
areas in which legislative action or traditional practice
indicate that courts are unqualified or that issues are in-
appropriate for judicial determination.

Several recent cases provide illustrations.  In Luftig
v. McNamara, 373 F.2d 664 (D.C.Cir. 1967), a serviceman sought
to enjoin the Secretary of Defense from ordering him to
Vietnam, claiming that American military action there was
unconstitutional and illegal.  In dismissing the action the
court stated:

    "It is difficult to think of an area less
    suited for judicial action than that into which
    Appellant would have us intrude.  The fundamental
    division of authority and power established by the
    Constitution precludes judges from overseeing the
    conduct of foreign policy or the use and disposition
    of military power; these matters are plainly the
    exclusive province of Congress and the Executive."
    373 F.2d at 665-66.

JA720

-42-

The sovereign immunity doctrine, briefly mentioned as an
alternative ground, was superfluous; the result would be
the same in its absence.  Similarly, the closing of a military
facility (Armstrong v. United States, 354 F.2d 648 (9th Cir.
1965)), the shift in location of a customs office (Los Angeles
Custom and Freight Brokers Ass'n v. Johnson, 277 F.Supp. 525
(C.D.Calif. 1967)), the discontinuance of a post office
(Sergeant v. Fudge, 238 F.2d 916 (6th Cir. 1956)), and the
like, are unreviewable because committed to agency discretion
or otherwise inappropriate for judicial determination.

Similarly, abolition of sovereign immunity will not ex-
pose governmental programs to indiscriminate judicial inter-
ference by injunction.  The result in Dugan v. Rank, 372
U.S. 609 (1963), discussed supra at pp. 19-20, would be un-
affected by the Committee proposal.  The Court in Dugan
interpreted the statutes under which the reclamation pro-
ject was proceeding as authorizing the seizure of private
water rights and as confining the plaintiff to his claim for
monetary relief under the Tucker Act.  Monetary relief, the
Court held, was intended to be the exclusive remedy.

Where Congress has not expressly or impliedly precluded
specific relief, injunctive relief nevertheless will be
denied if harm to public interests will result from such
relief.  The Committee's proposal does not affect the long-
standing tradition that an equity court has to balance the
interests of the parties in deciding what kind of relief is
appropriate:

"The court, in its discretion, may refuse
. . . to give a remedy which would work public
injury or embarrassment . . . just as in sound
discretion a court of equity may refuse to en-
force or protect legal rights, the exercise of
which may be prejudicial to the public interest."
United States ex rel. Greathouse v. Dern, 289
U.S. 352, 360 (1933).

See also § 10(d) of the APA, now 5 U.S.C. § 705.

It is true that considerable discretion is inescapably
vested in the judiciary, and the possibility of occasional
error remains.  But this is an inevitable concomitant of
the administration of any system by human beings.  This risk
must be weighed against the injustices and uncertainties re-
sulting from the sovereign immunity doctrine.  (Of course,

JA721

-43-

error is possible even under the sovereign immunity doctrine; lower courts in Dugan v. Rank, 372 U.S. 609 (1963), inter- fered with the administration of the Central Valley water project for several years, until reversed by the Supreme Court.) If the fear of improper judicial interference proves warranted, which seems unlikely, it could be met by a pro- vision restricting temporary or interlocutory relief, pend- ing a decision on the merits, in those situations in which caution is most warranted: when the action seeks (a) to compel the payment of money by the United States, (b) to secure the possession or enjoyment of property in which the United States is admitted or found to have a legal or equitable interest, or (c) to require action to be taken on behalf of the United States which would involve the ex- penditure of public funds.

Finally, the argument that abolition of sovereign immunity would allow judges to substitute their judgment for that of administrators overlooks the established limits on the scope of judicial review. Section 10(e) of the APA, now 5 U.S.C. § 706, limits review to such questions as constitutionality, statutory authority, proper procedure, abuse of discretion, and findings supported by substantial evidence. The scope of review in a case formerly kept out of court by sovereign immunity will be the same as the scope of review in a case that has always been reviewable. Substitution of judgment, de novo consideration, and the like, are not permitted.

The Committee considered but rejected proposals that attempted to state considerations governing the grant of specific relief. The factors involved are so numerous and their application so dependent upon the circumstances of individual cases that the attempt to spell them out is an exceedingly difficult task. It is, moreover, a hazardous one, since any attempt to restate a complex body of law creates problems while attempting to solve them. Language suggesting that the law of judicial review is being changed in one direction or another is almost impossible to avoid; and any partial restatement of relevant factors creates negative implications with respect to factors or doctrines that are omitted. Thus the Committee concluded that it was wiser to withdraw the defense of sovereign immunity in certain situations in which its application is inappropriate, leaving all other law unrestated and unchanged.

-44-

2. Inconvenience to the government from burdensome litigation?  Some government lawyers, defending the sovereign immunity doctrine, assert that it prevents a flood of litigation from overwhelming federal courts and government legal staffs.  They point to the large number of "crackpot" suits which are filed against the United States and its agencies; and the value of sovereign immunity as a device for getting rid of these cases at the threshhold, without the inconvenience and expense of a defense on the merits.  "Crackpot" suits, however, have deficiencies other than that they are directed against the United States or its officers.  In nearly every such case there will be other grounds for dismissal on the pleadings (most often because the plaintiff lacks standing, because the issue is inappropriate for judicial determination, because the action is committed to agency discretion or precluded from review, or because the complaint fails to state a claim for relief).  In nearly every case government lawyers assert a battery of defenses and objections, of which sovereign immunity is only one.  If no other defense or objection exists, one suspects that the suit is not properly classified as a "crank" suit and that consideration of the merits is desirable.

The "floodgates" argument is always a difficult one to rebut in advance, but fears of this kind tend to be exaggerated.  The doctrine of sovereign immunity is so riddled with exceptions that a large increase in the volume of litigation seems unlikely.  The experience of those agencies that are now fully subject to judicial review under statutory review provisions suggests that the level of litigation is not crippling or burdensome, and that judicial review has many advantages, even from the agency's point of view.  The heavy expense of litigation also serves as a pragmatic limit on the volume of cases.  Other limiting doctrines, already discussed, will allow a threshhold disposition of unmeritorious cases.  In the final analysis, if some additional cases do reach the merits because of the curtailment of sovereign immunity, the additional burden on government lawyers must be justified on the same basis as judicial review in general--the desirability of a judicial determination of the legality of official action.

E.  Retain Present Exclusions on the Availability of Monetary or Alternative Relief

The Committee's recommendation is phrased as not to effect an implied repeal or amendment of any prohibition, limitation, or restriction of review contained in existing

JA723

-45-

statutes, such as the Court of Claims Act, 28 U.S.C. § 1491,
the Tucker Act, 28 U.S.C. § 1346(a)(2), or the Federal Tort
Claims Act, 28 U.S.C. §§ 1346(b), 1402(b), 1504, 2110, 2401,
2402, 2411, 2412, 2671-80, in which Congress has conditionally
consented to suit. While this result would probably have been
reached by the preservation of all other "legal or equitable
ground[s]" for dismissal, which include the designation by
Congress of an exclusive remedy or method of review, clause
(2) of the final sentence of part (1) of the recommendation
is intended to prevent any question on this matter from
arising. It states unequivocally that

> "Nothing herein . . . (2) confers authority
> to grant relief if any other statute that
> grants consent to suit expressly or impliedly
> forbids the relief which is sought."

As the earlier discussion has indicated, the purpose of
the Committee's recommendation is to provide nonstatutory
review in some situations in which the doctrine of sovereign
immunity now stands in the way. The creation of new sub-
stantive damage claims is not within the sphere of our con-
cern; only a latitudinarian view of "judicial review" would
consider monetary relief against the United States, primarily
designed to compensate for harms done, as part of judicial
review of administrative action, which is the subject of
§ 10 of the APA. However that may be, the language of our
proposal, which is applicable in terms only to actions
"seeking relief other than money damages," indicates
that sovereign immunity remains as a defense to actions
seeking monetary relief. Existing law governing money
damages in tort and contract actions is left unchanged.
Thus the exceptions from liability contained in the Federal
Tort Claims Act, 28 U.S.C. § 2680, such as the exclusion
of most intentional torts and activities involving "a
discretionary function," remain unaffected by the Committee's
proposal.

Similarly, in situations in which the statute consenting
to monetary relief expressly or impliedly precludes an alter-
native remedy, such as the Court of Claims Act, 28 U.S.C.
§ 1491, and the Tucker Act, 28 U.S.C. § 1346(a)(2), suits
for specific relief would continue to be barred, as those
statutes by expressly consenting to certain actions for
money judgments impliedly prohibit actions seeking other
relief. Special statutory remedies having the same character,
such as those dealing with Indian claims, patent infringement,

-46-

water rights, and the like retain the same preclusive effect
on other remedies that they have now. Similarly, statutory
provisions which prohibit injunctive or declaratory relief
in certain situations continue to be effective where applicable
(e.g., federal tax cases, 26 U.S.C. § 7421 and 28 U.S.C.
§ 773b).

On the other hand, the language of the recommendation
should not be taken as withdrawing alternative remedies where
they now exist. No new authority is conferred in situations
dealt with by statutes granting consent to suit; but nothing
is taken away. Presumably there are situations now in which
specific relief can be obtained even though monetary relief
for the claim involved is not authorized by a statute con-
senting to suit; an example might be a suit to enjoin a
federal officer from engaging in an intentional tort, a
situation in which the damage remedy against the United
States is excluded by the Tort Claims Act, but without
affecting the availability of specific relief.

IV.  OTHER NEEDED REFORMS

The present recommendation is devoted to sovereign
immunity in suits for specific relief in federal courts,
but there are related reforms that are needed in order to
realize the full benefits of withdrawing sovereign immunity
as a defense in actions challenging federal administrative
behavior and seeking relief other than money damages.

A.  Gaps in Tucker and Tort Claims Acts

There are several situations in which neither monetary
nor specific relief can now be obtained and the plaintiff
has no judicial remedy at all, even though the matter is
otherwise appropriate for judicial consideration. These
cases come about mainly because of gaps in the Tucker and
Tort Claims Acts, and also because of the lack of full co-
ordination between these two legislative systems. Two situations
in which monetary relief should probably be expanded are:
(1) where monetary relief cannot be had in the Court of
Claims or under the Tucker Act because the claim is quasi-
contractual or restitutionary in character (contract im-
plied in law rather than contract implied in fact); and
(2) where tort damages cannot be recovered under the
Federal Tort Claims Act because of the exceptions--especially
that excluding most intentional torts--contained in that

-47-

enactment. The quasi-contract problem remains a real one
in theory, although the Court of Claims has been adept at
circumventing it by holding in case after case that the
particular contract is "implied in fact." There is no way
around the tort-damage problem except by amendment of the
Federal Tort Claims Act. Reconsideration of the question
of when the United States should be liable for the torts
of its officers is long overdue; in the process it may be
desirable to clarify inconsistent interpretations of other
aspects of the Tort Claims Act.

The relation of these matters to sovereign immunity is
readily apparent. So long as there are unjustified gaps in
the availability of monetary compensation, there will be pres-
sure to grant specific relief, even in instances where monetary
relief is clearly preferable. There will be, too, substan-
tial risk to the development of an orderly and coherent body
of law. For instance, there is no longer any justification
at all for excluding contracts "implied in law" from the
Tucker Act. There are tendencies, flowing from that ex-
clusion, to push such claims under the Tort Claims Act or to
expand the concept of contracts "implied in fact". There
may also be injunction suits brought where the claimant would
rather have the money, simply because no monetary relief is
available. Other examples come from some of the exceptions
to the Tort Claims Act which tend to put pressure on the
concept of what is a "taking" redressable under the Tucker
Act. For Congress to be in a position to make an intelligent
choice among the possibilities of monetary compensation,
specific relief, or both, these statutory exclusions from
the Tucker and Tort Claims Acts should be reviewed for cur-
rent soundness.

B. Subject Matter Jurisdiction of
Federal District Courts

The Committee's recommendation does not vest subject
matter jurisdiction on federal district courts in any situation
in which it does not now exist; it merely provides that certain
actions shall not be dismissed, or relief denied, solely on
sovereign immunity grounds. This leaves the possibility that
some actions for specific relief could not be brought either
because the plaintiff's complaint does not arise under federal
law or because, even though a federal question is stated, the
case must come within the general federal question provision
of 28 U.S.C. § 1331 and the amount in controversy does not

47-534 O - 70 - 10

JA726

-48-

exceed $10,000. An example of the former kind is <u>Malone</u> v.
<u>Bowdoin</u>, 369 U.S. 643 (1962), which was an ejectment action
against a federal officer. In that case, which was originally
brought in a state court, federal jurisdiction rested upon
the removal statutes, but it is doubtful that the case could
have been brought originally in a federal district court
since the plaintiff's claim rested on state law. The quiet
title statute, discussed below, would remedy this deficiency.
The second problem, that of jurisdictional amount in certain
federal-question cases, would be solved by the enactment of
Recommendation 7 of the Administrative Conference, adopted
December 12, 1968, providing for the elimination of the
jurisdictional-amount requirement in judicial review actions.

### C.   Quiet Title Statute

Regardless of whether or not the sovereign immunity
doctrine is abolished, a special statute authorizing suits
to quiet title against the United States is desirable.  Sub-
ject matter jurisdiction of federal district courts, as in-
dicated earlier (see also p. 33, <u>supra</u>), will be doubtful in
some cases without such an enactment.  Moreover, some pro-
cedural aspects of land dispute litigation involving the
United States deserve special treatment (<u>e.g.</u>, questions
of interlocutory relief, jury trial, multiple parties,
relation to eminent domain).  A draft of such a proposed
statute, prepared by the Land and Natural Resources Divi-
sion of the Department of Justice, is reproduced as Appendix
C of this report.  The Committee on Judicial Review hopes to
report on this matter at a later time.

### D.   Service of Process and Venue Problems

1.   <u>Service of process and parties defendant</u>.  Rule
4(d)(4) governs service of process upon the United States.
It provides that process must be served by delivery of a
copy of the summons and complaint to the United States
Attorney for the district in which the action is brought.
In addition, a copy of the summons and complaint must be
sent by registered or certified mail to the Attorney General
of the United States in Washington, D.C.  Failure to notify
the Attorney General has been held to require dismissal
(<u>Smith</u> v. <u>McNamara</u>, 395 F.2d 896 (10th Cir. 1968); <u>Mes-</u>
<u>senger</u> v. <u>United States</u>, 231 F.2d 328 (2d Cir. 1956);
<u>Lemmon</u> v. <u>Social Security Administration</u>, 20 F.R.D. 215

-49-

(E.D. S.C. 1957), although a few decisions prior to the 1966
amendment of Rule 15(c) permit the defect to be cured when
dismissal would mean the barring of plaintiff's claim be-
cause of the running of the statute of limitation. Rollins
v. United States, 286 F.2d 761, 768 (9th Cir. 1961); Fugle
v. United States, 157 F.Supp. 81 (D. Mont. 1957); the effect
of the 1966 amendment to Rule 15(c) is discussed, infra.
Moreover, in an action attacking the validity of an order
of an officer or agency of the United States, if the offi-
cer or agency has not been made a party to the action, a
copy of the summons and complaint also must be sent by
registered or certified mail to the relevant federal offi-
cer or agency.

    Rule 4(d)(5), which supersedes prior inconsistent
statutes, must be followed to effect service of process on
an officer or agency of the United States. A copy of the
summons and complaint must be delivered to the officer or
agency being sued and service must be made on the United
States itself as provided for in Rule 4(d)(4). If the
federal agency involved is a corporation, Rule 4(d)(5)
requires that service also be made on the agent of the
corporation as provided in Rule 4(d)(3), in addition to
service upon the United States under Rule 4(d)(4).

    Section 1391(e) of Title 28, added to the Judicial
Code in 1962, dispenses with the requirement of personal
service in actions in which each defendant is an officer
or employee of the United States or any agency thereof
acting in his official capacity or under color of legal
authority. In cases of this type, delivery of the summons
and complaint may be by certified mail rather than personal
delivery if the officer or agency to be served is beyond the
territorial limits of the district in which the action is
brought. Other aspects of Rule 4, however, continue to be
applicable. Thus in any such case service must be made
upon the United States by notifying the Attorney General as
provided in Rule 4(d)(4).

    The size and complexity of the federal government,
coupled with the intricate and technical law concerning
official capacity, parties defendant, and the like, have
given rise to innumerable cases in which a plaintiff's claim
has been dismissed because the wrong defendant was named or
served. See the full discussion in Byse, Suing the "Wrong"
Defendant in Judicial Review of Federal Administrative Action,
77 Harv. L. Rev. 40 (1963); Davis, Suing the Government By

-50-

Falsely Pretending To Sue An Officer, 29 U. Chi. L. Rev. 435
(1962). The unsatisfactory state of the law has been recog-
nized for some time and three attempts have now been made to
cure the deficiencies:

   First, the Mandamus and Venue Act of 1962, 28 U.S.C.
§§ 1361, 1391(e), circumvents the formerly troublesome re-
quirement that superior officers be joined as parties de-
fendant by allowing nationwide substituted service on the
superior officer. Although the superior officer still must
be joined when the law of parties considers him indispensable,
the requirement can now be met by mailing a copy of the sum-
mons and complaint to the superior officer, thus allowing
actions to proceed other than at the home base of the superior
officer (usually the District of Columbia). The legislative
history of the provision is to the effect that the law should
not be tailored for the convenience of the government, but
rather there should be "readily available, inexpensive judi-
cial remedies for the citizen who is aggrieved by the work-
ings of Government." The Congress noted that the law of
parties defendant was not altogether clear either in logic
or consistency and that such actions "are in essence against
the United States." 1962 U.S. Cong. & Adm. News 2784-2787.
Hence Congress seems committed to providing a path through
the procedural maze.

   Second, Rule 25(d) of the Federal Rules of Civil Pro-
cedure was amended in 1961 to provide for the automatic sub-
stitution of successors in office. This broad remedial pro-
vision is applicable to any action in which a "public offi-
cer" is sued in his "official capacity." The rule also
states that "any misnomer not affecting the substantial
rights of the parties shall be disregarded" and that the
officer may be "described as a party by his official title
rather than by name."

   Third, Rule 15(c) of the Federal Rules of Civil Pro-
cedure was amended in 1966 to make clear that an amendment
adding or changing parties defendant in actions "with
respect to the United States or any agency or officer
thereof" relates back to the date of the original plead-
ing whenever process was delivered or mailed "to the United
States Attorney or his designee, or the Attorney General of
the United States, or an agency or officer who would have
been a proper defendant if named." This sentence allows
a plaintiff who is in doubt concerning the identity of the
proper officer or agency to commence his action by serving

JA729

-51-

process on the United States Attorney, or the Attorney General,
or an agency or officer who would have been a proper defendant
if named. Difficulty of ascertaining the proper defendant is
often understandable considering the vast array of govern-
ment officers and agencies and the technicalities that govern
parties defendant. Under Rule 15(c) the plaintiff who has
served any one of the persons designated may correct his
pleading when the United States moves to dismiss on grounds
that a particular officer was not named or joined as a de-
fendant. Cases holding to the contrary either were decided
prior to the 1966 amendment of Rule 15(c) or they are er-
roneous. In Smith v. McNamara, 395 F.2d 896 (10th Cir. 1968),
for example, dismissing an action because the proper officer
was not served, the court's attention was not directed to the
amendment to Rule 15(c). Dismissal is proper under the
amended Rules only when the plaintiff fails to amend his
pleading and to complete service on the proper officer with-
in a reasonable time after the defect is raised.

A liberal application of the three remedial provisions
discussed above should prevent dismissals based on technicali-
ties of the law of officers. The Congress and the draftsmen
of the Federal Rules have indicated with great clarity that
actions challenging federal conduct should be decided on
the merits rather than on narrow procedural grounds. Al-
though the law of parties defendant remains unchanged, the
consequences of not selecting or serving the proper defendant
at the outset, or failing to substitute a successor in office,
have been ameliorated. The Department of Justice should take
full note of these recent changes and inform United States
Attorneys of their import.

If the amendments to Rules 15(c) and 25(d), coupled with
the extraterritorial service of process provision of 28 U.S.C.
§ 1391(e), do not remedy the unsatisfactory case law relat-
ing to service of process and parties defendant in suits
against federal officers, further reform will be required.
One possibility, eliminating all technical problems, would
be to provide for service of process upon the United States
Attorney of the district in which the action is brought,
without more, thus imposing on the Department of Justice
the burden of identifying the federal officer or agency
that should be notified and the manner in which such notice
is given. As long as the Government through its lawyers
has adequate notice of the suit, dismissal because of techni-
cal defects about parties defendant is inappropriate.

-52-

2. <u>Venue</u>. The venue part of the Mandamus and Venue
Act of 1962, 28 U.S.C. § 1391(e), provides for venue of the
type of action that the Committee's recommendation is con-
cerned with. 28 U.S.C. § 1391(e) allows actions against
federal officers or agencies, acting in their official
capacity or under color of legal authority, to be brought
in the district in which "(1) a defendant in the action
resides, or (2) the cause of action arose, or (3) any real
property involved in the action is situated, or (4) the
plaintiff resides if no real property is involved in the
action." This provision does not appear to be applicable
to suits against the United States <u>eo nomine</u>, since the
United States cannot be considered to be an "officer or
agency" of the United States. Although there is a special
venue provision dealing with actions in which the United
States is a defendant, that provision, 28 U.S.C. § 1402,
applies only to three kinds of damage actions brought under
28 U.S.C. § 1346 (Tucker Act cases, Federal Tort Claims Act
cases, and federal tax cases). And the general venue pro-
vision applicable to federal-question cases, 28 U.S.C.
§ 1391(b), is difficult to apply since it allows the action
to be brought only in the district where "all defendants
reside, or in which the claim arose." If the United States,
like a corporation, resides where it is doing business,
<u>i.e.</u>, everywhere, the general venue provision of § 1391(b)
is too broad since suit could be brought on any claim in
any judicial district chosen by the plaintiff; on the other
hand, if, as seems more likely, a residence cannot be at-
tributed to the United States, the action may be brought
only where the cause of action arose, a much narrower venue
choice than provided by 28 U.S.C. § 1391(e), which was drafted
with the situation of the suit against the officer in mind.

The Committee's recommendation, insofar as it permits
the plaintiff to name the United States as defendant, is un-
likely to be fully effective unless the venue provisions of
28 U.S.C. § 1391(e) are amended to include actions of the
same type in which the United States is the named defendant.
Until that happens, the suit against the officer, with the
ample venue choice given by 28 U.S.C. § 1391(e), is likely
to remain the manner in which actions are cast.

If 28 U.S.C. § 1391 is amended to include actions in
which the United States is named defendant, two other changes
in the section would be desirable. <u>First</u>, § 1391(e) has
been held inapplicable to territories such as the Canal Zone
(<u>Leber</u> v. <u>Canal Zone Central Labor Union</u>, 383 F.2d 110 (5th

JA731

-53-

Cir. 1967)), an oversight that should be remedied. Second,
§ 1391(e) prohibits the joinder of private persons or state
officials as defendants since it is expressly limited to
cases "in which each defendant is an officer or employee
of the United States or an agency thereof." (Emphasis
added.) Town of East Haven v. Eastern Airlines, 282 F.Supp.
507 (D.Conn. 1968); Chase Savings & Loan Ass'n v. Federal
Home Loan Bank Board, 269 F.Supp. 965 (E.D.Pa. 1967). There
is no functional justification for this limitation, which
prevents relief in some situations in which the federal
courts can make a special contribution. In many public land
controversies, for example, three parties are involved--the
official, a successful applicant, and an unsuccessful one.
Effective relief cannot be obtained in an action in which
the United States or its officer is not involved; but if the
government is named as defendant, § 1391(e) prevents the
joinder of the other private person (who cannot be joined
as a plaintiff because his interest is adverse to that of
the plaintiff). Another common type of situation in which
the limitation is troublesome is when specific relief is
sought against federal and state officers who are cooperating
in a regulatory or enforcement program. 28 U.S.C. § 1391(e)
should be amended so as to allow for effective relief and
binding judgments in multiple party situations.

### CONCLUSION

Compared to other contemporary social problems--race,
poverty, urban decay, and the like--sovereign immunity is
relatively trivial and unimportant. Yet it is a subject
on which the Administrative Conference of the United States
may make a modest contribution in rationalizing a complex
and intricate specialty of federal law. The Committee on
Judicial Review, believing that the doctrine of sovereign
immunity has outlived its usefulness, urges the Conference,
by adopting the Committee's recommendation, to broaden the
opportunities of citizens to obtain judicial review of
federal administrative actions.

# # # # #

-54-

APPENDIX A.  TEXT OF RECOMMENDATION OF
THE COMMITTEE ON JUDICIAL REVIEW

It is recommended that --

(1)  5 U.S.C. § 702 (formerly Section 10(a) of the
Administrative Procedure Act) be amended by adding the
following at the end of the section:

> An action in a court of the United States seeking
> relief other than money damages and stating a
> claim that an agency or an officer or employee
> thereof acted or failed to act in an official
> capacity or under color of legal authority shall
> not be dismissed nor relief therein be denied on
> the ground that it is against the United States
> or that the United States is an indispensable
> party.  The United States may be named as a
> defendant in any such action; and a judgment or
> decree may be entered against the United States
> whether or not the United States has been named
> as a defendant.  Nothing herein (1) affects
> other limitations on judicial review or the
> power or duty of the court to dismiss any action
> or deny relief on any other appropriate legal or
> equitable ground; or (2) confers authority to
> **grant relief if any other statute that grants consent
> to suit expressly or impliedly forbids the relief which
> is sought.**

(2)  5 U.S.C. § 703 (formerly Section 10(b) of the
Administrative Procedure Act) be amended by adding the
following sentence at the end of the first full sentence:

> If no special statutory review proceeding is
> applicable, the action for judicial review may
> be brought against the United States, the agency
> by its official title, or the appropriate officer.

JA733

-55-

APPENDIX B.  TEXT OF ADMINISTRATIVE
PROCEDURE ACT AS AMENDED BY THE
RECOMMENDATION

[New matter is underlined.]


TITLE 5, UNITED STATES CODE
Chapter 7, Judicial Review

§ 701.  Application; definitions

(a)  This chapter applies, according to the provisions
thereof, except to the extent that --

(1)  statutes preclude judicial review; or

(2)  agency action is committed to agency discretion
by law.

(b)  For the purpose of this chapter --

(1)  "agency" means each authority of the Government
of the United States, whether or not it is within or sub-
ject to review by another agency, but does not include --

(A)  the Congress;

(B)  the courts of the United States;

(C)  the governments of the territories or
possessions of the United States;

(D)  the government of the District of Columbia;

(E)  agencies composed of representatives of
the parties or of representatives of organizations
of the parties to the disputes determined by them;

(F)  courts martial and military commissions;

(G)  military authority exercised in the field
in time of war or in occupied territory; or

(H)  functions conferred by sections 1738, 1739,
1743, and 1744 of title 12; chapter 2 of title 41;
or sections 1622, 1884, 1891-1902, and former section
1641(b)(2), of title 50, appendix; and

JA734

-56-

    (2)  "person", "rule", "order", "license", "sanction", "relief", and "agency action" have the meanings given them by section 551 of this title.

§ 702.  Right of review

    A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. <u>An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.  The United States may be named as a defendant in any such action; and a judgment or decree may be entered against the United States whether or not the United States has been named as a defendant.  Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought</u>.

§ 703.  Form and venue of proceeding

    The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction.  <u>If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer.</u>  Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

-57-

§ 704.  Actions reviewable

Agency action made reviewable by statute and final agency
action for which there is no other adequate remedy in a court
are subject to judicial review.  A preliminary, procedural,
or intermediate agency action or ruling not directly re-
viewable is subject to review on the review of the final
agency action.  Except as otherwise expressly required by
statute, agency action otherwise final is final for the
purposes of this section whether or not there has been
presented or determined an application for a declaratory
order, for any form of reconsideration, or, unless the
agency otherwise requires by rule and provides that the
action meanwhile is inoperative, for an appeal to superior
agency authority.

§ 705.  Relief pending review

When an agency finds that justice so requires, it may
postpone the effective date of action taken by it, pending
judicial review.  On such conditions as may be required and
to the extent necessary to prevent irreparable injury, the
reviewing court, including the court to which a case may be
taken on appeal from or on application for certiorari or
other writ to a reviewing court, may issue all necessary
and appropriate process to postpone the effective date of
an agency action or to preserve status or rights pending
conclusion of the review proceedings.

§ 706.  Scope of review

To the extent necessary to decision and when presented,
the reviewing court shall decide all relevant questions of
law, interpret constitutional and statutory provisions, and
determine the meaning or applicability of the terms of an
agency action.  The reviewing court shall --

(1)  compel agency action unlawfully withheld
or unreasonably delayed; and

(2)  hold unlawful and set aside agency action,
findings, and conclusions found to be --

-58-

      (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

      (B) contrary to constitutional right, power, privilege, or immunity;

      (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

      (D) without observance of procedure required by law;

      (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

      (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

JA737

-59-

## APPENDIX C.  QUIET TITLE STATUTE

Draft Prepared by Land and Natural
Resources Division, Department of Justice

To amend Title 28 of the United States Code to permit
the United States to be named a party to suits to quiet
title to real property.

Be it enacted by the Senate and the House of Repre-
sentatives in Congress assembled, That Title 28 of the
United States Code is amended by adding at the end of
section 1347 the following new section:

### §1347A.  Quiet title action where
United States claims an interest

The district courts shall have exclusive original
jurisdiction, under the conditions prescribed in section
2409A of this title for the protection of the United States,
of any civil action to quiet title, or to remove a cloud or
clouds on title, to real property in which the United States
claims an interest other than one arising from unpaid federal
taxes.

Sec. 2.  The headnote to chapter 85 of Title 28, United
States Code, is amended by adding after the matter relating
to section 1347 new matter reading as follows:

### 1347A.  Quiet title action where United States
claims an interest.

Sec. 3.  Title 28 of the United States Code is further
amended by adding at the end of section 2409 the following
new section:

### §2409A.  Quiet title actions involving United States

(a)  Under the conditions prescribed in this section
for the protection of the United States, the United States
may be named as the sole or an additional party defendant
in any civil action or suit in any district court having
jurisdiction of the subject matter to quiet title, or to
remove a cloud or clouds on title, to any real property in
which the United States claims an interest, and to recover
in the same civil action or suit just compensation for use
of such property, except a civil action or suit which could
be brought under sections 1346, 1347, 1491, or 2410 of this
title, sections 7424, 7425, or 7426 of Title 26, or section

JA738

-60-

666 of Title 43: <u>Provided</u>, That this section shall not apply
to any civil action or suit to foreclose a mortgage, deed of
trust, or other security interest, or to cancel, remove, or
discharge a lien of any kind (including but not limited to
mechanics' liens, state or federal tax liens, or encumbrances
of a similar nature) or to any civil action or suit in any
way involving or relating to water rights.

(b)  The United States shall not be disturbed in pos-
session or control of any real property involved in any civil
action or suit brought under this section pending a final
judgment or decree and the conclusion of any appeal thereon,
and if the final determination shall be adverse to the claim
of the United States, the United States nevertheless may
retain such leasehold, fee, or other interest in the real
property or in any part thereof as it may elect, upon pay-
ment to the person determined to be entitled thereto of an
amount which upon such election the district court in the
same action or suit shall determine to be just compensation
for such interest.

(c)  The complaint shall set forth with particularity
the nature of the right, title or interest which the plain-
tiff claims in the real property, the circumstances under
which it was acquired, and the right, title or interest
claimed by the United States.

(d)  If the United States disclaims all interest in
the real property at any time prior to the actual commence-
ment of the trial, the jurisdiction of the district court
shall cease unless it has jurisdiction of the civil action
or suit on grounds other than and independent of the authority
conferred by section 1347A.

(e)  Any civil action or suit against the United States
under this section shall be tried by the court without a jury.

(f)  Any civil action or suit under this section shall
be barred unless the complaint is filed within six years
after the right of action first accrues.

Sec. 4.  The headnote to chapter 161 of Title 28,
United States Code, is amended by adding after the matter
relating to section 2409 new matter reading as follows:

2409A.  Quiet title actions involving United States

Sec. 5.  The provisions of this Act shall be prospective
in operation, and shall not apply to any claim or right of
action which accrued prior to the date of the enactment of
this Act.

JA739

C.        Recommendation 18: Parties Defendant


The size and complexity of the Federal Government, coupled
with the intricate and technical law concerning official capacity
and parties defendant, have given rise to innumerable cases in
which a plaintiff's claim has been dismissed because the United
States or one of its agencies or officers lacked capacity to
be sued, was improperly identified, or could not be joined as
a defendant.  The ends of justice are not served when dismissal
on these technical grounds prevents a determination on the merits
of what may be just claims.  Three attempts to cure the deficiencies
of the law of parties defendant have achieved only partial success
and further changes are required to eliminate remaining techni-
calities concerning the identification, naming, capacity, and
joinder of parties defendant in actions challenging federal admini-
strative action.

RECOMMENDATION

1.  The Federal Rules of Civil Procedure contain liberal provisions
for substitution of parties and for amendment of pleadings and
correction of defects as to parties defendant.  The Department of
Justice should instruct its lawyers and United States Attorneys
to call the attention of the court to these provisions in cases
involving technical defects with respect to the naming of parties
defendant in any situation in which the plaintiff's complaint
provides fair notice of the nature of the claim and the summons
and complaint were properly served on a United States Attorney,
the Attorney General, or an officer or agency which would have
been a proper party if named.  The Department of Justice should
be responsible for determining who within our complex federal
establishment is responsible for the alleged wrong and should
take the initiative in seeking correction of pleadings or adding
of proper parties.  Since the Department of Justice has acquiesced
in the substance of this recommendation, it would also be appropriate
for the Department of Justice and the Administrative Conference of
of the United States to seek an amendment of the Federal Rules of
Civil Procedure to provide that the Attorney General shall have
the responsibility to correct such deficiencies.

JA740

156

2. Congress should enact legislation:

(a)  Amending section 703 of title 5 to allow the plaintiff to name as defendant in judicial review proceedings the United States, the agency by its official title, the appropriate officer, or any combination of them.

(b)  Amending section 1391(e) of title 28 to include within its coverage actions challenging federal administrative action in which the United States is named as a party defendant, without affecting special venue provisions which govern other types of actions against the United States.

(c)  Amending section 1391(e) of title 28 to allow a plaintiff to utilize that section's broadened venue and extraterritorial service of process in actions in which non-federal defendants who can be served in accordance with the normal rules governing service of process are joined with federal defendants.

JA741

157

November 1969


COMMITTEE ON JUDICIAL REVIEW


Memorandum in support of the recommendation relating to
  the need for reform of the law of parties defendant in
  nonstatutory review of federal administrative action

(by Roger C. Cramton)


47-534 O - 70 - 11

158

## I. INTRODUCTION

The size and complexity of the Federal Government, coupled with the intricate and technical law concerning official capacity and parties defendant have given rise to innumerable cases in which a plaintiff's claim has been dismissed because the wront defendant was named or served. <u>Gnotta</u> v. <u>United States</u>[1] is illustrative. Gnotta, an engineer of Italian descent employed in a field office of the Army Corps of Engineers, remained in his initial grade of appointment after a dozen years of service. He charged that his superiors had refused to provide him opportunities for advancement because of his ethnic origin. An executive order proscribes such discrimination unequivocally and provides "for the prompt, fair, and impartial consideration of all complaints of discrimination in Federal employment" by the employing agency and the Civil Service Commission.[2] The Commission held a lengthy hearing at which testimony supporting and contradicting Gnotta's claim of discrimination was received. After an adverse determination by the Commission, Gnotta

_____

[1] 415 F.2d 1271 (8th Cir. 1969).

[2] Exec. Order No. 11,246 (1965), 30 Fed.Reg. 12,319.

159

sought judicial review in a suit in a United States
district court, naming as defendants the United States,
the Department of the Army, the Civil Service Commission,
and seven employees of the Army Corps of Engineers who
supervised his work.  The district court dismissed the
suit on the ground "that Gnotta's selected procedure
and his choice of defendants raise serious questions of
governmental immunity and of consequent jurisdiction."[3]
The United States Court of Appeals for the Eighth Circuit
affirmed the dismissal, holding that "Gnotta's appeal
necessarily falls because of the identity of the de-
fendants he had chosen to sue."[4]

Why were the defendants chosen by Gnotta improper?
The court listed these reasons:

(1)  "One cannot sue the United States without
its consent . . . ;"[5]

---

[3]415 F.2d at 1276.  The district court decision is
unreported.

[4]415 F.2d at 1276.

[5]415 F.2d at 1276, citing United States v. Sherwood,
312 U.S. 584, 586-88 (1941).

JA744

160

(2)  The Department of the Army and the seven in-
dividual officers could also cloak themselves in the
mantle of the sovereign;[6] and

(3)  "Congress has not constituted the [Civil Service]
Commission a body corporate or authorized it to be sued
eo nomine."[7]  Poor Gnotta, in suing "the United States
Civil Service Commission" failed to understand that the
Supreme Court had required that actions attacking
determinations of the Commission must be brought not
against the Commission but against its individual members.

One's sense of justice would not be pricked if the
court, reaching the merits, had decided that the adminis-
trative determination was supported by substantial
evidence.  Somewhat less satisfying, but tolerable,
would have been a decision in which the court, after
wrestling with federal civil service law and regulations,

---

[6] 415 F.2d 1271, 1277.  Enactment by Congress of legisla-
tion implementing Recommendation 9 of the Administrative
Conference of the United States, adopted October 21, 1969,
would eliminate the sovereign immunity objection in a case
of this type.

[7] 415 F.2d at 1277 citing Blackmar v. Guerre, 342 U.S.
512, 514-16 (1952); Bell v. Groak, 371 F.2d 202, 204 (7th
Cir. 1966).  It should be noted that if Gnotta had named
"Members of the United States Civil Service Commission" as
parties defendant, and served process on them, his complaint
could not have been dismissed, since Federal Rule 25(d) permits
a public officer to be described by title rather than individual
name.

161

held that adverse determinations of the Civil Service
Commission were subject to only limited review[8] or that
the particular matter of personnel advancement was "com-
mitted to agency discretion by law" and hence nonreview-
able.[9]  But it is disheartening that technical and foolish
rules about parties defendant should foreclose judicial
review of federal administrative action.

   The tangled web of problems involving parties de-
fendant in judicial-review actions has been ameliorated
over the years, but substantial room for improvement
remains.  The ultimate goal has been clearly stated by
the Supreme Court:  modern procedure "reject[s] the
approach that pleading is a game of skill in which one
misstep by counsel may be decisive to the outcome and
accept[s] the principle that the purpose of pleading

---

[8]Compare Bailey v. Richardson, 182 F.2d 46 (D.C.Cir.
1950) (judicial review of the discharge of a federal em-
ployee is limited to determining whether the employee re-
ceived the protection of prescribed administrative procedures),
affd by an equally divided Court, 341 U.S. 918 (1951), with
Charlton v. United States, 412 F.2d 390 (3d Cir. 1969) (scope
of judicial review is governed by the Administrative Pro-
cedure Act).

[9]See, e.g., Keim v. United States, 177 U.S. 290 (1900);
McEachern v. United States, 321 F.2d 31, 33 (4th Cir. 1963).
The court in Gnotta, stating that "promotion . . . of employees
. . . is a matter of supervisory discretion and not subject to
judicial review," considered resting its decision on this
ground, but concluded that a charge of ethnic discrimination
could not be bypassed in this way.  415 F.2d at1275-76.

162

is to facilitate a proper decision on the merits."[10]
What is true of ordinary civil litigation is even more
true when a citizen is attempting to obtain redress from
his government.  The ends of justice are not served when
Government attorneys advance highly technical rules in
order to prevent a determination on the merits of what
may be just claims.[11]

 The numerous problems relating to parties defendant
can be cured by (1) recognition and acceptance by the
Department of Justice that Congress and the draftsmen of
the Federal Rules of Civil Procedure have provided a
solution for most of the problems that arise when the
plaintiff sues the wrong defendant or fails to join a
superior officer;[12] (2) amending section 703 of title 5
to allow the plaintiff to name as defendant in judicial

---

 [10]Conley v. Gibson, 355 U.S. 41, 48 (1957).

 [11]Professor Davis asks whether the Government should
"spend taxpayers' money to pay government lawyers to use
their ingenuity in developing technical complexities that
will prevent plaintiffs from getting their cases decided on
the merits. . . ." Davis, Suing the Government by Falsely
Pretending to Sue an Officer, 29 U. Chi. L. Rev. 435, 439 (1962).

 [12]See text accompanying notes 16-20 infra.

JA747

**163**

review proceedings the United States, the agency by its official title, the appropriate officer, or any combination of them;[13] and (3) adopting several minor changes in the language of section 1391(e) of title 28--the venue provision of the Mandamus and Venue Act of 1962.[14]

## II. PRIOR ATTEMPTS TO PROVIDE SOLUTIONS

The unsatisfactory state of the law of parties defendant has been recognized for some time[15] and three

---

[13]See text accompanying notes 54-59 infra. This suggestion has already been adopted by the Administrative Conference of the United States as part of Recommendation 9 of the Conference (October 21, 1969).

[14]See text accompanying notes 60-65 infra, and the proposed revision of 28 U.S.C. § 1391(e) in the conclusion of this Report. A minor anomaly in the coverage of § 1391(e) may also deserve legislative correction. Because various territories of the United States are not "judicial districts" within the meaning of 28 U.S.C. § 451 (1964), the extraterritorial service of process and broadened venue of § 1391(e) are not available. See Doyle v. Fleming, 219 F. Supp. 277 (D.C.Z. 1963) (quashing service of process under § 1391(e) because Canal Zone is not a "judicial district"); Canal Zone Central Labor Union v. Flemming, 246 F. Supp. 998 (D.C.Z. 1965) (same) revd. on other grounds sub nom. Leber v. Canal Zone Central Labor Union, 383 F.2d 110, 113 n.3 (5th Cir. 1967). Requiring the Secretary of the Army to defend an action in the Canal Zone or Guam places no greater burden on Government attorneys than does sending them to defend an action in Hawaii. The omission of territorial courts should be corrected unless considerations with respect to the nature or powers of those courts provide a rational basis for the omission.

[15]See the full discussion in Byse, Suing the "Wrong" Defendant in Judicial Review of Federal Administrative Action, 77 Harv. L. Rev. 40 (1963); Davis, Suing the Government by Falsely Pretending to Sue an Officer, 29 U. Chi. L. Rev. 435 (1962).

164

attempts have now been made to cure the deficiencies.

First, Congress, in 1962, amended section 1391(e) of title 28 in order to allow broadened venue and extra-territorial service in suits against federal officers and thus to circumvent the formally troublesome requirement that superior officers be joined as parties defendant. Second, rule 25(d) of the Federal Rules of Civil Procedure was amended in 1961 to provide for the automatic sub-stitution of successors in office.  That rule also states that "any misnomer not affecting the substantial rights of the parties shall be disregarded" and that the officer may be "described as a party by his official title rather than by name." Third, rule 15(c) of the Federal Rules was amended in 1966 to deal with a plaintiff's failure to name any appropriate officer or agency as defendant. Each of these three remedial provisions will now be discussed in detail.

      A.  Section 1391(e):  Service of Process, Venue, and Indispensable Parties

Apart from section 1391(e) the service of process in nonstatutory review actions is governed by the Federal Rules of Civil Procedure.  Rule 4(d)(4) covers the service of process upon the United States.  It provides that process must be

JA749

**165**

served by delivery of a copy of the summons and complaint
to the United States Attorney for the district in which
the action is brought.  In addition, a copy of the summons
and complaint must be sent by registered or certified mail
to the Attorney General of the United States in Washington,
D.C.  Failure to notify the Attorney General has been held
to require dismissal,[16] although a few decisions prior to the
1966 amendment of rule 15(c)[17] permit the defect to be cured
when dismissal would mean the barring of plaintiff's
claim because of the running of the statute of limitations.[18]
Moreover, in an action against the United States attacking
the validity of an order of a federal officer or agency,
if the officer or agency has not been made a party to the
action, a copy of the summons and complaint must also be
sent by registered or certified mail to the relevant
federal officer or agency.

---

[16] Smith v. McNamara, 395 F.2d 896 (10th Cir. 1968);
Messenger v. United States, 231 F.2d 328 (2d Cir. 1956);
Lemmon v. Social Security Administration, 20 F.R.D. 215
(E.D.S.C. 1957).

[17] The "relation back" amendment of rule 15(c) is
discussed in the text accompanying notes 43-49 infra.

[18] Rollins v. United States, 286 F.2d 761, 768 (9th
Cir. 1961); Fugle v. United States, 157 F. Supp. 81 (D.
Mont. 1957).

166

Rule 4(d)(5), which supersedes prior inconsistent statutes, must be followed to effect service of process on an officer or agency of the United States. A copy of the summons and complaint must be delivered to the officer or agency being sued and service must be made on the United States itself as provided for in rule 4(d)(4). If the federal agency involved is a corporation, rule 4(d)(5) requires that service also be made on the agent of the corporation as provided in rule 4(d)(3), in addition to service upon the United States under rule 4(d)(4).[19]

Section 1391(e), which was added to the Judicial Code in 1962,[20] dispenses with the requirement of personal service in actions in which each defendant is an officer or employee of the United States or any agency thereof, acting in his official capacity or under color of legal authority. Nationwide service of process in such actions has circumvented difficulties stemming from holdings that superior officers are indispensable parties, and has allowed

---

[19]For an excellent discussion of rule 4(d)(5), see 4 C. Wright & A. Miller, Federal Practice and Procedure §§ 1106-07 (1969).

[20]Section 1391(e) is the venue part of the Mandamus and Venue Act of 1962, 28 U.S.C. § 1391(e) (1964).

the citizen to sue his Government in a local federal
district court.  The provision reflects a congressional
decision that "[r]equiring the Government to defend Govern-
ment officials and agencies in places other than Washington"
is fairer to citizens and is not "a burdensome imposition"
on the Government.[21]  In cases of this type, delivery of the
summons and complaint may be by certified mail rather than
personal delivery if the officer or agency to be served
is beyond the territorial limits of the district in which
the action is brought.  Other aspects of rule 4, however,
continue to be applicable.  Thus in any such case service
must be made upon the United States by notifying the
Attorney General as provided in rule 4(d)(4).

    With respect to venue, section 1391(e) allows actions
against federal officers or agencies, acting in their official
capacity or under color of legal authority, to be brought
in the district in which "(1) a defendant in the action
resides, or (2) the cause of action arose, or (3) any real
property involved in the action is situated, or (4) the
plaintiff resides if no real property is involved in

---

[21]H.R. Rep. No. 536, 87th Cong., 1st Sess. (1961).

168

the action."[22]  Although adopted as part of the Mandamus

and Venue Act of 1962,[23] section 1391(e) is not limited to

mandamus actions but applies broadly to all types of suits

against federal officers or agencies except those governed

by a special statutory review provision that deals with

venue.[24]

    Section 1391(e) is phrased in terms of suits against

officers and does not appear to be applicable to suits

against the United States eo nomine.  Detailed venue pro-

visions govern suits against the United States.[25]  If plain-

tiffs were to be given an option of suing the United States

---

[22]For excellent general discussions of the Mandamus
and Venue Act of 1962, see Byse & Fiocca, Section 1361
of the Mandamus and Venue Act of 1962 and "Nonstatutory"
Judicial Review of Federal Administrative Action, 81 Harv.
L. Rev. 308 (1967); Jacoby, The Effect of Recent Changes
in the Law of "Nonstatutory" Judicial Review, 53 Geo.
L.J. 19 (1964).

[23]See note 20 supra.

[24]See Jacoby, supra note 22, at 32.

[25]E.g., 28 U.S.C. § 1402(a) (1964) (tax refund
claims against United States); 28 U.S.C. § 1402(b)
(1964) (tort claims against United States).

169

in addition to or in lieu of suing the officer, section 1391(e) would need to be broadened to control venue in such actions.[26]

By allowing nationwide substituted service on the superior officer, section 1391(e) circumvents the technical requirement that superior officers be joined as parties defendant. A long line of cases established the proposition, easy to state but difficult to apply, that "the superior officer is an indispensable party if the decree granting the relief sought will require him to take action, either by exercising directly a power lodged in him or by having a subordinate exercise it for him."[27] Prior to the enactment of section 1391(e), limitations on venue and on service

---

[26]See the proposed revision of 28 U.S.C. § 1391(e) in the conclusion of this Report, which would add actions against "the United States" to the categories of cases in which venue and service of process are governed by that section. The addition of the United States to the general venue provisions of section 1391 would not displace the special venue provisions applicable to the United States (see note 25 supra) since special venue provisions would override the general provision.

[27]Williams v. Fanning, 332 U.S. 490, 439 (1947) (the Postmaster General was not indispensable to a suit against a local postmaster, because the latter could resume delivery of mail properly withheld). For an ample impression of the degree of confusion in the case law, see Davis, supra note 11, at 438-51.

170

of process often gave decisive significance to the plain-
tiff's failure to join a superior officer.[28]  Broadened
venue and extraterritorial service under section 1391(e),
however, have, for the most part, eliminated the importance
of the indispensability doctrine, since the superior officer
can now be joined as a defendant in any local district
court.  The legislative history of the section demonstrates
that the law should not be tailored for the convenience of
the Government, but that, rather, there should be "readily
available, inexpensive judicial remedies for the citizen
who is aggrieved by the workings of Government."[29]  The
Congress noted that the law of parties defendant was not
altogether clear in either logic or consistency and that
such actions "are in essence against the United States."[30]
Hence Congress seems committed to providing a path through
the procedural maze.

─────────────────

[28]Since venue was proper only where "all defendants re-
side" or where "the claim arose," 28 U.S.C. § 1391(b) (1964),
and since service of process could not be effected on a
superior in the plaintiff's home district, the plaintiff's
only choice was to sue the superior in the District of Columbia.
Limitations on venue and service of process thus had the effect,
when combined with the indispensable party rule, of centralizing
in the District of Columbia a great deal of nonstatutory review
of federal administrative action, thereby causing inconvenience
and expense to distant plaintiffs.  See Byse, Proposed Reforms in
Federal "Nonstatutory" Judicial Review, 75 Harv. L. Rev. 1479,
1493-99 (1962).

[29]H.R. Rep. No. 536, 87th Cong., 1st Sess. (1961).

[30]Id.

171

The confusing law governing the required joinder of superior officers,[31] however, has been circumvented rather than eliminated. Government attorneys who are more interested in scoring tactical points than in obtaining just results may still argue that an unjoined superior is indispensable and that he cannot be joined at a later time if the passage of time creates a bar.[32] That argument should be rejected. The remedial purposes of the 1966 amendment to rule 15(c) of the Federal Rules clearly

---

[31] Compare Hynes v. Grimes Packing Co., 337 U.S. 86 (1949) (the Secretary of the Interior is not an indispensable party to a suit to enjoin a regional director from enforcing regulations interfering with plaintiff's fishing rights), with Blackmar v. Guerre, 342 U.S. 512 (1952) (members of the Civil Service Commission are indispensable parties to a reinstatement action brought by a discharged employee against his regional supervisor).

[32] In some situations, such as review of social security determinations, a statute of limitations bars a review proceeding that is not properly brought within a designated period (see note 47 infra). In other situations the doctrine of laches performs a similar function. Dismissal may also result because the plaintiff has failed to perfect service of process within a reasonable time (see cases cited in note 16 supra).
In Bell v. Groak, 371 F.2d 202 (7th Cir. 1966), a discharged postal employee sought mandatory relief to require the Civil Service Commission to entertain his administrative appeal. The suit was brought against the Chairman of the Commission as an individual. After the Government had objected that the other members of the Commission were indispensable parties, the complaint was amended to join them, but no attempt was made to serve process on them. On appeal, the failure to perfect service resulted in dismissal even though the decision below was not based on that ground. If the plaintiff had had warning, he might have requested time within which to perfect service.

172

contemplate that an amendment adding a superior officer
relates back to the filing of the original complaint if
process has been served on the Government's lawyers.[33]
The inevitable uncertainty implicit in attempting to un-
ravel the authority of officials in order to ascertain
whether a subordinate indeed has authority to afford the
relief sought can be met, of course, by joining all
possible officers as parties defendant.  But plaintiffs
who do not thus encumber their complaints cannot properly
be thrown out of court.  In view of the liberal "relation
back" provisions of rule 15(c), Government lawyers should
take prompt steps to remedy any defects arising from the
nonjoinder of superior officers.  The Department of Justice
should instruct United States Attorneys to assist plain-
tiffs in curing such defects, rather than to move for
dismissal on that ground.[34]

---

[33]See discussion of rule 15(c) in the text accompanying
notes 43-49 infra.  See also the explanation of the purpose
of the 1966 amendment to rule 15(c) in the Advisory Com-
mittee's Note, reprinted in 3 J. Moore, Federal Practice
461-63 (1968).

[34]See text accompanying note 66 infra.

B.  Rule 25(d):  Substitution of
Successor Officers and Misnomer

Prior to its amendment in 1961, the provision of

rule 25(d) of the Federal Rules, which deals with the

continuance of actions brought by or against public

officers who died or were separated from office, was "a

trap for unsuspecting litigants . . . unworthy of a great

government."[35]  Authoritative Supreme Court decisions had

construed the language of rule 25(d) to require abatement

of an action in which plaintiff failed to substitute a

successor officer within six months after the original

defendant had died or left office.[36] A general recognition

that this harsh rule produced unjust results provided

the impetus for the 1961 amendment.[37]

As amended in 1961, rule 25(d) provides for auto-

matic substitution of public officers.[38]  It eliminates

---

[35]Vibra Brush Corp. v. Schaffer, 256 F.2d 681, 684
(2d Cir. 1958).

[36]Klaw v. Schaffer, 357 U.S. 346 (1958); McGrath v.
National Assn. of Manufacturers, 344 U.S. 804 (1952); Snyder
v. Buck, 340 U.S. 15 (1950).

[37] See, e.g., Davis, Government Officers as Defendants:
Two Troublesome Problems, 104 U. Pa. L. Rev. 68 (1955).

[38]Fed. R. Civ. P. 25(d)(1):  "When a public officer is a
party to an action in his official capacity and during its pendency
dies, resigns, or otherwise ceases to hold office, the action does
not abate and his successor is automatically substituted as a
party.  Proceedings following the substitution shall be in the

47-534 O - 70 - 12

174

the needless formality of numerous orders of substitution
in situations in which a public officer, by whose name or
against whom a great many actions have been brought, dies
or resigns.  If, as frequently happens, the parties and the
court are unaware of the change in the office, the litigation
can be continued under the name by which the action was
commenced without affecting its validity.  When and if
the Government raises the question, the name can be changed,
no matter how much time has elapsed.[39]

The Advisory Committee's note to the 1961 amendment
makes it clear that "mistaken analogies to the doctrine
of sovereign immunity" should not control the determination
of whether the officer is acting "in his official capacity"
within the meaning of the rule.[40]  A common-sense approach
makes the rule applicable "to any action brought in form

---

[38] continued name of the substituted party, but any mis-
nomer not affecting the substantial rights of the parties shall
be disregarded.  An order of substitution may be entered at
any time, but the omission to enter such an order shall not
affect the substitution."

[39] For an excellent discussion of the meaning and
application of the amended rule, see Wright, Substitution
of Public Officers:  The 1961 Amendment to Rule 25(d),
27 F.R.D. 221 (1962).

[40] Advisory Committee Note to 1961 amendment, reprinted
in 3B J. Moore, Federal Practice 578 (1968).

against a named officer, but intrinsically against the government. . . ."[41] Thus, rule 25(d) is applicable except when the officer is not acting under color of federal law or when he is personally liable in damages. Problems with respect to the substitution of officers have been eliminated.

Rule 25(d) also deals with the problem of misnomer. The constant growth and reorganization of the Federal Government make it difficult for even the well-informed citizen to be certain which officer or agency is responsible for a particular activity and under what official title. A statute often empowers a cabinet-level secretary to perform a particular function; a regulation of the secretary later delegates the function to a subordinate; a subsequent legislative reorganization proposal vests the function in a semi-autonomous board within the depart-ment; and later legislation may even transfer the board and function to another department. Instances of this type, in which it is difficult to determine precisely who is responsible for a particular activity, are frequent and familiar. The need is to ensure that a plaintiff who makes his intent to review a particular administrative activity

---

[41] Id.

176

fairly clear is not thrown out of court on the ground of
misnomer. Rule 25(d) of the Federal Rules of Civil Procedure
attempts to solve the problem by providing that "any misnomer
not affecting the substantial rights of the parties shall
be disregarded" and that the officer may be "described
as a party by his official title rather than by name."
The use of the official title without any mention of the
officer individually recognizes the intrinsic character
of the action and assists in eliminating concern with the
problem of substitution. In fact, when an action is
brought by or against a board or an agency that has
continuity of existence, naming the individual members
serves no useful purpose.[42]

C. Rule 15(c): Failure to Name
Any Appropriate Defendant

In some instances, the problem is more than misnomer
and involves the failure to name any appropriate officer
or agency as defendant. With respect to such a situation,
unjust results were frequent prior to the 1966 amendment
to rule 15(c). In these cases, most of which involved

_____

[42]See 3B J. Moore, Federal Practice ¶ 25.09 (1968);
Comment, 52 Mich. L. Rev. 433, 450 (1952).

attempts to obtain judicial review of social security

disability determinations, the plaintiffs mistakenly named

as defendants the United States,[43] the Department of Health,

Education, and Welfare,[44] the "Federal Security Administration"

(a predecessor agency),[45] and a Secretary who had retired

from office nineteen days before.[46] The statutory review

provision requires that judicial review of denials of

social security benefits be brought against the Secretary

within sixty days.[47] By the time the claimants discovered

their mistakes, the statutory limitation period had ex-

pired, and they were denied judicial review.[48]  Academic

---

[43]Cunningham v. United States, 199 F. Supp. 541
(W.D. Mo. 1959).

[44]Hall v. Department of Health, Education & Welfare,
199 F. Supp. 833 (S.D. Tex. 1960).

[45]Cohn v. Federal Security Administration, 199 F. Supp.
884 (W.D.N.Y. 1961).

[46]Sandridge v. Folsom, 200 F. Supp. 25 (M.D. Tenn. 1959).

[47]42 U.S.C. § 405(g) (1964).

[48]It is only fair to point out that Government took
administrative steps to cure the problem.  The Department
of Justice instructed United States Attorneys "to take
especial pains to be sure that our practice of advising
the plaintiff of the defect is followed where the plaintiff's
failure is noted before the running of the sixty-day limitation
period." Department of Justice Memorandum No. 380 (July 14,
1964).  The Secretary of Health, Education, and Welfare issued

178

criticism of these decisions[49] led to the inclusion of a
curative provision in the 1966 amendment to rule 15(c).
That provision states that an amendment of the pleadings,
adding or changing parties defendant in actions "with
respect to the United States or any agency or officer
thereof," relates back to the date of the original plead-
ing whenever process was delivered or mailed "to the United
States Attorney or his designee, or the Attorney General
of the United States, or an agency or officer who would
have been a proper defendant if named." This sentence
allows a plaintiff who is in doubt about the identity
of the proper officer or agency to commence his action by
serving process on one of those designated parties. Difficulty

---

48 continued a regulation liberally authorizing an extension
of time within which to file a new suit when an incorrect de-
fendant had been served within the statutory period. 29 Fed.
Reg. 8209 (1964), 20 C.F.R. § 404.954(b).

The problem, however, is not confined to social
security disability determinations. See, e.g., Bell
v. Groak, 371 F.2d 202 (7th Cir. 1966) (failure to perfect
service on all members of the Civil Service Commission);
Chournos v. United States, 335 F.2d 918 (10th Cir. 1964)
(the plaintiff named as defendants the Bureau of Land Manage-
ment and the Department of Interior rather than individual
officers; the court held that the named defendants "are not
suable entities"; M. G. Davis & Co. v. SEC, 252 F. Supp. 402
(S.D.N.Y. 1966) (nonstatutory review action challenging an
action of the Securities and Exchange Commission must be brought
against its individual members).

49 See Byse, Suing the "Wrong" Defendant in Judicial Review
of Federal Administrative Action, 77 Harv. L. Rev. 40 (1963).

in ascertaining the proper defendant is often understand-
able in light of the vast array of Government officers
and agencies and in light of the technicalities that govern
parties defendant.  Under rule 15(c) the plaintiff who has
served any one of the persons designated may correct his
pleading when the United States moves to dismiss on grounds
that a particular officer was not named or joined as a
defendant.[50]  Dismissal is proper under the amended Rules
only when the plaintiff fails to amend his pleading and
to complete service on the proper officer within a reason-
able time after the defect is raised.

_____

[50]Cases holding to the contrary either were decided
prior to the 1966 amendment of rule 15(c) or they are erroneous.
In Smith v. McNamara, 395 F.2d 896 (10th Cir. 1968), for example,
in which the court dismissed an action because the proper of-
ficer was not served, the court's attention was not directed
to the amendment of rule 15(c).
    There is a degree of tension between rule 4(d)(4) and
rule 15(c).  When the action "attack[s] the validity of an
order of an officer or agency not made a party," rule 4(d)(4)
requires that a copy of the summons and complaint be sent by
registered mail to such officer or agency.  Dismissals have
resulted in some cases when the plaintiff has failed to perfect
service on the officer or agency within a reasonable time.
Compare cases cited in note 16 _supra_, with cases cited in
note 18 _supra_.  On the other hand, rule 15(c) contemplates
great liberality in amending a complaint to add an additional
defendant who is indispensable, so long as the Government has
received notice of the action by service being made upon the
local United States Attorney, the Attorney General, or an officer
or agency who would be a proper defendant if named.  The under-
lying purpose of rule 15(c)--that a plaintiff's claim against
the Government should not be dismissed because the wrong de-
fendants were named--should take precedence over older notions
requiring service to be performed with punctillious exactitude.

180

A liberal application of these three remedial pro-
visions should prevent dismissals based on technicalities
of the law of officers, for the Congress and the drafts-
men of the Federal Rules have indicated with great clarity
that actions challenging federal conduct should be decided
on the merits rather than on narrow procedural grounds. Un-
fortunately, however, the attempts of Congress and the
draftsmen to ameliorate the law of parties defendant have
not been entirely successful. That failure results from
the fact that no attempt was made to change the law of
parties defendant, but only to alleviate particular problems
that had proven troublesome. Moreover, neither the Department
of Justice nor lower courts have accorded these measures the
liberal reception they deserve. Elimination of difficulties
in this area will come only if the choice of defendants and
their capacity to be sued is dealt with directly. Consequently,
further changes are required.

### III. PROPOSALS FOR REFORM

The partial elimination of sovereign immunity, proposed
in Recommendation 9 of the Administrative Conference,[51] will
help in solving the problems in the law of parties defendant

---

[51] Recommendation 9, Administrative Conference of the
United States (October 21, 1969).

JA765

by eliminating the related notion that the United States
is an indispensable party to certain actions.  But even
if the sovereign immunity and indispensable party doctrines
are eliminated as a barrier to judicial review of federal
administrative action, the technical requirements with
respect to parties defendant will remain as troublesome
relics of the past.  Thus, the elimination of sovereign
immunity is not enough; the technicalities themselves
must be eliminated.  This goal can be accomplished by
two amendments to the United States Code.  The first is an
amendment to section 703 of title 5, which is concerned
with form of proceeding in actions for judicial review,
to add the following language:

> If no special statutory review procedure
> is applicable, the action for judicial
> review may be brought against the United
> States, the agency by its official title,
> or the appropriate officer.[52]

---

[52] The quoted sentence was included in Recommendation 9
of the Administrative Conference of the United States, adopted
on October 21, 1969.  Recommendation 9 also would amend 5
U.S.C. § 702 to add the following sentence:  "The United States
may be named as a defendant in any such action [for judicial
review of administrative action], and a judgment or decree
may be entered against the United States."

The second reform is the amendment of section 1391(e) of title 28 to allow a plaintiff to utilize that section's broadened venue and extraterritorial service of process in actions in which non-federal defendants who can be served within the state in which the action is brought are joined with federal defendants.[53]  Such a provision would eliminate improper venue as an objection to such joinder, but would not affect the discretion of the court under the Federal Rules to determine that joinder was improper or not in the interests of justice in a particular case.

A.  Section 703:  Capacity to Sue an Agency
    by Its Official Title and Capacity to
    Sue the United States

When an instrumentality of the United States is the real defendant, and an authorized legal representative of the United States has been served, the names on the pleading should be irrelevant.  The plaintiff should have the option of naming as defendants the United States, the agency by its official title, appropriate officers, or any combination of them, and the outcome should not turn on the plaintiff's choice.  The proposed amendment of section 703 will accomplish these ends.

_____

[53]See the proposed revision of 28 U.S.C. § 1391(e) in the conclusion of this Report.

JA767

183

1.  Capacity to sue an agency by its official

title.  The lower federal courts, at the behest of Govern-
ment lawyers, continue to dismiss actions of which the
Government has received adequate notice, on the ground that
other names should have gone on the pleadings.  A recent
suit against "the Chairman, Civil Service Commission" was
dismissed because the other Commissioners were indispensable
parties.[54]  Since rule 25(d) provides that a public officer
"may be described as a party by his official title rather
than by name," the defect would not have been present if
the suit had been brought against "the members of the
United States Civil Service Commission."  Dismissals of
this type since the effective date of the 1966 amendment
to rule 15(c) are questionable, since rule 15(c) allows
the plaintiff who has served process on the local United
States Attorney, the Attorney General, or the agency to
amend his pleading without penalty.[55]

---

[54]Congress of Racial Equality v. Commissioner,
270 F. Supp. 537, 542 (D. Md. 1967) (alternative holding).
See also Bell v. Groak, 371 F.2d 202 (7th Cir. 1966).

[55]See text accompanying notes 33, 50 supra.

JA768

184

Allowing the plaintiff to sue the agency by its official title would be a step in the right direction.[56] Under the proposal an "agency," as defined in the APA, would possess a limited capacity to be sued, applicable only to actions seeking judicial review of the agency's activities. The agency could not be sued in other types of actions, such as one to recover damages in tort. In this way, one common type of defect concerning the naming of parties defendant would disappear.

   2. Capacity to sue the United States. The suit against the officer, challenging his official conduct, served a useful purpose as a device for circumventing

---

[56]The Task Force of Legal Services and Procedures of the Commission on Reorganization of the Executive Branch (Second Hoover Commission) recommended that "any problem of just who the true defendant is" should be avoided by allowing proceedings for review to be brought against "(1) the agency by its official title, (2) individuals who comprise the agency, or (3) any person representing an agency, or acting on its behalf or under color of its authority." Report 211 (March 1955).

   Proposed revisions of the APA have also included language amending § 10(b), now 5 U.S.C. § 703, to provide that "[t]he action for judicial review may be brought against the agency by its official title." An accompanying committee report stated: "This language would not preclude the bringing of the action against the individual comprising the agency or any person representing the agency or acting on its behalf in the matter under review. Bringing the action against the agency by name, however, would be simpler and more effective and would avoid those technical difficulties encountered in the past when the officials against whom an action was brought have resigned or have died or have been replaced for some other reason." S. Rep. No. 1234, 89th Cong., 1st Sess. 23 (1966).

the sovereign immunity doctrine.  Once sovereign immunity
is tamed, however, requiring the plaintiff to cast his
suit in that form is no longer essential.  Everyone
recognizes that the suit is in fact against the United
States or one of its agencies and involves the legality
of governmental action.  The important objective at this
point is to eliminate any remaining technical requirements.
This objective is best achieved by allowing the plaintiff
a wide choice in naming defendants and sanctioning his
choice whatever it may be.  The United States should be one
of the available alternatives.  The complaint, of course,
must indicate the nature of the plaintiff's claim and
service of process under rule 4(d)(4) will suffice to give
Government lawyers adequate notice of the claim.

Professor Davis has urged the adoption of a statutory
proposal that would tie the elimination of sovereign
immunity to a form of suit in which the United States
is named as defendant.[57] That proposal would discourage

_____

[57]The statutory proposal advanced in 3 K. Davis,
Administrative Law Treatise § 27.10, at 165 (Supp. 1968),
did not tie waiver of sovereign immunity to a form of suit
in which the United States is named as defendant, but
Professor Davis has advanced this position in subsequent
letters and memoranda sent to the author.

186

the suit against the officer and gradually displace it

with an action against the United States.  One objection

to Davis' position is that a mandatory requirement of

form of suit creates a new technical trap that some lawyers

and plaintiffs would be certain to fall into.  Moreover,

the profession is familiar with the suit against the officer

or agency, and federal statutes and the Federal Rules of

Civil Procedure have been drafted in the light of existing

practice.  Fundamental changes in the form of the suit

would require reconsideration and possible revision of

these other provisions.[58]  Settled rules concerning

---

[58]Revision of § 1391(e) of the Judicial Code to allow the
use of extraterritorial service of process and local venue when
the United States is named as a defendant in an action for judi-
cial review is desirable in its own right.  Section 1391(e) at
present does not appear to be applicable to suits against the
United States eo nomine, since the United States cannot be con-
sidered to be an "officer or agency" of the United States.  Al-
though there is a special venue provision dealing with actions
in which the United States is a defendant, that provision, 28
U.S.C. § 1402 (1964), applies to only three kinds of damage actions
brought under 28 U.S.C. § 1346 (1964) (Tucker Act cases, Federal
Tort Claims Act cases, and federal tax cases).  In addition, the
general venue provision applicable to federal-question cases, 28
U.S.C. § 1391(b) (1964), is difficult to apply, since it allows
the action to be brought only in the district in which "all de-
fendants reside, or in which the claim arose."  If the United
States, like a corporation, resides where it is doing business,
that is, everywhere, the general venue provision of § 1391(b)
is too broad, since suit could be brought on any claim in any
judicial district chosen by the plaintiff.  On the other hand,
if, as seems more likely, a residence cannot be attributed to

legal representation of governmental interests might also be affected.[59] Besides, the form of suit against the officer or agency, when relieved of the artificialities of the sovereign immunity doctrine, is not distasteful. On the contrary, the individual is in fact complaining about the conduct of a particular officer or agency and there may be psychic advantages in allowing him to bring his suit against the officer or agency that allegedly has harmed him. In addition, the anonymity of the United States will bury all cases involving nonstatutory review in indices and case finders with all criminal cases and damage cases under the uninformative heading of "Doe v. United States." The nature of the case is revealed much more by "Doe v. Laird" or "Doe v. Secretary of Defense."

---

[58] continued the United States, the action may be brought only where the cause of action arose, a much narrower venue choice than that provided by 28 U.S.C. § 1391(e) (1964), which was drafted with the situation of the suit against the officer in mind. In short, broadened venue of judicial review actions in which the United States is named as a defendant is a desirable reform in any event. It becomes a necessity if the plaintiff, in order to circumvent sovereign immunity, is required to bring his action against the United States. Without the reform, the inconvenience and unfairness of requiring plaintiffs to come to Washington, D.C. to attack local administration of federal activities would be recreated.

[59] This problem is not likely to be a very serious one. See text accompanying notes 68-70 infra.

188

The problems with the suit against the officer or agency,
then, are not in its form.  Rather the problems revolve
around the technical rules that some courts have applied
on such matters as capacity of an agency to be sued,
identification of the proper officer, and indispensability
of superior officers.  Most of these matters have been
solved, and the proposal advanced in this Report would
complete the task.

B.  Section 1391(e):  Joinder of Third
    Persons as Parties Defendant

For reasons of its own convenience in litigation, the
Department of Justice prefers to have federal interests
and federal law resolved in law suits in which the De-
partment can exercise a high degree of control over the
joinder of related parties and issues.  United States Attorneys
are told that "they are not authorized to waive objections
as to . . . third-party joinders and the like, without first
clearing such matters with the Civil Division [in Washington]
which in turn will clear them with the affected agencies."[60]
When section 1391(e) was enacted in 1962, the availability

---

[60]U.S. Dept. of Justice, Manual for United States
Attorneys, Tit. 3, p. 3 (1962).

JA773

of the extraterritorial service of process and the broadened
venue was limited--apparently at the behest of the Depart-
ment of Justice--to judicial review actions "in which <u>each</u>
defendant is an officer or employee of the United States
or an agency thereof."[61]

Remarkable as it may seem, there is a conflict of
authority on whether the statute means what it says--that
the plaintiff cannot join nonfederal third persons as
defendants in an action under section 1391(e).[62]  Indeed,
apart from the language, there is no functional justification
for this limitation, for it prevents relief in some
situations in which the federal courts can make a special

---

[61]28 U.S.C. § 1391(e) (1964) (emphasis added).
The legislative history provides no explanation for the
inclusion of the word "each." See S. Rep. No. 1992,
87th Cong., 2d Sess. (1962).

[62]Compare Chase Sav. & Loan Assn. v. Federal Home
Loan Bank Bd., 269 F. Supp. 965 (E.D. Pa. 1967), in which
the court dismissed an action joining the federal board
and a local bank, on the ground of improper venue, with
Powelton Civil Home Owners Assn. v. HUD, 284 F. Supp.
809, 833 (E.D. Pa. 1968), in which the court held that
effectuation of the "apparent intent" of § 1391(e)
requires that the "each defendant" language be read as
referring "only to defendants who are beyond the forum's
territorial limits." Hence, the court held, the joinder
of state officers who could be served within the district
was proper.

47-534 O  70 - 13

contribution.[63]  In many public land controversies, for

example, three parties are involved--the official, a

successful applicant, and an unsuccessful one.  Effective

relief cannot be obtained in an action in which the United

States or its officer is not involved; but if the Govern-

ment is named as defendant, section 1391(e) prevents the

joinder of the other private person as a defendant, and

that person cannot be joined as a plaintiff because his

---

[63]In Town of East Haven v. Eastern Airlines, 282
F. Supp. 507, 510-11 (D. Conn. 1968), the court reluctantly
dismissed for improper venue after criticizing the require-
ment of § 1391(e) that "each" defendant be a federal officer
or agency:  "The wording does prevent the hardship which
could result if a non-government defendant were subjected
to the provision's liberal service of process and venue rules
merely because the government was also joined as a defendant
in the same action.  But the wording does appear unnecessarily
broad and without justification where there is independent
authority for service of process and venue with respect to
each non-government party joined as a defendant.  The only
possible argument in support of the requirement in such
instances is that enough of a burden has been placed on
government officials and agencies by subjecting them to
suits away from their official residences without placing
upon them the additional burden of defending a suit with
non-government co-defendants.  The weakness of this argument
is evident.  The burden, if it is one at all, cannot be a
great one and certainly is minor in comparison to the burden
placed on the plaintiff of having to bring separate actions.
At any rate, there is no indication that Congress was acting
to avoid this additional burden upon the government."

191

interest is adverse to that of the plaintiff.[64] Another

common type of situation in which the limitation is

troublesome is that in which specific relief is sought

against federal and state officers who are cooperating

in a regulatory or enforcement program.[65]

The crux of the matter is whether there are sound

reasons of policy for excepting actions brought against

federal officers or agencies from the general principles

that control party joinder in federal courts. The

embarrassment of being joined as a defendant by state

officers or private persons with whom it may be alleged

that federal officials cooperated does not seem to be

a sufficient basis for special treatment. Thus, section

---

[64]Section 1391(e) is unavailing in the typical case
involving the use of public lands. In such a case, the
Secretary of the Interior makes an award to an individual
defendant but the plaintiff claims a right to it. The
problem arises since the plaintiff is unable to join the
Secretary and the individual defendant as parties defendant
without creating a venue objection. The same problem of
parties emerges, moreover, if the court proceedings take
the form of an action between private parties--an action in
which the Secretary is not heard and in which the United
States may not be named without danger of a dismissal
on the ground that the suit is one against the United
States and hence not maintainable without the latter's
consent. For the protection of third parties, private
or governmental, the laws relating to the federal court
system are simply inadequate.

[65]See cases cited in notes 62-63 supra.

1391(e) should be amended to allow for effective relief and bind-
ing judgments in multiple party situations. Deletion of the word
"each" and substitution of "a" will accomplish part of this
objective. The addition of a new sentence permitting joinder of
non-federal defendants who can be served in accordance with the
normal rules governing service of process, would cure the venue
objection that now stands in the way of convenient and appropriate
joinder. Other objections to such joinder, stemming from the
discretion vested in the trial judge under the Federal Rules to
control the dimension of the lawsuit and to protect particular
parties, would be unaffected. Since the plaintiff must state a
substantial claim against federal officers, use of this special
venue provision as a sham to circumvent other venue requirements
will not be a problem.

     C.   Role of the Justice Department

    If these statutory reforms are to be effective, the Department
of Justice must make firm efforts to instruct its lawyers and
United States Attorneys not to raise technical defects with respect
to the naming of parties defendant but to take active steps to cure
such defects. Once a plaintiff has stated the gravamen of his
complaint and has served process in accordance with rule 4(d)(4),
the burden should be on the Department to determine who within our
complex federal establishment is responsible for the alleged
wrong.[66] If there are reasons for joining that

------

    [66]Cf. the provisions of the Crown Proceedings Act of
Great Britain. Section 17(3) of that Act provides that in
tort claims against the government such "[c]ivil proceedings

individual or agency as a party defendant, the Department
of Justice should take the initiative in adding the desired
party defendant.  In any case, the Department should <u>never</u>
urge that a case be dismissed because of technical defects
about naming parties defendant.[67]

    D.  <u>Legal Representation and Res Judicata</u>

    The proposed amendments advanced with respect to
parties defendant raise two potential problems.  The first
concerns the proposal allowing but not requiring a plain-
tiff to bring his action for judicial review against the
United States:  if a plaintiff did bring such an action,
would it affect the question of whose lawyers should
represent the defendant?  The problem arises because the
Department of Justice alone is authorized to defend "the
United States" in court[68] while a limited number of federal

---

    [66] continued against the crown shall be instituted against
the appropriate authorized Government department, or, if none
of the authorized Government departments is appropriate <u>or
the person instituting the proceedings has any reasonable
doubt whether any and if so which of those departments is
appropriate, against the Attorney General</u>."  10 & 11 Geo.
6, c. 44 (1947).

    [67] See text accompanying note 34 <u>supra</u>.

    [68] See Exec. Order No. 6166 (June 10, 1933), 3 C.F.R.
which concentrated all government litigation functions in the
Department of Justice.  For a partial list of statutes and
executive orders with respect to the conduct of government litiga-
tion by lawyers of agencies other than the Department of Justice,
see D. Schwartz & S. Jacoby, Government Litigation--Cases and
Notes 26-27 (1963).

194

agencies have authority to defend their own orders in suits
brought against them. The proposal's potential impact,
however, appears to be nonexistent. The provisions
authorizing agencies to defend their own orders are
generally part of statutory review provisions such as
the Judicial Review Act of 1950.[69] Since specific statutory
review provisions are unaffected by the proposal, and
since nonstatutory review actions against those agencies
must now--at least in theory--be defended by the Department
of Justice, the opportunity to name the United States
could affect the question of representation only if an
agency has general authority to represent itself <u>and</u>
suits to review its orders need not be brought under
special statutory review provisions.[70] Although there

---

[69]28 U.S.C. §§ 2341-2351 (Supp. IV, 1965-1968).

[70]The authority of the ICC "to appear for and represent
the Commission in any case in court" appears to be so broad
and specific [49 U.S.C. § 16(11) (1964)] that it would not
be overridden by a general provision allowing the plaintiff,
in nonstatutory review actions, to name the United States as
defendant. The question, of course, might never arise
because judicial review of ICC orders is controlled by
exclusive and detailed statutory provisions which provide
for parties defendant and for separate representation of
the Commission by its own lawyers.

JA779

might be such a situation, none has been found.  This
particular problem, of course, is of interest only to
Government lawyers who are attuned to intragovernmental
feuding and are sensitive to the desire of agencies to
control the defense of their own activities.

The second problem raised by the proposals concerns
the effect on the United States of a judgment rendered
in a suit against an officer or agency.  The theory of the
officer's suit is that the officer, by acting unconstitutionally
or in excess of his authority, is no longer acting in his
official capacity.  This fiction allowed circumvention
of sovereign immunity, but raised questions concerning
the judgment's binding effect on the United States, which
was not and could not be made a party.[71]  A long line of cases
states the rule that the United States is not bound by a

---

[71]See, e.g., Carr v. United States, 98 U.S. 433 (1878),
in which the Court held that the United States was not pre-
cluded by a judgment in an ejectment suit brought by the
present defendant's predecessor against Government agents
who were in possession of the disputed land.  See also
Stanley v. Schwalby, 162 U.S. 255 (1896).  In Land v. Dollar,
330 U.S. 731, 736 (1947), in which the Court held that a
suit against an officer was not barred by sovereign immunity,
Justice Douglas twice stated that "an adjudication [against
the officer] is not res judicata against the United States
because it cannot be made a party to the suit."  A similar
statement was repeated in his dissenting opinion in Malone
v. Bowdoin, 369 U.S. 643, 650 (1962).

196

judgment in an unconsented in personam action against one of its officers.[72] These cases rest on the premise that, since only Congress can waive sovereign immunity, it would be anomalous to allow the same result to be reached by the decision of a Government lawyer to defend a suit brought against an officer.  If sovereign immunity is eliminated in actions for specific relief, however, the limited effect of a judgment against an officer would vanish with the disappearance of its underlying rationale.  The suit against the officer who is acting in his official capacity would be seen as it really is--as an action against the United States brought with its consent.

As a matter of general policy the Department of Justice affords counsel and representation to federal employees when suits are brought against them in connection with the

---

[72]See, e.g., Stanley v. Schwalby, 162 U.S. 255, 270 (1896): "The United States, by various acts of Congress, have consented to be sued in their own courts in certain classes of cases; but they have never consented to be sued in the courts of a State in any case.  Neither the Secretary of War nor the Attorney General, nor any subordinate of either, has been authorized to waive the exemption of the United States from judicial process, or to submit the United States, or their property, to the jurisdiction of the court in a suit brought against their officers. . . .  The answer actually filed by the District Attorney, if treated as undertaking to make the United States a party defendant in the cause, and liable to have judgment rendered against them, was in excess of the instruction of the Attorney General, and could not constitute a voluntary submission by the United States to the jurisdiction of the court."

197

performance of their official duties.[73] The policy extends
even to in personam actions that arise out of their official
duties. A few cases, difficult to reconcile with the larger
number to the contrary,[74] apply more usual notions of collateral
estoppel in holding that the United States is bound by a
judgment against its officers, when authorized legal
representatives of the United States have represented the
officer and controlled the defense.[75] With the partial
elimination of sovereign immunity, these decisions will
represent federal law. General principles of res judicata
and finality support the proposition that the United States
should be bound by a judgment when it has controlled the

---

[73]U.S. Dept. of Justice, Manual for United States
Attorneys 4 (1962). See also D. Schwartz & S. Jacoby,
Government Litigation--Cases and Notes 19-20 (1963).

[74]See cases cited in notes 71-72 supra.

[75]See, e.g., United States v. Candelaria, 271 U.S.
432, 444 (1926), in which the Court held that the United
States was estopped from asserting title to land claimed
by an Indian pueblo if the United States had employed
and paid a special attorney to litigate title on behalf
of the pueblo in a prior suit. See also Drummond v.
United States, 324 U.S. 316 (1944), in which the Court
held that payment by the United States of the fee of an
attorney who represented an Indian in land litigation did
not bind the United States; the Court stated that in order
to bind the United States "when it is not formally a
party it must have a laboring oar in the controversy".

JA782

198

defense in a suit against the officer.[76] In the future it
will appear natural and just if the United States is pre-
cluded under such circumstances and unconscionable if
the United States is not bound.

IV.  CONCLUSION

The remaining problems associated with the law of
parties defendant are overdue for total elimination.
The Department of Justice should take active steps to
instruct its lawyers not to seek dismissal of cases seek-
ing judicial review of federal administrative action on the
basis of technical defects in parties defendant.  Congress,
by adopting the provisions indicated below, can make a substantial
contribution to society through rationalizing a complex and
intricate specialty of federal law.[77]

---

[76]See, e.g., Souffront v. Compagnie des Sucreries, 217 U.S.
475, 486 (1910): "The persons for whose benefit, to the know-
ledge of the court and of all the parties to the record, litiga-
tion is being conducted cannot, in a legal sense, be said to be
strangers to the cause.  The case is within the principle that
one who prosecutes or defends a suit in the name of another to
establish and protect his own right, or who assists in the
prosecution or defense of an action in aid of some interest
of its own, and who does this openly to the knowledge of the
opposing party is as much bound by the judgment and as fully
entitled to avail himself of it as an estoppel against an
adverse party, as he would be if he had been a party to the
record."

[77]Language to be added is in italics; language to be
deleted is blocked out.

199

UNITED STATES CODE
Title 5

§ 703.  Form and venue of proceeding

The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence of inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction.  <u>If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer.</u>  Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provied by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

Title 28

§ 1391.  Venue generally

* * * *

(e) A civil action in which ~~each~~ <u>a</u> defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority,

JA784

200

or an agency of the United States, <u>or the United States</u>,
may, except as otherwise provided by law, be brought in
any judicial district in which:  (1) a defendant in the
action resides, or (2) the cause of action arose, or
(3) any real property involved in the action is situated,
or (4) the plaintiff resides if no real property is involved
in the action.  <u>Additional persons may be joined as parties
to any such action in accordance with the Federal Rules of
Civil Procedure without regard to other venue requirements</u>.

The summons and complaint in such an action shall
be served as provided by the Federal Rules of Civil Pro-
cedure except that the delivery of the summons and com-
plaint to the officer or agency as required by the rules
may be made by certified mail beyond the territorial limits
of the district in which the action is brought.

––––––––––

JA785

201

## APPENDIX II

*Professor Davis advocates enactment of S. 3568. He builds upon his comprehensive treat-*
*ment of sovereign immunity in his Treatise and Supplement.—The Editors.*

### SOVEREIGN IMMUNITY MUST GO

#### KENNETH CULP DAVIS[*]

Yes, sovereign immunity must go. And maybe it is about to go. The
House of Delegates of the American Bar Association in February, 1970,
adopted in principle a proposal of the Administrative Law Section to get
rid of nearly all the remnants of the doctrine in the federal courts, and
the Administrative Conference had previously adopted a similar
proposal. Now both organizations are jointly sponsoring the measure in
Congress. The specific proposal is set forth and explained near the end
of this discussion.

The present commentary is designed to present some main ideas
about sovereign immunity, building upon but not repeating the
comprehensive ninety-page treatment in chapter 27 of the Administrative
Law Treatise and its 1965 Supplement.[1]

Sovereign immunity (1) often causes serious substantive injustice,
(2) frequently results in final determinations without the safeguards that
are necessary for procedural justice, and (3) causes gross inefficiency in
the allocation of functions between officers and agencies, by preventing
courts from resolving controversies they are especially qualified to
resolve.

Although the substantive injustice caused by sovereign immunity is
widely recognized by thoughtful lawyers, the procedural injustice is
usually overlooked. What happens is that officers whose action is
judicially unreviewable because of sovereign immunity normally lack
incentive to provide the kind of procedural safeguards that courts would
insist upon if sovereign immunity did not cut off review. For instance,
when issues of fact and of law arise between government officers and a
private party as to who owns a piece of land, due process—apart from
sovereign immunity—would require submission of the issues to an
impartial tribunal for taking evidence, making findings on the record,
and receiving written or oral argument on the law. But officers of the
Department of the Interior acknowledge that when they are protected by

---

[*]John P. Wilson Professor of Law, The University of Chicago.

[1]The scholarly writers are unanimous in the view that sovereign immunity causes a good
deal of injustice and should be abolished. The literature is rather rich. Two outstanding
articles are Byse, Proposed Reforms in Federal "Nonstatutory" Judicial Review:
Sovereign Immunity, Indispensable Parties, Mandamus, 75 Harv. L. Rev. 1479 (1962);
Cramton, Nonstatutory Review of Federal Administrative Action: The Need for Statutory
Reform of Sovereign Immunity, Subject Matter Jurisdiction, and Parties Defendant, 68
Mich. L. Rev. 389 (1970).

202

sovereign immunity, the customary system is for the very officers who are engaged in the controversy with the private party to make the decision, without taking evidence, without allowing cross-examination or rebuttal, without receiving briefs or hearing oral argument, and without even pretending to use an impartial tribunal.

The allocation of functions that results from sovereign immunity is atrocious. Our normal system sensibly allocates functions between officers and courts on the basis of comparative qualifications so that controversies about governmental policies are decided primarily by officers and controversies about constitutionality or statutory interpretation or property law or commercial law are resolved primarily by judges. When the sovereign is held immune, courts are ousted from handling the very type of issues they are especially qualified to handle.

The strongest support for sovereign immunity is provided by that four-horse team so often encountered—historical accident, habit, a natural tendency to favor the familiar, and inertia. Nothing else supports sovereign immunity, despite the many recitations in judicial opinions that a court cannot "stop the government in its tracks" or interfere in public administration. What the courts should recite is largely the opposite—that courts should decide issues between government officers and private parties whenever the issues are appropriate for judicial determination, that courts do and should stop officers in their tracks when the officers are acting illegally and when the subject matter is within the competence of judges, and that courts should interfere in public administration to exactly the extent that is provided by the Administrative Procedure Act, that is, to the extent that the officers' action is found to be unconstitutional, in excess of statutory authority, an abuse of discretion, without procedure required by law, or based on findings unsupported by substantial evidence.[2] Since courts are accustomed to stopping even Congress and the President in their tracks when programs are held unconstitutional, the many judicial recitations that courts cannot stop a single officer in his tracks even when a court finds that he is acting illegally and doing irreparable damage to the plaintiff are very much in need of reexamination.

To improve substantive justice, to enforce procedural justice, and to allocate functions efficiently, Congress should abolish nearly all of what is left of sovereign immunity.

### I. An Overall Perspective, Federal and State

Courts created sovereign immunity. Whether kings or others at one time could justify the doctrine seems unimportant in comparison with the needs of modern justice. The Supreme Court in 1882 acknowledged that sovereign immunity "has always been treated as an established

---

[2] 5 U.S.C. § 706.

203

doctrine'' without judicial discussion of pros and cons.[3] Comparative research has demonstrated that the United States in retaining the doctrine is out of line with other parts of the world.[4] Casuistry about the question whether a legal right can exist against the authority that makes the law on which the right depends[5] has to yield to the practical fact that the federal government can and does often commit itself to obey judgments of courts in cases to which it is a party.

Of the whole fabric of sovereign immunity that once existed in federal and state courts, much more than half has been torn away. Congress abolished an enormous chunk of sovereign immunity in 1855 when it created the Court of Claims and another big chunk in 1946 when it enacted the Federal Tort Claims Act. Governmental responsibility in contract for more than a hundred years and in tort for more than twenty years has been wholly successful; the main unsatisfactory result has been uncertainty—stemming from incompleteness of governmental responsibility—a result that is mostly remediable through further legislation. No movement has developed to restore the chunks of sovereign immunity that have been abolished. Instead, Congress has many times enlarged the jurisdiction of the Court of Claims and of other courts to award judgments against the government, and in 1966 it legislated to facilitate payment of tort claims against the government, even without judicial determinations.[6]

In the states, the statutory picture is diverse and complex, but a good guess is that far more deserving claims against state and local governments are honored than are denied; this remark applies to tort claims, contract actions, and suits for specific relief. The satisfaction of claims comes about in many ways, including inexcusably cumbersome and expensive legislative relief through private laws, insurance arrangements, indemnification of public officers and employees, courts of claims or the equivalent, statutes creating public liability in the ordinary courts, and judicial abolition of sovereign immunity or of segments of it.[7]

Astonishing and dramatic is the action of eighteen state courts during the 1960's in boldly abolishing the immunity from tort liability of either state or local governments or both, despite the extreme difficulty of constructing an alternative system through judicial announcement.[8]

---

[3] United States v. Lee, 106 U.S. 196, 207 (1882).

[4] Borchard, Government Liability in Tort, 34 Yale L.J. 1 (1934).

[5] See Holmes, J., in Kawananakoa v. Polyblank, 205 U.S. 349, 353 (1907).

[6] 80 Stat. 306 (1966), 28 U.S.C. § 2672.

[7] See the full discussion in 3 Davis, Administrative Law Treatise ch. 25 (1958) and (Supp. 1965).

[8] For discussion of the development and of the first thirteen cases, see id. § 25.01 (1965

204

Some other state courts have acknowledged the need for abolition of sovereign immunity but have explicitly left the task to the legislatures.

The present need is especially for reducing federal sovereign immunity in suits for specific relief, but this subject can be better seen in perspective by mentioning four other changes that are needed in order that we may be rid of sovereign immunity: (1) All legislatures of states that retain some portion of sovereign immunity from tort liability should take full advantage of the superb work done by the California Law Revision Commission in the planning of legislation to create tort liability of governmental units—planning that was immediately adopted by the California Legislature and that is now the basis for a better brand of California justice.[9] (2) Each state has its own system with respect to granting and denying specific relief against state and local governments, agencies, and officers; usually such sovereign immunity of this kind as still continues should be abolished, but each state must tailor a statute to its unique legal settings. (3) Congress should plug up the principal hole that unnecessarily remains in the Federal Tort Claims Act—the immunity from liability for specified deliberate torts. For no good reason—for no reason whatsoever disclosed in the legislative history—government liability was withheld for "Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights."[10] Illogical and unexplained are such exceptions along with government liability for such important deliberate torts as trespass and conversion, and for many less frequent deliberate torts such as willful invasion of privacy. The "discretionary function exception"[11] is essential and something of the sort must be retained,

---

Supp.) In addition, see Parish v. Pitts, 244 Ark. 1239, 429 S.W.2d 45 (1968); Klepinger v. Board, 239 N.E.2d 160 (Ind. App. 1968), but cf. Perkins v. State, 251 N.E.2d 30 (Ind. 1969); Carroll v. Kittle, 203 Kan. 841, 457 P.2d 21 (1969); Stadler v. Board of Regents of the University of Nebraska, 182 Neb. 6, 151 N.W.2d 915 (1967); Brown v. City of Omaha, 183 Neb. 430, 160 N.W.2d 1968 (1968); Haney v. City of Lexington, 386 S.W.2d 738 (Ky. 1964). See also Spencer v. General Hospital of the District of Columbia, U.S. App. D.C.        F.2d        (1969).

[9]Calif. Gov't Code §§ 810-960.5, enacted 1963; Calif. Law Revision Comm., A Study Relating to Sovereign Immunity (Sacramento, State Printing Office, 568 pages, 1963); and see especially Arvo Van Alstyne, California Government Tort Liability (Calif. Continuing Education of the Bar, Prac. Book No. 24, 898 pages, 1964), and Supplement (1969).

[10]28 U.S.C. § 2680(h). "No persuasive reason has ever been advanced for their [the excepted wilful torts'] having been excluded from the reach of the Tort Claims Act." Gellhorn and Lauer, Federal Liability for Personal and Property Damage, 29 N.Y.U.L. Rev. 1325, 1341 (1954).

[11]28 U.S.C. § 2680(a). The basic problem is especially well presented in Weiss v. Fote, 7 N.Y.2d 579, 200 N.Y.S.2d 409, 167 N.E.2d 63 (1960).

205

although it has been the subject of much litigation and although an amendment to correct inconsistent interpretations may at some point be desirable. (4) Jurisdiction of the Court of Claims and of the district courts under the Tucker Act should be rounded out to terminate the uncertainty as to governmental liability for breach of contracts implied in law.[12]

## II.  THE BACKGROUND LAW ABOUT SUITS IN FEDERAL COURTS FOR SPECIFIC RELIEF

The most frequent injustice in federal courts from sovereign immunity occurs in suits for declaratory, injunctive, or mandatory relief, even when officers are named as defendants. In such suits, *sovereign immunity is today a larger barrier to justice than it was a quarter of a century ago.*

The basic theory of the present law is that a plaintiff may sometimes circumvent sovereign immunity by naming an officer as defendant, even when the reality is that the suit is against the United States. The two foundation cases are Ex parte Young[13] and Philadelphia Co. v. Stimson,[14] which established that an officer who acts unconstitutionally or in excess of statutory authority is "stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct."[15] The idea is that the relief is awarded against the officer, not against the sovereign; illogically, the officer is deemed an individual for purposes of sovereign immunity, but he is deemed an officer for purposes of applying constitutional limitations which affect governments but not individuals.

The two foundation cases involved judicial creativeness in getting around sovereign immunity. *The purpose was to allow suits that are*

---

[12] In United States v. Minnesota Mutual Investment Co., 271 U.S. 212 (1926), the United States had collected interest on a fund belonging to the claimant, but the Court held that in absence of a contract the claimant could not recover the interest, even if the United States had no right to it: "An implied contract in order to give the Court of Claims or a district court jurisdiction under the Tucker Act jurisdiction to give judgment against the Government must be one implied in fact and not one based merely on equitable considerations and implied in law." 271 U.S. at 217. See also United States v. Algoma Lumber Co., 305 U.S. 415, 423 (1939). Whether the limitation on jurisdiction continues seems unclear, but the court recognized the limitation in J.C. Pitman & Sons v. United States, 317 F.2d 366 (Ct. Cl. 1963). The court said of the Tucker Act in Northwest Publications v. United States, 253 F. Supp. 828, 829 (D.D.C. 1966): "No jurisdiction exists over a suit against the United States on quasi contract."

[13] 209 U.S. 123 (1908).

[14] 223 U.S. 605 (1912).

[15] 209 U.S. at 159-60.

47-534 O - 70 - 14

206

*really against the government. But the courts have gradually moved away from that purpose.* In recent years the courts keep discovering that a particular suit is "really" against the government, and that therefore it is barred; such discoveries are made even when unconstitutionality or excess of authority is asserted. The movement from the foundation cases has gone so far that in its latest pronouncement on the subject the Supreme Court has declared that the general rule is that a decree may not operate against the sovereign.[16] Yet in the Young case, for instance, the relief the Court upheld did operate against sovereign, for it enjoined the officer from carrying out the legislative will embodied in an enactment.

The best route for *judicial* reform of the law of sovereign immunity probably would be for the courts to return to the two foundation cases and, in addition, to hold that in absence of clear statutory authority an officer lacks authority to commit a trespass or other tort, to violate a private party's contract or property rights, or to take other action which interferes with what the court recognizes as legal rights of a private party. But as of 1970 judicial reform seems improbable; the movement during the 1960's was probably in the direction of further strengthening of sovereign immunity.

The worst of the present law is that sometimes sovereign immunity even cuts off judicial inquiries into unconstitutionality or excess of authority. The cornerstone of federal law of sovereign immunity for two decades has been the Larson case, and in that opinion the Supreme Court declared:

> Of course, a suit may fail, as one against the sovereign, *even if it is claimed that the officer being sued has acted unconstitutionally or beyond his statutory powers,* if the relief requested cannot be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign or the disposition of unquestionably sovereign property.[17]

Even though the statement just quoted is not always the law, it clearly is in some cases, and when it is, the result usually involves substantive injustice, procedural injustice, and gross misallocation of functions.

Let us look at a few samples.

---

[16] The Court said that "The general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter." Hawaii v. Gordon, 373 U.S. 57, 58 (1963).

[17] Italics added. Larson v. Domestic & Foreign Corp., 337 U.S. 682, 691 (1949).

207

### III. SOME SAMPLES OF INJUSTICE

In ᴛhe 1968 case of Simons v. Vinson,[18] the plaintiffs claimed ownership of "approximately 999.95 acres" of accreted land on the Red River, the boundary between Texas and Oklahoma. Officers of the Interior Department claimed the land on behalf of the United States, had leased it to a producer of oil, and were collecting oil royalties. Plaintiffs brought suit to quiet title, naming as defendants the Department of the Interior and two of its bureaus, the lessees, and the producing oil company. The district court dismissed because of sovereign immunity and denied a motion to amend the complaint to name individual officers as defendants. The Fifth Circuit affirmed, thus holding that even if the officers were named as defendants, sovereign immunity barred the suit.

The court found the question so easy that its discussion of the law fills only about one page. It called the proffered amendment "an unsophisticated attempt to avoid the defense of governmental immunity by naming as defendants the officers of the particular government agencies alleging that these officers acted beyond their authority,"[19] Then the court uttered the central proposition of the opinion:

> Generally, the relief sought nominally against an officer is against the sovereign if the decree would operate against the sovereign.[20]

After bolstering that proposition with a quotation from the Supreme Court,[21] the court said that the relief sought "would of necessity operate against the government."[22] Even if the officers were acting in excess of their statutory authority, sovereign immunity was a bar, the court said, because:

> Appellants attempt to show that appellee Lessors, by leasing oil and gas rights to the disputed land, have acted ultra vires their authority. However, this circuitous argument is based on appellants' assumption that the land in question belongs to

[18]394 F.2d 732 (5th Cir. 1968).
[19]394 F.2d at 736.
[20]Ibid.
[21]"The general rule is that a suit is against the sovereign if 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration,' [citation] or if the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act.'" Dugan v. Rank, 372 U.S. 609, 620 (1963).
[22]394 F.2d at 736.

208

appellants and not to the United States. Appellants contend that a decision by the District Court on the merits would prove their ownership. Appellants in "bootstrap" fashion would have the Court assume the very fact they desire to prove. However, in order so to prove appellants must necessarily sue the United States. Our original principle that absent its consent the United States may not be sued forecloses such a suit. Dismissal, therefore, was proper.[23]

The court by circuitous logic rejected the plaintiffs' argument as circuitous. But the holding was clear: The plaintiffs will not be allowed to show that the officers "have acted ultra vires their authority." Sovereign immunity barred the suit even if the officers were acting in excess of their statutory authority.

The result seems (1) substantively unjust, (2) procedurally unfair, and (3) grossly inefficient.

(1) The substantive injustice seems obvious except for the possibility that the plaintiffs had an action for damages under the Tucker Act or under the Federal Tort Claims Act. But even if they could collect damages, they were justly entitled to the land if they owned it. The government could not take the land by eminent domain because no public use could be shown; the government's only purpose was to collect royalties from oil production. As the dissenting judge said of the plaintiffs: "The Constitution commands that they shall have the property."[24]

(2) Procedurally, the Simons holding resulted in (a) a final decision by the very officers who were parties to the dispute, (b) without a trial-type hearing on issues of fact, (c) without opportunity for the private parties to present oral argument before the decision was made, (d) without systematic findings of fact, (e) without a reasoned opinion, (f) without opportunity for a decision by a tribunal that is or even pretends to be impartial, and (g) without opportunity for judicial review.

Indeed, *when sovereign immunity is held to apply to such a case as Simons, one may say without exaggeration that all the principles of administrative law that have been developed to assure fairness, including procedural safeguards and a judicial check for abuse of discretion, are swept away.*

(3) The questions of fact and law in the Simons case were peculiarly appropriate for judicial determination. Any doctrine that deprives the courts of jurisdiction to resolve such controversies as this exists in spite of, not because of, the needs of modern justice.

---

[23] 394 F.2d at 736-37.
[24] 394 F.2d at 738.

209

In Gardner v. Harris,[25] government officers simply followed their own convenience, disregarding the property rights of Dr. Harris, and then successfully asserted sovereign immunity. Dr. Harris' predecessor in title had conveyed land to the State of Mississippi, expressly reserving a right-of-way to the Parkway. When Mississippi conveyed the land to the Federal Government, the easement was expressly reserved. When the highway Superintendent erected barricades across the easement, Dr. Harris brought a suit in equity against him. The district court held that the Superintendent's deliberate obstruction of the easement was in excess of his authority and granted an injunction. But the Court of Appeals, reluctantly bowing to Supreme Court authority, reversed. Dr. Harris' assertion that the United States had shown no need for the easement was apparently undenied either by the Superintendent or by the court. The holding was simply that sovereign immunity barred the suit because "if a Federal Court were to order the Superintendent to remove the barricades, this would be compelling the Government to act." The court solemnly declared that the plaintiff had not shown that "acting wrongfully" or committing a tort was beyond the Superintendent's statutory powers.[26]

When the statute is essentially silent on the question, why should a court interpret it to authorize "acting wrongfully" or to authorize commission of a tort? Why not interpret the statute to mean that officers must respect the legal rights of private parties, in absence of explicit authority to override such rights?

Gnotta v. United States[27] shows that ordinary judicial review of an administrative adjudication may be cut off by the doctrine of sovereign immunity. Gnotta, a government employee, alleged that he had been denied a promotion for eleven years because of discrimination against employees of Italian origin. He sought to challenge in a reviewing court an administrative finding that no such discrimination had occurred. Even though the courts are hesitant to review promotion cases, such cases seem clearly reviewable when a plausible presentation of systematic discrimination is made. But the court was prevented from even reaching the question of reviewability. It dismissed the case on the ground of sovereign immunity, without reaching either the question of reviewability or the merits.

The meaning of the Gnotta case is that sovereign immunity prevented judicial review of administrative action, no matter what the facts may

---

[25] 391 F.2d 885 (5th Cir. 1968).

[26] The case is on all fours with an earlier decision of the Fourth Circuit in Switzerland v. Udall. 337 F.2d 56 (4th Cir. 1964).

[27] 415 F.2d 1271 (8th Cir. 1969).

210

have been concerning the alleged discrimination. What actuated the court was the case law that a suit against officers is deemed a suit against the United States if the decree would operate against the sovereign; the court thought that granting the relief sought would mean that the sovereign would have to promote the plaintiff. Even though the court did acknowledge exceptions to sovereign immunity for action in excess of statutory authority or in violation of the Constitution, it said without explanation that "This obviously is not a case which concerns either of the exceptions."

Multiplying examples of injustice caused by sovereign immunity will serve no useful purpose, but one more example may be needed to show that the harms to justice affect a regulatory area. In Wohl Shoe Co. v. Wirtz,[28] plaintiffs sought declaratory judgments that they were within designated exemptions from the Fair Labor Standards Act, after officers of the Department of Labor had warned them they were violating the Act. Plaintiffs would be liable for double the deficiency if they were not exempt. Sovereign immunity, the court held, was a bar, even if the plaintiffs were exempt under the statute, and hence even if the Department was acting in excess of its authority. The court's reasoning is especially interesting:

> The exact point of litigation before this court is whether an officer, while making an authorized determination, is still acting within his authority when and if he makes a wrong determination as to whether or not a party is subject to a particular provision of a valid statute. . . . [The Secretary's] determinations are those of the sovereign . . .[29]

The court's reasoning, if generally applied, would mean that any regulatory officer who is authorized to interpret a statute may violate its express terms and the party who is hurt by the interpretation will have no remedy!

*Sovereign immunity often produces an uncivilized result, because what counts—what determines who gets the property, for instance—is not reason but force, not law but power, not orderly adjudication but physical taking by the stronger party, not refinements the sum of which we call civilization but crudities that are sometimes characteristic of primitive men.*

The argument against sovereign immunity is on such an elementary plane that stating it is almost insulting to one's intelligence: Resolving

---

[28] 246 F. Supp. 821 (E.D. Mo. 1965).
[29] 246 F. Supp. at 822. The Wohl case seems extreme but it does not stand alone. See also Tejidos Konfort, Inc. v. McAuliffe, 290 F. Supp. 748 (D. Puerto Rico, 1968).

controversies by adjudication before a qualified tribunal which tries to be impartial is better than the use of force because a just result is more likely.

What, then, is the argument *for* sovereign immunity?

### IV. REASONS IN FAVOR OF SOVEREIGN IMMUNITY

One can read a hundred judicial opinions about sovereign immunity without ever encountering a reason in favor of it. Decisions based on sovereign immunity customarily rest on authority, the authority rests on history, and the history rests on medievalisms about monarchs.

A thoughtful district judge recently said that sovereign immunity "rests either on the theory that the United States is the institutional descendant of the Crown and enjoys its immunity or on a metaphysical doctrine that there can be no legal right as against the authority that makes the law."[30] Neither the history nor the metaphysics is a very satisfying basis on which to build modern law. The question worth asking is: From the standpoint of sound legal engineering, what reasons can be found for retaining sovereign immunity?

The most persuasive reason for sovereign immunity that has been found in reports of cases is a paragraph in the dissenting opinion of Mr. Justice Gray in United States v. Lee:

> The maxim is not limited to a monarchy, but is of equal force in a republic. In the one, as in the other, it is essential to the common defence and general welfare that the sovereign should not, without its consent, be dispossessed by judicial process of forts, arsenals, military posts, and ships of war, necessary to guard the national existence against insurrection and invasion; of customs-houses and revenue cutters, employed in the collection of the revenue; or of light-houses and light-ships, established for the security of commerce with foreign nations and among the different parts of the country.[31]

If the government were "dispossessed" of its military bases and equipment during an emergency, surely the judicial interference could be harmful.

The closest approach to a practical reason for sovereign immunity that has been found in a Supreme Court opinion of the twentieth century is a remark in the key case of Larson:

> There are the strongest reasons of public policy for the rule that

---

[30] Martyniuk v. Pennsylvania, 282 F. Supp. 252, 255 (E.D. Pa. 1968).
[31] 106 U.S. 196, 226 (1882).

212

such relief cannot be had against the sovereign. The Government, as representative of the community as a whole, cannot be stopped in its tracks by any plaintiff who presents a disputed question of property or contract right. As was early recognized, "The interference of the Courts with the performance of the ordinary duties of the executive departments of the government, would be productive of nothing but mischief . . . ."[32]

The Court in Larson, except for the words quoted, did not identify "the strongest reasons of public policy." Even though all will agree that the government as a litigant differs from a private corporation or an individual in that it represents the community as a whole, and that the government clearly ought not to be stopped by "any plaintiff who presents a disputed question," the crucial question is whether a private party who asserts that a government officer is wrongly interfering with his legal rights may have a judicial determination of the dispute between the private party and the officer. On that question the Larson opinion has nothing to offer except the 1840 statement that judicial interference in the ordinary duties of executive departments would be productive of nothing but mischief, and that statement was based on an assumption that was reasonable in 1840 but has turned out to be false during the ensuing century. The Court in 1840 assumed that it had to choose between performing executive tasks and refusing review; its choice was a good one. But later the Court learned that the assumption was mistaken; during the early part of the twentieth century, the Court invented a limited scope of review, so that the choice was no longer between judicial performance of executive tasks and refusal of review. By the time the Larson opinion was written in 1949, the usual practice was for courts to review the ordinary tasks of executive departments but to limit the review to such questions as constitutionality, statutory authority, proper procedure, abuse of discretion, and findings supported by substantial evidence.

Instead of reciting in the Larson opinion the clearly false proposition that interference of the courts with ordinary duties of executive departments would produce nothing but mischief, the Supreme Court should have said that experience had proved overwhelmingly that a limited scope of judicial review of ordinary duties of executive departments produces better government, and that that is why the courts have developed such review and why the Congress had codified the judge-made law by embodying it in the Administrative Procedure Act.[33]

---

[32] Larson v. Domestic & Foreign Corp., 337 U.S. 682, 704 (1949), quoting from Decatur v. Paulding, 14 Pet. 497, 516 (1840).

[33] 5 U.S.C. § 706.

213

The Supreme Court's "strongest reasons of public policy" in favor
of sovereign immunity turn out to embody nothing more than an 1840
assumption that experience has proved to be false and that is rejected
by settled judge-made law, which in 1946 was codified by unanimous
votes of both Houses of Congress.

But from the standpoint of sound legal engineering, do we not need a
doctrine of sovereign immunity as a judicial tool, so that a court will
not stop the government in its tracks whenever the court finds that a
governmental program interferes with a plaintiff's legal rights, so that
policies may be made by Congress and its delegates and not by courts,
so that courts will be kept out of such areas as the execution of foreign
policies and military policies where courts do not belong, and so that
the representatives of the community as a whole will be free from judicial
harassment in administering vital programs designed to benefit the whole
society? These argumentative questions in defense of sovereign immunity
may be about the best that can be concocted, but they are easy to
answer. The questions would be more effective *if* the courts were not
limited by law about scope of review to issues appropriate for judicial
determination (such as constitutionality, excess of authority, abuse of
discretion), *if* courts did not restrict themselves to subject matter within
their competence, and *if* the substantive law administered by courts
required governmental interests to be overridden by private rights in all
circumstances. But each of the three *if's* is plainly contrary to prevailing
judicial practices: The scope of review is limited to the kind of questions
that judges are equipped to decide; courts are quite successful in staying
out of areas into which they should not intrude; and the substantive law
generally allows courts to balance the interests of opposing parties as
equity requires.

What is needed is a much better balance between the public interest
in the effectiveness of governmental programs and private interests. The
present law, a mixture of medieval history and modern casuistry, does
not even aim at creating such a balance, as shown in the next section.

V. THE LAW OF SOVEREIGN IMMUNITY IS SOPHISTICAL AND ERRATIC

Hardly any other branch of Supreme Court law is so permeated with
sophistry as the law of sovereign immunity. Why is this so? Could it be
that judges feel bound by the authority of the doctrine but are unable
to discern a foundation for it in modern practicalities, so that they have
nothing to guide them except application of refined logic to abstract
concepts, many of which are almost devoid of meaning?

JA798

214

The Supreme Court, in its latest opinion on the subject, has stated "the general rule":

> The general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter.[34]

The decisive question thus becomes: When does declaratory, injunctive, or mandatory relief against an officer operate only against the officer and when does it operate against the sovereign?

Several questions about applying this "general rule" will bring out its sophistry: (1) If a government employee has been discharged by an officer, will a declaratory judgment that the employee is entitled to be reinstated operate against the sovereign? (2) If the Secretary of the Interior on the basis of a misinterpretation of a statute refuses to issue a patent to mining land, will mandatory relief interpreting the statute and requiring a disposal of the patent application on its merits operate against the sovereign? (3) When the Comptroller General wrongfully advises disbursing officers not to pay the plaintiff, will a mandatory injunction directing the disbursing officers to determine the application on its merits, without regard for the Comptroller General's opinion, operate against the sovereign? (4) If the Commandant of the Coast Guard unconstitutionally denies an application for a merchant mariner's document permitting service as a second class engineer, will a declaratory judgment for the applicant operate against the sovereign?

Probably almost any reader will get a higher score in answering these four questions by flipping a coin than by thinking about the questions.

Here are the answers the courts have given:

(1) On the question whether a court order to reinstate a federal employee operates against the sovereign, one might suppose that it clearly does, because the employee is not the Secretary's but the government's, and because the salary is paid not by the Secretary but by the government. Yet the Supreme Court in Vitarelli v. Seaton[35] ordered the Secretary to reinstate a federal employee, even though the Court said the "general rule" is that sovereign immunity is a bar if the relief would operate against the sovereign.

(2) When the Secretary denied a land patent, the Supreme Court

---

[34]Hawaii v. Gordon, 373 U.S. 57, 58 (1963). In Dugan v. Rank, 372 U.S. 609, 620 (1963), the Court said: "The general rule is that a suit is against the sovereign if 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration,' [citation], or if the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act.'"

[35]359 U.S. 535 (1959).

215

held: "A writ of mandamus should issue directing a disposal of the application for patent on its merits."[36] If mandamus with respect to land admittedly owned by the sovereign does not operate against the sovereign, what is the meaning of the "general rule" that relief may not operate against the sovereign?[37]

(3)   When a plaintiff seeks money or land from an officer who exercises discretionary power and the officer is accepting advice which is unfavorable to the plaintiff, sovereign immunity bars the plaintiff who seeks land from getting a declaratory judgment that the advice is illegal,[38] but does not bar the plaintiff who seeks money from getting a mandatory injunction against a disbursing officer "directing a disposal of petitioner's application for pay upon the merits, unaffected by the opinion of the Comptroller General."[39] The general rule is, if one is guided by these two Supreme Court *holdings*, that a decree may operate against the sovereign's money but not against the sovereign's land.

(4)   Although the Supreme Court has often expounded law that an order requiring official "affirmative action" would operate against the sovereign,[40] and although the "general rule" is that relief may not operate against the sovereign, the Court in 1968 approved a mandatory injunction requiring the Commandant of the Coast Guard to approve an application for a merchant mariner's document.[41] The reality is, of course, that the books are full of mandamus orders against government

---

[36]Wilbur v. United States ex rel. Krushnic, 280 U.S. 306, 319 (1930).

[37]The Supreme Court today could follow its holding or it could follow its "general rule." In Foster v. Seaton, 271 F.2d 836 (D.C. Cir. 1959), a decision by the Department of the Interior rejecting a mining claim was reviewed, and in Best v. Humboldt Mining Co., 371 U.S. 334, 338 (1962), the Court cited the Foster case in support of a footnote statement that mining claimants may appeal from an examiner to the Director, from him to the Secretary, and from there to the courts. But this footnote seems clearly inconsistent with "the general rule."

In Chournos v. United States, 335 F.2d 918 (10th Cir. 1964), a mining claimant was denied review, but the principal reason was that "The Bureau of Land Management and the United States Department of the Interior are not suable entities." The court did not mention and may have been unaware of Rule 25(d) of the Rules of Civil Procedure: "When a public officer sues or is sued in his official capacity, he may be described as a party by his official title rather than by name." The spirit of Rule 25(d), if not the letter, should have prevented dismissal for failure to name the right defendants.

[38]The outstanding case is Hawaii v. Gordon, 373 U.S. 57 (1963), fully reviewed below.

[39]Miguel v. McCarl, 291 U.S. 442 (1934).

[40]For instance, in the key Larson opinion, the Court said that "a suit may fail, as one against the sovereign, even if it is claimed that the officer being sued has acted unconstitutionally or beyond his statutory powers, if the relief requested . . . will require affirmative action by the sovereign . . ." Larson v. Domestic & Foreign Corp., 337 U.S. 682, 691 (1949).

[41]Schneider v. Smith, 390 U.S. 17 (1968).

216

officers, the very purpose of which is to require "affirmative action" by the government, but the sovereign immunity opinions solemnly recite that a court cannot "require affirmative action by the sovereign"!

## VI. WHO IS THE SOVEREIGN AND WHAT ARE THE SOVEREIGN'S INTERESTS?

The four questions just discussed were considered on the superficial assumption the Supreme Court usually makes—that an order against officers who are representing a proprietary interest of the government is an order against the sovereign. But one need not delve very deeply to discover that the sovereign may have other interests that are far more vital than its proprietary interest in a pile of coal or a piece of land. And who is the sovereign when the congressional will differs from the officers' will? Who is the sovereign when the Constitution requires one result, when the statute calls for a second result, and when the officers are insisting on a third? Can the most fundamental interest of the sovereign ever be squared with the Court's Larson remark that "a suit may fail, as one against the sovereign, even if it is claimed that the officer being sued has acted unconstitutionally or beyond his statutory powers . . ."?[42] Which interest of the sovereign is stronger—retaining a piece of property that a court would award to a private owner, or maintaining a rule of law with respect to ownership of property? Does a decree which does justice to all interests affected always operate *for* the sovereign even if the sovereign's proprietary interest is adversely affected? Can a decree which carries out the sovereign's established constitutional law, statutory law, or common law ever operate against the sovereign, or is such a decree always in favor of the sovereign's paramount interest in preferring a rule of law to a rule of force? And can anyone else in the society be deemed so well qualified to determine what the law is, whether or not the government is a real party in interest, than the courts?

Judicial opinions hardly ever address themselves to such questions as these, but at least one judicial opinion has done so. In Land v. Dollar,[43] the Supreme Court said of public officials:

> And where they unlawfully seize or hold a citizen's realty or chattels, recoverable by appropriate action at law or in equity, he is not relegated to the Court of Claims to recover a money judgment. The dominant interest of the sovereign is then on the side of the victim who may bring his possessory action to reclaim that which is wrongfully withheld.

---

[42]Larson v. Domestic & Foreign Corp., 337 U.S. 682, 691 (1949).
[43]330 U.S. 731, 738 (1947).

217

That statement may be thoroughly sound, for *it raises the right question* and it gives the right answer. The dominant interest of the sovereign is in seeing that justice is done, not in using force to take or to retain property that legally belongs to a private party.

The glimmer in the Dollar opinion is a faint one, but it is a beginning. If the Supreme Court had added some fuel to it, the glimmer might have grown into a bright light that would have illuminated the whole subject of sovereign immunity; sensible opinions would have replaced sophistical ones, and justice would have crowded out injustice.

Unfortunately, however, the unusual glimmer in the Dollar opinion has been neglected and has grown so faint that it is no longer discernible to the Supreme Court. The Court has moved back into the darkness, for it is again assuming that whatever is adverse to the government's proprietary interest is against the sovereign.

With magnifying glasses to augment the faint light shed by the Dollar remark, let us examine closely the Supreme Court's latest decision. Our inquiry will be into the two questions, who is the sovereign and what is the sovereign's interest?

In Hawaii v. Gordon,[44] the holding was that a declaratory judgment interpreting a statute would operate against the sovereign. The Hawaii Statehood Act provided that federal agencies having control over land retained by the United States under a provision of the Act should report to the President as to the "continued need" for such land, and if the President finds it is no longer needed by the United States "it shall be conveyed" to Hawaii. The President delegated to the Director of the Budget Bureau, who advised the federal agencies, pursuant to an opinion of the Attorney General, that the lands subject to the provision were those which once belonged to Hawaii, even though the Act said "any land" retained by the United States. The purpose of the suit was to challenge that "advice." The complaint did not pray for an order that the land be transferred to Hawaii; it recognized that "need" could be decided only by the President or his delegate. In its brief, Hawaii said:

> The suit seeks only the removal of a bar which the defendant, acting beyond his statutory authority, has imposed upon the processes for the making of determinations in respect of such properties.[45]

But the Supreme Court held that sovereign immunity prevented it from deciding whether the Director was acting beyond his statutory authority.

---

[44]373 U.S. 57 (1963).
[45]Page 3.

218

The one-page per curiam opinion was devoted mostly to a summary of the facts, with only three sentences in the nature of reasons:

> We have concluded that this is a suit against the United States and, absent its consent, cannot be maintained by the State. The general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter. [Citations.] Here the order requested would require the Director's official affirmative action, affect the public administration of government agencies and cause as well the disposition of property admittedly belonging to the United States.

In the Hawaii case, who was the sovereign? Was the sovereign (a) Congress, (b) the Attorney General and the Director of the Budget Bureau, (c) the government in its proprietary capacity as owner of the lands, or (d) the government in all its many capacities including the proprietary? One would rather say that Congress is the sovereign than to say that the Attorney General and the Director of the Budget Bureau are, and one would rather say that the government in all its capacities is the sovereign than that the government in its proprietary capacity is. But *the choice the Court made was to treat the officers as the sovereign and to limit its consideration to the government's proprietary capacity.*

What were the sovereign's interests in the Hawaii case? They included (a) the proprietary interest in retaining for the government as much land as possible from Hawaii's adverse interest in getting as much of the land as it could, (b) the interest in carrying out the intent of Congress, whatever it was, (c) the interest in maintaining the rule of law, (d) the interest in proper procedure for resolving controversies, and (e) the interest in allocating functions between officers and judges on the basis of comparative qualifications. In determining whether the decree would operate against the sovereign, the Court surely should take into account all five of these interests. Yet the Court in the Hawaii case took into account only the first and ignored the other four.

In the spirit of what the Court said in the Dollar opinion about "the dominant interest of the sovereign," that dominant interest was on the side of a judicial determination of the issue of statutory interpretation, because four of the five interests were on that side: (a) The only sovereign interest served by the Court's decision was the proprietary interest, but the fact is that Congress, which is surely at least a major part of the sovereign, intended to give away land for which the United States had no "need," and how far that intent extended could better be decided by a court than by officers. (b) We do not know how the Court would have interpreted the statute; if the officers were right the congressional intent

JA803

219

was carried out, and if they were wrong, that intent was thwarted; the best way to carry out the intent of the congressional sovereign would have been to allow judicial interpretation of it. (c) Although the courts are not always the exclusive enforcers of the rule of law, they clearly should be on questions of statutory interpretation about real property. (d) The interest of the sovereign in proper procedure for resolving controversies was sacrificed by the Court in the Hawaii case, for the question of law was resolved without an impartial tribunal, and without opportunity for Hawaii to submit briefs and arguments. (e) The interest of the sovereign in proper allocation of functions was likewise sacrificed; officers who have their own relation to the lands in question are obviously less qualified than impartial judges to interpret the statute governing the disposition of the lands.

But what of the Court's idea in the Hawaii opinion that an order should not "affect the public administration of government agencies"? To that question we now turn.

VII.  SHOULD A COURT INTERFERE WITH PUBLIC ADMINISTRATION OR
STOP THE GOVERNMENT IN ITS TRACKS?

Not only in the Hawaii opinion but in many opinions the Supreme Court in sovereign immunity contexts has asserted that courts cannot "interfere with the public administration."[46] Another idea, or perhaps the same idea, is that "the Government . . . cannot be stopped in its tracks."[47]

The plain, clear, visible reality is, as no one knows better than Supreme Court Justices, that courts including the Supreme Court are constantly interfering with the public administration and constantly stopping the government in its tracks.

Many of the great constitutional decisions throughout our history have stopped the government in its tracks and have interfered in public administration. Congress in 1916 enacted a statute prohibiting shipment in interstate commerce of products of child labor. Two years later in Hammer v. Dagenhart,[48] a suit against a U.S. Attorney to enjoin enforcement, the Supreme Court stopped not only the U.S. Attorney but stopped the whole government in its tracks in its effort to outlaw child labor.

Perhaps the most pervasive peacetime program of the federal government in American history was the National Industrial Recovery

---

[46] E.g., Dugan v. Rank, 373 U.S. 609, 620 (1963).
[47] Larson v. Domestic & Foreign Corp., 337 U.S. 682, 704 (1949).
[48] 247 U.S. 251 (1918).

Act of the 1930's. It was overwhelmingly enacted and vigorously administered with the President's hearty support. But when the Schechter brothers took an appeal from a conviction for violating the Act, the Supreme Court stopped the whole government—both the Congress and the President—in their tracks, in a most spectacular judicial interference in public administration.[a]

When President Truman seized most of the steel mills in order to avert a strike that he believed would jeopardize national defense, and the steel companies challenged the President's action in a suit against the Secretary of Commerce for declaratory judgment and injunction, the question was surely whether the courts would stop *the government* in its tracks. The Supreme Court in the Youngstown case held that the seizure was beyond the constitutional power of the President, affirming a decree against the Secretary.[b] The Court said nothing about stopping the government in its tracks or about interfering in public administration.

*How utterly incongrous for the courts to stop the President and Congress in their tracks and to interfere in the public administration of the most vital programs and at the same time to recite and hold that sovereign immunity prevents stopping the government in its tracks or interfering in public administration when a single officer is claiming a pile of coal or a piece of land and when the government has no special program with respect to the coal or the land!*

### VIII. THE PROPOSED STATUTE

Currently proposed by the American Bar Association and the Administrative Conference of the United States, acting in cooperation with each other, is an amendment of the Administrative Procedure Act the essence of which is abolition of sovereign immunity in suits in federal courts for specific relief. The proposal was adopted in October, 1969, by the Administrative Conference and by the Council of the Administrative Law Section of the Bar Association, and it was approved in principle by the House of Delegates of the Bar Association in February, 1970.

The proposal is to add provisions to §§ 702 and 703 of 5 U.S.C., the judicial review provisions of the Administrative Procedure Act. The provision to be added at the end of § 702 is as follows:

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity

---

[a] A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495 (1935).
[b] Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952).

221

> or under color of legal authority shall not be dismissed nor relief
> therein denied on the ground that it is against the United States
> or that the United States is an indispensable party. The United
> States may be named as a defendant in any such action, and a
> judgment or decree may be entered against the United States.
> Nothing herein (1) affects other limitations on judicial review or
> the power or duty of the court to dismiss any action or deny relief
> on any other appropriate legal or equitable ground; or (2) confers
> authority to grant relief if any other statute that grants consent to
> suit expressly or impliedly forbids the relief which is sought.

The provision to be added after the first full sentence of § 703 is as
follows:

> If no special statutory review proceeding is applicable, the action
> for judicial review may be brought against the United States, the
> agency by its official title, or the appropriate officer.

*The amendment's main purposes.* The two main purposes of the
proposed amendment are to allow the plaintiff in any suit for relief other
than money to name the United States as defendant and to authorize
the court to enter a judgment or decree against the United States
irrespective of sovereign immunity.

*The basic ideal.* The amendment pushes toward the basic ideal which
was stated by the Supreme Court in 1882: "Courts of justice are
established, not only to decide upon controverted rights of the citizens
as against each other, but also upon rights in controversy between them
and the government."[51]

*The broad perspective.* Congress has already abolished about two-
thirds of sovereign immunity, especially through the Court of Claims
Act of 1855 and through the Federal Tort Claims Act of 1946.
Governmental responsibility in contract for more than a hundred years
and in tort for more than twenty years has been wholly successful. No
movement has developed to restore the chunks of sovereign immunity
that have been abolished; instead, Congress has from time to time
strengthened those abolitions. The largest remaining area of federal
sovereign immunity relates to specific relief. The present proposal is
designed primarily to reach that area.

*Inadequacy of present law.* The present federal law of sovereign
immunity in suits for specific relief is inadequate in many ways, as the
preceding discussion shows, including frequent denial of substantive
justice to parties who should be entitled to relief against governmental

47-534 O - 70  15

JA806

encroachments on their legal rights, denial of procedural justice when officers who are protected by sovereign immunity make final determinations affecting private rights without providing the customary procedural safeguards, and gross inefficiency resulting from depriving the courts of authority to resolve controversies the courts are especially qualified to resolve.

*Limitation of proposal to relief other than money.* Although the proposal refrains from using the term "specific relief," its principal effect is to allow suits for specific relief. The first sentence of the proposal limits it to "relief other than money damages." Perhaps ninety per cent of the cases affected will be suits for injunction or declaratory judgment or for both, and perhaps most of the rest will be suits for relief in the nature of mandamus. But all other specific relief is covered, including specific performance, quieting title, ejectment, habeas corpus, and all other forms of specific relief.

*Prohibitions of relief in statutes granting consent to suits.* The last sentence of the proposed addition to § 702 provides: "Nothing herein . . . (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." The purpose of this clause is to avoid making any change in the interpretation of other statutes granting consent to suits against the government, including the Court of Claims Act, the Tucker Act, and the Federal Tort Claims Act. If any statute such as these is interpreted to forbid a suit for specific performance, then that interpretation remains unchanged by the present proposal. The intent of Congress as expressed or implied in other statutes remains undisturbed.

*Officers as defendants.* Although the proposed amendment does not change the law concerning suits against the government in the guise of suits against officers, such suits are subject to many uncertainties, including a possible holding that an officer who has not been named is indispensable or that the suit is barred by sovereign immunity. Because suits against the United States pursuant to the proposed amendment will be free from such uncertainties, suits against officers may be expected to decline and perhaps virtually disappear as parties and their representatives learn the advantages of naming the United States as a defendant.

*Applicability of proposed amendment.* Because the amendment is to be added to 5 U.S.C. §§ 702 and 703 (provisions of the Administrative Procedure Act concerning judicial review) it will be applicable only when those provisions are applicable. This means that the exceptions stated in § 701(b)(1)(H) will apply (relating mostly to specified wartime subjects); more importantly, it means that the proposed amendment will not apply

"to the extent that . . . statutes preclude judicial review . . . or . . . agency action is committed to agency discretion by law." The case law concerning the two categories of review precluded by statute and action "committed" to agency discretion is thus untouched by the proposed amendment.

*Law other than sovereign immunity unchanged.* Government defenses other than sovereign immunity remain unaffected by the proposed amendment. Indeed, all law other than the law of sovereign immunity is unchanged. A very large proportion of all cases that have been disposed of on the ground of sovereign immunity, perhaps as many as nine-tenths, might have been won by the government on some ground other than sovereign immunity, including the merits. Because nothing is changed except the law of sovereign immunity, and because all other constitutional law, statutory law, and common law remains unchanged, the government may still win cases on such grounds as unreviewability, standing, ripeness exhaustion, primary jurisdiction, or any other legal or equitable principle. Yet to the extent that the proposed amendment will remove the defense of sovereign immunity, a larger proportion of the cases brought will be decided on their merits.

*More government by judges?* The proposed amendment will not mean a larger proportion of government by judges or a smaller proportion of government by executives and administrators. Courts will still be limited to deciding issues appropriate for judicial determination, and they will still be limited by the limitations on scope of judicial review prescribed by the Administrative Procedure Act in 5 U.S.C. § 706. Clearly, the courts will continue to develop and apply their own law about what the Supreme Court calls "the appropriateness of the issues for judicial determination." Gardner v. Toilet Goods Ass'n., 387 U.S. 167, 170 (1967). The lines between issues which are or are not appropriate for judicial determination will not be affected by the proposed amendment. To the extent that some issues may come to court that have heretofore been barred by sovereign immunity, the usual principles as to what issues are appropriate for judicial determination will apply. And the established limitations on scope of review will be fully applicable. The courts will thus have no authority to remake administrative policy or to exercise the discretionary power that statutes have conferred upon administrators. Courts will continue to be normally limited to such strictly legal questions as constitutionality, statutory jurisdiction, proper administrative procedure, substantiality of evidence, abuse of administrative discretion, and conformity to law. The proposed amendment will mean only that when a party who is hurt by governmental action seeks relief other than money, sovereign immunity will not be a bar to judicial determination of such strictly legal questions.

224

APPENDIX III

# STUDY OF THE DIVISION OF JURISDICTION BETWEEN STATE AND FEDERAL COURTS

### As Adopted and Promulgated
### by

## THE AMERICAN LAW INSTITUTE

### AT WASHINGTON, D.C.
### May 18, 1965
### and
### May 21-22, 1968

### § 1311.   General federal question jurisdiction; original jurisdiction; exclusive jurisdiction

(a) Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction without regard to amount in controversy of all civil actions, including those for a declaratory judgment, in which the initial pleading sets forth a substantial claim arising under the Constitution, laws, or treaties of the United States.

### NOTE

*Subsection (a)* is declaratory of existing law, under the construction the courts have developed of 28 U.S.C. § 1331 (a), except that no amount in controversy is required, and that jurisdiction is extended in terms to all declaratory judgment actions in which the complaint rests on federal law.

JA809

225

## GENERAL FEDERAL QUESTION JURISDICTION

* * *

### II. Specific Provisions

#### SECTION 1311

* * *

*Amount in Controversy:*

It is proposed in this section to make no requirement of an amount in controversy for original federal question jurisdiction. Removal presents somewhat different problems, which are discussed in the Commentary to § 1312.

When Congress raised the amount in controversy requirement from $3,000 to $10,000, it said that its purpose was to set a figure "not so high as to convert the Federal courts into courts of big business nor so low as to fritter away their time in the trial of petty controversies." Sen. Rep. No. 1830, 85th Cong., 2d Sess., 1958. As is shown in an appendix,[a] the stated requirement of an amount in controversy in fact has relatively little impact on the volume of federal question litigation. The few cases there are, however, that must satisfy the § 1331 requirement are likely to involve matters particularly deserving of a federal forum. *E.g., Giancana v. Johnson,* 355 F.2d 366 (7th Cir. 1964) (action to enjoin allegedly unlawful surveillance by FBI in violation of plaintiff's constitutional rights to privacy, personal liberty and freedom). Cases in which the plaintiff claims violation of his constitutional rights by action of a federal official warrant federal cognizance without the need of demonstrating that the requisite amount is in controversy.

Adoption of this proposal would assure that cases involving matters of serious consequence arising under the Constitution, laws, or treaties of the United States can be heard in a federal court without regard to amount in controversy. A recent example of such a case is *Oestereich v. Selective Service Local Board No. 11,* 393 U.S. 233, 89 S.Ct. 414 (1968), where

---

[a] Appendix D, p. 489 *infra.* (Reproduced infra.)

JA810

226

reclassification for protest against participation in the war in Vietnam of a registrant exempt by statute from military service was ruled invalid, but the case was remanded for determination of the presence of the requisite amount in controversy. See also *Wolff v. Selective Service Local Board No. 16*, 372 F.2d 817 (1967) where a registrant was deprived of his student deferment as punishment for such protests. The reclassification was ruled to be improper, but this case was also remanded for determination as to jurisdictional amount. Judge Medina said, at p. 826: "It is an unfortunate gap in the statutory jurisdiction of the federal courts that our ability to hear a suit of this nature depends on whether appellants can satisfactorily show injury in the amount of $10,000 but the fact remains and on remand the District Court must determine this question." Tentative Draft No. 4 of this Study 48-52, encompassing the present proposal, was cited by the court. These cases are instances of a situation that occasionally arises in which there may be great difficulty in determining the amount in controversy, a difficulty that of course would be eliminated if the requirement were abolished.

It has been suggested that it is inappropriate ever to require a jurisdictional amount in federal question cases, since the effect of such a requirement is to deny a federal forum in cases where the federal courts have a special expertness and a special interest. See Friedenthal, *New Limitations on Federal Jurisdiction*, 11 Stan.L.Rev. 213, 216-218 (1959); Wechsler, *Federal Jurisdiction and the Revision of the Judicial Code*, 13 Law & Contemp. Prob. 216, 225-226 (1948). If the purpose of original federal question jurisdiction is to protect the national interest in uniform application of national law, this argument has much force. But at present, except in a few special areas, a federal forum is not required in a federal question case, and the choice of forum is left to one or both of the litigants. Thus the apparent purpose is to protect the litigants from the possibility of state court misconstruction of federal law, if a litigant chooses to be so protected. The plan here proposed builds on that premise. Given such a premise, there would be no necessary inconsistency in the requirement of a jurisdictional amount. The jurisdiction is provided for the protection of the parties, and where only a small amount is involved, so it might

227

be argued, the parties will not be greatly harmed if they are denied that protection and federal law is misapplied. Presumably a similar argument justifies denying the parties in a suit involving $10,000 or less federal protection against whatever dangers the diversity jurisdiction is intended to avoid.

Figures showing actual experience as to amount involved[4] suggest that a substantial portion of federal question jurisdiction does involve "petty controversies," in terms of the amount in controversy. But these cases must be tried in some forum. To impose a jurisdictional amount requirement that would keep such cases out of federal court would require them to be heard in state court. In cases within the diversity jurisdiction, where parties are relying entirely on state law, it is not inappropriate to require the states to provide a forum for cases involving a small amount. Where the right relied on is federal, the national government should bear the burden of providing a forum to parties who wish to be heard in federal court. Congress has the power to require state courts to hear federal question cases, but to exercise that power in such fashion as to force small claims into state courts, while reserving larger claims for federal courts, would smack too much of regarding the state courts as inferior tribunals, rather than a coordinate system. *See* Anderson, *The Line Between Federal and State Court Jurisdiction*, 63 Mich.L.Rev. 1203, 1205 (1965).

From the table referred to above it appears that the two classes of cases that most consistently involve "petty controversies" are those under the Fair Labor Standards Act and those the Administrative Office describes as "interstate commerce." In these classes, a high proportion of the cases result in a judgment of less than $10,000, and both the median claim and the median judgment are very small sums. Yet FLSA cases involve an important congressional policy, intended to benefit those of modest means. If the federal courts cannot hear small claims under this act, they will not hear any cases under it, and the entire burden of enforcing the act will be left to the state courts. The state courts would be asked to discharge this burden without significant assistance from the Supreme Court, because the fact that only a small amount is involved would discourage resort to expensive appeals.

Most of the cases classified by the Administrative Office as

---

[4] *Id.* at 491-492.

JA812

"interstate commerce" are cases involving the collection or refund of freight charges, demurrage, and the like, in which there is a dispute between a shipper and a carrier as to what tariff is to be applied to a given commodity. It is held that such cases arise under an Act of Congress regulating commerce, and thus are maintainable in federal court, under 28 U.S.C. § 1337, without regard to amount in controversy. *Louisville &N. R.R. v. Rice,* 247 U.S. 201, 202-203 (1918); *Turner, Dennis & Lowry Lumber Co. v. Chicago, M. & St. P. R.R.,* 271 U.S. 259, 261 (1926). Although these suits quite typically are over a very small sum, they are not regarded as "petty controversies" by the parties because the effect of the decision will control all similar shipments. The side effects of a decision, whether by way of stare decisis or collateral estoppel, cannot, on orthodox doctrine, be considered in determining the amount in controversy. *Healy v. Ratta,* 292 U.S. 263 (1934); *Town of Elgin v. Marshall,* 106 U.S. 578 (1882). Such side effects are not irrelevant, however, in assessing whether a particular class of cases is appropriate for federal court. These rate disputes do have far-reaching implications, and decision of them requires application of a distinctively federal body of materials. It would be unwise, as a matter of policy, to insist that all such cases in which less than $10,000 is in controversy be tried in state court.

These are the two most striking instances of small claims heard in federal court. They lend support to the commentators who argue that there should be no jurisdictional amount requirement in any federal question case. For reasons indicated in an appendix,[5] the same conclusion is indicated with regard to actions under the Miller Act.

[A further benefit from the proposal would be to avoid problems of aggregation of the amounts demanded by individual claimants in class actions under F.R. Civ. Proc. 23, especially those brought under subdivision (b)(3) of the rule. Elimination of the requirement of satisfying the jurisdictional amount would nullify the risk of damaging restrictions on the effective operation of the rule. The conflict of authority under the present law will presumably be resolved in the near future by the Supreme Court. Compare *Alvarez v. Pan American Life Ins. Co.,* 375 F.2d 992 (5th Cir. 1967) and *Snyder v. Harris,* 390 F.2d 204 (8th Cir. 1968), *cert. granted,* 393 U.S. 911 (1968)

---

[5] Appendix E, p. 493 *infra.*

(aggregation of "separate and distinct" claims not permitted)
*with Gas Service Co. v. Coburn,* 389 F.2d 831 (10th Cir. 1968),
*cert. granted,* 393 U.S. 911 (1968) (aggregation permitted in
all class actions).] [Ed. Note—The Supreme Court reversed
*Snyder v. Harris* and affirmed *Gas Service Co. v. Coburn* on
March 25, 1969. 37 U.S.L.W. 4262.]

## APPENDIX D

### The Jurisdictional Amount Requirement in Federal Question Cases

Section 1331 of the Judicial Code purports to limit federal question jurisdiction to those cases in which the amount in controversy, exclusive of interest and costs, exceeds $10,000. However a series of particular statutes grant jurisdiction, without regard to the amount in controversy, in virtually all the areas which otherwise would fall under the general federal question statute. Thus in 1958, when the required amount was increased from $3,000 to $10,000, it was repeatedly asserted in the committee reports and supporting documents that "the only significant categories of 'federal question' cases subject to the jurisdictional amount are suits under the Jones Act and suits contesting the constitutionality of State statutes." Sen. Rep.No. 1830, 85th Cong., 2d Sess., 1958, p. 6. It is highly doubtful whether the amount requirement extends so far as that limited statement would suggest.

No decision has been found squarely holding that Jones Act actions must meet the jurisdictional amount test of 28 U.S.C. § 1331. There are decisions that seem to assume that the general federal question statute, § 1331, is the only jurisdictional basis for such suits. *E.g., Wade v. Rogala,* 270 F.2d 280 (3d Cir. 1959); *Branic v. Wheeling Steel Corp.,* 152 F.2d 887 (3d Cir. 1945); *Turner v. Wilson Line of Mass., Inc.,* 142 F.Supp. 264 (D. Mass. 1956), *aff'd,* 242 F.2d 414 (1st Cir. 1957); *McDonald v. Cape Cod Trawling Corp.,* 71 F.Supp. 888 (D.Mass. 1947); *Rowley v. Sierra S.S. Co.,* 48 F.Supp. 193 (N.D. Ohio 1942). These cases do not so hold, however, and the assumption they make is a questionable one. It has always been supposed that suits under the Federal Employers' Liability Act may be maintained without regard to amount in controversy, since the FELA is an Act of Congress regulating commerce, and jurisdiction exists, regardless of amount, by virtue of 28 U.S.C. § 1337. *Imm v. Union R.R.,* 289 F.2d 858 (3d Cir. 1961). *But see* CURRIE, FEDERAL COURTS: CASES AND MATERIALS 430-432 (1968). The Jones Act, which makes available to seamen the remedies given railway employees by

231

FELA, also rests, in part at least, on the power to regulate commerce. *O'Donnell v. Great Lakes Dredge & Dock Co.*, 318 U.S. 36, 39 (1943). The courts have found in § 1337 of the Judicial Code, and its predecessors, support for jurisdiction without regard to amount in so many different kinds of suits that it seems fair to say that that section of the code grants jurisdiction whenever suit is under an act the constitutional basis of which is the commerce clause. If this construction is right, the Jones Act cases can hardly be excluded. *Ballard v. Moore-McCormack Lines, Inc.*, 285 F.Supp. 290 (S.D.N.Y. 1968); *Richardson v. St. Charles-St. John The Baptist B & F Authority*, 274 F.Supp. 764 (E.D.La.1967).

There is equal difficulty in saying that suits contesting the constitutionality of state statutes require a particular amount in controversy. Many such cases now come under 28 U.S.C. § 1343(3), which gives jurisdiction, without regard to amount, of actions to redress the deprivation, under color of any state law, of any right, privilege, or immunity secured by the federal Constitution or by any federal civil rights statute. In a separate opinion in *Hague v. C.I.O.*, 307 U.S. 496, 518-532 (1939), Justice Stone endeavored to draw the line between those actions that may be brought under § 1343(3), and require no jurisdictional amount, and those that must be brought under § 1331, where the jurisdictional amount is required. He suggested that the special statute covers those cases where the right involved is "inherently incapable of pecuniary valuation," such as the right to vote, and the right of free expression, while resort must be had to § 1331, and the amount in controversy test satisfied, where the party is claiming a property right which can be given a dollars-and-cents value. This is a workable reconciliation of the two statutes, and insofar as it dispenses with a monetary requirement where suit is to redress a right that cannot be valued in terms of money, it is clearly desirable. *Douglas v. City of Jeanette*, 319 U.S. 157 (1943). Whether it is sound, however, to bar from federal court cases involving constitutional issues because a property right of less than $10,000 is involved, is more doubtful.

There are apparently a few other instances, besides those mentioned at the time of the 1958 amendment, in which no

JA816

special statute is applicable and thus the requirement of 28
U.S.C. § 1331 as to amount in controversy must be satisfied.
*See* Friedenthal, *New Limitations on Federal Jurisdiction,* 11
STAN.L.REV. 213, 217-218 (1959). One such example is a suit
by a veteran claiming a civil service job preference. *Powers v.
Gold,* 124 F.Supp. 93 (D.Mass. 1953). Another is an action to
enjoin the allegedly unconstitutional action of a federal official
*Giancana v. Johnson,* 335 F.2d 366 (7th Cir. 1964). But it is clear
that the amount requirement of § 1331 has no significant impact
on the workload of the federal courts.

Statistical information made available by the Administra-
tive Office of the United States Courts shows that a majority
of private federal question cases involve less than $10,000, and
that in some categories of such litigation the proportion of
cases involving such a small sum is very high. The following
table is concerned with those cases during the fiscal year 1961
in which a money judgment was reported to the Administra-
tive Office. More recent figures are not readily available, and
the 1961 figures sufficiently indicate the pattern. The table is
limited to contested cases, which includes both cases which
were actually tried and those in which a pretrial disposition
was made after a contest. The first column indicates the num-
ber of cases in which the judgment was for less than $10,000,
and the percentage of all cases in the category which this num-
ber represents. The amount of the judgment is here used as
the criterion, rather than the dollar amount originally claimed,
because the figures of the Administrative Office are more com-
plete as to the amount of the judgment than as to the amount
of the claim. In fact there is very little difference between the
percentage of cases in which the judgment was under $10,000
and the percentage in which the amount claimed was under
$10,000—only in the Fair Labor Standards Act cases is the
difference more than three percentage points. The second col-
umn of the table is the median dollar amount of the judgment
in those contested cases in which the judgment was less than
$10,000. The third column is the median amount claimed in
those contested cases in which the judgment was less than
$10,000.

233

| | (1) | (2) | (3) |
|---|---|---|---|
| | Judgment less than $10,000 | Median judgment | Median amount claimed |
| All federal question cases | 350 (58%) | $2,209 | $ 5,000 |
| Bankruptcy trustee | 18 (60%) | 3,425 | 4,073 |
| Fair Labor Standards Act | 13 (100%) | 686 | 1,600 |
| FELA | 39 (32%) | 4,623 | 55,000 |
| Interstate commerce | 20 (80%) | 677 | 723 |
| Marine contracts | 47 (69%) | 1,339 | 1,730 |
| Marine torts— personal injury | 65 (52%) | 3,946 | 50,000 |
| Marine torts— personal property | 21 (60%) | 2,002 | 4,049 |
| Miller Act | 53 (62%) | 3,632 | 4,326 |

JA818

234

## APPENDIX IV

———

SELECTED STATUTORY PROVISIONS RELATED TO JUDICIAL REVIEW AND
FEDERAL COURT JURISDICTION

### A. ADMINISTRATIVE PROCEDURE ACT: JUDICIAL REVIEW PROVISIONS

§ 702. *Right of review*

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. Pub.L. 89–554, Sept. 6, 1966, 80 Stat. 392.

§ 703. *Form and venue of proceeding*

The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibition or mandatory injunction or habeas corpus, in a court of competent jurisdiction. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement. Pub.L. 89–554, Sept. 6, 1966, 80 Stat. 392.

§ 704. *Actions reviewable*

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority. Pub.L. 89–554, Sept. 6, 1966, 80 Stat. 392.

§ 705. *Relief pending review*

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings. Pub.L. 89–554, Sept. 6, 1966, 80 Stat. 393.

§ 706. *Scope of review*

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole

JA819

record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error. Pub.L. 89–554, Sept. 6, 1966, 80 Stat. 393.

§ 1331.  *Federal question; amount in controversy; costs*

(a)  The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States.

(b)  Except when express provision therefor is otherwise made in a statute of the United States, where the plaintiff is finally adjudged to be entitled to recover less than the sum or value of $10,000, computed without regard to any setoff or counterclaim to which the defendant may be adjudged to be entitled, and exclusive of interests and costs, the district court may deny costs to the plaintiff and, in addition, may impose costs on the plaintiff. June 25, 1948, c. 646, 62 Stat. 930; July 25, 1958, Pub.L. 85–554, § 1, 72 Stat. 415.

§ 1333.  *Admiralty, maritime and prize cases.*

The district courts shall have original jurisdiction, exclusive of the courts of the States, of:

(1)  Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled.

(2)  Any prize brought into the United States and all proceedings for the condemnation of property taken as prize.

(June 25, 1948, ch. 646, 62 Stat. 931; May 24, 1949, ch. 139, § 79, 63 Stat. 101.)

§ 1334.  *Bankruptcy matters and proceedings.*

The district courts shall have original jurisdiction, exclusive of the courts of the States, of all matters and proceedings in bankruptcy. (June 25, 1948, ch. 646, 62 Stat. 931.)

§ 1336.  *Interstate Commerce Commission's orders.*

Except as otherwise provided by Act of Congress, the district courts shall have jurisdiction of any civil action to enforce, enjoin, set aside, annul or suspend, in whole or in part, any order of the Interstate Commerce Commission. (June 25, 1948, ch. 646, 62 Stat. 931.)

§ 1337.  *Commerce and anti-trust regulations.*

The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies. (June 25, 1948, ch. 646, 62 Stat. 931.

§ 1338.  *Patents, copyrights, trade-marks, and unfair competition.*

(a)  The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, copyrghts and trade-marks. Such jurisdiction shall be exclusive of the courts of the states in patent and copyright cases.

(b)  The district courts shall have original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the copyright, patent or trade-mark laws. (June 25, 1948, ch. 646, 62 Stat. 931.)

§ 1339.  *Postal matters.*

The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to the postal service. (June 25, 1948, ch. 146, 62 Stat. 932.)

§ 1340.  *Internal revenue; customs duties.*

The district courts shall have original jurisdiction of any civil action arising under any Act of Congress providing for internal revenue, or revenue from imports or tonnage except matters within the jurisdiction of the Customs Court. (June 25, 1948, ch. 646, 62 Stat. 932.)

§ 1341.  *Taxes by States.*

The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State. (June 25, 1948, ch. 646, 62 Stat. 932.)

236

*§ 1343. Civil rights and elective franchise.*

The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

(1) To recover damages for injury to his person or property, or because of the deprivation of any right of privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in section 1985 of Title 42;

(2) To cover damages from any person who fails to prevent or to aid in preventing any wrongs mentioned in section 1985 of Title 42 which he had knowledge were about to occur and power to prevent;

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

(June 25, 1948, ch. 646, 62 Stat. 932; Sept. 3, 1954, ch. 1263, § 42, 68 Stat. 1241; Sept. 9, 1957, Pub.L. 85–315, part III, § 121, 71 Stat. 637.)

*§ 1391. Venue generally*

(a) A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in the judicial district where all plaintiffs or all defendants reside.

(b) A civil action wherein jurisdiction is not founded solely on diversity of citizenship may be brought only in the judicial district where all defendants reside, except as otherwise provided by law.

(c) A corporation may be sued in any judicial district in which it is incorporated or licensed to do business or is doing busness, and such judicial district shall be regarded as the residence of such corporation for venue purposes.

(d) An alien may be sued in any district. June 25, 1948, c. 646, 62 Stat. 935.

*§ 1392. Defendants or property in different districts in same State*

(a) Any civil action, not of a local nature, against defendants residing in different districts in the same State, may be brought in any of such districts.

(b) Any civil action, of a local nature, involving property located in different districts in the same State, may be brought in any of such districts. June 25, 1948, c. 646, 62 Stat. 935.

*§ 1393. Divisions; single defendant; defendants in different divisions.*

(a) Except as otherwise provided, any civil action, not of a local nature, against a single defendant in a district containing more than one division must be brought in the division where he resides.

(b) Any such action, against defendants residing in different divisions of the same district or different districts in the same State, may be brought in any of such divisions. June 25, 1948, c. 646, 62 Stat. 935.

### APPENDIX V

ADMINISTRATIVE CONFERENCE TRANSCRIPT (EDITED AND EXCERPTED) FROM PLENARY SESSION, OCTOBER 21, 1969: SOVEREIGN IMMUNITY RECOMMENDATION DISCUSSED

Chairman WILLIAMS. We now continue on our agenda to the first proposed recommendation, which comes to us from the Committee on Judicial Review; and if the Chairman of that committee will come forward, please.

Mr. SELLERS. Mr. Chairman, members of the conference, ladies and gentlemen, normally the Committee on Judicial Review of which I have had the honor of being Chairman not only in this conference but the preceding conference has always come up on the agenda last. So we are not accustomed to being first up at bat.

You have before you, on your desk this morning, a revision of the first proposal, Recommendation A. If you will look at it, you will see that the only change made in the tort of the recommendation occurs in the middle of the page where there is deleted the words, "whether or not the United States has been named as a defendant."

237

The committee met yesterday and decided that its recommendations should be revised to this extent. Appropriately, the explanatory note which follows on the two or three succeeding pages has been revised simply to accommodate that change.

Other than that minor change, the recommendation is precisely in the form in which it was submitted first to the Council and ultimately to the members of the conference.

This recommendation is, as is stated, a recommendation for statutory reform of the sovereign immunity doctrine. May I say at the very outset that this is not a proposal to abolish the doctrine of sovereign immunity. It is a partial abolition, however. We have taken great pains. We endeavored to function with a scapel, rather than a bludgeon, to preserve the defense of sovereign immunity wherever existing statutes seem clearly to contemplate that that was the intention of the Congress.

This would, however, do away with the defense of sovereign immunity in those instances which are listed in the very first lengthy sentence of the recommendation. "An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein denied on the ground that it is against the United States or that the United States is an indispensable part."

This recommendation, which will be explained to you in greater detail by our distinguished consultant, Professor Roger Cramton, would constitute an amendment to the Administrative Procedure Act. Also we have proposed that Section 703 of Title 5 be amended to provide, after the first full sentence of the existing law, "If no special statutory review proceedings is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer."

This is a matter which has been long urged, primarily by certain well-known scholars. It has been exhaustively written about in the law reviews and the other legal literature. I will mention two of these scholars, not merely because they are here and members of the Conference, but because I suppose it is fair to say that those two among many others have been the ones that have written most extensively on the subject—namely, Professor Clark Byse and Professor Kenneth Davis.

Thus when this project was decided upon by the Committee on Judicial Review, we had a considerable body of materials and also the individual and personal assistance of two people who had been long in the field.

This proposal has been on the agenda of the Committee on Judicial Review from almost the inception of this conference, and we did arrive at a draft fairly early in our lifetime as a committee. It was extensively circulated and made available to other groups and individuals and government agencies.

The section on Administrative Law of the American Bar Association acting independently and more or less paralleling our efforts had the same project under consideration. It was rather exhaustively debated before the Council of that section. The projects were so similar, and because there were so many people on one group who were members of the other or vice versa, it was only natural that the Council of the Conference suggest that the two groups endeavor to arrive at, if not identical recommendations, at least entirely consistent recommendations.

The section on Administrative Law did arrive at language which we regard in this committee as certainly not inconsistent with our version but quite compatible with it.

The House of Delegates of the American Bar decided to defer action on the section's recommendation to await the action of this Conference, thinking perhaps that it would be more appropriate if the Conference acted first. We now feel that it is timely for this Conference to act upon this long awaited proposal.

Professor Cramton, I wish you would explain in more detail the proposal itself.

Professor CRAMTON. My remarks will be brief. I will address myself to two topics: first, the need for a limited and modest reform of the sovereign immunity doctrine and, second, the precise form and language of our proposal.

First, as to the need, although many of the intelligent, sophisticated lawyers

47–534 O—70——16

JA822

238

and particularly government lawyers who are gathered in this room understand the complexity, the metaphysical aspects and fictional aspects of sovereign immunity and the ways to circumvent it by suit against the officer, Federal District Judges around the country do not understand it and the Bar in general does not understand it. The truth of the matter is that the U.S. attorneys and litigants in the Department of Justice have used sovereign immunity as a barrier, as an obfuscation, which has been thrown out in hundreds and hundreds of law suits in the United States District Court, particularly those cases involving a request for injunctive relief against an officer.

The broad language of the *Larson* case aids the Government because it distinguishes between action which is supposedly erroneous and wrongful, and action which is "authorized," and it tests the authority of the officer not by notions of Federal law but by of all things by the private law doctrines of respondiat superior which have no relevance at all to the problem. And there is dicta in a whole line of Supreme Court cases which talk as if the real question was whether the suit is in essence or in effect a suit against the sovereign, and whether effective relief can be given only by the government acting. These cases also suggest that the request for affirmative relief is very different from an attempt to get negative relief.

\*          \*          \*          \*          \*          \*          \*

There are two other objectives of the committee's recommendation. The first one is to eliminate the remaining technical defects in the law of party defendants by allowing a broad option in terms of a plaintiff's choice of defendants, and making nothing turn on which path he takes. No matter whether he chooses an officer, the agency by its title, or the United States, or any combination of the three, his suit is all right. Further, it essentially provides capacity to be sued to every Federal agency if it is named by its official title.

Finally, we have tried to leave everything else unchanged. We have tried to distinguish very sharply between the doctrine of sovereign immunity and all the other law, most of which is desirable law; but whether it is good or bad, we don't attempt to change it at all.

If I could direct your attention very briefly now to the form of the proposal itself, I will make a series of points relating to that. The proposal is an amendment to the Administrative Procedure Act and that has several important consequences.

First, it is applicable only to the agencies. It is applicable only to administrative action and conduct of the individual that is contemplated for judicial review by the APA, and it is subject to the exemptions from the APA.

Second, actions for money damages are totally excluded from our recommendation. We deal only with actions seeking other than money damages. The Tort Claims Act, the Tucker Act, the liability of the United States in damages is totally unaffected.

Third, the limitations on judicial review are expressly preserved by Proviso 1: "Nothing herein affects other limitations on judical review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground." Standing, committed to agency discretion, those defenses are all left untouched.

Finally, we tried to deal very specifically with the problem of those statutes in which Congress granted consent to sue in a particular area, such as the Tucker Act—which said the Government is going to be liable for its contracts and created a specific remedy. Congress intended to make that the exclusive remedy. There is no specific performance of a contract in our Federal jurisprudence, and we do not create it with this proposal. The legislative history on that, we hope, and the language of the statute should make this very, very clear.

\*          \*          \*          \*          \*          \*          \*

Chairman WILLIAM. Let me point out to you that the explanatory note is not part of the recommendation before you. The committee moved and seconded the adoption of what we now denominate Recommendation A, statutory reform of the sovereign immunity doctrine.

Under our custom we save a few moments for those who would like to make brief seconding statements simply to indicate they favor the proposal, before we get into the details. Are there any such statements?

Chairman WILLIAMS. Mr. Warner Gardner.

JA823

Mr. GARDNER. I will try to speak to the long lost time when I was a minor government bureaucrat trying to get problems settled and being exceedingly frustrated in a capacity at the Department of Justice.

No, we can't sue the sovereign, and most of my life I am trying to find ways to do it. I consider this at least 50 years overdue and a greatly needed reform.

Chairman WILLIAMS. Any other general statements?

Professor Davis.

Professor DAVIS. I shall limit myself to three minutes even though I would like to speak for three hours in favor of the proposal. The limitation means I can deal only with the large perspective. The United States is not keeping pace with the rest of the world on this subject or the advanced nations of the world. The countries of continental Europe have long understood for centuries that sovereign responsibility is to be preferred to sovereign irresponsibility or sovereign immunity which we have kept in some measure.

Britain has moved away from sovereign immunity in the Crown Proceedings Act of 1947, although there are some remnants of the doctrine still in Britain. We have moved away from it beginning in 1855 when the first Court of Claims Act was enacted to make the Government responsible on its contracts. We abolished another big chunk of sovereign immunity in 1946 in the Federal Tort Claims Act.

In each instance there were fears of Government lawyers that too much had been given away. In each instance after these measures were adopted, Congress came back to strengthen them. The whole history has been one of adding to the Court of Claims Act and adding to the Federal Tort Claims Act.

We legislated again in 1966 to provide more strength in the Federal Tort Claims Act so that the claims may be administratively paid without going to court.

I think if the conference adopts this measure, it will be a great accomplishment by the conference.

Chairman WILLIAMS. Any other general statements?

(No response.)

Chairman WILLIAMS. Let us move to the details of whatever discussion any of you wish to engage in, pro or con.

Yes, Mr. Barrett.

Mr. BARRETT. Mr. Chairman, I have two questions. The first relates to the portion of the language of the proposal down to the two provisos. I would like to ask if that language cannot be much simplified by deletions and still state all that the committee intends it state. Specifically, I would ask if the language cannot be modified as follows: delete starting on the second line with the last word, "and," through to the sixth line through the word, "authority," delete two lines further down, the last clause of the first sentence starting, "or that the United States," to the end of that sentence; delete the next sentence. That would leave the language, "An action in a court of the United States seeking relief other than money damages shall not be dismissed nor relief therein denied on the ground that it is against the United States."

It seems to me when you have said that you have made it clear that the United States may be named as a defendant, or at least if named the United States may not be dismissed as a defendant simply because it is the United States and that relief may be granted against the United States.

As far as the provision of the last clause of the first sentence, "or that the United States is an indispensable party," seems to me that once you have said that the defense of sovereign immunity isn't available, then the same rules, whatever they may be in the particular action regarding indispensable parties, should apply to the United States as well as any other claim.

I can proceed with my second question or if Professor Cramton wishes to respond——

Chairman WILLIAMS. Why don't you go ahead on that.

Professor CRAMTON. The first part of the question, relating to the language in the first six lines, really involves, I think, not so much a question of substance but one of an excess of caution. It is true that even though "any action in a court of the United States" covers a very broad scope, including diversity between individual citizens, the question of its dismissal on the ground it is against the United States would clearly not be relevant.

JA824

It is relevant only where there is a challenge to official action. Thus my answer would be that the results of the deletion would not probably be one of substance. But the language does parallel that of 28 U.S. Code, Section 1391(e), which is the venue and service provision.

Many of the Government lawyers, both on the committee and with whom the committee talked, were reassured somehow by our spelling out that we in fact were talking about actions challenging Federal administrative action or non-action. I don't think it is particularly a matter of substance, but it is a matter of style and of clarification and consistency wth the present language of 28 U.S. Code, Section 1391(e).

The other two deletions do involve some important substantive issues and problems, and partly they do so because some Supreme Court decisions have distinguished between sovereign immunity in the sense of bringing a suit and sovereign immunity in the sense of the capacity of the United States as an indispensable party. We thought that to be absolutely clear, we should refer specifically to both of those even though I think if legislative history were clear enough the same result would be achieved. The problem, again, may be with the District Judge out in Boise, Idaho, who doesn't have the legislative history before him. This judge may have only the statute before him and we wanted to make it clear a Government lawyer couldn't even argue that the indispensable party doctrine continued somehow to be viable even though the barrier to the suit was gone. This reasoning is likewise applicable to the omission of some of the following language having to do with United States being named as a defendant and the judgment entered against it.

There is a line of state court decisions on sovereign immunity which separates the question whether the court has jurisdiction at the outset from whether or not it can enter a judgment. Again, out of an excess of caution, we provide that the appropriate judgment can be entered if the United States is a party. Allowing the United States to be named as a party is consistent with the second part, the amendment to 5 U.S. Code, Section 703.

   *          *          *          *          *          *          *

Chairman WILLIAMS. Mr. Barrett, would you like to go on with your other point now.

Mr. BARRETT. Yes.

My other question relates to the second proviso and specifically to the phrase, "expressly or impliedly forbids," and I would suggest the word "impliedly" would invite a lot of future litigation on questions of statutory construction and that the point this proviso should really be directed to is making it clear that this waiver of immunity, which it is, is intended to operate only where there is no other form of available judicial relief. So I would like to ask, Professor, if it would not be preferable—I must say I am not prepared to make a motion to that effect——to have the second clause read as follows: "confers authority to grant relief if any other statute" and then deleting starting with the word "that grants" and ending with the word "impliedly," then continuing "forbides the relief which is sought," and then adding this phrase, "or affords any other form of judicial relief."

Professor CRAMTON. That would be an important change in substance and I think the committee has considered this in great detail and would oppose it, although the members of the committee can speak for themselves.

Let me illustrate the issue that is at stake with several hypotheticals. In proviso 2 you have to use the word "impliedly" because Congress, legislating in the background of sovereign immunity, has not spelled out the effect on other relief of a statute granting a particular form of relief. For example, the Tucker Act—with Congress legislating against background of the citizens not being able to sue the sovereign—says we consent to suit for damages, for breach of contract, in a particular court, under a particular procedure.

Now, impliedly—but only impliedly—Congress is saying there can be no injunctive relief which has the effect of specific performance of a contract, not because of what the Tucker Act says specifically. It doesn't say that. So the prohibition of suits for specific performance is by implication only, based upon judicial decisions. That is why the word "impliedly" is put in.

No doubt it involves statutory interpretation. It directs the attention of the court to the particular statute that grants consent to suit, and to the purpose and intent of that statute.

JA825

As to your language, "affording any other form of relief," we did not want to take away alternative relief which is provided under existing law. Let's assume that someone in the FBI authorizes or directs subordinate Federal officers to engage in what clearly are violations of the law—harassment, illegal searches and seizures and the like.

If that activity is intentional in character, as I am assuming that it is, it is within the exception for money-damage liability on the part of the United States under the Federal Tort Claims Act. The mere fact the subject matter is dealt with by the Federal Tort Claims Act, and damages excepted from liability, does not mean in our judgment that injunctive relief should always be foreclosed. I assume that a court, under the present doctrines having to do with circumvention of sovereign immunity—for example, by a suit against the officer dealing with his authority to engage in particular actions of an unconstitutional character—would in fact grant injunctive relief in the hypothetical I am posing.

Sometimes Congress does not intend the provision or denial of monetary relief in a particular situation to be the only relief for that matter, and what we are trying to do is to direct the attention of the court to that intent. What was Congress' intent? If they intended monetary relief to be the exclusive remedy, then that is all you get; but if they intended it to be supplementary with injunctive relief, providing irreparable harm and all the other conditions exist, we think that right existing under present law should continue.

      \*         \*        \*        \*        \*        \*        \*

Chairman WILLIAMS. Yes sir. Mr. Lawrence Silberman.

Mr. SILBERMAN. I would like to phrase my remarks in terms of a question. I am concerned about the overruling of the cases relating to the Department of Labor. This is not strictly a parochial interest. I think it is a problem of general applicability. When you have a situation where you have a frame of government regulations, such as the Fair Labor Standards Act where the government is charged with the enforcement of that statute in the Federal District Courts, it also carries the responsibility of publishing in full the interpretations of law.

What concerns me is that your proposal, by eliminating sovereign immunity as a defense, may well allow persons affected by or allegedly affected by the regulation to sue by use of a declaratory judgment and by so doing, pick the vehicle in which the issue as to whether the regulations are appropriately within the statute is going to be determined.

I think it ought to be up to the Government, as part of its litigation strategy, to be able to pick the appropriate vehicle. Now, I make no brief for sovereign immunity as a whole, but I am concerned that the defenses you leave us with, ripeness, standing, etc., may not be sure enough, may not be strong enough, and I think you should deal with this problem. Perhaps you have.

Professor CRAMTON. We have made no assertion that the results in all the cases mentioned in my memorandum would in fact be changed. In most of them courts might not even get to the merits because of the existence of other questions such as standing, and so on, and even if they went to the merits, the Government may well win.

On the question you are raising, I think the answer is that it ought to be handled by the doctrine and the language of the Administrative Procedure Act that action may be committed to the agency's discretion and if the form in which the agency is acting involves the discretionary choice of different procedures, that is going to be held, and has been held by many courts, to be essentially either nonreviewable or subject to a very limited review for arbitrariness or abuse of discretion. I don't want to get in a dispute between Professor Davis and Ralph Berger as to the effect of abuse of discretion and the phrase action committed to agency discretion. But whatever that law is, it continues.

Mr. SILBERMAN. I think the Professor may have missed the point I was trying to make. With respect to the Fair Labor Standards Act, you are not talking about administrative enforcement. You are talking about judicial enforcement. The interpretations just reflect the viewpoint of the Department of Labor as the interpretation of the law expresses the view they will likely take in litigation.

JA826

242

Now, it seems to me that if you eliminate the sovereign immunity defense, you run the risk of allowing a prospective claimant a declaratory judgment proceeding challenging an interpretation of law and thus giving the private party the right to chose his own vehicle to the disadvantage of the Government.

Professor CRAMTON. I grant that is possible and the Supreme Court has already upheld that.

Maybe Professor Byse has the answer to this.

Professor BYSE. Mr. Chairman, I do not want to continue this exhausting discussion. I thought Mr. Sellers directed his remark to Professor Davis' article and my article as creative and pioneering. I guess it is rather exhausting and rather difficult. I am glad to comment to Mr. Silberman's point because he personifies a graphic example of exactly what is wrong with sovereign immunity in my opinion.

Should people subject to the Fair Labor Standards Act be able to get pre-enforcement review of the bulletin put out by the Administrator? That is the issue.

Now, my own hunch is most of the time, no, they ought to wait. But why should they wait? Well, because there is a proper way in which to enforce laws and the Administrator, particularly having only judicial power, should have that power. My argument would be when that is presented to the court, it should be presented in that way and the Government should say, "your Honor, if you permit this kind of pre-enforcement examination, this is what is going to happen to our program, and it is not right and it is not proper and we ask for dismissal."

I might go on to discretion, but I say it is premature. You are then addressing yourself to the issue of pre-enforcement judicial review. You are not saying, "Your Honor, you are suing the Government" and the judge then says, "by God, yes, you are suing the Government," in which event he then never examines what should be examined, namely, the propriety of review at this time.

So I would say to Mr. Silberman, to the extent you can get judges to buy this really idiotic doctrine—and I don't limit it to any particular state, and there are very good judges involved too—by the nature of it it creates problems. Sure you are going to create a little more burden. You will not be able to use the immunity defense, and my position is that you shouldn't be able to use it, and if you have a good case, you should be able to present that case. The virtue of this is that now judges will have to address themselves to what is at issue and not be able to say, "Sovereign Immunity, bye, bye, blackbird," or whatever they say.

Chairman WILLIAMS. Mr. Gardner.

Mr. GARDNER. I made a lot of mistakes that should have been corrected by declaratory judgment. I am glad to see that time is past. But I certainly do not believe that the choice of litigating strategy should be reserved to the Government. If a man is oppressed by a regulation which he believes is wrong, why should he be handicapped and helpless because the Government has a favorite judge or a favorite forum or favorite set of circumstances.

I believe, as Professor Byse said, Mr. Silberman's remarks in a broader sense indicate what is wrong with sovereign immunity.

Chairman WILLIAMS. Any further discussion?

(No response.)

Chairman WILLIAMS. Are you ready for the question?

From the Floor. Question.

Chairman WILLIAMS. We are ready to vote then on Recommendation A, both Parts 1 and 2.

Mr. BARRETT. Mr. Chairman, I would like to make a motion to amend the language to effect the deletions I suggested in connection with my first question solely in the interest of simplicity in what seems to be clean legislative drafting.

Chairman WILLIAMS. Will you again read to us the form that Section 702 would be as you are amending it?

　　*　　　　　*　　　　　*　　　　　*　　　　　*　　　　　*

Mr. BARRETT. It would read, "An action in a court of the United States seeking relief other than money damages shall not be dismissed nor relief therein denied on the ground that it is against the United States." "Nothing herein," and then the numbered 1 and 2 provisos as already appearing.

Chairman WILLIAMS. All right.

Do I hear a second?

JA827

From the Floor. I second it.

Professor DAVIS. May I say a word?

Chairman WILLIAMS. Professor Davis.

Professor DAVIS. I think Mr. Barrett has a good idea. One of the reasons is I think I had that idea quite independently. [Laughter.]

I think that in addition to what he has said there is some advantage in this deletion. What I fear is that the words he wants to delete if adopted will encourage plaintiffs' lawyers to bring their suits against officers either instead of or in addition to suing the United States, and I think that would be unfortunate. I think we should lean in the direction of trying to discourage suits against officers. The reason for that is that in case after case there is a dismissal because the plaintiff's lawyer, however competent he may be, has made the wrong choice of party defendant. If we can only get away from these cases in which the suits against officers cause troubles and prevent the court from getting to the merits of the case, that will be a great gain.

I would say that adopting Mr. Barrett's motion will tend in that direction. It will not call to the attention of the plaintiff's lawyer the idea of suing an officer or that it is specifically because an officer has misbehaved in the view of the plaintiff that the suit is brought. The suit should be a clean suit against the United States and the court should make the determination of whether or not the action should be brought, whether or not a judgment should be entered against the United States.

Chairman WILLIAMS. May I as the Chairman who is obligated by statute to try to obtain enforcement of the recommendations of the conference ask either Mr. Barrett or Professor Davis whether they think the proposed amendment would be more difficult to enact as legislation in the Congress.

Professor DAVIS. I think not, Mr. Chairman. I think there is the psychological advantage Professor Cramton mentioned. Some lawyers will take that psychological advantage. I would put that into the legislative history. I would not make it a part of a main provision of this measure.

Chairman WILLIAMS. Mr. Cohen.

Mr. COHEN. May I ask Mr. Barrett whether he intends any change in the substance of the committee's recommendation by his motion and that was not clear to me from the dialogue between him and Professor Cramton.

Mr. BARRETT. If I understand correctly the substance of the committee language, the answer is no.

Chairman WILLIAMS. Professor Nathanson.

Professor NATHANSON. Mr. Chairman, I would like to add a word to the explanation which Professor Cramton gave when he first answered Mr. Barrett's question. I want to do it because I think out of an excess of modesty Professor Cramton did not indicate the extent to which this language has been carefully designed to allay the fears in high and relatively sophisticated circles with respect to the possible effect of this proposal.

Frankly, I myself am not quite sure there is any substantive difference between the proposal as the committee has presented it and the proposal as Mr. Barrett has suggested. But I am quite sure that there will be many people in the Government or close thereto who will be quite convinced that there is a difference and that the possible implications may be much broader than is intended by this proposal and will make it immeasurably hard to secure legislative action for this proposal.

Chairman WILLIAMS. Professor Walter Gellhorn.

Professor GELLHORN. As I listened to the discussion I can't see there is a bit of difference between the proposal that has just been advanced and the one that is put before us by the committee, although I take cognizance of what Mr. Nathanson has just said about the tactical advantage of more verbose style. It seems to me we ought not to be called upon to reach a conclusion as to this point. We are only 11 minutes away from the luncheon recess. Wouldn't it be feasible to ask the committee during the luncheon recess to consider further and report back to us. They are cognizant of all of these matters as we are not and I should hate to have to vote on the basis of a proposal on the floor for amendment in this technical matter.

*        *        *        *        *        *        *

Professor CRAMTON.

I originally supported language much simpler and more like this and I was driven to the position that really this would work out better, have greater acceptance and be clearer. I would very strongly object to the deletion of the

phrase, "or that the United States is an indispensable party," because I think it is quite clear that that is a separate problem, I think Professor Davis also would object to that; he has made that point in the past.

Mr. BARRETT. Can I ask one question?

Chairman WILLIAMS. Yes, Mr. Barrett.

Mr. BARRETT. If the United States can in fact be sued, then they would under the ordinary rules be an indispensable party. Why shouldn't they be brought in as a party? Doesn't that relieve whatever other problem you would have had under the old rule?

Chairman WILLIAMS. Professor Byse.

Professor BYSE.

\*        \*        \*        \*        \*

On this point of amending A, as Mr. Barrett suggested, I am not surprised that it is accepted because Mr. Davis would like to have the idea established that you get judicial review against the Government. Let's do away with all the folderal of suing the individual. I have great sympathy for that kind of great, forward, hard-hitting approach. The trouble with it is that I am not really concerned whether this brings us up with the traditional European countries. I am not really concerned whether it is a good, straight, clean, hard-hitting approach.

What I am concerned about is that we have a sensible system for litigants to get their cases heard, and we write this statute in the background of a history, a silly history in one sense, but a very functional and practical history in another sense. I can't sue the sovereign, therefore, you are bringing your action against the individual who is committing a legal wrong against you. You may not like that history, but you can't just write it off. This language makes this very clear that we include that, and then we take some steps forward along Kenneth's proposal, bringing the Government in, suing the Government.

It seems to me that the attorney anywhere looking at the statute is entitled to have information. He shouldn't have to run to the legislative history. He shouldn't have to run to the law review articles. And I suggest to you, Mr. Barrett, when you say, "Well, no, insofar as I understand the proposal this doesn't change it," you ought really to be a little concerned about making changes about proposals that maybe you don't feel you have a full grasp of. I would ask what is the advantage to Mr. Barrett's suggestion? Clean draftsmanship. Of course, that is a very valid thing. The committee has wrestled with this. I know Roger Cramton would have favored a narrow language. They have concluded that there are, and Professor Nathanson suggested, some very legitimate political reasons—all in all I drafted many years ago a much better, cleaner statute than this. I am not writing over that statute. I think it is a very important thing here, and I would hate to see us grind it down perhaps to make it a little cleaner or a little harder-hitting. You have got something that makes sense. The fact that Mr. Barrett would like it a little clearer and even Ken wants it a little harder-hitting, I think is not important. Unlike Walter Gellhorn, I can vote against the amendment right now without any difficulty. I don't have to refer it back to the committees.

Chairman WILLIAMS. Mr. Robert Graham.

Mr. ROBERT GRAHAM. I would like to speak in opposition to Mr. Barrett's and Professor Davis' suggestion. We considered at length Mr. Davis' suggestions about eliminating the suits against the officers.

When you start thinking of venue and related problems, you get all bogged down. I would appeal and urge the Conference to abandon the problem of trying to work with words. I would also urge moreover, Mr. Chairman, that possible suggestions of members for amendments be forwarded, if at all possible, to the committee, who met several hours yesterday in deliberations on these and other matters.

It seems to me that the process should be directed toward the substance. I can assure you hours and hours have been put into this. I would urge passing the recommendation.

From the Floor. Question.

Chairman WILLIAMS. Professor Gellhorn, would you like to continue your suggestion?

Professor GELLHORN. No.

Chairman WILLIAMS. The issue is on the amendment as proposed by Mr. Barrett, and I believe you know what it is. It is to strike most of the wording before "Nothing herein" in the Section 702.

Any further discussion?
(No response.)
Chairman WILLIAMS. All those in favor of the amendment please say aye.
[Chorus of ayes.]
Chairman WILLIAMS. Opposed, no.
[Chorus of noes.]
Chairman WILLIAMS. The amendment fails.
Are you ready for the question?
From the Floor. Question.
Chairman WILLIAMS. Apparently we are ready. I see no further signs of discussion. All those in favor of Recommendation A of the Committee on Judicial Review please say aye.
[Chorus of ayes.]
Chairman WILLIAMS. Opposed?
[Chorus of noes.]
Chairman WILLIAMS. The recommendation is carried and now becomes Recommendation Number 9 of the Administrative Conference.
Without objection we shall recess until precisely 2:00 o'clock and you may leave your papers here.
(The conference recessed for lunch at 12:45, to reconvene at 2:00 p.m.)

## APPENDIX VI

CORRESPONDENCE RELATING TO ADMINISTRATIVE CONFERENCE RECOMMENDATIONS AND S. 3568

OFFICE OF THE DEPUTY ATTORNEY GENERAL,
*Washington, D.C., March 31, 1970.*

Prof. ROGER C. CRAMTON,
*University of Michigan Law School.*
*Ann Arbor, Mich.*

DEAR PROFESSOR CRAMTON: Reference is made to your letter of February 9, 1970 which concerns proposed modifications of certain statutes relating to suits against the United States. My comments follow:

(1) The Department has no objection to your proposal that Justice lawyers assist the court in clearing up technical defects in pleadings. In fact, on many occasions our attorneys have notified plaintiff's counsel of errors made with respect to the naming of parties defendant, and this practice will continue.

(2) We would not oppose an amendment to 5 U.S.C. 703, the effect of which would be to enable a person seeking judicial review under any special statutory review proceeding to name "the United States, the agency by its official title, the appropriate officer, or any combination of them"—in lieu of naming the particular defendants specified in the statute establishing a special form of review proceeding.

(3) We would have no objection to amending 28 U.S.C. 1391(e) to cover cases in which defendants other than Federal officials are named. As we understand the recommendations, they do not affect the special provisions for jurisdiction and venue in suits against the United States for money judgments under the Tucker Act or under the Federal Tort Claims Act.

I regret the delay in forwarding this recommendation to your office.

Sincerely,

RICHARD G. KLEINDIENST,
*Deputy Attorney General.*
ADMINISTRATIVE CONFERENCE OF THE UNITED STATES,
*Washington, D.C., March 31, 1970.*

———

Hon. JAMES O. EASTLAND,
*Chairman, Committee on the Judiciary,*
*U.S. Senate, Washington, D.C.*

DEAR MR. CHAIRMAN: This is in response to your letter of March 20, 1970, requesting my views on Senate Joint Resolution 3568.

Enactment of the bill would (1) limit the application of the doctrine of sovereign immunity and (2) eliminate any requirement of a minimum jurisdictional amount in United States District Courts where a federal question is involved. Both of these matters have been studied fully by the Judicial Review Committee of the Administrative Conference of the United States under the chairmanship of Mr. Ashley Sellers and have been the subject of recommendations by the Conference. Assisting the Committee was Professor

JA830

Roger C. Cramton of the University of Michigan who wrote a basic research document on both subjects. A copy of each document is enclosed for the use of your Committee.

Sections 1 and 3 of the bill deal with the sovereign immunity question and with designation of the United States as a party defendant in cases where the suit is one essentially against the United States. As spokesman for the Administrative Conference, I support those sections fully. Removal of the technical legal defense of sovereign immunity, which the Government may still use in some instances to block suits against it by its citizens, regardless of the merits of their claims, is long overdue. Many years ago the United States adopted statutory means for the establishment of federal monetary liability with regard to contracts and torts, thereby eliminating the defense of sovereign immunity in those cases. S. 3568 would accomplish the same purpose with regard to claims challenging official action or non-action by Government agencies and seeking relief other than money damages such as injunction, declaratory judgment, mandatory relief, quiet title, and ejectment.

Since S. 3568 would be limited only to actions for such specific relief, the limitations on the recovery of money damages contained in the Federal Torts Claims Act, the Tucker Act, and similar statutes would be unaffected. Moreover. Government defenses other than sovereign immunity would remain unaffected.

Section 2 of the bill deals with elimination of the $10,000 original jurisdictional amount for cases involving a Federal question in the United States District Courts. The Administrative Conference has recommended elimination of any requirement of a minimum jurisdictional amount where a "plaintiff alleges that he has been injured or threatened with injury by an officer or employee of the United States or any agency thereof, acting under color of law." To the extent that this recommendation is encompassed by Section 2 of S. 3568, I, as spokesman for the Conference, support it.

Today a litigant seeking resolution of a clearly Federal controversy for which there is no specific statutory review procedure may find himself without an adequate form because of his inability to prove that the amount in controversy is $10,000 or because it is impossible to place a monetary value on his right. S. 3568 would remedy this anomaly.

The bill, however, is broader than the recommendation of the Administrative Conference and eliminates the jurisdictional amount in all federal question cases, rather than only those involving an officer, employee, or agency of the United States. Therefore, I have no authority from the Conference to state its support for the bill in its full scope, although the Conference recommendation encompasses part of its scope and moves in the direction of this legislative proposal. The Conference neither favors nor opposes this proposal insofar as it is broader than the Conference recommendation.

I respectfully urge the Committee to consider S. 3568 at an early date. If we can be of any assistance to you or your staff in this matter, we would be pleased to cooperate with you.

Sincerely yours,

—————

JERRE S. WILLIAMS, *Chairman.*

THE UNIVERSITY OF CHICAGO,
THE LAW SCHOOL,
*Chicago, Ill., April 21, 1870.*

Hon. EDWARD M. KENNEDY,
*U.S. Senate*
*Washington, D.C.*

DEAR SENATOR KENNEDY: In your letter informing me that you have introduced a bill on sovereign immunity, you said that "the position of the Department of Justice may be crucial." I agree, and I have been doing what I can do to influence the Department. The Deputy Attorney General, Mr. Richard Kleindienst, is in charge of formulating the Department's response to the inquiry by the Senate Judiciary Committee, and he has referred your bill to interested department officials. One report to me is that the process will be a slow one unless your Subcommittee on Administrative Practice and Procedure decides to hold hearings on the bill at this session.

JA831

247

The instinct of government lawyers to protect the government from expanded liability seems likely to prevail within the Department. My best argument is that a large majority of members of the Administrative Conference are representatives of government agencies, and that the vote of the members of the Conference may be of special significance to the Department, since the Conference so directly represents government agencies. That the Department is capable of expanding governmental liability is shown by its sponsorship of the Federal Tort Claims Act in 1946.

At this time, I should like to emphasize to you that this measure is jointly sponsored by the American Bar Association and the Administrative Conference. A statement of the background seems appropriate.

For many years I have believed that the doctrine of sovereign immunity has often been a source of injustice in the federal courts. I first asserted that view in my writings during the 1940's. A 1954 article of mine (40 Cornell L.Q.3) began by quoting the Supreme Court's 1882 statement: "Courts of justice are established not only to decide upon controverted rights of the citizens as against each other, but also upon rights in controversy between them and the government." What I said about that statement is as true now as it was then: "This mild proposition . . . is sensible and sound. It should be the law. It is now sometimes the law and sometimes not." I repeated and strengthened my view in my Administrative Law Treatise, published in 1958. Yet at that time I was still hoping that the Supreme Court might do the needed job of reforming its own law. In the 1965 Supplement to my Treatise, I gave up that hope and set forth my early draft of a proposed bill in § 27.10.

Two years ago, when I was chairman of the American Bar Association's Committee on Judicial Review, I took advantage of my position as a member of the Administrative Conference to propose to the Conference's Committee on Judicial Review that the two organizations should work together in preparing and sponsoring a measure to reduce sovereign immunity. That was done. The two committees cooperated in drafting the measure you have introduced. The Conference adopted it by an overwhelming vote. The Council of the Administrative Law Section of the ABA adopted it unanimously, and later the House of Delegates unanimously approved it in principle.

Because I was the chairman of the Committee that sponsored the measure within the Association, the Association has asked me to serve as its representative in trying to get the bill enacted.

The two organizations that are sponsoring the bill, the Administrative Conference and the American Bar Association, are in no way motivated by trying to gain some advantage for clients or for any special interest group. We are seeking a better brand of justice as we see it. But we hope that we may persuade all concerned that decisions of courts on the merits of issues of law and fact usually mean a better brand of justice than decisions for the government on the ground of sovereign immunity, without a consideration of the merits.

The Administrative Conference and the American Bar Association are likely to be the only organizations interested in this measure, because the question is such a highly technical one. The only other possibility I think of is the Judicial Conference, which has sometimes taken a position on such measures as this; whether or not the Judicial Conference would respond, you might find appropriate an invitation to it to express its views.

Sincerely yours,

KENNETH CULP DAVIS.

———

THE UNIVERSITY OF MICHIGAN LAW SCHOOL,
HUTCHINS HALL,
*Ann Arbor, Mich., May 20, 1970.*

Mr. THOMAS M. SUSMAN,
*U.S. Senate, Subcommittee on Administrative Practice, Washington, D.C.*

DEAR TOM: I have conversed with Ken Davis and Ashley Sellers concerning our respective roles at the hearing on June 3. Ashley will deliver some brief remarks outlining the consideration of the proposals by the Committee on Judicial Review and the Administrative Conference. Ken will deliver a summary version of his paper, "Sovereign Immunity Must Go," which is to

JA832

be published in the Administrative Law Review on May 5. I will summarize the gist of my article, using examples which I hope will readily communicate the basic ideas in a sympathetic frame.

Of course, our presentations may take a very different form depending upon the posture taken by the Department of Justice. If the Department supports the proposal, the hearing may turn into a love feast. On the other hand, if the Department opposes the proposal in whole or part, Ken and I will try to meet with you on June 2nd (probably after the social event at the State Department) or early on June 3rd (prior to the hearing).

I am enclosing a number of letters that I have received endorsing the proposal. The letter of mine to which each of the writers is responding asked for their assistance in selling the proposal. Thus, I view the letters as available for inclusion in the hearing record as indicative of the broad range of academic support for reform.

I might also add that letters from two eminent Circuit Court Judges included language endorsing the proposal:

EXCERPTS FROM LETTERS TO PROFESSOR ROGER C. CRAMTON:

The Honorable *John R. Brown*, United States Circuit Judge, U.S. Court of Appeals for the Fifth Circuit:

"It is a remarkable thing how much time is taken up in briefs, arguments, and in appellate court opinions on the timeworn and now weary plea of sovereign immunity and the lack of access to courts. Amendments to the venue statutes in the judicial Code have helped a lot, but every once in awhile there comes a real lulu."

". . . I am vitally interested in many phases of [the proposal]. Especially do we need a way for a citizen to have access to a court to resolve genuine disputes over property."

The Honorable *Henry J. Friendly*, United States Circuit Judge, U.S. Court of Appeals for the Second Circuit:

"Thank you for sending me your excellent article. Of course I favor your proposals and would be happy to help. . . ."

Please keep in touch.

Sincerely,

ROGER C. CRAMTON,
*Professor of law.*

---

INDIANA UNIVERSITY, SCHOOL OF LAW,
LAW BUILDING,
*Bloomington, Ind., March 13, 1970.*

Prof. ROGER C. CRAMTON,
*University of Michigan Law School,*
*Ann Arbor, Mich.*

Dear ROGER: This letter answers somewhat belatedly, yours of February 25 from the Administrative Conference, with which a copy of your article in the Michigan Law Review on Nonstatutory Review of Federal Administrative Action was enclosed. I have read the article with great interest and profit. Many thanks for sending it.

I am wholeheartedly in favor of the legislation proposals which are set forth in your article. Something of this nature has long been overdue, and it seems to me that these specific measures would, if adopted, meet in excellent fashion the needs that have existed for so long. I devoutly hope that the Administrative Conference will complete this set of recommendations from its Committee on Judicial Review, and that Congress will be responsive to the opportunity for a significant improvement in the machinery of justice relating to administrative action which these proposals offer.

Wtih cordial regards, I am,

Sincerely yours,

RALPH F. FUCHS.

---

DUKE UNIVERSITY,
*Durham, N.C., March 2, 1970.*

Prof. ROGER C. CRAMTON,
*University of Michigan Law School,*
*Ann Arbor, Mich.*

DEAR ROGER: I have read your review of nonstatutory review of federal administrative action and want to express my support for your proposal. No reasonable man could oppose it after reading your thorough and thoughtful

analysis—which may mean that it will have difficult going in the Senate hearings. I hope not. Good luck and congratulations!

With best regards.

Sincerely yours,

ERNEST GELLHORN,
*Professor of Law.*

——

UNIVERSITY OF PENNSYLVANIA,
THE LAW SCHOOL,
*Philadelphia, Pa., March 4, 1970.*

Prof. ROGER C. CRAMTON,
*Committee Consultant,*
*Law School, University of Michigan,*
*Ann Arbor, Mich.*

DEAR PROFESSOR CRAMTON: I have read with great interest your recent Law Review article on nonstatutory judicial revision of federal administrative action and accompanying proposed legislation, which you were so kind to send me. I want to express my congratulations on this very fine piece of work.

I also wish to express complete agreement with your analysis of the problem and your suggested statutory revisions. For whatever value this might have, you, of course, have my support in trying to effectuate these proposals.

Sincerely,

STEPHEN R. GOLDSTEIN,
*Associate Professor of Law.*

——

UNIVERSITY OF VIRGINIA,
SCHOOL OF LAW,
*Charlottesville, Va., March 3, 1970.*

Prof. ROGER C. CRAMTON,
*University of Michigan, Law School*
*Ann Arbor, Mich.*

DEAR PROFESSOR CRAMTON: Thank you for your letter of February 25 and the copy of your article, which I have read carefully. In addition to the excellence of thought and workmanship, it is the first real attempt to build on the Administrative Procedure Act, which was drafted a quarter century ago with the hope that it would in time serve that purpose.

Please let me know at any time if there is any way in which you think I might aid in securing the adoption of your proposals.

Sincerely yours,

CARL McFARLAND.

——

THE UNIVERSITY OF CHICAGO,
THE LAW SCHOOL,
*Chicago, Ill., June 4, 1970.*

Hon. EDWARD M. KENNEDY,
*U.S. Senate,*
*Washington, D.C.*

DEAR SENATOR KENNEDY: At yesterday's hearing on S. 3568, you will recall that the time allocation worked out in such a way that I had no opportunity to respond to the statement by William D. Ruckelshaus of the Department of Justice. You specifically asked me to make my response in writing, and I am glad to do so. I shall limit myself to the portion of his statement pertaining to sovereign immunity.

In this letter, I shall discuss three aspects of the Ruckelshaus statement: (1) Justice or injustice, (2) overloading the courts, and (3) the allocation of functions between courts and agencies.

(1) Justice or injustice. Perhaps the most significant feature of the Ruckelshaus statement is that it avoids *any* discussion of the effect of the doctrine of sovereign immunity on justice or injustice. Not a single word is devoted to the question whether sovereign immunity contributes to justice or injustice. Instead, the whole statement is devoted to the two subjects of overloading the courts, and the allocation of functions between courts and agencies.

I wonder why the Department of Justice, in opposing the partial abolition of sovereign immunity, chooses not to discuss the merits and demerits of

sovereign immunity as an instrument for the administration of justice. Might it be that whatever it might say about merits and demerits would be unfavorable to its position?

The American Bar Association and the Administrative Conference have dealt with the problem of the effects of the sovereign immunity doctrine on justice. We believe that the doctrine causes injustice in many cases. My own opinion is that the injustice that results from the doctrine is both substantive and procedural. Most of the discussion at the hearing had to do with substantive injustice, and therefore I should like now to emphasize that the injustice is also procedural, in that, when sovereign immunity applies, (a) the party who has a claim against the government often finds that the very officers who are striving to protect proprietary interests of the government are the ones who make a final decision, (b) the officers typically decide without giving the private party an opportunity for a trial-type hearing on issues of fact, (c) the officers decide without allowing opportunity for presentation of oral arguments or briefs, (d) the officers make no systematic findings of fact, (e) they write no reasoned opinion, and (f) judicial review is cut off. *All the protection that are normal for providing procedural fairness are typically cut off when sovereign immunity applies.*

For instance, in Simons v. Vinson, 394 F. 2d 732 (5th Cir. 1968), the court refused because of sovereign immunity to decide who owned the six-million-dollar piece of land that was in controversy. I talked with officers of the Department of the Interior about who made the decision for the government and what procedure was used. They confirmed that all the usual procedural protections were denied.

(2) *Overloading the courts.* The Ruckelshaus statement seems to me to be clearly wrong in asserting that the proposed partial abolition of sovereign immunity will substantially increase the judicial caseload. All the talk in the hearing about "opening the floodgates" seems to me to have no relation to reality. I think the facts are readily obtainable, and that when the facts are collected, the finding will be that the proposed partial abolition of sovereign immunity will increase the caseload by *less than one percent.*

My estimate of less than one percent is a conservative one. My impression from working constantly with the federal reporters (F.2d and F. Supp.) is that sovereign immunity problems may appear, on the average, about once in each volume. And each volume contains something like three hundred cases. If this estimate is about right, the percentage of sovereign immunity cases among all reported cases is about *one-third of one per cent.* Yet it may well be that among unreported cases the percentage is higher. But it could hardly be so much higher that the one-third of one percent would be brought up to one percent.

A closer estimate could be made by taking say, the last dozen volumes of F.2d and F. Supp., finding how many cases are reported and what proportion involve sovereign immunity. Such a sampling would probably be an adequate basis for a reasonably reliable finding.

Of course, if I am right in my impression that sovereign immunity cases are no more than one percent—or even if the proportion is several times what I think it is—the argument about "opening the floodgates" seems completely unjustified.

(3) *The allocation of functions between courts* and agencies. The remaining question raised by the Ruckelshaus statement has to do with the proper role of the courts in reviewing governmental action. The statement is indeed easy to answer, for the position taken is quite an extreme one. At page 6 of the Ruckelshaus written statement the assertion is made: "The sweeping nature of this bill determines that most, if not all, governmental decisions are judicially reviewable."

That assertion, as well as the whole argument founded on it, seems to me to be clearly mistaken.

One of my strongest areas of American administrative law, in my opinion, is the huge body of case law that has worked out the relationship between the courts and the executive branch of the government. The fundamental basis for the division of functions between courts and administrators is comparative qualifications: Judges are especially qualified for some tasks, and administrators are especially qualified for others; what administrators do in the areas where they are especially qualified is subjected to only a limited

check by courts. Huge areas of governmental action courts stay out of almost completely, such as foreign policy and military action. Even when the subject matter is within an area where judges are specialists, the scope of review is limited, as provided in 5 U.S.C. § 706, to those aspects of whole problems which judges are peculiarly qualified to deal with.

A true fundamental is that courts deem themselves limited by Article III of the Constitution to "issues appropriate for judicial determination." The Supreme Court has often used that language, as it did, for instance, in Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240 (1937). In Abbott Laboratories v. Gardner, 387 U.S. 136, 153 (1967), the Court found the issue "fit for judicial resolution."

Ninety-nine percent of the time the determining factor as to whether a court will review (assuming no explicit statutory guidance) is the judicial judgment as to whether the issue is "appropriate for judicial determination" or "fit for judicial resoluton." Less than one percent of the time the determining factor is something related to sovereign immunity.

But within that one percent where the sovereign immunity doctrine has an effect on the allocation of functions as between courts and agencies, the influence of the doctrine is to upset the usual sound basis for allocating functions. The partial abolition of sovereign immunity will remove the upsetting factor. For instance, when a controversy concerns application of commercial law or land law or other common law, no one in our entire society is better qualified than judges to resolve the controversy. But sovereign immunity often means that judges are barred from resolving it.

Not only will S. 3568 *not* result in making "most, if not all, governmental decisions" judicially reviewable, but it will correct most of the misallocation of functions that is caused by the doctrine of sovereign immunity.

Sincerely yours,

KENNETH CULP DAVIS.

_____

THE UNIVERSITY OF MICHIGAN, LAW SCHOOL,
HUTCHINS HALL,
*Ann Arbor, Mich., June 5, 1970.*

Hon. EDWARD M. KENNEDY,
*U.S. Senator,*
*Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR: I very much appreciated the opportunity to appear before the Subcommittee on Administrative Practice in support of S. 3568. It is my belief that the hearing demonstrated the need for the reforms incorporated in the bill and the soundness of its present form.

I would like to make several additional comments concerning an issue that was repeatedly raised at the hearing—the extent to which the bill would increase the already heavy burdens of federal courts. Mr. Ruckelshaus, speaking on behalf of the Department of Justice, stressed the heavy burden that would be imposed upon the federal courts if the sovereign immunity doctrine were modified. He left the implication that a trial on the merits in these cases would be time-consuming and expensive. It is my position that the application of the doctrine of sovereign immunity is so uncertain and unpredictable that the Government is required in every case to assert other defenses that it has, including the merits of the case, in its motion for summary judgment. Examination of hundreds of these cases convinces me of the truth of this statement. Thus sovereign immunity may be viewed as adding an additional, complex issue rather than as displacing the consideration of other issues.

In addition, consideration of other issues, including the merits of the case, does not involve the trial of contested issues of fact, except in very unusual cases. S. 3568 is concerned with judicial review of final administrative action. If the plaintiff is entitled to judicial review, the court determines whether the administrative order is valid, and, in appropriate cases, whether it is supported by substantial evidence. This inquiry does not require that witnesses be heard, evidence taken, a jury be impaneled, and the like. Such cases present only questions of law which are decided on the basis of written briefs and oral argument. The Government's motion for summary judgment precipitates

JA836

a decision by the United States District Judge of the legal questions that are involved. It is not the function of the District Court to try issues of fact in these cases. Since only legal questions are involved, the determination does not involve the same commitment of time and energy that is involved when the court is required to decide contested issues of fact. Cases involving judicial review of final administrative action can be and are handled expeditiously by federal district courts.

It is somewhat ironic that the one exceptional area—where the court is required to resolve contested issues of fact after a full trial—is one in which the Department of Justice concedes that statutory reform is necessary. In situations involving property disputes between private persons and the United States, the Department of Justice agrees that sovereign immunity should be waived to allow specific relief in a United States District Court. In these cases, unlike the ordinary case of judicial review of federal administrative action, there is no formal administrative determination to be reviewed. There is merely an assertion by the United States of an interest in the property claimed by the plaintiff. Provision of a remedy for the resolution of property disputes involving the United States will in fact produce a substantial volume of new litigation in United States District Courts. In addtion, since a factual determination will usually be required, such cases will consume a considerable amount of judicial energy. I am not, of course, arguing that the remedy should not be provded—these property disputes constitute a clear instance where an obvious injustice needs a remedy even if some additional litigation results. I am merely arguing that arguments predicated on a disinclination to increase the burdens of federal courts have their primary application to the property cases, a matter on which the Department of Justice concedes that reform is necessary.

One final point. If it is indeed true that the federal courts are overburdened, with resulting delays and injustice, and if the solution to this problem cannot be found in the appointment of additional judges, then reconsideration of the functions and purposes of federal courts would seem to be in order. S. 3568 involves cases in which questions of federal law are presented. The federal courts have a specialized knowledge and competence on such questions. In addition, because the defendant is a federal officer, state courts are powerless to grant effective relief. Thus the denial of a federal forum is the denial of any remedy whatsoever. Other categories of litigation in the federal courts do not involve these considerations. In diversity cases, for example, the federal court is applying state law to controversies which may be brought in a state court. If the federal courts are too busy to handle important questions of federal law, perhaps it is time to reconsider the wisdom and desirability of the diversity jurisdicton.

I hope that these additional remarks will be helpful to your subcommittee and that they will be added to the hearing record. Many thanks for your courtesy.

Sincerely,

ROGER C. CRAMTON,
*Professor of Law.*

----

THE UNIVERSITY OF TEXAS AT AUSTIN,
SCHOOL OF LAW,
*Austin, Tex., June 12, 1970.*

HON. EDWARD M. KENNEDY,
*U.S. Senate,*
*Washington, D.C.*

DEAR SENATOR KENNEDY: I have studied S. 3568, which you and other have introduced. I do not feel competent to state an opinion about section 1 of the bill, dealing with review of administrative action. It has been a great many years since I last taught Administrative Law and I have not kept up with developments in that field.

My professional specialty is the jurisdiction and procedure of the federal courts. I am Charles T. McCormick Professor of Law at The University of Texas. I am the author of a seven-volume revision of the Barron & Holtzoff Treatise on Federal Practice and Procedure and now am collaborating with others on a new Treatise on Federal Practice and Procedure to replace Barron

& Holtzoff. Five volumes of the new Treatise have so far been published. I am the author of a one-volume hornbook. *Wright on Federal Courts*, of which a Second Edition was published in February of this year, and, in collaboration with two others, of a casebook, *Cases on Federal Courts*, of which a Fifth Edition was published in April of this year. Since 1964 I have been a member of the Standing Committee on Rules of Practice and Procedure of the Judicial Conference of the United States and prior to that time was a member of the Advisory Committee on Civil Rules. I was Reporter for the recently-completed Study of Division of Jurisdiction between State and Federal Courts made by the American Law Institute.

Section 2 of S. 3568 would end the requirement that more than $10,000 be in controversy in order for a federal court to have jurisdiction of a federal question case. This is a step that should have been taken long ago. As I have recently written elsewhere:

> "It is difficult to understand why there should ever be a monetary requirement in federal question cases. The requirement is of extremely limited application, and when it does apply the effect is to deny a federal forum in cases in which the amount involved is small but for which the federal courts have a special expertness and a special interest."

Wright, *Federal Courts* 110 (2d ed. 1970). Other writers have taken a similar view. Friedenthal, *New Limitations on Federal Jurisdiction*, 11 Stan.L.Rev. 213, 216–218 (1959) ; Wechsler, *Federal Jurisdiction and the Revision of the Judicial Code*, 13 Law & Contemp. Prob. 216, 225–226 (1948). A recent Comment, *A Federal Question: Does Priceless Mean Worthless?*, 14 St. John's L.Rev. 268, 282 (1969), the requirement is said to have created "a quagmire of inequity" and its retention on the books is attributed to "legislative adamance or mindless worship of tradition." I am familiar with the literature of this subject and do not know of any defense for retaining an amount in controversy requirement for federal question litigation. The American Law Institute has recommended that the requirement be abolished. A.L.I., *Study of the Division of Jurisdiction between State and Federal Courts* § 1311(a) (Official Dr. 1969), with supporting Commentary at pp. 172–176 and 488–492.

Abolition of the monetary requirement for federal question cases would have no measurable impact on the caseload of the federal courts. A great many specific statutes grant jurisdiction of federal question cases without a monetary requirement and the actual application of the requirement is quite rare. When the Congress last considered amount in controversy in 1958 it was repeatedly asserted in committee reports and supporting documents that "the only significant categories of 'Federal question' cases subject to the jurisdictional amount are suits under the Jones Act and suits contesting the constitutionality of State statutes." Sen. Rep. No. 1830, 85th Cong., 2d Sess., 1958, pp. 6, 15, 22. In fact it is extremely doubtful that a jurisdictional amount is required for Jones Act cases. It has been held that it is not in *Ballard* v. *Moore-McCormick Lines, Inc.*, 285 F.Supp. 290 (S.D.N.Y. 1968), and in *Richardson* v. *St. Charles-St. John the Baptist Bridge and Ferry Authority*, 274 F. Supp. 764 (E.D.La.1967). See Wright, *Federal Courts* 109 (2d ed. 1970). Similarly most cases contesting the constitutionality of state statutes may be brought under 28 U.S.C. § 1343(3), which gives jurisdiction, without regard to amount in controversy, of action to redress the deprivation, under color of any state law, of any right, privilege, or immunity secured by the federal Constitution, or by any federal civil rights statute. The relation between § 1343(3) and § 1331 is far from clear. In a separate opinion in *Hague* v. *C.I.O.*, 307 U.S. 496, 518–532 (1939), Justice Stone suggested that a person claiming a right inherently incapable of pecuniary valuation may proceed under § 1343 (3) without regard to amount in controversy but that if the claim is that a property right is being unconstitutionally denied the suit is under § 1331 and the requisite amount must be in controversy. This distinction has been generally followed in the lower courts. *Bussie* v. *Long*, 383 F.2d 766 (5th Cir. 1967) ; *Howard* v. *Higgins*, 379 F.2d 227 (10th Cir. 1967) ; *Fuller* v. *Volk*, 351 F.2d 323 (3d Cir. 1965). *But cf. Hornsby* v. *Allen*, 326 605 (5th Cir. 1964).

What cases would come to the federal courts if the amount requirement were removed from § 1331 that are not there now? There would be the cases just mentioned in which a state statute interfering with property rights is claimed to be unconstitutional. There would also be cases in which a state statute is claimed to be invalid because contrary to a federal statute other

47–534 O—70——17

JA838

than a civil rights statute. E.g., *McCall* v. *Shapiro*, 292 F.Supp. 268 (D.Conn. 1968). Finally, and most importantly, there would be cases challenging the validity of actions by the federal government and its officers. A challenge to a draft reclassification cannot be heard unless more than $10,000 is in controversy. *Oestereich* v. *Selective Service Local Board 11*, 393 U.S. 233 (1968). A person claiming unconstitutional surveillance by the FBI cannot be heard because not enough is in controversy. *Giacana* v. *Johnson*, 355 F.2d 366 (7th Cir. 1964). A veteran claiming he has been wrongfully denied a job preference by the Navy Yard is out of court because of the inability to predict what the preference will be worth to him in the future. *Powers* v. *Gold*, 124 F.Supp. 93 (D. Mass. 1953). Tenants challenging a rent increase allowed by the Federal Area Rent Control Director cannot get a hearing in federal court because they are not allowed to aggregate their claims and no single tenant has enough in controversy, *Fox v. 34 Hillside Realty Corp.*, 79 F.Supp. 832 (S.D.N.Y. 1948), and they cannot get a hearing in state court because of the inability of state courts to direct the action of federal officers. *Fox v. 34 Hillside Realty Corp.*, 87 N.Y.S. 2d 351 (Sup.Ct. 1949), affirmed 276 App. Div. 994, 95 N.Y.S. 2d 598 (1950). That litigants should be denied a federal forum for federal claims of this sort because their claims are too small is "an unfortunate gap in the statutory jurisdiction of the federal courts." *Wolff* v. *Selective Service Local Board No. 16*, 372 F.2d 817, 826 (2d Cir. 1967). That in many instances denial of a federal forum means, as with the tenants, denial of any forum at all is outrageous. We do nothing to encourage confidence in our judicial system or in the ability of persons with substantial grievances to obtain redress through lawful processes when we close the courthouse door to those who cannot produce $10,000 as a ticket of admission.

There is no risk that ending the amount in controversy requirement for federal question cases would open the federal courts to unpredictable numbers of unknowable kinds of cases. The terrain is well marked. The cases affected are those in which federal action is challenged and that in which state action is challenged on grounds that do not come within § 1343(3). These are important cases for which a federal forum is especially appropriate.

Section 3 of S. 3568 would amend 28 U.S.C. § 1391(e) so that if any defendant is an officer, employee, or agency of the United States and venue is properly laid under that section, other defendants subject to process from the court may be joined without regard to ordinary venue requirements. This is probably already the law, *Powelton Civic Home Owners Assn.* v. *Department of Housing and Urban Development*, 284 F. Supp. 809, 832–834 (E.D. Pa. 1968), but it would be well to amend the statute as proposed in order that there may be no doubt about this sensible result.

For the reasons stated I express no opinion about section 1 of S. 3568 but strongly support enactment of sections 2 and 3 of that bill.

Very truly yours,

CHARLES ALAN WRIGHT.

———

U.S. DEPARTMENT OF LABOR,
OFFICE OF THE SECRETARY,
*Washington, D.C., June 17, 1970.*

Hon. EDWARD M. KENNEDY,
*Chairman, Subcommittee on Administrative Practice and Procedure, Committee on the Judiciary, U.S. Senate, Washington, D.C.*

DEAR MR. CHAIRMAN: I am taking the liberty of writing to you concerning S. 3568, a bill "To amend chapter 7, title 5, United States Code, with respect to procedure for judicial review of certain administrative agency action, and for other purposes."

The purpose of the bill is to restrict further the Federal Government's use of the doctrine of sovereign immunity. We understand the bill to be in furtherance of a recommendation to this effect adopted by the Administrative Conference of the United States. See Recommendation 9 of the Administrative Conference of the United States (January 1970), page 40.

We express deep concern about the possible impact of the bill upon the administration of the Fair Labor Standards Act. As you cogently observed

in your remarks to the Senate on March 9, 1970 (116 Cong. Rec. S3259, 3260), the basic issue in cases where the doctrine of sovereign immunity has been invoked should include an assessment of the degree of judicial interference with the Government's programs along side the harm or threat of harm to individuals by Governmental activities. In making this assessment concerning the application of the Fair Labor Standards Act, it seems to us that, in balance, the possible judicial interference would exceed the harm or threat of harm to individuals.

To illustrate, the bill would affect the result in *Wohl Shoe Company* v. *Wirtz*, 246 F.Supp. 821 (E.D. Mo., 1965) wherein it was held that sovereign immunity barred an action seeking a declaration that an employer, advised by officers that it was violating the Act, was within certain exemptions under the Act. See the memorandum in support of the recommendation entitled, "Statutory Enforcement of the Sovereign Immunity Doctrine," which accompanied the Administrative Conference recommendation number 9 (September 1969), page 28. Of course the court's decision did not deny the plaintiff possible judicial review of the Department of Labor's position concerning the applicability of the exemptions. Their applicability would be contestable in of the Act (29 U.S.C. 216 and 217). Thus, there is no blocking of the right any enforcement action brought by the Secretary pursuant to sections 16 and 17 of the Act (29 U.S.C. 216 and 217). Thus, there is no blocking of a citizen to challenge the legality of the Department's action. Thus, the assumption of such blocking whic his expressed in the Administrative Conference recommendation number 9 is clearly erroneous within this context.

When a statute provides for judicial enforcement of its substantive terms by means of a trial de novo, and when the courts have sustained an application of the doctrine of sovereign immunity concerning "agency action" before such judicial enforcement, there should be no legislative alteration of the application of the doctrine. The definition of "agency action" under the Administrative Procedure Act is broad. See 5 U.S.C. 551(13). Therefore, limitation of the doctrine of sovereign immunty here would have a wide sweep, and possibly seriously impair some Federal enforcement programs in ways which cannot be measured with precision at this time.

The Bureau of the Budget advises that there is no objection to the submission of this report from the standpoint of the Administration's program.

Sincerely,

GEORGE P. SCHULTZ,
*Secretary of Labor.*

———

DEPARTMENT OF JUSTICE,
*Washington, July 8, 1970.*

Hon. EDWARD M. KENNEDY,
*U.S. Senate,*
*Washington, D.C.*

DEAR SENATOR KENNEDY: I appreciate the opportunity of commenting upon the supplemental statements of Professors Davis and Cramton concerning my remarks on S. 3568 made before your Subcommittee on June 3, 1970.

Turning to Professor Davis' letter, I do not find the concepts he discusses so easily separable into distinct categories, even for purposes of discussion.

The overall objective in passing upon disputes either administratively or judicially is to achieve justice or fairness in the result. It is, of course, true that somebody is usually dissatisfied at the final settlement of a dispute, but that does not necessarily make the process unjust. Couched in general terms, it is difficult to come to grips with what justice means for Professor Davis. That was why I concluded from his writings that Professor Davis desired a very significant expansion in the number of cases that went to trial on the merits. Only in that way did he seem to think that substantive and procedural justice could be achieved.

It was this conclusion that led to some of my doubts about the desirability of the legislation. It seemed inevitable that, if the bill were enacted, a large number of additional trials would now be required of the Federal judiciary. The possibility of an increased number of cases cannot be refuted by pointing to the few reported cases involving sovereign immunity. There are probably one hundred unreported cases involving this issue for every reported case. Great numbers of other such disputes never get to court because of inhibitions based on the existing law. If any significant number of cases now dismissed on motion

or inhibited entirely were to appear in court for a trial on the merits, the burden thus imposed upon the Federal courts would be clear and undeniable. And I expect that such cases would promptly appear.

Despite Professor Davis' assertions, the facts on the numbers of cases involving sovereign immunity are not readily determinable. In the many cases against Federal officers that come to my Division, we usually answer with several jurisdictional defenses including sovereign immunity, agency discretion, justiciability, standing to sue, and the like. The court will frequently accept several of these defenses and the case will be dismissed. In such a result there has not, therefore, been a clear-cut case on sovereign immunity. The point will no doubt be raised that this is a demonstration that sovereign immunity is not needed for the Government's defense of these cases. But this does not follow.

As I pointed out in my statement before your Subcommittee, the jurisdictional defenses other than sovereign·immunity are being significantly eroded by the courts. It can be argued that they are being held together by the defense of sovereign immunity—the general prohibition against unconsented suits against the Government. If the Congress decides to remove this defense, I foresee a weakening of the others with the consequent accumulation of new cases to which reference was previously made.

It was because of the sweeping nature of S. 3568 and what were to me the foreseeable consequences of its enactment what I ventured the suggestion that its ultimate effect would be the determination that most, if not all, governmental decisions would be judicially reviewable. I see no reason to modify this opinion.

Finally, Professor Davis suggests that the present law results in a misallocation of functions between the courts and the agencies. He wishes to restore the courts' functions that are appropriate to the courts but which are denied by the doctrine of sovereign immunity. Functions which are appropriate to the courts are those in which they are allegedly peculiarly qualified to deal with.

This argument is not clear. What is appropriate for judicial judgment is not easily determinable as a fact; it is primarily a matter of policy to be resolved basically by the Legislative branch of the Government. For example, the Congress determined that decisions of the Veterans Administration were not judicially reviewable not necessarily because they were not appropriate for judicial judgment, but because it foresaw the thousands of decisions that that agency was going to make and the sheer impossibility of having any fraction of them reviewed by the courts. I suggested that a survey of the problems of the Federal courts today indicaes a great need for reallocation of functions in the direction of taking whole classes of cases out of the judicial system and putting them elsewhere for final decision. The Supreme Court sees no misallocation of functions because of the availability of the defense of sovereign immunity. It has declined to allow the judicial process to be used as a means of interfering with or obstructing governmental programs. The conclusion I draw is that barring a case from judicial review permits no inference of injustice or misallocation of functions between courts and agencies. Whether injustice is present in the results obtained in a particular class of cases is determinable. If it is, attention should be directed at that particular problem. Sweeping general legislation such as S. 3568 is not the answer to particular problems yet to be determined.

Professor Cramton's letter makes four points which I shall discuss in order :

1. Sovereign immunity is such a vague concept that it cannot stand alone but must be bolstered by other jurisdictional defenses available to the government. As was previously noted, sovereign immunity is, in my judgment, more than just "an additional, complex issue", it is a key concept, well supported by the Supreme Court, that should not be waived because such waiver could be interpreted as a clear signal to the Courts from Congress that the Government should now be held judicially accountable for most if not all actions of its officials and agents.

2. S. 3568 is concerned solely with judicial review of final administrative action. Therefore, proceedings authorized by this bill will be simple ones based on the review of the record of the hearings in the agency and argument will be confined to questions of law. This is not the way in which this bill as been previously supported. We have had a presentation of numerous cases with allegedly unjust results concluding with the intimation that the result would have been quite different if a court had had authority to examine the facts. Since there is no doubt that a court today may look into unauthorized or unconsti-

tutional agency action, this appears to leave as the principal need a judicial review of the facts. This is a trial on the merits and consumes valuable court time.

3. The professor finds some paradox between our opposition to S. 3568 and our willingness to concede the general principle that judicial review should be allowed in property disputes between citizens and the Government. He points out that this concession, although a highly desirable one, is quite likely to lead to an increased amount of litigation. This, of course, is true. If an area is discovered in which injustice or unsatisfactory results were evident because of prohibition against judicial review, that was the precise type of situation in which judicial review should be permitted. We asked Professor Cramton to point to other such areas and assured him that our support would be given to waiving the defense of sovereign immunity in those areas also.

4. Professor Cramton suggests that, if the existing burden on the Federal courts is too great to accommodate the new cases that would be produced by the enactment of S. 3568, we ought to consider some modification of the Federal jurisdiction in diversity cases. His reason is that the cases arising under S. 3568 all involve Federal law in which the judges have a specialized knowledge and competence, whereas diversity cases usually involve State law where the special knowledge, if anywhere, is in State courts. This suggestion, of course, opens up a new question far beyond the scope of S. 3568. I must note, however, that my argument has been based on the belief that the health of the judiciary requires that we strive to remove great numbers of cases not only from the Federal courts but also from the State courts. The issue is not the competence of the judges but the overwhelming mass of cases with which all courts are faced today. There is no doubt that we must consider new ways to handle disputes so that all courts can operate effectively and justly. I do not think that a solution will be found by simply sending diversity cases back to the State courts and filling in with cases in which the Government has waived sovereign immunity.

You asked me to respond to the issues raised by these two statements and I have attempted to do that. However, I do not want to appear entirely negative. The problems that your Subcommittee is considering are very real ones. The proponents of S. 3568 are stressing the difficulties citizens have in challenging agency decisions. I know these difficulties exist. My own emphasis, on the other hand, has been on the very widely recognized burden of the caseload under which our judiciary is working. I have suggested that we should not suddenly enlarge that burden in a sweeping general fashion. It is not entirely clear just what would be opened up by S. 3568; but it seems certain that too much is being unnecessarily offered by the bill.

The record is not established that the defense of sovereign immunity is all bad. The Supreme Court does not find it so and I do not believe that this is due to confusion about the concept. All I ask is that the dictates of prudence be followed. If a line of a particular type of case can be shown to produce a persistent set of unjust results, we would not hesitate to recommend a waiver of sovereign immunity for such cases. But short of such a demonstration, we oppose creating unnecessary problems for a judiciary already in need of relief.

Thank you for this opportunity to discuss this bill further.

Sincerely yours,

WILLIAM D. RUCKELSHAUS,
*Assistant Attorney General.*

○

JA842

JA843

# EXHIBIT 1

| | |
|---|---|
| **From:** | Lane, Gary [Lane.Gary@epa.gov] |
| **Sent:** | 3/10/2025 5:58:59 PM |
| **To:** | Jennette, Vonda [Jennette.Vonda@epa.gov] |
| **CC:** | Henry, Latonya [Henry.Latonya@epa.gov]; Gulamali, Adil [Gulamali.Adil@epa.gov]; Boyd, Wyatt [Boyd.Wyatt@epa.gov] |
| **Subject:** | RE: Place Hold/ Control in ASAP - 8 programs |

Thanks

**From:** Jennette, Vonda <Jennette.Vonda@epa.gov>
**Sent:** Monday, March 10, 2025 1:58 PM
**To:** Lane, Gary <Lane.Gary@epa.gov>
**Cc:** Henry, Latonya <Henry.Latonya@epa.gov>; Gulamali, Adil <Gulamali.Adil@epa.gov>; Boyd, Wyatt <Boyd.Wyatt@epa.gov>
**Subject:** RE: Place Hold/ Control in ASAP - 8 programs

Recipients typically have 120 days to submit the FFR.

*Vonda K. Jennette*, Director
OCFO, Office of the Controller, RTP Finance Division
109 TW Alexander Dr
Mail Code AA 216-01
RTP, NC 27711

Email: jennette.vonda@epa.gov
Call me on teams | Mobile: 919-797-5260

**From:** Lane, Gary <Lane.Gary@epa.gov>
**Sent:** Monday, March 10, 2025 1:50 PM
**To:** Jennette, Vonda <Jennette.Vonda@epa.gov>
**Cc:** Henry, Latonya <Henry.Latonya@epa.gov>; Gulamali, Adil <Gulamali.Adil@epa.gov>; Boyd, Wyatt <Boyd.Wyatt@epa.gov>
**Subject:** RE: Place Hold/ Control in ASAP - 8 programs

Thanks for the info. We are trying to get a sense of timing of the FFR process and thinking ahead in the event these funds are rescinded in future appropriations.

With the FFR process what is the likely hood funds will be deobligated in the coming weeks or months?

**From:** Jennette, Vonda <Jennette.Vonda@epa.gov>
**Sent:** Monday, March 10, 2025 1:37 PM
**To:** Lane, Gary <Lane.Gary@epa.gov>
**Cc:** Henry, Latonya <Henry.Latonya@epa.gov>; Gulamali, Adil <Gulamali.Adil@epa.gov>
**Subject:** RE: Place Hold/ Control in ASAP - 8 programs

Hi Gary. We don't process a deobligation until we get the final financial report. We have not been instructed to deobligate without following the normal process.

*Vonda K. Jennette*, Director
OCFO, Office of the Controller, RTP Finance Division
109 TW Alexander Dr
Mail Code AA 216-01

EPA_00000864

RTP, NC 27711

Email: jennette.vonda@epa.gov
Call me on teams | Mobile: 919-797-5260

---

**From:** Lane, Gary <Lane.Gary@epa.gov>
**Sent:** Monday, March 10, 2025 9:58 AM
**To:** Jennette, Vonda <Jennette.Vonda@epa.gov>
**Cc:** Henry, Latonya <Henry.Latonya@epa.gov>
**Subject:** FW: Place Hold/ Control in ASAP - 8 programs

Hi Vonda – when will the funds for the below Grants be deobligated? I'm assuming they all currently obligated.

---

**From:** Gulamali, Adil <Gulamali.Adil@epa.gov>
**Sent:** Friday, March 7, 2025 4:29 PM
**To:** Johnson, Charlene <Johnson.Charlene@epa.gov>
**Cc:** Robinson, Angel <robinson.angel@epa.gov>; Lavergne, Dany <lavergne.dany@epa.gov>; Jennette, Vonda <Jennette.Vonda@epa.gov>; Evans, Antoinette <Evans.Antoinette@epa.gov>; Lane, Gary <Lane.Gary@epa.gov>; Boyd, Wyatt <Boyd.Wyatt@epa.gov>; Puglisi, Peter <puglisi.peter@epa.gov>
**Subject:** RE: Place Hold/ Control in ASAP - 8 programs

Thanks Charlene and Gary. Have a good weekend

Adil

---

**From:** Johnson, Charlene <Johnson.Charlene@epa.gov>
**Sent:** Friday, March 7, 2025 4:24 PM
**To:** Gulamali, Adil <Gulamali.Adil@epa.gov>
**Cc:** Robinson, Angel <robinson.angel@epa.gov>; Lavergne, Dany <lavergne.dany@epa.gov>; Jennette, Vonda <Jennette.Vonda@epa.gov>; Evans, Antoinette <Evans.Antoinette@epa.gov>; Lane, Gary <Lane.Gary@epa.gov>; Boyd, Wyatt <Boyd.Wyatt@epa.gov>; Puglisi, Peter <puglisi.peter@epa.gov>
**Subject:** RE: Place Hold/ Control in ASAP - 8 programs

Attached is a list of awards suspended by CFDA/Assistance Listings, per email thread below.

Have a good weekend!

**Charlene A. Johnson**
Lead Financial Specialist | U.S. EPA | Grants Services Branch |OCFO-OC-RTP-Finance Division, NC | Phone: 919.541.3582 | Org Email: rtpfc-grants@epa.gov
EPA Finance Home Page: http://www2.epa.gov/financial | Search for SF425: https://www.epa.gov/grants/epa-grantee-forms | Forward payments & SF425: rtpfc-grants@epa.gov

Let us know how we're doing RTP-FC Customer Service Survey

**Please consider the environment before printing this e-mail**

---

**From:** Lane, Gary <Lane.Gary@epa.gov>
**Sent:** Friday, March 7, 2025 1:16 PM
**To:** Boyd, Wyatt <Boyd.Wyatt@epa.gov>; Gulamali, Adil <Gulamali.Adil@epa.gov>; Puglisi, Peter <puglisi.peter@epa.gov>; Johnson, Charlene <Johnson.Charlene@epa.gov>
**Cc:** Robinson, Angel <robinson.angel@epa.gov>; Lavergne, Dany <lavergne.dany@epa.gov>; Jennette, Vonda <Jennette.Vonda@epa.gov>; Evans, Antoinette <Evans.Antoinette@epa.gov>
**Subject:** RE: Place Hold/ Control in ASAP - 8 programs

EPA_00000865

I added the PRCs associated with EJ "Grant / BOC 41" programs for Base and IRA appropriations below. I'm assuming all but he last 2 CFDA listings are associated with Base appropriations/PRCs.

| | CFDA/Assistance Listing Title |
|---|---|
| 66.306 | Environmental Justice Collaborative Problem-Solving Cooperative Agreement Program - 000W57 |
| 66.309 | Surveys, Studies, Investigations, Training and Special Purpose Activities Relating to Environmental Justice - 000W57 |
| 66.312 | Environmental Justice Government-to-Government (EJG2G) Program - 000W57 |
| 66.604 | Environmental Justice Small Grant Program - 000W57 |
| 66.614 | Financial Assistance For Community Support Activities To Address Environmental Justice Issues - 000W57 |
| 66.615 | Environmental Justice Thriving Communities Grantmaking Program (EJ TCGM) 000W57 |
| 66.616 | Environmental and Climate Justice Block Grant Program (000W57XKS; 000W57XK1; 000A57XK1; 000L57XK1) |
| 66.721 | Reducing Embodied Greenhouse Gas Emissions for Construction Materials and Products (000A95XCL; 000C95XCL; 000F95XCL; 000JMMXCL; 000MMMXCL; 000NMMXCL; 000YMMXCL) |

EPA_00000866

**From:** Boyd, Wyatt <Boyd.Wyatt@epa.gov>
**Sent:** Friday, March 7, 2025 12:14 PM
**To:** Gulamali, Adil <Gulamali.Adil@epa.gov>; Puglisi, Peter <puglisi.peter@epa.gov>; Johnson, Charlene <Johnson.Charlene@epa.gov>
**Cc:** Robinson, Angel <robinson.angel@epa.gov>; Lavergne, Dany <lavergne.dany@epa.gov>; Jennette, Vonda <Jennette.Vonda@epa.gov>; Evans, Antoinette <Evans.Antoinette@epa.gov>; Lane, Gary <Lane.Gary@epa.gov>
**Subject:** RE: Place Hold/ Control in ASAP - 8 programs

Yes Gary's team can assist with detailed crosswalk.

Low Embodied Carbon is any PRC with CL at the end in the RPIO Activity string.

The others are in PP 57.

**From:** Gulamali, Adil <Gulamali.Adil@epa.gov>
**Sent:** Friday, March 7, 2025 12:07 PM
**To:** Puglisi, Peter <puglisi.peter@epa.gov>; Johnson, Charlene <Johnson.Charlene@epa.gov>
**Cc:** Robinson, Angel <robinson.angel@epa.gov>; Lavergne, Dany <lavergne.dany@epa.gov>; Jennette, Vonda <Jennette.Vonda@epa.gov>; Evans, Antoinette <Evans.Antoinette@epa.gov>; Boyd, Wyatt <Boyd.Wyatt@epa.gov>; Lane, Gary <Lane.Gary@epa.gov>
**Subject:** RE: Place Hold/ Control in ASAP - 8 programs

Received confirmation. Please lock and if it is going to take longer than today let me know. Also, provide a list of the grants paused. Thanks

OB: will be able to provide a crosswalk for the below to help us identify the grants in ASAP.

Adil

**From:** Gulamali, Adil
**Sent:** Friday, March 7, 2025 11:57 AM
**To:** Puglisi, Peter <puglisi.peter@epa.gov>; Johnson, Charlene <Johnson.Charlene@epa.gov>
**Cc:** Robinson, Angel <robinson.angel@epa.gov>; Lavergne, Dany <lavergne.dany@epa.gov>; Jennette, Vonda <Jennette.Vonda@epa.gov>; Evans, Antoinette <Evans.Antoinette@epa.gov>; Boyd, Wyatt <Boyd.Wyatt@epa.gov>; Lane, Gary <Lane.Gary@epa.gov>
**Subject:** RE: Place Hold/ Control in ASAP - 8 programs

Hold- until I got confirmation from Travis

Adil

**From:** Gulamali, Adil
**Sent:** Friday, March 7, 2025 11:55 AM
**To:** Puglisi, Peter <puglisi.peter@epa.gov>; Johnson, Charlene <Johnson.Charlene@epa.gov>
**Cc:** Robinson, Angel <robinson.angel@epa.gov>; Lavergne, Dany <lavergne.dany@epa.gov>; Jennette, Vonda <Jennette.Vonda@epa.gov>; Evans, Antoinette <Evans.Antoinette@epa.gov>; Boyd, Wyatt <Boyd.Wyatt@epa.gov>; Lane, Gary <Lane.Gary@epa.gov>
**Subject:** FW: Place Hold/ Control in ASAP - 8 programs

EPA_00000867

Please see below. Confirm once done. Any questions let me know. Thanks

Adil

**From:** Coogan, Daniel <Coogan.Daniel@epa.gov>
**Sent:** Friday, March 7, 2025 11:53 AM
**To:** Treml, Gregg <Treml.Gregg@epa.gov>; Kadeli, Lek <Kadeli.Lek@epa.gov>; Jones-Peeler, Meshell <Jones-Peeler.Meshell@epa.gov>; Gulamali, Adil <Gulamali.Adil@epa.gov>
**Cc:** Patrick, Kimberly <Patrick.Kimberly@epa.gov>; Wise, Melissa <wise.melissa@epa.gov>
**Subject:** Place Hold/ Control in ASAP - 8 programs

All, we just had a check-in with Travis and as part of a broader effort related to certain grant programs, please put a control on ASAP accounts for all grants funded under the following grant programs so recipients cannot draw funds.

| CFDA/Assistance Number Listing | CFDA/Assistance Listing Title |
|---|---|
| 66.306 | Environmental Justice Collaborative Problem-Solving Cooperative Agreement Program |
| 66.309 | Surveys, Studies, Investigations, Training and Special Purpose Activities Relating to Environmental Justice |
| 66.312 | Environmental Justice Government-to-Government (EJG2G) Program |
| 66.604 | Environmental Justice Small Grant Program |
| 66.614 | Financial Assistance For Community Support Activities To Address Environmental Justice Issues |
| 66.615 | Environmental Justice Thriving Communities Grantmaking Program (EJ TCGM) |

JA849

| 66.616 | Environmental and Climate Justice Block Grant Program |
|---|---|
| 66.721 | Reducing Embodied Greenhouse Gas Emissions for Construction Materials and Products |

JA850

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Appalachian Voices, *et al.*,

    *Plaintiffs,*

*v.*

United States Environmental Protection
Agency, *et al.*,

    *Defendants.*

Civil Action No. 25-1982 (RJL)

### MEMORANDUM OPINION

August 29, 2025 [Dkt. #29, 30, 66]

Plaintiffs, twenty-three recipients of Environmental and Climate Justice Block

Grants, bring this suit individually and on behalf of a class of others similarly situated

against the United States Environmental Protection Agency ("EPA") and EPA

Administrator Lee Zeldin in his official capacity (collectively, "defendants") for relief from

the termination of their grants. They allege that defendants terminated Environmental and

Climate Justice Block Grants in violation of the separation of powers, Presentment Clause,

U.S. Const. art. I, § 7, cl. 2–3, and the Administrative Procedure Act ("APA"), 5 U.S.C.

§ 706. Accompanying their Complaint, plaintiffs move for a preliminary injunction and to

certify a Federal Rule of Civil Procedure 23(b)(2) class for all entities that received

Environmental and Climate Justice Block Grants, excluding those entities that have sued

in other courts. Defendants move to dismiss the suit for lack of subject-matter jurisdiction

and plaintiffs' failure to state a claim for relief. For the reasons set forth below, I **GRANT**

defendants' motion to dismiss, **DENY** plaintiffs' motion for preliminary injunction, and

**DENY** plaintiffs' motion for class certification.

## BACKGROUND

### I.    Statutory and Factual Background

In 2022, as part of the Inflation Reduction Act ("IRA"), Congress amended the Clean Air Act to create the Environmental and Climate Justice Block Grants. *See* Pub. L. No. 117-169, § 60201, 136 Stat. 1818, 2078 (2022) (codified at 42 U.S.C. § 7438). In the amendment, Congress appropriated $2.8 billion to EPA to award grants for climate projects and an additional $200 million for technical assistance to support grant recipients.    42 U.S.C. §§ 7438(a)–(b).    The statute provides that EPA "shall use" the appropriated funds "to award grants for periods of up to 3 years to eligible entities to carry out [eligible activities] that benefit disadvantaged communities, as defined by the Administrator." *Id.* § 7438(b)(1). An "eligible entity" is: (i) "a partnership between . . . an Indian tribe, a local government, or an institution of higher education; . . . and a community-based nonprofit organization;" (ii) "a community-based nonprofit organization;" or (iii) "a partnership of community-based nonprofit organizations." *Id.* § 7438(b)(3). Eligible entities may use a grant awarded for one of the activities enumerated in the statute. *See id.* § 7438(b)(2).

EPA then developed four grant programs and a technical assistance program. Complaint ("Compl.") [Dkt. #1] ¶¶ 9, 64. The four grant programs are the Community Change Grants Program, the Environmental Justice Collaborative Problem Solving Cooperative Agreement Program, the Government-to-Government Program, and the Environmental Justice Thriving Communities Technical Assistance Centers Program. *Id.* at ¶¶ 67, 83, 90, 95. EPA awarded hundreds of grants and provided periodic reimbursement

2

to grant recipients. *Id.* at ¶ 11.

On January 20, 2025, the President issued two executive orders implicating the Environmental and Climate Justice Block Grants. Executive Order 14,154, entitled "Unleashing American Energy," instructs, in part, that "[a]ll agencies shall immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022 . . . and shall review their processes, policies, and programs for issuing grants, loans, contracts, or any other financial disbursements of such appropriate funds for consistency with the law and the policy outlined" in the order. 90 Fed. Reg. 8353, 8357 (2025); *see* Compl. ¶¶ 101–03. The second, Executive Order 14,151, entitled "Ending Radical and Wasteful Government DEI Programs and Preferencing," instructs federal agencies, in part, to provide the director of the Office of Management and Budget with a list of all "Federal Grantees" who received Federal funding for "environmental justice" programs and orders agencies to "terminate" all "environmental justice" offices and positions. 90 Fed. Reg. 8339, 8339–40 (2025); *see* Compl. ¶¶ 105–07.

Shortly after the President issued these executive orders, EPA began implementing them. The agency first froze all grant funding authorized under the IRA and prohibited grant recipients from drawing additional funds. Compl. ¶¶ 13–14, 109–10. EPA then terminated grant awards under the Environmental and Climate Justice Block Grant program *en masse. Id.* at ¶ 14. From February through May 2025, EPA sent form letters to grant recipients, notifying them that their grants were terminate for "policy reasons." *Id.* at ¶¶ 113–15.

During this period, grant recipients began challenging EPA's terminations. On

3

March 19, 2025, thirty-eight grant recipients sued in the District of South Carolina, alleging that the freezing of their funds and termination of their grants violated their rights under the United States Constitution and the APA. *See Sustainability Inst. v. Trump*, No. 2:25-cv-2152, 2025 WL 1486979, at \*1 (D.S.C. May 20, 2025); *see generally* Compl., ECF No. 1, *Sustainability Inst.*, 2:25-cv-2152 (D.S.C.). Not long after, on April 2, 2025, three additional grant recipients sued in the District of Maryland, alleging that the termination of their grants violate the APA, their rights under the Constitution, and various federal regulations. *See Green & Healthy Homes Initiative, Inc. v. EPA*, No. 25-cv-1096, 2025 WL 1697463, at \*1 (D. Md. June 17, 2025); Compl., ECF No. 1, *Green & Healthy Homes Initiative*, No. 25-cv-1096 (D. Md.). The district court in *Sustainability Institute* entered judgement on the APA claims, and the district court in *Green & Health Homes Initiative* held that EPA's termination of the grants violated the APA. *See Sustainability Inst.*, 2025 WL 1486979, at \*3; *Green & Healthy Homes Initiative*, 2025 WL 1697463, at \*21. The Fourth Circuit subsequently stayed the district court's order in *Sustainability Institute*, holding that the Tucker Act likely divests the district court of jurisdiction. No. 25-1575, 2025 WL 1587100, at \*1–2 (4th Cir. June 5, 2025).

On July 3, 2025, Congress passed the "One Big Beautiful Bill." It included a rescission of funding for the Environmental and Climate Justice Block Grants. *See* H.R. 1, 119th Cong. § 60016 (2025). The bill rescinds "[t]he unobligated balances of amounts made available to carry out" the Environmental and Climate Justice Grants. *Id.*

## II.    Procedural History

Prior to the passage of the rescission bill, on June 25, 2025, plaintiffs brought this

4

suit, alleging that EPA's termination of the Environmental and Climate Justice Block Grants program violates the separation of powers and the Presentment Clause. Compl. ¶¶ 175–85. They also alleged that the terminations were arbitrary and capricious, and contrary to law, under the APA. *Id.* at ¶¶ 186–213.

Shortly thereafter—and several months after EPA began grant terminations— plaintiffs moved for a preliminary injunction and class certification, seeking "urgent injunctive relief to restore the Environmental and Climate Justice Block Grant program." *See* Pls.' Mot. for PI ("PI Mot.") [Dkt. #29]; Pls.' Br. in Supp. of PI Mot. ("Pls.' Br.") [Dkt. #29-1] at 2; Pls.' Reply in Supp. of PI Mot. ("Pls.' Reply") [Dkt. #77]; Pls.' Mot. for Class Cert. ("Class Cert. Mot.") [Dkt. #30]. Defendants oppose and move to dismiss the case. *See* Defs.' Mot. to Dismiss & Opp'n to PI Mot. ("MTD") [Dkt. # 66]; Defs.' Opp'n to Class Cert. Mot. [Dkt. #68]; Pls.' Opp'n to MTD ("Pls.' Opp'n") [Dkt. #87]; Defs.' Reply in Supp. of MTD ("Defs.' Reply") [Dkt. #91]. In addition, nineteen states and the District of Columbia, and a group of nonprofit organizations that were beneficiaries of the grantees, filed amicus briefs in support of plaintiffs' motion for a preliminary injunction. *See generally* Amici State Br. [Dkt. #60]; Nonprofit Amici Br. [Dkt. #81]. The Court held a hearing on plaintiffs' motion for preliminary injunction and defendants' motion to dismiss on August 5, 2025. The motions are ripe for review.

## LEGAL STANDARDS

Defendants move to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). When evaluating a Rule 12(b) motion, the Court may consider "the facts alleged in the Complaint, any documents either attached to or incorporated in the

5

complaint and matters of which [the Court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). A Rule 12(b)(1) motion tests the Court's subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by the Constitution and statute.'" *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). Plaintiffs bears the burden of demonstrating the Court's subject-matter jurisdiction over the claims at issue. *See Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

A Rule 12(b)(6) motion to dismiss for failure to state a claim tests the legal sufficiency of the Complaint. *See* Fed. R. Civ. P. 12(b)(6); *Herron v. Fannie Mae*, 861 F.3d 160, 173 (D.C. Cir. 2017). To survive a Rule 12(b)(6) motion, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Complaint must include "factual content" sufficient to allow the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Plaintiffs move for a preliminary injunction, which is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC*, 555 U.S. 7, 22 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and

6

that an injunction is in the public interest." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 727 (D.C. Cir. 2022) (quoting *Winter*, 555 U.S. at 20). A likelihood of success on the merits includes plaintiffs' ability to successfully establish this Court's jurisdiction. *See Elec. Privacy Info. Ctr. v. Dep't of Corrections*, 928 F.3d 95, 104 (D.C. Cir. 2019). Further, the last two factors merge when the Government is the opposing party. *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021).

## ANALYSIS

Defendants argue that this case requires dismissal. They argue that the Court lacks subject-matter jurisdiction because plaintiffs' claims belong in the Court of Federal Claims under the Tucker Act; Congress's rescission of the "unobligated balance amounts" of the Environmental and Justice Block Grants moots plaintiffs' claims; and the Court lacks jurisdiction to review EPA's discretionary decision regarding how to allocate funds. MTD at 7–18. Defendants also argue that plaintiffs have not put forward independent constitutional claims. *Id.* at 25. Plaintiffs respond that this Court has subject-matter jurisdiction because they challenge the wholesale dismantling of the Environmental Justice and Climate Justice Block Grants program—rather than individual grant terminations—seek forward-looking equitable relief, and challenge actions that were not committed to EPA's discretion. Pls.' Reply at 5–18. They also argue that their grant funds are still obligated, so Congress's rescission bill does not moot their claims. *Id.* at 2–5.

Unfortunately for the plaintiffs, I have concluded that their claims warrant dismissal. I do not have jurisdiction over plaintiffs' APA claims under the Tucker Act, and plaintiffs' requested injunctive relief is incompatible with the Government's sovereign immunity.

7

Plaintiffs also do not have a cause of action for either of their constitutional claims, so those claims warrant dismissal as well. Because the Court lacks subject-matter jurisdiction under the Tucker Act, I do not address whether Congress's rescission of unobligated funds appropriated for the Environmental and Climate Justice Block Grants moots plaintiffs' claims, nor whether EPA's actions were committed to agency discretion.

## I.   Administrative Procedure Act Claims

"The United States and its agencies are generally immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). Under the APA, Congress has waived sovereign immunity for lawsuits by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, . . . [and] seeking relief other than money damages." 5 U.S.C. § 702; *see Crowley*, 38 F.4th at 1105–06. This waiver does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Crowley*, 38 F.4th at 1106 (quoting *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 618 (D.C. Cir. 2017)); 5 U.S.C. § 702.

The Tucker Act grants jurisdiction to the Court of Federal Claims for "any claim against the United States founded . . . upon any express or implied contract with the United States[.]" 28 U.S.C. § 1491. Our Circuit has "interpreted the Tucker Act as providing the *exclusive* remedy for contract claims against the government, at least *vis a vis* the APA." *Transohio Savings Bank v. Director, Off. of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992), *abrogated on other grounds as recognized in Perry Cap.*, 864 F.3d at 620.

8

Courts must therefore determine whether "action against the United States . . . is *at its essence* a contract claim." *Crowley*, 38 F.4th at 1106 (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982)).

That inquiry requires an individualized assessment based on the source of the plaintiffs' rights and the nature of the relief that they seek. *Id.* To determine the source of the rights upon which the plaintiff bases his claims, the Court analyzes whether "the plaintiff's asserted rights and the government's purported authority arise from statute," "whether the plaintiff's rights 'exist[ ] prior to and apart from rights created under the contract,'" and "whether the plaintiff 'seek[s] to enforce any duty imposed upon' the government 'by the . . . relevant contracts to which' the government 'is a party[.]'" *Id.* at 1107 (quoting *Perry Cap.*, 864 F.3d at 619). In analyzing the type of relief sought, "[t]he crux of this inquiry . . . boils down to whether the plaintiff effectively seeks to attain money damages in the suit." *Id.* The Supreme Court has not, however, adopted our Circuit's two-part test.

Plaintiffs bring three APA claims. First, they allege that defendants acted arbitrarily and capriciously, in violation of the APA, by terminating the grant program because defendants did not engage in a "reasoned analysis," did not consider the "serious reliance interests" of plaintiffs, acted "on factors which Congress has not intended [EPA] to consider," and failed to consider how the terminations would impact the "primary goal[s]" of the Clean Air Act. Compl. ¶¶ 186–96 (Count III); *see* 5 U.S.C. § 706(2)(A). Second, they allege defendants acted contrary to law, in violation of the APA, by exceeding EPA's statutory authority, by acting unconstitutionally, and by acting "not in accordance with"

9

the Clean Air Act and the Impound Control Act, 2 U.S.C. § 683, when EPA terminated the grant program. Compl. ¶¶ 197–205 (Count IV); *see* 5 U.S.C. §§ 706(2)(A)–(C). Third, plaintiffs allege that defendants acted contrary to law, in violation of the APA, by violating the "Community Change Grants Terms and Conditions," by exceeding EPA's statutory authority, and by acting unconstitutionally when it de-obligated all funding for the grant programs. Compl. ¶¶ 206–13 (Count V); *see* 5 U.S.C. §§ 706(2)(A), (B).

As relief for defendants' claimed violations, plaintiffs seek both a declaratory and injunctive order. *See* Compl. at 44–45 (Prayer for Relief). They seek a declaration from the Court holding defendants' termination of the grant program and individual grants as unlawful. *Id.* at 44. As for the injunction, plaintiffs request an order that sets aside EPA's termination of the Environmental and Climate Justice Block Grants, prohibits "EPA from taking action to termination grant programs"; "[r]equire[s] EPA to reinstate all grant awards"; "[r]equire[s] EPA to make adequate staffing and other resources available to effectuate the grant programs"; and "[r]equire[s] EPA to extend the period of performance to allow Plaintiffs and class members to complete the period of performance specified in their grant agreements, accounting for the time between the time they lost access to their grant funding and [the date of relief.]" *Id.* at 44–45.

A.    Arbitrary-and-Capricious Claim

Starting with plaintiffs' arbitrary-and-capricious claim, the Court lacks jurisdiction under *Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam). There, several states sued the Secretary of Education for terminating "all grants previously awarded" under congressionally funded programs. *California v. Dep't of Educ.*, 769 F.

10

Supp. 3d 72, 75 (D. Mass. 2025). The district court held that the Department of Education's grant terminations were arbitrary and capricious under the APA because the agency had failed to conduct individualized analyses or offer a reasoned explanation for its *en masse* grant terminations. *Id.* at 77. As a remedy, the district court ordered defendants to "immediately restore Plaintiff States to the pre-existing status quo prior to the termination under all previously awarded . . . grants for recipients in Plaintiff States," among other things. *Id.* at 76–78, 80. The Supreme Court subsequently stayed the district court's order because "the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *California*, 145 S. Ct. at 968. The Supreme Court reasoned that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered here." *Id.* (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). "Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U.S.C. § 1491(a)(1)).

The Supreme Court affirmed its decision in *National Institutes of Health v. American Public Health Association*, No. 25A103, 2025 WL 2415669, at *1 (U.S. Aug. 21, 2025). There, the National Institutes of Health ("NIH") changed its funding to align with changed police priorities mandated by several executive orders. *Id.* (Barrett, J., concurring in part). In doing so, NIH issued internal guidance documents describing those priorities and terminating numerous grants. *Id.* (Barrett, J., concurring in part). The district court declared unlawful and vacated both the guidance and the individual grant

11

terminations under the APA. *Id.* (Barrett, J., concurring in part). The Supreme Court subsequently stayed the district court's judgment vacating the Government's termination of the individual grants. *Id.* The Supreme Court reasoned that the APA's "limited waiver of [sovereign] immunity" does not provide courts with jurisdiction "to order relief designed to enforce any 'obligation to pay money' pursuant to those grants." *Id.* (quoting *California,* 145 S. Ct. at 968).

Plaintiffs' arbitrary-and-capricious claim closely aligns with the claim at issue in *California.* Like in *California,* plaintiffs' challenge here involves a statute that requires the Executive Branch to issue grants for specified purposes; the Executive Branch terminated those grants *en mass* with a boilerplate explanation; and plaintiffs challenged the agency's terminations under the APA. *See* Compl. ¶¶ 186–96; *California,* 145 S. Ct. at 970–71, 975. Here too plaintiffs request that the Court order "EPA to reinstate all grant awards" and request extended time to perform on their grants. Compl. at 45. In other words, plaintiffs request that the Court return plaintiffs to the status quo prior to EPA's termination of their grants. I cannot issue such relief in light of the Supreme Court's holding in *California. See Nat'l Insts. of Health,* 2025 WL 2415669, at *4 (Gorsuch, J., concurring in part and dissenting in part) ("[W]hen this Court issues a decision, it constitutes a precedent that commands respect in lower courts."); *see also Harris Cnty. v. Kennedy,* No. 25-cv-1275, 2025 WL 1707665, at *6–7, *14–15 (D.D.C. 2025) (finding that an APA arbitrary-and-capricious claim is subject to *California*'s bar); *Vera Inst. of Just. v. U.S. Dep't of Just.,* No. 25-cv-1643, 2025 WL 1865160, at *10–11 (D.D.C. July 7, 2025) (same).

12

Plaintiffs respond that *California* does not defeat this Court's jurisdiction because they seek "declaratory relief from global decision made in direct conflict with Congressional direction." Pls.' Opp'n at 24. Specifically, they ask the Court to "[i]ssue a declaratory judgment that the termination of grant programs mandated by Section 138 of the Clean Air Act . . . and the termination of legally-obligated grant awards issued under those programs violate the United States Constitution and the APA . . . ." Compl. at 44. Plaintiffs, however, bundled together EPA's discrete actions (*i.e.*, the termination of individual grants), presented it as global events (*i.e.*, the termination of the Environmental and Climate Justice Block Grants programs)—and then crafted its claims as programmatic challenges instead of challenges to EPA's individual grant terminations. *See, e.g.*, *id.* at ¶ 3 ("EPA's termination of the program is unlawful."). Plaintiffs cannot artfully plead around the Tucker Act by mounting a programmatic challenge to EPA's decision to cease a contractual relationship with them. *See Crowley*, 38 F.4th at 1107 ("[W]e have cautioned plaintiffs that this court prohibits the creative drafting of complaints . . . to avoid the jurisdictional consequences of the Tucker Act." (cleaned up)).

Moreover, plaintiffs' requested declaration, holding that the termination of the grant awards is unlawful, does not have "considerable value" independent of the "future potential for monetary relief." *See Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C. Cir. 1995) (internal quotation marks omitted). Such "non-monetary relief has little, if any, independent value from the future potential of monetary recovery." *Vera Inst. of Just.*, 2025 WL 1865160, at *13. Without reinstatement of plaintiffs' grants, they will receive no monetary relief, which is what they ultimately hope to attain. *See* Compl. at 44–45;

13

Proposed Preliminary Injunction Order [Dkt. #29-2] at 1–2 ("Defendants shall immediately resume the processing, disbursement, and payment of Plaintiffs' and Class Members' grants, and release funds previously withheld due to termination of the Environmental and Climate Justice Block Grant program[.]").

Accordingly, plaintiffs have not established the Court's jurisdiction over their arbitrary-and-capricious claim. I therefore deny injunctive relief and grant dismissal of plaintiffs' arbitrary-and-capricious claim.

B.    Contrary-to-Law Claims

The Court also lacks jurisdiction over plaintiffs' contrary-to-law claims. Several of my colleagues have cabined *California*'s application to arbitrary-and-capricious claims, as opposed to all claims brought under the APA. *See, e.g.*, *Harris Cnty.*, 2025 WL 1707665, at *6–7, *14–15; *Vera Inst. of Just.*, 2025 WL 1865160, at *12. I do not need to reach this issue because the Tucker Act bars plaintiffs' contrary-to-law claims under our Circuit's precedent. *See Crowley*, 38 F.4th at 1106.

Our Circuit's decisions in *Spectrum Leasing Corp. v. United States*, 764 F.2d 891 (D.C. Cir. 1985), and *Ingersoll-Rand Co. v. United States*, 780 F.2d 74 (D.C. Cir. 1985), are instructive. In *Spectrum Leasing*, General Services Administration ("GSA") awarded a contract to Spectrum to develop a data communications network. 764 F.2d at 892. Subsequently, GSA did not pay Spectrum's invoices, and Spectrum sued alleging that GSA violated the Debt Collection Act. *Id.* As relief, Spectrum sought a declaration that GSA violated Spectrum's rights under the Debt Collection Act and "an injunction compelling GSA to cease withholding hardware and maintenance payments under the contract." *Id.*

14

Our Circuit held that Spectrum's suit belonged in the Court of Federal Claims because it sought "an injunction requiring the government to pay monie owed for computer hardware," and "[t]he right to these payments is created in the first instance by the contract, not by the Debt Collection Act." *Id.* at 894. Our Circuit reasoned that, "even if [the Debt Collection Act] applied," it "confers no such right in the absence of the contract itself"; "the Act in no way creates the substantive right to the remedy Spectrum seeks." *Id.*

Similarly, in *Ingersoll-Rand*, the Air Force contracted with Ingersoll-Rand to supply air compressors. 780 F.2d at 75. The Air Force terminated its contract pursuant to Federal Acquisition Regulation 52.249-2(a), "which was incorporated into the contract." *Id.* Ingersoll-Rand sued, claiming that the Air Force's decision to terminate the contract violated two other federal regulation and was arbitrary and capricious under the APA. *Id.* It sought a declaration that the contract termination was unlawful and an injunction requiring the Air Force to "reinstat[e] the original award of the contract." *Id.* at 79–80. Our Circuit held that the district court did not have jurisdiction because the suit was inherently contractual. *Id.* It acknowledged that plaintiffs sought "only a declaratory and injunctive order" but that "the essence" of the claim was "a request for specific performance of the original contract." *Id.*

Here too the source of plaintiffs' rights is contractual. *See Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021) ("treating federal grant agreements as contracts when the standard conditions for a contract are satisfied, including that the federal entity agrees to be bound"). The Clean Air Act does not entitle grant funds to any particular entity "in the absence of the contract itself." *See Spectrum Leasing*, 764 F.2d at

15

894. Instead, it provides that EPA shall award grants to "*eligible entities* to carry out [eligible] activities . . . that benefit disadvantaged communities, as defined by the Administrator." 42 U.S.C. § 7438(b)(1) (emphasis added). Thus, plaintiffs' "right to . . . payments arose only upon creation and satisfaction of its contract[s] with the government; in no sense did it exist independently of [those] contract[s]." *Spectrum Leasing*, 764 F.2d at 894.

That distinguishes the present action from *Widakuswara v. Lake* (*Widakuswara II*), No. 25-5144, 2025 WL 1288817, at *1 (D.C. Cir. May 3, 2025) (per curiam). *See Widakuswara v. Lake* (*Widakuswara IV*), No. 25-5144, 2025 WL 1521355, at *1 (D.C. Cir. May 28, 2025) ("substantially" adopting Judge Pillard's reasoning in *Widakuswara II*). In *Widakuswara,* plaintiffs sued when the Executive Branch sought to reduce the United States Agency for Global Media to the minimum level of operations. 2025 WL 1288817, at *1. In doing so, the Executive Branch terminated funds that Congress had explicitly appropriated in the statute for federally created entities. *Id.* at *11 (Pillard, J., dissenting). Our Circuit, sitting en banc, found that plaintiffs were likely to show that the district court had jurisdiction over plaintiffs' grant-related claims, in part, because plaintiffs' source of rights arose from statute. *See id.*; *Widakuswara IV*, 2025 WL 1521355, at *1. Here, by contrast, because the Clean Air Act did not create an entitlement for plaintiffs, their rights in no way "precedes the individual grants." *See Wadakuswara II*, 2025 WL 1521355, at *12 (Pillard, J., dissenting).

Further, it is "possible to conceive of" plaintiffs' claim that defendants acted contrary to law by allegedly de-obligating congressional funding for the Environmental

16

and Climate Justice Block Grants "as entirely contained within the terms of the contract[s]." *See Ingersoll-Rand*, 780 F.2d at 78; Compl. ¶¶ 206–13 (Count V). The Community Change Grants Program terms stipulate that, if EPA de-obligates any awarded funds, it must "re-obligate them by an award to another Community Change Grant recipient receiving an award . . . ." Compl. ¶ 209 (quoting Compl., Ex. 1-K ("CCG Grant Terms & Conditions") [Dkt. #1-4] at 16). These terms and conditions are "required for all CCG [Community Change Grant] awards." CCG Grant Terms & Conditions at 1. The Court must therefore look back to the awards themselves and ask whether plaintiffs' contracts forbade defendants' challenged conduct. This, of course, is a classic contract question that belongs in the Court of Federal Claims. *See Ingersoll-Rand*, 780 F.2d at 77–80 (Tucker Act applies to claims that the Government's termination of a contract violated statutes or regulations incorporated therein).

Plaintiffs' requested relief also signifies that I do not have jurisdiction over both contrary-to-law claims. Plaintiffs seek a court order instructing the Government to reinstate their grant awards and extend the period of performance specified in their grant agreements. *See* Compl. at 44–45. Essentially, they seek continued payment on their grants, but this is "the classic contractual remedy of specific performance." *Spectrum Leasing*, 764 F.2d at 894. Though plaintiffs insist that they only request "forward-looking, equitable relief," their "creative drafting" of the Complaint cannot "avoid the jurisdictional consequences of the Tucker Act." *See Crowley*, 38 F.4th at 1107. Put simply, I *cannot* order the Government to reinstate contracts and pay money due on them. *See Spectrum Leasing*, 764 F.2d at 894; *California*, 145 S. Ct. at 968–69, 972 ("Government is likely to

17

succeed in showing the District Court lacked jurisdiction to order" that the Department of Education restore the grant program to the "pre-existing status quo" under the APA). Such a request "must be resolved by the Claims Court." *Ingersoll-Rand*, 780 F.2d at 80.

The Supreme Court's decision in *Bowen v. Massachusetts*, 487 U.S. 879 (1988) does not permit otherwise. *See* Pls.' Opp'n at 20–21. In *Bowen*, the Supreme Court addressed the difference between money damages and equitable relief under APA § 702. *See* 487 U.S. at 893–96; 5 U.S.C. § 702 (APA's waiver of sovereign immunity applies to suits that seek "relief other than money damages"). There, Massachusetts sought judicial review of the Secretary of the Department of Health and Human Service's decision to disallow reimbursement of certain expenses. *Id.* at 882–87. The Supreme Court held that § 702's reference to "other than money damages" invoked the distinction between "damages" that "refers to a sum of money used as compensatory relief'" and "specific remedies" that "'are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled.'" *Id.* at 895 (quoting D. Dobbs, *Handbook on the Law of Remedies* 135 (1973)).

"Applying that dichotomy to the case in front of it," the Supreme Court "determined that Massachusetts' suit to enforce a statutory *entitlement* to receive withheld federal grant-in-aid money was a suit for specific relief" and thus was permitted under the APA. *Hubbard v. Adm'r, EPA*, 982 F.2d 531, 536 (D.C. Cir. 1992). That "the entitlement was a cash allotment did not alter the Court's conclusion: 'The State's suit . . . is not a suit seeking money in *compensation* for the damage sustained by the failure of the Federal Government to pay as mandated; rather, it is a suit seeking to enforce the statutory mandate

18

itself, which happens to be one for the payment of money.'" *Id.* (quoting *Bowen*, 487 U.S. at 900).

*Bowen*, however, does not control here. *See California*, 145 S. Ct. at 968 (distinguishing the relief in *Bowen* from the relief that the district court ordered). Plaintiffs do not seek to enforce a statutory entitlement to payment, but rather enforce and amend their grant agreements with the Government. *See* Compl. at 44–45. An order reinstating plaintiffs' grants and extending their time for performance compensates plaintiffs for EPA's terminations. Moreover, *Bowen* "did not address the 'impliedly forbids' limitation on the APA's waiver of sovereign immunity"—that is, that the Tucker Act bars an APA action in federal district court that is based on contractual claims. *See Transohio*, 967 F.2d at 613. I fail to see how it may order the relief plaintiffs seek under the APA.

Accordingly, plaintiffs have not established the Court's jurisdiction over their contrary-to-law claims, and as such, I deny injunctive relief and grant dismissal as to these claims as well.

## II.     Constitutional Claims

Turning next to the constitutional claims, plaintiffs' attempt to package their challenge to EPA's grant terminations as constitutional violations does not alter the Court's conclusion that the Court of Federal Claims has exclusive jurisdiction here. Plaintiffs lack a cause of action to press both their separation-of-powers and Presentment Clause claims.

In *Dalton v. Specter*, the Supreme Court has rejected the notion "that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." 511 U.S. 462, 472 (1994). The Supreme Court

19

JA869

explained that the Constitution is implicated when the challenged executive acts are taken by "inherent constitutional" authority or when the statute that the Executive Branch relies on for authority is itself unconstitutional. *See id.* at 473 & n.5. Our Circuit interprets *Dalton* as prohibiting a plaintiff from "bring[ing] a freestanding constitutional claim if the underlying alleged violation and claimed authority are statutory." *Glob. Health Council v. Trump*, No. 25-5097, 2025 WL 2480618, at *1 (D.C. Cir. Aug. 13, 2025).

Plaintiffs' constitutional claims here are predicated on "underlying statutory violations"—that defendants have violated, and are continuing to violate, the Clean Air Act and the IRA. *See id.* at *8; Compl. ¶¶ 175–77, 182–84. Plaintiffs allege that defendants violated the separation of powers by exceeding their statutory authority by not "carry[ing] out ... congressionally mandated programs and ... obligat[ing] and distribut[ing] the funds that Congress appropriated for these programs." *Id.* at ¶ 173; *see also id.* at ¶¶ 166–79. They do not allege that defendants claimed to have acted under "inherent constitutional power." *See Dalton*, 511 U.S. at 473; Compl. ¶ 176 ("EPA did not identify any statutory, regulatory, or constitutional authority to terminate congressionally appropriated funds based on the President's policy preferences."). Plaintiffs also allege defendants violated the Presentment Clause because they "unlawfully amend[ed] the spending provisions of the IRA by ending grant programs mandated by Congress, based on *presidential* policies that are wholly different than *Congress's* directives for the funds and programs." *Id.* at ¶ 183; *see also id.* at ¶¶ 180–85. But claims "alleging that [an agency] has exceed [its] statutory authority are not 'constitutional' claims." *Dalton*, 511 U.S. at 473; *see Glob. Health Council*, 2025 WL 2480618, at *8–9 (plaintiffs lacked a

20

cause of action under *Dalton* for their separation-of-powers claim because the claim was predicated on underlying statutory violations). Plaintiffs, however, may not circumvent the Tucker Act and the APA's non-reviewability provision by reframing an alleged statutory violation as constitutional claims. *See Validata Chemical Servs. v. U.S. Dep't of Energy*, 169 F. Supp. 3d 69, 89 (D.D.C. 2016) (rejecting attempt to "reframe" an APA claim "as a constitutional due process challenge" to evade the Tucker Act).

Plaintiffs rely on *Chamber of Commerce of the United States v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996) to argue that *Dalton* has no applicability here. *See* Pls.' Opp'n at 13–14 ("*Dalton* merely stands for the proposition that when a statute contains *no limitations* on the President's exercise of that authority, judicial review of an abuse of discretion claim is not available."). *Reich*, however, only addressed the Supreme Court's holding concerning whether a statutory cause of action against the President exists outside the APA. *See Reich*, 74 F.3d at 1330–32; *see also Am. Forest Res. Council v. United States*, 77 F.4th 787, 797 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 1110 (2024) ("*Dalton* has no force where, as here, 'the claim instead is that the presidential action . . . independently violates [another statute].'" (quoting *Reich*, 74 F.3d at 1332)). It does not address the Supreme Court's holding that "statutory claims cannot be transformed into constitutional ones." *Glob. Health Council*, 2025 WL 2480618, at *8. Therefore, *Dalton* controls this action.

In sum, plaintiffs have not stated a cause of action for either of their constitutional clams. As such, I deny injunctive relief and grant dismissal of these claims.

## CONCLUSION

For the foregoing reasons, I **GRANT** defendants' motion to dismiss, **DENY**

21

plaintiffs' motion for preliminary injunction, and **DENY** plaintiffs' motion for class

certification. An Order consistent with the above accompanies this Memorandum Opinion.


RICHARD J. LEON
United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Appalachian Voices, *et al.*,

        *Plaintiffs*,                         Civil Action No. 25-1982 (RJL)

*v.*

United States Environmental Protection
Agency, *et al.*,

        *Defendants*.

### ORDER
August 29, 2025 [Dkt. #29, 30, 66]

For the reasons set forth in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that plaintiffs' Motion for Preliminary Injunction [Dkt. #29] is

**DENIED**; it is further

**ORDERED** that plaintiffs' Motion for Class Certification [Dkt. #30] is **DENIED**;

it is further

**ORDERED** that defendants' Motion to Dismiss [Dkt. #66] is **GRANTED**.

**SO ORDERED**.

RICHARD J. LEON
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| APPALACHIAN VOICES, et al., | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:25-cv-01982-RJL |
| | ) | |
| UNITED STATES | ) | |
| ENVIRONMENTAL PROTECTION | ) | |
| AGENCY, et al., | ) | |
| | ) | |
| *Defendants*. | ) | |

**PLAINTIFFS' NOTICE OF APPEAL**

Notice is hereby given this 16th day of September, 2025, that all Plaintiffs except the

Institute for Sustainable Communities hereby appeal to the United States Court of Appeals for

the District of Columbia Circuit from the Orders entered by this Court on August 29, 2025 (Dkts.

98, 99).

**Dated:** September 16, 2025          Respectfully submitted,

<div style="margin-left: 40%;">

*/s/ Ben Grillot*
Ben Grillot (D.C. Bar No. 982114)
Kimberley Hunter (N.C. Bar No. 41333)
(*Pro Hac Vice*)
Irena Como (N.C. Bar No. 51812)
(*Pro Hac Vice*)
James Whitlock (N.C. Bar No. 34304)
(*Pro Hac Vice*)
SOUTHERN ENVIRONMENTAL LAW CENTER
122 C St NW, Suite 325
Washington, DC 20001
Telephone: (202) 828-8382
Facsimile: (202) 347-6041
bgrillot@selc.org
kmeyer@selc.org
icomo@selc.org
jwhitlock@selc.org

*Counsel for Appalachian Voices, 2°C Mississippi,*

</div>

JA874

*Lowcountry Alliance for Model Communities, Parks Alliance of Louisville, Pittsburgh Conservation Corps (d/b/a Landforce) and Southwest Renewal Foundation and Proposed Class Counsel.*

*/s/ Hana V. Vizcarra*
Hana V. Vizcarra (D.C. Bar No. 1011750)
Deena Tumeh (D.C. Bar No. 1741543)
Linnet Davis-Stermitz (WA Bar No. 63190)
(*Pro Hac Vice*)
Molly Prothero (D.C. Bar No. 1779237)
Andrew Saavedra (N.Y. Bar No. 6062814)
(*Pro Hac Vice*)
EARTHJUSTICE
1001 G Street NW, Suite 1000
Washington, D.C. 20001
(202) 667-4500
hvizcarra@earthjustice.org
dtumeh@earthjustice.org
ldavisstermitz@earthjustice.org
mprothero@earthjustice.org
asaavedra@earthjustice.org

*Counsel for Air Alliance Houston, Bessemer Historical Society (d/b/a Steelworks Center of the West), Deep South Center for Environmental Justice, Downwinders at Risk, Health Resources in Action, Inter-Tribal Council of Michigan, PUSH Buffalo, and WE ACT for Environmental Justice and Proposed Class Counsel.*

*/s/ Toby Merrill*
Toby Merrill (D.D.C. Bar ID MA0006)
Graham Provost (D.C. Bar No. 1780222)
(*Pro Hac Vice*)
Elaine Poon (VA Bar No. 91963)
(*Pro Hac Vice*)
Cassandra Crawford (N.C. Bar No. 45369)
(*Pro Hac Vice*)
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609
Telephone: (510) 738-6788
toby@publicrightsproject.org
graham@publicrightsproject.org
elaine@publicrightsproject.org

cassandra@publicrightsproject.org

*Counsel for Allegheny County, Kalamazoo County, King County, Native Village of Kipnuk, City of Sacramento, City and County of San Francisco, City of Springfield and Treasure Island Mobility Management Agency, and Proposed Class Counsel.*

*/s/ Gary DiBianco*
Gary DiBianco (D.C. Bar No. 458669)
Jillian Blanchard (CA Bar No. 203593)
(*Pro Hac Vice*)
Larissa Koehler (CA Bar No. 289581)
(*Pro Hac Vice*)
LAWYERS FOR GOOD GOVERNMENT
6218 Georgia Avenue NW, # 5001
Washington, D.C. 20011
(202) 258-6826
Gary@lawyersforgoodgovernment.org
Jillian@lawyersforgoodgovernment.org
Larissa@lawyersforgoodgovernment.org

*Co-Counsel for Native Village of Kipnuk, Inter-Tribal Council of Michigan, and Kalamazoo County.*

*/s/ Yvonne R. Meré*
David Chiu (CA Bar No. 189542)
*San Francisco City Attorney*
Yvonne R. Meré (CA Bar No. 175394)
(*Pro Hac Vice*)
*Chief Deputy City Attorney*
Mollie M. Lee (CA Bar No. 251404)
(*Pro Hac Vice*)
*Chief of Strategic Advocacy*
Sara J. Eisenberg (CA Bar No. 269303)
(*Pro Hac Vice*)
*Chief of Complex and Affirmative Litigation*
1390 Market Street, 7th Floor
San Francisco, CA 94102
Telephone: (415) 554-4274
yvonne.mere@sfcityatty.org
mollie.lee@sfcityatty.org
sara.eisenberg@sfcityatty.org

JA876

*Counsel for Plaintiffs City and County of San Francisco and Treasure Island Mobility Management Agency.*

*/s/ Alison Holcomb*
David J. Hackett
(*Pro Hac Vice*)
General Counsel to King County Executive &amp;
Special Deputy Prosecutor
Alison Holcomb
(*Pro Hac Vice*)
Deputy General Counsel to King County Executive and
Special Deputy Prosecutor
OFFICE OF KING COUNTY PROSECUTING ATTORNEY
LEESA MANION
401 5th Avenue, Suite 800
Seattle, WA 98104
(206) 477-9483
*David.Hackett@kingcounty.gov*
*aholcomb@kingcounty.gov*

*Counsel for Plaintiff Martin Luther King, Jr. County.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
---

APPALACHIAN VOICES, et al.,   )
                              )
      Plaintiffs,             )
                              )   CIVIL NO. 25-1982
v.                            )
                              )
UNITED STATES ENVIRONMENTAL   )   Tuesday, August 5, 2025
PROTECTION AGENCY, et al.,    )
                              )
      Defendants.             )
_____)

TRANSCRIPT OF PRELIMINARY INJUNCTION

BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT JUDGE
---

APPEARANCES:          SOUTHERN ENVIRONMENTAL LAW CENTER
                      BY:  BENJAMIN GRILLOT
                           SPENCER GALL
                      122 C Street NW, Suite 325
                      Washington, DC 20001
                      202-963-1141
                      Email:  Bgrillot@selc.org

                      EARTHJUSTICE
                      BY:  HANA VESELKA VIZCARRA
                      1001 G Street, NW, Suite 1000
                      Washington, DC 20001
                      202-840-6203
                      Email:  Hvizcarra@earthjustice.org

                      PUBLIC RIGHTS PROJECT
                      BY:  GRAHAM PROVOST
                      490 43rd Street, Suite 115
                      Oakland, CA 94609
                      530-828-3554
                      Email:  Graham@publicrightsproject.org

                      For the Plaintiffs

COURT REPORTER:       CHANDRA R. KEAN, RMR
                      Official Court Reporter
                      333 Constitution Avenue, NW
                      Washington, DC 20001

APPEARANCES CONTINUED:

                    UNITED STATES DEPARTMENT OF JUSTICE
                    BY:   JESSICA LUNDBERG
                          JOSEPH BORSON
                    1100 L St. NW
                    Washington, DC 20004
                    202-427-7659
                    Email:  Jessica.a.lundberg@usdoj.gov

1                        **PROCEEDINGS**

2            (Court called to order at 4:11 p.m.)

3                DEPUTY COURTROOM CLERK:  This is civil matter

4     25-1982, Appalachian Voices et al. v. United States

5     Environmental Protection Agency et al.

6            Starting with the plaintiff, please approach the

7     podium and identify yourself for the record.

8                MR. GRILLOT:  Good afternoon.  My name is Ben

9     Grillot with the Southern Environmental Law Center

10    representing the plaintiffs.

11           With me at counsel's table is Hana Vizcarra from

12    Earthjustice and Graham Provost from the Public Rights

13    Project.  And also Spencer Gall from the Southern

14    Environmental Law Center.

15                THE COURT:  Welcome.

16                MS. LUNDBERG:  Good afternoon, Your Honor.  My

17    name is Jessica Lundberg.  I'm representing the

18    government.  With me today is the Assistant Branch

19    Director of the Federal Programs Branch, Joseph Borson.

20                THE COURT:  Welcome.

21           All right.  Counsel, sorry for the volume of the

22    proceedings in the courtroom next to me.

23           Hopefully we can get that turned down a little bit.

24    So speak loudly.  Articulate.

25           All right.  As my order indicated, you'll have

1    20 minutes for plaintiffs' argument on the PI and the

2    motion to dismiss and 20 minutes for the defendants'

3    argument on the PI and motion to dismiss, and five

4    minutes rebuttal for the plaintiffs and five minutes

5    rebuttal for defendants.

6        Who will speak for the plaintiffs?

7            MR. GRILLOT:  I will, Your Honor.

8            THE COURT:  Come on up.

9            MR. GRILLOT:  Good afternoon, Your Honor.

10           THE COURT:  Good afternoon.

11           MR. GRILLOT:  This case is distinct from other

12   federal grant cases that have been in front of courts in

13   this District.

14       In 2022, Congress enacted the Environmental and

15   Climate Justice Block Grant Program to provide grants to

16   communities for needed infrastructure to allow them to

17   adapt to natural disasters.

18       EPA developed several distinct programs and

19   provided for technical assistance for grant applicants,

20   solicited thousands of proposals, and selected a smaller

21   number to go forward.

22       Work then began on these important projects until

23   this administration began.  This administration entered

24   two executive orders and then terminated the

25   Environmental and Climate Justice Block Grant program.

           1        What makes this distinct is that we have evidence

           2    that they did so simply because they disagreed with

           3    Congress's stated policy purposes.  This is shown in the

           4    Voyles' declaration, which was Exhibit 1A to the

           5    complaint in Paragraph 3, and the form termination

           6    letter is the formal processes that were followed by the

           7    government.

           8        Plaintiffs bring a class action on behalf of over

           9    350 proposed class members challenging the unlawful

          10    wholesale termination of an entire congressionally

          11    mandated grant program simply because they disagreed

          12    with Congress's aims.

          13        This Court has jurisdiction to hear these claims.

          14        First, regarding plaintiffs' Claims 1 and 2, the

          15    plaintiffs bring independent constitutional claims that

          16    do not require a waiver of sovereign immunity.  And the

          17    elimination of Section 138 violates the Constitution's

          18    separation of powers in this instance.

          19        Secondly, for Claims 3 through 5, plaintiffs rely

          20    on the APA's waiver of sovereign immunity which applies

          21    here.  Plaintiffs' claims arise under the Constitution

          22    in federal grant statutes, not the terms of the

          23    individual guarantee agreements.  The cause of action

          24    here is focused on the termination of this entire grant

          25    program.

1        Secondly, plaintiffs seek classic APA relief to

2   hold unlawful and set aside unlawful government action.

3        Defendants have a different view of this case, one

4   not supported by facts or by law.

5        First, they assert this is a simple contracts case

6   to be heard in the Court of Federal Claims where

7   plaintiffs can go and get money damages for breach of

8   contract for money past due, for past harms.

9        Importantly, plaintiffs here do not challenge the

10   individual grant terminations nor allege contract

11   breach, and the Court of Federal Claims cannot provide

12   adequate relief in this context.

13        Secondly, defendants assert that this decision was

14   committed to their agency discretion.  But this is not a

15   case where defendants are acting within lawful

16   discretion to adjust how the executive branch faithfully

17   executes laws.  No, instead, here, the defendants are

18   acting to terminate Congress's lawful funding decision

19   and targeting the exact ideas and priorities that

20   Congress chose to fund.

21        Plaintiffs seek forward-looking injunctive relief

22   to restore the Environmental and Climate Justice Block

23   Grant Program that was established by Congress and

24   continue to perform their important work across the

25   country.  This Court should grant the motion for

1    preliminary injunction and deny government's motion to

2    dismiss.

3        Turning first to jurisdiction over constitutional

4    claims.  Importantly, plaintiffs here bring

5    constitutional claims, and the Tucker Act is no bar to

6    such claims.  The government has conceded this in other

7    cases, *Vera v. Institute of Justice*, and Page 6 of the

8    opinion notes this.  And federal courts have an inherent

9    authority under Section 1331, federal question

10   jurisdiction, to hear claims to enjoin federal officials

11   from acting unconstitutionally.  And that's what's

12   happening here.  When there's a separation of powers

13   violation, any party with standing may file a

14   constitutional challenge and the executive branch is not

15   free to override Congress's spending power.

16       Parties have a right to bring actions like this to

17   enjoin government officials from violating this

18   important constitutional protection.

19       The Court of Federal Claims cannot hear such

20   claims, and that's why it's important that they're

21   resolved here.

22       This is not an instance of artful pleading.  The

23   government cites the case *Metadure*.  In that case the

24   government contractor brought claims based on contracts

25   that were delayed in payment and alleged due process

1    violations.  That's not what's happening here.

2        What's happening here is that Congress has clearly

3    indicated that EPA shall spend this money on these

4    programs and these grants, and EPA has decided to

5    terminate that because they disagree with the stated

6    policy preferences of the agency.

7        That's unconstitutional action, and that this Court

8    has every right to enjoin separate and apart from the

9    EPA's waiver of sovereign immunity.

10        Turning to the APA waiver, plaintiffs' claims are

11    not essentially contractual.  *Bowen*, the Supreme Court

12    case, controls the analysis here, and the *Megapulse* test

13    applies.  And under *Megapulse*, there are two aspects to

14    this.

15        First, you look at the source of rights, then you

16    look at the relief sought.  Under source of rights, the

17    question is what must the Court examine to resolve this

18    case.  And here, the question is:  Was this termination

19    of this entire grant program unlawful?

20        The right to be enforced here, the source of the

21    rights, is the right to be free of government action

22    beyond congressional authority.  That's how the right

23    was framed in *Crowley* in this court; that's how the

24    right was framed in *AIDS Vaccine*, *Labor Solidarity.*

25    That's the proper way to view the rights at essence

1    here.  They exist prior to the grant agreements -- the

2    specific grant agreements in particular, and this Court

3    must interpret the Constitution and statutes to see if

4    the executive has followed the law.  And the executive

5    must follow the law here.  Not the law of contracts,

6    that's not the allegation here.  The executive must

7    follow the law of the Constitution and the statutes.

8         The Court doesn't need to look at the terms of the

9    agreements here at all.  This distinguishes it from

10   *Ingersoll* or *Spectrum*, which were contract cases that

11   could be resolved within the confines of the contract

12   language and questions that arose from them.

13        Importantly, it's very important not to conflate

14   standing and the injury that was caused by the

15   terminations that gives plaintiffs standing here with

16   the source of rights.  And *TransUnion* cautions against

17   this and *Harris County* recognizes this as well.  It's

18   important to not conflate standing harms, standing

19   injuries, with the source of rights under the *Megapulse*

20   analysis.  Plaintiffs' rights here, the source of their

21   rights, are constitutional and statutory.

22        Secondly, looking to the relief sought, plaintiffs

23   are seeking forward-looking injunctive relief.  The

24   *Bowen* framework adopted Judge Bork's D.C. Circuit

25   distinction between specific relief and substitute

1    relief.

2        Substitute relief is compensatory relief for

3    damages, money damages, that's appropriate in the Court

4    of Federal Claims.

5        Specific relief, as sought here, is relief that's

6    not available in the Court of Federal Claims.

7        This is in effort to restore and hold -- to restore

8    a federal grant program by holding unlawful and setting

9    aside the agency's unlawful decision to terminate.

10    That's classic APA relief.  This is not a request for

11    past -- for money past due.

12        The legislative history of the APA, which Bork

13    engaged in significantly, supports this analysis, and

14    was upheld by the Supreme Court in *Bowen*.

15        This is true even if the ultimate result of the

16    decision is to provide some form of monetary relief.  As

17    a result, the money would continue to keep flowing to

18    these grants, but that's downstream of the underlying

19    decision, which was to terminate this entire federal

20    grant program.

21        If a grand slam is ruled a foul ball, all the

22    runners go back to the base that they started on.  So

23    it's the undoing of the underlying unlawful action.

24        Importantly, this is also not specific performance.

25    Specific performance is a contract remedy for breach of

1    contract.  We're not alleging breach of contract.

2    There's no allegation here that these contracts have

3    been breached, and instead the relief is classic APA

4    relief.

5        California does not change this analysis.  At issue

6    in that case were only arbitrary and capricious APA

7    claims that implicated the terms and conditions of those

8    grants.  And the Supreme Court's decision, unlimited

9    briefing and no argument, should be limited to this

10   narrow set of claims.

11       And even for the arbitrary and capricious claims

12   here, what we're alleging is very different.  We are

13   alleging a wholesale unlawful termination of a grant

14   program, and accordingly, California's analysis does not

15   and should not control such a broad-reaching decision.

16   This was a program-wide decision.

17       Turning next to discretion.  Defendants claim that

18   they have discretion here.  Not so.  This is not a lump

19   sum appropriation, like in *Lincoln* where the government

20   reallocated a regional program to a national program.

21   This is a situation where they terminated an entire

22   program because they disagreed with Congress's stated

23   intent.

24       This is congressionally mandated and not committed

25   to agency discretion.

1      Turning to the mootness argument, defendants allege

2   that this case should be dismissed because it's moot.

3   Not so.  HR-1 did not moot this case.  Section 60016 of

4   that bill rescinded only unobligated balances.  And the

5   Congressional Budget Office, when scoring this bill for

6   purposes of determining how much money would be at

7   issue, identified only $561 million out of the entire

8   $3 billion that had been appropriated by Congress as

9   being rescinded.  It rescinded unobligated balances.

10   Importantly, termination does not equal deobligation.

11      So after there's a termination there's a close-out

12   process in which the agency engages with the grant

13   recipient, and there's a period of time in which they

14   determine the amount of money through final financial

15   reports and other things, how long -- the amount that's

16   due.  And during that period, those funds remain

17   obligated.

18      And this is shown through emails with EPA employees

19   where they understood that this normal process would

20   carry out in this case, and that the funds would not

21   become deobligated until at least 120 days after the

22   termination decisions.  Therefore, what was in front of

23   Congress when they passed HR-1 and rescinded these funds

24   was only the unobligated balances.  They did not include

25   this universe of obligated funds that had been attached

1     to specific awards.

2          And this is analogous to the *Harris County* case.

3     Those grants were COVID-era grants.  The ones at issue

4     involved grants to localities to modernize their health

5     systems.

6          And in that case, Congress had gone in and

7     rescinded unobligated balances under that grant program.

8     But as the Court in *Harris County* recognized, grants

9     that were, quote, "already issued were left

10    undisturbed," and that's at Page 2 of the *Harris County*

11    opinion.

12         So in this instance, as the chair of the

13    Environmental Subcommittee, Morgan Griffith, said, at

14    the time Congress understood that you cannot rescind

15    expenditures that are already obligated, and that

16    includes these grants at issue here.  Therefore, this

17    case is not moot, and the motion to dismiss should be

18    denied.

19         Further, plaintiffs are likely to succeed on the

20    merits here.  The termination violated the separation of

21    powers.  Congress has the power of the purse to set

22    limits and conditions on spending, and the government

23    cannot unilaterally refuse to spend those.  That's *Aiken*

24    *County*, Judge Kavanaugh in the D.C. Circuit.

25         EPA decided to terminate these grants simply

1   because these are programs that they disagree with the

2   stated policy intention of Congress, and this is

3   contrary to the statutory mandate.

4        The evidence shows -- and it's one way that this

5   case is different -- the evidence shows, based on

6   declarations from the deputy administrator, that they

7   intended to fully eliminate these programs.  They

8   identified these as taxpayer savings and showed no

9   evidence or intent to reobligate or reuse any of these

10  funds.

11       Further, the termination violated the

12  Administrative Procedure Act.  It was contrary to law,

13  the Constitution and the Clean Air Act, as well as the

14  Impoundment Control Act.  This Court can consider

15  Impoundment Control Act claims for contrary to law

16  analysis under the APA.  The *Center for Labor Solidarity*

17  opinion at Page 22 identifies that, and, further, these

18  actions were textbook arbitrary and capricious, and the

19  government does not strongly refute this.

20       There was no reasoned explanation here.  There was

21  no consideration of the important aspects of the

22  problem, reliance interest, economic impacts.  At most,

23  defendants point to the executive orders, but those

24  themselves are not sufficiently reasoned to justify the

25  termination of an entire federal grant program.

1          Further, plaintiffs here are irreparably harmed.

2     This harm is actual and imminent.  This harm is

3     happening to communities across the country.

4          For example, the Village of Kipnuck in Alaska has a

5     riverbank stabilization project to prevent the village

6     from sinking into the river.  This work can only be done

7     in the summer and has been interrupted as a result of

8     this funding, and their harms are concrete and actual.

9          Similarly, many of these grants went to

10    infrastructure projects, like in Allegheny County,

11    Pennsylvania, to provide a water diversion project to

12    prevent flooding.  These projects have all been

13    interrupted, and these projects are needed by their

14    communities.

15         Further, these organizations have faced

16    organizational and financial harm, employees have been

17    laid off, people are working without salary,

18    organizations have lost large parts of their funding.

19    These harms are real and accruing daily and weigh in

20    favor of a preliminary injunction here.

21         On the balance of the equities, there's no public

22    interest in perpetuating unlawful agency action.  These

23    grants are for communities across the country and are

24    necessary to perform important work.  And to the extent

25    that the government argues that in the event that they

1    ultimately succeed on the merits on this, their exposure

2    is limited to incremental drawdowns, and plaintiffs are

3    welcomed -- welcome an expedited briefing schedule, but

4    it's not as though the entirety of the $2.5 billion

5    would be instantly available for everyone.  The way it

6    works is as they perform work, they can submit for

7    reimbursement and have that drawn down.

8         So the government's exposure is limited,

9    particularly when weighed against the significant

10   irreparable harms that are here and happening to these

11   plaintiffs across the country.

12        Accordingly, unless Your Honor has further

13   questions, the motion for preliminary injunction should

14   be granted, and defense motion to dismiss -- pardon,

15   Your Honor?

16             THE COURT:  What about the motion to dismiss?

17             MR. GRILLOT:  It should be denied.  And the

18   motion to dismiss is largely a jurisdictional argument;

19   it's a 12(b)(1) motion.  And to the extent that they

20   allege, for example, 12(b)(6), we have -- the complaint

21   must be read in -- as -- accepted as true.  And the

22   allegations that -- or the -- what we have alleged

23   clearly shows that EPA has acted with the intent to

24   terminate this entire grant program and eliminate that

25   funding and not repurpose it.

```
 1            So in the complaint at Paragraph 109, for example,
 2    we reference facts that show that the government
 3    intended to entirely terminate this program.  That
 4    violates the separation of powers and it's somewhat
 5    different than the Vera v. DOJ case.  In that case, the
 6    government submitted declarations describing how they
 7    intended to reallocate certain funding, and the Court
 8    also found that that complaint did not allege
 9    sufficiently that they were going to terminate the
10    entire program.
11            That's not our facts, Your Honor.  The complaint
12    read here and the allegations in the complaint read here
13    with inferences drawn in our favor clearly show that
14    we've established a separation of powers violation.
15    We've also established an APA violation.  And the
16    remainder of their arguments for the motion to dismiss
17    turn on the jurisdictional question and those arguments
18    are -- have been addressed here.
19            THE COURT:  Thank you.
20        Are you ready to proceed?
21            MS. LUNDBERG:  Sorry?
22            THE COURT:  Are you ready to proceed?
23            MS. LUNDBERG:  I'm ready to proceed, Your
24    Honor.
25            Thank you.
```

```
 1              THE COURT:  You may do so.

 2              MS. LUNDBERG:  Okay.  Good afternoon.

 3         Defendants will be arguing today in support of

 4    their motion to dismiss plaintiffs' complaint and in

 5    opposition to their motion for preliminary injunction.

 6         I will first present the government's arguments in

 7    favor of its motion to dismiss.

 8         This Court should dismiss the plaintiffs' claims

 9    because they are moot and because they sound in contract

10    and must be heard in the Court of Federal Claims.

11         Turning to the mootness issue first, plaintiffs'

12    claims are moot because Congress has now rescinded all

13    unobligated funding for the grant programs at issue

14    here.

15         This means that apart from allowable close-out

16    costs and obligations that were incurred prior to the

17    termination, the funds for each terminated grant are no

18    longer available for award.  They are deobligated from

19    the terminated grant.

20         OMB defines an obligation as a binding agreement

21    that will result in outlays immediately or in the

22    future, and the budgetary resources must be available

23    before obligations can be incurred legally.

24         When a grant is terminated, there is no longer a

25    binding agreement between the grantee and the
```

1    government.  At that point, a grantee may not incur any

2    new expenses for the grant, although it does have a

3    certain period of time to submit for reimbursement any

4    of the costs that were incurred prior to termination or

5    the allowable close-out costs, and during that time

6    period, the grant funds remain on the books at the

7    agency to ensure that any allowable costs can be

8    covered, if claimed.

9        The agency does this so as not to run afoul of the

10   Antideficiency Act.  Once those costs are resolved, the

11   remaining funds are either used for a new award or

12   returned to the Treasury.

13       So as of today, the funds for the terminated grants

14   do still remain on the books at EPA, but this does not

15   mean the funds are still obligated to the grants.

16   Plaintiffs' complaint in fact acknowledges this by

17   claiming that EPA deobligated the grants and was not

18   complying with the terms of the program by failing to

19   obligate the funds to a new award.  That, I believe, is

20   in Count 5.

21       I think that plaintiffs may be confusing --

22   conflating obligation with recording.  The recording

23   statute, 31 U.S.C. Section 1501, requires that an agency

24   record an obligation only when there is sufficient

25   documentary evidence of a government liability and such

1    evidence includes a written, binding agreement between

2    an agency and another person.

3        While the closeout of the terminated grants are

4    still pending, the agency has kept the funds therefor

5    over-recorded to account for these potential costs, even

6    though there is no longer a binding agreement between

7    the government and the grantees that would authorize an

8    obligation.

9        Plaintiffs are attempting to argue that the grants

10    were never deobligated.  They have pointed, as you just

11    heard, to an email thread where the EPA employees

12    unfortunately are mistakenly using the term

13    "deobligation" when they are actually referring to a

14    recording action.

15        They also point to the CBO report that assessed --

16    as they said, around $500 million would be returned

17    after the rescission, but CBO would not have been able

18    to calculate the full amount of the rescission savings

19    until the grant closeout process had completed.  CBO

20    necessarily could only point to the money that was never

21    obligated to grants to begin with, or had otherwise

22    already been returned.

23        If, as plaintiffs claim, a termination action

24    cannot deobligate a specific grant, there would be no

25    other way for an agency to transfer the funds of a

1    terminated award to a new award in its place.  It would

2    mean that once an agency makes an award, it gets one

3    shot at it, and if the award is not working out, they're

4    just out those funds.  This has to be a process.  They

5    have to be able to terminate -- after termination, those

6    funds have to become available.  That's the only way to

7    make them available again.

8         These are the constraints that plaintiffs, though,

9    essentially seem to be placing on the agencies.  Yes,

10   some funds still remain available to satisfy close-out

11   costs but that's all.  Once that process is complete,

12   defendants could, in theory, use the substantial amount

13   of funds remaining to award new grants.  But Congress

14   has now stepped in to say that it wants its money back.

15   Congress passed a reconciliation bill in July that

16   rescinded unobligated funds for the block grants, and as

17   I've described earlier, these terminated grants are now

18   unobligated funds.

19        In a reconciliation bill, Congress cannot abolish

20   programs wholesale, but it can express its policy

21   priorities by declaring what it does or does not want to

22   spend money on.

23        In this case, Congress has shown that it does not

24   consider the Environmental and Climate Justice Block

25   grants a policy priority, and in fact does not want to

1    spend limited taxpayer dollars on this program.

2        By rescinding those unobligated funds for the block

3    grants, Congress has now left this Court without a

4    remedy for plaintiffs.  And without an available remedy,

5    this case is moot and should be dismissed.

6        Moving on, though, to the subject matter

7    jurisdiction portion of our motion to dismiss,

8    plaintiffs have also failed to meet their burden of

9    showing the Court has subject matter jurisdiction.

10        Plaintiffs' claims are in essence contractual.

11    Therefore, their claims are not properly before this

12    Court.  Instead, according to the Tucker Act, this case

13    should be heard in the Court of Federal Claims.

14        Plaintiffs already covered the *Megapulse* prongs --

15    the factors that we need to assess here, so I'll just

16    move right into those.  And I would note that in

17    determining the source of the rights, the courts

18    consider whether, among other factors, the plaintiffs

19    asserted rights and the government's purported authority

20    arise from statute or, importantly, whether the

21    plaintiffs' rights exist prior to and apart from rights

22    created under the contract.

23        And that's really -- that's really the heart of our

24    argument here, because in contrast to what the

25    plaintiffs are arguing, the government's position is

1    that the source of the rights upon which plaintiffs base

2    their claims is not truly constitutional or statutory

3    but contractual.

4        Plaintiffs are seeking to enforce their right to

5    payment under a contractual agreement.  Plaintiffs'

6    injuries largely do not exist prior to and apart from

7    rights created under their grant agreements.  Their

8    entitlement to funds comes only from the terms of their

9    contract, rather than from independent statutory

10   entitlement.

11       Plaintiffs would not be here were it not for their

12   terminated grants.  And as courts have repeatedly

13   concluded, plaintiffs framing of their contractual

14   claims for relief under the APA and the Constitution do

15   not take this case out of the domain of the Tucker Act.

16       Plaintiffs also fail the relief prong of the Tucker

17   Act test.  This inquiry boils down to whether the

18   plaintiff effectively seeks to obtain monetary damages

19   in the suit.  Plaintiffs' request for relief repeatedly

20   reference reinstating grants.  Plaintiffs ask this Court

21   to declare that the termination of legally obligated

22   grants, grant awards issued under the Clean Air Act,

23   violate the Constitution and the APA.  They further ask

24   the Court to enjoin EPA from terminating grant programs

25   and to require EPA to reinstate all grant awards

1    previously authorized.  In other words, plaintiffs are

2    asking the government to pay money purportedly due under

3    the contract.

4        In recent months, the Supreme Court and members of

5    the Circuit have rejected attempts by litigants to

6    enforce contractual obligations against the government

7    in District Court.  In Department of Education v.

8    California, for example, the Supreme Court reaffirmed

9    that the APA's limited waiver of immunity does not

10   extend to orders to enforce a contractual obligation to

11   pay money.

12       And in *Widakuswara*, the D.C. Circuit panel

13   acknowledged that the District Court's injunction

14   substantively orders specific performance of the grant

15   agreements, a quintessentially contractual remedy.  The

16   inherently contractual nature of the relief afforded

17   that makes the Court of Federal Claims the exclusive

18   forum for this suit.

19       Plaintiffs here ask the Court to order defendants

20   to require EPA to reinstate all grant awards previously

21   authorized.  The practical effect of such relief would

22   be to order specific performance of these grant

23   agreements.  This, of course, is the quintessential

24   contract remedy, which prompted the panel in the

25   *Widakuswara* case to question the District Court's

1      jurisdiction.

2          Even though -- I'll put this out there, too -- even

3      though the en banc panel ultimately decided against

4      staying the injunction while defendants pursued appeal,

5      this was in part because of concerns about the specific

6      irreparable harm of the plaintiffs in that case that are

7      not present here and are not relevant to the motion to

8      dismiss in any event.

9          And then briefly I'll just touch upon the 12(b)(6)

10     aspect to this, which really boils down to whether or

11     not these are independent -- truly independent

12     constitutional and statutory claims.  And in the

13     government's view, we believe that they have not

14     demonstrated that any statute meaningfully constrains

15     EPA's discretion regarding how to allocate appropriated

16     funds among the potential grant recipients.  And on the

17     contrary, the relevant statute does provide an

18     undifferentiated sum.  Yes, there are specific

19     activities, general activities in support of

20     environmental and climate justice initiatives that the

21     money is supposed to be spent on, but it does not direct

22     the government or the EPA to award specific grants for,

23     you know, very precise activities or to certain

24     plaintiffs or anything of that nature.

25          Therefore, because plaintiffs' claims are

1    contractual, seek specific performance of grant

2    agreements, and effectively seek money damages in the

3    form of reinstated grants and their accompanying

4    funding, plaintiffs' complaint belongs in the Court of

5    Federal Claims, and this Court should dismiss.

6        I will just pause for any questions, if the Court

7    has any.  If not, I'll move on to our opposition to the

8    PI motion.

9            THE COURT:  You can move on.

10           MS. LUNDBERG:  Okay.  Thank you.

11       Turning to the plaintiffs' motion for preliminary

12   injunction.  This Court should deny their motion.

13       Plaintiffs have not met their burden to show a

14   clear need for immediate relief.  As the Court knows,

15   this District considers a preliminary injunction an

16   extraordinary and drastic remedy that is never awarded

17   as of right.  Plaintiffs must demonstrate a substantial

18   likelihood of success on the merits, imminent

19   irreparable harm, the balance of the equities and the

20   public interest, which merge, of course, when the

21   government is a party.

22       If plaintiffs fail to meet their burden on any one

23   of these prongs, the Court must deny the preliminary

24   injunction.  To start, plaintiffs have not shown a

25   substantial likelihood of success on the merits, and it

1    is important to emphasize that the standard is not mere

2    likelihood, but substantial likelihood.  This is a high

3    burden to meet, and plaintiffs have not done so.

4         As an initial matter, the plaintiffs cannot show it

5    will succeed on the merits if jurisdiction is in doubt.

6    And defendants -- we have already covered jurisdiction,

7    so I won't belabor that point here, but if there's no

8    jurisdiction, the plaintiffs simply cannot succeed on

9    the merits; we shouldn't be reaching the merits if that

10   is the case.

11        And then also on the constitutional claims, I also

12   reference those briefly, and I'll just reiterate that

13   Congress did not circumscribe exactly how EPA must

14   allocate the funds.  The government's position is that

15   we were not -- that EPA was not necessarily acting with

16   zero authority, that there was discretion.  In the

17   statute itself it says that these activities and the

18   organizations with which the funds could be granted

19   could be as defined by the administrator.  The

20   government clearly does have some discretion here.

21        The jurisdiction issue and the constitutional issue

22   cut against the potential that the plaintiffs would have

23   a substantial likelihood of success on the merits, and

24   thus, they have not met that prong, and the Court could

25   deny their PI motion simply on that ground.

1     However, turning to the second part of the test,

2     plaintiffs also have not clearly shown a need for

3     immediate relief.  The timing of the suit belies

4     arguments that plaintiffs are making for urgency.  The

5     President made his policy priorities clear beginning in

6     late January.  EPA began freezing access to grant funds

7     that same month, and the first terminations occurred no

8     later than February.

9          Plaintiffs could have moved for a temporary

10     restraining order or preliminary injunction as early as

11     February.  Plaintiffs could even have moved for

12     injunction relief -- injunctive relief in early May

13     after the last grant terminations were issued.

14          Instead, plaintiffs brought their claim nearly two

15     months after the last of the terminations and nearly

16     five months after EPA began freezing the funds and

17     terminating the grants.  That they instead waited to

18     bring this case as a class action undercuts their

19     arguments demanding urgent relief from this Court.

20          Indeed, the urgency, if there ever was any, was

21     occurring between January and May when the writing was

22     on the wall that EPA intended and had begun taking

23     action to terminate the grants.  At that time plaintiffs

24     might have had a colorable argument that termination

25     would cause irreparable harm and require court

1     intervention.  But now, it is clear that a few more

2     months, at most, I would assume, will not make a

3     substantial difference because plaintiffs' claims

4     ultimately are not irreparable.  They are in fact

5     exceedingly reparable in that the provision of funds can

6     make the plaintiffs whole.

7          If the provision of money at a later date could not

8     redress plaintiffs' claims, they would have either

9     brought their claims to court much sooner or would not

10     be here at all.

11          What plaintiffs seem to really be asking for at

12     this point, now that Congress has rescinded the funds,

13     terminated the grants, what they want is a change in the

14     policy.  And they're understandably disappointed that

15     the grants were terminated, but does not give them an

16     inherent right to a federal grant.  And now that

17     Congress has rescinded the unobligated funding for the

18     grants, the plaintiffs' concerns are really best suited

19     for their legislators and not the courts.  Which

20     actually brings me to the last two parts or last third

21     part, which is the -- I will frame my argument around

22     the public interest.

23          Congress as an elected body meant to represent the

24     will of the people has stepped in to say it no longer

25     believes that the funding of these grant programs is in

1    the public interest.

2        It went so far as to take the uncommon step of

3    including a rescission action in a reconciliation bill.

4    A separate rescission bill is also making its way

5    through the house and Senate, but Congress did not want

6    to wait for that.  It felt this issue was important

7    enough to include in the reconciliation bill that was

8    signed into law on July 4th.  The public interest

9    decidedly weighs against the plaintiffs' motion here.

10        Because the plaintiffs cannot meet any of the

11    standards for preliminary injunction, the government

12    asks that their motion be denied.  The government also

13    asks that if the Court finds an injunction is warranted,

14    a bond be entered in light of the fact that Congress has

15    now rescinded the unobligated funds, and the government

16    will not have a way to recoup its costs if ordered to

17    provide money to plaintiffs that is no longer available.

18    Any money that is ordered through a preliminary

19    injunction will now have to come out of a different

20    fund, a judgment fund, or -- I'm not really sure exactly

21    what EPA has at its disposal, but it will not be coming

22    from the Environmental and Climate Justice Block grant

23    fund.

24        And that concludes the government's arguments on

25    the motions, and I welcome any questions.

1          Thank you, Your Honor.

2               THE COURT:  The plaintiffs have five minutes

3     for rebuttal.

4               MR. GRILLOT:  Good afternoon, Your Honor.  As

5     government's counsel represented, the funds remain on

6     the books.  I think that was her quote.  And the email

7     exchange that she references I think is particularly

8     instructive.  It is the director of the office of the

9     controller responding to an internal question.  The

10    question is:  "Hi, Vanda.  When will the funds for the

11    below grants be deobligated?  I'm assuming they all are

12    currently obligated."

13         Vanda, again the director of the office of the

14    controller responds:  "Hi, Gary.  We don't process

15    deobligation until we get the final financial report.

16    We have not been instructed to deobligate without

17    following the normal process."

18         The normal process is that deobligation does not

19    occur until after final financial reports have been

20    filed, and that process -- termination may be the

21    beginning of the process, but that process was underway

22    and ongoing at the time HR-1 passed.  Therefore, the

23    rescission in HR-1 of unobligated funds did not touch

24    these specific grants and those funds do remain both on

25    the books and obligated for these particular grantees.

```
1          Government's argument redefining deobligation does
2      not have a citation or a basis, and it's reasonable to
3      assume that the director of the office of controller at
4      EPA understands what the terms mean.
5          Secondly, regarding the discussion around the
6      source of rights here, these are in fact constitutional
7      and statutory claims.  We are asserting that the
8      termination of the --
9              THE COURT:  What section of the Constitution?
10             MR. GRILLOT:  The separation of powers in
11     particular, Your Honor.  It is fundamentally a
12     disagreement between the policy stated by Congress when
13     enacting this law and the executive acting with a want
14     of authority in this context deciding that it disagrees
15     with that policy determination and thereby terminating
16     the entirety of the grant program.
17         And that's why the claims focus on the termination
18     of the program as a whole.  From the introduction of the
19     complaint through the prayer for relief, that's the
20     focus.  And the idea or the suggestion from the
21     defendants that the request is to restate specific --
22     and state specific grants, that's downstream of the
23     underlying unlawful action.  Again, it's putting the
24     runners back on base after deciding on replay review
25     that it was a foul ball.
```

```
 1          So the idea that Section 138 of the Clean Air Act,
 2     these grants do not require specific grants to go to
 3     specific people.  That is true, but they've terminated
 4     the entirety of the program and indicated no evidence or
 5     no intention to reallocate or reobligate these funds,
 6     again, unlike in the Vera context where they did in fact
 7     submit a declaration.
 8          So the government's discussion of the idea that
 9     they have discretion, for example, to define what
10     disadvantaged communities are and perhaps reallocate
11     those grants to things they feel are more deserving,
12     they show no effort -- or evidence, no -- provided no
13     information that would rebut that.  In fact, they refer
14     to these as taxpayer savings and ultimately claim that
15     the program should be eliminated.  That is the core
16     constitutional violation here.
17          Regarding the relief -- so that touches on the
18     relief sought.
19          As noted, the en banc panel in Widakuswara has
20     stayed the -- or has vacated the stay of the panel
21     decision for the reasons stated by Judge Pillard, who
22     touched on things beyond just the irreparable harm
23     aspect of the case.
24          Regarding the discussion of the public interest
25     factor, it's improper to assign motives to Congress who
```

1    simply -- what we know, they did not include a statement

2    of intent in the rescission bill.  What they did was

3    they rescinded unobligated funds.

4        So to the extent that there's any indication of

5    what that means in terms of an express policy statement

6    by Congress is over-reading HR-1.  But more importantly,

7    if in the future some Congress -- if these funds in fact

8    are fully deobligated and are rescinded, we don't

9    dispute that in the future some Congress could do that,

10   but at the moment, they remain obligated, as recognized

11   in *Harris County*, as recognized by the Office of the

12   Controller.  For now, these funds are obligated and this

13   case is not moot.

14       Regarding the timing of the filing of this case,

15   the important thing is not when the terminations began,

16   but when it became clear that this was in fact a

17   widespread effort to terminate the entirety of the

18   federal -- of this block grant program.

19       That did not become clear until Administrator

20   Voyles' declaration was filed in May of 2025, May 6th.

21   At that point, it became a matter of -- an instance with

22   complex facts, complex law, and a large number of

23   plaintiffs.  It took a reasonable amount of time to get

24   the case filed.  It does not undercut the idea that

25   there is significant harm ongoing to these communities

1    and that preliminary relief is in fact important and

2    necessary in this context.

3        Finally, no bond is required here.  Courts have

4    found that bond is not required when it would have the

5    effect of denying plaintiffs the right to judicial

6    review, particularly of constitutional claims.  And

7    defendants have failed to show how continuing to operate

8    a congressionally mandated grant program would

9    materially harm them.  In this instance, numerous cases

10   have found bonds are not required in funding freeze

11   cases like this one.

12       For those reasons, the preliminary injunction

13   should be granted and the government's motion to dismiss

14   should be denied.

15           THE COURT:  You have five minutes.

16           MS. LUNDBERG:  Yes, thank you.  I just want to

17   respond to a few of the points that the plaintiffs

18   raised.

19       The first, they mentioned the OMB definition.  I

20   don't know.  Your Honor maybe didn't have a chance to

21   look at my reply brief yet because it was filed last

22   night, but it's from the OMB Circular.  It's Circular

23   A-11, so I think -- I want to say section 20.5.  That's

24   where that comes from.

25       But I think we mostly would agree that OMB is one

1    of the best sources of authority on budget and

2    obligations, so that's why I chose to bring that out.

3         The other thing I would mention is the plaintiffs

4    are trying to frame this as a program.  And I understand

5    why that is, of course.  But there is no real program

6    besides the grants.  There's nothing independent of the

7    grant funding mechanisms that constitutes this program.

8    So that's why, when they're saying that they have an

9    independent statutory or constitutional claim regarding

10   whether or not EPA shut down the programs, EPA can only

11   shut down the grants that are funded for the program.

12   There's nothing beyond that in which to shut down.

13        And it kind of cuts back to our argument that money

14   damages, so to speak, could satisfy the plaintiffs here

15   because that's all the grants were.  It was money.

16   There was not an additional part of the program.  There

17   was not a physical location, et cetera, et cetera.  They

18   can still do their job or pursue their goals if they

19   were to get a money judgment at the Court of Federal

20   Claims that would satisfy them.  So I just wanted to

21   kind of bring that out a little bit.

22        And also, you know, clearly there's some

23   disagreement on whether or not these funds are

24   obligated.  I understand, and, again, we would just say

25   that they are not obligated after they're terminated

1    because there's no binding agreement anymore.

2        And now, Congress has said that they want that

3    money to be returned to the Treasury.  Plaintiffs are

4    arguing that we don't have evidence of Congress's intent

5    in doing those -- in having those rescission actions,

6    but if that is the case, then a very similar argument

7    can be made about their argument in favor of public

8    interest.

9        You know, of course, yes, 2022 Congress passed the

10   bill to create this program, and now in 2025, while they

11   have not actually abolished the program wholesale, as I

12   mentioned, because they can't do that in a

13   reconciliation bill, they have clearly shown that they

14   do not think this is what the public wants money spent

15   on.

16       So I just -- it cannot reobligate money that is no

17   longer there.

18       I think that's about it, yes.

19       Thank you very much for your time.

20           THE COURT:  Thank you.

21       Well, I want to compliment both sides for their

22   pleadings and their arguments.  This is a complex

23   matter, and you did a fine job of trying to make it -- I

24   won't say easily understandable but more understandable

25   than it might have otherwise been.  A lot of effort

1    obviously was expended to bring these briefs together

2    and for doing a fine job in your arguments today, so my

3    compliments to both sides.

4        I don't know when I'll give you an opinion.  I'll

5    do my best to get one out soon, but, like I said, it's

6    not an easily understandable area.

7        We'll do our best to get you something quickly.

8        We stand in recess.

9        (Court adjourned, 4:59 p.m.)

10                        - - -

11

12

13            CERTIFICATE OF OFFICIAL COURT REPORTER

14

15        I, CHANDRA KEAN, RMR, do hereby certify that the

16    above and foregoing constitutes a true and complete

17    transcript of the proceedings held in the above-titled

18    matter.

19        Dated this 18th day of September, 2025.

20

21

        _____
23        Chandra Kean, RMR
          Official Court Reporter
24        United States Courthouse
          333 Constitution Avenue, NW
25        Washington, DC 20001

JA915